**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED AIR LINES, INC.,

             Plaintiff,

    v.

AIR LINE PILOTS ASSOCIATION,
    INTERNATIONAL

    and

STEVEN M. TAMKIN

    and

ROBERT J. DOMALESKI, JR.

    and

XAVIER F. FERNANDEZ

    and

ANTHONY R. FREEMAN,

             Defendants.

Civil Action No.

FILED: JULY 30, 2008
08CV4317
JUDGE LEFKOW
MAGISTRATE JUDGE DENLOW

CEM

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

Plaintiff, United Air Lines, Inc. ("United" or the "Company"), for its Complaint herein against the Air Line Pilots Association, International ("ALPA"), Steven M. Tamkin ("Tamkin"), Robert J. Domaleski, Jr. ("Domaleski"), Xavier F. Fernandez ("Fernandez"), and Anthony R. Freeman ("Freeman") states as follows:

## INTRODUCTION

1.     In this action, United seeks declaratory and injunctive relief against ALPA, which represents pilots at United through the United Air Lines Master Executive Council ("MEC"); members of the MEC's Industrial Relations Committee ("IRC") Tamkin, Domaleski and Fernandez, officers and members at United; and an individual United pilot, Freeman (collectively, "Defendants") for violation of Section 2, First of the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (the "RLA").  As detailed below, ALPA has been engaged in a public campaign for more than a year in which it has encouraged its members to "adhere strictly to the contract," and to refuse voluntary flight assignments allowed under the current contract, for the explicit purpose of exerting economic pressure on United to open a collective bargaining agreement for renegotiation that would otherwise remain in effect until the end of 2009.  In the last few weeks, ALPA has also encouraged a sick-out organized by Freeman and certain junior pilots to oppose United's announced intent to reduce its fleet size and furlough some 950 active pilots in response to the financial challenges it faces.  As a result of these actions, United was forced to cancel 329 flights between July 19, 2008 and July 27, 2008, costing United millions of dollars in lost profit, damaging its reputation and customer good will, disrupting the travel plans of some 36,000 customers and adversely impacting United's other employees.

2.     Section 2, First of the RLA obligates carriers, unions and employees "to exert every reasonable effort to make and maintain [collective bargaining] agreements . . . and resolve

2

all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier."

It has consistently has been interpreted by the federal courts to prohibit a union from seeking to

put economic pressure on a carrier through a strike, slow-down, sick-out or any other form of job

action designed to disrupt the normal operations of the carrier both while an agreement is in

force and before exhaustion of the bargaining and mediation process required under the RLA for

a new agreement.  Where a union or its members violate this obligation, the federal courts have

routinely provided injunctive relief.  *See United Air Lines, Inc. v. Int'l Ass'n of Machinists &*

*Aerospace Workers*, 243 F.3d 349, 362 (7th Cir.), *cert. denied,* 534 U.S. 889 (2001) (finding

failure to issue preliminary injunction to be an abuse of discretion).

3.      While the urgency of the recent sick-out precipitates this filing, ALPA began its

campaign to put pressure on the Company through targeted actions in 2006, less than a year after

United exited bankruptcy protection.  At that time, ALPA's officers publicly demanded that

United renegotiate its contract and work rules negotiated during bankruptcy.  Following a

blueprint that ALPA has used many times against both United and other airlines -- including a

widely-publicized slowdown at United during the summer of 2000 that caused immense

inconvenience to the traveling public and great harm to United's business and reputation --

ALPA officers publicly began to advise United's pilots that the only way to create the "leverage"

necessary to force United to reopen the contract was for United's pilots to adhere strictly to

contractual requirements, and refuse to fly any voluntary assignments offered by United -- a

clear change from past Company and standard industry practice.  At the same time, ALPA began

to encourage -- by inaction if not through express directive -- various acts of harassment against

pilots who continued to accept voluntary flight assignments.

4.      ALPA's tactics had the intended effect.  Within months, ALPA's actions erased United's ability to use voluntary flight assignments, provided for in the collective bargaining agreement, known as "junior/senior manning," and United began to see a slow but steady increase in flight delays and cancellations attributable to flight crew unavailability and discretionary pilot actions.  United has attempted over the last 18 months to manage these problems without resort to litigation -- by increasing its reserve pilot staffing, and by negotiating with ALPA to modify some of the work rules in the existing agreement, making meaningful improvements to pilots' work lives.  Although United's financial situation deteriorated substantially because of soaring fuel prices since ALPA began its campaign, ALPA has not changed course.  Indeed, since United announced in June 2008 that it was reducing its fleet by 100 aircraft and furloughing some 950 active pilots because of the fuel price crisis, the decibel level of ALPA's rhetoric has increased substantially, and sick leave usage has sharply increased, particularly among the most junior pilots, who are facing furlough as a result of the capacity reductions.  Most recently, the combination of increased sick leave and the refusal of United's pilots to accept voluntary assignments forced United to cancel 329 flights in less than 10 days (July 19 - 27, 2008), inconveniencing some 36,000 of United's customers.

5.      United simply cannot afford a repeat of the summer of 2000 and its impact on the Company's customers and employees.  To avoid further harm to all of its constituents, United seeks a preliminary injunction, to be made permanent following a trial on the merits, barring ALPA and its members, and the other Defendants, from advocating or engaging in any form of job action designed to put economic pressure on United or disrupt its operations, and ordering ALPA to "exert every reasonable effort" to ensure that United's operations are not disrupted

further.  *See United Air Lines, Inc.*, 243 F.3d at 363 (union has an "affirmative legal duty" under the RLA to take actions to stop an unlawful job action).

6.      The requirements for issuance of a preliminary injunction are plainly met here. On the merits, ALPA's directives to United's pilots to adhere strictly to the terms of the contract and refrain from accepting voluntary flight assignments for the express purpose of "creating leverage" to reopen the existing contract cannot seriously be disputed, and those directives are patent violations of ALPA's obligations under Section 2, First to "exert every reasonable effort to make and maintain" agreements without disruption to the carrier's operations.  Indeed, the Seventh Circuit held in the *United v. IAM* case that it was an abuse of discretion to fail to issue a preliminary injunction under substantially similar circumstances.  *United Air Lines, Inc.*, 243 F.3d at 361.

7.      The evidence will also show that the recent jump in sick leave and resulting cancellations were the product of concerted action by certain United pilots, and were certainly endorsed -- if not actually planned -- by ALPA.  Despite denials of complicity and responsibility, ALPA's communications are essentially a guide describing how to use sick leave inappropriately.   While investigating the sick leave abuse, United learned that individual defendant Anthony Freeman organized a group of junior pilots -- known as "the 2172" because they were among the 2,172 pilots furloughed by United in 2001 -- and established a private, password-protected website called www.ual2172.com to facilitate unlawful concerted actions by that group.  Based on a number of factors described in connection with United's Motion For Expedited Discovery, United believes that Freeman organized a concerted abuse of sick leave in order to force United to abandon its plans to reduce its fleet and furlough pilots as necessitated by the current economic climate, and anticipates that expedited discovery will definitively

establish this.  United also believes that expedited discovery will show that ALPA encouraged, condoned, facilitated, and/or was involved in planning this action with Freeman.  For example, on June 5, 2008 -- the day after United announced its fleet reduction -- ALPA asked that Freeman and three other pilots who also serve on ALPA's Industrial Relations Committee be released by United from their pilot duties to perform official ALPA duties.  The Chairman of the ALPA Strike Preparedness Committee, James Anderson, was also granted a release to perform official ALPA duties coinciding with Mr. Freeman's and the IRC's release and the evidence indicates they met in Los Angeles on or about June 12, 2008.  The IRC has been described as a "secretive wing of ALPA" that participated in the organization of the ALPA slowdown at United during the summer of 2000.  *See* Roger Lowenstein, *Into Thin Air*, N.Y. Times, Feb. 17, 2002 (citing pilots' belief that publications encouraging slowdown at United during the summer of 2000 were "produced by the Industrial Relations Committee, a secretive wing of ALPA formed by [United Captain and union leader] Dubinsky during the strike [of 1985]").  Freeman's interaction with that group and the Chairman of the ALPA Strike Preparedness Committee plainly implicates ALPA in his actions.

8.     The other showing traditionally required to obtain a preliminary injunction -- that irreparable injury will occur if the injunction is not issued -- does not apply under the RLA. *United Air Lines*, 243 F.3d at 362.  Even if it did, however, ALPA's actions are irreparably harming United in the form of increased costs for reserve staffing (some $15 million a year), lost profits from flight cancellations (some $3.9 million in the last two weeks of July alone), and incalculable harm to its customer goodwill and business reputation in an industry in which customers have a choice of air carriers and make decisions based on reliability and reputation.

Finally, there can be no claim of harm to ALPA or its members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

## JURISDICTION

9.     This action for declaratory and injunctive relief arises under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*  The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1337.

## VENUE

10.     Venue is proper within the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) & (e).

## THE PARTIES

11.     Plaintiff United is a commercial air carrier, headquartered in Chicago, with national and international operations.  United is a "common carrier by air" as defined in the Federal Aviation Act of 1958, and a "carrier" as defined by the RLA.  United entered into Chapter 11 bankruptcy in December 2002 and emerged from bankruptcy protection more than three years later on February 1, 2006.  While United generated net income of $25 million for the 11 months ending December 31, 2006, and net income of $403 million for 2007, fuel prices remain highly volatile.  For the first six months of the year fuel costs are running about 60 percent higher than the same period last year.  During the first two quarters of 2008, United posted a $688 million loss.  Notably, when United entered Chapter 11 bankruptcy, crude oil, to which United's cost of fuel is directly tied, was approximately $25-30/barrel.  Crude reached a record high price of $145/barrel in early July 2008.  It now costs approximately $130/barrel or more.  On June 4, 2008, United, facing these unprecedented, and rising, fuel prices, announced that it would remove a total of 100 aircraft from its mainline fleet, and reduce its mainline

domestic capacity in the fourth quarter 2008 by 14 percent year over year. With those reductions, United announced significant reductions in management, salaried, and front-line employees, including pilots. On June 23, 2008, the Company announced that the reduction would result in furlough notices to approximately 1,450 pilots, including those on leave, and result in the furlough of approximately 950 active pilots. Each of these reactions by United to its current financial challenges is squarely and indisputably within the Company's rights under the collective bargaining agreement between United and ALPA.

12.     Defendant ALPA is an unincorporated labor organization, with its principal offices in Washington, D.C. and Herndon, Virginia. ALPA is the certified collective bargaining representative under the RLA of United's pilots. United and ALPA are currently parties to a collective bargaining agreement (the "United-ALPA Agreement"), negotiated during United's bankruptcy and which became effective on August 24, 2005. The parties agreed that the duration of the United-ALPA Agreement would extend until December 31, 2009 (the "amendable date"). It further provides that neither party may serve notice of intended changes, beginning the bargaining process under the RLA, until 270 days prior to December 31, 2009. ALPA's MEC is a representative body that, under the ALPA Constitution and Bylaws, makes all decisions for ALPA on matters affecting United pilots. The MEC consists of the Chairman, Vice-Chairman and Secretary-Treasurer from each of the eight Local Executive Councils ("LECs") maintained by ALPA at United. The MEC members, in turn, elect an MEC Chairman, Vice Chairman and Secretary-Treasurer, who serve two-year terms. The immediately prior MEC Chairman was Captain Mark Bathurst and the current MEC Chairman, as of January 1, 2008, is Captain Steve Wallach.

13.    Defendants Tamkin, Domaleski and Fernandez, are the Chairman and members, respectively, of a standing committee of the ALPA MEC called the Industrial Relations Committee.    According to the MEC Policy Manual, the duties of the IRC include, "The formulation and implementation of labor actions which will accomplish the goals of the United pilots and the directives of the UAL-MEC" and "Communicat[ion] with the Local Council Industrial Relations Coordinators (appointed by each LEC) to implement any activity, either local or national in nature, which is significant to the United pilots."

14.    Defendant Freeman is a United pilot First Officer and member of ALPA who United believes implemented a website that is dedicated to organizing activities designed to disrupt United's operations.    Specifically, Freeman administers and maintains a password-protected website called "www.ual2172.com," which he is using in conjunction with phone trees and other means to communicate with other pilots, much like ALPA has done in the past, and has engaged in other forms of communication with other pilots, in a concerted effort to engage in activities directed at harming United in violation of the RLA.    Freeman has sent e-mail and e-note messages through the United electronic messaging system that plainly disclose his role in running the website, and the purpose of the site.

## BACKGROUND OF THE DISPUTE

**ALPA Is Engaged In A Campaign to Reopen The Collective Bargaining Agreement.**

15.    ALPA has tried to use concerted action to force United to reopen the United-ALPA Agreement since December 2006.    The goal of ALPA's campaign -- to re-open the Agreement -- was confirmed by the President of the ALPA International, John Prater, who warned "that airline managers are 'playing with fire should they refuse to put us back on pre-concessionary contracts.'"    In this action, United will show that ALPA has carried out its plan

through (1) a work to rule campaign, (2) a concerted effort to refuse voluntary flight assignments, and (3) a recent sick-out among certain A320 and 737 First Officers ("F/Os").

16.     Since the new MEC chair took office on January 1, 2008, each and every MEC Update issued by ALPA on its website, https://crewroom.alpa.org/ualunity, is prefaced with ALPA's demand to re-open the contract. And since February 27, 2008, each MEC membership Update has concluded with a quote from *The Art of War* by Sun Tzu: "Fighting with a large army under your command is nowise different from fighting with a small one: *it is merely a question of instituting signs and signals*." (Emphasis added.)

**ALPA's "Work To Rule" Campaign.**

17.     In December 2006, ALPA created a Strike Preparedness Committee ("SPC") and launched a campaign it called "Fix It Now," the purpose of which was to pressure United to reopen the collective bargaining agreement. As part of this campaign, in a series of pilot-focused, but publicly available communications over the last 18 months, ALPA has directed pilots not to waive any provision of the United-ALPA Agreement as a means of protecting the current contract and aiding ALPA in obtaining "leverage" over the Company in order to negotiate a "better" contract. ALPA's messages included veiled directives encouraging pilots to work to rule (i.e., strictly follow the contract in an effort to delay flights), and, most recently, encouraging pilots to decline to fly aircraft with minimum equipment issues (i.e., those that do not affect the safety of the aircraft), another way of refusing to waive any contractual rights.

18.     These express directives from ALPA are undoubtedly only the tip of the iceberg. ALPA possesses a large number of confidential communication mechanisms to which United has not had access. ALPA's elaborate system of communications among its members includes regular meetings in each domicile, contract education/audit desks set up in each domicile, written

materials mailed to pilots' homes, telephone "trees," confidential e-mails to the pilots' homes, frequent UAL-MEC updates, internet sites and message boards, and the "Pilot-2-Pilot" communications program. There is no way of knowing what is contained in those communications systems without discovery, but it is undoubtedly even more explicit than what is publicly available. In fact, the website likely at the center of the recent sickout is open only to certain union members, and the only logical purpose of such a restriction would be to avoid scrutiny of improper activity. The discovery requested in the accompanying Motion For Expedited Discovery will undoubtedly turn up hundreds of additional incriminating statements.

19.    Although it is not necessary under the RLA to show union direction in order to obtain an injunction against an unlawful job action, there is substantial evidence in this case that the MEC and LECs at United have encouraged ALPA members to refuse to perform any duty that is voluntary under the United-ALPA Agreement, to decline to waive any contractual provisions under the agreement, and to engage in increased sick leave usage in order to significantly disrupt United's operations. The express purpose of this campaign is to put pressure on United to agree to reopen contract negotiations and to stop the Company from instituting the necessary fleet reductions and furloughs. Now, ALPA is using a group of junior pilots to further exert pressure on the Company, as described below.

20.    The evidence in this case further shows that ALPA's directives to its membership were effective. For more than ten years, United has maintained an extensive system for tracking and categorizing all flight delays and cancellations. Under this system, every delay and cancellation is assigned one of more than 50 codes covering every possible reason for such an action. United also maintains detailed records on junior/senior manning and sick leave usage. As a result, it is possible to identify precisely those delays and cancellations which are due to the

slowdown tactics described herein (and to exclude delays and cancellations caused by weather, air traffic control, or other reasons). This data demonstrates that certain of United's pilots have been engaged in a concerted effort to alter the status quo which began over a year ago and has escalated in the past few months. These delays and cancellations cannot be explained by "chance."

**ALPA Is Directing Its Membership To Refuse Voluntary Flight Assignments And Condoning Harassment of Pilots Who Accept Such Assignments.**

21.    Under the United-ALPA Agreement, if United is unable to cover all open trips with reserve pilots, United may employ a procedure called "junior manning" or "junior/senior manning." This is a process that is used in some form by every airline to staff "open flying" -- that is, flights that do not have a pilot assigned to them, generally because the originally assigned pilot has called in sick -- by offering that flying to pilots who were scheduled to be off duty during the period. It is, in essence, a form of voluntary overtime, and in normal circumstances some portion of an airline's pilots will seek out this work because it provides a way for the pilots to increase their income. At the same time, it allows the airline to reduce the number of reserve pilots needed while ensuring that flights are covered when the number of open flights exceeds the number of available reserve pilots. Although the decision of whether to accept a junior/senior manning assignment is voluntary, in ordinary circumstances -- that is, under the "status quo" -- United and other airlines can almost always find a pilot willing to fly the trip.

22.    By directing pilots to refuse all junior/senior manning assignments on a concerted basis, even though some of the pilots might desire those assignments on an individual basis, ALPA can put great economic pressure on a carrier by causing flight cancellations or, over time, by forcing the airline to hire unnecessary reserves. Accordingly, this has become a common

element of pilot job actions even though it is clearly unlawful.  *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307-08 (11th Cir. 2001).

23.    There is evidence that United's ALPA leadership has directly participated in threats and intimidation of any pilots who refuse to acquiesce in the union's illegal activities.  If a pilot accepts a junior manning assignment, that fact is noted in the pilot's monthly schedule, which is available to every other pilot.    ALPA requested and obtained from United a computerized, monthly summary of all pilots' schedules from which it can readily determine which pilots have accepted junior/senior manning.  Thus, if a pilot accepts junior/senior manning he will be immediately identifiable to ALPA and its members allowing them to put pressure on the pilots to cease accepting junior/senior manning.  Since the time ALPA received the summary, and continuing to the present, ALPA members have harassed pilots accepting junior/senior manning, coinciding with the precipitous drop in junior/senior manning.  During 2007, so-called "Rat Lists" were posted at various locations in the United system.  These lists included names, and occasionally phone numbers and addresses, of those who had accepted junior/senior manning assignments and were clearly intended to intimidate pilots who accepted such assignments and portray them as traitors to their colleagues.  In addition, some pilots who accepted junior/senior manning requests have reported receiving massacre/horror novels at home, harassing e-mail messages and phone calls, typewritten threatening notes, pornography, falsified mortgage applications and subscriptions, and rat figurines.  Over the course of the year, fewer pilots accepted junior/senior manning assignments.

24.    To the extent there is any question that ALPA is behind the refusal to junior/senior man, ALPA removed all such doubt when, in January 2008, the MEC adopted a resolution to change its Policy Manual to state "Although allowed in the Collective Bargaining

13

Agreement, the UAL-MEC does not endorse the use of [Junior Manning/Senior Manning] as a manpower planning tool." In May 2008, ALPA specifically told its members not to accept United's requests for junior and senior manning to avoid cancellations, reiterating its position that ALPA is "opposed to JRM/SRM being used as a manpower planning tool."

25.    Historically, the number of pilots accepting requests for junior/senior manning has averaged more than 430 per month, and in periods of severe need it frequently rises to as many as 182 pilots during a single weekend. As a result of ALPA's campaign, however, the number of pilots accepting junior/senior manning requests from January to July 2008 has averaged only 83 per month, and the number of acceptances has averages less than three pilots a day out of a workforce of almost 6500 pilots.

26.    As part of its efforts to address this problem without resorting to litigation, United changed its staffing model and increased its reserve pilot staffing (i.e. pilots who are on "stand-by" to fly, but who do not have a specific flight assignment) from 13% to 17%, which is a 30% increase. However, because of the sick leave abuse discussed below, even United's attempt to work around ALPA's refusal to allow junior/senior manning cannot stop cancellations now.

**ALPA's Encouragement Of A Sick-Out Among Junior Pilots.**

27.    One of the most common tactics in a pilot slowdown is an increase in sick leave. *See Am. Airlines v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909 (N.D. Tex. 1999). While United maintains a group of reserve pilots designed to cover a normal number of sick calls, a substantial increase in sick calls can exceed the number of available reserve pilots, and without the ability to use junior/senior manning as a staffing tool to cover those open flights, United is forced to cancel flights. Given the pilots' steadily increasing sick leave usage since mid-2006, United has already increased staffing to try to avoid such cancellations.

28.    While in May 2008, the highest number of pilots on the sick list on any given day was 350, beginning June 5, 2008, the sick list began a steady and swift increase from a low of 327 on June 5, 2008, to a high of 497 on June 30, 2008.  On July 16, 2008, 470 United pilots were on the sick list, and that number jumped to 493 the next day, and again to 525 on Friday, July 18, 2008.  Over the weekend of July 19 and 20, 2008, 538 pilots were on the sick list each day, resulting in the cancellation of 58 flights on Sunday (July 20, 2008) due to lack of crew.  On Monday, July 21, 2008, with a sick list of 510 pilots, United was forced to cancel 77 flights due to the lack of a crew.  This most recent spike in sick leave is largely driven by junior pilots who serve as first officers on United's narrow-body Airbus 320 Boeing 737 aircraft.  The sick list has remained significantly above what is considered normal or typical since that time for pilots who fly that aircraft.  For example, from June 4, 2008, through July 27, 2008, sick rates among 737 narrow-body First Officers has been more than double the average for the past three and a half years.  As of July 29, 2008, the narrow-body first officer sick list has not dissipated.

29.    The anecdotal and statistical evidence confirms that the only explanation for this enormous increase in sick leave usage among certain A320 and 737 First Officers is a concerted action.  There is a considerable amount of circumstantial evidence, including e-mails and communications on the Company's "e-note" system, that Defendant Freeman administers and maintains a private, password-protected website called "www.ual2172.com," and that this website has been used by Freeman and others to facilitate communications among a group of junior United pilots known as the "UAL 2172," including communications orchestrating a concerted "sick out" in violation of the RLA.

30.    The communications United has seen make it clear that the job actions are intended to peak during the summer, and that the group has ties to the ALPA MEC.  Moreover,

on June 12, 2008, according to travel records, it appears that Captains Tamkin, Domaleski, and Fernandez, each a member of the IRC, as well as the Chairman of the ALPA Strike Preparedness Committee, Jim Andersen, and Freeman met in Los Angeles.  This meeting, along with other electronic communications, strongly suggests that Freeman worked with ALPA's job action arm, the IRC, to organize and coordinate the recent sick out.

31.     As a result of the spike in sick leave, on July 20, 2008, the Company enforced a doctor's certification requirement for sick leave use by A320 and 737-300 first officers in order to try to stem the tide of sick usage.  Sick leave usage has not dissipated since then and ALPA, as well as individual pilots, have responded by explicitly and implicitly encouraging the sick-out and suggesting ways to circumvent the Company's doctor's certification requirement.

32.     From a statistical perspective, the percentage increase in sick rates among A320 and 737 first officers over the past seven weeks compared to the prior three years removes any doubt that the sick-out was a concerted effort and not simply chance.  The 737 first officers engaged in a 103.4% increase in sick rates and the A320 first officers engaged in a 61.0% increase in sick rates.  Indeed, United's expert will show that there is a zero percent probability that the observed difference in sick rates is "random."

33.     There is very strong circumstantial evidence of ALPA's involvement with the 2172 and the ongoing sick-out.  In addition to Freeman's apparent meeting with ALPA's secretive IRC and the Chairman of the Strike Committee on June 12, 2008, ALPA's has issued recent communications to the pilots both explicitly and implicitly encourage the sick-out.  These communications show that even if ALPA did not directly plan the sick-out, ALPA most certainly ratified it.  Indeed, ALPA's communications are essentially a guide describing how to use sick leave inappropriately.

**The Irreparable Injury To United And Its Customers Caused By ALPA's Unlawful Job Action.**

34.     Although a showing of irreparable injury is not required in an action under the RLA, ALPA's unlawful job action has caused -- and if not enjoined will continue to cause -- irreparable injury to United and its customers in a number of different respects.  United and other U.S. airlines are facing a precarious financial position given the sharp increase in oil prices over the last few years.  United can little afford further damage from any source, much less its own employees.  ALPA's unlawful campaign, however, has done just that, and, unless enjoined, the conduct is likely to continue -- and presumably intensify -- through December 31, 2009 -- the duration of the current Agreement between the parties -- or longer if the parties cannot reach an agreement by that date.

35.     ALPA's campaign has caused direct financial harm to United through increases in United's costs or reductions in profit, including the cost of increased reserve staffing, roughly $15 million a year.  Moreover, the 300-plus flight cancellations experienced by United over the last two weeks cost United roughly $8.05 million in lost revenue, and approximately $3.9 million in net lost operating profit.

36.     The campaign has also caused long-term harm to United's reputation and customer goodwill.  Any unnecessary delay or cancellation -- particularly for something as inexplicable to the public as not having a pilot available for the flight -- will caused at least some percentage of United's customers, whether they were affected directly by the delay or cancellations or who heard about it from a friend, family member or colleague, to question whether to book United for future travel.  The effect of any single delay or cancellation may be impossible to quantify but it undoubtedly has an adverse effect of the airline.

37.    Although the harm to United is significant, it is not the most important factor the court should consider in issuing injunctive relief.  The purpose of the status quo obligation under the RLA is not to protect carriers or unions; it is to protect the public by avoiding interruptions to commerce caused by labor disputes.   Over the last two weeks, United estimates that approximately 36,000 members of the travelling public have had their flights cancelled because United did not have a pilot available to operate the flight.  While there is no way to predict with certainty whether the number of cancellations will increase or decrease in the coming months, every single cancellation will disrupt some customer's travel plans, and with 18 months to go under the current United-ALPA collective bargaining agreement there will undoubtedly be more members of the public who are inconvenienced -- and perhaps many more.

**United's Efforts To Resolve This Dispute Without Judicial Intervention.**

38.    United has made numerous efforts to resolve its dispute with ALPA without seeking judicial intervention.  Only when it became clear that those efforts would be unavailing, and that the failure to act could inflict significantly greater harm on United and its customers, did United seek injunctive relief.

39.    First, rather than resort to the court when ALPA eliminated United's ability to obtain junior/senior manning assignments, United increased its reserve pilot staffing -- ultimately by 30 percent over its historical staffing levels -- at significant expense.  While United could have gone to court earlier, it believed that by addressing ALPA's underlying concerns the parties could resolve the issues without a legal confrontation.

40.    Second, United has tried for 18 months to resolve ALPA's stated concerns about the adverse effect that the work rules under the existing agreement had on the pilot workforce, reaching several agreements with ALPA that addressed those concerns.  Every time the parties

reached an agreement, however, ALPA has moved the bar, and increased its denunciation of United management. It became clear to United when MEC Chairman Wallach published a communication on July 15, 2008, that ALPA had no real interest in resolving the parties' disputes through negotiations, and that ALPA was merely positioning itself for a long battle with United.

41.    Third, in an effort to avoid seeking court intervention over the sick leave action that become apparent in mid-July, United's Senior Vice President, Labor Relations, P. Douglas McKeen, had multiple communications with ALPA's counsel, Robert Nichols, as well as with MEC Chairman Wallach, to persuade ALPA to put an end to the job action.

42.    As detailed above, however, ALPA's statements to its members have been designed to encourage, and not to stop, this job action. Given the history between the parties, United concluded that it had no choice but to seek injunctive relief.

### FIRST CAUSE OF ACTION – VIOLATION OF RAILWAY LABOR ACT

43.    Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-42, inclusive.

44.    Section 2, First, of the RLA, 45 U.S.C. § 152, First, imposes an affirmative legal duty on employers, unions and employees to "make and maintain agreements concerning rates of pay, rules, and working conditions . . ." so as to avoid any interruption to commerce. *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 571 (1971). This provision prohibits either party from altering the status quo, or otherwise attempting to employ economic self-help, from the moment a union is certified until the parties have exhausted the elaborate negotiation and mediation mechanisms provided for under the RLA. *Consol. Rail Corp. v. Ry. Labor Executives*

*Ass'n*, 491 U.S. 299, 303-04 (1989); *Bhd. of Ry Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 244 (1966).

45.     The obligation under Section 2, First to refrain from engaging in slowdown activities is "a substantive legal duty 'enforceable by whatever appropriate means might be developed on a case-by-case basis.'   An injunction is an appropriate remedy to compel the performance of this legal duty."  *Delta Air Lines, Inc.,* 238 F.3d at 1308-09 (quoting. *Chicago & N.W. Ry. Co.*, 402 U.S. at 577).   Accordingly, the Seventh Circuit has made clear that, under Section 2, First, courts are authorized to "enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns and sit-ins." *United Air Lines*, 243 F.3d at 362 (*citing Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)); *Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982) ("[t]hat the overtime was designated as voluntary in the contract does not . . . render the concerted refusal to perform it any less a strike").

46.     United and ALPA currently are parties to a collective bargaining agreement that remains in full force and effect through December 31, 2009.  The parties therefore have not exhausted the procedures required by the RLA.  Accordingly, the concerted campaign by certain United pilots, at the direction of ALPA, to slowdown, work to rule and refuse all duty not contractually required, violates Sections 2, First, of the RLA.

## PROPRIETY OF INJUNCTIVE RELIEF

47.     No showing of irreparable injury is required to obtain an injunction against an unlawful violation of the status quo obligations under the RLA.

48.     Even if such a showing were required, United has suffered and will continue to suffer irreparable injury as a result of ALPA's unlawful job action.  As a direct result of the

refusal to accept "junior/senior manning," increased sick leave usage and other disruptive activity by ALPA-represented pilots, United has been forced to delay or cancel numerous flights each day. The resulting net operating profit loss for the past two weeks alone is $3.9 million, and these losses will continue unless the conduct is enjoined. Even if damages were available for direct monetary loss caused by ALPA's actions, there is no way to calculate the loss of customer goodwill and damage to reputation that United has suffered as a result of the over 36,000 United customers impacted by these cancellations.

49.    United has no adequate remedy in a civil action at law because delays and cancellations incident to obtaining relief by way of a civil action at law will result in serious and irreparable damage to United's relationship with its passengers and ability to conduct its business before such legal relief could be obtained; because such an action would not prevent ALPA, and the pilots it represents, from continuing to refuse picking up voluntary flying, engage in a "sick-out," and engage in other disruptive conduct, resulting in delay and cancellation to United flights; and because all of the injuries suffered by United could not be fully remedied in the form of money damages.

50.    As to each item of relief sought, greater injury will be inflicted on the public and upon United if such relief is denied than will be inflicted upon the Defendants by the granting of the relief sought.

WHEREFORE, Plaintiff prays for relief as follows:

1.    That this Court issue an order enjoining Defendants, and each of them, their members, agents and employees, and all persons and organizations acting by, in concert with, through or under them, or by and through their orders, pending a hearing on the permanent

injunction in this matter, from calling, permitting, instigating, authorizing, encouraging, participating in, approving or continuing any interference with United's airline operations, including but not limited to any strike, work stoppage, sick-out, slowdown, work to rule campaign, concerted refusal to accept voluntary or overtime flying, or other concerted refusal to perform normal pilot operations in violation of the RLA, 45 U.S.C. § 151 *et seq.*

2.     That this Court further order that the Defendants take all reasonable steps within their power to prevent the aforesaid actions, and to refrain from continuing the aforesaid actions if commenced, including but not limited to the following:

(a)     Instructing all ALPA-represented pilots employed by United to resume their normal working schedule and practices, and providing Plaintiff a copy of all such instructions;

(b)     Notifying all ALPA-represented pilots employed by United, by the most expeditious means possible, of the issuance, contents and meaning of this Preliminary Injunction, and producing a copy of all such messages to Plaintiff;

(c)     Including in such notice a directive from ALPA to those pilots who are engaging in a slowdown, sick-out, work to rule campaign, refusal to accept voluntary or overtime flying, or other concerted refusal to conduct pilot operations in the normal manner to cease and desist all such activity and to cease and desist all exhortations or communications encouraging same upon pain of fine, suspension, or other sanction by ALPA;

(d)     Posting the notice described above to ALPA's Internet websites and the ual2172.com website, and providing a copy of the notices to the Plaintiff;

(e)    Including the contents of such notice on all recorded telephone hotlines under control of Defendants, or any of them, until such time as the Court has acted on Plaintiff's Motion for a Permanent Injunction, and providing a copy of all messages to the Plaintiff; and

(f)    Distributing the contents of such notice through all non-public communication systems maintained by Defendants, including any telephone trees, pilot-to-pilot communication systems or similar systems, and providing a copy of the notice to the Plaintiff.

3.    That this Court further order that the Defendants are prohibited from including in such notices (or distributing contemporaneously with such notices) any statements that are intended, or could reasonably be interpreted to mean, that pilots should continue to engage in the previously-described conduct notwithstanding the Preliminary Injunction, including:

(a) any assertion that the Preliminary Injunction does not prohibit individual pilots from making voluntary decisions to engage in such actions; and

(b) any explanation of circumstances in which it would be appropriate or necessary for pilots to decline to waive a contractual requirement that the pilot may waive, decline a request to undertake a voluntary flight assignment, refuse a flight assignment or refuse to fly an aircraft that meets legal requirements for flight.

4.    That this Court further order that Defendants report to the Court by 5 p.m. on the day immediately following issuance of the Preliminary Injunction Order, by sworn affidavit, the methods used to effect the notice described above to all ALPA-represented pilots, and furnish to the Court copies of all notices required to be furnished to the Plaintiff by Defendants under the Court's Order; and

5.      That this Court further order that the injunction be issued on the condition that a bond be filed by Plaintiff at a time and in an amount to be determined by the Court, and that Defendants shall recover from the Plaintiff under said bond all costs and damages, if any, suffered by them in the event that Plaintiff does not succeed in this action.

DATED: July 30, 2008.

Respectfully submitted,

By:___s/Gary S. Kaplan_____
        TOM A. JERMAN
        APARNA B. JOSHI
        MARK W. ROBERTSON
        O'MELVENY & MYERS LLP
        1625 Eye Street, N.W.
        Washington, D.C. 20006
        (202) 383-5300
        e-mail:  tjerman@omm.com

        GARY S. KAPLAN
        SEYFARTH SHAW LLP
        131 South Dearborn Street
        Suite 2400
        Chicago, IL 60603-5577
        (312) 460-5000
        e-mail:  gkaplan@seyfarth.com

        Attorneys for Plaintiff
        United Air Lines, Inc.