**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

UNITED AIR LINES, INC.,

        Plaintiff,

   v.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, et al.,

        Defendants.

Civil Action No.

---

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TOM A. JERMAN
APARNA B. JOSHI
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
e-mail: tjerman@omm.com

GARY S. KAPLAN
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
(312) 460-5000
e-mail: gkaplan@seyfarth.com

Attorneys for Plaintiff
United Air Lines, Inc.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................. 6

    A.   The Parties To This Action ................................................................ 6

        1.   Plaintiff United Air Lines ....................................................... 6

        2.   Defendant ALPA .................................................................... 7

        3.   The Individual Defendants ...................................................... 9

    B.   ALPA Is Engaged In A Campaign To Re-Open the Collective Bargaining Agreement ................................................................... 10

    C.   ALPA's "Work To Rule" Campaign ................................................ 11

        1.   ALPA Is Encouraging Pilots To "Fly the Contract." ............... 12

        2.   ALPA's Directives Have Been Effective ................................ 14

    D.   ALPA Is Directing Its Membership To Refuse Voluntary Flight Assignments And Condoning Harassment of Pilots Who Accept Such Assignments ........................................................................ 15

        1.   Harassment And Intimidation of Pilots Who Accept Voluntary Assignments ......................................................... 17

        2.   ALPA's MEC Express Refusal To "Allow" Junior/Senior Manning. ............................................................................. 18

        3.   United's Inability to Use Junior/Senior Manning Because of ALPA's Directives ................................................................ 19

    E.   ALPA's Encouragement OF A Sick-Out Among Junior Pilots ............ 19

        1.   The Junior Pilots' Sick-Out ................................................... 19

        2.   ALPA's Direct Involvement. ................................................. 23

    F.   The Irreparable Injury To United And Its Customers Caused By ALPA's Unlawful Job Action ...................................................... 24

        1.   Fuel Cost Increases Have Put the Entire Airline Industry in a Precarious Financial Position ................................................. 25

        2.   Unless Enjoined, ALPA's Unlawful Actions Will Continue to Inflict Harm to United and Its Reputation ............................. 27

        3.   ALPA's Campaign Has Already Inconvenienced At Least 36,000 Members of the Traveling Public, and Unless an Injunction Is Issued That Number Will Continue to Grow. ........................... 29

    G.   United's Efforts To Resolve This Dispute Without Judicial Intervention .......... 29

ARGUMENT ................................................................................................. 32

# TABLE OF CONTENTS
(continued)

Page

I. ALPA'S SLOWDOWN CAMPAIGN CLEARLY VIOLATES ITS STATUS QUO OBLIGATIONS UNDER THE RAILWAY LABOR ACT ................................. 32

    A. The RLA Prohibits A Union Or Its Members From Engaging In Any Form Of Economic Self-Help During The Term Of The Parties' Agreement ............. 32

    B. The Case Law Does Not Require Union Direction As A Predicate For Issuing A Preliminary Injunction ........................................................... 34

    C. The Evidence Overwhelmingly Establishes That ALPA Is Encouraging, And Its Members Are Engaged In, An Unlawful Slowdown To Put Pressure On United ............................................................................. 37

II. THIS COURT SHOULD ISSUE INJUNCTIVE RELIEF PROHIBITING THE UNLAWFUL CONDUCT PENDING A TRIAL ON THE MERITS ........................... 39

    A. No Showing Of Irreparable Injury Is Required To Obtain An Injunction Against A Status Quo Violation Under The RLA ........................................ 40

    B. Even If A Showing Of Irreparable Injury Were Necessary, United Has Suffered, And Will Continue To Suffer, Irreparable Injury As A Result Of The Slowdown ...................................................................................... 41

    C. The Public Interest Demands Issuance of Injunctive Relief to Prevent Further Harm to the Traveling Public .................................................... 42

    D. Any Assertion That Injunctive Relief Would Harm ALPA, or Threaten Safety, Is Without Merit ...................................................................... 43

    E. ALPA Has Demonstrated the Ability to Control the Conduct of United's Pilots ...................................................................................................... 44

III. THE NORRIS-LAGUARDIA ACT DOES NOT PROHIBIT AN INJUNCTION IN THIS CASE ............................................................................................... 45

    A. The Federal Courts Have Jurisdiction To Enjoin a Violation of the RLA Notwithstanding the Norris-LaGuardia Act.......................................... 46

    B. The Requirement of "Clear Proof" Under Section 6 of the NLRA, Even If Applicable, Has Been Satisfied........................................................... 46

    C. The Requirement of "Clean Hands" Under Section 8 of the NLGA Does Preclude A Preliminary Injunction ....................................................... 48

CONCLUSION ................................................................................................... 49

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Labs v. Mead Johnson & Co.*,
    971 F.2 6 (7th Cir. 1992) ................................................................. 39, 40, 42

*Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*,
    802 F.2d 886 (7th Cir. 1986) ................................................................. 33

*Am. Airlines v. Allied Pilots Ass'n*,
    53 F. Supp. 2d 909 (N.D. Tex. 1999) ................................................................. 19

*American Airlines, Inc. v Transport Workers Union*,
    No. 499-CV-10066-Y (N.D. Tex. Dec. 29, 1999) ................................................................. 36

*American Train Dispatchers Dept. v. Fort Smith R.R. Co.*,
    121 F.3d 267 (7th Cir. 1997) ................................................................. 42

*Bhd. of Locomotive Eng'rs v. Atchinson, Topeka & Santa Fe Ry. Co.*,
    768 F.2d 914 (7th Cir. 1985) ................................................................. 46

*Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*,
    353 U.S. 30 (1957) ................................................................. 46

*Bhd. of R.R. Trainmen v. Howard*,
    343 U.S. 768 (1952) ................................................................. 46

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*,
    394 U.S. 369 (1969) ................................................................. 32

*Charles D. Bonanno Linen Service, Inc. v. McCarthy*,
    532 F.2d 189 (1st Cir. 1976) ................................................................. 47

*Chicago River & Indian R.R. Co. v. Brotherhood of R.R. Trainmen*,
    229 F.2d 926 (7th Cir. 1956) ................................................................. 42

*Chicago. & N.W. Ry. Co. v. United Transp. Union*,
    402 U.S. 570 (1971) ................................................................. 32, 33, 46

*Comair, Inc. v. Air Line Pilots Ass'n*,
    No. 99-250 (E.D. Ky. Dec. 21, 1999) ................................................................. 36

*Consolidated Rail Corp. v. Railway Labor Executives Association*,
    491 U.S. 299 (1989) ................................................................. 40

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
    123 F. Supp. 2d 1356 (N.D. Ga. 2000), *reversed by* 238 F.3d 1300 (11th Cir. 2001) ............ 36

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
    238 F.3d 1300 (11th Cir. 2001) ................................................................. passim

*Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*,
    396 U.S. 142 (1969) ................................................................. 34

*Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors*,
    689 F.2d 382 (2d Cir. 1982) ................................................................. 33

# TABLE OF AUTHORITIES
(continued)

Page

*ITASCA Lodge 2029 v. Railway Express Agency, Inc.*,
    391 F.2d 657 (8th Cir. 1968) ................................................................ 33

*Long Island R.R. Co. v. International Ass'n of Machinists*,
    874 F.2d 901 (2nd Cir. 1989) .............................................................. 34

*Long Island R.R. Co. v. Sys. Fed'n No. 156*,
    368 F.2d 50 (2nd Cir. 1966) ................................................................ 33

*Mayo v. Dean*,
    82 F.2d 554 (5th Cir. 1936) ................................................................. 47

*Meridian Mutual Ins. Co. v. Meridian Ins. Group, Inc.*,
    128 F.3d 1111 (7th Cir. 1997) .................................................. 24, 40, 42

*National Airlines, Inc. v. International Ass'n of Machinists*,
    416 F.2d 998 (5th Cir. 1969) ............................................................... 47

*Northwest Airlines, Inc. v. Local 2000, Int'l Brotherhood of Teamsters*,
    163 L.R.R.M. 2460 (D. Minn. 2000) .................................................... 36

*Pan Am. World Airways v. Indep. Union of Flight Attendants*,
    93 Lab. Cas. (CCH) ¶ 13,307 (S.D.N.Y. 1981) ................................... 33

*Pan Am. World Airways v. Transport Workers Union*,
    117 L.R.R.M. (BNA) 3350 (E.D.N.Y. 1984) ....................................... 33

*Pan Am. World Airways, Inc. v. Independent Union of Flight Attendants*,
    1981 WL 2367 (S.D.N.Y. July 20, 1981) ............................................. 39

*Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters*,
    736 F. Supp. 1179 (D. Mass. 1990) ..................................................... 47

*Tex. & New Orleans  R.R. Co. v. Bhd.  of Ry. & S.S. Clerks*,
    281 U.S. 548 (1930) ............................................................................. 32

*Tex. Int'l Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*,
    518 F. Supp. 203 (S.D. Tex. 1981) ................................................ 33, 38

*Trans World Airlines v. Int'l Ass'n of Machinists*,
    75 Lab. Cas. (CCH) ¶ 10,312 (W.D. Mo. 1974) .................................. 33

*United Air Lines v. Int'l Ass'n of Machinists*,
    54 L.R.R.M. (BNA) 2154 (N.D. Ill. 1963) .......................................... 34

*United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*,
    243 F.3d 349 (7th Cir. 2001), *cert. denied,* 534 U.S. 889 (2001) .............. passim

*United Brotherhood of Carpenters v. United States*,
    330 U.S. 395 (1947) ............................................................................. 47

*Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*,
    698 F.2d 862 (7th Cir. 1993) ............................................................... 41

## TABLE OF AUTHORITIES
(continued)

**Page**

**Statutes**

29 U.S.C. § 101 ................................................................................................. 33, 46

45 U.S.C. § 151 ................................................................................................... 1, 32

45 U.S.C. § 151a ...................................................................................................... 32

45 U.S.C. § 152 ........................................................................................................ 32

**Others**

Lowenstein, Roger,
*Into Thin Air,* N.Y. Times, Feb. 17, 2002 ................................................................. 5

McDonald, Jr., James J., & Ephraim Asher,
*Airline Employee Slowdowns and Sickouts as Unlawful Self Help: A Legal and Statistical Analysis*, 55 J. Air L. & Com. 349, 359 (1990) ........................................... 28, 38, 42

Reed, Dan,
*Pilots Strategize to Regain Pay, Benefits Lost during Downturn*, USA Today, June 6, 2007 . 10

## PRELIMINARY STATEMENT

For the past several years, United Air Lines, Inc. ("United" or the "Company") and its 55,000 employees have worked very hard to improve the Company's operational performance, re-establish its financial stability and reassert its preeminent position in the marketplace.  Today, with highly volatile fuel prices reaching historic highs and a softening economy, United, along with the entire airline industry, faces unprecedented challenges.  This year alone, United will likely pay $3.3 billion more for fuel than it paid in 2007, resulting in an adjusted net loss of $688 million for the first half of 2008.

In this already difficult environment, the work to build a stronger United is being threatened by the unlawful actions of the Air Line Pilots Association, International ("ALPA"), the collective bargaining representative of United's 6500 pilots.  ALPA has publicly and consistently urged its pilots to avoid picking up voluntary flying assignments allowed under the current contract and supported and encouraged a sick-out organized by certain junior pilots – a campaign designed to exert economic pressure on the Company in violation of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA").  The explicit purpose of this campaign is to open  a collective bargaining agreement for renegotiation that would otherwise remain in effect until the end of 2009, and more recently, to oppose United's announced intent to reduce its fleet size and furlough some 950 active pilots. ALPA's actions are harming the Company, its employees and its customers, all of whom depend on the stability, reliability and viability of United and its operation.

In this action, United seeks declaratory and injunctive relief under Section 2, First of the RLA against ALPA, which represents pilots at United through its Master Executive Council ("MEC"); members of the MEC's Industrial Relations Committee ("IRC") Steven Tamkin, Robert Domaleski and Xavier Fernandez, officers and members at United; and an

individual United pilot, Anthony Freeman (collectively, "Defendants").   Section 2, First obligates carriers, unions and employees "to exert every reasonable effort to make and maintain [collective bargaining] agreements . . . and resolve all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier."  It has consistently been interpreted by the federal courts to prohibit a union from seeking to put economic pressure on a carrier through a strike, slow-down, sick-out or any other form of job action designed to disrupt the normal operations of the carrier both while an agreement is in force and before exhaustion of the bargaining and mediation process required under the RLA for a new agreement.  Where a union or its members violate this obligation, the federal courts routinely provide injunctive relief.  *See United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers,* 243 F.3d 349, 362 (7th Cir. 2001), *cert. denied,* 534 U.S. 889 (2001) (finding failure to issue preliminary injunction to be an abuse of discretion).

While the urgency of the recent sick-out precipitates this filing, ALPA began its campaign to put pressure on the company through targeted actions in December 2006, less than a year after United exited bankruptcy protection.   At that time, ALPA's officers publicly demanded that United renegotiate its contract and work rules negotiated under bankruptcy. Following a blueprint that ALPA has used many times against both United and other airlines -- including a widely-publicized slowdown at United during the summer of 2000 that caused immense inconvenience to the traveling public and great harm to United's business and reputation -- ALPA officers publicly began to advise United's pilots that the only way to create the "leverage" necessary to force United to reopen the contract was for United's pilots to adhere strictly to contractual requirements, and refuse to fly any voluntary assignments by United -- a clear change from past practice.  At the same time, ALPA began to encourage -- by inaction if

not through express directive -- various acts of harassment against pilots who continued to accept voluntary flight assignments.

ALPA's tactics had the intended effect.  Within months, ALPA's actions erased United's ability to use voluntary flight assignments provided for in the collective agreement, known as "junior/senior manning," and United began to see a slow but steady increase in flight delays and cancellations attributable to flight crew unavailability and discretionary pilot actions. United has attempted over the last 18 months to manage these problems without resort to litigation -- by increasing its reserve pilot staffing, and by negotiating with ALPA to modify some of the work rules in the existing agreement, making meaningful improvements to pilots' work lives.  Although United's financial situation deteriorated substantially because of soaring fuel prices since ALPA began its campaign, ALPA has not changed course.  Indeed, since United announced in June 2008 that it was reducing its fleet by 100 aircraft and furloughing some 950 pilots because of the fuel price crisis, the decibel level of ALPA's rhetoric has increased substantially, and sick leave usage has sharply increased, particularly among the most junior pilots, who are facing furlough as a result of the capacity reductions.  Most recently, the combination of increased sick leave and the refusal of ALPA to accept voluntary assignments forced United to cancel 329 flights in less than 10 days (July 19-27, 2008), inconveniencing some 36,000 of United's customers.

United simply cannot afford a repeat of the summer of 2000 and its impact on the Company's customers and employees.  To avoid further harm to all of its constituents, United seeks a preliminary injunction, to be made permanent following a trial on the merits, barring ALPA, its members, and the other Defendants from advocating or engaging in any form of job action designed to put economic pressure on United or disrupt its operations, and ordering ALPA

to "exert every reasonable effort" to ensure that United's operations are not disrupted further. *See United Air Lines, Inc.,* 243 F.3d at 361 (union has an "affirmative legal obligation" under the RLA to take actions to stop an unlawful job action).

The requirements for issuance of a preliminary injunction are plainly met here. On the merits, ALPA's directives to United's pilots to adhere strictly to the terms of the contract and refrain from accepting voluntary flight assignments for the express purpose of "creating leverage" to reopen the existing contract cannot be seriously disputed, and those directives are patent violations of ALPA's obligations under Section 2, First to "exert every reasonable effort to make and maintain" agreements without disruption to the carrier's operations. Indeed, the Seventh Circuit held in the *United v. IAM* case that it was an abuse of discretion to fail to issue a preliminary injunction under substantially similar circumstances. *United Air Lines, Inc.,* 243 F.3d at 361.

The evidence will also show that the recent jump in sick leave and resulting cancellations were the result of concerted action by certain United pilots, and were certainly endorsed -- if not actually planned -- by ALPA. Despite denials of complicity and responsibility, ALPA's communications are essentially a guide describing how to use sick leave inappropriately. While investigating the sick leave abuse, United learned that individual defendant Anthony Freeman organized a group of junior pilots -- known as "the 2172" because they were among the 2,172 pilots furloughed by United in 2001 -- and established a private, password-protected website called www.ual2172.com to facilitate unlawful concerted actions by that group. Based on a number of factors described in connection with United's motion for expedited discovery, United believes that Mr. Freeman organized a concerted abuse of sick leave in order to force United to abandon its plans to reduce its fleet and furlough pilots as necessitated

-4-

by the current economic climate, and anticipates that expedited discovery will definitively establish this. United also believes that expedited discovery will show that ALPA encouraged, condoned, facilitated, and/or was involved in planning this action with Mr. Freeman. For example, on June 5, 2008 -- the day after United announced furloughs -- ALPA asked that Mr. Freeman and three other pilots who also serve on ALPA's Industrial Relations Committee ("IRC") be released by United from their pilot duties to perform official ALPA duties. The Chairman of the ALPA Strike Preparedness Committee, James Andersen, was also granted a release to perform official ALPA duties coinciding with Mr. Freeman's and the IRC's release and the evidence indicates that they met in Los Angeles on or about June 12, 2008. The IRC has been described as a "secretive wing of ALPA" that participated in the organization of the ALPA slowdown at United during the summer of 2000. *See* Roger Lowenstein, *Into Thin Air,* N.Y. Times*,* Feb. 17, 2002, (citing pilots' belief that publications encouraging slowdown at United during the summer of 2000 were "produced by the Industrial Relations Committee, a secretive wing of ALPA formed by [Captain and union leader] Dubinsky during the strike [of 1985]"). Mr. Freeman's interaction with that group and the Chairman of the ALPA Strike Preparedness Committee plainly implicates ALPA in his actions.

The other showing traditionally required to obtain a preliminary injunction -- that irreparable injury will occur if the injunction is not issued -- does not apply under the RLA. *See United Air Lines,* 243 F.3d at 362. Even if it did, however, ALPA's actions are irreparably harming United in the form of increased costs for reserve staffing (some $15 million a year), lost profits from flight cancellations (some $3.9 million in net lost operating profit in the last two weeks of July alone), and incalculable harm to its customer goodwill and business reputation in an industry in which customers have a choice of air carriers and make decisions based on

reliability and reputation. Finally, there can be no claim of harm to ALPA or its members in issuing an injunction because it would simply prohibit them from engaging in illegal activity.

## STATEMENT OF FACTS

**A.    The Parties To This Action.**

**1.    Plaintiff United Air Lines.**

Plaintiff United is a commercial air carrier, headquartered in Chicago, with national and international operations. (Declaration of Peter McDonald ("McDonald Decl.") ¶5.) United is a "common carrier by air" as defined in the Federal Aviation Act of 1958, and a "carrier" as defined by the Railway Labor Act. (*Id.*)

United entered into Chapter 11 bankruptcy in December 2002 and emerged from bankruptcy protection more than three years later on February 1, 2006. (McDonald Decl. ¶¶ 6, 7.) While United generated net income of $25 million for the 11 months ending December 31, 2006, and net income of $403 million for 2007, its continually skyrocketing cost of fuel (projected at $9.2 billion for 2008, a $3.3 billion increase over 2007) resulted in a $688 million adjusted net loss over the first half of 2008. (*Id.* ¶¶ 7, 9.) As set forth in the Report of Daniel M. Kasper and Darin N. Lee ("Kasper & Lee Report"), when United entered Chapter 11 bankruptcy, crude oil, to which United's cost of fuel is directly tied, was approximately $ 25-30/barrel. (Kasper & Lee Report at Ex. 17.) Crude reached a record high price of $145/barrell in early July 2008. (*Id.* ¶ 19.) It now costs approximately $130/barrel or more. (*Id.* at Ex. 17.) On June 4, 2008, United, facing these unprecedented, and rising, fuel prices, announced that it would remove a total of 100 aircraft from its mainline fleet, and reduce its mainline domestic capacity in the fourth quarter 2008 by 14 percent year over year. (McDonald Decl. ¶ 11.) The Company also announced that it conditionally expected to retire all of its 94 B-737s, and six Boeing-747s. With those reductions, United announced significant reductions in management, salaried, and

front-line employees, including pilots.[1] On June 23, 2008, the Company announced that the reduction would result in furlough notices to approximately 1,450 pilots, including those on leave, and result in the furlough of approximately 950 active pilots. (*Id.* ¶ 13.)  Each of these reactions by United to its current financial challenges is squarely and indisputably within the Company's rights under the collective bargaining agreement between United and ALPA.

## 2.    Defendant ALPA.

Defendant ALPA is an unincorporated labor organization, with its principal offices in Washington, D.C. and Herndon, Virginia.  (Declaration of Jay Milone ("Milone Decl.") at ¶ 5.)  ALPA is the certified collective bargaining representative under the RLA of United's pilots.  *Id.*  United and ALPA are currently parties to a collective bargaining agreement (the "United-ALPA Agreement" or "CBA"), negotiated during United's bankruptcy and which became effective on August 24, 2005.  (*Id.* ¶ 6.)

United Air Lines Master Executive Council ("MEC") is a representative body that, under the ALPA Constitution and Bylaws, makes all decisions for ALPA on matters affecting United pilots.  (*Id.* ¶ 7.)  The MEC consists of the Chairman, Vice-Chairman and Secretary-Treasurer from each of the eight Local Executive Councils ("LECs") maintained by ALPA at United.[2]  (*Id.*)  The MEC members, in turn, elect a MEC Chairman, Vice Chairman and Secretary-Treasurer, who serve two-year terms.  (*Id.*)  On October 9, 2007, the MEC members elected new officers, who took office on January 1, 2008.  (*Id.*)  Accordingly, the former MEC

---

[1]    The June 4, 2008 announcement followed previous announcements of much smaller fleet reductions.  On March 18, 2008, United first announced that it planned to reduce its aircraft fleet size by 15-20 older narrow-body aircraft by year-end.  As fuel prices worsened, on April 22, 2008, United announced plans to eliminate 30 aircraft from its operating fleet, 10 to 15 more aircraft than initially announced in March.  (McDonald Decl. ¶ 10.)

[2]    The LECs correspond to United's seven pilot "domiciles" or bases (Dulles, Chicago, Seattle, Denver, San Francisco, Los Angeles and New York) plus United's Denver Training Center.  (Milone Decl. ¶ 7.)

Chairman, Mark Bathurst, was replaced by the new MEC Chairman, Steve Wallach, on January 1, 2008. (*Id*.) Both the MEC and LECs also maintain a large number of standing committees, some of whose chairmen are appointed, and may be removed, by the UAL-MEC or LEC Chairman, respectively. (*Id*. at ¶ 8.) One of those committees is the Industrial Relations Committee, discussed below. (*Id*.)

ALPA has a long history of fomenting unlawful slowdown activity, most recently at United in the summer of 2000. In the summer of 2000, ALPA engaged in a "Fly the Contract" slowdown campaign that commenced shortly after United's collective bargaining agreement with ALPA in effect at the time became amendable on April 12, 2000. (McDonald Decl. ¶ 14.) ALPA's campaign in the summer of 2000 consisted of delays in completing preflight checklists, the refusal to depart with minor equipment problems, refusal to waive contractual rest and duty requirements, the refusal to volunteer for "open flying" and the refusal to accept "junior/senior manning" requests. (*Id*.) That campaign caused thousands of flights delays and cancellations, inconvenienced hundreds of thousands of passengers, and cost United millions of dollars as well as an incalculable amount of customer goodwill. (*Id*. at ¶ 15.) ALPA stopped its 2000 "Fly the Contract" campaign in late August 2000, after United and ALPA reached agreement on a new collective bargaining agreement with wages and benefits that were substantially higher than any other carrier. (*Id*.)

The parties agreed in the current United-ALPA Agreement that the duration of the Agreement would extend "through and including December 31, 2009" (the amendable date). (McDonald Decl. at ¶ 6.) The United-ALPA Agreement further provides that neither party may serve notice of intended changes, beginning the bargaining process under the RLA, until 270 days prior to December 31, 2009. (*Id*.) The long duration of the United-ALPA Agreement was

critical because it provided stability in the labor cost savings that United obtained through the renegotiated contract.  (*Id.*)  United also has collective bargaining agreements with its other five labor unions covering approximately an additional 38,000 employees that do not become amendable until January 2010. (*Id.*)  In late 2006, however, less than a year after United exited bankruptcy, ALPA demanded that United re-negotiate the United-ALPA Agreement well before the amendable date.  (Milone Decl. ¶¶ 12.)  United declined to enter into negotiations on the existing CBA, which still had nearly three years left until the amendable date, but agreed to enter into negotiations for limited side agreements to address ALPA's concerns at the time.  (*Id.* ¶ 17.)  The parties eventually reached a tentative agreement ("TA") in March 2007, but ALPA's membership rejected it.  (*Id.*)

### 3.    The Individual Defendants.

Defendants Steven Tamkin ("Tamkin"), Robert Domaleski ("Domaleski") and Xavier Fernandez ("Fernandez") are Chairman and members, respectively, of the MEC Industrial Relations Committee ("IRC").  (Milone Decl. ¶ 57.)  According to the UAL MEC Policy Manual, the duties of the IRC include, "The formulation and implementation of labor actions which will accomplish the goals of the United pilots and the directives of the UAL-MEC" and "Communicat[ion] with the Local Council Industrial Relations Coordinators (appointed by each LEC) to implement any activity, either local or national in nature, which is significant to the United pilots."  (*Id.* ¶56; Ex. 17.)

Defendant Anthony Freeman is a United pilot First Officer  and member of ALPA who United believes implemented a website that is dedicated to organizing activities designed to disrupt United's operations.  (Milone Decl. ¶ 53-55.)  Specifically, Mr. Freeman administers and maintains a password-protected website called "www.ual2172.com," which he is using in conjunction with phone trees and other means to communicate with other United pilots, much

like ALPA has done in the past, and he has engaged in other electronic forms of communication with other United pilots, in a concerted effort to engage in activities directed at harming United in violation of the RLA.  The evidence thus far includes e-mail and e-note messages that Mr. Freeman sent and received through the United electronic messaging system that plainly disclose his role in running the website, and the purpose of the site.  Electronic messages from Mr. Freeman include numerous statements that reveal his activities, including statements that (1) the group is going to "fight for your jobs;" (2) pilots should "keep in touch through the tree" because "it's going to get interesting;" (3)  he removed postings on a specific topic because "some things aren't meant for paper or electronic communications;" and (4) "Summer is our leverage as a pilot group."  (Declaration of Benjamin Vaughn ("Vaughn Decl.") at Ex. 7.)  Moreover, on or about June 12, 2008, according to travel records, the three members of the IRC, the Chairman of the ALPA Strike Preparedness Committee, Jim Andersen, and Mr. Freeman met in Los Angeles. (Milone Decl. ¶ 58-59; Ex. 18.)  Mr. Freeman's unlawful activities are described in detail in United's Motion for Expedited Discovery filed concurrently with this motion.

**B.    ALPA Is Engaged In A Campaign To Re-Open the Collective Bargaining Agreement.**

ALPA has tried to use concerted action to force United to reopen the United-ALPA Agreement since December 2006.  (*See* Milone Decl. ¶ 12.)  ALPA's goal of re-opening the Agreement was confirmed by the President of the ALPA International, John Prater, who warned "that airline managers are 'playing with fire should they refuse to put us back on pre-concessionary contracts.'" (*See* Dan Reed, *Pilots Strategize to Regain Pay, Benefits Lost during Downturn*, USA Today, June 6, 2007.)  In the sections below, United demonstrates that ALPA has carried out its plan through (1) a work to rule campaign, (2) a concerted effort to refuse

voluntary flight assignments in violation of long-standing practice and custom, and (3) a recent sick-out among the A320 and 737 First Officers ("F/Os").

Since the new MEC chair took office on January 2, 2008, each and every MEC Update issued by ALPA on its website, https://crewroom.alpa.org/ualunity, is prefaced with ALPA's demand to re-open the contract:

> Today was the 197th day that the Company could have sat down with its pilots to discuss a complete fair and equitable contract. They chose not to.  That makes 1,896 days (5 years, 2 months, 14 days) of living under the current draconian contract and work rules negotiated under duress of bankruptcy.

(*See* Milone Decl. ¶ 14; Ex. 2.)  And since February 27, 2008, each MEC Update has concluded with a quote from *The Art of War* by Sun Tzu: "Fighting with a large army under your command is nowise [sic] different from fighting with a small one: it is merely a question of *instituting signs and signals*."  (*See, e.g., id.* at Ex. 14 (emphasis added).)

## C. ALPA's "Work To Rule" Campaign.

In December 2006, ALPA created a Strike Preparedness Committee ("SPC") and launched a campaign it called "Fix It Now."  (Milone ¶ 11.)  ALPA stated that the campaign's "theme is the SPC's message to you that you need to join us in ensuring we all fly the present contract, and not waive *any* section of it. . . . Only through **one voice** will management hear us." (*Id.* ¶ 11; Ex. 1 (emphasis in original).)  ALPA began its campaign in earnest in January 2007 by launching a poll to determine which contract modifications its members deemed most important and holding rallies to garner member support.  (*Id.* ¶ 16.)  Moreover, ALPA issued a "UAL Pilot Unity Handout" called "YOUR CONTRACT-- HONOR IT."  (*Id.* ¶ 16; Ex. 3.)  The handout directed pilots not to waive any provision of the United-ALPA Agreement, stating "our contract still contains numerous protections that many of you choose to ignore or waive. . . . **THE TIME HAS COME TO STOP HELPING THE COMPANY GUT YOUR COLLECTIVE**

**BARGAINING AGREEMENT.**" (*Id.* (emphasis in original).) ALPA further explains that the ALPA Grievance Committee has put out a series of "Did-You-Knows (DYK's) which are intended to highlight your contractual rights. We urge you to read them, understand them and **follow them** in order to protect your current contract and ***aid us in getting you a better one.***" (*Id.* (emphasis added).)

     1.      **ALPA Is Encouraging Pilots To "Fly the Contract."**

Over the past 18 months and continuing to date, ALPA leadership has explicitly encouraged members to "fly the contract" and decline to waive contractual provisions. These phrases, which are widely recognized in the airline industry as synonyms for a work slowdown and were the same phrases that ALPA used to launch the slowdown during the summer of 2000 have appeared in official ALPA "Fix It Now" campaign communications and speeches, as well as elsewhere. For example:

On *December 20, 2006*, ALPA issued an MEC Update stating that "[t]he 'Fix It Now' theme is the SPC's message to you that you need to join us in ensuring we all fly the present contract, and not waive *any* section of it." (Milone Decl. ¶ 11; Ex. 1.)

On *March 26, 2007,* in an e-mail message encouraging LEC Council 12 members to carefully consider the TA, LEC Vice Chairman Captain Briggs emphasized that getting favorable terms in contract negotiations comes from "leverage" and "[l]everage comes from each of us flying the line and our actions standing up for our contract, and such leverage is required before our Negotiating team can make progress in restoring our contract to its rightful state…[l]everage is flying the contract." (*Id.* ¶ 34; Ex. 6.)

On *April 20, 2007*, in a video posted on the MEC website, former MEC Chairman Mark Bathurst stated, "I cannot over emphasize the importance to all of us, however, that we embrace a new attitude about our contractual obligations. It is in no one's interest to waive

anything in our contract.... If the contract does not say that a waiver requires pilot concurrence, the provision is not waivable and the company has no business asking that you do so. Even where the contract says that a provision may be waived with your concurrence, there may be adverse collective consequences to consider. For example, I have spoken to you previously about how the widespread use of junior-senior manning, which was originally designed as a tool for irregular operations and how it slows down recalls and promotions. This is only one example. Until our work rules and compensation are restored, these issues should be carefully considered before waiving any part of our contract." (*Id.* ¶ 29.)

In *December 2007*, ALPA issued an MEC update, telling pilots that they need to "strictly adhere" to their CBA and that to not do is "prolonging the length of time you will have to endure under industry trailing pay and benefits." (Milone Decl. ¶ 35; Ex. 7.) ALPA went on to ask the pilots "what are you going to do about [the Company's refusal to reopen the contract and provide relief]" and concluded with "SAFETY FIRST, IN ALL THINGS, AT ALL TIMES." (*Id.* at ¶35; Ex. 7 (emphasis in original).)

In *February 2008*, ALPA told its membership to be "battle-ready." (Milone Decl. ¶ 36; Ex. 8.) (ALPA encouraged its members to be "battle-ready" and directing them to a website to get the "tools required to effectively execute our mission of unity.") Shortly thereafter on February 19, 2008, sick leave increased significantly, rising to over 50% more than the anticipated rate. (*Id.* ¶¶ 36-37; Ex. 8.)

On *June 4, 2008*, Capt. Wallach issued a letter regarding the planned reduction of the fleet and furloughs, stating "I have made this latest development my top priority. I have directed the Negotiating Committee and the System Schedule Committee to devote all their time and energy to protecting the jobs of all of our pilots. No idea will be discounted." (*Id.* ¶ 41.)

On *July 21, 2008*, ALPA issued a statement to pilots, subtly encouraging them to decline to fly aircraft with minimum equipment issues (i.e. those that do not affect the safety of the aircraft), which is another way of refusing to waive any contractual rights. "If we continue to try to do management's job, one we clearly were not hired to do, we enable their continued mismanagement of our airline. It is not our job or responsibility. We will not save our airline by risking safety. We will not save our airline by trying to do management's job. Our job as pilots is to support them with write-ups regarding the tools we need to operate our aircraft safely." (*Id.* ¶ 48; Ex. 12.)

These express directives from ALPA are undoubtedly only the tip of the iceberg. In considering this evidence, the Court should take into account that ALPA possesses a large number of confidential communication mechanisms to which United has not had access. ALPA's elaborate system of communications among its members includes regular meetings in each domicile, contract education/audit desks set up in each domicile, written materials mailed to pilots' homes, telephone "trees," confidential e-mails to the pilots' homes, internet sites and message boards available only to union members, and the "Pilot-2-Pilot" communications program. (*Id.* ¶ 9.) There is no way of knowing what is contained in those communications systems without discovery, but it is undoubtedly even more explicit than what is publicly available. In fact, the website likely at the center of the recent sickout is open only to certain union members, and the only logical purpose of such a restriction would be to avoid scrutiny of improper activity. (Vaughn Decl. ¶ 5.) The discovery requested in the accompanying Motion For Expedited Discovery would undoubtedly uncover many additional incriminating statements.

## 2.    ALPA's Directives Have Been Effective.

Although it is not necessary under the RLA to show union direction in order to obtain an injunction against an unlawful job action, there is substantial evidence in this case that

the MEC and LECs at United have encouraged ALPA members to refuse to perform any duty that is voluntary under the United-ALPA Agreement, to decline to waive any contractual entitlement under the agreement, and to engage in increased sick leave usage in order to significantly disrupt United's operations.  The express purpose of this campaign is to put pressure on United to agree to reopen contract negotiations and to stop the Company from instituting the necessary fleet reductions and furloughs.  Now, ALPA is using a group of junior pilots to further exert pressure on the Company, as described in detail below.

The evidence in this case further shows that ALPA's directives to its membership were effective.  For more than ten years, United has maintained an extensive system for tracking and categorizing all flight delays and cancellations.  ((Declaration of Paul Carlson ("Carlson Decl.") ¶ 6.)  Under this system, every delay and cancellation is assigned one of more than 50 codes covering every possible reason for such an action.  (*Id*.)  United also maintains detailed records on junior/senior manning and sick leave usage.  (*Id*.)  As a result, it is possible to identify precisely those delays and cancellations, which are due to the slowdown tactics described herein (and to exclude delays and cancellations caused by weather, air traffic control, or other reasons). This data demonstrates that ALPA has been engaged in a concerted effort to alter the status quo which began over a year ago and has escalated in the past few months.  (*Id*. ¶¶ 11-12.)  These delays and cancellations cannot be explained by "chance."  (Kasper & Lee Report at ¶7.)

**D.     ALPA Is Directing Its Membership To Refuse Voluntary Flight Assignments And Condoning Harassment of Pilots Who Accept Such Assignments.**

Under the United-ALPA Agreement, if United is unable to cover all open trips with reserve pilots, United may employ a procedure called "junior manning" or "junior/senior

manning."[3]  (Carlson Decl. ¶ 8.)  This is a process that is used in some form by every airline to

staff "open flying" -- that is, flights that do not have a pilot assigned to them, generally because

the originally assigned pilot has called in sick -- by offering that flying to pilots who were

scheduled to be off duty during the period.  It is, in essence, a form of voluntary overtime, and in

normal circumstances some portion of an airline's pilots will seek out this work because it

provides a way for the pilots to increase their income.  At the same time, it allows the airline to

reduce the number of reserve pilots needed while ensuring that flights are covered when the

number of open flights exceeds the number of available reserve pilots.  Although the decision of

whether to accept a junior/senior manning assignment is voluntary, in ordinary circumstances --

that is, under the "status quo" -- United and other airlines can almost always find a pilot willing

to fly the trip.  (*Id*. at ¶ 9.)

By directing pilots to refuse all junior/senior manning assignments on a concerted

basis, even though some of the pilots might desire those assignments on an individual basis,

ALPA can put great economic pressure on a carrier by causing flight cancellations or, over time,

by forcing the airline to hire unnecessary reserves.  Accordingly, this has become a common

element of pilot job actions even though it is clearly unlawful.  *See Delta Air Lines, Inc. v. Air

Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1307-08 (11th Cir. 2001).

---

[3]    The two different terms are used because the phrase "junior manning" is actually a misnomer when applied to United.  The term, which is commonly used in the airline industry to describe the process of covering open trips, refers to a situation in which the carrier in entitled to involuntarily assign an open trip to the most junior available pilot-- i.e., the "junior man."  United does not have the right to assign flights on this basis, and the opportunity to accept a flight, and earn extra money, is considered a *benefit* that must be offered in seniority order beginning with the most senior available pilot.  Thus, United pilots often refer to the process as "junior/senior manning."  (Carlson Decl. ¶¶ 8-9.)

1.      **Harassment And Intimidation of Pilots Who Accept Voluntary Assignments.**

There is evidence that United's ALPA leadership has directly participated in threats and intimidation of any pilots who refuse to acquiesce in the union's illegal activities.  If a pilot accepts a junior/senior manning assignment, that fact is noted in the pilot's monthly schedule, which is available to every other pilot.  (Milone Decl. ¶ 26.)  ALPA requested and obtained from United a computerized, monthly summary of all pilots' schedules, from which it can readily determine which pilots have accepted junior/senior manning.  (*Id.*)  Thus, if a pilot accepts junior/senior manning he will be immediately identifiable to ALPA and its members, allowing them to put pressure on the pilots to cease accepting junior/senior manning.  Since the time ALPA received the summary, and continuing to the present, ALPA members have harassed pilots accepting junior/senior manning, coinciding with the precipitous drop in junior/senior manning.  For example:

During 2007 so-called ***"Rat Lists"*** were posted at various locations in the United system.  For instance, in Chicago Flight Operations, names of pilots have been posted on both the inside and outside of ALPA's locked glass case bulletin board, and placed in pilot company mailboxes, who are alleged to be "rats" by having accepted Junior/Senior man trip assignments.  (*Id.* at ¶ 27.)  These lists have included pilots' phone numbers and addresses and were clearly intended to intimidate those who accepted junior/senior manning assignments and portray them as traitors to their colleagues.  (*Id.*)  Over the course of the year, fewer pilots accepted junior/senior manning assignments.  (*Id.* ¶ 32.)

Some pilots have reported receiving massacre/horror novels at home, harassing e-mail messages and phone calls, typewritten threatening notes, pornography, falsified mortgage

applications and subscriptions and rat figurines.  (*Id.* ¶ 28.)  Some pilots were so concerned about this harassment they contacted the police and US Postal Service for assistance.  (*Id.*)

On June 10, 2008, an ALPA member, F/O Gabriel Wright sent a message through United's "e-note" system, used by pilots and flight attendants, to a Captain, stating "***Just to let you know your F/O junior manned this trip with you...for what it's worth***...the 2172 group." (*Id.* ¶ 65; Ex. 21 (emphasis added).)

F/O Wright also sent a harassing e-note message on that same day directly to the F/O who had accepted the voluntary assignment, highlighting ALPA prohibition against junior/senior manning "Thanks for Junior Manning…. I know all of us 2172's really appreciate your unity and helping out the Company.  Again way to go and enjoy your vacation while we will soon be on the street."  (*Id.* ¶ 66; Ex. 22.)

### 2. ALPA's MEC Express Refusal To "Allow" Junior/Senior Manning.

ALPA has expressly directed its pilots not to accept junior/senior man assignments.  In a "Special MEC Update" video message in April 2007, then-MEC Chair Bathurst reminded pilots that "junior-senior manning, which was originally designed as a tool for irregular operations . . . slows down recalls and promotions. . . .  Until our work rules and compensation are restored, these issues should be carefully considered before waiving any part of our contract." (*Id.* ¶ 29; *see also id.* at Ex. 4.)

To the extent there is any question that ALPA is behind the refusal to junior/senior man, ALPA removed all such doubt when, in January 2008, the MEC adopted a resolution to change its Policy Manual to state "Although allowed in the Collective Bargaining Agreement, the UAL-MEC does not endorse the use of [Junior Manning/Senior Manning] as a manpower planning tool."  (*Id.* ¶ 30; Ex. 4.)   In May 2008, ALPA specifically told its members not to accept United's requests for junior/senior manning to avoid cancellations, reiterating its

position that ALPA is "opposed to JRM/SRM being used as a manpower planning tool." (*Id.* ¶ 31; Ex. 5.)

### 3. United's Inability to Use Junior/Senior Manning Because of ALPA's Directives.

Historically, the number of pilots accepting requests for junior/senior manning has averaged more than 430 per month, and in periods of severe need it frequently rises to as many as 182 pilots in a single weekend. (Carlson Decl. ¶14.) As a result of ALPA's campaign, however, the number of pilots accepting junior/senior manning requests from January to July 2008 has averaged only 83 per month. (*Id.*) The number of acceptances has averaged less than three pilots a day out of a workforce of almost 6500 pilots. (Kasper & Lee Report at Ex. 8.)

As part of its efforts to address this problem without resorting to litigation, United changed its staffing model and increased its reserve pilot staffing (*i.e.* pilots who are on "stand-by" to fly, but who do not have a specific flight assignment) from 13% to 17%, which is a 30% increase. (Carlson Decl. ¶ 16.) However, because of the sick leave abuse discussed below, even United's attempt to work around ALPA's refusal to allow junior/senior manning cannot stop cancellations now.

### E. ALPA's Encouragement OF A Sick-Out Among Junior Pilots.

#### 1. The Junior Pilots' Sick-Out.

One of the most common tactics in a pilot slowdown is an increase in sick leave. *See Am. Airlines v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909 (N.D. Tex. 1999). While United maintains a group of reserve pilots designed to cover a normal number of sick calls, a substantial increase in sick calls can exceed the number of available reserve pilots, and when pilots refuse to accept junior/senior manning requests to cover those open flights, United is forced to cancel flights. (*See generally* Carlson Decl. ¶¶ 8-10, 14-15.) Given the pilots' steadily increasing sick

leave usage since mid-2006, United had already increased staffing to try to avoid such cancellations.

While in May 2008, the highest number of pilots on the sick list on any given day was 350, beginning June 5, 2008, the sick list began a steady and swift increase from a low of 327 on June 5, 2008, to a high of 497 on June 30, 2008.  (*Id.* ¶ 11.)  On July 16, 2008, 470 United pilots were on the sick list, which number jumped to 493 the next day, and again to 525 on Friday, July 18, 2008.  (*Id.*)  Over the weekend of July 19 and 20, 2008, 538 pilots were on the sick list each day, resulting in the cancellation of 58 flights on Sunday (July 20, 2008) due to lack of crew.  (*Id.* ¶ 12.)  On Monday, July 21, 2008, with a sick list of 510 pilots, United was forced to cancel 77 flights due to the lack of a crew.  (*Id.*)  This most recent spike in sick leave is largely driven by junior pilots who serve as first officers on United's narrow-body Airbus 320 Boeing 737 aircraft.  The sick list has remained significantly above what is considered normal or typical for pilots who fly that aircraft.  For example, from June 4 through July 27, 2008, sick rates among 737 narrow-body F/Os has been more than double the average for the past three and a half years.  (*Id.*)  As of July 29, 2008, the narrow-body F/O sick list has not dissipated.  (*Id.*)

The anecdotal and statistical evidence confirms that the only explanation for this enormous increase in sick leave usage among the A320 and 737 F/Os is concerted action.  There is a considerable amount of circumstantial evidence that Defendant Anthony Freeman administers and maintains a private, password-protected website called "www.ual2172.com," and that this web site has been used by Freeman and others to facilitate communications among a group of junior United pilots known as the "UAL 2172," (Milone Decl. ¶ 54-55), including communications orchestrating a concerted "sick out" in violation of the RLA.

On May 13, 2008, an e-mail message was sent laying out "the plan," stating that "Work as a group with the leaders of our union... we need to have a cohesive voice as the junior pilots here at United." (Vaughn Decl. ¶ 13; Ex. 5). The communication further laid out the steps the group intended to pursue to implement their plan including a letter to 500 of the 2172 pilots furloughed after 9/11 that clearly indicates the group was planning a job action during the summer:

- "I am hoping by writing you today that I can get the 2172 to work hard today and ***not wait for our leverage of the busy summer months to disappear.***" (*Id.* (emphasis added).)

- "***Summer is our leverage as a pilot group. . . . The 2172 must become cohesive fast to use this summer as leverage***." (*Id.* at Ex. 7 (emphasis added).)

On June 4, 2008, the group forwarded the MEC's June 4 letter via e-mail, stating at the end of the e-mail message, "Please log on to the ual2172.com site today and tomorrow as we gather to discuss on how to deal with the issues of the stress and fatigue in our current work environment. We will be asking for volunteers of the 2172 to help counsel those members on the issue relating to fatigue as well." (*Id.* ¶ 13; Ex. 7.)

On June 12, 2008, according to travel records, it appears that the three members of the IRC, the Chairman of the ALPA Strike Preparedness Committee, Jim Andersen, and Tony Freeman met in Los Angeles. (Milone Decl. ¶ 59.) This meeting strongly suggests that Freeman worked with ALPA's job action arm, the IRC, to organize and coordinate the recent sick out.

On June 18, 2008, the 2172 group further signaled its ties to the ALPA MEC in an e-mail message from Freeman, stating that "***it will be imperative to pay attention to all communications put out by the MEC.*** It will imperative for us to keep in touch with each other." (Vaughn Decl. ¶12; Ex. 7.) Indeed, the group connects itself to the MEC, stating "You are not being leveraged or held hostage by our current MEC..." (*Id.* at Ex. 3) The e-mail

-21-

message vowed that "We will not allow what happened to us before to happen again. Not quietly and without repercussions anyway." (*Id.* at Ex. 7)  It concluded: "keep your ears open. Keep in touch through the [phone] tree and through your friends here.  ***It's going to get interesting***."  (*Id.* (emphasis added).)

On June 28, 2009, an e-note message to Tony Freeman from F/O Hemant Bhana suggests a concerted effort at work and further confirms Freeman's involvement in ual2172.com, "Hey Tony, I'm one of the 2172 and have enjoyed the spirited debate on the bulletin board. Could you please call me when you have a free minute? ***I'd like to ask you some questions about what is going on.*** Waiting for info is agonizing. … Regards, Hem."  (Milone Decl. ¶ 62; Ex. 19) (emphasis added).)  Similarly, a July 2, 2008 e-note message to F/O Jeff Jaslow from F/O Octavio Trippe further indicates the concerted activities of the 2172:  "Jeff-- Sent an email to 2172.com and have had no response, but I'm sure u r a busy guy like me!! Pls call to discuss some 2172 ideas. Tavo Trippe, DENFO 737 F/O …."  (*Id.* at ¶ 63; Ex. 20.)

As a result of the spike in sick leave, on July 20, 2008, the Company enforced a doctor's certification requirement for sick leave use by A320 and 737 F/Os to try to stem the tide of sick usage.  (*Id.* ¶ 47.)  Sick leave usage has not dissipated since then and ALPA, as well as individual pilots, have suggested ways to circumvent the Company's doctor's certification requirement, as described in detail below.  (*Id.* at ¶¶ 48-49, Exs. 12, 13.)

From a statistical perspective, the percentage increase in sick rates among A320 and 737 F/Os over the past seven weeks compared to the prior three years removes any doubt that the sick-out was a concerted effort and not simply chance.  The 737 F/Os engaged in a 103.4% increase in sick rates and the A320 F/Os engaged in a 61.0% increase in sick rates.

(Kasper & Lee Report at Ex. 4.)  Indeed, there is a zero percent probability that the observed difference in sick rates is "random."  (*Id.* ¶ 7)

### 2.    ALPA's Direct Involvement.

There is very strong circumstantial evidence of ALPA's involvement with the 2172 and the ongoing sick-out.  In addition to Freeman's apparent meeting with ALPA's secretive IRC and the Chairman of the Strike Preparedness Committee on June 12, 2008, ALPA's communications to the pilots both explicitly and implicitly encourage the sick-out.

On July 15, 2008, ALPA issued an statement on fatigue, providing "Obviously, if a pilot is fatigued, he does not know when he will no longer be fatigued until after he gets some rest. . . . pilots should just give the crew desk a time estimate far enough into the future to ensure adequate rest…"  (Milone Decl. ¶ 45; Ex. 11.)

Also on July 15, 2008, Capt. Wallach issued a letter stating "We face a focused, hostile and arrogant management group: a management group that gives not a damn about you, your well-being, or the well-being of your family."  He concluded, "You will see renewed and focused efforts on the part of your union that will highlight the importance of United pilots' contributions to this airline*.  **Do not discount the efforts all of us make each and every day that enable this company to operate.  We cannot get out from under the present contract on time if we do not begin our work now***."  (*Id.* ¶ 44; Ex. 10 (emphasis added).)

On July 22, 2008, Capt. Wallach issued a letter to pilots that could only be read to encourage the sick-out. Although he paid lip-service, in one sentence of the two-page letter, to ALPA's obligation under the RLA not to engage in such behavior, the rest of the letter undercut this.  Capt. Wallach told pilots that "Sick leave, and the pay that goes with it, is a contractually negotiated benefits to be used for a specific purpose and in specific situations.  (*Id.* ¶ 49; Ex. 13.) He listed a variety of reasons to call in sick, including stress and emotion and also advised pilots,

with respect to the Company's required doctor's certification, that "How many of the non-fitness items listed above can be measured by a physician? ***Some of them can only be detected by the pilots***. Nonetheless, it is your legal obligation not to fly if you are not fit to do so. ***You may have to explain that to your doctor.***" (*Id.* (emphasis added).)

At the same time, Capt. Wallach issued a separate letter reassuring pilots that United was not in danger of bankruptcy, implying that any job action would not put United "over the edge," but would make the Company pay attention. (*Id.* ¶ 51; Ex. 15.) On that same day, the MEC Update began with a segment called "Focus on Fatigue," with a quote from 2000: "no pilot should ever feel pressured to accept an assignment when properly rested." (*Id.* at ¶ 50, Ex. 14)

On July 25, 2008, ALPA issued an MEC "Unity Update" stating "Fatigue, stress, illness, exhaustion, anger, fear, depression, resentment, uncertainty, frustration and disrespect are all being crammed down our throats by a company that gives not a damn about goodwill, morale, its employees or its customers. So, how's your summer going? **Leverage does not just show up, unannounced, on one's doorstep. Unified pilots create leverage.**" (*Id.* ¶ 52; Ex. 16.)

Even if ALPA did not directly plan the sick-out, ALPA most certainly ratified it. Indeed, ALPA's communications quoted above are a blueprint for how to effectuate a sick-out.

**F.    The Irreparable Injury To United And Its Customers Caused By ALPA's Unlawful Job Action.**

As discussed in Section II.A below, the "traditional showing of irreparable injury" is not required to obtain a preliminary injunction against a violation of Section 2, First of the RLA. *See United Air Lines*, 243 F.3d at 362. To the extent that the Court has any question about the propriety of a preliminary injunction, however, the significant harm that ALPA's conduct poses to United and its customers strongly militates in favor of a preliminary injunction. *See Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997) (where

the actual or threatened harm to the moving party is significant, the likelihood of success on the merits need only be "better than negligible").

         **1.**      **Fuel Cost Increases Have Put the Entire Airline Industry in a Precarious Financial Position.**

The sharp increase in oil prices over the last few years, while threatening the entire U.S. economy, has been particularly challenging to the airline industry. In December 2002, when United entered Chapter 11, the cost of jet fuel was approximately $1 per gallon. By January 2006, when United exited bankruptcy, the cost had risen to $2 per gallon. Currently, the price is $4 per gallon -- a 300 % increase over 2002, and a 100 % increase in the last 16 months alone. (Kasper & Lee Report at Ex. 16.) In 2002, fuel represented roughly 18 % of an airline's total revenue; today, it represents almost 40 %. (*Id.* ¶ 18) For example, United anticipates that it will spend roughly $9.2 billion for fuel in 2008, a $3.3 billion increase over 2007, and a $3.5 billion increase over 2006. (McDonald Decl. ¶ 9.) As a result of these increased fuel costs, United had an adjusted net loss of $2.7 billion in the second quarter alone. (*Id.* ¶ 7.)

The airline industry simply cannot sustain the current price of fuel. While airlines have some ability to pass increased fuel costs on to the customer, that ability is limited because the demand for air travel is elastic, meaning that every time an airline increases fares by a dollar some portion of the public will chose not to fly. (Kasper & Lee Report at ¶ 21.) Thus, many airlines currently face the Hobson's choice of selling tickets at a loss or not selling the ticket at all. The only course available to the industry is to reduce capacity until the smaller supply of airline seats equals demands for those seats at the price that airlines must charge to make a profit given current fuel prices. Accordingly, most industry experts believe that the industry as a whole must cut capacity by a substantial margin to reach that point. (*Id.* ¶ 22.)

As a result of this situation, eight smaller U.S. airlines -- MAXJet, Big Sky, Aloha, ATA, Skybus, Eos, Champion and Air Midwest -- have gone of out business entirely since December 2007, and a ninth, Frontier Airlines, has filed for bankruptcy protections. (Kasper & Lee Report at ¶ 18, fn. 14.)   At the same time, every major U.S. carrier except Southwest Airlines has announced large reductions in capacity, and furloughs of the associated employees, over the last few months.  (*Id.* ¶ 23.)

- Northwest Airlines has announced that it would reduce its domestic mainline capacity by 18 to 19 percent in the fourth quarter of 2008, remove 47 aircraft from service and eliminate 2,500 jobs.  <u>*See*</u> "Northwest Airlines Reports Second Quarter 2008 Results", Northwest Airlines Press Release, July 23, 2008 and "Northwest Predicts Revenue Boost From Capacity Cuts," *Aviation Daily*, July 24, 2008

- US Airways has announced it will reduce domestic mainline capacity by six to eight percent in the fourth quarter of 2008 and by eight to ten percent in 2009.  *See* "US Airways Group, Inc. Reports Second Quarter 2008 Results", Business Wire, July 22, 2008.

- American Airlines has announced that it would reduce domestic mainline capacity by 11-12 percent in the fourth quarter of 2008, retire 64 mainline and 63 regional aircraft from its fleet and eliminate 6,500 jobs (approximately 8 percent of its workforce).  *See* "AMR Corporation Reports Second Quarter 2008 Net Loss of $284 Million Excluding Special Items as Record Fuel Prices Drove $838 Million in Higher Costs Compared to a Year Ago", Company Press Releases, July 16, 2008, and "American Airlines' parent AMR to cut 6,500 or more jobs", The Dallas Morning News, July 3, 2008.

- Continental Airlines has announced that it would shrink domestic capacity by 10 percent starting in September, retire 67 aircraft and eliminate 3,000 jobs.  "Continental Airlines Announces Second Quarter Loss." PRNewswire-First Call, July 17, 2008.

- Delta Air Lines has announced it would reduce domestic capacity by 13% in the second half of 2008 by removing 15-20 mainline and 100 regional jet aircraft from its fleet by the end of 2008.  Delta Air Lines Reports June 2008 Quarter Financial Results", Company Press Release, July 16, 2008 and "Delta Air Lines Reports March 2008 Quarter Financial Results", Company Press Release, April 23, 2008

- Midwest Airlines has announced that it would reduce capacity by 30 to 40 percent and eliminate 40% of its workforce.  "Midwest Airlines will reduce flights from Kansas City This Fall", *The Kansas City Star*, July 20, 2008 and "Nine SkyWest CRJ200s to exit the Midwest Connect Network", *Air Transport Intelligence*, July 21, 2008.

- AirTran has announced it would reduce capacity in the last four months of 2008 by seven to eight percent and by four to eight percent in 2009. "AirTran Holdings Inc., Reports Second Quarter Results", *PRNewswire-First Call*, July 29, 2008

Consistent with the rest of the industry, United announced on June 4, 2008, that it would retire 100 older aircraft during the fall of 2008, and reduce its flying 14 percent compared to 2007, and reduce its workforce, including salaried and management employees, by a similar amount.  (McDonald Decl. ¶¶ 10-12.)  On June 23, 2008, the Company informed ALPA that this reduction would result in furlough notices to approximately 1,450 pilots and would result in furloughs of approximately 950 active pilots.  (*Id.* ¶ 13.)  As explained above, it is these announcements that preceded the sharp increase in sick leave that United suffered in July.

### 2.     Unless Enjoined, ALPA's Unlawful Actions Will Continue to Inflict Harm to United and Its Reputation.

Given the precarious financial position facing United and other U.S. airlines, United can little afford to further damage from any source, much less its own employees. ALPA's unlawful campaign, however, has done just that.  More importantly, unless this Court enjoins the conduct ALPA is likely to continue -- and presumably intensify -- the campaign through December 31, 2009 -- the duration of the current agreement between the parties -- or longer if the parties cannot reach an agreement by that date.

***First,*** ALPA's campaign has caused direct financial harm to United through increases in United's costs or reductions in profit.  The virtual elimination of United's ability to use junior/senior manning has required the Company to increase the number of reserve pilots from 13% of the pilot workforce to 17% to date, and that direct cost of that increased staffing is

roughly $15 million a year.  (Carlson Decl. ¶ 16.)  Likewise, the 300-plus flight cancellations experienced by United over the last two weeks cost United roughly $8.05 million in lost revenue, and approximately $3.9 million in net lost operating profit.  (McDonald Decl. ¶ 18.)

**Second,** and potentially much more damaging, is the long-term harm to United's reputation and customer goodwill.  Any unnecessary delay or cancellation -- particularly for something as inexplicable to the public as not having a pilot available for the flight -- will cause at least some percentage of United's customers, whether they were affected directly by the delay or cancellations or who heard about it from a friend, family member or colleague, to question whether to book United for future travel.  As one expert has observed, "Slowdowns bring a potent form of pressure to bear upon a carrier because inconvenienced, irate passengers caught in the middle of such a war between an airline and its employees are likely to take their business elsewhere, given the choice."  James J. McDonald, Jr. & Ephraim Asher, *Airline Employee Slowdowns and Sickouts as Unlawful Self Help: A Legal and Statistical Analysis*, 55 J. Air L. & Com. 349, 359 (1990).  The effect of any single delay or cancellation may be impossible to quantify with precision but it undoubtedly has an adverse effect of the airline.

If the pattern of delays and cancellations becomes so pronounced that it receives press coverage or generates discussion among the carrier's frequent fliers, the harm is even greater.  The best illustration of this fact -- and one that needs no evidentiary support for anyone who lived in Chicago at the time -- was ALPA's sustained job action during the summer of 2000.  The long-term damage to United from that job action, and the publicity it generated, cannot be understated.

### 3.    ALPA's Campaign Has Already Inconvenienced At Least 36,000 Members of the Traveling Public, and Unless an Injunction Is Issued That Number Will Continue to Grow.

Although the harm to United is significant, it is not the most important factor the court should consider in issuing injunctive relief.  The purpose of the status quo obligation under the RLA is not to protect carriers or unions; it is to protect the public by avoiding interruptions to commerce caused by labor disputes.  Thus, the harm caused to United's customers by ALPA's unlawful job action that is an independent basis for injunctive relief, and the public interest alone demands that a preliminary injunction be issued.

Over the last two weeks, United estimates that approximately 36,000 members of the traveling public have had their flights cancelled because United did not have a pilot available to operate the flight.  (McDonald Decl. ¶ 20.)  While there is no way to predict with certainty whether the number of cancellations will increase or decrease in the coming months, every single cancellation will disrupt some customer's travel plans, and with 18 months to go under the current United-ALPA collective bargaining agreement there will undoubtedly be more members of the public who are inconvenienced -- and perhaps many more.

### G.    United's Efforts To Resolve This Dispute Without Judicial Intervention.

United has made numerous efforts to resolve its dispute with ALPA without seeking judicial intervention.  Only when it became clear that those efforts would be unavailing, and that the failure to act could inflict significantly greater harm on United and its customers, did United seek injunctive relief.

*First,* rather than resort to the court when ALPA eliminated United's ability to obtain junior/senior manning assignments, United increased its reserve pilot staffing -- ultimately by 30 percent over its historical staffing levels -- at significant expense.  (Carlson Decl. ¶ 16.)

While United could have gone to court earlier, it believed that by addressing ALPA's underlying concerns the parties could resolve the issues without a legal confrontation.

  **Second,** United has tried for 18 months to resolve ALPA's stated concerns about the adverse effect that the work rules under the existing agreement had on the pilot workforce, reaching several agreements that addressed those concerns.  Every time the parties reached an agreement, however, ALPA has moved the bar, and increased its denunciation of United management.  (Milone Decl. ¶ 24.)

- ALPA began the current campaign in January 2007, under the moniker "Fix It Now."  (*Id.* ¶ 11.)  ALPA's primary assertion in the Fix It Now campaign was that the work rules in the existing agreement -- in particular, the lack of "line guarantees" and "LCO pay rigs" -- had an unnecessarily adverse effect on quality of life for more junior pilots. United agreed to discuss changing these rules, but asked that ALPA agree to change other rules in the agreement so that the overall impact of the changes would be cost-neutral on United.  (*Id.* ¶ 15.)

- After several months of negotiations, the parties reached a 19-page Letter of Agreement that both United, and ALPA's leadership at the time, believed addressed both parties' concerns in a fair manner.  That agreement, dated March 16, 2007, was submitted to ALPA's membership for ratification.  A portion of United's pilots who believed the Company should have agreed to ALPA's requests for modifications without any "quid pro quo" opposed the agreement, however, and it failed ratification. (*Id.* ¶ 17.)

- On February 21, 2007, contemporaneous with these negotiations, United and ALPA reached agreement on providing new crew rest facilities for pilots on certain of United's B777 aircraft.  This agreement was ratified by ALPA's MEC which subsequently attempted to rescind the ratification. United insisted that an agreement had been reached and that ALPA's effort to rescind the agreement was null and void.  A grievance was filed and on April 11, 2008 Arbitrator David L. Beckman denied the grievance and upheld the agreement.  (*Id.* ¶ 18.)

- On September 21, 2007, the parties reached agreement on implementation of a web-based trip trading program that ALPA and United believed would make it easier for pilots to trade trips.  (*Id.* ¶ 19.)

- On October 1, 2007, the parties reached agreement on changes that addressed the minimum block hour guarantee, a provision which guarantees United's pilots an agreed upon level of flying. (*Id.* ¶ 20.)

- On January 25, 2008, after current MEC Chairman Steve Wallach took office, United and ALPA reached agreement on the modifications to the two work rules, line guarantees and LCO pay rigs, that had been major subjects of the Letter of Agreement in March 2007. These were the changes to which the parties agreed in March 2007, but without the offsetting modifications sought by United. United agreed, in effect, to modify its prior position because Capt. Wallach said it would be viewed by the pilots as a "show of good faith" by the Company that would improve the relationship between the parties. (*Id.* ¶ 21.)

- On April 18, 2008, United agreed with ALPA on a Memorandum of Understanding to address fatigue-related issues. (*Id.* ¶ 22.)

- On July 11, 2008, after United announced the need to reduce capacity and furlough pilots, United and ALPA reached a Letter of Agreement on Furlough Mitigation that was designed to minimize the number and effect of involuntary furloughs on the pilot workforce. (*Id.* ¶ 23.)

Despite 18 months of negotiations and six different agreements designed to address ALPA's concerns, it became clear to United when Capt. Wallach published his letter of July 15, 2008, that ALPA had no real interest in resolving the parties' disputes through negotiations, and that ALPA was merely positioning itself for a long battle with United.

***Third,*** in an effort to avoid seeking court intervention over the sick leave action that become apparent in mid-July, United's Senior Vice President, Labor Relations, P. Douglas McKeen, had multiple communications with ALPA's counsel, Robert Nichols, as well as with MEC Chairman Wallach, to persuade ALPA to put an end to the job action. (*Id.* ¶ 24.) As detailed above, however, ALPA's statements to its members have been designed to encourage, not stop, this job action. Given the history between the parties, United concluded that it had no choice but to seek injunctive relief.

## ARGUMENT

**I.    ALPA'S SLOWDOWN CAMPAIGN CLEARLY VIOLATES ITS STATUS QUO OBLIGATIONS UNDER THE RAILWAY LABOR ACT.**

### A.    The RLA Prohibits A Union Or Its Members From Engaging In Any Form Of Economic Self-Help During The Term Of The Parties' Agreement.

The principal purpose of Congress in enacting the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA"), was to prevent strikes or other interruptions to the nation's transportation systems.  45 U.S.C. § 151a (2008); *Tex. & New Orleans  R.R. Co. v. Bhd.  of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930).  To this end, Section 2, First of the RLA provides that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert *every reasonable effort to make and maintain agreements* concerning rates of pay, rules, and working conditions . . . *in order to avoid any interruption to commerce or to the operations of any carrier* growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152, First (emphasis added). The restrictions of Section 2, First of the RLA apply equally to individual members of the union as to the union itself.  *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 238 F.3d 1300, 1309, fn. 9 (11th Cir. 2001), *cert. denied* 532 U.S. 1019 (2001) (noting that the RLA imposes a duty to maintain agreements on "employees" and finding that the District Court failed to "enforce this clear provision of the RLA" when it did not enjoin individual pilots from engaging unlawful campaign to refuse overtime).

The Supreme Court has described Section 2, First as "[t]he heart of the Railway Labor Act."  *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377 (1969); *United Air Lines, Inc.*, 243 F.3d at 361 (hereinafter "the "*IAM* case").  For this reason, the Supreme Court has held that the duty to make and maintain agreements without interruption to the carrier's operations is not "a mere statement of policy or exhortation to the parties."  *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971).  Rather, it is an affirmative

legal obligation, enforceable by injunction, without regard to the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.  See Chi. & N.W. Ry.*, 402 U.S. at 581.

The prohibition against economic self-help by a union applies not only to strikes, but to any alteration of the status quo that is designed to put economic pressure on the carrier. Accordingly, the Seventh Circuit has made clear that, under Section 2, First, courts are authorized to "enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns and sit-ins." *United Air Lines*, 243 F.3d at 362 (citing *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)); *Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982) ("[t]hat the overtime was designated as voluntary in the contract does not . . . render the concerted refusal to perform it any less a strike").  Indeed, federal courts have routinely invoked this principle to enjoin slowdowns, *e.g.*, *United Air Lines*, 243 F.3d at 369; *Pan Am. World Airways v. Transport Workers Union*, 117 L.R.R.M. (BNA) 3350, 3351 (E.D.N.Y. 1984); *Trans World Airlines v. Int'l Ass'n of Machinists*, 75 Lab. Cas. (CCH) ¶ 10,312 (W.D. Mo. 1974); sickouts, *e.g.*, *Pan Am. World Airways v. Transport Workers Union*, 117 L.R.R.M. (BNA) at 3351; *Pan Am. World Airways v. Indep. Union of Flight Attendants*, 93 Lab. Cas. (CCH) ¶ 13,307 (S.D.N.Y. 1981); work-to-rule programs, *e.g.*, *Long Island R.R. Co. v. Sys. Fed'n No. 156, Am. Fed'n of Labor,* 368 F.2d 50, 52 (2d Cir. 1966); *Tex. Int'l Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203, 216 (S.D. Tex. 1981); "safety" campaigns, *e.g.*, *United Air Lines*, 243 F.3d at 369; special union meetings designed to interrupt operations, *e.g.*, *ITASCA Lodge 2029 v. Railway Express Agency, Inc.*, 391 F.2d 657, 663 (8th Cir. 1968); increased write-ups of maintenance problems, *e.g.*, *Long Island R.R.*, 368 F.2d at 52; *Texas Int'l Air Lines*, 518

F. Supp. at 207; and concerted refusals to work overtime, *e.g.*, *Delta Air Lines, Inc.*, 238 F.3d at 1311; *United Air Lines v. Int'l Ass'n of Machinists*, 54 L.R.R.M. (BNA) 2154 (N.D. Ill. 1963).

Under the RLA's status quo rule, it does not matter whether the individual employees have a right under the existing collective bargaining agreement to take the action, or refuse the duty, in question. This issue was definitively resolved in the *Shore Line* case, in which the Supreme Court held that the status quo obligation requires the parties "to preserve and maintain unchanged those *actual, objective working conditions and practices, broadly conceived*, which were in effect prior to the time the pending dispute arose," regardless of whether the parties have a contractual right to change the existing practices. *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 153 (1969) (emphasis added). Under *Shore Line*, it is the existing practices, and not the parties' contractual rights, that define the status quo. *See*, *e.g.*, *United Air Lines*, 243 F.3d at 349 (finding injunction appropriate where, among other things, union members refused voluntary overtime); *Delta Air Lines*, 238 F.3d at 1311 (same). Thus, even if ALPA claimed that there was a contractual justification for the concerted refusal to accept junior/senior manning, for example, an injunction prohibiting any alteration of the status quo would still be appropriate. *See Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1042 (1990) (union may not exercise self-help in a minor dispute even where its right to engage in the conduct in question raises an issue of contractual interpretation).

### B.     The Case Law Does Not Require Union Direction As A Predicate For Issuing A Preliminary Injunction

Even if the Court were to accept the incredible premise that ALPA neither authorized nor ratified the slowdown campaign, the Seventh Circuit has made clear that "[a] union has the affirmative duty under the status quo provisions of the RLA to exert every

reasonable effort to prevent or discourage a strike or a concerted work action . . . ."  *United Air Lines*, 243 F.3d at 363.  This duty applies regardless of whether the union sponsored or ratified the campaign.  *See Delta Air Lines*, 238 F.3d at 1309 n.22 ("The duty of ALPA under the RLA is sufficiently high that even if it has not sponsored or ratified the unlawful job action by the pilots, it has a duty to end such unlawful action").

In the *United v. IAM* case, United believed that the union representing its mechanics was engaged in a slowdown that involved increased maintenance write-ups, an increase in the length of scheduled maintenance checks, increased numbers of aircraft held out for unscheduled maintenance, increased flight delays and cancellations due to mechanical problems, and refusals to work voluntary overtime.  *United Air Lines*, 243 F.3d at 365-367.  Like the ALPA-endorsed sick out and slowdown here, the mechanics' slowdown was largely orchestrated and encouraged through publications that used *indirect* messages to exhort members to disrupt the airline's operations.  Numerous union- sponsored bulletins and other publications use code words to encourage a slow down, for example repeatedly emphasizing that the mechanics needed "work safe" and "keep safety first."  In the *United v. IAM* case, the union denied before the district court that it had encouraged any employee to violate the collective bargaining agreement or the RLA. Despite this, based on the union publications combined with statistical evidence of increases in the volume of maintenance work and resulting flight delays and cancellations, the Seventh Circuit found clear evidence of a union-authorized illegal job action and found the failure to issue a preliminary injunction to be an abuse of discretion.  *Id.* at 362-64.

In *Delta Air Lines*, the carrier sought a preliminary injunction against ALPA, alleging that Delta's pilots were engaged in an unlawful concerted refusal to work overtime.

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 123 F. Supp. 2d 1356, 1357 (N.D. Ga. 2000),

*reversed by* 238 F.3d 1300 (11th Cir. 2001).  The district court found that Delta's pilots were

engaged in a concerted refusal to work overtime, but denied Delta's motion for a preliminary

injunction, concluding that there was insufficient evidence to connect ALPA to the unlawful job

action.  The carrier appealed, arguing that an injunction was proper regardless of whether ALPA

sponsored the refusal to work overtime because, under the RLA, there is an absolute statutory

obligation for a union to do everything reasonably within its power to prevent such a disruption.

> The Eleventh Circuit agreed with the carrier, reversing and remanding the matter

to the district court with instructions to issue an appropriate injunction.  The court stated:

> > The district court erred in failing to appreciate the depth and
> > seriousness of the duty to "make and maintain agreements" in a
> > way so as "to avoid any interruption to commerce or to the
> > operation of any carrier." 45 U.S.C. § 152 First. . . .
> >
> > ***The district court's error came in its decision that it would "not
> > hold that a union has an affirmative duty to end or prevent the
> > unilateral unlawful activity of its members.***"  The RLA imposes
> > such a duty on the union in section 152 First, and the district court
> > should have enforced that duty. . . .  ALPA is statutorily bound to
> > do everything possible to "maintain" the CBA so that commerce is
> > not in any way interrupted.  We are not satisfied that ALPA has
> > fulfilled this duty.  Therefore, ***the district court, on remand,
> > should enjoin ALPA to take specific steps aimed at stopping the
> > pilots' no-overtime campaign and resuming normal operations of
> > Delta's operations, including its overtime scheduling***.

> *Delta Air Lines*, 238 F.3d at 1308-09 (Emphasis added).[4]

---

[4] A number of other courts likewise have properly issued injunctions against the unions that represent the
employees engaging in those actions even if the union is not found to have authorized the unlawful
action,.  *Northwest Airlines, Inc. v. Local 2000, Int'l Brotherhood of Teamsters*, 163 L.R.R.M. 2460 (D.
Minn. 2000); *Am. Airlines, Inc. v Transport Workers Union*, No. 499-CV-10066-Y (N.D. Tex. Dec. 29,
1999); *Comair, Inc. v. Air Line Pilots Ass'n*, No. 99-250 (E.D. Ky. Dec. 21, 1999).  In each of these
cases, like the present, the unions claimed that they had no responsibility for the job actions in question
and in each case, the court properly rejected this argument and issued an injunction enjoining the job
action.

On multiple occasions, United has provided ALPA with notice and evidence of the pilots' ongoing job action and requested that ALPA take immediate steps, as required by the RLA, to prevent the action from continuing.  The concerted activity, however, has continued unabated, and there is no evidence that ALPA has exerted *any* effort, much less "every reasonable effort" to discourage pilots from engaging in the slowdown conduct.  Thus, a preliminary injunction must issue to force the union to undertake the efforts it is required to under the RLA to stop ALPA from engaging in the illegal activity.  *See United Air Lines*, 243 F.3d at 363 ("[o]nce a court determines that such a concerted work action is occurring in violation of the RLA, an injunction can issue ordering the union to observe its statutory duty by trying to stop it"); *Delta Air Lines, Inc.,* 238 F.3d at 1309.

### C.     The Evidence Overwhelmingly Establishes That ALPA Is Encouraging, And Its Members Are Engaged In, An Unlawful Slowdown To Put Pressure On United.

Even assuming ALPA's direct involvement were a predicate to a preliminary injunction, that requirement is fully satisfied in this case.  The evidence overwhelmingly establishes that ALPA has directed, and its members have engaged in, a slowdown campaign that constitutes an unlawful violation of the status quo.  It has done so with the avowed purpose of putting pressure on United to agree to negotiate the parties' contract well before its amendable date of January 1, 2010 and stopping United from exercising its rights under the CBA to reduce its fleet and furlough pilots, as United must do under the current financial circumstances.  Indeed, there is "clear proof" that ALPA has promoted these job actions in violation of the status quo.  *See United Air Lines,* 243 F.3d at 366 (stating that to issue an injunction against a union for having engaged in a status quo violation, carrier must present "clear proof" that the union directed employees to engage in the status quo violation).

*First*, the ALPA publications and other communications described above are, on their face, blatant violations of the status quo obligation under the RLA.  In those communications, ALPA officials have encouraged ALPA members to alter their normal behavior with regard to sick leave, junior/senior manning, and contractual waivers for the express purpose of putting pressure on United to negotiate contract concessions and halt furloughs.  Some of these directions are thinly-veiled, but no one familiar with the status of negotiations at United and the history of such campaigns among pilot groups could interpret the messages from ALPA officials to be anything other than a direction to engage in a concerted effort to "Fly the Contract."  *See, e.g.*, *United Air Lines*, 243 F.3d at 366 (suggestions to "work safe" or "work by the book" are "commonly recognized signals" for a work slowdown and "[g]iven the context in which the 'work safe' messages appeared and the prominent nature of their display, their obvious intent was to urge mechanics to engage in a work slowdown"); *Northwest Airlines, Inc. v. Local 2000, Int'l Brotherhood of Teamsters*, 163 L.R.R.M. 2460 at 6 (D. Minn. 2000) (unpublished) (slip opinion attached hereto as Ex. A) (the union's sick-out strategy was publicized through intentionally "cryptic" messages); *Tex. Int'l Airlines*, 518 F. Supp. at 210-11 (advice to "adhere to company policies, and contractual agreements," and "to check every item on the checklists," were sent with understanding that pilots would interpret it as a call for a slowdown).

*Second*, while ALPA's leaders have publicly denied that ALPA has authorized or directed the job action, those denials are not entitled to any weight.  *See Northwest Airlines*, Slip Op. at 9 ("The union's public posture may be one of denial, but the evidence indicates that its private strategy is one of advocating a concerted 'sick-out'").  As commentators have noted, because job actions of this sort are blatantly illegal, union leadership will inevitably try to conceal its involvement in the campaign.  McDonald & Asher, 55 J. Air L. Com. at 355, 360.

Common sense dictates that if the union has decided to engage in an unlawful job action, it is not going to admit it is doing so. *United Air Lines*, 243 F.3d 366-67 (finding, based on circumstantial evidence, that union directed slow down despite union's strenuous denials).

*Third*, even assuming against all evidence that ALPA has not been directing and facilitating the campaign, ALPA has undoubtedly ratified it. Even before discovery, the overwhelming statistical and anecdotal evidence that United's pilots are engaged in a concerted sick-out cannot seriously be disputed. *See supra* at 20-24. Despite its knowledge of these violations of the RLA, ALPA has done nothing whatsoever to stop or discourage the job action. For example, although the MEC assured the Company that it would issue a statement to the pilots after the Company raised the issue of the sick-out, instead, the MEC promptly put out a series of notices suggesting how to obtain doctor's certifications for "illnesses" without any physical signs, telling all pilots that United is not in danger of bankruptcy. (Milone Decl. ¶¶ 49-51); *see    Pan Am. World Airways, Inc. v. Indep. Union of Flight Attendants*, No. 81 Civ 3785, 1981 WL 2367 at *9 (S.D.N.Y. July 20, 1981) (finding evidence of union involvement in a sickout sufficient to support an injunction where, *inter alia*, the union did not take sufficient steps to discourage a planned sickout).

## II.     THIS COURT SHOULD ISSUE INJUNCTIVE RELIEF PROHIBITING THE UNLAWFUL CONDUCT PENDING A TRIAL ON THE MERITS.

Under Seventh Circuit case law, to obtain a TRO or preliminary injunction a party typically must show that (1) it is reasonably likely to succeed on the merits of its case; (2) it has no adequate remedy at law; (3) it will suffer irreparable injury if the injunction is not granted, and that this harm will outweigh the harm to the defendant if the relief is granted; and (4) that the injunction is not contrary to the public interest. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). The courts apply a "sliding scale" approach where if a claim is very strong

on the merits, little or no harm may be required to justify an injunction. *Id*. Conversely, where the potential harm is particularly great, the likelihood of success on the merits need only be "better than negligible." *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).

A.    **No Showing Of Irreparable Injury Is Required To Obtain An Injunction Against A Status Quo Violation Under The RLA.**

In *Consolidated Rail Corp. v. Railway Labor Executives Ass'n*, 491 U.S. 299 (1989), the Supreme Court held that "[t]he district courts have subject matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures *without the customary showing of irreparable injury*." 491 U.S. at 303 (emphasis added). The Seventh Circuit applied this principle in the *United v. IAM* case, directing the district court to issue a preliminary injunction without any consideration of whether United had shown irreparable injury, and rejecting the IAM's argument that the district court properly denied an injunction on the ground that United could deal with the job action by disciplining the individuals involved. *See United Air Lines*, 243 F.3d at 362 (finding that "[i]f either side unilaterally alters the status quo during the bargaining and mediation process, a court may issue an injunction to put a stop to that party's illegal self-help and to restore the status quo, and it may do so even without the traditional showing of irreparable injury to the other party").

Thus, upon a showing that a union or its members have altered the status quo, an injunction should issue as a matter of course. Here, ALPA's express directions to the pilots to alter the status quo justify injunctive relief without further analysis. ALPA has undeniably engaged in a campaign to stop pilots from following the parties' longstanding practices of accepting "junior/senior manning" assignments and waivers of contractual rest period and other requirements in order for the company to have flexibility to meet staffing needs. Indeed, the

MEC adopted a resolution in January 2008 to amend its existing Policy Manual -- that is, to alter the status quo -- to provide that the UAL-MEC "does not endorse the use of [Junior Manning/Senior Manning] as a manpower planning tool."  (Milone Decl. ¶ 30; Ex. 4.) This is exactly the conduct that the Eleventh Circuit found unlawful in the *Delta* case except that at Delta ALPA denied any direction to its members to refuse overtime flying whereas here ALPA has trumpeted in unlawful actions.

Likewise, ALPA has openly instructed pilots that they should "strictly adhere" to contractual requirements, and other synonyms for a "work to rule" campaign.  Again, this is precisely the type of activity that the Seventh Circuit held to be unlawful in the *United v. IAM* case except that the IAM denied authoring the documents directing this conduct whereas ALPA cannot dispute the numerous similar statements made by ALPA officers in ALPA publications.

### B.    Even If A Showing Of Irreparable Injury Were Necessary, United Has Suffered, And Will Continue To Suffer, Irreparable Injury As A Result Of The Slowdown.

Even if a showing of irreparable injury were required, that showing is easily met here.  As a result of ALPA's slowdown campaign, United has been forced to incur hundreds of flight delays and cancellations.  (Carlson Decl. ¶ 15; Kasper & Lee Report at ¶¶ 12-13.)  The resulting net operating profit loss for the past two weeks alone is $3.9 million, and these losses will continue unless the conduct is enjoined.  (McDonald Decl. ¶ 18.)  *See Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) (continuing financial harm sufficient to justify preliminary injunction). Some courts have held that monetary damages are not available to carriers for union violations of Section 2, First of the RLA.  To the extent this reading of Section 2, First is correct, then Defendants would be causing United irreparable harm by inflicting even garden-variety monetary damages on United, let alone the significant losses

United has suffered. Thus, without an injunction United would be left without any remedy whatsoever for actions that plainly violate the RLA.

Even if damages were available for direct monetary loss caused by ALPA's actions, there is no way to calculate the loss of customer goodwill and damage to reputation that United has suffered. *See Meridian Mut. Ins. Co.*, 128 F.3d at 1120 (loss of good will constitutes irreparable injury). "Slowdowns bring a potent form of pressure to bear upon a carrier because inconvenience, irate passengers caught in the middle of such a war between an airline and its employees are likely to take their business elsewhere, given the choice." *See* McDonald & Asher, 55 J. Air L. & Com. at 359.

## C.     The Public Interest Demands Issuance of Injunctive Relief to Prevent Further Harm to the Traveling Public.

In considering whether to issue injunctive relief, an important factor under the Seventh Circuit standards is the public interest. *Abbott Labs.*, 971 F.2d at 12. Here, the public interest demands issuance of an injunction to prevent further harm to the countless United passengers whose flights have been delayed or cancelled as a result of ALPA's actions, most recently during this busy summer vacation season. *See e.g.*, *Am. Train Dispatchers Dept. v. Fort Smith R.R. Co.*, 121 F.3d 267, 268 (7th Cir. 1997) *cert. denied* 522 U.S. 1016 (1997) (strike in violation of RLA enjoined because of disruption to commerce and inconvenience to passengers); *Chi. River & Indian R.R. Co. v. Bhd. of R.R. Trainmen*, 229 F.2d 926, 932 (7th Cir. 1956), *aff'd*, 353 U.S. 30 (1957) (interruption to transportation system is itself sufficient irreparable injury to justify injunction). To date, some 36,000 United customers have seen their flights cancelled, and their lives inconvenienced, by ALPA's conduct. (McDonald Decl. ¶ 20.) Absent injunctive relief, that number will only increase.

**D.    Any Assertion That Injunctive Relief Would Harm ALPA, or Threaten Safety, Is Without Merit.**

On its face, ordering ALPA and its members to refrain from altering the status quo imposes no legally cognizable harm whatsoever because merely requires them to satisfy their existing, and indisputable, legal obligations under the RLA.  *See Northwest Airlines*, Slip Op. at 9 (injunction "would simply prohibit the Defendants from engaging in illegal activity"). In balancing the equities, therefore, the court has on one side the enormous, indisputable harm to United and the traveling public, and on the other the side ALPA's "interest" in engaging in an unlawful job action whose existence it denies.

Facing this indisputable calculus, ALPA and other unions faced with a potential injunction under the RLA have frequently argued in these cases that issuance of the injunction would raise safety concerns because in the face of a court order employees would err on the side of efficiency rather than safety.  In particular, United anticipates that ALPA will argue that an injunction would force pilots to fly when they are too ill or fatigued to fly safely, or to accept aircraft that may be unsafe to fly.  For example, MEC Chairman Wallach took that approach in a July 22, 2008, letter to pilots in response to the recent surge in sick leave, effectively endorsing the improper use of sick leave under the guise of safety:  "How many of the non-fitness items . . . can be measured by a physician? . . .*Some of them can only be detected by the pilots*. . . *You may have to explain that to your doctor*."  (Milone Decl. ¶ 49; Ex. 13 (emphasis added).)

Any argument that issuance of injunctive would raise safety concerns, however, is utterly specious.  No one takes safety more seriously that United, and United would not seek relief that it thought would in any way compromise the safety of the airline.  United's pilots are highly-trained professionals.  They understand that safety is the most important function of their job, and they will understand that United is not asking them to do anything that they sincerely

believe would compromise safety in any way.  Because they are highly trained professionals, United's pilots do not need to be told that they should not fly when they are too ill or too fatigued to fly safely and they know that.  It is precisely for this reason that when ALPA tells them not to fly when they are too fatigued to do so, they understand that what ALPA really means is that they should tell United they are too fatigued or ill to fly *when they are not*.

Every United pilot knows that United's normal operations are as safe as they could possibly be, and every United pilot understands that United expects them to do everything possible to ensure that is the case.  What United does not expect, and what the law does not permit, is fabricating illness or fatigue that does not exist in order to inflict economic harm on United and, ultimately, obtain what ALPA believes would be a better result in collective bargaining negotiations.  Thus, any argument that safety would be impaired by ordering pilots to resume their *normal operations* is without merit.

### E.    ALPA Has Demonstrated the Ability to Control the Conduct of United's Pilots.

One of the common defenses to a request for injunctive relief against an unlawful job action is that employees are acting on their own initiative, and that union has no ability to control its members' behavior.  At United, however, ALPA has demonstrated -- indeed, it has flaunted -- an incredible ability to control its members to achieve ALPA's ends.  This ability to control the membership both refutes any claim that ALPA is not responsible for the job actions, and undermines any possible argument that injunctive relief would put ALPA in an untenable position by ordering it to control what it cannot control.

While there are many examples of ALPA's control, one of the best is the "hats on, hats off" policy that ALPA initiated in January 2008 "to show management that this pilot group is serious about regaining what was stripped from us during bankruptcy."  (Milone Decl. ¶ 38.)

Under this policy, ALPA informs pilots in periodic messages whether they were supposed to wear their uniform with their hats on or off "whenever you are likely to be viewed by management." (*Id.*) The purpose of this seemingly sophomoric exercise was to train United pilots to follow ALPA's directions on the most trivial issue in order to demonstrate "solidarity" to United management. (*Id.*)

Two recent incidents demonstrate how seriously United pilots take ALPA's directives. On June 18, 2008, a United first officer confronted United captains in different airports who were wearing their hats during a "hats off" period. In the first incident, the F/O allegedly told a Captain who refused to remove his hat that "you are lucky I don't have a pipe." (*Id.* ¶ 39.) In the second incident, after a heated argument the F/O allegedly told another captain that "you better be glad that the union doesn't have us carry baseball bats." In that case, the captain was so upset by the confrontation that he was unable to complete the flight, which resulted in the flight being cancelled. (*Id.*)

When ALPA can achieve this level of compliance with something as trivial as wearing or not wearing a hat, it becomes clear that United's pilots would not carry out a sick out, slowdown or job action over ALPA's objections, and that ALPA has the power to stop the job action if it wants to do so. Absent an injunction, ALPA has no incentive to stop the behavior, and every incentive to encourage it. Faced with an injunction, and the threat of sanctions if it violates the injunction, ALPA can and will be able to return United's operations to normal.

## III.    THE NORRIS-LAGUARDIA ACT DOES NOT PROHIBIT AN INJUNCTION IN THIS CASE.

In response to efforts to enjoin job actions under the RLA, unions frequently seek to divert attention from the requirements of the RLA to the requirements of the Norris-LaGuardia

Act, 29 U.S.C. § 101, *et seq.* ("NLGA").  As shown below, the NLGA does not bar an injunction in this case.

      **A.**      **The Federal Courts Have Jurisdiction To Enjoin a Violation of the RLA Notwithstanding the Norris-LaGuardia Act.**

While the NLGA generally deprives the federal courts of jurisdiction to enjoin labor disputes, it is well established that the more specific provisions of the RLA take precedence over the more general provisions of the NLGA.  *E.g., Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570 (1971).  "It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a 'specific provision' of the RLA and, moreover, is central to the purpose and functioning of the RLA.  Therefore, the provision takes precedence over the more general provisions of the NLGA."  *Delta Air Lines, Inc.*, 238 F.3d at 1307; *Chi. & N.W. Ry. Co.*, 402 U.S. at 581-82 (1971); *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30 (1957); and *Bhd. of R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952)).  Indeed, the Supreme Court has expressly held that the federal courts have subject matter jurisdiction to enjoin a violation of the status quo obligations under the RLA. *Chi. & N.W. Ry. Co.*, 402 U.S. at 570.  *See also United Air Lines*, 243 F.3d at 362; *Bhd. of Locomotive Eng'rs v. Atchinson, Topeka & Santa Fe Ry. Co.*, 768 F.2d 914, 919 (7th Cir. 1985).  Thus, the anti-injunction provisions of the Norris-LaGuardia Act do not apply in this case.  *Chi. & N.W. Ry. Co.*, 402 U.S. at 570.

      **B.**      **The Requirement of "Clear Proof" Under Section 6 of the NLRA, Even If Applicable, Has Been Satisfied.**

While the NLGA does not deprive the courts of jurisdiction to issue an injunction under the RLA, the procedural requirements of the NLRA still apply in such cases.  *See United Air Lines*, 243 F.3d at 362. One argument that unions frequently make, therefore, is that the injunction must be denied under Section 6, which requires that there be "clear proof" that there

has been authorized or ratification of unlawful conduct to hold a union or its officers "responsible or liable" for the acts of union members.

The purpose of Section 6, as the Supreme Court noted in *United Brotherhood of Carpenters v. United States*, 330 U.S. 395, 403 (1947), is to relieve unions "from liability for damages or imputation of guilt" for the unauthorized acts of individual officers or members. Thus, as the First Circuit held in *Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 532 F.2d 189, 191 (1st Cir. 1976), "it is readily apparent that § 106 applies only (by its own terms) to liability for damages or criminal responsibility," and not to requests for injunctive relief.  *See also Mayo v. Dean*, 82 F.2d 554, 556 (5th Cir. 1936) (Section 6 "might prevent punishment for contempt or the recovery of damages, but clearly was not intended to apply to the issuance of an injunction to prevent future acts of coercion in a case where such relief would be proper"); *Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters*, 736 F. Supp. 1179, 1182 (D. Mass. 1990) ("the prohibition of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, does not apply to injunctions but only to claims for damages").  Indeed, if the rule were otherwise, a court could never enjoin a wildcat strike, yet clearly it has the authority to do so.  *See, e.g., Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 416 F.2d 998 (5th Cir. 1969).

Even if the requirements of Section 6 applied to injunctive relief, however, they have clearly been satisfied here.  Indeed, in the *IAM* case the Seventh Circuit found clear proof of the IAM's involvement in an slowdown among United's mechanics based on far less evidence that exists here.  In that case, the Seventh Circuit found that United had presented "clear proof" of the IAM's involvement as a matter of law through documents posted on IAM bulletin boards that contained the term "Work Safe," which was recognized as a "code word" for a job

slowdown, and that using the term "work safe" in the context of discussing collective bargaining

negotiations could only be interpreted to mean that employees should engage in a slow down.

> While some of these bulletins also contain statements urging members not to "engage in any job action," such statements are dwarfed by the messages to "work safe," leaving the clear impression that the relatively inconspicuous statements discouraging a slowdown were not meant to be taken a face value.

*United Air Lines, Inc.,* 243 F.3d at 366-67.

In the present case, United has presented dozens of formal MEC communications,

published on the ALPA website or distributed to United pilots, that explicitly urge United pilots

to "fly the contract," not waive any section" of the contract, to "strictly adhere" to the contract, to

put "safety first," not to accept junior manning, and many other similar directives, all for the

express purpose of "creating leverage" in negotiations with United.  More "clear proof" is

difficult to imagine.

C.    **The Requirement of "Clean Hands" Under Section 8 of the NLGA  Does Preclude A Preliminary Injunction.**

The other section of the NLGA frequently cited by unions in an attempt to avoid

issuance of an injunction against an unlawful job action is Section 8, the "clean hands" provision

of the NLGA, which prohibits injunctive relief where the complainant "failed to comply with

any obligation imposed by law which is involved in the labor dispute," or has failed to make

"every reasonable effort to settle such dispute" through negotiation, mediation or arbitration.

Any argument by ALPA under Section 8, however, would be without merits for two reasons.

First, the Seventh Circuit made it clear in the *IAM* case that the obligation under

Section 8 to make "every reasonable effort to settle such dispute" has no application where the

"dispute" at issue is whether the union's actions violate the RLA.  In rejecting the notion that a

carrier is required under Section 8 to seek to settle a dispute over the union's violation of its

status quo obligations, the Seventh Circuit held that such a prerequisite for injunctive relief would allow unions to ask for concessions in exchange for ending illegal job actions.  *United Air Lines*, 243 F.3d at 365.  This would "render the union's duty under 45 U.S.C. § 152, First a nullity, and would run directly contrary to the policy rationales of the RLA's status quo provisions."  *Id.*

Second, even if such an obligation applied, United has exerted every reasonable effort to resolve the parties' disputes consensual, and only filed the current action as a last resort. As detailed in Section G of the Statement of Facts, United attempted over a course of 18 months to resolve ALPA's stated concerns.  Only when it became clear that ALPA had no interest in resolving the disputes consensually was United forced to seek injunctive relief.

## CONCLUSION

For all of the reasons set forth above, this Court should issue injunctive relief, in the form submitted herewith, barring defendants from engaging in the ongoing job action.


DATED: July 30, 2008.

<div style="margin-left:40%">

Respectfully submitted,

By:___s/ Gary S. Kaplan_____
        TOM A. JERMAN
        APARNA B. JOSHI
        MARK W. ROBERTSON
        O'MELVENY & MYERS LLP
        1625 Eye Street, N.W.
        Washington, D.C. 20006
        (202) 383-5300
        e-mail:  tjerman@omm.com

        GARY S. KAPLAN
        SEYFARTH SHAW LLP
        131 South Dearborn Street
        Suite 2400

</div>

Chicago, IL 60603-5577
(312) 460-5000
e-mail:  gkaplan@seyfarth.com

Attorneys for Plaintiff
United Air Lines, Inc.