IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------x
:
UNITED AIR LINES, INC.,                                    :
:
Plaintiff,                        :        Civil Action No. 08 CV 4317
:        Judge Lefkow
- v. -                            :        Magistrate Judge Denlow
:
AIR LINE PILOTS ASSOCIATION,                               :
INTERNATIONAL, et al.,                                     :
:
Defendants.                       :
:
-------------------------------------------------------------------X

## DEFENDANTS' MEMORANDUM IN OPPOSITION
## TO MOTION FOR PRELIMINARY INJUNCTION

Michael E. Abram
Joseph J. Vitale
Travis M. Mastroddi
Eyad Asad
Robin H. Gise
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036
(212) 563-4100

Elizabeth Ginsburg
David Semanchik
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
Legal Department
535 Herndon Parkway
Herndon, VA 20170
(888) 359-2572

Judiann Chartier
KATZ, FRIEDMAN, EAGLE,
EISENSTEIN, JOHNSON & BARECK
77 West Washington Street, Suite 2000,
Chicago, Illinois 60602
(312) 263-6330

Attorneys for Defendants

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................iii

INTRODUCTION ........................................................................................................ 1

FURTHER BACKGROUND .......................................................................................... 2

STATEMENT OF FACTS ............................................................................................. 5

1.    The Defendants ............................................................................................ 5

2.    The Website "www.ual2172.com" ................................................................ 6

3.    The United MEC's Efforts to Educate the Pilots the Regarding Their Contractual
       Rights In Preparation for Future Negotiations ................................................. 7

4.    ALPA Has Repeatedly and Publicly Educated Its Pilots As to Its Interpretation of
       the CBA's Voluntary Overtime Provisions As Intended To Assist the Airline
       During Times of Irregular Operations ............................................................ 9

5.    As United Anticipated, Sick Leave Usage Immediately Began to Increase After
       June 4, When United Announced Fleet Reductions, With Furloughs to Follow.............. 10

6.    Acting on Rumors, the MEC and the IRC Act To Prevent a Potential July 4 Sick
       Out by Junior Pilots .................................................................................... 14

7.    ALPA's Efforts to Address the Junior Pilots' Concerns That Coincide With
       Ongoing Industry and Union Attention To The Issue of Fatigue ....................... 16

8.    Elevated Sick Leave in July Alarms the IRC, But Their Investigation Determines
       That There Was No Concerted Action ............................................................ 18

9.    United Brings Its Lawsuit to Blame the IRC for Elevated Sick Leave, Without
       Evidence For Its Assertion ........................................................................... 18

10.   ALPA Has Acted Both Before and Since United Filed Suit to Quell Any Improper
       Sick Leave Usage, and With ALPA's Active Support, Sick Leave Usage Has
       Abated to Normal Operational Levels Since the End of July ............................. 20

ARGUMENT ................................................................................................................. 21

I.    THE COMPANY'S DISPUTES WITH ALPA OVER VOLUNTARY
      JUNIOR/SENIOR MANNING AND THE PILOTS' ELECTIONS NOT TO
      WAIVE CONTRACTUAL REQUIREMENTS ARE MINOR DISPUTES THAT
      LIE OUTSIDE THE COURT'S JURISDICTION .......................................................... 21

II.   UNITED'S CLAIM CHALLENGING ALPA'S CONDUCT AND
      COMMUNICATIONS REGARDING VOLUNTARY JUNIOR/SENIOR
      MANNING AND WAIVER OF TERMS IS BARRED BY THE APPLICABLE
      SIX MONTH STATUTE OF LIMITATIONS ................................................................ 25

III.  UNITED HAS FAILED TO ESTABLISH THAT THERE WAS AN
      ORGANIZED SICK OUT; RATHER THERE WAS AN ELEVATION IN SICK
      LEAVE USAGE THAT WAS EXPECTED BY THE COMPANY AS A
      RESULT OF ITS ANNOUNCEMENTS OF FLEET REDUCTIONS AND
      RESULTING FURLOUGHS ........................................................................................ 26

IV.   ALPA'S OVERT REPUDIATION OF ALLEGED IMPROPER CONDUCT
      SATISFIES ALPA'S DUTIES UNDER SECTION 2, FIRST AND OBVIATES
      THE NEED FOR A PRELIMINARY INJUNCTION .................................................... 28

V.    UNITED HAS NOT SATISFIED THE REQUIREMENTS OF THE NORRIS-
      LAGUARDIA ACT  FOR AN INJUNCTION IN THIS LABOR DISPUTE ................. 29

      A.    United Cannot Show By Clear and Convincing Evidence, Nor Even By A
            Preponderance of the Evidence, That Any Defendant Committed Unlawful
            Acts as Required By Section 6 of NLGA ............................................................. 31

      B.    United Cannot Point to Any Continuing or Threatened Unlawful Conduct
            That Would Warrant an Injunction Under the NLGA .......................................... 33

CONCLUSION .............................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

Page

*Air Line Pilots Association  v. United Air Lines*,
    802 F.2d 886 (7th Cir. 1986) ..................................................................30, 31, 32

*Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*,
    768 F.2d 914 (7th Cir. 1985) ...............................................................................25

*Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*,
    373 U.S. 33 (1963)................................................................................................22

*Bhd. of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*,
    138 F.3d 635 (7th Cir. 1997) ...............................................................................22

*Bhd. of R.R. Trainmen v. Toledo, P.W.R.R.*,
    321 U.S. 50 (1944)................................................................................................30

*Brown v. Illinois Central R.R. Co.*,
    254 F.3d 654 (7th Cir. 2001) ...............................................................................22

*Burlington N. R. Co. v. Bhd. of Maint. of Way Employees*,
    481 U.S. 429 (1987)..............................................................................................29

*Chicago & N.W. Transp. Co. v. Ry. Labor Executives Ass'n*,
    855 F.2d 1277 (7th  Cir. 1988) ............................................................................22

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*,
    491 U.S. 299 (1989)..........................................................................................22, 23

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
    238 F.3d 1300 (11th Cir. 2001) ...........................................................................24

*Donnelly Garment Co. v. Dubinsky*,
    154 F.2d 38 (8th Cir. 1946) .................................................................................31

*Elgin, J. & E. Ry. Co. v. Burley*,
    325 U.S. 711 (1945)..............................................................................................22

*Hawaiian Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994)..............................................................................................22

*Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*,
    372 U.S. 682 (1963)..............................................................................................22

iii

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,*
   457 U.S. 702 (1982)................................................................................29, 30

*Marine Cooks & Stewards v. Panama S.S. Co.,*
   362 U.S. 365 (1960).....................................................................................29

*Milwaukee Police Ass'n v. Jones,*
   192 F.3d 742 (7th Cir. 1999) .......................................................................28

*Monroe v. Mo. Pac. R.R. Co.,*
   115 F.3d 514 (7th Cir. 1997) .......................................................................22

*N. Am. Coal Corp. v. Local Union 2262,*
   497 F.3d 459 (6th Cir. 1974) .......................................................................31

*Old Dominion Branch No. 496 v. Austin,*
   418 U.S. 264 (1974).....................................................................................34

*Order of R.R. Telegraphers v. Chicago & N.W. R. Co.,*
   362 U.S. 330 (1960).....................................................................................30

*Ry. Labor Executives' Assn v. Soutger Ry. Co.,*
   860 F.2d 1038 (11th Cir. 1988) ...................................................................25

*Union Pac. R.R. Co. v Local #1409, United Transp. Union, No. Civ. A. 03-2600,*
   2004 WL 3106757 (D. Kan. Jan. 18, 2004)..................................................23

*U.S. v. W.T. Grant Co.,*
   345 U.S. 629 (1953).....................................................................................28

*United Air Lines, Inc. v. Int'l Ass'n of Machinists,*
   243 F.3d 349 (7th Cir. 2001) ............................................................. *passim*

*United Bhd. of Carpenters v. U.S.,*
   330 U.S. 395 (1947).....................................................................................31

*United Mine Workers v. Gibbs,*
   383 U.S. 715 (1966).....................................................................................31

*United Transp. Union v. Burlington N. R.R. Co.,*
   875 F. Supp. 468 (N.D. Ill. 1994) ................................................................23

*Va. Ry. v. System Fed'n No. 40,*
   300 U.S. 515 (1937).....................................................................................30

*Wernsing v. Thompson,*
   423 F.3d 732 (7th Cir. 2005) .......................................................................28

## FEDERAL STATUTES

29 U.S.C. §106................................................................................................31

29 U.S.C. §107(a)............................................................................................33

29 U.S.C. §113(c)............................................................................................29

## <u>INTRODUCTION</u>

The parties to this case are an airline (United Airlines, Inc. -- "United" or the "company"), the union that represents its pilots (Air Line Pilots Association -- "ALPA"), and four members of that union. The airline only recently emerged from bankruptcy after receiving life-saving concessions from its pilots. These concessions, among other things, force the pilots to work harder for far less money. The pilots, however, preserved the ability to decline even additional work by the right not to accept offers of overtime and the right not to waive provisions of the contract. The company has long accepted these pilot prerogatives and has never challenged them in the mandatory dispute resolution system under Section 204 of the Railway Labor Act, 45 U.S.C. § 184. Now, however, United wants to push the pilots to work even harder and to enmesh this Court in its contractual disputes with the pilots, but the Court lacks jurisdiction over such disputes.

On the heels of its announcement that hundreds of its junior pilots are soon to be laid off, many after only recently having returned to United after a five-year lay off, United experienced an expected increase in sick leave among the soon-to-be unemployed pilots. United asks the Court to force ALPA and the individual defendants, under the threat of sanctions, to do what they have already done: take multiple steps to assist the airline to alleviate the sick leave increase that it anticipated among pilots whom it plans to furlough for a second time by dissuading any pilot from abusing sick leave. As we show below, despite the blaring of its trumpets as it entered this Court last month, United has simply pieced together a series of surmises and suspicions, and has utterly failed to make a case in support of injunctive relief. Its motion must be denied.

## FURTHER BACKGROUND

In 2003 and 2005, while plaintiff United Airlines ("United" or the "company") was in bankruptcy, its pilots agreed to massive concessions that were instrumental in enabling United to reorganize successfully. In 2003, the United pilots gave back $1.1 billion annually in wages, benefit and work rules concessions, and in 2005 gave an additional $181 million annually in contract value and accepted the termination of their defined benefit pension plan. *See* First Amended Disclosure Statement attached to Declaration of Robin H. Gise dated August 19, 2008 ("Gise Dec.") Ex. 1, at 54-55. According to United, those agreements, reached after "round-the-clock negotiations," were "critically important" to United and its ability to reorganize. *See* Gise Dec. Ex. 2, at 13, 27. United's Vice President and Treasurer at the time stated that ALPA and the United pilots "provide[d] necessary -- yet tremendous -- labor savings and cost concessions in two rounds of Section 1113 negotiations." Gise Dec. Ex. 3, ¶¶16-17.

The United pilots' concessions cost the pilots, among other things, their defined benefit pension plan and massive reductions in pay, and materially increased their working hours even as they were earning materially less in total compensation. The cuts were severe and unrelenting. All of this was in addition to the sacrifices of the two thousand one hundred seventy-two (2172) pilots whom United furloughed (laid off) beginning in late 2001 following the horrific attacks of September 11, 2001. Most of those furloughed pilots have only been recalled within the past two years.

After United exited Chapter 11 in 2006, it paid its top five executives compensation totaling $66 million. *See* Gise Dec. Ex. 4. United later also paid out $250 million in cash to its stockholders. *See* Gise Dec. Ex. 5, at 2. In the meantime, the pilots continued to labor under the onerous working conditions negotiated to enable United to exit bankruptcy. Recognizing that they were -- and are -- subject to a terrible injustice, the pilots began to seek

United's agreement to modify their contract to ease some of the most oppressive provisions of the bankruptcy contract. Although United was willing to, and did, make minor modifications, it refused to address the fundamental issues of the agreement. Indeed, as recently as April 1, 2008, the company's Senior Vice President for Labor Relations again reiterated that United would not even start negotiations for a new agreement. *See* Gise Dec. Ex. 6. As the company's managing director for labor strategy-flight has explained, the company will not start negotiations with the pilots even if United and ALPA agreed that there will be no self-help by either party prior to the amendable date of the present contract. United simply will not do it. *See* Transcript of Deposition of Jay D. Milone, dated August 14, 2008, at 103.[1]

United, thus, insists on defending the present contract, and, therefore, so do the pilots. Beginning in 2006, the pilots have consistently and publicly taken the position that they seek to abide by what is written in the contract and not waive its provisions. They recognize that waivers not only financially benefit the company but also provide United ammunition for management's future attacks on the existing contract. *See* Wallach Tr. 59. Defendant ALPA has also consistently taken the position since 2006 that United cannot use the practice of soliciting pilots to accept overtime, called "junior/senior manning," as a manpower planning tool, but must limit junior/senior manning to irregular situations where adequate planning could not address staffing shortages.

These are matters of neither clandestine activity nor of recent vintage. ALPA's positions on these issues have been clear and open, and have been well-known to the company

---

[1] Excerpts from the currently available transcripts of depositions taken in this case are included in a compendium of deposition excerpts and exhibits, dated August 19, 2008 and submitted herewith. Pages to the transcripts are cited as "[deponent] Tr. __" and exhibits to depositions as "[deponent] Ex. __." Given the expedited discovery schedule, several of the transcripts have not yet been executed and finalized; defendants will supplement the record with corrected pages from the final transcripts as necessary when they become available.

for nearly two years.  ALPA's positions have been unchallenged by United, and have become an established feature of the parties' relationship.  Indeed, in the course of these nearly two years, the company has had multiple opportunities to file grievances against ALPA under the United-ALPA Agreement to assert that the pilots' interpretations of the contract are incorrect, but United has never done so.  Instead, the company has rushed into court (albeit after weeks of apparent preparation) seeking an injunction against the very contractual practices concerning waivers and junior/senior manning that it has accepted without challenge for nearly two years.

Since the filing of the Complaint, the parties have engaged in intense discovery that has revealed the recklessness of United's accusations that the union and the individual defendants orchestrated a "spike" in sick leave usage among junior pilots or, at the least, failed to prevent such a spike:

- Union officials did not encourage, but in fact sought to prevent, any concerted misuse of sick leave;

- The individual defendants met in mid-June, not to organize a sick out, but to prevent one;

- United and ALPA agree that the company cannot use junior/senior manning as a scheduling tool and ALPA has notified its members of this understanding;

- ALPA has notified its members of the union's view that the pilots should accept junior/senior manning when there are irregular operations or other extraordinary circumstances (as could occur if there are unanticipated levels of sick leave usage);

- United does not dispute that its pilots may choose not to waive contractual terms, and that ALPA may so inform pilots;

4

- There was no "spike" in sick leave usage among the company's junior first officers but a general elevation in sick leave use among pilots who, having just returned from post-9/11 furloughs, have learned that they will be furloughed again after a little more than a year back on the job, and the company expected this elevation;

- This sick leave use elevation among the soon-to-be furloughed pilots bore no relation to conduct by the defendants, but when it got to be larger than expected in the last several days of July, ALPA cooperated with the company in attempting to moderate the sick leave usage; and

- The company now concedes that the increase in sick leave that occurred in June and the first half of July "*was probably about the amount of individual response in a non-collective, non-concerted activity, that you would expect to see following*" the announcement of fleet reductions.  Milone Tr. 150-51 (emphasis added).

## STATEMENT OF FACTS

1.     **The Defendants**

   ALPA is the collective bargaining representative under the Railway Labor Act ("RLA") for all airline pilots employed by United.  ALPA's United Master Executive Council (the "United MEC" or "MEC") serves as ALPA's coordinating body for the United pilots.[2]  For many years, United and ALPA have been parties to a series of collective bargaining agreements.

   Defendant Captain Steven Tamkin is Chairman of the United MEC Industrial Relations Committee ("IRC").  *See* Tamkin Tr. 18.  Captain Mark Bathurst, who at the time was

---

  [2] Captain Stephen Wallach was elected as Chairman of the United MEC in October, 2007 and assumed office on January 1, 2008.  *See* Wallach Tr. 7-8.

the United MEC Chairman, appointed Tamkin to that post in April, 2007.  *See* Tamkin Tr. 18.

The IRC has several functions as identified in the United MEC Policy Manual, *see* Milone Dec.

Ex. 17, but it is primarily used as an informal communications conduit between the pilot

workforce and the United MEC leadership, acting as the "eyes and ears of the pilot group."  *See*

Freeman Tr. 23; Wallach Tr. 77; Tamkin Tr. 80.

Shortly after his appointment as IRC Chairman, Captain Tamkin selected

Defendants Captain Xavier Fernandez and Captain Robert Domaleski to be members of the IRC

at the MEC level.  *See* Tamkin Tr. 61-62.  Each of the three generally covers a different

geographic region:  Tamkin covers the West, Domaleski covers the East, and Fernandez covers

the Midwest.  *See* Fernandez Tr. 17.  Each utilizes several pilots across the various United

domiciles (the airports where United pilots report for duty) as "coordinators," though these local

coordinators do not serve in any official capacity.  *See* Fernandez Tr. 16; Tamkin Tr. 66-67.

Defendant First Officer Anthony Freeman is one such local coordinator of the IRC.  *See* Tamkin

Tr. 63.

**2.      The Website "www.ual2172.com"**

In December 2007, Freeman established a website called www.ual2172.com to

marshal a voting bloc of ALPA-represented United pilots that would advocate the interests of

junior pilots to the United MEC, and to exchange information regarding such things as "job

leads, benefits information, financial type information and contract type information."  Freeman

Tr. 32-33, 37, 64.  The website's title is a reference to the number of pilots who were furloughed

by United after September 11, 2001, and who returned to work for United between 2006 and

2007.  *See* Freeman Tr. 33; Milone Tr. 20.  Over time, these pilots came to refer to themselves as

"the 2172."  Freeman Tr. 33; Fernandez Tr. 19.  The site is password protected, and only United

pilots who belong to the 2172, not all United pilots, are permitted to access it.  *See* Freeman Tr.

56; Fernandez Tr. 20.  Union officers and MEC members have no access unless they are members of the 2172.

   The website is not affiliated with or funded by ALPA or by the United MEC, *see* Freeman Tr. 32, and Freeman receives no assistance from the union to operate it.  *See* Freeman Tr. 38.  Freeman did not inform any ALPA official of its existence, and only discussed the site with Tamkin after Tamkin learned of the site and asked Freeman about it in the spring of 2008. *See* Freeman Tr. 59-60, 62-63, 67.

**3.**   **The United MEC's Efforts to Educate Pilots Regarding Their Contractual Rights In Preparation for Future Negotiations**

   Over the past two years, the United MEC has engaged in ongoing efforts to unify the pilot workforce through education about the law and about the pilots' contractual rights in anticipation of contract negotiations.  *See* Wallach Tr. 29-30, 59.  For example, the United MEC has counseled its members as to which contractual provisions the contract allows pilots to waive and has advised against waiver of any terms so as not to undermine the union's leverage at the bargaining table.  As MEC Chairman Wallach testified regarding these continued efforts, "I intended to start educating … the pilot group about their contract.  [H]istorically speaking the company monitors and tracks waivers, whether waivable or unwaivable, and uses that against the negotiators in negotiation."  Wallach Tr. 59.

   These efforts, and ALPA's communications in furtherance of these efforts, date back to 2006, have continued to the present, and have drawn no complaint from United until the current lawsuit.  *See* Milone Tr. 120-22; Carlson Tr. 21 (pilots started to decrease acceptance of junir/senior manning in the "summer of 2006").  *Compare, e.g.,* Declaration of J. Milone, dated July 29, 2008 ("Milone Dec.") ¶11 (describing a December 2006 MEC publication that states pilots should "not waive any section" of the contract") *with* Milone Tr. 11-13 (admitting no objection was made to the December 2006 publication).  In fact, in 2007 the MEC publicly

issued a handout called "Pilot Unity," in which it advised pilots not to waive and not to ignore

sections of their contract.  *See* Milone Dec. ¶16 & Ex. 3 thereto.  During this time, as a result of a

grievance filed by ALPA, United agreed to discontinue United's attempts to have pilots waive

non-waivable provisions of their contract; declarant Jay Milone signed the settlement, although

as of the time of his recent deposition he did not remember doing so.  *See* Milone Tr. 74-76.

United also concedes that the MEC's policy discouraging pilots' waivers of

contract terms is consistent with the collective bargaining agreement.  *See* Milone Tr. 10-11.

The MEC has sought to unify the pilot group as a means of improving its position

at the bargaining table -- to create "leverage" by convincing management that the pilots are

unified behind their union's bargaining positions.  As explained by Chairman Wallach,

"Leverage could be, you know, as small as optics.… [C]ertainly in any negotiation, section 6

negotiation if the pilots are not unified, you know, the company … picks off various groups.

And that's not acceptable in any struggle."  Wallach Tr. 57.  One example of the MEC's efforts

to impress on management that the pilots are unified is the "unity exercise" of the Hats On/Hats

Off program.  *See* Wallach Tr. 85-86; Tamkin Tr. 53.  And in December 2006, then-United MEC

Chairman Mark Bathurst reconstituted the MEC's Strike Preparedness Committee, appointing

James Anderson as its chair with the intention of preparing the pilot group to respond with a

unified front to calls from management for contract changes.  *See* Anderson Tr. 34.

The MEC's purpose is to put the pilots in the best possible position for whatever

negotiations may arise, and at whatever point they may commence.  Indeed, as has been widely

reported, United has entertained merger possibilities with several other air carriers since it

emerged from bankruptcy; in the event such talks went through, the pilots would be immediately

faced with major negotiations for a new collective bargaining agreement and seniority list

integration involving two or more pilot groups, regardless of the existing contract's stated

amendable date of December 31, 2009.  *See, e.g.*, Gise Dec. Ex. 7.

4.  **ALPA Has Repeatedly and Publicly Educated Its Pilots As to Its Interpretation of the CBA's Voluntary Overtime Provisions As Intended to Assist the Airline During Times of Irregular Operations**

United employs a "proprietary manpower model" to determine its monthly pilot

staffing needs.  *See* Carlson Tr. 10.  The model includes inputs for, among things, awarded

vacations, the pilots' training, contractual minimum staffing levels, and projected absences

resulting from, among other things, sick leave usage.  *See* Carlson Tr. 10-15.  Using the model,

the company schedules a number of "reserve pilots" for each day during the month to cover

projected absences among the "line holders."  *See* Carlson Tr. 16, 18.[3]  When the company has

more absences than available reserves, it "expects" to utilize several tools including the

solicitation of pilots to accept assignment of voluntary overtime, known by the parties as

"junior/senior manning," in order to avoid flight cancellations.  Carlson Tr. 18.

As ALPA has stated many times over the past eighteen months, including through

amendment to its Policy Manual, the contract provisions which allow junior/senior manning are

not intended to provide United with a manpower planning tool.  Rather, they are intended to

assist the airline through times of irregular carrier operations and "unplanned" manning

shortages.  *See* Milone Tr. 107-08; *contra* Milone Dec. ¶25; *see also* Anderson Tr. 136

(junior/senior manning "part of a recovery program should the airline fall apart due to weather or

circumstances").  Thus United now acknowledges that a May 7, 2008 Local Council 12

publication which stated ALPA's position on junior/senior manning and was cited by United as

evidence of an effort to disrupt operations, *see* Milone Dec. ¶¶31-32, actually concerned the

---

[3] "Line holders" are pilots who receive through a bidding system a "schedule or a sequence of trips to fly for the month," while a "reserve is a pilot that has a series of days" on which he or she is assigned through the bidding system to be available to fly for United.  *See* Carlson Tr. 16.

company's mismanagement of *planned* vacation time, thus leading it to seek junior/senior

manning volunteers, *see* Milone Tr. 116-18.

Although United asserts that junior/senior manning has been used since its

inception to address unplanned pilot shortages, *see* Milone Tr. 107, the company also asserts that

the contract permits it to assign junior/senior manning as a scheduling tool.  As Milone testified,

"[t]here is nothing in the language of the contract or [his] understanding of the negotiating

history that would prohibit" its use as a scheduling tool.  Milone Tr. 112.  To resolve this dispute,

"[w]e'd have to get the contract section out to see exactly what it states."  Milone Tr. 112.

Nevertheless, United did not, as it is permitted to do, file any contractual grievance over ALPA's

interpretation, even long after United experienced a decrease in the rate at which pilots accepted

junior/senior manning assignments.  Milone Tr. 111, 112.  Instead, since September 2006,

United has responded to the decrease in acceptances by increasing the number of reserve pilots

in its manning model.  *See* Carlson Dec. ¶16.  As a result, United has no evidence that the

decrease in junior/senior manning over the last 18 or more months has itself interfered with

United's normal operations.  *See* Carlson Tr. 21-22.

**5.    As United Anticipated, Sick Leave Usage Immediately Began to
Increase After June 4, When United Announced Fleet Reductions,
With Furloughs to Follow**

On June 4, 2008 United announced that it would ground one hundred (100) planes

from its fleet, including all ninety-four (94) of its Boeing 737s.  *See* Milone Tr. 29; Carlson Tr.

35-36; Wallach Tr. 92-93, Wallach Ex. 16.  The reduction "was of such a size that furloughs

were certainly in the cards."  Carlson Tr. 38; Milone Tr. 105.  Almost three weeks after

announcing the fleet reduction, on June 24 United announced that the groundings would result in

hundreds of pilot furloughs.  *See* Wallach Tr. 93 and Ex. 17.  The pilots to be furloughed would

be the carrier's most junior, some of whom had been hired following the bankruptcy but the bulk

of whom had been furloughed in 2001 and had only been returned to work in 2006 and 2007. *See* Milone Tr. 149-50.

Thus, United's June 4, 2008 announcement meant that hundreds of junior pilots -- specifically those who are assigned as First Officers on "narrow body" aircraft, (the Boeing 767s, Airbus 300s and Airbus 320), who had only recently come back to United after approximately a five-year layoff -- would soon be out of work again. *See* Carlson Tr. 56-57. Many of these pilots only recently left other jobs in order to respond to United's request that they return to service. *See* Freeman Tr. 15-16.

After the June 4 announcement, ALPA engaged United in negotiations with the goal of mitigating the depth and impact of furloughs on the pilot group. *See* Wallach Tr. 122. Captain Wallach focused the MEC System Scheduling Committee and its Negotiating Committee on this task, and issued a notice to pilots stating that in addressing the furloughs, "no idea will be discounted." Wallach Dep. Ex. 16. United concedes that it was proper for ALPA to negotiate furlough mitigation, and that "nothing on the face of this memo, would reflect anything improper." Milone Tr. 18; *contra* Milone Dec. ¶¶41-42 (implying nefarious purpose to Captain Wallach's statement that "no idea will be discounted"). As Captain Wallach has testified, "No idea would be discounted" did not mean anything unlawful but referred to the ideas that the union's negotiating committee and system scheduling committee would use in meetings with the company to mitigate the scope and effects of the furloughs. *See* Wallach Tr. 133-34.

United management recognized early on that its announcement of a massive reduction in the fleet with the inevitable need for large-scale furloughs that would follow, would result in an increase in the usage of sick leave among pilots about to lose their jobs. Even before the announcement was made, United was well aware that this development would impact United's "ability to cover all of [its] flights." Carlson Tr. 36; *see also* Milone Tr. 150-51.

11

Indeed, it is logical to assume that pilots about to lose their jobs, some for the second time, may take sick leave to "provide for their families and … look[] for another job."  Anderson Tr. 101-02.  As United's managing director for labor strategy-flight conceded, "there would be some understandable increase in sick leave when an announcement like that is made."  Milone Tr. 132.  Yet despite its ability to make adjustments for unanticipated events, *see* Carlson Tr. 30-31; *see also* Carlson Tr. 28 (United "could" adjust planning with respect to upcoming months), United nevertheless continued to rely upon the manpower model based on 2007 assumptions, even after it determined in May 2008 to reduce its fleet.  Carlson Tr. 28, 35.

As United predicted, after it announced the fleet reduction on June 4, sick leave usage began to increase above the company's estimate for June.  *See* Carlson Tr. 51-52 ("not surprised" that sick leave usage increased after fleet reduction announced); Milone Tr. 132 (same).  In fact, the company now concedes that the increase in sick leave that occurred in June and the first half of July "*was probably about the amount of individual response in a non-collective, non-concerted activity, that you would expect to see following that [June 4] announcement*."  Milone Tr. 150-51; *see also* Milone Tr. 130-31 (increase in sick leave in June and July was "understandable" but the alleged "sharp, dramatic spike beginning in mid-July isn't explainable by that"); Carlson Tr. at 37-38 (pilots' knowledge of potential for furloughs after fleet reduction announcement was anticipated to "impact the [company's] operation" by an increase in pilots taking sick leave).[4]

---

[4] The company's expert report, while showing increases of absences due to illness compared to previous years, does not account for the impact of fleet reduction and furlough announcements on the pilots.  The conclusion that the increases in sick leave must be a result of "non-random, collaborative behavior," *see* Expert Report of Daniel M. Kasper and Darin N. Lee, dated July 30, 2008, at 11, completely ignores those announcements and does not even take into account the company's own predictions of increased sick leave usage as a result of the announcements.

In its initial filings, United claimed that the June increase in sick leave was followed by a "spike" in sick leave on the weekend of July 18-19, and a lesser spike on July 20, 2008 that resulted in flight cancellations.  *See* Carlson Dec. ¶12; *see also* Milone Tr. 132 (testifying that there was a "sharp, dramatic spike beginning in mid-July," and particularly on July 18).  According to United, the "spike" was "largely driven by" the 320 and 737 first officers ("FOs").  *See* Carlson Dec. ¶12.  On July 22, however, the very day after United claims that it was "forced to cancel 77 flights due to the lack of a crew," Carlson Dec. ¶12, CEO Glenn Tilton stated that "we've seen periodically increases in our sick rate performance and I think we've seen a bit of that recently, concentrating on our narrow-bodied fleet but ***we are managing the system with the interest of our customers in mind and I would not call it yet notable***."  Gise Dec. Ex. 7, p. 24 (emphasis added).

Further, at their depositions, United's witnesses gave contradictory accounts of the alleged "spike."  Whereas Milone remained convinced sick leave spiked beginning July 18, and that this spike was attributable to action by the union, *see* Milone Tr. 28, 37-38; Milone Dec. ¶¶44-46, company witness Carlson disagreed, asserting that the spike really began earlier in the month.  *See* Carlson Exs. 4 and 5; Carlson Tr. 62, 64-67 (acknowledging increase starting around July 12 and 13).

The parties do not dispute that sick leave usage was elevated during this mid-July time-frame, and indeed, when the elevation impacted United's operations, Chairman Wallach advised the pilots that "**Your MEC does not condone the inappropriate use of sick leave. Sick leave should only be used for purposes set out in the contract or as required by law.**" Wallach Ex. 21.  But there was no "spike" indicative of a job action; there was an increase over time after the fleet reduction and furlough announcements.  In fact, in his deposition, Carlson

admitted that the "spike" asserted in paragraph 12 of his declaration actually *reflects the trend viewed over the entire period* of June and July.  *See* Carlson Tr. 63.

In short, there was no sudden, dramatic, unexpected usage of sick leave on any single day or during any single weekend as one might expect would result from a concerted job action; rather, United experienced an expected and fluctuating increase in the usage of sick leave over the course of two months among the pilots who were about to lose their employment, again, and by its own account, United was nevertheless able to "manage the system."

**6.    Acting on Rumors, the MEC and the IRC Act to Prevent a Potential Sick Out by Junior Pilots**

With United's June 4 announcement that it would ground 100 planes, previous rumors of a sick out among junior pilots became more pronounced, and IRC member Fernandez became "alarmed."  See Fernandez Tr. 20-22.  Fernandez reported the rumors to Tamkin.  *See* Fernandez Tr. 22; Tamkin Tr. 102.  As Freeman testified, following United's announcement pilots began to post questions and concerns regarding sick leave on the ual2172 website that, though seemingly legitimate and lawful, could be read as inciting or encouraging improper actions, *so he deleted them*.  *See* Freeman Tr. 66-67.  Around this time, Chairman Wallach also became aware of the 2172 website and "chatter" regarding a "sick list."  *See* Wallach Tr. 100. He directed Tamkin "in no uncertain terms … to use his communications ability to stop it." Wallach Tr. 100.

Tamkin determined to discuss the matter with Freeman because Freeman had deep connections with the junior pilot group that had been organizing itself as a political bloc within ALPA.  *See* Tamkin Tr. 100, 102.  Although Fernandez expressed reservations about connecting the IRC to this bloc, Tamkin had determined that Freeman's contacts would be valuable in stopping the "runaway situation" among the junior pilots.  *See* Tamkin Tr. 107; Domaleski Tr. 38; Fernandez Tr. 24.  As he would report to Tamkin, Freeman believed that some

14

junior pilots intended to target July 4 weekend for a sick out, and, though he was trying "to hold these guys back," was concerned that he may be unable to stop it.  *See* Fernandez Tr. 22-24; Tamkin Tr. 103.

United held a shareholders meeting on June 12, 2008 in Los Angeles, at which ALPA had planned to rally and conduct informational picketing to demonstrate its disaffection with the company's current senior management.  *See* Tamkin Tr. 96-97; Fernandez Tr. 27. Tamkin took the opportunity to bring the IRC together to address the rumored sick out.  He arranged to meet with Domaleski, Fernandez and Freeman at his home on the evening of June 11.  *See* Tamkin Tr. 105; Fernandez Tr. 24-25.  Once gathered, Tamkin issued a single message, demanding that each of them "get involved" to stop any sick out, *see* Fernandez Tr. 25-26; Domaleski Tr. 38-39; Tamkin 105, and he "hammered … home" just how bad the idea of a sick out was.  Freeman Tr. 99-100.  Coming away from the June 11 meeting, Freeman and the others understood that each would use the IRC's "structure and influence" to "communicate as loud as possible to the pilot group that … a sick out is not a good thing to do" and that they should "knock this off."  Fernandez Tr. 26.  Tamkin felt that both Freeman's and Fernandez's connections to the junior pilots would be particularly helpful in getting this message out.  *See* Tamkin Tr. 106; Freeman Tr. 99.

As directed by Tamkin and pursuant to Wallach's direction, the IRC took affirmative steps in the days following the June 11 meeting to stamp out any planned sick out. Freeman saw to it that any message threads on the ual2172 website's message board that referenced "sick" or "sick list" were removed.  *See* Freeman Tr. 101, 103.  Fernandez called a number of his friends among the junior pilots and explained "ad nauseum" that "we really needed to be aggressive in trying to stop" any sick out, because it would "lead to legal action" that could result in sanctions against the union.  Fernandez Tr. 30-31.

7.     **ALPA's Efforts to Address the Junior Pilots' Concerns That Coincide with Ongoing Industry and Union Attention to the Issue of Fatigue**

On the evening following the June 12 rally, the IRC, including Freeman,

discussed ways to address the workplace concerns of the junior pilots. *See* Fernandez Tr. 28.

United's scheduling practices had increasingly become onerous and, in the view of many junior

pilots, "unsustainable." *See* Fernandez Tr. 27-28; Tamkin Tr. 85. As Fernandez, himself a

junior pilot, testified, "they're exhausted. [W]e discussed the fact that this was a really severe

chronic safety issue for the pilots at United." Fernandez Tr. 28. Moreover, United admits to

questioning pilots who report themselves fatigued. *See* Milone Tr. 40-41. Fatigue also presents

pilots with a financial concern. Freeman described that "plenty of people [] are flying around

extremely tired and they're on the verge of getting furloughed and they cannot take a financial

hit of calling in fatigued because there is a pay difference between calling in fatigued and calling

in sick." Freeman Tr. 26.

The safety risks associated with flying fatigued are well documented. *See* Gise

Dec. Ex. 8 (remarks of NTSB Chairman Robert A. Sturgell, June 17, 2008). Given that the

junior pilots' "chief complaint" was the "unsustainable schedules" United pushed them to fly,

*see* Tamkin Tr. 108; Fernandez Tr. 28, the IRC members agreed that ALPA should educate the

pilots regarding the contract protections available should they find themselves too fatigued to fly.

*See* Fernandez Tr. 29; Tamkin Tr. 108. Tamkin brought the issue of fatigue among the junior

pilots to Chairman Wallach, *see* Tamkin Tr. 112; Wallach Tr. 96, so that such a message could

be "institutionally administered" by the union, *see* Tamkin Tr. 108; Fernandez Tr. 29-30, rather

than mixed with the clear message -- that there should be no sick out -- the IRC would put out

immediately through its informal communication channels. *See* Fernandez Tr. 30.

In fact, both ALPA and United had already begun work to address issues of pilot

fatigue resulting from the current contract. They renewed discussions "about fatigue and fatigue-

16

related issues," Milone Tr. 44, and the parties took steps "to move forward with a prior

agreement … to establish a Joint Implementation Team" that would "figure out ways to avoid

situations where pilots would become fatigued in the operation." Milone Tr. 44. Recognizing

the critical importance of this issue to the safety of its operations, United is firm in its

commitment that "a pilot who is fatigued should never take a flight." Milone Tr. 42.

        The United MEC continued its effort to deal with the fatigue issue by including

the topic of pilot fatigue in communications to pilots such as the "MEC Updates." Although

United now cites such publications in support of its claims against ALPA, *see* Milone Dec. ¶14

& Ex. 2, it made no complaint to ALPA at the time they issued. Milone Tr. 42-43; Milone Dec.

¶45 & Ex. 1. Indeed, the United MEC allowed the company to preview at least one such

publication in July 2008, titled "Did You Know," which emphasized the importance of

recognizing and properly reporting fatigue. *See* Milone Tr. 48-50; Milone Dec. Ex. 2. United

raised no objection. Milone Tr. 49-50. Nor has United cited to any alleged operational impact

from ALPA's efforts to address the issue of fatigue.

        ALPA's publications on the subject of "fatigue" come within the overall context

of heightened recent attention to these issues by industry, unions, and the Federal Aviation

Administration ("FAA"), the federal regulatory body charged with overseeing the safety of

commercial airline operations. In a June 24, 2008 press release, the FAA stated that its first

"Aviation Fatigue Management Symposium," in which ALPA was an active participant, was

attended by "325 experts from industry, government and academia," and that all participants

agreed that "fatigue can be a genuine factor affecting aviation operations, and *now is the time to

do something about it*." Gise Dec. Ex. 9 (emphasis added). "They also emphasized the necessity

for government and industry to develop a culture that does not penalize employees who excuse

themselves from duty due to fatigue." *Id.*; *see also* Gise Dec. Ex. 8 (remarks of NTSB Vice

17

Chairman Robert A. Sturgell, June 17, 2008) (citing "over 250 deaths due to fatigue in air carrier operations of accidents investigated by the NTSB over the past 15 years").

8.     **Elevated Sick Leave in July Alarms the IRC, But Their Investigation Determines That There Was No Concerted Action**

ALPA's efforts to prevent any concerted sick leave abuse continued when on or about July 18, Fernandez "became concerned" when he noticed an unusually high number of open trips (*i.e.*, pilot assignments) for which there would be an insufficient number of reserves. *See* Fernandez Tr. 33-35.  He reported his observation to Tamkin, *see* Fernandez Tr. 35, and began calling other pilots.  Fernandez did not uncover any indications of concerted action.  *See* Fernandez Tr. 35-36.  Nevertheless, Tamkin contacted the MEC Communications department to have potentially incendiary messages removed from the MEC's website bulletin board, *see* Tamkin Tr. 45-47, and with the assistance of another pilot, inspected the website maintained by Freeman.  *See* Tamkin Tr. 100-02.  Tamkin also contacted Freeman, who had no knowledge of any concerted use of sick leave.  *See* Freeman Tr. 106-07.  It appeared, as reported to MEC Chairman Wallach, to be a matter of "spontaneous combustion."  *See* Wallach Tr. 101. Nonetheless, Captain Wallach wrote all pilots to remind them that the MEC "does not condone the inappropriate use of sick leave."  Wallach Ex. 21

9.     **United Brings Its Lawsuit to Blame the IRC for Elevated Sick Leave, Without Supporting Evidence**

United has sued four individual union members in addition to ALPA, and attempts to lay blame at their feet for its elevated sick levels and July flight cancellations.  In a recorded message to all pilots made the same day of the Complaint, Joseph Kolshak, United's Senior Vice President of Operations stated unequivocally that "with this complaint, we are seeking a preliminary injunction against *ALPA and four pilots who have organized sick leave abuse* by certain pilots."  Kolshak Tr. 25-26 and Ex. 7 (emphasis added).  However, when asked

at his deposition whether he knew "for a fact that Steven M. Tamkin 'organized sick leave abuses by certain pilots,'" Kolshak did not even know that Tamkin was a defendant.  *See* Kolshak Tr. 27.  Once informed of Tamkin's identity, Kolshak explained that United "believes that the facts will prove that" Tamkin and the other individual defendants organized sick leave abuse.  Kolshak Tr. 29.  Despite the certitude of his previous initial statement, United in fact brought the suit with no supporting evidence, and discovery has revealed none.

As Milone testified, he "primarily" believed that the four individuals named as defendants were "acting in concert" to orchestrate a sick out because the four men traveled together to Los Angeles around June 12, 2008, *see* Milone Tr. 27-29 (traveling together, "in our minds would indicate they were acting in concert"); *see* Comp. ¶33 (citing June travel records as "very strong circumstantial evidence"), and United experienced a "sharp and distinctive increase in sick leave," Milone Tr. 29, "[n]ot immediately thereafter," but "on or about July 18th [] when we saw the first significant spike."  Milone Tr. 37-38.  This extraordinary extrapolation (over *five weeks* between the meeting and the "first significant spike") is unsupported by the evidence.

First, there was no such "significant spike" on or about July 18.  *See supra* at 12; Carlson Tr. 62; 64-67.  Second, the accused pilots' travel coincided with the long-planned rally that ALPA sponsored at the United shareholders meeting in Los Angeles that each of the four men attended along with many other pilots.  Fernandez Tr. 20, 26-27; Freeman Tr. 98-99.  In fact, United's entire complaint is predicated upon no more than supposition that relies upon alleged "private" communications between Wallach and others about which the company admittedly has no knowledge or information.  *See* Milone Tr. 21-22.

The company finds no support in its other stitched-together strings of inference and supposition.  For example, Milone implies in his declaration a causal connection between a February 5 Local Council 12 publication and an increase in sick leave usage two weeks later, on

February 19.  *See* Milone Dec. ¶¶36-37.  At deposition, however, Milone acknowledged that the

February 5 publication does not address sick leave, that he does not know if was distributed to all

United pilots, that he is unaware if anyone at United investigated the sick leave usage of

February 19, and that United made no complaint to ALPA over the issue.  *See* Milone Tr. at 125-

26, 129-30.  His inferences of concerted activity are drawn only from the two-week time lag and

his unsupported suspicion of "back channel communications," *id*. at 126-27.

**10.    ALPA Has Acted Both Before and Since United Filed Suit to Quell Any Improper Sick Leave Usage, and With ALPA's Active Support, Sick Leave Usage Has Abated to Normal Operational Levels Since the End of July**

On July 22, ALPA issued a letter to pilots that stated emphatically:  "**Your MEC**

**does not condone the inappropriate use of sick leave.  Sick leave should only be used for**

**purposes set out in the contract or as required by law.**"  Wallach Tr. 105 & Ex. 21.  MEC

Chairman Wallach issued the letter "to reinforce the fact that we do not condone the

inappropriate use of sick leave, and to remind the pilots that the medical standards that they are

held to are contained in the [Federal Aviation Regulations] and the airman's information

manual" which the letter excerpts.  Wallach Tr. 106-07.[5]

Following United's filing of this action, the United MEC issued a statement

through its MEC Update and via blast email to all pilots that included the following message:

> [P]ilots should not engage in activities either individually or
> collectively that may disrupt operations.  Specifically, the United
> MEC and its officers do not condone and strongly oppose calling
> in sick when you are not ill, refusing to accept junior/senior
> manning assignments for the purpose of disrupting operations, or

---

[5] United argues that Chairman Wallach's July 22 letter to pilots encouraged sick leave abuse, *see* Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Pl. Mem.") at 23-24, but has no evidence that these communications resulted in a spike in sick leave; in fact, the letter post-dates the July 18-20 sick leave levels highlighted by the company in support of its sick out theory, *see* Milone Tr. 152-53, and as the data reveals, the list for 320 First Officers dropped from 84 on July 24 to 72 on July 26.  *See* Carlson Ex. 5

> pressuring other pilots in any way with respect to their individual
> decisions to accept junior/senior manning assignments.

*See* Gise Decl. Ex. 11. The MEC issued this statement by email on August 1, and it remains

posted on the United MEC website.

The United MEC also issued the following statement to all 767/320/737 First

Officers:

> As you know, the pilot agreement contains a provision providing
> for junior/senior manning that is designed to assist the company
> during times of irregular operations and in extraordinary
> circumstances.  The Company alleges and the Court may find that
> the recent spike in absenteeism in your fleet and seat has gone well
> beyond the Company's planned absences, which ALPA has
> reviewed and believes is reasonable.  These circumstances have
> caused the Company to experience irregular operations sufficient
> to make requests for senior/junior manning appropriate.

*See* Gise Decl. Ex. 11.  The MEC also issued this statement by email and it too remains posted

on the United MEC website.

The United MEC further agreed to "support the company's efforts to keep sick

leave" within its "system-wide plan for sick leave for the pilot flying month of August" which is

426 pilots.  Gise Decl. Ex. 11.

Since these actions by ALPA, and as United concedes, *see* Milone Tr. 135-36, the

sick leave usage has dissipated, and United has made no complaints to ALPA about sick leave or

flight cancellations.  Wallach Tr. 132.

## <u>ARGUMENT</u>

**I.    THE COMPANY'S DISPUTES WITH ALPA OVER VOLUNTARY
JUNIOR/SENIOR MANNING AND THE PILOTS' ELECTIONS NOT
TO WAIVE CONTRACTUAL REQUIREMENTS ARE MINOR
DISPUTES THAT LIE OUTSIDE THE COURT'S JURISDICTION**

Under the RLA, disputes between employers and employees are characterized as

either "major" or "minor" disputes.  Major disputes are those that involve the formation or

amendment of collective bargaining agreements.  *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S.

246, 252 (1994); *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302-03

(1989) (hereinafter "*Conrail*"); *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723-24 (1945).

Minor disputes "'relate[] either to the meaning or proper application of a particular provision'"

of a collective bargaining agreement, *Conrail*, 491 U.S. at 303 (quoting *Burley*, 325 U.S. at 723),

"'in a particular fact situation.'"  *Norris*, 512 U.S. at 252-53 (quoting *Bhd. of R.R. Trainmen v.*

*Chicago River & Ind. R.R. Co.*, 353 U.S. 30, 33 (1957)).  All that is required for a dispute to be a

minor dispute is that a party's conduct is "arguably justified" under the terms of the collective

bargaining agreement as applied by the parties.  *See Conrail*, 491 U.S. at 307, 310; *Bhd. of*

*Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 36-39 (1963); *Bhd. of Maint.*

*of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 639 (7th Cir. 1997) (a

dispute is minor if the challenged conduct is "arguably justified" by the terms of the contract).

Section 204 of the RLA, 45 U.S.C. §184, places upon the parties "the statutory

duty of establishing and utilizing system, group, or regional boards of adjustment for the purpose

of adjusting and deciding" minor disputes.  *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.,* 372

U.S. 682, 686 (1963).  The RLA requires that such boards hear and decide minor disputes in

order to minimize "interruptions in the Nation's transportation services by strikes and labor

disputes."  *Id.* at 687.  As a result, the courts have no jurisdiction over minor disputes, and these

disputes must be submitted to a contractual grievance process, and, absent resolution, to binding

arbitration before a system board of adjustment established pursuant to Section 204 of the RLA.

*Bhd. of Locomotive Eng'rs v. Louisville & Nashville R.R.*, 373 U.S. 33, 36-38 (1963); *Brown v.*

*Illinois Central R.R. Co.*, 254 F.3d 654, 658 (7th Cir. 2001); *Monroe v. Mo. Pac. R.R. Co.*, 115

F.3d 514, 516 (7th Cir. 1997)); *Bhd. of Maint. of Way Employees*, 138 F.3d at 638 (7th Cir.

1997); *Chicago & N.W. Transp. Co. v. Ry. Labor Executives Ass'n*, 855 F.2d 1277, 1286 (7th

Cir. 1988) (minor dispute within exclusive jurisdiction of board of adjustment); *see also Conrail*, 491 U.S. at 303-04.

For example, in *Union Pac. R.R. Co. v Local #1409, United Transp. Union*, No. Civ. A. 03-2600, 2004 WL 3106757 (D. Kan. Jan. 18, 2004), the court rejected a claim that Section 2, First of the Act had been violated and denied injunctive relief where the carrier sought to require the union to prevent its members from making "excessive use" of discretionary time off on weekends and holidays in violation of agreed upon "staffing requirements." *Id.* at *1  The court found that the "requested relief goes directly to the merits of this 'minor dispute'" and that it "lack[ed] subject matter jurisdiction over such claims." *Id.* at *4 (citing *S. Ry. Co. v. Locomotive Firemen,* 384 F.2d 323, 329 (D.C. Cir. 1997)).  Similarly, in *United Transp. Union v. Burlington N. R.R. Co.*, 875 F.Supp. 468 (N.D. Ill. 1994), a union sought an injunction arguing that the carrier "was attempting to modify an existing collective bargaining agreement" by its conduct.  *Id.* at 469.  The court, finding the issue to "concern[] interpretation of the [parties'] contractual rights," determined the dispute to be minor, and thus concluded that it was "without jurisdiction to impose injunctive relief." *Id.* at 470.

Here, United's Section 2, First claim rests heavily upon United's challenge to ALPA's longstanding and very public efforts to advance its interpretation of the CBA's voluntary junior/senior manning provision as well as ALPA's public position on contractual waivers.  ALPA has continually and publicly advised the pilots for at least fifteen months, including through amendment to the United MEC Policy Manual, that the contract's voluntary junior/senior manning provision is not intended to provide United with a "manpower planning tool."  In response, United adjusted its manpower planning, apparently accepting ALPA's interpretation rather than challenging it through the grievance process.  ALPA has also publicly advised the pilots since 2006, without protest from the company, that waivers can lead to erosion

of the present contract, and even the company concedes that this position is not a contractual

violation.  Moreover, in all this time, United has cited no disruption to its operations resulting

from pilots' refusal to waive contractual terms.  Both the junior/senior manning issue and the no-

waiver issues present minor disputes.

United relies heavily on two cases to support its claim for injunctive relief under

Section 2, First.  *United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349 (7th Cir. 2001),

and *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001).  In the

former case, however, the International Association of Machinists (the "IAM") made no

argument that it had a "write-up" policy that was a long-standing interpretation of the collective

bargaining agreement left unchallenged by the carrier.  *IAM*, 243 F.3d 349.  In *Delta*, the court

rejected the union's argument that concerted refusal to accept overtime gave rise to a minor

dispute, finding an "implicit" understanding behind the contract that there would always be some

number of pilots who would accept overtime; but the union's interpretation in that case did not

represent a settled union policy.  *Delta*, 238 F.3d at 1302-03, 1307.  Here, by contrast, ALPA's

interpretation has been settled and well known for at least fifteen months, and United has

adjusted its planning models accordingly.  Further, the parties agree that the use of junior/senior

manning is intended for unplanned shortages, and ALPA has advised the pilots of that

agreement.

Because both the underlying disputes over voluntary overtime and the pilots'

refusal to waive contractual requirements present minor disputes outside the Court's jurisdiction,

neither dispute supports United's Section 2, First claim.

**II.    UNITED'S CLAIM CHALLENGING ALPA'S CONDUCT
AND COMMUNICATIONS REGARDING VOLUNTARY
JUNIOR/SENIOR MANNING AND WAIVER OF TERMS IS BARRED BY
THE APPLICABLE SIX MONTH STATUTE OF LIMITATIONS**

A six-month statute of limitations applies to claims brought under Section 2, First

of the RLA.  *See Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.*, 768 F.2d

914, 919 (7th Cir. 1985).  For example, in *Ry. Labor Executives' Assn v. Soutger Ry. Co.,* 860

F.2d 1038, 1045 (11th Cir. 1988), the union's failure for over six months to object to a carrier's

implementation of a new urinalysis policy precluded its claim for a violation of the *status quo*.

Similarly here, United cannot rely upon its stale disputes with ALPA's positions on junior/senior

manning and on pilots' waiver of contractual terms as a means of obtaining injunctive relief

under Section 2, First.

United has been aware of ALPA's position that the contract's junior/senior

manning provisions were intended to address irregular operations and not to be used as a

planning tool since at least April 20, 2007, when former MEC Chairman Bathurst stated in a

video posted on the MEC website that "junior/-senior manning [] was originally designed as a

tool for irregular operations."  Milone Dec. ¶29; *see also* Milone Tr. 109-110.  And in the

"Spring of 2007," Milone provided United lawyers with a file that he had been collecting since

"[n]ot long after [he] arrived" at United in November 2006, in which he documented ALPA

communications that addressed, among other things, "junior/senior manning."  Milone Tr. 165-

66.  Most recently, but still outside the limitations period, on January 25, 2008, the United MEC

amended its Policy Manual to state that "the UAL-MEC does not endorse the use of junior/senior

manning as a manpower planning tool."  Milone Dec. Ex. 4.

United has also known of ALPA's position on the pilots' waiver of contract terms

since 2006, and has been repeatedly reminded since as early as December 2006.  Thus, on

December 20, 2006, the United MEC Update urged pilots to "fly the present contract, and not

waive _any_ section of it."  Milone Dec. Ex. 1.  Milone was made aware of the communication

"within a matter of days."  Milone Tr. 11-12.

Also in 2007, ALPA "issued a 'UAL Pilot Unity Handout' called 'YOUR

CONTRACT -- HONOR IT,' [which] directed pilots not to waive any provisions of the United-

ALPA Agreement."  Milone Dec. ¶16 and Ex. 3; _see also_ Milone Tr. 77.  In the April 20, 2007

video posted to the MEC website, former MEC Chairman Bathurst stated that "Even where the

contract says that a provision may be waived with your concurrence, there may be adverse

collective consequences to consider."  Milone Dec. ¶29.

The Court should not consider the contractual disputes over junior/senior manning

or pilots' refusal to waive contract terms as a basis for finding a violation of Section 2, First

because United has filed these claims too late.

**III.   UNITED HAS FAILED TO ESTABLISH THAT THERE WAS AN ORGANIZED
        SICK OUT; RATHER THERE WAS AN ELEVATION IN SICK LEAVE USAGE
        THAT WAS EXPECTED BY THE COMPANY AS A RESULT OF ITS
        ANNOUNCEMENTS OF FLEET REDUCTIONS AND RESULTING
        FURLOUGHS**

United repeatedly asserts that ALPA's actions in June and July, including the Los

Angeles IRC meeting and ALPA's communications on July 15, July 22 and July 25, created a

"sick out."  _See_ Pl. Mem. at 23.  United's varying accounts since it filed its Complaint and

throughout the discovery period as to _when_ it believes sick leave "spiked" and _why_, demonstrate

that its allegations are mere guesses.  Indeed, even United's expert fails to account for the only

underlying cause of elevated sick leave usage on which the parties agree:  the June 4

announcement of fleet reductions, with massive lay-offs to follow.

According to United, as of the initiation of the lawsuit, the "spike" happened

throughout June and July.  _See_ Carlson Dec. ¶11 (citing sick leave increase beginning between

June 5 and June 30); Carlson Tr. 61-62 (explaining that the "recent spike" described at paragraph

12 of his declaration referred to the entire span of June and July). In discovery, United admitted that it *expected* the sick leave elevation observed beginning on June 5. *See* Milone Tr. 130-31; Carlson Tr. 38. Focused now more intently upon July, even its witnesses do not agree upon when the so-called "spike" occurred. While Milone testified that it began July 18, *see* Milone Tr. 37-38, Carlson testified that it began even earlier, *see* Carlson Tr. 61-64. This testimony from Carlson in particular belies the company's contentions that the union's communications issued on July 15, 22 and 25 -- ***after*** the so-called "spike" as identified by Carlson -- instigated a concerted sick out.

Moreover, while United tries to demonstrate a sudden causal effect from these recent communications, it also argues that these communications have been part of a "steady drumbeat" of similar communications over the past two years. *See* Milone Tr. 127. These are not consistent propositions.

There is no dispute that sick leave use increased, particularly among the narrow body first officers, and the parties agree that this increase was an expected result of the company's fleet reduction announcement. When the sick leave increase appeared to be affecting the operation, the union took steps to address the problem. These steps included further calls by the IRC, correspondence from the MEC chairman, and, when the company filed its lawsuit, additional messages to the pilots on both sick leave usage and junior/senior manning.

In short, the evidence reflects not an orchestrated "spike" in sick leave but simply an anxious work force faced with imminent furloughs, which, to no one's surprise, began to take more sick leave than usual.

IV.    **ALPA'S OVERT REPUDIATION OF ALLEGED IMPROPER CONDUCT SATISFIES ALPA'S DUTIES UNDER SECTION 2, FIRST AND OBVIATES THE NEED FOR A PRELIMINARY INJUNCTION**

To obtain injunctive relief there must be "'some cognizable danger of recurrent violation, something more than the mere possibility.'" *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).  The voluntary "[c]essation of allegedly illegal conduct" will moot a request for injunctive relief, *id.* at 748, unless the conduct can "reasonably be expected to reoccur." *Wernsing v. Thompson,* 423 F.3d 732, 744 (7th Cir. 2005).  The "mere 'theoretical possibility' of a repeat violation is not enough." *Id.* at 745 (quoting *Walsh v. United States Dep't of Veterans Affairs*, 400 F.3d 535, 537 (7th Cir. 2005)).

In *Wernsing v. Thompson*, employees sought to enjoin implementation of a directive restricting certain of their communications.  The court refused to issue an injunction, finding that the directive had not been enforced and was not considered "official policy," making the "possibility of recurrence … purely speculative."  423 F.3d at 745.

In this case, ALPA has taken affirmative and agreed upon steps to ensure that objectionable conduct does not take place, and there is now nothing more than a "mere possibility" that such conduct could occur.  Specifically, the United MEC agreed to issue and has issued statements to its entire membership of United pilots exhorting them not to refuse voluntary overtime in order to disrupt the airline's operations, not to pressure other pilots into refusing such assignments, not to engage in conduct that will disrupt the airline's operations, and not to call in sick when they are not ill.  It also agreed to issue and issued a statement to the junior pilots stating that the elevated sick levels experienced in July amount to "irregular operations sufficient to make requests for senior/junior manning appropriate," and thus encouraging acceptance of such assignments. *See* Gise Dec. Ex. 11.  The statements remain

28

posted on the MEC's website, and were delivered to all United pilots via "blast email" from the United MEC.

ALPA also agreed to "[s]upport the Company's efforts to keep sick leave within" certain defined levels, and by United's own admission, the elevated sick leave usage has dissipated. *See* Milone Tr. at 135-36. The company has not asserted otherwise to the Union. *See* Wallach Tr. at 132.

With these actions, ALPA has met its *status quo* obligations under the RLA, in that it has "exert[ed] every reasonable effort to prevent or discourage" any alleged sick out, and has communicated to pilots that the recent elevation in sick leave usage attributable to the impending pilot furloughs justifies the company's efforts to make junior/senior manning assignments in accordance with the contract. *IAM*, 243 F.3d at 363. ALPA's actions have obviated any need for a preliminary injunction in that it has essentially afforded the relief that the company seeks. There is simply no justification to hang the threat of contempt sanctions on ALPA or on the individual defendants.

## V. UNITED HAS NOT SATISFIED THE REQUIREMENTS OF THE NORRIS-LAGUARDIA ACT FOR AN INJUNCTION IN THIS LABOR DISPUTE

Congress enacted the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. §§101-115, to "tak[e] the federal courts out of the labor injunction business." *Marine Cooks & Stewards v. Panama S.S. Co.*, 362 U.S. 365, 369 (1960); *see Burlington N. R. Co. v. Bhd. of Maint. of Way Employees*, 481 U.S. 429, 438 (1987) (discussing purpose and history of the Act). The statute broadly applies to all cases involving a "labor dispute," which the statute defines to "includ[e] any controversy concerning terms and conditions of employment." 29 U.S.C. §113(c); *see generally Burlington Northern*, 481 U.S. at 440-43 (rejecting narrow construction of "labor dispute"). The Supreme Court has repeatedly held that a "labor dispute" exists where, as here, the dispute centers on an allegedly unlawful withholding of labor. *See Jacksonville Bulk*

29

*Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982) (alleged violation of no

strike pledge constitutes a "labor dispute" under the NLGA); *Order of R.R. Telegraphers v.*

*Chicago & N.W. R. Co.*, 362 U.S. 330, 335 (1960) (NLGA applies to RLA carrier's action to

enjoin work stoppage).

      The critical element in determining whether a labor dispute exists is whether "the

employer-employee relationship [is] the matrix of the controversy." *Jacksonville*, 457 U.S. at

712-13 (citation omitted).  In this case, the matrix of the dispute is between United and its

employees both individually and as represented by ALPA, and concerns the allegedly improper

conduct of certain United pilots in connection with their usage of sick leave.  It is clearly a labor

dispute.

      That United seeks relief under the RLA does not preclude application of the

NLGA's requirements.  *See Bhd. of R.R. Trainmen v. Toledo, P.W.R.R.*, 321 U.S. 50, 56-57

(1944) (applying NLGA to labor dispute); *Va. Ry. v. System Fed'n No. 40*, 300 U.S. 515, 607-08

(1937) (same); *IAM*, 243 F.3d at 364-67 (same); *ALPA v. United Air Lines*, 802 F.2d 886, 905

(7th Cir. 1986) (same).  Even upon allegations of *status quo* violations under Section 2, First of

the RLA, the Seventh Circuit requires that the NLGA's requirements be met before issuance of

an injunction.  *See IAM*, 243 F.3d at 365 (the exception "carved out" from the NLGA's "general

prohibition on injunctive relief against union activity" is a "limited one" applicable "only if an

injunction is the only practical, effective means of enforcing" the duty under Section 2, First, or

if that remedy alone can effectively guard the plaintiff's right") (quoting *Chicago & North*

*Western Ry.*, 402 U.S. at 583)).

      Because this case constitutes a labor dispute, the NLGA applies and United was

required to, but did not, satisfy its exacting requirements.

**A.     United Cannot Show By Clear and Convincing Evidence, Nor Even By A Preponderance of the Evidence, That Any Defendant Committed Unlawful Acts as Required By Section 6 of NLGA**

Section 6 of the NLGA provides that

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof* of *actual* participation in, or *actual* authorization of, such acts, or of ratification of such acts after *actual* knowledge thereof.

29 U.S.C. §106 (emphasis added); *see generally United Bhd. of Carpenters v. U.S.*, 330 U.S. 395, 403 (1947). Section 6 governs United's request for an injunction against ALPA and the individual defendants. *See IAM*, 243 F.3d at 365-66 (requiring "clear proof" of union's involvement in unlawful "work action" to issue injunction); *N. Am. Coal Corp. v. Local Union 2262*, 497 F.3d 459, 466 (6th Cir. 1974) (NLGA Section 6 controls court's power to enjoin union); *Donnelly Garment Co. v. Dubinsky*, 154 F.2d 38, 41 (8th Cir. 1946) (same).

Under Section 6, a plaintiff must provide "clear, unequivocal and convincing proof" of the defendants' culpability. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 737 (1966); *IAM*, 243 F.3d at 362 (same). This requires United to prove clearly that ALPA and each individual defendant either "approved of the [unlawful conduct], or that it participated actively or by knowing tolerance in further acts that were in themselves actionable." *Gibbs*, 383 U.S. at 739. A carrier must satisfy Section 6 even where, as here, it claims that the union's conduct violates the status quo provisions of the RLA. *See ALPA*, 802 F.2d at 905 (even though pilots' pre-strike may violate RLA, Section 6 insulates union from liability).

Applied here, United's burden is to prove by clear and convincing evidence that ALPA and the other defendants engaged in self help by promoting a concerted abuse of sick leave, and to provide statistical evidence demonstrating that the pilots engaged in same. *See*

*ALPA*, 802 F.2d at 905-06.  Yet United cannot establish these elements even by a *preponderance* of the evidence.  Indeed, the evidence contradicts United's assertions and undermines its claims.

As revealed in discovery, far from promoting any sick out, the individual defendants met on June 11 for the purpose of *preventing* a potential abuse of sick leave among United's pilots.  Thereafter, the IRC members, including Freeman, took specific and consistent steps to discourage and prevent a rumored sick out by pilots, by explaining to pilots the dire consequences that could result and by censoring internet postings that might incite improper conduct.  *See supra* at 15.

In addition, when IRC members observed that there was an unusual pilot shortage in the July 18-20 timeframe, they investigated the possibility of a concerted abuse of sick leave.  They found none, but they and the United MEC nevertheless took steps to discourage any potential sick leave abuse, concerted or otherwise.  Tamkin and Freeman, respectively, removed individual pilots' potentially incendiary postings from the United MEC website and the independently operated www.ual2172.com.  *See supra* at 16.

ALPA also did not encourage any unlawful concerted activity, but instead Wallach directed the IRC to attempt to put a stop to such activity.  In addition ALPA issued the July 22 letter emphasizing that "**Your MEC does not condone the inappropriate use of sick leave.  Sick leave should only be used for purposes set out in the contract or as required by law.**"  Wallach Tr. 105 & Ex. 21.  ALPA has since issued further communications to the pilots to discourage any efforts, concerted or individual, to disrupt operations, and to discourage excessive sick leave usage.

The various ALPA publications cited by United regarding safety, fatigue and the pilots' obligations to ensure that they and their assigned aircraft are fit to fly do not demonstrate ALPA's participation in any concerted work slowdown.  ALPA, whose slogan is "Schedule With

Safety" has worked for years to address the effect of scheduling on fatigue, and the cited publications have been issued over an extended period and in response to company actions and growing industry concerns. *See supra* at 17. Given the seriousness with which the FAA and ALPA take the issue of pilot fatigue, *supra* at 17, the known concern over fatigue among the junior pilots, *supra* at 16-17, and the company's admitted efforts to question pilots who report themselves fatigued, *see* Milone Tr. 40-41, ALPA's responsive educational communications on the issue bear no relation to the "work safe" exhortations that the Seventh Circuit found lacked any credible explanation other than as "code" to call for a work slow down in *IAM*, 243 F.3d at 366. Nor has the company shown any link between ALPA's longstanding communications on these issues and the increases in sick leave in June and July -- increases that the company admits were expected results of its fleet grounding announcement.

Finally, the statistical evidence put forth by United does not demonstrate a singular spike in sick leave usage by the same pilots on the same days as one would expect to see in a concerted "sick out." Rather, the data shows an elevated use of sick leave among pilots that fluctuates over the course of several weeks. The increases that were associated with flight cancellations took place in late July and were promptly addressed by the defendants.

**B.    United Cannot Point to Any Continuing or Threatened Unlawful Conduct That Would Warrant an Injunction Under the NLGA**

Section 7(a) of the NLGA deprives a court of jurisdiction to issue injunctive relief absent a finding of fact that "*unlawful acts* have been threatened *and will be committed* unless restrained or have been committed *and will continue* unless restrained." 29 U.S.C. §107(a) (emphasis added).

Here, the evidence does not support a finding of any unlawful acts committed or threatened by ALPA or the individual defendants. United tries four times to find "unlawful acts" and each attempt fails.

33

First, United claims that individuals have posted "rat lists" calling attention to those pilots who accepted junior/senior manning assignments, and in a few instances, expressing displeasure with such acceptances. As an initial matter, such statements are protected by the First Amendment and federal labor law. *See Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 273 (1974) (publication by union of list of non-union members under heading entitled "Scabs" was protected organizational activity and freedom of expression).

More importantly, United fails to attribute these posted lists to ALPA or to any defendant. The fact that someone has occasionally slipped a posting behind the glass of a locked bulletin board, *see* Tamkin Tr. 132-33; Milone Tr. 116-17, does not mean ALPA bears responsibility for the conduct, especially given Chairman Wallach's directive to Tamkin in November 2007 that he use his communications network among the pilots to discourage such derogatory postings. *See* Wallach Tr. 77.

Second, United cites unattributed "reports" that "some pilots" have received threatening or harassing messages and packages through the mails. *See* Milone Dec. ¶28. United does not support these assertions with any evidence at all, let alone evidence connecting such alleged conduct to any defendant.

Third, United recites the unfortunate alleged actions of a single first officer who, in violation of United MEC policy, allegedly made threatening statements to a captain who did not participate in ALPA's lawful "hats on/hats off" campaign. *See* Milone Dec. ¶39. Yet no injunctive relief is appropriate to restrain this single individual from similar future conduct, if it took place, particularly given that United has apparently terminated this first officer.

Nor has the company shown that there was a concerted abuse of sick leave, let alone that such abuse will continue unabated in the absence of an injunction. ALPA has repeatedly taken steps to prevent sick leave abuse -- in mid-June 2008, when the IRC took steps

to stamp out a potential sick out, and on July 22 and again August 1, when ALPA issued

communications to all pilots stating ALPA's strong opposition to the use of sick leave by pilots

who are not sick -- and United acknowledges that sick leave usage has returned to acceptable

levels.

In short, defendants have not committed any unlawful acts, and have taken steps

to discourage such acts by others.  The Court lacks jurisdiction under the NLGA to issue the

injunction sought by United.

## **CONCLUSION**

For the reasons stated herein, defendants respectfully request that plaintiff's

Motion for Preliminary Injunction be denied.

Dated:  August 19, 2008

Respectfully submitted,


  /s/  Judiann Chartier
Michael E. Abram
Joseph J. Vitale
Travis M. Mastroddi
Eyad Asad
Robin H. Gise
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036
(212) 563-4100

Elizabeth Ginsburg
David Semanchik
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
Legal Department
535 Herndon Parkway
Herndon, VA 20170
(888) 359-2572

Judiann Chartier
KATZ, FRIEDMAN, EAGLE,
EISENSTEIN, JOHNSON & BARECK
77 West Washington Street, Suite 2000,
Chicago, Illinois  60602
(312) 263-6330

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------------------------------- x
                                                    :
UNITED AIR LINES, INC.,                             :
                                                    :
                                Plaintiff,          :          Civil Action No. 08 CV 4317
                                                    :          Judge Lefkow
            - v. -                                  :          Magistrate Judge Denlow
                                                    :
AIR LINE PILOTS ASSOCIATION,                        :
INTERNATIONAL, et al.,                              :
                                                    :
                                Defendants.         :
                                                    :
----------------------------------------------------------------X

## DECLARATION OF ROBIN H. GISE

I, Robin H. Gise, under penalty of perjury and in lieu of an affidavit as permitted by 28 U.S.C. §1746, declare as follows:

1.      I am an associate at the firm of Cohen, Weiss and Simon LLP, counsel to the Air Line Pilots Association, International.

2.      I submit this declaration in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.

3.      Attached hereto as Exhibit 1 are excerpts from United's First Amended Disclosure Statement for Reorganizing Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code dated October 20, 2005, *In re UAL Corporation, et al.*, Case No. 02-B-48191 (Bankr. N.D. Ill.).

4.      Attached hereto as Exhibit 2 are excerpts from the Transcript of
Proceedings Before the Honorable Eugene R. Wedoff dated January 6, 2005, *In re UAL
Corporation, et al.*, Case No. 02-B-48191 (Bankr. N.D. Ill.).

5.      Attached hereto as Exhibit 3 are excerpts from the Affidavit of Kathryn A.
Mikells in Support of Reorganizing Debtors' Memorandum of Law (A) in Support of
Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter
11 of the United States Bankruptcy Code and (B) in Response to Objections Thereto dated
January 11, 2006,  *In re UAL Corporation, et al.*, Case No. 02-B-48191 (Bankr. N.D. Ill.).

6.      Attached hereto as Exhibit 4 is a true and accurate copy of selected pages
from the Annual Report (10-K) filed with the Securities and Exchange Commission by United
Airlines, Inc. on March 29, 2007.

7.      Attached hereto as Exhibit 5 is a true and accurate copy of a report
published on the United Airlines, Inc. website and entitled "UAL Corporation Reports First
Quarter 2008 Results."

8.      Attached hereto as Exhibit 6 is a true and accurate copy of an article from
the *New York Times* entitled "Delta and Northwest Pilots Overwhelmingly Ratify Joint Pact"
dated August 12, 2008.

9.      Attached as Exhibit 7 is a true and correct copy of a transcript from the
UAUA 2Q 2008 UAL Corporation Earnings Conference Call held on July 22, 2008 at 11:00 a.m.
E.T.

10.      Attached as Exhibit 8 is a transcript of remarks made by Robert Sumwalt,
Vice Chairman National Transportation Safety Board to the FAA Aviation Fatigue Management:

Partnerships for Solutions Symposium on June 17-19, 2008 in Vienna, VA, and which is publicly available at http://www.ntsb.gov/speeches/sumwalt/rls080617a.html.

11.    Attached as Exhibit 9 is a copy of a press release issued by the Washington Headquarters of the Federal Aviation Administration dated June 24, 2008, which is publicly available at http://www.faa.gov/news/press_releases/news_story.cfm?newsId=10246.

12.    Attached as Exhibit 10 is a copy of a press release issued by the Washington Headquarters of the Federal Aviation Administration dated August 14, 2008, which is publicly available at http://www.faa.gov/news/press_releases/news_story.cfm?newsId=10269.

13.    Attached as Exhibit 11 is a copy of the agreement entered between Air Line Pilots Association, International and United Airlines, Inc. dated August 1, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 19, 2008
       New York, New York

                                        By: _____
                                              Robin H. Gise

- 3 -

# Exhibit 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| UAL Corporation, <u>et al.</u>, | ) | |
| | ) | Case No. 02-B-48191 |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | Honorable Eugene R. Wedoff |

## FIRST AMENDED DISCLOSURE STATEMENT FOR REORGANIZING DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

- Record Date: October 20, 2005

- Voting Deadline: December 19, 2005 at 4:30 p.m. prevailing Pacific time

- Date by which objections to Confirmation of the Plan must be filed and served: December 12, 2005 at 4:00 p.m. prevailing Central time

- Hearing on Confirmation of the Plan: January 18, 2006 at 10:30 a.m. prevailing Central time

James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C.
David R. Seligman
David A. Agay
Erik W. Chalut
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000

Counsel for the Debtors and the Debtors in Possession

Dated: October 20, 2005

---

[1]    The Debtors are the following entities: Air Wisconsin, Inc., Air Wis Services, Inc., BizJet Charter, Inc., BizJet Fractional, Inc., BizJet Services, Inc., Ameniti Travel Clubs, Inc., Cybergold, Inc., Domicile Management Services, Inc., Four Star Leasing, Inc., itarget.com, inc., Kion Leasing, Inc., Mileage Plus, Inc., Mileage Plus Holdings, Inc., Mileage Plus Marketing, Inc., MyPoints.com, Inc., MyPoints Offline Services, Inc., Premier Meeting and Travel Services, Inc., UAL Benefits Management, Inc., UAL Company Services, Inc., UAL Corporation, UAL Loyalty Services, LLC, United Air Lines, Inc., United Aviation Fuels Corporation, United BizJet Holdings, Inc., United Cogen, Inc., United GHS, Inc., United Vacations, Inc., and United Worldwide Corporation.

ATSB on terms that would have allowed the Debtors to exit bankruptcy with their Pension Plans intact. By statute, a precondition of an ATSB guarantee would have been that non-ATSB-guaranteed financing of the Debtors' business plan submitted to the ATSB was not available on commercially reasonable terms. Thus, no parallel exit financing process could have been undertaken in earnest during the ATSB process. During this time, the Debtors made tremendous strides (which the ATSB expressly acknowledged) in reducing their overall cost structure and making their businesses more competitive, including a tripartite restructuring of their labor, pension, and other retirement costs.

(i)    The Debtors' 2003 Labor Cost Restructuring Activities

Negotiations to modify the Debtors' CBAs commenced three days after the Petition Date, when the Debtors presented each of their Unions with proposed modifications to their CBAs, initiating the Section 1113 process under the Bankruptcy Code. While the Debtors committed to reaching consensual settlements, they informed their Unions that to satisfy covenants under the DIP Facility they would be forced to seek rejection of their CBAs if negotiations proved unsuccessful. Simultaneously, the Debtors took immediate steps to reduce the pay, benefits and staffing levels of their non-represented SAM employees.

The DIP Facility covenants originally required that the Debtors lower their labor costs by mid-February 2003, which would have necessitated a filing to reject the Debtors' CBAs by December 26, 2002. To allow the Debtors enough headroom under the DIP Facility covenants, thereby delaying their Section 1113(c) rejection motion, and allowing the parties more time to reach consensual agreements, the Debtors, ALPA, AFA, PAFCA, and TWU agreed to interim wage reductions, which were ratified by their memberships in early January 2003. The Debtors subsequently moved under Section 1113(e) for interim wage relief against IAM 141 and IAM 141M, which the Bankruptcy Court granted on January 10, 2003.

After attaining interim wage relief, the Debtors and their Unions continued negotiations to achieve long-term wage and benefit cost-saving agreements. By mid-March, the Debtors had reached agreement only with TWU, the smallest of the Debtors' Unions (the "TWU 2003 Restructuring Agreement"). Thus, even while continuing to negotiate, the Debtors were forced to file their Section 1113(c) motion on March 17, 2003, to reject all of their other CBAs.

Ultimately, the negotiations succeeded. On March 27, 2003, the Debtors and ALPA reached tentative agreement on long-term wage and benefit modifications to the ALPA CBA (the "ALPA 2003 Restructuring Agreement"), while the Debtors reached tentative agreements with AFA (the "AFA 2003 Restructuring Agreement"), PAFCA (the "PAFCA 2003 Restructuring Agreement"), IAM 141 (the "IAM 141 2003 Restructuring Agreement"), and IAM 141M[13] (the "IAM 141M Restructuring Agreement," and collectively, the "2003 Restructuring Agreements") in early April 2003. Each of the Unions' memberships subsequently ratified their respective 2003 Restructuring Agreements.

Significantly, the 2003 Restructuring Agreements provided for: enhanced flexibility with respect to regional jets, outsourcing, and code share arrangements; a low-cost product offering; and a success-sharing program. The Debtors, ALPA, and IAM also entered into letters of agreement providing that ALPA and IAM would have a seat on Reorganized UAL's board of directors. Pursuant to the 2003

---

[13]    In July 2003, the National Mediation Board announced that the Debtors' mechanics and related employees, previously represented by the IAM, voted to change their union representation to AMFA. This change in representation from IAM to AMFA had no effect on the terms or duration of the modified CBAs ratified in April 2003.

Restructuring Agreements, the Debtors achieved average annual savings of approximately $1.1 billion from ALPA; approximately $500,000 from TWU; approximately $4 million from PAFCA; approximately $300 million from AFA; approximately $350 million from IAM 141M; and approximately $450 million from IAM 141. The Debtors also achieved average annual savings of approximately $332 million from their SAM employees. In all, these changes were projected to result in average annual savings of approximately $2.5 billion over the 2003 to 2008 time period. Additionally, concessions included in the 2003 Restructuring Agreements reduced the Debtors' projected pension funding contributions by approximately $1.2 billion between 2004 and 2008.

The Debtors determined that all of their employee groups would share proportionately in the distribution under the Debtors' plan to the Unsecured Creditor body. Specifically, the Debtors agreed to propose a plan of reorganization that provided for distributions to each of the their Union-represented and SAM employee groups based on their pro rata share of the Unsecured Distribution as though such employee groups had Unsecured Claims, calculated as follows: (a) the dollar value of 30 months of average cost reductions obtained in the Debtors' 2003 labor savings initiatives with respect to each employee group as reasonably measured by the Debtors' labor model, divided by (b) the sum of each respective distribution amount and the total amount of all other allowed prepetition general Unsecured Claims against the Debtors. Collectively, the average labor cost savings over 30 months based on the Debtors' 2003 labor savings initiatives total approximately $6.4 billion.

On April 30, 2003, the Debtors filed a motion to approve the 2003 Restructuring Agreements, and the Bankruptcy Court considered the motion the same day. (Although the Debtors' labor model contemplated a pro rata distribution of the Unsecured Distribution to SAM employees, the Debtors' motion did not include a request for Bankruptcy Court approval of such distributions to SAM employees). Certain parties objected to the distributions under the 2003 Restructuring Agreements. The Debtors addressed the objectors' concerns by including a reservation of rights in the order approving the motion as follows:

> [V]arious parties state that the claims set forth in the Distribution Agreements contained in the [2003] Restructuring Agreements may be challenged at a later date; the Debtors and the unions state that the Restructuring Agreements speak for themselves in that regard.

Order Approving 2003 Restructuring Agreements, ¶ 4. When one of the objectors asked for clarification of this provision in the order, the Bankruptcy Court stated as follows:

> I don't know, and can't possibly have given sufficient consideration to know, the appropriateness of a claim to be asserted by the unions in connection with these restructurings. I have every reason to believe that it was the subject of considerable negotiation between United and the unions. If there's also no question that the agreement of the unions to accept reductions in the compensation of their members as this case moves forward would be essential to the continued operation of the airline, it's continued ability to generate income and, hence, the potential for your clients recovering anything on their general unsecured claims -- with those observations, I would suggest that it is highly likely that the claims that are set forth in this agreement would ultimately be approved by the Court if there were a challenge made to the claims. However, I have to believe that the provisions of Section 502 of the Bankruptcy Code which would allow other parties to challenge claims asserted by any creditors of the estate, could not be undone by a bilateral agreement between the debtor and a particular creditor. So those -- those would be my observations. If that's troubling to either party in such a way as to

48

provided in their business plan to distribute New UAL Convertible Employee Notes to SAM employees calculated using a methodology consistent with that used to calculate the New UAL Convertible Employee Notes for ALPA, PAFCA, and TWU, totaling approximately $56 million (the "SAM Notes"). In addition, SAM employees will be eligible for a 100% match on their own contributions to the SAM defined contribution plan (up to 4 percent), and will be eligible for an additional, direct company contribution of up to 4 percent (depending on the participant's age and years of service).

Moreover, as they previously had agreed in their 2003 Restructuring Agreements, the Debtors also agreed to provide in their plan of reorganization that their ALPA, PAFCA and TWU-represented and SAM employee groups would share in the distributions to the Debtors' unsecured creditors on account of labor and pension-related savings achieved during the 2005 labor savings initiative. Specifically, the Debtors agreed to propose a plan of reorganization providing for distributions to each of these employee groups as though such groups had Unsecured Claims, calculated as follows: (a) (i) the dollar value of 30 months of average cost reductions obtained in the Debtors' 2003 labor savings initiatives with respect to each respective employee group as reasonably measured by the Debtors' labor model, plus (ii) the dollar value of 20 months of average cost reductions obtained in the Debtors' 2005 labor savings initiatives with respect to each respective employee group as reasonably measured by the Debtors' labor model, divided by (b) the sum of each respective distribution and the total amount of all other allowed prepetition general Unsecured Claims against the Debtors.

Each of the ALPA, TWU, and PAFCA 2005 Restructuring Agreements also provided that they could be terminated at the option of the respective Union if, for example, a plan of reorganization is filed or confirmed which contains any material term that is materially inconsistent with the terms of the respective 2005 Restructuring Agreement or if the Debtors failed to achieve a specifically defined aggregate level of cost saving from all of its other employee groups, including SAM. Each of the ALPA, TWU, and PAFCA 2005 Restructuring Agreements was ratified by their respective Union membership and approved by the Bankruptcy Court.[17] The orders approving the ALPA, PAFCA, and TWU 2005 Restructuring Agreements provided that, except for the allowed Administrative Claim, judicial approval of such agreements would have the same meaning and effect as judicial approval of the 2003 Restructuring Agreements.

Again, although the Debtors' labor model also contemplated a pro rata distribution of the Unsecured Distribution to SAM employees based on such employees' additional concessions in the second 1113 process, the Bankruptcy Court did not specifically approve such additional distributions. Moreover, although the Debtors' business plan contemplated the distribution of SAM Notes to SAM employees, the Bankruptcy Court did not specifically approve such distributions. The Plan does in fact provide for the distribution of the SAM Notes and for the SAM Distribution.

The Debtors estimate that with respect to wage and related relief, they will achieve approximately $181 million of average annual wage and related savings pursuant to the ALPA 2005 Restructuring Agreement; approximately $230,000 of average annual wage and related savings pursuant to the TWU 2005 Restructuring Agreement; approximately $2.8 million of average annual wage and related savings pursuant to the PAFCA 2005 Restructuring Agreement; and approximately $112 million of average

---

[17] Two parties, URPBPA and PBGC, appealed the Bankruptcy Court's approval of the ALPA 2005 Restructuring Agreement. The Debtors filed motions to dismiss both appeals. On June 24, 2005, the District Court dismissed the URPBPA appeal. On July 19, 2005, URPBPA appealed the District Court's ruling to the Seventh Circuit Court of Appeals. The Seventh Circuit has set a deadline for URPBPA to file its opening brief of September 16, 2005. On July 22, 2005, the District Court entered an order approving PBGC's motion to voluntarily dismiss its appeal.

# Exhibit 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                        )
                              ) No. 02 B 48191
UAL CORPORATION,,             )
                              ) Chicago, Illinois
                              ) January 6, 2005
                     Debtor.  ) 10:30 a.m.

TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE EUGENE R. WEDOFF

APPEARANCES:
MR. JAMES SPRAYREGEN
on behalf of the debtors;

MS. CAROLE NEVILLE
MR. FRUMAN JACOBSON
on behalf of the creditors committee;

MR. JOHN MENKE
MS. STEPHANIE THOMAS
on behalf of the Pension Benefit Guaranty
Corporation;
MR. JACK CARRIGLIO
on behalf of the United Retired Pilots Benefit
Protection Association;
MR. IRVING KING
on behalf of the Transport Workers Union of America;

MR. WESLEY KENNEDY
on behalf of the Professional Air Line Flight
Control Association;

MS. ANN ACKER
on behalf of the Bank of New York and Wells Fargo
Bank;

MS. SHARON LEVINE
on behalf of the International Association of
Machinists and Aerospace Workers;

1   whatever activities would be useful between now and

2   1:30, and I expect there are many that can be

3   engaged in.

4           MR. SPRAYREGEN:  Thank you, your Honor.

5                 (Brief recess.)

6           THE CLERK:  Recalling UAL Corporation, 02

7   B 48191.

8           MR. SPRAYREGEN:  Good afternoon, Judge

9   Wedoff.  James Sprayregen again on behalf of the

10  debtors.

11          THE COURT:  I don't think we'll need

12  appearances again.  So if you would just like to

13  begin with your argument, I would appreciate it.

14          MR. SPRAYREGEN:  Sure.

15          THE COURT:  I don't know if there is any

16  more room on the chairs in the courtroom, but I am

17  uncomfortable with people having to stand.  If we

18  can make room for them, I would appreciate it.  And

19  perhaps we can bring in -- there are other chairs

20  here that are available, people can use them.

21          Okay.  We do have a couple more chairs

22  here for anyone who is standing.

23          Go ahead, Mr. Sprayregen.

24          MR. SPRAYREGEN:  Your Honor, when we

25  commenced the second 1113 process of this case, we

Page 12

1  reported to the court and reported to all parties

2  that our intent in recommencing that process was to

3  arrive at consensual agreements, if at all possible,

4  with each of our labor groups.  We have undertaken

5  strenuous efforts to do that.  The good news is we

6  believe that we're here today seeking approval on

7  the agreement with ALPA.   There is two other

8  agreements in a separate motion that we'd like to

9  address after this.

10         Obviously we had the 1113(e) motion

11  with the IAM approved this morning, which is a

12  temporary resolution, but we think actually not

13  necessarily unrelated to the momentum created by the

14  execution of the ALPA agreement and actually being

15  here today seeking approval of that.

16         We obviously have two other unions

17  that we are starting the trial with tomorrow,

18  barring developments, that is AMFA and AFA.  I tell

19  the court we continue to be hard at work with

20  respect to those two unions and will do everything

21  we can to arrive at a consensual agreement with

22  them.

23         But we reported when we recommenced

24  the 1113 process that there was something that we

25  did not desire to do, but due to the economic

Page 13

1    circumstances of the debtors, which I think everyone

2    in this courtroom well understands at this point in

3    time, it was simply unavoidable, and due to the

4    developments of the case, which I think the court is

5    well familiar with at this point with respect to the

6    ATSB and fuel and the revenue environment.

7          Your Honor, when we filed the

8    rejection motion shortly before Thanksgiving, again

9    it was in the hopes that we wouldn't be here for a

10   trial that is starting tomorrow with all of our

11   unions.  It was in the continued hopes that that

12   trial would be avoided through agreement.

13         We had virtually round-the-clock

14   negotiations with ALPA, our pilots union, to reach

15   the agreement that we're seeking approval on today,

16   for a lengthy period of time.  Your Honor, it was at

17   the point in time when we had no deals with any

18   other unions.  Your Honor, we think that's actually

19   critically important to the context of how we

20   arrived at today because this agreement was made by

21   the debtors and the first union to step forward and

22   reach agreement with the debtors in the current

23   environment.  It's quite important to us, quite

24   important to them, we believe quite valuable to the

25   estate, and has all sorts of purely economic

1  benefits and others somewhat intangible benefits,

2  but significant benefits nonetheless to the estate.

3        Obviously we can't pass over even for

4  a moment the fact that this agreement contains a

5  provision that ALPA will not object to the removal

6  from their contract of the provision requiring a

7  defined benefit pension plan.  I don't think anybody

8  can overstate the difficulty of dealing with that

9  issue or the importance of the debtors having dealt

10  with that issue with one of its major unions in a

11  consensual fashion.  That is a provision that has

12  been in their collective bargaining agreement for

13  decades, literally decades that we have dealt with

14  through this agreement.

15        Now, in reaching consensual agreement,

16  Your Honor, it would be nice if the debtors could

17  get all benefits and no burdens.  And that would

18  make it an easy case for the court and easy case for

19  all of the creditors if the agreement that we were

20  seeking to approve had all sorts of provisions that

21  got economic benefits and other benefits for the

22  debtors and the debtors did not give up anything to

23  get those.

24        However, it's quite hard to make an

25  agreement of that type.  We have not made an

1  can't quantify the nonmonetary damages -- or

2  nonmonetary benefits?

3           MR. SPRAYREGEN:  Your Honor, we believe

4  actually the proof is in the pudding.  That is when

5  we made this deal, we had no deals with anybody

6  else.  Since we've made that deal, we have two

7  permanent deals and one interim deal.  And, again,

8  I'm not going to characterize the other

9  negotiations, but we're working hard at those.  I

10 can't tell you a cause and effect.  And that's the

11 very concept of a liquidated damages provision, that

12 is if -- again, we're not arguing this is liquidated

13 damages, but some people have argued it.  If you

14 want to look at it in that box, in that context, as

15 the court just noted, it's a difficult amount to

16 specifically quantify.

17           We believe that there is tremendous

18 benefits.  The court itself has noted the benefits

19 of consensual arrangements in this case on numerous

20 occasions.  We agree.  We actually think that having

21 an agreement with our pilots here is critically

22 important to the reorganization of this estate.  And

23 even if we compared this to a litigated victory, and

24 nobody says that litigation is risk free, we think

25 that this deal compares favorably to a litigated

# Exhibit 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **UAL CORPORATION, et al.,** | ) | **Case No. 02-B-48191** |
| | ) | **(Jointly Administered)** |
| Debtors. | ) | |
| | ) | **Honorable Eugene R. Wedoff** |
| | ) | |

**AFFIDAVIT OF KATHRYN A. MIKELLS IN SUPPORT OF**
**REORGANIZING DEBTORS' MEMORANDUM OF LAW (A) IN**
**SUPPORT OF CONFIRMATION OF THE DEBTORS' SECOND**
**AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO**
**CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE AND**
**(B) IN RESPONSE**
**TO OBJECTIONS THERETO**

**(RELATED TO DOCKET NO. 14506)**

Kathryn A. Mikells, being duly sworn, deposes and states:

1.      I am Vice President and Treasurer of United Air Lines, Inc. ("United," and

together with the above-captioned debtors and debtors in possession, the "Debtors"). I have held

this position since January 21, 2005. Prior thereto, I was Vice President-Corporate Real Estate

for United. I joined United in 1994 and have held several positions, including Director of

Corporate Planning, Managing Director of United NetVentures, Chief Financial Officer for

Mileage Plus, Director of Financial Analysis, Manager of Operating Budgets and Manager of

United's treasury department. In my current position, I am responsible for United's treasury

department, including corporate finance, risk management, cash management, insurance and

corporate tax. These responsibilities include, among other things, overseeing United's aircraft

fleet restructuring.  I am generally familiar with United's day-to-day operations, businesses, affairs, and books and records, and have played an active role in the formulation of the Debtors' business plan and plan of reorganization.

2.    I submit this affidavit in support of the Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Second Amended Joint Plan of Reorganization of The Debtors Pursuant to Chapter 11 of The United States Bankruptcy Code and (B) In Response to Objections Thereto (the "Memorandum" [Docket No. 14506]).[1]  All matters set forth in this affidavit are based on: (a) my personal knowledge, (b) my review of relevant documents, (c) my view, based upon my experience and knowledge of the Debtors' business and financial condition, or (d) as to matters involving United States bankruptcy law or rules, my reliance on the advice of counsel to the Debtors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

I.    **Background**

3.    During the more than three years in which United has operated in Chapter 11, United has restructured almost every aspect of its business, including revamping its labor and pension costs, marking to market its aircraft fleet, restructuring its municipal bond obligations, and renegotiating its leases and contracts, all against the backdrop of a difficult industry environment, including historically high fuel prices, persistently low yields, unrelenting competition from low cost carriers, and increased fare transparency.  United is now poised to

---

[1]    Any capitalized terms not otherwise defined herein shall have the meanings set forth in the Memorandum or the Plan.

2

emerge from Chapter 11 with a resilient balance sheet, a strong cash position, and a renewed and sustainable ability to compete for the long term.

## II.    The Plan Should Be Confirmed

### A.    Classification of Claims (§ 1122)

4.     I believe that the methodology of claims classification employed in the Plan satisfies the classification requirements of 11 U.S.C. § 1122 by placing only substantially similar claims or equity interests in each Class.    Here, unsecured creditors have been separately classified based upon their different rights and the different attributes of their Claims.    For example, the Plan classifies Holders of Unsecured Aircraft Claims (e.g., Classes 2E-1 and 2E-2) separately from Holders of Other Unsecured Claims (Class 2E-6).    The reason for this is simple. Holders of Unsecured Aircraft Claims have rights (i.e., Section 1110 rights in aircraft equipment) different than those of Holders of Other Unsecured Claims.    In fact, in the case of Unsecured Aircraft Claims, the Plan separately classifies these unique creditors into further subgroups based on the treatment of their aircraft.    In particular, Class 2E-1 consists of Holders of Unsecured Retained Aircraft Claims (creditors whose aircraft are subject to postpetition agreements entered into by the Debtors) while Class 2E-2 consists of Holders of Unsecured Rejected Aircraft Claims (creditors whose aircraft were rejected or abandoned during these Chapter 11 Cases).    Other examples of separate classification are the Unsecured PBGC Claims, the Unsecured Chicago Municipal Bond Claims, and the Unsecured Public Debt Aircraft Claims, each of which are separately classified based on settlement agreements approved by this Court resolving such parties' unique Claims against the Debtors' estates and providing for unique treatment.    In each instance of separate classification, the Plan uses similar logic.    As such, valid business and

3

factual reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Thus, the Plan satisfies Section 1122 of the Bankruptcy Code.

### B.    Plan Proposed In Good Faith § 1129(a)(3)

5.    I believe that United has proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and maximizing the value of each of the Debtors and the recovery to creditors.

### C.    Best Interests of Creditors (§ 1129(a)(7))

6.    I have reviewed the liquidation and valuation analyses included with the Disclosure Statement, and I believe that the Plan satisfies the Bankruptcy Code's best interests test. As demonstrated by the liquidation and valuation analyses included with the Disclosure Statement, estimated recoveries for members of each Impaired Class under the Plan are equal to or in excess of the recoveries estimated in a hypothetical Chapter 7 liquidation. On a consolidated basis, the Debtors estimate that the net proceeds available for distribution to Creditors by a Chapter 7 trustee would be approximately $4.4 billion in a forced liquidation and approximately $5 billion in an orderly liquidation. In either scenario, the Chapter 7 liquidation proceeds would satisfy in full all DIP Facility Claims and Secured Claims. However, Administrative Claims would not be paid in full, and Unsecured Creditors would receive no distribution. Meanwhile, under the Plan, Holders of Unsecured Claims are estimated to recover 4-8% of their Claims.

7.    Meanwhile, on an unconsolidated basis, only Unsecured Creditors of ULS (i.e., Class 23E) would receive a distribution in a Chapter 7 liquidation: a 2.07% recovery in a forced liquidation and a 2.83% recovery in an orderly liquidation. Even though Unsecured Creditors of

K&E 10900973.11

ULS may receive a distribution in a Chapter 7 liquidation, that distribution is still less than they would receive under the Plan (4-8%).

**D.      Feasibility (§ 1129(a)(11))**

8.      I have reviewed the Financial Projections included with the Disclosure Statement and believe the Plan satisfies the feasibility requirement of § 1129(a)(11).  In general, based on the Financial Projections, I believe that with a significantly deleveraged capital structure, the Debtors' business will return to viability.  The decrease in the amount of debt on the Debtors' balance sheet will substantially reduce their interest expenses and improve cash flow.  Upon emergence, the Debtors will have billions less of debt and other liabilities on their balance sheet. Thereafter, based on the Projections, the Debtors should have sufficient cash flow to pay and service their debt obligations, including the exit facility, and to fund operations.  Indeed, I have been highly involved in the Debtors' efforts to secure exit financing and can report that the underwriting and syndication of the Debtors' six-year, $3 billion exit facility has been highly competitive.  The proceeds of the exit facility will be used to repay outstanding loans under the DIP Facility and other Chapter 11 expenses, provide working capital, and support other general corporate purposes, among other things.  Thus, I am informed and believe that the Debtors will satisfy their obligations under the Plan and that confirmation of the Plan will not be followed by the need for liquidation or further financial reorganization.

9.      In addition, I am aware that recent independent third-party evaluations of the Debtors' business lend significant support to the feasibility of the Plan.  In fact, on January 9, 2006, Standard & Poor's ("S&P") and Moody's each issued new credit ratings for the restructured United that reflect the company's strengths.  In particular, S&P issued a Corporate

Credit rating of B with a stable outlook for United, while the company's new $3-billion exit financing facility was rated B+, with a recovery rating of 1, reflecting an expectation of full recovery. Moody's gave United a Corporate Family Rating of B2 with a stable outlook. Moody's also gave the exit financing facility a Corporate Family rating of B1 and a Speculative Grade Liquidity Assessment Rating of 2. These ratings are superior to the ratings of a number of United's non-bankrupt network competitors, thus providing powerful third-party validation of the Debtors' business plan and demonstrating that United passes the feasibility standard with flying colors.

### E.    The Plan Does Not Unfairly Discriminate Against Any Class of Claims (Section 1129(b)—Cramdown)

10.    As noted in paragraph 4 above, I believe the rationale employed by the Plan in separately classifying Claims makes business sense. All Holders of Unsecured Claims— regardless of Class—receive the same treatment under the Plan on account of those Claims (a pro rata share of the Unsecured Distribution, which is estimated at 4-8% of the value of each Unsecured Claim). Additionally, to the extent the Plan provides different treatment to certain Classes—e.g., the Unsecured PBGC Claims, the Unsecured Chicago Municipal Bond Claims, and the Unsecured Public Debt Aircraft Claims—all of those differing treatments track precisely the terms of settlement agreements previously approved by this Court resolving such parties' unique Claims and unique legal rights against the Debtors' estates, such as PBGC's ERISA rights, aircraft financiers' Section 1110 rights, and airport authorities' alleged Section 365 rights. All instances of differing treatment under the Plan are justified. Thus, I do not believe that the Plan unfairly discriminates against any Impaired Classes and this portion of the cramdown test is satisfied.

6

### III.   Responses to Objections

11.    I have personal knowledge of certain facts pertaining to certain Plan objections. Following is a discussion of such facts.

### A.   OCUC Objection to SAM Distribution

12.    I am a salaried and management employee of United, and thus have personal knowledge regarding the issues relating to the SAM distribution provided for under the Plan.  It is my understanding that the Debtors agreed to the SAM distribution to treat all employees alike by providing equity distributions that reflect the economic contributions that SAM employees (like union employees) made during the restructuring.   This distribution also incentivized SAM employees (like union employees) to continue to contribute to United's restructuring efforts, and to maintain a stable, positive, and fair working environment.  United recognized the real threat of potential resignations of these employees in light of wage and benefit reductions.  Treating all employees alike and maintaining a stable, positive, and fair working environment while reducing labor costs is a difficult balancing act, yet critical to the restructuring process.  With respect to all of its employees, United's corporate philosophy has always been to treat employees fairly and to incentivize them to continue working for and contributing to United, even as painful sacrifices were made.  Without dedicated employees—SAM or otherwise—United would be incapable of effectively reorganizing.

### B.   ALPA's Conditional Objection

13.    I have personal knowledge as to the distribution issues raised in ALPA's conditional objection.  The Debtors fully intend to distribute New UAL Common Stock to all employee groups, including ALPA, as soon as reasonably practicable.  However, as the Debtors

K&E 10900973.11

correctly anticipated in the 2005 Restructuring Agreement negotiations, there are a number of issues, particularly with respect to ALPA, that make distribution immediately upon the Effective Date infeasible. These issues include the withholding and associated liquidation of shares necessary to pay all applicable withholding taxes set against a backdrop of uncertain liquidity and stability with respect to these shares due to a number of factors including how quickly the market for the shares grows and how the capital markets react to the uncertainty created by the establishment of the conversion price for the employee convertible notes within the first 60 days of trading; the need to parse the distribution to individual pilots into amounts for employer contributions to their Pilots' Directed Account Retirement Income Plan ("PDAP") accounts by plan year as well as determining the remaining amount of direct distribution as appropriate; the mechanics of depositing New UAL Common Stock into employees' PDAP or Computershare accounts; and the need to complete the necessary systems programming to implement the $7.5 billion in employee distributions. Timing is also dependent on resolving as many disputed/invalid claims as possible over the course of the next few weeks so as to maximize distributions to unsecured creditors as soon as possible.

C.    **The Plan's Conditional Assumption Of The AFA CBA Is Necessary**

14.    While AFA's pension related litigation remains unresolved, United must reserve its rights under Section 1113 and ERISA to ensure that United's pension liability is not reimposed post-emergence without United having the opportunity to bring a voluntary termination proceeding to the extent required. Otherwise, United would have to consider staying in bankruptcy merely to wait until the ultimate conclusion of AFA's pension related litigation— including all appeals and petitions for certiori—to preserve its right to bring a Section 1113

8

proceeding as a debtor-in-possession. I do not believe that such a delay would be in the interests of United's stakeholders.

**D.     The Plan's Exculpation Provisions Are Necessary**

15.     I understand that certain parties have objected to the Plan's implementation of exculpations for certain parties. In my view, the exculpation of the ALPA Released Parties under the Plan is appropriate. First, there is a clear identity of interests between United and the ALPA Released Parties. Among other reasons, under the ALPA 2005 Restructuring Agreement, the Debtors agreed to indemnify ALPA, its members, officers, committee members, agents, employees, counsel, financial advisors and representatives from any and all losses relating to the negotiation or implementation of the ALPA 2005 Restructuring Agreement (except where such party committed gross negligence, fraud or willful misconduct). As such, without an exculpation clause that applies to the ALPA Released Parties, United's estate might be responsible for indemnifying the ALPA Released Parties in any lawsuit by a third party in connection with the ALPA 2005 Restructuring Agreement, to the detriment of all creditors.

16.     Second, the ALPA Released Parties made a substantial contribution to United's reorganization. The ALPA Released Parties agreed to provide necessary—yet tremendous— labor savings and cost concessions in two rounds of Section 1113 negotiations. This included the critically important concession to be the first union to agree not to object to the termination of their pension plan under certain circumstances. Without that agreement, and the momentum it provided, it is difficult to say whether the Debtors could have achieved consensual savings as a result of their 2005 labor restructuring initiatives. Since the Court's approval of the 2005 ALPA Agreement, the ALPA Released Parties have continued to play a significant role in working

9

through the literally hundreds of issues that must be addressed for the Debtors to make distributions to its employees under the Plan in a quick and efficient manner.

17. Third, United's agreement to exculpate the ALPA Released Parties in the Plan was critical in the final negotiations of the 2005 ALPA Restructuring Agreement. Without that Restructuring Agreement, it is unclear whether the Debtors would have consensually obtained the pilot savings it actually did obtain, and thus unclear whether the Debtors would have gained the momentum to reach consensual arrangements with its other unions. At the very least, absent the 2005 ALPA Restructuring Agreement, these Chapter 11 Cases likely would have been materially prolonged, to the detriment of all stakeholders.

18. Similarly, there are valid business reasons for each of the other exculpations provided under the Plan. The Debtors, the Reorganized Debtors, the DIP Facility Agent, the DIP Lenders, the New Credit Facility Agents and the New Credit Facility Lenders, the Servicers, the OCUC and its members, and the ESOP Committee all have a vested interest in seeing the company reorganize and thus share an "identity of interest" with the Debtors.

19. The other Exculpated Parties all made substantial contributions to the reorganization. For example, the DIP Facility Agent and Lenders negotiated the terms of a favorable debtor in possession facility that ensured that the Debtors were able to make a smooth entry into Chapter 11. They also provided much needed financial capital to the Debtors throughout the Chapter 11 Cases that allowed the Debtors to restructure and to file the Plan, including the granting of numerous waivers and amendments necessitated by the industry ups and downs that occurred over the past 37 months. The New Credit Facility Lenders are providing the Debtors with the financing to exit Chapter 11 and to finance the Plan itself. The

10

Servicers provided much needed assistance with respect to the transmission of information to various holders of bonds and corporate debentures—something the Debtors needed to obtain approval of the Plan in addition (in some cases) to settlements entered during the Chapter 11 Cases. With respect to the Debtors' officers and directors and other agents, they all worked tirelessly to achieve an effective operational and financial restructuring. Therefore, there can be no doubt that the Exculpated Parties have provided substantial, and indeed indispensable, contributions to the Debtors' reorganization.

20.     It is also important for the Debtors' reorganization that their directors and officers not be distracted by future litigation. The DIP Facility Agent, the DIP Facility Lenders, and the New Credit Facility Lenders each required some protection from liability to provide the Debtors with the financing it needed. The TWU Released Parties, the PAFCA Released Parties, and the ESOP Committee each entered into compromises important to the Debtors' reorganization. Therefore, the exculpation provisions must be viewed as integral to the Plan.

**E.     The Plan's Proposed Treatment of Executory Contracts Is Necessary for the Debtors' Operations**

21.     I believe the Debtors may be unable to reach agreement on the cure obligations required to assume certain of their executory contracts and/or unexpired leases. If the Debtors are not provided the necessary flexibility to evaluate fully the cure required to assume these agreements prior to making the assumption decision, the Debtors could unwittingly take on excessive and unnecessary obligations that could have, and should have, been otherwise discharged by the Plan. Thus, I believe the Plan's limited provisions allowing the Debtors to amend their decisions to assume or reject following confirmation of the Plan (to the extent the cure is disputed) are necessary.

K&E 10900973.11

Executed on January 11, 2006

```
"OFFICIAL SEAL"
Stephanie G. Jordan
Notary Public, State of Illinois
My Commission Expires June 23, 2008
```

KATHRYN A. MIKELLS
VICE-PRESIDENT AND TREASURER
UNITED AIR LINES, INC.

Sworn to and subscribed before me

This 11th day of January, 2006.

*Stephanie G. Jordan*
Notary Public

# Exhibit 4



About EDGAR Online | Login

The following is an excerpt from a 10-K SEC Filing, filed by UNITED AIR LINES INC on 3/29/2007

Jump to :  | -- Use Sections To Navigate Through The Document -- |

.

## ITEM 11. EXECUTIVE COMPENSATION.

Compensation Discussion and Analysis

Overview

This Compensation Discussion and Analysis will explain the material elements of the compensation of our named executive officers and describe the objectives and principles underlying the Company's executive compensation programs.

Objectives and Principles of Our Executive Compensation Program

The principal objectives of the Company's executive compensation program are:

- To support the Company's business strategy and objectives;
- To drive the creation of stockholder value; and
- To attract, retain and appropriately reward executives in line with market practices.

The Company strives to meet these objectives by implementing the principles listed below:

- Significant portions of compensation should be tied to our performance. Significant portions of executive compensation are tied both to the achievement of the Company's key operational and financial performance goals and to the value of UAL's stock, thereby aligning executive compensation with both the success of the Company's business strategy and objectives as well as the returns realized by UAL stockholders. For example, our short-term incentive programs are tied to the achievement of key customer, operational and financial metrics which drive the Company's business strategy. These measurements, which are part of our short-term incentive program, which we refer to as the Success Sharing Plan, are described below under "Our Executive Compensation Program-Short-term incentive compensation." Furthermore, all our executives were granted restricted shares and stock options under UAL's Management Equity Incentive Plan, which we refer to as the MEIP, to align the interests of our executives with those of UAL's stockholders. For purposes of this discussion, as well as the tables and narrative that follow, all references to "restricted shares" refer to restricted shares of UAL common stock and "stock options" shall refer to non-qualified stock options relating to UAL common stock, unless otherwise indicated.

- Significant portions of our executives' compensation should be at risk. Our executives' fixed compensation (which primarily includes base salaries, benefits and perquisites) is generally targeted at amounts below the 50th percentile of comparable companies. Our executives' performance-based compensation (which primarily includes short-term incentives) is generally targeted at a percentage of their fixed compensation equivalent to the percentage of

## Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($)[1] | Stock Awards ($)[2] | Option Awards ($)[3] | Non-Equity Incentive Plan Compensation ($)[4] | All Other Compensation ($)[5] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Tilton, Glenn<br>Chairman, President & Chief Executive Officer | 2006 | $687,083 | $ 0 | $11,694,640 | $10,377,847 | $839,028 | $ 210,959 | $23,809,557 |
| Brace, Frederic<br>Executive Vice President & Chief Financial Officer | 2006 | $501,000 | $ 0 | $ 4,677,856 | $ 4,153,664 | $654,872 | $ 386,988 | $10,374,380 |
| McDonald, Peter<br>Executive Vice President & Chief Operating Officer | 2006 | $542,125 | $ 0 | $ 3,222,040 | $ 5,385,092 | $678,600 | $3,381,173 | $13,209,030 |
| Tague, John<br>Executive Vice President & Chief Revenue Officer | 2006 | $501,000 | $ 0 | $ 4,677,856 | $ 4,153,664 | $654,872 | $ 88,141 | $10,118,783 |
| Fields, Sara<br>Senior Vice President Office of the Chairman | 2006 | $325,933 | $ 0 | $ 4,027,550 | $ 3,311,160 | $359,073 | $ 448,413 | $ 8,472,129 |

[1] The Company did not pay any discretionary bonuses to the named executive officers in 2006.

[2] Amounts disclosed in the Stock Awards column relate to grants of restricted stock made under UAL's 2006 Management Equity Incentive Plan ("MEIP"). With respect to each restricted stock grant, the amounts disclosed generally reflect the compensation cost that the Company recognized for financial accounting purposes in 2006 in accordance with Statement of Financial Accounting Standards No. 123 (revised 2004) ("FAS 123R"). Generally, FAS 123R requires the full grant-date fair value of a restricted stock award to be amortized and recognized as compensation cost over the service period that relates to the award. However, in the case of a restricted stock grant which vests upon retirement (which is the case for the restricted stock grants made to each of the Company's named executive officers), the entire unamortized compensation cost must be recognized in the year the grant recipient becomes retirement eligible. Mr. McDonald and Ms. Fields are considered "retirement eligible" under the 2006 restricted stock grants; therefore, the recognized 2006 compensation cost for such grants was equal to the restricted stock grants' full grant-date fair value. Grant-date fair value of the restricted stock awards was determined by multiplying the number of restricted shares awarded by the volume weighted average price of a share of UAL's stock on the date of grant.

[3] Amounts disclosed in the Option Awards column relate to grants of stock options made under the MEIP. With respect to each stock option grant, the amounts disclosed generally reflect the compensation cost that the Company recognized for financial accounting purposes in 2006 in accordance with FAS 123R. Generally, FAS 123R requires the full grant-date fair value of a stock option award to be amortized and recognized as compensation cost over the service period that relates to the award. However, in the case of a stock option grant which vests upon retirement (which is the case for the stock option grants made to each of the Company's named executive officers), the entire unamortized compensation cost must be recognized in the year the grant recipient becomes retirement eligible. Mr. McDonald and Ms. Fields are considered "retirement eligible" under the 2006 stock option grants; therefore, the recognized 2006 compensation cost for such grants was equal to the stock option grants' full grant-date fair value. Grant-date fair value was determined using a generally accepted option valuation methodology referred to as the Black-Scholes Option Pricing Model. The assumptions used in calculating the grant-date fair value of each stock option award are disclosed in footnotes to UAL's financial statements that are set forth in UAL's 2006 Annual Report on Form 10-K.

[4] Amounts disclosed in the Non-Equity Incentive Plan Compensation column represent the aggregate amounts earned in 2006 under UAL's 2006 Success Sharing Program, Key Employee Retention Program, and the Profit Sharing Program, respectively. Mr. Tilton voluntarily waived his rights to a payment under the KERP which was otherwise due him in 2006.

[5] See following table titled "Explanation of All Other Compensation Disclosure" for details regarding amounts disclosed in All Other Compensation column.

# Exhibit 5

**UAL Corporation Reports First Quarter 2008 Results**

Announces Actions to Combat Higher Fuel Costs

CHICAGO, April 22, 2008 /PRNewswire-FirstCall/ -- UAL Corporation (Nasdaq: UAUA), the holding company whose primary subsidiary is United Airlines, reported a pre-tax loss of $542 million for the first quarter ended March 31, 2008, $305 million higher than the first quarter of 2007, driven primarily by a $618 million increase in consolidated fuel expense. For the quarter, the company:

-- Reported basic and diluted loss per share (EPS) of $(4.45).

-- Increased mainline passenger unit revenue (or PRASM) by 8.7 percent year-over-year through continued capacity discipline and strong yield management.

-- Continued its focus on controlling costs, with mainline cost per available seat mile (CASM), excluding fuel and special items, for the quarter up 2.4 percent versus 2007. Mainline CASM for the quarter was up 15.9 percent versus the first quarter of 2007, reflecting a 50 percent increase in fuel price.

-- Strengthened its balance sheet by reducing on and off balance sheet debt by $195 million. The company ended the quarter with an unrestricted cash and short-term investments balance of $2.9 billion and restricted cash of $0.7 billion.

-- Announced a plan to reduce 2008 non-fuel costs by an incremental $200 million and to reduce 2008 capital expenditures by $200 million.

-- Acted decisively to reduce mainline domestic capacity by approximately 9 percent by the fourth quarter, on top of a 5 percent reduction in the fourth quarter of 2007.

-- Announced plans to eliminate 30 aircraft from its operating fleet, 10 to 15 more aircraft than initially announced in March.


Fundamental Improvements Overshadowed By Escalating Fuel Prices

The company's net, pre-tax and operating results were all significantly lower year-over-year primarily due to a $618 million increase in consolidated fuel expense. The company generated an operating loss of $441 million in the first quarter of 2008, versus a loss of $92 million in the year ago period. The company generated a net loss of $537 million in the first quarter of 2008, $385 million higher than the first quarter of 2007 when the company recognized an $84 million tax credit.

The company recorded a $3 million income tax credit in the first quarter of 2008. Because of its Net Operating Loss carry-forwards, the company expects to pay minimal cash taxes for the foreseeable future.

While the company reported strong unit revenue growth that is expected to be among the best in the industry, the 7.7 percent year-over-year increase in consolidated revenues was insufficient to offset the nearly 50 percent increase in average fuel price.

"The path to sustainable profitability requires us to fundamentally overhaul every facet of our business," said Glenn Tilton, United chairman, president and CEO. "Consolidation is only one of many changes needed together with capacity discipline, new revenue streams and elimination of assets that do not earn a sufficient return, particularly in this environment. The pressure of high energy prices and a weakening economy are a wake-up call that the pace of change must accelerate."

Taking Action to Combat Higher Fuel Costs

The unprecedented increase in fuel prices and a weakening economic environment has created an extremely challenging environment for the industry. United is taking a number of aggressive actions to respond to these challenges.

The company is further shrinking 2008 mainline domestic capacity. By the fourth quarter of 2008 mainline domestic capacity will be down approximately 9 percent year-over-year. This reduction follows a 5 percent reduction in the fourth quarter of 2007. Consolidated capacity will be approximately 4 percent lower than prior year levels for the fourth quarter of 2008.

The company will permanently remove 30 narrowbody aircraft from its operations, 10 - 15 more aircraft than initially announced last month. The aircraft being retired are some of the oldest and least fuel efficient in the company's fleet.

The company continues to take actions to pass rising commodity costs to customers. In addition to leading the industry in capacity discipline, United continues to be a leader of fare and fuel surcharge actions. The company is also creating new revenue streams through unbundling products, offering new a la carte services and expanding choices for our customers. The company's existing merchandising programs, such as Economy Plus and Premium Cabin upsell have been extremely successful and the company is following through with initiatives such as the $25 fee for a second checked bag announced in February.

The company is also expanding the scope of its 2008 cost reduction program. The company is now targeting $200 million in non-fuel cost savings, in addition to the $200 million announced earlier this year, for a total of $400 million. The company is also streamlining its operations and corporate functions in order to match the size of its workforce to the size of its business. The company expects to reduce its salaried and management workforce by 500 employees and its represented workforce by approximately 600 employees by year-end.

The company is also reducing 2008 capital expenditures by approximately $200 million from $650 million in expenditures previously planned.

"We continue to focus on cash flow and, with a strong cash balance and more than $3 billion in unencumbered assets, we are well positioned to manage the challenges ahead," said Jake Brace, EVP and chief financial officer. "We are responsibly reducing our fleet, eliminating less efficient aircraft that are not profitable in this fuel environment."

Strong Liquidity Position

Due primarily to escalating fuel prices, the company generated negative operating cash flow of $80 million. The company made a special distribution of approximately $250 million to stockholders during the quarter and reduced on and off balance sheet debt by $195 million, ending the quarter with an unrestricted cash and short-term investments balance of $2.9 billion and a restricted cash balance of $728 million. Free cash flow, defined as operating cash flow less capital expenditures, declined to a negative $181 million.

In addition to its strong cash balance, the company has over $3 billion in unencumbered assets that provide it with significant flexibility to raise additional cash, if necessary.

Strong Revenue Growth Enabled By Continued Capacity Discipline

The company's continuing focus on capacity discipline and strong revenue management again drove strong revenue performance, both internationally and domestically. Total revenues increased by 7.7 percent in the first quarter of 2008 compared to the same period in 2007, driven by growth in passenger and cargo revenue, partially offset by a decline in other operating revenues due to the elimination of $22 million in pass-through sales for our fuel subsidiary, UAFC.

The company's mainline RASM increased by 8.0 percent year-over-year from the first quarter of 2007 due to strong passenger and cargo yield performance partially offset by lower load factors. Excluding UAFC, mainline RASM increased by 8.6 percent.

The company's cargo business continued its strong performance with a 29.8 percent year-over-year increase in revenue. Revenue gains have been driven by stronger yields, higher mail volumes, an improved traffic mix as well as favorable foreign currency gains.

Total passenger revenues increased by 8.1 percent in the first quarter compared to the prior year driven by an 11.6 percent consolidated yield improvement. Mainline domestic PRASM for the quarter increased by 11.1 percent, aided by a 6.4 percent reduction in capacity. International PRASM grew 5.5 percent in the first quarter compared to the same period last year, despite a 9.6 percent increase in international capacity year-over-year. Consolidated PRASM increased 8.3 percent year-over-year.

The company's change to deferred revenue accounting for the Mileage Plus program, from the previous incremental cost method, decreased consolidated passenger revenue by approximately $65 million in the first quarter of 2008. The change to the expiration period for Mileage Plus accounts without activity from 36 to 18 months, that the company instituted in January 2007, did not impact the company's revenue results in the first quarter of 2008, as it did in the first quarter of 2007.

In the first quarter of 2007 deferred revenue accounting decreased consolidated passenger revenue by a net $107 million, including $28 million of non-cash revenue recognized from the expiration policy change. In total, these Mileage Plus accounting changes resulted in a net year-over-year increase in consolidated passenger revenues of $42 million for the first quarter of 2008 compared to the same period in 2007.

As the company no longer follows the incremental cost method of accounting, differences between the two accounting methods are calculated using the company's best estimate of the incremental cost method. Excluding Mileage Plus accounting impacts, consolidated PRASM increased 7.0 percent year-over-year.

Regional affiliate PRASM was up 7.2 percent compared to last year, with a 12.3 percent increase in yield and a 1.2 percent capacity decline. Load factor for regional affiliates decreased 3.4 points in the first quarter of 2008 compared to the first quarter of 2007, while stage length for regional affiliates was up 6.5 percent for the same period.

Comparison of 2008 First Quarter Geographic Passenger Revenue Versus 2007 First Quarter

| Geographic Area | 1Q 2008 Passenger Revenue (millions) | Passenger Revenues % Increase/ (Decrease) | PRASM % Increase/ (Decrease) | ASM (1) % Increase/ (Decrease) |
|---|---|---|---|---|
| North America | $2,066 | 4.0% | 11.1% | (6.4)% |
| Pacific | $773 | 12.1% | 6.1% | 5.6% |
| Atlantic | $549 | 20.9% | 2.2% | 18.3% |
| Latin America | $157 | 15.7% | 12.1% | 3.2% |
| Total Mainline | $3,545 | 8.6% | 8.7% | (0.0)% |
| Regional Affiliates | $715 | 5.9% | 7.2% | (1.2)% |
| Total Consolidated | $4,260 | 8.1% | 8.3% | (0.1)% |
| Adjusted Consolidated (2) | $4,325 | 6.9% | 7.0% | |

(1) ASM (available seat miles)
(2) Consolidated Passenger Revenue and PRASM adjusted for Mileage Plus effects (See Footnote 7(b)).

"We are delivering top-tier revenue results by facing the realities of the marketplace and making the tough choices: aggressively managing our capacity, passing commodity costs onto customers where possible, and identifying new revenue opportunities," said John Tague, EVP and chief revenue officer. "We need to adopt a

step change in the revenue model. Nothing short of that will be sufficient and that is the work we have underway."

Improving Productivity and Operating Performance

United is focused on further improving its operational performance this year. While adverse weather and air traffic control issues impacted the company's performance in the Department of Transportation (DOT) operational statistics in the early months of 2008, DOT on-time arrival statistics have improved significantly in March with United expected to improve its ranking to third among the six major U.S. network carriers. As the company's new reliability initiatives continue to roll out, the company expects these metrics to continue to improve.

"Our employees continue to deliver great work for our customers despite extremely challenging weather conditions and the antiquated air traffic control system," said Pete McDonald, EVP and chief operating officer. "We are beginning to see results from the enterprise work underway across our operations to improve on-time performance and reliability rankings for our customers."

Cost Control Focus Continues

Mainline CASM increased by 15.9 percent from the year-ago quarter to 12.67 cents reflecting the steep increase in fuel expense. First quarter mainline CASM, excluding fuel and special items, came in below the low end of the company's prior guidance increasing 2.4 percent, from 7.91 cents to 8.10 cents, reflecting United's continued focus on controlling costs in an inflationary environment.

|  | First Quarter Increase/(Decrease) | | | | | |
|  | Mainline | | | Consolidated | | |
|  |  |  | % Chg. |  |  | % Chg. |
|  | 2008 | 2007 | Chg. | 2008 | 2007 | Chg. |
| CASM (cents) | 12.67 | 10.93 | 15.9% | 13.41 | 11.61 | 15.5% |
| CASM excluding fuel and special items (cents) | 8.10 | 7.91 | 2.4% | 8.59 | 8.39 | 2.4% |

The company has classified its various fuel hedging positions as economic hedges. The company recorded a net gain of $41 million on hedge contracts in the first quarter . a realized gain of $9 million relating to the current quarter and an unrealized gain of $32 million relating to contracts settling in future periods. The economic benefit of hedging during the quarter was $12 million. These benefits were recorded in mainline aircraft fuel expense and resulted in lower fuel expense, than would otherwise be the case, for the first quarter.

Business Highlights
-- In February, United announced a new, simplified checked bag policy for customers who purchase domestic economy tickets. United's new checked bag policy is available at united.com/baggage. Customers who purchase domestic economy tickets and do not have elite status in Mileage Plus or Star Alliance may check one bag for free and a second bag for a $25 service fee.

-- During the quarter, the company distributed $110 million in profit sharing payments to U.S.-based employees, a result of the strong performance by employees in 2007. For the year, employees earned a total of $170 million in payments related to 2007 performance.

-- On January 23, 2008, the company made a special distribution of $2.15 per share to common stockholders. Payments to stockholders totaled approximately $250 million, including approximately $20 million to employee shareholders.

-- United's new Denver-London service began on March 30, 2008, a result of the new Open Skies agreement between the U.S. and Europe that removes the regulatory barriers to fly to London Heathrow.

-- United continues to improve the experience for its premium customers and will be rolling out several new initiatives over the next quarter -- a new Red Carpet Club in Chicago, free wireless at Red Carpet Clubs, new information displays at all hubs, custom dining in the first and business class cabins and upgrades to all Pacific lounges.

"We are continuing to roll out new enhancements for our best guests, as we opened our new Global Reception Lobby at O'Hare, which is providing more individualized service and a faster check in for our Global Services and international first class customers," said Graham Atkinson, EVP and chief customer officer. "We also completed two key international terminal moves, joining all the Star Alliance carriers in the new Beijing Terminal 3 and moving our operations to a new terminal at Singapore's Changi International the same day. These terminals provide state of the art facilities and faster connections for our customers to our Star partners."

Fresh Start Reporting

Upon emergence from its Chapter 11 reorganization in February 2006, the company adopted fresh-start reporting in accordance with SOP 90-7. The company's emergence resulted in a new reporting entity with no retained earnings or accumulated deficit as of February 1, 2006. Accordingly, the company's financial information shown for periods prior to February 1, 2006 is not comparable to consolidated financial statements presented on or after that date. For further discussion of fresh-start reporting, please refer to the company's 2006 and 2007 Form 10-Ks as filed with the Securities and Exchange Commission (SEC).

To offer additional information for investors, the company has identified certain items consisting only of major non-cash fresh-start reporting and exit-related credits and charges (Note 8). While it is not practical for the company to present information for all items that are not comparable in the pre- and post-exit periods, the company believes that the items identified in Note 8 are the material non-cash fresh-start reporting and exit-related items and that such information is useful to investors in understanding year-over-year performance. These fresh-start and exit-related items were discussed in the company's Form 8-K filed with the Securities and Exchange Commission on May 8, 2006 and in the company's 2006 and 2007 Form 10-Ks.

Outlook

In response to higher fuel prices and a weaker domestic economic environment, the company has reduced its capacity for 2008 from prior guidance and currently expects the following capacity for the second quarter and full-year 2008:

| Capacity (Available Seat Miles) | Second Quarter 2008 | Full-year 2008 |
|---|---|---|
| North America | -5.5% to -4.5% | -7.0% to -6.0% |
| International | +3.5% to +4.5% | +3.5% to +4.5% |
| Mainline | -2.0% to -1.0% | -2.5% to -1.5% |
| Express | -0.5% to +0.5% | +1.5% to +2.5% |
| Consolidated | -2.0% to -1.0% | -2.0% to -1.0% |

Factoring in the impact of the company's expanded cost reduction program and the reduction in capacity, the company expects 2008 full-year mainline CASM, excluding fuel and special items, to increase between 1.5 and 2.5 percent. Mainline CASM, excluding fuel and special items, is anticipated to increase between 3.0 and 3.5 percent in the second quarter of 2008.

As of April 21, the company had hedged 25 percent of forecasted fuel consumption for the last three quarters of 2008, of which approximately 69 percent is through three-way collars with upside protection beginning on average at a crude equivalent price of $89 per barrel and capped at $101 per barrel, with payment obligations beginning on average at crude equivalent price below $83 per barrel. The remaining 31 percent is hedged through collars with upside protection beginning at an average crude equivalent price of $97 per barrel with payment obligations on average beginning at crude equivalent price below $87 per barrel.

The company has hedged approximately 30 percent of its estimated 2008 second quarter fuel consumption, of which approximately 76 percent is through three-way collars with upside protection beginning on average at a crude equivalent price of $87 per barrel and capped at $97 per barrel, with payment obligations beginning on average at crude equivalent price below $81 per barrel. The remaining 24 percent is hedged through collars with upside protection beginning at an average crude equivalent price of $102 per barrel with payment obligations on average beginning at crude equivalent price below $92 per barrel.

The company expects mainline jet fuel price per gallon, including the impact of hedges, to average $3.24 per gallon in the second quarter of 2008.

Note 7 to the attached Statements of Consolidated Operations provides a reconciliation of net income or loss reported under GAAP to net income or loss adjusted for special items for all periods presented as well as a reconciliation of other non-GAAP financial measures.

About United

United Airlines (Nasdaq: UAUA) operates more than 3,200* flights a day on United, United Express and Ted to more than 200 U.S. domestic and international destinations from its hubs in Chicago, Denver, Los Angeles, San Francisco and Washington, D.C. With key global air rights in the Asia-Pacific region, Europe and Latin America, United is one of the largest international carriers based in the United States. United also is a founding member of Star Alliance, which provides connections for our customers to 965 destinations in 162 countries worldwide. United's 55,000 employees reside in every U.S. state and in many countries around the world. News releases and other information about United can be found at the company's Web site at united.com.

        *Based on the flight schedule between Jan. 1, 2008 and Dec. 31, 2008.

Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: Certain statements included in this press release are forward-looking and thus reflect the company's current expectations and beliefs with respect to certain current and future events and financial performance. Such forward-looking statements are and will be subject to many risks and uncertainties relating to the operations and business environment of the company that may cause actual results to differ materially from any future results expressed or implied in such forward-looking statements. Factors that could significantly affect net earnings, revenues, expenses, costs, load factor and capacity include, without limitation, the following: the company's ability to comply with the terms of its credit facility; the costs and availability of financing; the company's ability to execute its business plan; the company's ability to realize benefits from its resource optimization efforts and cost reduction initiatives; the company's ability to attract, motivate and/or retain key employees; the company's ability to attract and retain customers; demand for transportation in the markets in which the company operates; general economic conditions (including interest rates, foreign currency exchange rates, crude oil prices and energy refining capacity in relevant markets); the effects of any hostilities or act of war or any terrorist attack; the ability of other air carriers with whom the company has alliances or partnerships to provide the services contemplated by the respective arrangements with such carriers; the costs and availability of aircraft insurance; the costs of jet fuel; our ability to cost-effectively hedge against increases in the price of jet fuel; the costs associated with security measures and practices; labor costs; industry consolidation; competitive pressures on pricing and on demand; capacity decisions of United and/or its competitors; U.S. or foreign governmental legislation, regulation and other actions, including the effect of open skies agreements; the company's ability to utilize its net operating losses; the ability of the company to maintain satisfactory labor relations and our ability to avoid any disruptions to operations due to any potential actions by our labor groups; weather conditions; and other risks and uncertainties set forth from time to time in UAL's reports to the United States Securities and Exchange Commission. Consequently, the forward-looking statements should not be regarded as representations or warranties by the company that such matters will be realized. The company disclaims any intent or obligation to update or revise any of the forward-looking statements, whether in response to new information, unforeseen events, changed circumstances or otherwise.

UAL CORPORATION AND SUBSIDIARY COMPANIES
STATEMENTS OF CONSOLIDATED OPERATIONS (UNAUDITED)
(In millions, except per share amounts)

|  | Three Months Ended March 31, | | % Increase/ (Decrease) |
|---|---|---|---|
| (In accordance with GAAP) | 2008 | 2007 | |
| Operating revenues: | | | |
| Passenger - United Airlines | $3,545 | $3,264 | 8.6 |
| Passenger - Regional Affiliates | 715 | 675 | 5.9 |
| Cargo | 218 | 168 | 29.8 |
| Other operating revenues | 233 | 266 | (12.4) |
| | 4,711 | 4,373 | 7.7 |
| Operating expenses: | | | |
| Aircraft fuel | 1,575 | 1,041 | 51.3 |
| Salaries and related costs | 1,046 | 1,068 | (2.1) |
| Regional affiliates (a) | 779 | 692 | 12.6 |
| Purchased services | 349 | 301 | 15.9 |
| Aircraft maintenance materials and outside repairs | 317 | 281 | 12.8 |
| Landing fees and other rent | 230 | 238 | (3.4) |
| Depreciation and amortization | 220 | 220 | – |
| Distribution expenses | 184 | 188 | (2.1) |
| Aircraft rent | 99 | 100 | (1.0) |
| Cost of third party sales | 64 | 93 | (31.2) |
| Special operating items (Note 3) | – | (22) | (100.0) |
| Other operating expenses | 289 | 265 | 9.1 |
| | 5,152 | 4,465 | 15.4 |
| Loss from operations | (441) | (92) | 379.3 |
| Other income (expense): | | | |
| Interest expense | (135) | (206) | (34.5) |
| Interest income | 48 | 58 | (17.2) |
| Interest capitalized | 5 | 5 | – |
| Miscellaneous, net | (19) | (2) | NM |
| | (101) | (145) | (30.3) |
| Loss before income taxes and equity in earnings of affiliates | (542) | (237) | 128.7 |
| Income tax benefit | (3) | (84) | (96.4) |
| Loss before equity in earnings of affiliates | (539) | (153) | 252.3 |
| Equity in earnings of affiliates, net of tax | 2 | 1 | 100.0 |
| Net loss | $(537) | $(152) | 253.3 |
| Loss per share, basic and diluted | $(4.45) | $(1.32) | |
| Weighted average shares, basic and diluted | 121.1 | 117.0 | |

See accompanying notes.

(a) Regional affiliates expense includes regional aircraft rent expense.
    See Note 2 for more information.

NM   Not meaningful.

UAL CORPORATION AND SUBSIDIARY COMPANIES
CONDENSED STATEMENTS OF CONSOLIDATED CASH FLOWS (UNAUDITED)
(In millions)

| (In accordance with GAAP) | Three Months Ended March 31, 2008 | 2007 | % Increase/ (Decrease) |
|---|---|---|---|
| Cash flows provided (used) by operating activities | $(80) | $626 | – |
| Cash flows provided (used) by investing activities: | | | |
| Net sales of short-term investments | 1,809 | 119 | NM |
| Additions to property and equipment | (101) | (68) | 48.5 |
| (Increase) decrease in restricted cash | 28 | (9) | – |
| Other, net | (11) | (8) | 37.5 |
| | 1,725 | 34 | NM |
| Cash flows provided (used) by financing activities: | | | |
| Special distribution | (251) | – | – |
| Repayment of other long-term debt | (182) | (318) | (42.8) |
| Principal payments under capital leases | (12) | (13) | (7.7) |
| Repayment of Credit Facility | (9) | (986) | (99.1) |
| Other, net | (12) | 1 | – |
| | (466) | (1,316) | (64.6) |
| Increase (decrease) in cash and cash equivalents during the period | 1,179 | (656) | – |
| Cash and cash equivalents at beginning of the period | 1,259 | 3,832 | (67.1) |
| Cash and cash equivalents at end of the period | $2,438 | $3,176 | (23.2) |

Reconciliation of cash and cash equivalents to total cash and cash
equivalents, short-term investments and restricted cash:

| | As of March 31, 2008 | 2007 | % Increase/ (Decrease) |
|---|---|---|---|
| Cash and cash equivalents | $2,438 | $3,176 | (23.2) |
| Short-term investments | 486 | 193 | 151.8 |
| Restricted cash | 728 | 856 | (15.0) |
| Total cash and cash equivalents, short-term investments and restricted cash (a) | $3,652 | $4,225 | (13.6) |

(a) See Note 7[i] for the Company's computation of free cash flow.

NM  Not meaningful.

CONSOLIDATED NOTES (UNAUDITED)

(1) UAL Corporation ("UAL" or the "Company") is a holding company whose
    principal subsidiary is United Air Lines, Inc. ("United"). On
    December 9, 2002, UAL, United and twenty-six direct and indirect
    wholly-owned subsidiaries filed Chapter 11 petitions for relief in the
    U.S. Bankruptcy Court for the Northern District of Illinois. On
    February 1, 2006 (the "Effective Date"), the Company emerged from
    Chapter 11. In connection with its emergence from Chapter 11
    bankruptcy protection, the Company implemented fresh-start reporting
    in accordance with American Institute of Certified Public Accountants'
    Statement of Position 90-7, "Financial Reporting by Entities in
    Reorganization Under the Bankruptcy Code" on the Effective Date. The
    application of fresh-start reporting resulted in significant changes
    to the historical financial statements.

(2) United has contractual relationships with various regional carriers to
    provide regional jet and turboprop service branded as United Express.
    Under these agreements, United pays the regional carriers
    contractually agreed fees for crew expenses, maintenance expenses and
    other costs of operating these flights. These costs include aircraft
    rents of $104 million and $107 million for the three months ended
    March 31, 2008 and 2007, respectively, which are included in regional
    affiliate expense in our Statements of Consolidated Operations.

(3) The Company recorded a special operating expense credit of $22 million
    in the three months ended March 31, 2007 related to bankruptcy
    facility lease secured interest litigation, which remains unresolved
    from the Company's recent reorganization.

(4) Included in UAL's operating earnings are the results of United's
    wholly-owned subsidiary United Aviation Fuels Corporation ("UAFC").

| UAFC (In millions) | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2008 | 2007 | |
| Other operating revenues | $3 | $25 | (88.0) |
| Cost of third party sales | – | 23 | (100.0) |
| Earnings from operations | $3 | $2 | 50.0 |

(5) UAL's results of operations include aircraft fuel expense for both
    United mainline jet operations and regional affiliates. Aircraft fuel
    expense incurred as a result of the Company's regional affiliates'
    operations is reflected in Regional affiliates operating expense. In
    accordance with UAL's agreement with its regional affiliates, these
    costs are incurred by the Company.

Year-Over-Year Impact of Fuel Expense
United Mainline and Regional Affiliate Operations

| (In millions, except per gallon) | Three Months Ended March 31, | | % Change |
|---|---|---|---|
| | 2008 | 2007 | |

```
Mainline fuel expense                      $1,575    $1,041    51.3
Regional affiliates fuel expense              278       194    43.3
United system fuel expense                 $1,853    $1,235    50.0

Mainline fuel consumption (gallons)           556       551     0.9
Mainline average jet fuel price per gallon
 (in cents)                                 283.3     188.9    50.0

Regional affiliates fuel consumption (gallons)  92        92       -
Regional affiliates average jet fuel
  price per gallon (in cents)               302.2     209.9    44.0
```

(6) The tables below set forth certain operating statistics by geographic
    region and the Company's mainline, regional affiliates and
    consolidated operations, excluding special items:

(% change from prior year)

| Three Months Ended March 31, 2008 | North America | Pacific | Atlantic | Latin | Main-line | Regional Affiliates | Consoli-dated |
|---|---|---|---|---|---|---|---|
| Passenger revenues | 4.0 | 12.1 | 20.9 | 15.7 | 8.6 | 5.9 | 8.1 |
| ASM | (6.4) | 5.6 | 18.3 | 3.2 | - | (1.2) | (0.1) |
| RPM | (8.2) | 0.3 | 15.3 | 0.5 | (2.9) | (5.6) | (3.2) |
| PRASM | 11.1 | 6.1 | 2.2 | 12.1 | 8.7 | 7.2 | 8.3 |
| Yield [a] | 13.2 | 11.7 | 5.1 | 17.1 | 11.8 | 12.3 | 11.6 |
| Load factor (points) | (1.6) | (4.2) | (2.0) | (2.1) | (2.3) | (3.4) | (2.4) |

[a] Yields for geographic regions exclude charter revenue, industry
    reduced fares, passenger charges and related revenue passenger miles.


                    CONSOLIDATED NOTES (UNAUDITED)


(7) Pursuant to SEC Regulation G, the Company has included the following
    reconciliation of reported non-GAAP financial measures to comparable
    financial measures reported on a GAAP basis.  The Company believes
    that excluding fuel costs from certain measures is useful to
    investors because it provides an additional measure of management's
    performance excluding the effects of a significant cost item over
    which management has limited influence.  The Company also believes
    that adjusting for special items is useful to investors because they
    are non-recurring items not indicative of the Company's on-going
    performance. In addition, the Company adjusts for Mileage Plus
    impacts for better comparison to several of its peers as many still
    apply the incremental cost method of accounting to their loyalty
    plans.

    The tables below set forth the reconciliation of GAAP and non-GAAP
    financial measures for certain operating statistics that are used in
    determining key indicators such as adjusted passenger revenue per
    revenue passenger mile ("Yield"), operating revenue per available

seat mile ("RASM"), operating margin, net income (loss) and operating
expense per available seat mile ("CASM").

|  | Three Months Ended March 31, | | % Change |
|---|---|---|---|
|  | 2008 | 2007 | |
| [a] Yield  (In millions) | | | |
| Mainline | | | |
| Passenger - United Airlines | $3,545 | $3,264 | 8.6 |
| Less: industry reduced fares and passenger charges | (10) | (10) | – |
| Mainline adjusted passenger revenue | $3,535 | $3,254 | 8.6 |
| Mainline revenue passenger miles | 26,927 | 27,729 | (2.9) |
| Adjusted mainline yield (in cents) | 13.13 | 11.74 | 11.8 |
| | | | |
| Consolidated | | | |
| Consolidated passenger revenue | $4,260 | $3,939 | 8.1 |
| Less: industry reduced fares and passenger charges | (10) | (10) | – |
| Consolidated adjusted passenger revenue | $4,250 | $3,929 | 8.2 |
| Consolidated revenue passenger miles | 29,736 | 30,706 | (3.2) |
| Adjusted consolidated yield (in cents) | 14.29 | 12.80 | 11.6 |
| | | | |
| [b] PRASM  (In millions) | | | |
| Mainline | | | |
| Passenger - United Airlines | $3,545 | $3,264 | 8.6 |
| Add:  Mileage Plus - effect of accounting change | 54 | 113 | (52.2) |
| Less:  Mileage Plus - effect of expiration period change | – | (23) | (100.0) |
| Mainline adjusted passenger revenue | $3,599 | $3,354 | 7.3 |
| Mainline available seat miles | 34,528 | 34,535 | – |
| Adjusted mainline PRASM (in cents) | 10.42 | 9.71 | 7.3 |
| | | | |
| Regional Affiliates | | | |
| Passenger - Regional Affiliates | $715 | $675 | 5.9 |
| Add:  Mileage Plus - effect of accounting change | 11 | 22 | (50.0) |
| Less:  Mileage Plus - effect of expiration period change | – | (5) | (100.0) |
| Regional affiliates passenger revenue | $726 | $692 | 4.9 |
| Regional affiliates available seat miles | 3,881 | 3,929 | (1.2) |
| Regional affiliates PRASM (in cents) | 18.71 | 17.61 | 6.2 |
| | | | |
| Consolidated | | | |
| Consolidated passenger revenues | $4,260 | $3,939 | 8.1 |
| Add:  Mileage Plus - effect of accounting change | 65 | 135 | (51.9) |
| Less:  Mileage Plus - effect of expiration period change | – | (28) | (100.0) |
| Adjusted consolidated passenger revenues | $4,325 | $4,046 | 6.9 |
| Consolidated available seat miles | 38,409 | 38,464 | (0.1) |
| Adjusted consolidated PRASM (in cents) | 11.26 | 10.52 | 7.0 |

[c] RASM  (In millions)
```
    Mainline
    Consolidated operating revenues       $4,711     $4,373        7.7
    Less:  Passenger - Regional
     Affiliates                             (715)      (675)        5.9
    Mainline operating revenues           $3,996     $3,698        8.1
    Mainline available seat miles         34,528     34,535          -
    Mainline RASM (in cents)               11.57      10.71        8.0

    Mainline operating revenues           $3,996     $3,698        8.1
    Less:  UAFC (i)                           (3)       (25)      (88.0)
    Adjusted mainline operating
     revenues                             $3,993     $3,673        8.7
    Adjusted mainline RASM (in cents)      11.56      10.64        8.6
```

CONSOLIDATED NOTES (UNAUDITED)

| | Three Months Ended March 31, | | % |
| | 2008 | 2007 | Change |
|---|---|---|---|
| Consolidated | | | |
| Consolidated operating revenues | $4,711 | $4,373 | 7.7 |
| Less:  UAFC (i) | (3) | (25) | (88.0) |
| Adjusted consolidated operating revenues | $4,708 | $4,348 | 8.3 |
| Consolidated available seat miles | 38,409 | 38,464 | (0.1) |
| Adjusted consolidated RASM (in cents) | 12.26 | 11.30 | 8.5 |

[d] Operating Margin (In millions)
```
    Consolidated operating loss          $(441)      $(92)      379.3
    Less:  income from special items          -       (22)     (100.0)
    Adjusted operating loss              $(441)     $(114)      286.8
    Consolidated operating revenues      $4,711     $4,373        7.7
    Operating loss (percent)              (9.4)      (2.1)      (7.3) pt.
    Adjusted operating loss (percent)     (9.4)      (2.6)      (6.8) pt.
```

[e] Pre-tax loss (In millions)
```
    Loss before income taxes and
     equity in earnings of affiliates    $(542)     $(237)      128.7
    Less:  income from special items          -       (22)     (100.0)
    Adjusted pre-tax loss                $(542)     $(259)      109.3
    Pre-tax loss (percent)               (11.5)      (5.4)      (6.1) pt.
    Adjusted pre-tax loss (percent)      (11.5)      (5.9)      (5.6) pt.
```

[f] Net loss (In millions)
```
    Net loss                             $(537)     $(152)      253.3
    Less:  income from special items          -       (22)     (100.0)
    Add:  income tax expense (ii)             -         8      (100.0)
    Adjusted net loss                    $(537)     $(166)      223.5
```

[g] CASM (In millions)
```
    Mainline
    Consolidated operating expenses      $5,152     $4,465       15.4
    Less:  Regional affiliates            (779)      (692)       12.6
    Mainline operating expenses          $4,373     $3,773       15.9
    Mainline available seat miles        34,528     34,535          -
```

```
Mainline CASM (in cents)            12.67      10.93       15.9

Mainline operating expenses         $4,373    $3,773       15.9
Less: mainline fuel expense         (1,575)   (1,041)      51.3
Less: cost of third party sales -
  UAFC (i)                              -        (23)     (100.0)
Add:  income from special items         -         22      (100.0)
Adjusted mainline operating
  expense                           $2,798    $2,731        2.5
Adjusted mainline CASM (in cents)     8.10      7.91        2.4


Consolidated
Consolidated operating expenses     $5,152    $4,465       15.4
Less: fuel expense & UAFC (i)       (1,853)   (1,258)      47.3
Add:  income from special items         -         22      (100.0)
Adjusted consolidated operating
  expenses                          $3,299    $3,229        2.2
Consolidated available seat miles   38,409    38,464       (0.1)
Adjusted consolidated CASM
  (in cents)                          8.59      8.39        2.4
```

CONSOLIDATED NOTES (UNAUDITED)

| | Three Months Ended March 31, | | % |
|---|---|---|---|
| | 2008 | 2007 | Change |
| [h] Operating expenses (In millions) | | | |
| Consolidated operating expenses | $5,152 | $4,465 | 15.4 |
| Add: income from special items | – | 22 | (100.0) |
| Adjusted operating expenses | $5,152 | $4,487 | 14.8 |
| | | | |
| [i] Operating cash flow (In millions) | | | |
| Operating cash flow | $(80) | $626 | – |
| Less: capital expenditures | (101) | (68) | 48.5 |
| Free cash flow | $(181) | $558 | – |

   (i) UAFC's revenues and expenses are not derived from mainline jet operations. Therefore, UAL has excluded these revenues and expenses from the above reported GAAP financial measures. See Note 4, above, for more details.

   (ii) The income tax adjustment for special items is the difference in the income tax provision on actual net loss and the income tax provision on adjusted net loss, both computed using an effective tax rate of 35%.

  NM - Not meaningful.

(8) The table below sets forth the estimated exit-related and fresh-start reporting impacts on the Company's results of operations.

| | 2008 Increase (Decrease) |
|---|---|
| (In millions) | 1Q |
| Revenue impact: | Estimate |
| Mileage Plus revenue | $(65)   [a] |

```
Operating expense impact:
Share-based compensation                    11      [b]
Mileage Plus marketing expense               5      [a]
Postretirement welfare cost                 14      [c]
Depreciation and amortization               10      [d]
Deferred gain                               18      [e]
Total operating expense impact              58

Non-operating expense impact:
Non-cash and fresh-start interest
  expense                                   $4      [f]
```

[a]  In connection with its emergence from Chapter 11 protection effective
     February 1, 2006, the Company adopted fresh-start reporting.
     Accordingly, the Company elected to change its accounting policy from
     an incremental cost basis to a deferred revenue model to measure the
     obligation for the Mileage Plus Frequent Flyer program. Adjustments to
     the obligation are recorded to operating revenues. Historically,
     adjustments were based upon incremental costs and were recorded in
     both operating revenues and advertising expense.

     The deferred revenue model is more volatile than the incremental cost
     basis. Because all miles are now accounted for under the deferred
     revenue model, the amount of revenue recognized is more sensitive to
     the number of miles earned and redeemed during the period than the
     incremental cost basis.

[b]  In accordance with the plan of reorganization, the Company implemented
     stock-based compensation plans for certain management employees and
     non-employee directors.  The Company adopted SFAS 123R effective
     January 1, 2006 and recorded compensation expense for such plans.

[c]  In accordance with fresh-start reporting, the Company revalued its
     liabilities effective February 1, 2006 to fair value.  As a result,
     all prior period service credits related to postretirement costs were
     eliminated.

[d]  In accordance with fresh-start reporting, the Company revalued its
     assets to fair value effective February 1, 2006.  As a result,
     definite lived intangible asset values increased substantially which
     results in higher associated amortization expense.  In addition, the
     value of the Company's operating property and equipment was
     significantly reduced which results in lower depreciation expense.
     The Company has estimated the net impact of changes in asset values at
     fresh-start on net depreciation and amortization.

[e]  In accordance with fresh-start reporting, the Company revalued its
     liabilities effective February 1, 2006 to fair value.  As a result,
     all deferred gains on aircraft sale/leasebacks were eliminated.

[f]  As a result of fresh-start reporting, the Company recognizes certain
     non-cash interest expenses, including the amortization of
     mark-to-market discounts on all debt and capital leases.


                        CONSOLIDATED NOTES (UNAUDITED)


(9) The following table presents additional detail on the Mileage Plus
    impacts summarized in the table above. These items consist of the

additional amount of revenue that the Company estimates would have
been recognized had we continued to apply the incremental cost method
of accounting after exiting bankruptcy and, for 2007, the estimated
impact of the change in the expiration period for inactive accounts
from 36 months to 18 months.  The Company utilizes this adjustment
for comparison of its performance to its peers, as certain of our
peers currently still apply the incremental cost method of accounting.

| (In millions) | 2008 1Q | Increase (Decrease) 2007 | | | | |
|---|---|---|---|---|---|---|
| | | YTD | 4Q | 3Q | 2Q | 1Q |
| **Mainline** | | | | | | |
| Effect of accounting change | (54) | (230) | (50) | (30) | (37) | (113) |
| Effect of expiration period change | – | 204 | 100 | 42 | 39 | 23 |
| Total Mainline | (54) | (26) | 50 | 12 | 2 | (90) |
| **Regional Affiliates** | | | | | | |
| Effect of accounting change | (11) | (47) | (11) | (5) | (9) | (22) |
| Effect of expiration period change | – | 42 | 21 | 8 | 8 | 5 |
| Total Regional Affiliates | (11) | (5) | 10 | 3 | (1) | (17) |
| **Consolidated** | | | | | | |
| Effect of accounting change | (65) | (277) | (61) | (35) | (46) | (135) |
| Effect of expiration period change | – | 246 | 121 | 50 | 47 | 28 |
| Total Consolidated | (65) | (31) | 60 | 15 | 1 | (107) |

### CONSOLIDATED NOTES (UNAUDITED)

(10) Pursuant to SEC Regulation G, the Company has included the following
     reconciliation of reported non-GAAP financial measures to comparable
     financial measures reported on a GAAP basis. Further, the Company
     believes that excluding fuel costs from certain measures is useful to
     investors because it provides an additional measure of management's
     performance excluding the effects of a significant cost item over
     which management has limited influence.  The Company also believes
     that adjusting for special items is useful to investors because they
     are non-recurring income and/or charges that are not indicative of
     the Company's on-going performance.  The forecasted amounts shown
     below were estimated based on a forecasted jet fuel price of $3.31
     per gallon for both the second quarter and the full year of 2008.

| Operating expense per ASM - CASM (cents) | Three Months Ending June 30, | | | | |
|---|---|---|---|---|---|
| | 2008 Estimate | | 2007 | YOY | |
| | Low | High | Actual | % Change | |
| Mainline operating expense | 13.25 | 13.29 | 10.99 | 20.6 | 20.9 |
| Less: fuel expense & cost of third party sales - UAFC | (5.42) | (5.42) | (3.39) | 59.9 | 59.9 |
| Mainline excluding fuel & UAFC | 7.83 | 7.87 | 7.60 | 3.0 | 3.5 |
| Add: income from special items | – | – | – | – | – |
| Mainline excluding fuel, UAFC and special items | 7.83 | 7.87 | 7.60 | 3.0 | 3.5 |

|  | Twelve Months Ending December 31, | | | | |
| Operating expense per ASM - CASM (cents) | 2008 Estimate | | 2007 Actual | YOY % Change | |
|  | Low | High |  | | |
| Mainline operating expense | 13.34 | 13.42 | 11.39 | 17.1 | 17.8 |
| Less: fuel expense & cost of third party sales - UAFC | (5.35) | (5.35) | (3.55) | 50.7 | 50.7 |
| Mainline excluding fuel & UAFC | 7.99 | 8.07 | 7.84 | 1.9 | 2.9 |
| Add: income from special items | - | - | 0.03 | (100.0) | (100.0) |
| Mainline excluding fuel, UAFC and special items | 7.99 | 8.07 | 7.87 | 1.5 | 2.5 |

UAL CORPORATION AND SUBSIDIARY COMPANIES
Successor Company Operating Statistics
(Mainline and Regional Affiliates (a))

|  | Three Months Ended March 31, | | % Change |
|  | 2008 | 2007 | |
| Mainline revenue passengers (In thousands) | 15,250 | 16,350 | (6.7) |
| Revenue passenger miles - RPM (In millions) | | | |
| Mainline | 26,927 | 27,729 | (2.9) |
| Regional affiliates | 2,809 | 2,977 | (5.6) |
| Consolidated | 29,736 | 30,706 | (3.2) |
| Available seat miles - ASM (In millions) | | | |
| Mainline | 34,528 | 34,535 | - |
| Regional affiliates | 3,881 | 3,929 | (1.2) |
| Consolidated | 38,409 | 38,464 | (0.1) |
| Passenger load factor (percent) | | | |
| Mainline | 78.0 | 80.3 | (2.3) pt. |
| Regional affiliates | 72.4 | 75.8 | (3.4) pt. |
| Consolidated | 77.4 | 79.8 | (2.4) pt. |
| Consolidated operating breakeven passenger load factor (percent) | 85.5 | 81.7 | 3.8 pt. |
| Passenger revenue per passenger mile - Yield (cents) [See Note 7a] | | | |
| Mainline adjusted | 13.13 | 11.74 | 11.8 |
| Regional affiliates | 25.45 | 22.67 | 12.3 |
| Consolidated adjusted | 14.29 | 12.80 | 11.6 |
| Passenger revenue per available seat mile - PRASM (cents) [See Note 7b] | | | |
| Mainline | 10.27 | 9.45 | 8.7 |
| Mainline adjusted for Mileage Plus | 10.42 | 9.71 | 7.3 |
| Regional affiliates | 18.42 | 17.18 | 7.2 |
| Regional affiliates adjusted for Mileage Plus | 18.71 | 17.61 | 6.2 |
| Consolidated | 11.09 | 10.24 | 8.3 |
| Consolidated adjusted for Mileage | | | |

|  |  |  |  |
|---|---|---|---|
| Plus | 11.26 | 10.52 | 7.0 |
| Operating revenue per available seat mile - RASM (cents)  [See Note 7c] |  |  |  |
| Mainline | 11.57 | 10.71 | 8.0 |
| Mainline excluding UAFC | 11.56 | 10.64 | 8.6 |
| Regional affiliates | 18.42 | 17.18 | 7.2 |
| Consolidated | 12.27 | 11.37 | 7.9 |
| Consolidated excluding UAFC | 12.26 | 11.30 | 8.5 |
| Operating expense per available seat mile - CASM (cents)  [See Note 7g] |  |  |  |
| Mainline | 12.67 | 10.93 | 15.9 |
| Mainline excluding fuel, UAFC and special items | 8.10 | 7.91 | 2.4 |
| Regional affiliates | 20.07 | 17.61 | 14.0 |
| Consolidated | 13.41 | 11.61 | 15.5 |
| Consolidated excluding fuel, UAFC and special items | 8.59 | 8.39 | 2.4 |
| Mainline unit loss (cents) (b) | (1.10) | (0.22) | 400.0 |
| Mainline unit earnings excluding fuel, UAFC and special items (cents) (b) | 3.46 | 2.73 | 26.7 |
| Number of aircraft in operating fleet at end of period |  |  |  |
| Mainline | 460 | 460 | – |
| Regional affiliates | 275 | 289 | (4.8) |
| Consolidated | 735 | 749 | (1.9) |
| Other Mainline Statistics |  |  |  |
| Mainline average price per gallon of jet fuel (cents) | 283.3 | 188.9 | 50.0 |
| Average full-time equivalent employees (thousands) | 52.5 | 51.5 | 1.9 |
| Mainline ASMs per equivalent employee - productivity (thousands) | 658 | 671 | (1.9) |
| Average stage length (in miles) | 1,414 | 1,359 | 4.0 |
| Fleet utilization (in hours and minutes) | 10:43 | 10:59 | (2.4) |

(a) Mainline includes United Air Lines, Inc. scheduled and chartered jet operations. Regional affiliates include operations from regional carriers with whom the Company has entered into capacity purchase agreements to provide jet and turboprop operations branded as United Express.
(b) Unit earnings are calculated as RASM minus CASM.

SOURCE UAL Corporation 04/22/2008
CONTACT: Worldwide Press Office of UAL Corporation, 1-312-997-8640
Web site: http://www.united.com (UAUA)

# Exhibit 6

The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

**August 12, 2008**

# Delta and Northwest Pilots Overwhelmingly Ratify Joint Pact

**By THE ASSOCIATED PRESS**

ATLANTA (AP) — Pilots at Delta and the Northwest have approved a collective bargaining agreement. Ratification has been an element of Delta's efforts to achieve a smooth integration when it acquires Northwest later this year.

Delta's pilots union issued a memorandum detailing the results Monday, the deadline for rank-and-file pilots of both airlines to vote.

The agreement covers roughly 12,000 pilots of the two airlines.

Of eligible Delta pilots who cast a ballot, 61.74 percent voted in favor of the agreement, while 86.76 percent of eligible Northwest pilots who cast a ballot voted in favor.

With ratification by the pilots, the agreement will become effective when the merger between Delta and Northwest closes, which is expected by the end of the year, Delta's pilots union said.

The pilots still do not have a deal to integrate their seniority lists but have agreed to submit to binding arbitration if they cannot come to terms by Tuesday. A three-member panel has already been chosen in case arbitration is needed.

Pilots value their seniority because it determines their schedule, the aircraft they fly and layoff protection.

Delta's stock-swap deal to acquire Northwest, announced April 14, is subject to shareholder and American regulatory approval. European regulators cleared the deal last week.

The combination, being proposed at a time of persistently high fuel prices and airline industry financial woes, would create the world's largest carrier in terms of traffic.

The pilot agreement, together with one reached earlier between Delta pilots and management, calls for compounded raises totaling more than 18 percent over four years, a summary

provided to Delta pilots says.

In exchange, the company will be able to place the Delta code and brand on Northwest flights and retain Northwest's large stake in Midwest Airlines, while maintaining the separate operational status of those two carriers.

The joint contract agreement also calls for premerger Northwest pilots to receive a 2.38 percent equity stake in the new Delta. Current Delta pilots would receive a 3.5 percent equity stake.

The summary sent by Delta union officials to its pilots says the two amounts are proportional given the size of the two pilot groups. There are about 5,000 Northwest pilots and about 7,000 Delta pilots.

Copyright 2008 The New York Times Company

# Exhibit 7

## Thomson StreetEvents℠

### UAUA - Q2 2008 UAL Corporation Earnings Conference Call

Event Date/Time: Jul. 22. 2008 / 11:00AM ET

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call

## CORPORATE PARTICIPANTS

**Kathryn Mikells**
*UAL Corporation - VP IR*

**Glenn Tilton**
*UAL Corporation - Chairman, President, CEO*

**Jake Brace**
*UAL Corporation - EVP, CFO*

**John Tague**
*UAL Corporation - COO*

**Graham Atkinson**
*UAL Corporation - Chief Customer Officer*

## CONFERENCE CALL PARTICIPANTS

**William Greene**
*Morgan Stanley - Analyst*

**Mike Linenberg**
*Merrill Lynch - Analyst*

**Gary Chase**
*Lehman Brothers - Analyst*

**Ray Neidl**
*Calyon Securities - Analyst*

**Daniel McKenzie**
*Credit Suisse - Analyst*

**Jamie Baker**
*JPMorgan - Analyst*

**Kevin Crissey**
*UBS - Analyst*

**Susan Kerry**
*Wall Street Journal - Media*

**Josh Frey**
*Associated Press - Media*

**Micki Maynard**
*New York Times - Media*

**Dan Reed**
*USA Today - Media*

**Julie Johnson**
*Chicago Tribune - Analyst*

## PRESENTATION

**Operator**

Good morning. Welcome to UAL's Corporations earnings conference call for the second quarter of 2008. My name is Theresa and I will be your conference facilitator today. Following the prepared remarks from UAL's management, we will open the lines

THOMSON                    www.streetevents.com                    Contact Us

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the
prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

for questions from analysts. At the end of the analysts' Q and A at approximately noon eastern time, we will take questions from the media. If you have a question, please press star, followed by the digit one on your touch-tone telephones. This call is being recorded and is copyrighted. Please note that it cannot be recorded, transcribed or rebroadcast without UAL's permission. Your participation implies consent to our recording of this call. If you do not agree with these terms, simply drop off the line. I would now like to turn the presentation over to your host for today's call, Kathryn Mikells. Please go ahead, ma'am.

**Kathryn Mikells** - *UAL Corporation - VP IR*

Thank you, Theresa. Welcome to UAL's second quarter conference The announcement of our financial results was released earlier this morning, and is available on our website at www.United.com/IR. Let me point out that the information in the press release and those made during this conference call may contain various forward-looking statements which represent the company's expectations or beliefs concerning future events. All forward-looking statements are based upon information currently available to the company. A number of factors could cause actual results to differ materially from our current expectations. Please refer to our press release, Form 10-K and other reports filed with the SEC for a more thorough description of these factors.

Also during the course of our call, we will be discussing several non-GAAP financial measures. For a reconciliation of these non-GAAP numbers to GAAP financial measures, please refer to the tables at the end of our earnings release. As we announced on July 11th, our second quarter results were impacted by a number of special and unusual charges, totaling $2.6 billion. The overwhelming majority of which were non-cash. These charges included following: A special non-cash charge of of $2.3 billion for goodwill impairment, non-cash special charges of $194 million related to the impairment of certain 737 aircraft that are being retired from the company's operating fleet, aircraft pre-delivery deposits and certain indefinite live intangible assets other than goodwill net of a related tax benefit. Severance charges of $82 million related to staffing reductions that will occur as a result of the capacity changes that the company has recently announced. Other largely non-cash charges of $54 million related to certain projects that have been terminated or indefinitely deferred by the company, as well as the non-cash balance sheet adjustment to increase certain employee benefit obligations. And a $29 million cash gain from a litigation settlement. As Glenn, Jake and John walk you through the numbers for the quarter they will be excluding these items unless otherwise noted.

Our results for the quarter and year to year were also impacted by the deferred revenue accounting that we adopted for the Mileage Plus program in 2006 as well as the change in the the mileage expiration policy from 36 to 18 months that we announced in early 2007. In the second quarter of 2008, the change to deferred revenue accounting decreased Mileage Plus revenues by $42 million. In comparison, in the second quarter of 2007, the impact of mileage plus accounting was essentially a push as the company recognized $47 million in additional revenue from the change in the expiration period for miles that effectively offset the $46 million decrease in consolidated passenger revenue, driven by the change to deferred revenue accounting. On a year-over-year basis, Mileage plus accounting resulted in a $43 million decrease to second quarter 2008 consolidated passenger revenue, depressing our passenger unit revenue growth by about 1 percentage point. You can find more information about all of these items in the tables at the end of our earnings release.

And now I'd like to turn the call over to Glenn Tilton, UAL's Chairman, President and CEO. Glenn?

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Thanks very much, Kathy. And good morning and welcome to everyone on the call. Joining me and participating on the call today are Jake Brace, Chief Financial Officer, and John Tague, Chief Operating Officer. Pete McDonald, Chief Administrative Officer and Graham Atkinson, our Chief Customer Officer are also with us this morning and they're available to take questions.

Earlier today we announced our second quarter 2008 results. We reported a net loss of $151 million, excluding the accounting charges that Kathy just walked us through. An increase of some $773 million in fuel expense over last year drove a second quarter pretax result that was $617 million worse than 2007. Our industry continues to be challenged, perhaps as never before,

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

by fuel prices that are marring higher, most recently hitting an all-time high of of $147.27 a barrel. Our revenue results for the quarter were in line with our network peers and we are taking steps to improve, particularly internationally, where industry growth has been rapid for the last several quarters and is beginning now to put pressure on yields. As part of our capacity reduction, we are pulling down international capacity and eliminating routes that are not performing well. As John will discuss later, we expect these changes will significantly improve our revenue performance internationally.

We are also taking steps to improve our liquidity. We recently closed a number of transactions that add approximately $550 million in additional cash, which Jake will talk about further. And we have a number of actions underway which Jake will also speak to during his segment. We believe these steps, together with our large pool of unencumbered assets, position us well relative to – to peers. As fuel again hit record prices during the second quarter and as fuel expense increased nearly $350 million over the first, we intensified the actions we are taking to offset the skyrocketing cost as well as to strengthen the competitiveness of our business at United. As we told you last quarter, we are executed against a plan focusing on enabling United to compete and return to profitability over time with fuel at these levels.

We are cutting capacity and grounding 100 planes. Significantly more than the number we discussed with you just a quarter ago. By the fourth quarter, mainline domestic capacity will be down some 16% year-over-year. In doing so, we expect to be able to leverage our capacity reductions to pass more cost into the marketplace. We're taking the difficult but imperative action of reducing the size of our work force across the company. We also are pursuing new revenue streams, our new baggage fees chief among them. We continue to reduce our costs and today announced we are reducing non-fuel operating cost by another $100 million, Bringing our total cost reduction program to $500 million. Enabling us to maintain our full-year non-fuel unit cost guidance despite the significant capacity reductions we have underway.

Our capital expenditures, reduced to some $450 million this year, will be focused on safety and investments that are critical to improving the travel experience for our customers. We're doing all we can to control our costs and improve our revenue to offset fuel and together with the Air Transport Association and a broad-based coalition, we are calling on Congress to take action on excess indexed fuel speculation that is adding to volatility and driving the price of oil well beyond its underlying fundamental value. Our industry faces more than a $20 billion increase in its fuel bill this year, and United's portion of that is more than than $3.5 billion. This requires action in Washington and different thinking about how we can best run our businesses in this economic environment.

We believe that our partnership with Continental is one such example. As we announced last month, we will be linking our networks and services worldwide to create revenue opportunities, cost savings and operational efficiency. Continental will join the Star Alliance, the world's leading global alliance after exiting Skyteam, following the closing of the Delta/Northwest merger. Continental, along with our existing immunized star alliance partners will jointly apply for anti-trust to join our immunized transatlantic alliance which will enable us to coordinate schedules and pricing across the Atlantic and to share revenues generated in these markets. We expect to next pursue a similar agreement in Latin America.

The teams are off to a very good encouraging start, pursuing several work streams to ensure our new partnership extends well beyond simple code-sharing benefits. Specifically, we are identifying the path to create additional customer benefits and airline and partner revenue by more closely aligning our frequent flyer programs. Leveraging Continental's and United's combined buying power to reduce our overall spending, providing a world-class airline IT infrastructure in order to improve the services we offer customers and reduce cost, extending our lounge network to provide more opportunities for personalized service, focusing on enhanced joint spaces across our linked networks, and optimize on and off airport facilities to enhance network connectivity, and make it work for our customers and our employees while we maximize cost-saving opportunities. As Larry and I agreed during our progress review this Friday, this partnership has all of the elements for success: a shared commitment and understanding of the opportunities that we can create together between our companies and management teams with the capabilities, the attitude and the relationships to make those opportunities a reality. As we work through the difficult task of getting costs permanently out of the company, generating new streams of revenue and resizing the workforce to match the business, we need also to focus on future opportunities, to enhance our ability to compete globally. Our agreement with

| THOMSON | www.streetevents.com | Contact Us |  |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

continental is such an opportunity for both of our companies, and there's commitment to move forward aggressively, to realize the full potential of this partnership.

I'll now turn the call over to Jake who will walk us through more of the numbers in greater detail. Jake, over to you.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Thanks, Glenn. And good morning, everyone. Our loss for the quarter is a direct result of the punishing price of fuel the industry is experiencing. During the quarter, oil averaged about $124 a barrel for us, up 27% from the first quarter and up 90% from last year. As I will discuss in a few minutes, of the past 90 days, we have accelerated and intensified the actions we are taking in response to this industry crisis, as well as increasing our cash balance to support the execution of those actions. The bottom line for the quarter was that the increase in fuel expense significantly outpaced the industry's ability to pass on these costs to consumers. At United, consolidated fuel expense rose $773 million as the price per gallon of jet fuel rose more than 55%, driving a second quarter operating loss of of $87 million, $624 million worse than the same period last year. While we beat the consensus, we recorded a net loss of $151 million or $1.19 per share for the quarter.

Our revenue results were solid, with second quarter mainline RASM increasing 5.1% year-over-year, consolidated RASM increased by 4.4%, excluding the impact of mileage plus accounting as Kathy mentioned consolidated revenue per ASM was up 5.3% and cargo and other revenue of 475 million-dollars was up 7.7%. In contrast to the passenger business, we saw very strong performance in cargo revenues which grew by approximately 30% as we successfully passed on rising costs of fuel to cargo customers through substantial fuel surcharges. Our performance was also helped by higher mail volumes as we benefited from the year-over-year addition of our new domestic mail contract. A little bit of guidance here. We expect cargo and other revenues of about 450 to to $460 million in the third quarter of 2008.

Turning to costs, operating expenses increased by about 17% in the second quarter with the increase almost exclusively attributable to higher fuel expense, including hedging gains average mainline jet fuel expense for the quarter was $3.24, up from $2.08 a year ago. The total mark-to-market of our fuel portfolio as of July 18th, last Friday, was $135 million. On an accounting basis, we will booked $30 million in realized gains during the second quarter, and $208 million in unrealized gains. We recognized a cash gain, an economic gain, if you will, of $51 million for contracts that settled during the second quarter. We also recognized a below the line gain of $22 million for fuel hedges that did not qualify as economic hedges.

Importantly non-fuel costs for the quarter were a little bit better than our guidance with mainline CASM excluding fuel exceeding 2.6% year-over-year. While the beat was small, we are encouraged that we saw a good cross performance as we took capacity down 1.3% during the quarter. We are holding the line on costs and are committed to removing both variable and fixed costs from the system as we take down capacity. Now let me walk you through some of the expenses where we saw significant year-over-year changes this quarter. Landing fees and other rent declined by by $16 million year-over-year or roughly 7.5%, driven by the timing of certain airport rent credits which were received a quarter earlier than last year, as well as the savings from our efforts to optimize our airport real estate, regional affiliates expense increased $114 million year-over-year on $131 million increase in regional affiliate fuel expense.

The variances in salaries, purchase services and other operating expenses are all due to the effects of the accounting charges that Kathy outlined earlier. We continue to see the results of our debt reduction and refinancing efforts with interest expense for the quarter down $13 million or 9.5% versus laster, however this was offset by a $34 million decline in increase income due to lower yields on cash as well as a lower average cash balance versus last year. As I mentioned earlier, we recorded a gain of roughly $22 million in the second quarter on transactions that did in the qualify for hedge accounting and thus were booked below the line. Net-net for the quarter totaled non-operating expenses was $65 million, $7 million lower than a year ago. Despite incurring $773 million in higher fuel costs, we generated positive cop rating cash flow of $218 million in the second quarter, free cash flow which we define as operating cash flow less capital expenditures came in as positive $127 million for the quarter.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

Enhancing our cash position is critical. We executed a number of transactions to bolster our cash balance and we have a number of other actions underway. As noted in our press release this morning, we raised $90 million through aircraft financing transactions and asset sales in the second quarter and we also completed a $241 million aircraft financing transaction earlier this month. In this transaction, we utilized the equity we had built up in some existing aircraft mortgages enabling us to raise cash without encumbering any additional aircraft. We also entered into agreements in principle for several aircraft and other asset sales worth about $40 million. The company also freed up up $130 million in restricted cash during the second quarter, as well as an additional $50 million during the third quarter. These transactions were very efficient vis-a-vis utilization of collateral. After all of the transactions are closed we will still have have $3 billion in hard collateral remaining, including over $2 billion in aircraft.

And now some real time information. Hopefully we've just crossed the wires with a press release announcing that we've come to an agreement in principle with Chase to extend the terms of our agreement with them on both the the Mileage Plus credit card and our credit card processing agreement. As part of this transaction, United will receive a payment of $600 million from Chase which relates to the advance purchase of frequent miles and for the extension of the contract and we expect this transaction to improve our cash flow in addition to this by $200 million over the next couple of years. In addition, the level of — of credit card holdback that we are required to maintain on our processing agreement with Chase payment tack has been reduced to $25 million, this reduction will result in the release of approximately $350 million in previously restricted cash.

As a result of these agreements, we expect to increase our cash position by approximately $1.2 billion including a billion dollars in the short term, and the additional $200 million over the next five years, combined with the $550 million that I just told you about, we expect that we will have improved our cash balance by $1.7 billion in the near future. And as I said before, all of these transactions use very little collateral and we still have more than $3 billion in unencumbered assets, including $2 billion in aircraft. We ended the quarter with with $2.9 billion in unrestricted cash, excluding the financing transactions and the release of the unrestricted cash — the release of the restricted cash that occurred in the second quarter, we closed the quarter with unrestricted cash and short-term investments balance of $2.7 billion in line with our guidance. Our main focus is on making the substantial changes necessary to get the business profitable in this environment, essentially offsetting the $3.5 billion increase to our fuel bill.

As I said, as fuel prices have soared, we have intensified and accelerated the action plan we discussed with you last quarter. I would like to take a few moments to update you on the status of each of the areas of focus. First, we are sizing the business appropriately. The industry simply cannot recover higher fuel crosses unless we affect a shift in the supply curve and in order to get a shift in the supply curve we must increase capacity. This isn't rocket science, it's Econ 101. At United, we are leading the industry in permanently reducing capacity, removing 94 narrow-body aircraft and six wide body aircraft from our operations retiring our entire fleet of 737 aircraft and phasing out our Ted product. We will deploy A-320s currently flying in Ted markets to many routes previously covered by 737s, substituting A-320s for older inefficient 737s results in about a 16% reduction in fuel burn per seat across our entire fleet the 737 retirements will result in a 2.4% improvement in fuel efficiency. We plan to remove three quarters of the 100 aircraft of our fleet by year end with the remaining aircraft coming out in 2009, these retirements drive a 16% year-over-year reduction in main line domestic r n capacity in the fourth quarter as Glenn mentioned and about a 20% reduction in the full year 2009 compared to 2007.

We are using our capacity discipline to pass higher commodity costs onto consumers. We continue to lead fare and fuel surcharge increases and also recently reinstated minimum stays in some markets as part of our efforts to recoup higher fuel costs. We are creating significant incremental revenue by unbundling our products. Last quarter, we announced our new second checked bag fee, in June we announced that we will be charging for the first checked bag. John will give you more details around the financial targets we have for ancillary revenues for this year and next. While revenue will fill the lion's share of the gap caused by higher fuel, reducing costs will also make a meaningful contribution. As Glenn mentioned, we reduced our 2008 cost savings target by $100 million to $500 million, more than twice the original 2008 target we discussed with you in January. A large portion of this incremental reduction in expense comes from the salaried and management reductions we are making this year, around 1500 positions or 20% of our salaried and management workforce. We expect these changes to save us $235 million in 2009.


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

As we reduce capacity, we also need to reduce our frontline workforce. We expect to reduce this group by about 5500 employees, or about 12% by the end of 2009. We fully understand how difficult these reductions are for our people and we are working to mitigate the effects of it by implementing several voluntary programs. We've announced voluntary programs for pilots, flight attendants and airport employees and are discussing voluntary programs with our other unions. Lastly, as I mentioned on our call last quarter, we are also reducing our capital spending. We now have a non-aircraft capital spending budget of $450 million for 2008 which is $200 million less than originally planned.

We are operating in an environment that the industry has never seen before. At United we are executing against our action plan to offset the impacts of rising fuel expense. We have a solid cash position. We have successfully raised quite a bit of cash in the last 30 days. We are stabilizing our business and accelerating the pace of our actions to enable profitability in the current environment. Now let me turn it over to John.

**John Tague** - *UAL Corporation - COO*

Thanks, Jake. Today and on these calls going forward I will talk with you about the steps we are taking to improve our cost, revenue and operating performance. Our focus and our energy are all about generating a breakthrough in performance. The pressure of the industry environment and the need to do so is obvious. Importantly we also see the opportunity. I'm going to walk you through some of the specific actions we are taking to improve our performance and regain profitability. In addition to the work we have underway to right-size our capacity we are pursuing an aggressive agenda focused on the basics of running a good airline. Simply put, an airline that runs on time with clean planes providing the platform for our employees to deliver great service and in doing so deliver great financial performance.

To that end, we are turning all of our attention to five fundamental areas: Deliver industry-leading revenues, achieve the full potential of our cost performance, drive top tear operational performance and improve the cleanliness and workability of our products, all in support of a courteous, caring and respectful service environment. Our focus is clearly set on the areas focused on an industry leading performance at united. First on the revenue front United's revenue growth rates lead the industry for the trailing 12 months, our second quarter results are quite competitive but somewhat below our own expectations and clearly insufficient to address the gap created by rising fuel costs. Second quarter mainline Prime mainline PRASM was up 4.7% year-over-year and consolidated PRASM was up 3.9%, our consolidated results driven by 7.7% increase in yield partially offset by a 3 point drop in load factor. Similarly our main line results were driven by a yield improvement of 8.2% year-over-year on a 2.7 point decline in load factor.

Domestic market performance was solid. Benefiting from a 4.8% reduction in mainline capacity. Mainline domestic PRASM was up 5.9%, driven by a strong yield increase of 8.6%. International PRASM was up 3.2% year-over-year on capacity growth of 3.7%. While Latin America continues to see very strong PRASM growth, up 16% this quarter, growth in other regions has decelerated as we and the industry have added significant capacity. In the Pacific region, China, including Hong Kong, has been particularly hard hit as industry capacity has grown by more than 20%. China represents over 40% of United-specific capacity. PRASM growth in Japan and the intra-Asia operations was quite strong. In the Atlantic region we've seen 20% capacity growth in Heathrow and significant growth in our core areas of strength in Germany, which resulted in a PRASM growth of less than 1% this quarter.

Our domestic performance is clearly benefiting from the capacity actions that we have taken and we recognize the developing oversupply situation in the marketplace and have taken steps to address it with the elimination of six 747 aircraft, additionally eliminating 8% of our international capacity in 2009 will result in a substantial reduction of our current international losses. At current fuel price, the economics of many routes right now just don't make sense. We are aggressively responding to market conditions by permanently eliminating underperforming capacity. And we will continue to have a bias towards more action should market conditions require it. In June we announced capacity reductions for the fourth quarter of this year, and into 2009. By the fourth quarter of this year our domestic main line capacity will be down about 16%. International capacity will be down 7%, resulting in a 11% reduction in consolidated capacity. In 2009 we will reduce capacity another 8% compared to 2008. All told, 2009 capacity when compared with 2007 reflects about a 13% reduction in the company's consolidated capacity.


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

In implementing these changes we are aggressively looking at our network, routes that cannot profitably withstand the pressure of elevated fuel costs are being eliminated. Our fourth quarter capacity will be down 20% in Los Angeles, 16% in Denver, 12% in Chicago, and 11% in San Francisco with 3% in Washington. We recently announced that we will close seven stations this year, we are looking at our international network and we are making the right choices to improve performance. Closing Nagoya, reducing service to Mexico city, eliminating Los Angeles - Frankfurt, Los Angeles - Hong Kong and Denver - Heathrow routes in the fall while also reducing our service to Moscow and Ghaungzhou . We expect the elimination of these unproductive routes to provide a mix improvement of our RASM, improving our results by three points. We recognize that the impact of our reductions have on communities that we serve and the importance of a strong network and schedule towards our customers, and we are focused on minimizing the impact to the network by retaining service through other hubs and through our alliance partners. The current environment requires a step change in revenue production. In addition to the value we are driving through capacity reductions, we must unlock significant new revenue streams.

On our last call I walked you through the details of the revenue opportunity from upbundling our product and introducing new merchandising initiatives, as well as raising a number of the miscellaneous fees and charges. Several of these initiatives are either underway or will be introduced shortly. Jake mentioned the first and second bag initiatives that we are currently implementing. We estimate that the potential revenue from the new baggage service handling fees will be about $275 million annually in 2009. Revenues from new optional services to be introduced will be approximately $100 million in 2009. This is in addition to the approximately $270 million in Economy Plus and Premium Cabin upsell. This totals to $650 million in 2009 for merchandising initiatives, an improvement of of $450 million versus 2007. We also will be collecting more than $600 million in other fee revenue in 2009, up $150 million from 2007. Combined, these opportunities now represent over $1 billion in our 2009 estimates, a $600 million increase relative to 2007.

And as Glenn discussed, we are continuing to work on our new partnership with Continental and we see significant cost savings and revenue opportunities from our relationship. The alignment of the management teams is quite encouraging and productive. As is our mutual assessment of the value opportunity. Moving to our revenue outlook, despite a continuing soft economy, we expect continued solid unit revenue growth in the third quarter, and we also expect to start seeing the full benefits of our capacity pulldown and the industry capacity reduction late in the third quarter of this year. While it is quite early in the booking curve, we have reason to be encouraged by a strong yield performance and improvement in book load factor year-over-year during the fall period. The requirement for us is straightforward. Revenue must improve substantially, and yield must carry the bulk of that burden for that improvement. Should demand levels fail to support our yield requirements more capacity adjustments will be required and the full cost associated with the capacity must be taken out of the system.

As Jake mentioned earlier, cost performance for the quarter was good. However, the environment and the opportunity emphasizes the need to do more, and we have targeted a number of opportunities for improvement including maintenance cost reduction, principally to be achieved by supply chain, materials management and efficiency opportunities in our base and line maintenance operations. We are setting the bar high, and expect to significantly close the gap relative to our historical lack of competitiveness in our maintenance cost position. We also see opportunities in catering to readjust our service patterns, explore new supplier models, leading to a continued substantial reduction in our catering costs.

Across the organization, we are looking at opportunities we see in salaries and wages, particularly in the overhead functions. As Jake mentioned, salaried and management staff is being reduced by 20%. Additional opportunities exist, and we need to do more. We have also begun to engage our express partners, and believe that there are a number of potential levers to reduce the cost of the United Express lifts. We are working with our partners to translate the efficiency practices such as fuel saving techniques to the express operations.

Distribution and cost of sales continues to be a key focus area in our cost reduction efforts. Actions we've set in place, even over the past several weeks, will reduce our agency commissions by more than $80 million on an annual basis, helping us achieve our overall cost saving target this year, and working towards a significant improvement in costs for 2009. We are continuing to do more. Our actions include the rework of all agency incentive programs, walking away from many agencies altogether where appropriate cost of sale targets cannot be achieved, including the recent termination of a large multinational agency agreement.

| THOMSON | www.streetevents.com | Contact Us |
|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

We also stopped participating in agency affiliate programs, eliminated consolidator commissions in the Pacific and reduced numerous base commissions internationally. These are not actions we take lightly. But they are appropriate actions to reduce our cost of sale. And we believe necessary to succeed in this environment. Fully realizing our opportunity to improve costs is essential to our success. And I can assure you we have the will and the opportunity to bring down the improvements necessary to achieve our goal.

Moving to the operational side, our performance was neither acceptable nor was it competitive. Our action plan and goals are substantial. United must deliver top tier operational performance. The work required to do so is clear. And it forms the basis of our improvement plans. Over the last 12 months, we've consistently placed in the bottom tier among network carriers across the DOT performance measurements.

To improve our performance, we are focusing our efforts in several specific areas: Improving our out of service aircraft performance, improving execution on turn times, addressing our schedule structure, focusing on a regular operations recovery, and better aligning all of our operating divisions against our new goals. We are making straightforward changes to our schedule, increasing ground times by eight to ten minutes in September. We are also increasing the number of crew held in reserve and are focused on improving the departure performance of our very first flights of the day. In part by increasing the number of spare aircraft we have available by four compared with the third quarter of last year. Finally, the addition of a new runway at O'Hare in November, combined with our capacity reductions and those of our competitors should give our operating performance a big boost. These changes should also set our employees up for success in their efforts to present the best United to our customers. We are fully confident that these investments are refired to improve operational performance, although they are very consistent with our cost objectives and in fact we believe that they will be substantially funded through the cost benefit of running an on-time airline.

Fundamental to each of our focused areas is providing and fielding the right team. To that end, as you know, Joe Colshack joined United as Senior Vice President of Operations. Joe served as Delta's Executive Vice President of Operations for a number of years and clearly has the right experience and expectations to be successful in this role at United. Recently joining Joe, we announced that Timothy Canovan also joined United from Delta as Vice President of Line Maintenance and Aircraft Appearance. This represents just a few of the months that we are making across the company to put the right team in place to go after these opportunities, and we are confident that we will make steady progress each quarter and we will continue to report that progress in calls in the future. These leaders share common characteristics: They have deep functional experience. They are true performance managers, with a strong sense of urgency. And the well-earned confidence to get the job didn't and show up with the results.

In closing, we've done the work to find the areas of opportunity for improvement. We've set the stretch targets, put the right leadership in place and we are executing against our plan. The current environment demands more action and you can count on us to continue to act aggressively and responsibly. We know what we need to achieve. How we need to do it, and that we are ultimately accountable for that outcome.

Now I'll turn it back to

---

**Jake Brace** - *UAL Corporation - EVP, CFO*

Thanks, John. And let me move to guidance here real quickly, for the third quarter we expect mainline in North America and capacity to be down 5.5 to 6.5% while international capacity is expected to be down 1 to 2%. Overall third quarter mainline capacity is expected to be down 3.5 to 4.5% and Express capacity expected to be flat which results in consolidated third quarter capacity being down 3 to 4%. For the full year 2008, we expect mainline capacity to be done 7.5 to 8.5% and consolidated capacity to be down 3.5 to 4.5%.


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

Our current capacity plans have sized the business to solve for $125 per barrel crude. If higher fuel prices prevail, we are ready to make further capacity adjustments to account for this and in fact John and his team are in the process of examining what the next round of capacity cuts would look like. A large number of unencumbered aircraft in our fleet, even after removing the 737 and the latitude in our collective bargaining agreements gives us the ongoing flexibility that we need to make the changes to the business necessary in light of this environment. On the cost side we estimate that mainline cost per ASM excluding fuel will be up 1.5 to 2.5% in the third quarter, and up 1.5 to 2.5% for the full year as well. All of those numbers exclude the special and other accounting charges we highlighted it this quarter, as well as any other special or accounting charges that may be incurred later this year.

As you will note, our full year cost guidance remains unchanged from the guidance we provided in January, despite the significant reduction in capacity since that time. Reflecting the additional cost reductions that we discussed earlier in the call call. As you know, as the airline shrinks, it becomes increasingly difficult to maintain the same cost per ASM excluding fuel however we are committed to getting the cost out of the system as we reduce capacity and are pleased with our progress so far this year. You can find our fuel and hedge position guidance in our earnings release and now, Theresa, we are ready to open the call for questions.

## QUESTIONS AND ANSWERS

### Operator

Thank you. First we will take questions from the analyst community, then we will take questions from the media. The question-and-answer session will be conducted electronically. (OPERATOR INSTRUCTIONS). We'll take our first question from William Greene with Morgan Stanley.

### William Greene - Morgan Stanley - Analyst

Yeah, hi. I'm wondering if you can talk a little bit about the elasticity of demand on the corporate and leisure side, obviously with the increases in fares that we've seen you would be expecting to see quite a bit more of that and I would like to hear your thoughts.

### John Tague - UAL Corporation - COO

Yeah, Bill. John Tague here. I think we've all been a little disappointed in yield performance relative to the changes we've made to the pricing structure and the fuel surcharge increases and we're clearly seeing business travelers change behavior and book earlier and so we have seen a modest decline from that perspective. We continue to believe we have the right level of capacity now. And we believe that for the time being our fourth quarter capacity plans were addressed with this trend in mind. But, at the end of the day we've got to right size around a profitable demand base. And I think the next six to nine months will give us clear indication as to what that is.

### William Greene - Morgan Stanley - Analyst

Okay. And then if we turn to the Star alliance, now that Continental's joining, does it change how you think about the part of it with US airways? Would you -- do you even have the right to recess it is or is that solely an US Airways decision?

| THOMSON | www.streetevents.com | Contact Us |  |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**John Tague** - *UAL Corporation - COO*

No. We've come to an agreement with US airways and we expect them to fully participate as they have in the past, which is one of the great accomplishments of this agreement is to be able to bring Star -- with Continental into the Star Alliance and maintain the enormous partnership and it's full economic impact to US Air.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Bill, this is Glenn. We had an unanimous vote of all of the Star members, including US Airways in support of Continental joining the alliance.

---

**William Greene** - *Morgan Stanley - Analyst*

Okay. Thanks for your help.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

You bet.

---

**Operator**

Our next question comes from Mike Linenberg with Merrill Lynch.

---

**Mike Linenberg** - *Merrill Lynch - Analyst*

Yeah, two questions. One your capacity cuts in North America, they are big and you are also cutting Express later this year and yet I believe you're still committed to the five domestic hubs. How do you -- you know, how do you cut that big without compromising the integrity of the network or reducing the connectivity? I mean what are some of the challenges that you run into here?

---

**John Tague** - *UAL Corporation - COO*

John again. I think that when we talk about the competitiveness of the network, we really have to look at what is the relative strength of the network. And the whole industry is going through the type of dramatic capacity reductions that United is. And so I think we're quite comfortable around the relative strength of the network. A number of the reductions that we took might be elimination of service to some hubs but clearly not all hubs, again allowing for continued presence in each of these cities. And so, look, these are hard decisions to make but the need to do so is inarguable. And we're quite comfortable that we can flow traffic over multiple hubs with the five, and that our comparable profit is still quite robust from a network perspective.

---

**Mike Linenberg** - *Merrill Lynch - Analyst*

Okay. Good. And just my second questions when you look at some of the cuts, L.A. Denver a little bit bigger than say, what is going on Dulles, is there an opportunity to downsize facilities and get savings from reduced rental expense et cetera.

---



| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**John Tague** - *UAL Corporation - COO*

Yeah. Let me start by saying that the fourth quarter sort of comparative cuts may be, , somewhat misleading. If I look at 2008 in total, Denver is being reduced by 5.2 Dulles is actually growing a bit a bit. L.A. is down by 1.1 and actually the biggest cut comes in Chicago with a 10.3 reduction. However we do see a -- significant opportunities to reevaluate opportunities for our facility's foot present particularly in combination with the relationship and discussions we have underway with

**Mike Linenberg** - *Merrill Lynch - Analyst*

Okay. Very good. Thank you.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

That is one of the things that we would really ask everybody to focus on a bit, is not just that Continental is coming into the Star Alliance but that the partnership arrangement with us gives us opportunities that are unique to any relationship that we've had with a previous Star Alliance partner.

**Mike Linenberg** - *Merrill Lynch - Analyst*

Very good. Okay. Great. Thank you.

**Operator**

And we'll go next to Gary Chase, Lehman Brothers.

**Gary Chase** - *Lehman Brothers - Analyst*

Good morning, everybody.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Hi, Gary.

**Gary Chase** - *Lehman Brothers - Analyst*

Hi. Was curious on a couple of quick follow-ups on the credit agreement that I was trying to read as you were running through the call, the first is are there -- you obviously freed up $350 million in cash. Are there circumstances where that could change adversely and you'd be subject to additional cash restrictions, or should we consider that more of a permanent condition here?

**John Tague** - *UAL Corporation - COO*

No. There are -- some triggers in there, just like there would -- there were in the original agreement. We modified those triggers though in a way that we think was actually favorable to the current agreement and so we'll outline the specific whys of those triggers in our SEC filings but you can think of them as sort of along the Continental lines.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**Gary Chase** - *Lehman Brothers - Analyst*

Okay. And then the second question on that is I'm curious about the comment that says that we'll improve cash flow about by 200 million in the next two years. I mean, is that P&L? I'm just curious why you used the term "cash flow" and if you could give us a little flavor as to how it is going to improve cash flow.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Sure. It is -- that is P&L. The deal has a number of components. Obviously there's a liquidity component which -- which we outlined.

**Gary Chase** - *Lehman Brothers - Analyst*

Right.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Of approximately $1 billion. But in addition to that, we improved in certain areas both the rate per mile and the number of miles that we had -- that we'd be selling in the short term so that -- that will -- more of a P&L improvement but it is better than our current circumstance, which is why we highlighted it in the press release.

**Gary Chase** - *Lehman Brothers - Analyst*

Is the -- is the rate improvement, Jake, the substantive portion of it or is it more the volume?

**Jake Brace** - *UAL Corporation - EVP, CFO*

Both of them are relevant to that.

**Gary Chase** - *Lehman Brothers - Analyst*

Okay. And then just a quick one, if I could, for John. The -- the -- or I guess Glenn or Jake. You've all talked a lot about the Continental alliance. If that were happening in a vacuum I could see why there would be clear optimism on that front but it is -- and I mean you have delta and northwest merging, you have four-way immunity being granted to Sky Team. There are at least press reports, and I should say at least we fully expect British Airways and American to fully immunize their alliance, when you think of all of the different things shifting on the alliance front, not just what is happening to united and continental in a vacuum how do you feel about your ability to retain revenue and retain benefit net of all of those competitive changes?

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Well, the two -- a couple of things to think about, number one, Gary, we -- we'd obviously accentuate the work that we are doing ourselves that -- that the three of us have outlined on the call as the most important book of work that we have to do at united. So it -- that work, which again we think is opportunity within united, is priority work. That work also enables us to take full advantage of the work streams that we have agreed with continental. As I said a moment ago in response to Mike, yes, it is membership in the Star Alliance but it is also the creation of joint ventures in numerous international markets. As we said, we're going to progress from the Atlantic in what we're calling A plus-plus and we shouldn't leave recognition of Air Canada out of this. They have been a strong participant in it. Air Canada, United, Continental, Lufthanza.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

If you look at the revenue opportunities that that combination presents to us across the Atlantic, and then you triangulate it into the foot print that continental has in Latin America that candidly we do not and then you go from there to the Pacific I think that you can see the strength of the network opportunity that John and his team, Kevin, will have to execute. But the thing that excites me about it is what we have agreed with respect to efficiency, productivity, cost reduction in areas such as and I will just mention one because I think it presents itself promptly in areas such as IT and procurement of IT. And there is truly an opportunity for us there that I think is going to be competitive with the other propositions that you mentioned a moment ago. You can look at it two ways, I suppose. It is on the one hand we think aggressive and on the other you could say that it is defensive. But, nonetheless it is something that we have to add to our own book of work and in that regard Gary, we're really -- we're very excited about it, Larry and I both.

---

**Jake Brace** - *UAL Corporation - EVP, CFO*

I would only add one thing, our alliance valuation models looking at just the alliance impacts, both competitively and with this agreement could he chair impacts and things of that nature as Glenn suggested just a small box of the opportunity. These have been very accurate models in the past and they suggest that we will fully recover the impact of the competitive changes you've noted and generate that new value just from an alliance evaluation perspective.

---

**Gary Chase** - *Lehman Brothers - Analyst*

Okay, guys. Thanks.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

You bet.

---

**Operator**

Our next question comes from Ray Neidl, Calyon Securities.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Hey, Ray, how are you?

---

**Ray Neidl** - *Calyon Securities - Analyst*

Doing well, thank you. As an old oil man you sounded pretty militant.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

I take some exception to old.

---

**Ray Neidl** - *Calyon Securities - Analyst*

I said old not old. You sound pretty militant which is understandable about the recent sharp increase in oil prices but do you think that that trending in futures has really contributed to that and it is not basically a law of supply and demand? What is your opinion on that?

---

| THOMSON | www.streetevents.com | Contact Us |  |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

I think it has absolutely contributed to volatility and unpredictability. I think that the indexing, speculation has created to -- an enormous momentum play in oil that almost in an unique commodity context. So I think that it has certainly contributed. I don't think that to accept that, to take that position, Ray, one need argue the point relative to supply and demand. And, as I've said in my very, very frequent visits to Washington, A, the country need as comprehensive energy strategy. B, it needs to moderate the growth in this particular commodity activity. I think that the opacity and the over the counter trade is too great.

The ratio of the over the counter volume to the the NYMEX and the physical side of the business is too disproportionate and I think that bringing some disclosure transparency as the Reed bill does that I note was just voted to the floor unanimously by the Senate for consideration and debate is -- is an important part of the proposition. That having been said, I think that the solutions on the supply side are equally important. I certainly think that we need to open up the offshore. And I think we also need to pursue alternatives, Ray. And I think all of that, if we do that and if we show resolve will bring down the perception of the future value of this particular commodity. If we don't do that, I think it will continue to escalate.

**Ray Neidl** - *Calyon Securities - Analyst*

Okay. And there seems to be another ill wind beginning it blow this time for the industry, this time coming from Europe where the environmental movement is putting in new rules, regulations, taxes and fees on the airlines, being an international carrier with large operations to these areas do you think that this will be the next crisis for the airlines as governments try to raise extra cash by taxing airlines under the guise of environmental protection?

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Ray, I don't know. I will let John speak to it here in a second. I do not know if I would call it the next crisis but I would certainly refer to it as piling on and certainly it is an incremental challenge that we don't need and I think as usual, ray, it was said best by Giovanni when he said this is absolutely the wrong thing at the wrong time and we subscribe to IATA's assessment of it. John, want to add anything? Maybe you, Kevin?

**John Tague** - *UAL Corporation - COO*

I think that Glenn said it all. We're now beginning to see the European carriers be under the same pressure that we are and hopefully we'll have an unified front here. As you know, Europe has often been out in front of some of the issues that ultimately end up in the States so we're working very, very hard to moderate the impact, Ray.

**Ray Neidl** - *Calyon Securities - Analyst*

Great, thank you, guys.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

You bet. Thank you, Ray.

**Operator**

We'll go next to Daniel McKenzie, Credit Suisse.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**Daniel McKenzie** - *Credit Suisse - Analyst*

Hi, good morning, thanks. You know, first off, just a quick housekeeping detail, what's the loss per share after adjusting for the out of period fuel hedges? I'm arriving at a a loss of $3.63 per share but I suspect I'm not adjusting the tax rate properly.

**John Tague** - *UAL Corporation - COO*

We don't -- you have to be careful in there because the only taxes in there relate to the special charge and so you should think of it as zero tax, if I recall correctly, that number was $2.99 excluding the out of period mark to market.

**Daniel McKenzie** - *Credit Suisse - Analyst*

I see. Okay. And then, John, I'm wondering if you could provide some perspective about the link between corporate travel and the need to adjust capacity to keep RASM constant. I guess in particular, I appreciate we're not seeing any significant decline today but if corporations begin by cracking down by cutting corporate travel, say, 10 to 15%, does that mean that capacity needs to be cut 10 to 15% to hold RASM constant?

**John Tague** - *UAL Corporation - COO*

Well, I -- I think that, you are correct in saying that we're really sizing the system around the most profitable core customer base and it is inevitable that we're going to see changes. As I drove to work this morning I even heard that if you work for some investment banks you will in the be able to fly in first class and so I thought that that was a significant change and so our capacity plans assume that that is going to occur. The elasticity of this market is less than some of the other markets but nevertheless it exists and we'll size the market around that and we believe, as Jake said, for $125 we got the capacity in the right place but if learnings over the next several months suggest that -- that more needs to be done, we'll do more.

**Daniel McKenzie** - *Credit Suisse - Analyst*

Okay, great. And then just for my second question, I'm wondering if you could talk about, your contract actual flexibility to cut regional affiliates line. I'm wondering how much regional flying can you cut without cause?

**John Tague** - *UAL Corporation - COO*

We recently terminated seven aircraft in 2009. Most of our flexibility is further out in the 10, 11, 12 range. Although we do believe that contract extensions and the few that we may be willing to provide could provide economic and/or capacity relief. We are also lowering our utilization, which is driving the reduction and the outlook for express capacity we're seeing. And so, , we're going to press on this issue. It is inevitable that we're going to have to improve the economics and the flexibility of these relationships, and for those that recognized that early in the game there may be extensions available. For those that don't the risk around, 50-seat aircraft at renewal is going to be theirs to

**Jake Brace** - *UAL Corporation - EVP, CFO*

And I -- this is Jake. I'd remind you that we have, a lot of flexibility in the rest of our fleet. And so we can change to whatever -- whatever environment we need to change to. So it's -- even though we may have a little bit less flexibility on the regional side, we have a lot of flexibility on the mainline side.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

**Daniel McKenzie** - *Credit Suisse - Analyst*

Okay, great. Thanks a lot. Appreciate it.

---

**Operator**

We'll go next to Jamie Baker, JPMorgan.

---

**Jamie Baker** - *JPMorgan - Analyst*

Yeah, good morning, everybody.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Good morning, Jamie.

---

**Jamie Baker** - *JPMorgan - Analyst*

Jake, a question on the aircraft side, are you concerned that the windows for raising money against unencumbered aircraft is closing? I'm just trying to assess whether you're still focused on any near-term financial -- now that the the $1.7 billion is behind you?

---

**Jake Brace** - *UAL Corporation - EVP, CFO*

Well, we chose, Jamie, to focus our initial efforts on things that didn't require more collateral, viewing that -- things that do require collateral are a little bit easier to do. So we have also parallel paths and a number of other aircraft financings and obviously the selling of the aircraft that we are going to permanently ground, both of which we think can raise substantial liquidity. So we're -- we've got those efforts underway in parallel but we just chose to focus on the -- you know, on doing it in a very collateral friendly way first and then tap the secured markets second.

---

**Jamie Baker** - *JPMorgan - Analyst*

Got it. And -- and secondly and I guess expanding on what Glenn was speaking to earlier, given the main line capacity and the full-year cost guidance that you've given it implies very, very strong cost control in the fourth quarter and I'll admit that perhaps I haven't been the kindest among the analysts to United in the past on the subject of cost control but this really does imply very stellar performance. Can you outline some of the additional inputs that contributes to your confidence to offer up this guidance?

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

I'll let John speak to it, Jamie, and I'll -- I'll be silent on your comment relative to your own perspective on our abilities.

---

**Jamie Baker** - *JPMorgan - Analyst*

Well, I'm humbled here as long as you deliver on it.

---



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**Jake Brace** - *UAL Corporation - EVP, CFO*

I'll let John outline some of the areas that are incremental to what he mentioned in his prepared remarks, Jamie, but re really do thing it is two things. Number one, we have perfect transparency into our competitiveness or lack thereof. We are focused on the significant few, and we really do mean the significant few and they will yield benefit to us, and we are putting the right team in place to he can cute against the opportunity. So I'm -- I'm very confident. And I'll turn it over to the guy that I'm going to be talking to every morning at about 8:00 on our progress. John, over to you.

**John Tague** - *UAL Corporation - COO*

I think as Jake indicated certainly the -- the reduction of 20% in SAM is significant. We are also beginning, you will know, during the quarter and looking forward beginning to see significant improvements in our maintenance cost outlook. You know, part of that is focusing on an improvement agenda but part of that is making sure that we're fully capitalizing on the structural change that the elimination of the 737 creates. We know where all of this money is. You know, there isn't a blank space in the guidance that Jake indicated. We have programs, commitments, and I would say that my perspective is that this does not represent our full potential. As Jake indicated, reduction in cost is -- is tough in a capacity reduced environment but we in the industry have no choice. The value of the incremental $100 million that Jake indicated is about 250 million on an annual run rate. So it's important to indicate that these are -- we're not getting this performance through deferral. We're getting it through sustainable cost elimination.

**Jamie Baker** - *JPMorgan - Analyst*

Okay.

**Jake Brace** - *UAL Corporation - EVP, CFO*

This is Jake. I just add that I think you've seen both with us and -- and maybe to a lesser extend in the industry, as we have faced this -- this very difficult time and unprecedented cost challenges of the industry, and especially united as found different ways to adapt. And that, I think, is -- you know, when you are -- when you are facing the kind of cost pressures that we face from fuel, you look at the world a little bit differently and that is what we've been doing. And when we look at it differently, we see -- we see these opportunities out there. So we're -- we're very, very confident that we'll be able to deliver on these numbers.

**Jamie Baker** - *JPMorgan - Analyst*

Excellent. Thank you very much for the clarity. I appreciate it, everyone.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

You bet. Thank you, Jamie.

**Operator**

We'll take our final question from Kevin Crissey, UBS.

**Kevin Crissey** - *UBS - Analyst*

As you guys are reducing capacity are you starting to see low cost carriers get into these markets or make incursions into that?

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

We haven't seen a substantial change in low cost carrier plans. They tend to be flattish right now. Although, as you know, we've seen some significant increases in Denver principally on the part of southwest. So I think as -- as you've heard, as I've heard, Southwest seems to be biased to capitalizing despite the current economic condition of the industry but overall we don't see a significant threat. Low-cost carriers with the exception of Southwest pay the same for fuel that we do and we're very competitive in terms of our revenue premium. If these markets weren't profitable through United I have no reason to believe that they would be profitable for a low-cost carrier.

**Kevin Crissey** - *UBS - Analyst*

Right. Thank you.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Thank you. Okay.

If I could, operator, let me wrap up for a moment just with a couple of remarks. Number one, it's -- it's a privilege that the Chief Executive Officer gets to be able to thank people for extraordinary work during challenging times, and with respect to the crafting of the new agreement with Chase, the executive team here on the call gets the opportunity to thank Dennis Carey, our Chief Marketing Officer, Kathy Mikells, somebody very familiar to all of you on the call, the two of whom are sitting here with us, both of them a little bleary eyed and Kathy, of course, for whom this work was decidedly extracurricular, took her back to her days as Treasurer of the company and the Vice President for Financial Analysis and Planning and I personally and the executive appreciate the work that Dennis and Kathy put in to reach this agreement and I want to thank Robert Sidhoven who is our Vice President responsible for Mileage Plus who was the third very important member of the team in crafting this new agreement. That having been said, I also want to thank Ray Fischer at JPMorgan Chase and his team for all of the work that they put in to the effort on behalf of United at an important partner and customer of JPMorgan Chase and it just furthers the quality of our long-term relationship with that institution. So thanks very much for that. And I'll bring it -- bring the -- this segment of the call to a close. Thanks. And we'll turn it over now to the call for the media. Thank you, operator.

**Operator**

Thank you. We will now take calls from the media.

We'll go first to Susan Kerry, "The Wall Street Journal."

**Susan Kerry** - *Wall Street Journal - Media*

Good morning. I guess this is a question for Jake. Just to make sure absolutely that I understand on your Chase agreement, do I take it to mean that your credit card holdback has gone from 375 to $25 million?

**Jake Brace** - *UAL Corporation - EVP, CFO*

Yeah. Actually 385 to 25. I was rounding off to 350 as the difference. But, yeah, that's -- that's what's happened. That's what's going to happen, I should say.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**Susan Kerry** - *Wall Street Journal - Media*

And is this -- I mean what did you have to do to effect this very large reduction in the holdback?

**Jake Brace** - *UAL Corporation - EVP, CFO*

We have the situation that Chase is our credit card provider and we have a -- the Mileage Plus credit card relationship with them, as well as a broad and deep relationship between our institutions that goes back many, many years. And we negotiated across both of those agreements and we had certain things that we wanted to achieve and they had certain things that they wanted to achieve and the -- the teams got together and found a way to achieve what all of us needed to do. And so it was -- it was a complete agreement on both sides of that relationship. I will not say all sides of the relationship. Because we -- have a banking relationship with JP as well. But it was a comprehensive negotiation and done on a very rapid time frame to a very successful result.

**Susan Kerry** - *Wall Street Journal - Media*

Well, thank you. So just to follow up then, I mean $385 million at -- I assume that that was a holdback that dated from when you emerged from chapter 11. And was seen from what I've seen from the analysts over the last couple of years as a rather high holdback, especially during the better couple of past years and so to go down to $25 million when the industry is in crisis seems like a rather dramatic change.

**Jake Brace** - *UAL Corporation - EVP, CFO*

I would agree with that.

**Susan Kerry** - *Wall Street Journal - Media*

Okay. Thank you.

**Jake Brace** - *UAL Corporation - EVP, CFO*

So, no, so I agree and so the holdback that we had was as a result of the agreement that we exited bankruptcy with, and it required 25% holdback under the -- in the current situation that amounted to $385 million as of today, and that agreement going forward is going to change, and we're going to go down to a $25 million holdback under the current situation. We do have some situations as we alluded to with the analysts where that holdback could go up. But we're -- we're -- we're feeling that overall, it is a better situation than we -- than the agreement that we currently have today.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

The -- I would echo what Jake said a little bit. I want to emphasize that the team accomplished a very balanced commercial outcome in terms of the basic operating program going forward. So I think everyone walks away from this negotiation feeling like it was a fair and equitable transaction.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Yeah. I think -- I think everybody got something from this -- this agreement and that is the way that good agreements are done.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**Operator**

Your next question comes from Josh Frey, The Associated Press.

**Josh Frey** - *Associated Press - Media*

Good morning. A little more on the credit card agreement. So I -- I guess I'm still not totally clear on maybe what United gave up to get the smaller holdback and I'm wondering if maybe you sold frequent flier miles to Chase for perhaps less than what they were selling for before and if that is not it then maybe you can help me to understand what -- what went in Chase's favor on this.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Well I'll let Chase speak to their -- to their thing. Would I just observe a couple of points, the -- the cost of a mile, if you will, what we're selling the miles to did not go down, it went up. And what we principally did is we lengthened the term of the contract with Chase, that was something they want, and there was some other business terms that they want and we basically redid almost the entire agreement and refined it even though we'd been working together for a long time. So there was -- there was a number of possibilities that were important to them and we were able to accommodate that and there were a number of things that were -- that were important to us and they were able to accommodate it and we reached a very favorable agreement for all parties.

**Josh Frey** - *Associated Press - Media*

Okay. And just to double-check, when you see lengthened the term of the contract, you mean the affinity card contract or the processing.

**Jake Brace** - *UAL Corporation - EVP, CFO*

Yes. I was speaking about the affinity card contract.

**Josh Frey** - *Associated Press - Media*

Sure, sure. And related to that, on the $600 million advance for the frequent flyer miles to some extent is that a future shift from revenue this year to next year. Is there any concern that are you eating tomorrow's lunch today or is that not the right way to look at it.

**Jake Brace** - *UAL Corporation - EVP, CFO*

It is a cash shift, not a revenue shift because we don't account for it that way, but it is a cash shift the advance sales of miles and it is something that was important to us to enhance our liquidity in these difficult times and soap we felt good about it but, again we -- we got what we needed out of that contract. We didn't -- we got a higher price per mile, and that was something that was important to us. And we also wanted some liquidity and all of that came together to be what we think is a good agreement and what we think they think is a good agreement.

THOMSON | www.streetevents.com | Contact Us 

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
|---|

**Josh Frey** - *Associated Press - Media*

All right. Thank you.

---

**Operator**

Next question comes from Micki Maynard, the "New York Times."

---

**Micki Maynard** - *New York Times - Media*

Good afternoon, everybody.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Hi, Micki.

---

**Micki Maynard** - *New York Times - Media*

Hi. I have a question for either Glenn or John and it is about aircraft owners, I've just gotten back from Farnborough, but you don't have any I understand and I realize that you are grounding planes and retiring plains but what will it take for you to consider actually placing some aircraft orders? Does fuel have to come down? Do you have to be more stable with liquidity? What would be the proper environment for you to consider ordering some planes?

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

I think, Micki, if you take the sum of all of the responses that the various companies are taking to address the economic environment that we've described, characterized by $147.22 crude oil.

---

**Micki Maynard** - *New York Times - Media*

Yes. Not to be specific about the number but, yes.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Yeah, I know. I've got it etched. Along with, I think it is about about $170-odd jet fuel price.

---

**Micki Maynard** - *New York Times - Media*

Yes.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

So when we say 147.22 it is not actually what we buy.

---

**THOMSON** | www.streetevents.com | Contact Us

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**Micki Maynard** - *New York Times - Media*

Right. You have to pay the refining.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

It is a widening crack spread. There's going to be a recasting of the entire industry and it's now stretch the, Mickey I think as you probably saw in the UK, it is stretched now offshore it is reaching Europe, it's getting to the Asian carriers and you are seeing a tremendous amount of capacity reduction coming into play in the offshore markets, and that is inevitably going to recalibrate the state of the industry and it is going to have, I think, an effect on order books for aircraft over time and you are seeing many deferrals, companies were touting the fact that they had the orders in place. We think that that actually, as we have always said, has an effect on our place in the eventual queue. And we -- we have said repeatedly that we thought that when things sorted out, our place in the queue would be to our advantage competitively or to our satisfaction competitively and I personally believe that that will turn out to be true. John, Kevin, you want to speak to that?

---

**John Tague** - *UAL Corporation - COO*

I think first making money would cause us to do that and believing it is sustainable.

---

**Micki Maynard** - *New York Times - Media*

Yes.

---

**John Tague** - *UAL Corporation - COO*

We really have no pressure in terms of average age as Jake has noted quite often, particularly with the elimination of the 737s. I think one of the things that people haven't yet focused on with the 737 elimination is think about the capital avoidance of reduced -- of eliminating the need to replace those airplanes over time. So we feel that we will not be forced to do anything in the near to mid-term. And when the economics underlying the decision are appropriate, we'll act.

---

**Micki Maynard** - *New York Times - Media*

One every the things that did happen at Farnborough was the announcement of a new airline flying to Dubai and we were told by Airbus -- sorry, by Boeing that three American carriers had decided not to take planes which freed up planes for Emirates to get for them. That raises the question at some point by not taking planes and by return planes you are enabling your competition to spring up, so don't you have to order some planes in the only to make passengers a little more comfortable and potentially save some fuel, but also to keep others from getting them?

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

You know, Micki, maybe we could let Graham speak to the premium product that we are putting in place on the 76, triple 7s and triple 4s as the customer responsive capital initiative that we want to take first on aircraft that, as John said, are certainly within the range of -- acceptable youth in a fleet. Graham, you want to speak to it?

---

**Graham Atkinson** - *UAL Corporation - Chief Customer Officer*

Sure. Mickey, this is Graham.

---

| **THOMSON** | www.streetevents.com | Contact Us |  |
| --- | --- | --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call

**Micki Maynard** - *New York Times - Media*

Hi, Graham.

---

**Graham Atkinson** - *UAL Corporation - Chief Customer Officer*

And I think as we've spoken before, we've embarked on not purchasing planes but enhancing the customer experience. And the initial result coming in from that endeavor and that investment are highly encouraging to the point that John and Jake talked about improving yelled and unit revenue. So we don't see the -- the contention that you talk about. And indeed we have embarked on this endeavor specifically to compete with the best of the best. And I think both the deployment in Europe at the moment and shortly to be in Asia is beginning to change that paradigm. We've seen significant market share shifts, significant yield increases and, indeed, significant customer satisfaction rating improvements. So there is always going to be competition out there. We're very respectful of it. But we're for sure in the afraid of it and I think that we can absolutely compete with this new product.

---

**Micki Maynard** - *New York Times - Media*

Thank you.

---

**John Tague** - *UAL Corporation - COO*

Yeah. I think -- you know, Mickey, what goes into our capacity discipline is the same thing that would go into the issue you referenced. I mean, we're not going to operate capacity or new airplanes at a substantial loss in the open of preventing someone else from doing something.

---

**Micki Maynard** - *New York Times - Media*

Okay. Thanks very much, gentlemen.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Okay, Mickey.

---

**Operator**

Our next question comes from Dan Reed, "USA Today."

---

**Dan Reed** - *USA Today - Media*

Good morning, fellows. A while ago John mentioned that the operational perform Alliance was I believe in the words were neither competitive nor acceptable. Can you put some sort of dollar valuation on what that operational lack of performance is costing costing you? Another way of saying how much could you -- could you pick up in terms of dollars, revenue, if you improved operations to your -- to your liking?

---



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

It's hard to target those -- hard to tie those down exactly. II can tell you however that both the cost improvement and the revenue improvement is supportive of our need to -- but at the end of the day, we need to do this just simply from a reputation and sustainable performance perspective for United but as you point out, an airline that's running on time generates more revenues and I believe lowers its cost.

**Dan Reed** - *USA Today - Media*

Okay. And -- and then the follow-up, can you say whether or not we're -- we're getting indication there might have been to some degree, I don't want to overstate it, but to some degree a slowdown among your A320 pilots?

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

No. I mean, we've seen periodically increases in our sick rate performance and I think we've seen a bit of that recently, concentrating on our narrow-bodied fleet but we are managing the system with the interest of our customers in mind and I would not call it yet notable.

**Dan Reed** - *USA Today - Media*

Okay. Thank you.

**Operator**

Your next question comes from Julie Johnson with the Chicago Tribune.

**Julie Johnson** - *Chicago Tribune - Analyst*

Hi, guys.

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Hi, Julie.

**Julie Johnson** - *Chicago Tribune - Analyst*

Hey, I've got a quick question for John on the network for next year. It looks like Express is going to be growing 6.5 to 7.5%. And that's a little less than the guidance you gave last month. But I'm just wondering where this growth is coming and is this -- is -- you see this as a replacement for 737 flying and also sort of what is the economic case to -- to be made for that level of increase in this environment?

**John Tague** - *UAL Corporation - COO*

Well, let me start by saying those commitments existed prior to $147 and as I believe Glenn said $0.22. You know, having said that, we're having good success with the 70-seaters. Shedding some PROPs. But the cost of the 70-seaters in this environment is actually very favorable on the network. We have, I believe at this point in time, more 70-seat first-class configured aircraft than any other carrier in the country and so this is largely the continued influence of bringing those aircraft onboard. But as I

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Jul. 22. 2008 / 11:00AM, UAUA - Q2 2008 UAL Corporation Earnings Conference Call |
| --- |

mentioned, we are looking for every opportunity to reduce the footprint particularly of the 50-seaters and currently we're most certainly acting on the props.

---

**Julie Johnson** - *Chicago Tribune - Analyst*

Okay. One other question, are you potentially looking at dehubbing LAX, I mean especially given the 20% year-over-year cut for the fourth quarter?

---

**John Tague** - *UAL Corporation - COO*

Of those cuts that we indicated would not result in that impact. And we're really not in a position to speculate what may or may not be necessary in the future. This — this schedule reduction remains — retains our commitment to the five hubs.

---

**Julie Johnson** - *Chicago Tribune - Analyst*

Okay. All right. Great.

---

**Glenn Tilton** - *UAL Corporation - Chairman, President, CEO*

Thanks, Julie. Okay. Thank you, everybody. Thank you Theresa. We're done with the call now.

---

**Operator**

Thank you, ladies and gentlemen.

---

**John Tague** - *UAL Corporation - COO*

Thanks very much for your help, operator, bye-bye.

---

**Operator**

Thank you ladies and gentlemen. This concludes our call today. You may disconnect your lines at this time.

---

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2008, Thomson Financial. All Rights Reserved.


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Seeking Alpha$^\alpha$

# UAL Corporation Q2 2008 Earnings Call Transcript

posted on: August 05, 2008 | about stocks: UAUA

UAL Corporation (UAUA)

Q2 2008 Earnings Call

July 22, 2008 11:00 am ET

**Executives**

Kathryn A. Mikells - VP of IR

Glenn F. Tilton - Chairman, President and CEO

Jake Brace - EVP and CFO

John P. Tague - EVP and Chief Revenue Office

**Analysts**

William Green – Morgan Stanley

Mike Linenberg - Merrill Lynch

Gary Chase - Lehman Brothers

Ray Neidl - Calyon Securities

Daniel Mckenzie - Credit Suisse

Jamie Baker - J.P. Morgan

Chris Allen – UBS

**Presentation**

**Operator**

Good morning and welcome to UAL Corp.'s earnings conference call for the second quarter of 2008. (Operator Instructions) I would now like to turn this presentation over to your host for today's call, Kathryn A. Mikells. Please go ahead, ma'am.

**Kathryn A. Mikells**

Thank you, Teresa. Welcome to UAL's second quarter conference call. The announcement of our financial results was released earlier this morning and is available on our website at www.united.com/ir.

Let me point out that the information in the press release and those made during this conference call may contain various forward-looking statements which represent the company's expectations or beliefs concerning future events. All forward-looking statements are based upon information currently available to the company. A number of factors could cause actual results to differ materially from our current expectations. Please refer to our press release, Form 10-K and other reports filed with the SEC for a more thorough description of these factors.

Also during the course of our call we will be discussing several non-GAAP financial measures. For a reconciliation of these non-GAAP numbers to GAAP financial measures please refer to the tables at the end of our earnings release.

As we announced on July 11, our second quarter results were impacted by a number of special and unusual charges totaling $2.6 billion, the overwhelming majority of which were non-cash. These charges include the following: a special non-cash charge of $2.3 billion for goodwill impairment; non-cash special charges $194 million related to the impairment of certain 737 aircraft that are being retired from the company's operating fleet; aircraft pre-delivery deposits; and certain indefinite lives intangible assets other than goodwill net of a related tax benefit; severance charges of $82 million related to staffing reductions that will occur as a result of the capacity changes that the company has recently announced; other largely non-cash charges of $54 million related to certain projects that have been terminated or indefinitely deferred by the company, as well as a non-cash balance sheet adjustment to increase certain employee benefit obligations; and a $29 million cash gain from a litigation settlement.

As Glenn, Jake and John walk you through the numbers for the quarter, they will be excluding these items unless otherwise noted.

Our results for the quarter and year to year were also impacted by the deferred revenue accounting we adopted for the Mileage Plus program in 2006 as well as the change in mileage expiration policy from 36 to 18 months that we announced in early 2007.

In the second quarter of 2008 the change to deferred revenue accounting decreased Mileage Plus revenues by $42 million. In comparison, in the second quarter of 2007 the impact of Mileage Plus accounting was essentially a push as the company recognized $47 million in additional revenue from the change in the expiration period for miles that effectively offset the $46 million decrease in consolidated passenger revenue driven by the change to deferred revenue accounting.

On a year-over-year basis Mileage Plus accounting resulted in a $43 million decrease to second quarter 2008 consolidated passenger revenue, depressing our passenger unit revenue growth by about 1 percentage point. You can find more information about all of these items in the tables at the end of our earnings release.

And now I would like to turn the call over to Glenn Tilton, UAL's Chairman, President and CEO.

**Glenn F. Tilton**

Thanks very much. Good morning and welcome to everyone on the call. Joining me and participating on the call today are Jake Brace, Chief Financial Officer; and John Tague, Chief Operating Officer. Pete McDonald, Chief Administrative Officer and Graham Atkinson, our Chief Customer Officer, are also with us this morning and are available to take questions.

Earlier today we announced our second quarter 2008 results. We reported a net loss of $151 million excluding the accounting charges that Kathy just walked us through. An increase of some $773 million in fuel expense over last year drove a second-quarter pretax result that was $617 million worse than 2007.

Our industry continues to be challenged, perhaps as never before, by fuel prices that are marching higher, most recently hitting an all-time high of $147.27 a barrel.

Our revenue results for the quarter were in line with our network peers and we are taking steps to improve, particularly internationally, where industry growth has been rapid for the last several quarters and is beginning now to put pressure on yields. As part of our capacity reduction we're pulling down international capacity and eliminating routes that are not performing well. As John will discuss later, we expect these changes will significantly improve our revenue performance

internationally.

We are also taking steps to improve our liquidity. We recently closed a number of transactions that add approximately $550 million in additional cash, which Jake will talk about further, and we have a number of actions underway, which Jake will also speak to during his segment. We believe these steps, together with our large pool of unencumbered assets, position us well relative to peers.

As fuel again hit record prices during the second quarter, and as fuel expense increased nearly $350 million over the first, we intensified the actions we're taking to offset this skyrocketing cost, as well as to strengthen the competitiveness of our business at United.

As we told you last quarter, we are executing against a plan focused on enabling United to compete and to return to profitability over time with fuel at these levels. We're cutting capacity and grounding 100 planes, significantly more than the number we discussed with you just quarter ago.

By the fourth quarter mainline domestic capacity will be down some 16% year over year. In doing so, we expect to be able to leverage our capacity reductions to pass more cost into the marketplace. We are taking the difficult but imperative action of reducing the size of our workforce across the company. We also are pursuing new revenue streams, our new baggage fees chief among them.

We continue to reduce our costs. Today we announced we are reducing nonfuel operating costs by another $100 million, bringing our total cost reduction program to $500 million, enabling us to maintain our full year, nonfuel unit cost guidance despite the significant capacity reductions we have underway.

Our capital expenditures reduced to some $450 million this year will be focused on safety and investments that are critical to improving the travel experience for our customers.

We're doing all we can to control our costs and improve our revenue to offset fuel, and together with the Air Transport Association and a broad-based coalition, we're calling on Congress to take action on excess indexed fuel speculation that is adding to volatility and driving the price of oil well beyond its underlying fundamental value.

Our industry faces more than a $20 billion increase in its fuel bill this year, and United's portion of that is more than $3.5 billion. This requires action in Washington and different thinking about how we can best run our businesses in this economic environment.

We believe that our partnership with Continental is one such example. As we announced last month, we will be linking our networks and services worldwide to create revenue opportunities, cost savings and operational efficiencies. Continental will join the Star Alliance, the world's leading global alliance after exiting Sky Team following the closing of the Delta Northwest merger.

Continental, along with our existing immunized Star Alliance partners will jointly apply for antitrust approval to join our immunized transatlantic alliance which will enable us to coordinate schedules and pricing across the Atlantic and to share revenues generated in these markets. We expect to next pursue a similar agreement in Latin America.

The teams are off to a very good, encouraging start. Pursuing several workstreams to ensure our new partnership extends well beyond simple code-sharing benefits. Specifically, we identifying the path to create additional customer benefits and airline and partner revenue by more closely aligning our frequent flyer programs; leveraging Continental's and United's combined buying power to reduce our overall spending; providing a world class airline IT infrastructure in order to improve the services we offer customers, and reduce costs; extending our Alliance network to provide more opportunities for personalized service; focusing on enhanced joint spaces across our linked networks; and optimize on and off airport facilities to enhance network activity and make it work for our customers and our employees while we maximize cost-saving opportunities.

As Larry and I agreed during our progress review this Friday, this partnership has all of the elements for success. A shared commitment and understanding of the opportunities we can create together between our companies and management teams with the capabilities, the attitude and the relationships to make those opportunities a reality.

As we work through the difficult task of getting costs permanently out of the company, generating new streams of revenue and resizing the workforce to match the business, we need also to focus on future opportunities to enhance our

ability to compete globally. Our agreement with Continental is such an opportunity for both of our companies and there is commitment to move forward aggressively to realize the full potential of this partnership.

I'll now turn the call over to Jake who will walk us through more of the numbers in greater detail.

**Jake Brace**

Thanks Glenn and good morning everyone. Our loss for the quarter is a direct result of the punishing price of fuel the industry is experiencing. During the quarter, oil averaged about $124 a barrel for us, up 27% from the first quarter and up 90% from last year. As I will discuss in a few minutes, over the past 90 days we have accelerated and intensified the actions we're taking in response to this industry crisis as well as increasing our cash balance to support the execution of those actions.

The bottom line for the quarter was that the increase in fuel expense significantly outpaced the industry's ability to pass on these costs to consumers. At United, consolidated fuel expense rose $773 million as the price per gallon of jet fuel rose more than 55%, driving a second-quarter operating loss of $87 million, $624 million worse than the same period last year. While we beat the consensus, we recorded a net loss of $151 million, or $1.19 per share for the quarter.

Or revenue results were solid with second quarter mainline RASM increasing 5.1% year-over-year, consolidated RASM increased by 4.4%. Excluding the impact of Mileage Plus accounting, as Kathy mentioned, consolidated revenue per ASM was up 5.3%, cargo and other revenue of $475 million was up 7.7%. In contrast to the passenger business, we saw very strong performance in cargo revenues which grew by approximately 30% as we successfully passed on rising costs of fuel to cargo customers through substantial fuel surcharges. Our performance was also helped by higher mail volumes as we benefited from the year-over-year addition of our new domestic mail contract.

A little bit of guidance here. We expect cargo and other revenues of about $450 million to $460 million in the third quarter of 2008.

Turning to costs, operating expenses increased by about 17% in the second quarter, with the increase almost exclusively attributable to higher fuel expense. Including hedging gains, average mainline jet fuel expense for the quarter was $3.24, up from $2.08 a year ago.

The total mark to market of our fuel portfolio as of July 18, last Friday, was $135 million. On an accounting basis, we booked $30 million in realized gains during the second quarter, and $208 million in unrealized gains. We recognized a cash gain, an economic if you will, of $51 million for contracts that settled during the second quarter. We also recognize a below the line gain of $22 million for fuel hedges that did not qualify as economic hedges.

Importantly, nonfuel costs for the quarter were a little bit better than our guidance with mainline CASM excluding fuel increasing 2.6% year over year. While the beat was small, we are encouraged that we saw good cost performance as we took capacity down 1.3% during the quarter. We are holding the line on costs and are committed to removing both variable and fixed costs from the system as we take down capacity.

Now let me walk you through some of the expenses where we saw significant year-over-year changes this quarter. Landing fees and other rent declined by $16 million year-over-year or roughly 7.5% driven by the timing of certain airport rent credits which were received a quarter earlier than last year as well as the savings from our efforts to optimize our airport real estate. Regional affiliates expense increased $114 million year-over-year on $131 million increase in regional affiliate fuel expense. The variances in salaries, purchased services and other operating expenses are all due to the effect of the accounting charges that Kathy outlined earlier.

We continue to see the results of our debt reduction and refinancing efforts with interest expense for the quarter down $13 million or 9.5% versus last year. However this was offset by a $34 million decline in interest income due to lower yields on cash as well as a lower average cash balance versus last year.

As I mentioned earlier, we recorded a gain of roughly $22 million in the second quarter on transactions that did not qualify for hedge accounting and thus were booked below the line. Net net for the quarter, total non-operating expenses were $65 million, $7 million lower than a year ago.

Despite incurring $773 million in higher fuel costs we generated positive operating cash flow of $218 million in the second quarter. Free cash flow, which we define as operating cash flow less capital expenditures came in at positive

$127 million for the quarter.

Enhancing our cash position is critical. We executed a number of transactions to bolster our cash balance and we have a number of other actions underway. As noted in our press release this morning, we raised $90 million through aircraft financing transactions and assets sales in the second quarter. We also completed a $241 million aircraft financing transaction earlier this month. In this transaction we utilized the equity we had built up in some existing aircraft mortgages enabling us to raise cash without encumbering any additional aircraft.

We also entered into agreements in principle for several aircraft and other asset sales worth about $40 million. The company also freed up $130 million in restricted cash during the second quarter as well as an additional $50 million during the third quarter.

These transactions were very efficient vis-à-vis utilization of collateral. After all these transactions are closed we will still have $3 billion in hard collateral remaining including more than $2 billion in aircraft.

Now some real-time information. Hopefully we have just crossed the wires with a press release announcing that we have come to an agreement in principle with Chase to extend the terms of our agreement with them on both the Mileage Plus credit card and our credit card processing agreement. As part of this transaction United will receive a payment of $600 million from Chase which relates to the advanced purchase of frequent flyer miles and for the extension of this contract. We expect this transaction to improve our cash flow in addition to this by $200 million over the next couple of years.

In addition, the level of credit card holdback that we are required to maintain on our processing agreement with Chase PaymenTech has been reduced to $25 million. This reduction will result in the release of approximately $350 million in previously restricted cash. As a result of these agreements, we expect to increase our cash position by approximately $1.2 billion, including $1 billion in the short term and the additional $200 million over the next couple of years. Combined with the $550 million that I just told you about, we expect that we will have improved our cash balance by $1.7 billion in the near future.

As I said before, all of these transactions use very little collateral and we still have more than $3 billion in unencumbered assets, including $2 billion in aircraft.

We ended the quarter with $2.9 billion in unrestricted cash, excluding the financing transaction and release of the restricted cash that occurred in the second quarter we closed the quarter with unrestricted cash and short-term investments balance of $2.7 billion in line with our guidance.

Our main focus is on making the substantial changes necessary to get the business profitable in this environment, essentially offsetting the $3.5 billion increase to our fuel bill.

As I said, as fuel prices have soared we have intensified and accelerated the action plan we discussed with you last quarter. I would like to take a few moments to update you on the status of each of the areas of focus

First, we are sizing the business appropriately. The industry simply cannot recover higher fuel costs unless we affect a shift in the supply curve. In order to get a shift in the supply curve we must shrink capacity. This isn't rocket science, this is econ 101.

At United, we're leading the industry in permanently reducing capacity. We are removing 94 narrow-body aircraft and six wide-body aircraft from our operations, retiring our entire fleet of 737 aircraft and phasing out our Ted product. We will deploy A320s currently flying in Ted markets to many routes that were previously covered by 737s. Substituting A320s for older, inefficient 737s results in about a 16% reduction in fuel burn per seat. Across our entire fleet, the 737s retirements will result in a 2.4% improvement in fuel efficiency.

We plan to remove three-quarters of the 100 aircraft from our fleet by year-end with the remaining aircraft coming out in 2009. These retirements drive about a 16% year-over-year reduction in mainline domestic capacity in the fourth quarter and about a 20% reduction in the full year 2009 compared to 2007.

We're using our capacity discipline to pass higher commodity costs onto consumers. We continue to lead fare and fuel surcharge increases and also recently reinstated minimum stays in some markets as part of our efforts to recoup higher fuel costs.

We are creating significant incremental revenue by unbundling our products. Last quarter we announced our new second checked bag fee and in June we announced that we will be charging for the first checked bag. John will give you more details around the financial targets we have for ancillary revenues for this year and next.

While revenue will fill the lion's share of the gap caused by higher fuel, reducing costs will also make a meaningful contribution. As Glenn mentioned, we raised our 2008 cost savings target by $100 million to $500 million, more than twice the original 2008 target we discussed with you in January. A large portion of this incremental reduction in expense comes from the salaried and management reductions we are making this year, about 1,500 positions or 20% of our salaried and management workforce. We expect these changes to save us $235 million in 2009.

As we reduce capacity, we also need to reduce our front-line workforce. We expect to reduce this group by about 5,500 employees or about 12% by the end of 2009. We fully understand how difficult these reductions are for our people and we are working to mitigate the effects of it by implementing several voluntary programs. We have announced voluntary programs for pilots, flight attendants and airport employees and are discussing voluntary programs with our other unions.

Lastly, as I mentioned on our call last quarter we are also reducing our capital spending. We now have a non-aircraft capital spending budget of $450 million for 2008 which is $200 million less than originally planned.

We are operating in an environment that the industry has never seen before. At United we are executing against our action plan to offset the impact of rising fuel expense. We have a solid cash position. We have successfully raised quite a bit of cash in the last 30 days. We're stabilizing our business and accelerating the pace of our actions to enable profitability in the current environment.

Now let me turn it over to John.

**John P. Tague**

Thanks, Jake. Today, and on these calls going forward I will talk with you about the steps we are taking to improve our cost, revenue and operating performance. Our focus and our energy are all about generating a breakthrough in performance. The pressure of the industry environment and the need to do so is obvious.

Importantly, we also see the opportunity. I'm going to walk you through some of the specific actions we're taking to approve our perform and regain profitability.

In addition to the work we have underway to right size our capacity, we're pursuing an aggressive agenda focused on the basics of running a good airline. Simply put, an airline that runs on time with clean planes, providing the platform for our employees to deliver great service, and in doing so deliver great financial performance.

To that end, we're turning all of our attention to five fundamental areas: deliver industry-leading revenues; achieve the full potential of our cost performance; drive top tier operational performance; and improve the cleanliness and workability of our products all in support of a courteous, caring and respectful service environment.

Our focus is clearly set on the areas that are inarguably important in our pursuit of an industry-leading performance at United. First on the revenue front, United's unit revenue growth rates lead the industry for the trailing 12 months. Our second quarter results are quite competitive but somewhat below our own expectations and clearly insufficient to address the gap created by rising fuel costs.

Second-quarter mainline PRASM was up 4.7% year-over-year and consolidated PRASM was up 3.9%. Our consolidated results were driven by a 7.7% increase in yield, partially offset by a 3 point drop in load factor.

Similarly, our mainline results were driven by yield improvement of 8.2% year over year on a 2.7 point decline in load factor. Domestic market performance was solid, benefiting from a 4.8% reduction in mainline capacity. Mainline domestic PRASM was up 5.9%, driven by a strong yield increase of 8.6%. International PRASM was up 3.2% year-over-year on capacity growth of 3.7%.

While Latin America continues to see very strong PRASM growth up 16% this quarter, growth in other regions has decelerated as we and the industry have added significant capacity.

In the Pacific region, China including Hong Kong, has been particularly hard hit as industry capacity has grown by more than 20%. China represents over 40% of United's Pacific capacity. PRASM growth in Japan and the intra-Asia operations was quite strong.

In the Atlantic region we have seen 20% capacity growth in Heathrow, and significant growth in our core areas of strength in Germany which resulted in a PRASM growth of less than 1% this quarter.

Our domestic performance is clearly benefiting from the capacity actions we have taken and we recognize the developing oversupply situation in the international marketplace and have taken steps to address it with the elimination of six 747 aircraft. Additionally, eliminating 8% of our international capacity in 2009 will result in a substantial reduction of our current international losses.

At current fuel price, the economics of many routes right now just don't make sense. We are aggressively responding to market conditions by permanently eliminating underperforming capacity and we will continue to have a bias towards more action should market conditions require it.

In June we announced capacity reductions for the fourth quarter of this year and into 2009. By the fourth quarter of this year our domestic mainline capacity will be down about 16%. International capacity will be down 7% resulting in an 11% reduction in consolidated capacity. In 2009 we will reduce capacity another 8% compared to 2008. All told, 2009 capacity when compared with 2007 reflects about a 13% reduction in the company's consolidated capacity.

In implementing these changes we are aggressively looking at our network. Routes that cannot profitably withstand the pressure of elevated fuel costs are being eliminated. Our fourth quarter capacity will be down 20% in Los Angeles, 16% in Denver, 12% in Chicago and 11% in San Francisco with 3% in Washington.

We recently announced that we will close seven stations this year. We're looking at our international network and we're making the right choices to improve performance, closing the [Goya], reducing service to Mexico City, eliminating Los Angeles-Frankfurt, Los Angeles-Hong Kong and Denver-Heathrow routes in the fall. while also delaying our service to Moscow and Guangzhou. We expect the elimination of these unproductive routes to provide a mix improvement of our RASM, improving the results by 3 points. We recognize the impact our reductions have on communities we serve and the importance of a strong schedule and network to our customers. We're focused on minimizing the impact to the network by retaining service from other hubs and through our alliance partners.

The current environment requires a step change in revenue production. In addition to the value we are driving through capacity reductions, we must unlock significant new revenue streams. On our last call I walked you through the details of the revenue opportunity from unbundling our products and introducing new merchandising initiatives, as well as raising a number of the miscellaneous fees and charges. Several of these initiatives are either underway or will be introduced shortly. Jake mentioned the first and second bag initiatives that we are currently implementing. We estimate that the potential revenue from the new baggage service handling fees will be about $275 million annually in 2009.

Revenues from new optional services to be introduced will be approximately $100 million in 2009. This is in addition to the approximately $270 million in economy class and premium cabin upsell. This totals $650 million in 2009 for merchandising initiatives, an improvement of $450 million versus 2007.

We also will be collecting more than $600 million in other fee revenue in 2009, up $150 million from 2007. Combined these opportunities now represent over $1 billion in our 2009 estimate, a $600 million increase relative to 2007.

As Glenn discussed, we are continuing to work on our new partnership with Continental. We see significant cost savings and revenue opportunities from our relationship. The alignment of the management teams is quite encouraging and productive as is our mutual assessment of the value opportunity.

Moving to our revenue outlook, despite a continuing soft economy we expect continued solid unit revenue growth in the third quarter. We also expect to start seeing the full benefits of our capacity pull down and the industry capacity reduction late in the third quarter of this year.

While it is quite early in the booking curve, we have reason to be encouraged by a strong yield performance improvements and improvements in booked load factor year-over-year during the fall period. The requirement for us is straightforward: revenue must improve substantially and yield must carry the bulk of the burden for that improvement. Should demand levels fail to support our yield requirements, more capacity adjustments will be required and the full costs associated with the capacity must be taken out of the system.

As Jake mentioned earlier, cost performance for the quarter was good. However the environment and the opportunity emphasizes the need to do more and we have targeted a number of opportunities for improvement, including maintenance cost reduction, principally to be achieved through supply chain, materials management and efficiency opportunities in our base and line maintenance operations. We're setting the bar high and expect to significantly close the gap relative to our historical lack of competitiveness in our maintenance cost position.

We also see opportunities in catering to readjust our service patterns, explore new supplier models leading to a continued substantial reduction in our catering costs. Across the organization we are looking at opportunities we see in salaries and wages, particularly in the overhead functions. As Jake mentioned, salaried and management staff is being reduced by 20%. Additional opportunities exist and we need to do more..

We have also begun to engage our Express partners and believe that there are a number of potential levers to reduce the cost of the United Express left. We are working with our partners to translate the efficiency practices such as fuel saving techniques to the Express operations.

Distribution and cost of sales continues to be a key focus area in our cost reduction efforts. Actions we have set in place, even over the past several weeks will reduce our agency commissions by more than $80 million on an annual basis, helping us achieve our overall cost saving targets this year and working towards a significant improvement in costs for 2009.

We are continuing to do more. Our actions include the rework of all agency incentive programs, walking away from many agencies altogether where appropriate cost of sales targets cannot be achieved, including the recent termination of a large multinational agency agreement.

We also stopped participating in agency affiliate programs, eliminated consolidator commissions in the Pacific and reduced numerous base commissions internationally. These are not actions we take lightly but they are appropriate actions to reduce our cost of sale and we believe necessary to succeed in this environment.

Fully realizing our opportunity to improve costs is essential to our success. I can assure you we have the will and the opportunity to bring down the improvements necessary to achieve our goal.

Moving to the operational side, our performance was neither acceptable nor was it competitive. Our action plan and goals are substantial. United must deliver top tier operational performance. The work required to do so is clear and forms the basis for our improvement plans.

Over the last 12 months we have consistently placed in the bottom tier amongst network carriers across the DOT performance measurements. To improve our performance, we are focusing our efforts in several specific areas. Improving our out of service aircraft performance, improving execution on turn times, addressing our schedule structure, focusing on a regular operations recovery, and better aligning all of our operating divisions against our new goals.

We're making straightforward changes to our schedule, increasing ground times by 8 to 10 minutes in September. We are also increasing the number of crew held in reserve and are focused on improving the departure performance of our very first flights of the day. In part by increased the number of spare aircraft we have available by four compared with the third quarter of last year.

Finally, the addition of a new runway at O'Hare in November, combined with our capacity reductions and those of our competitors, should give our operating performance a big boast. These changes should also set our employees up for success in their efforts to present the best United to our customers.

We are fully confident that these investments are required to improve operational performance, although they are very consistent with our cost objectives and in fact we believe they will be substantially funded through the cost-benefit of running an on-time airline.

Fundamental to each of our focus areas is providing and fielding the right team. To that end, as you know, Joe Kolshak joined United as Senior Vice President of Operations. Joe served as Delta's Executive Vice President of Operations for a number of years, and clearly has the right experience and expectations to be successful in this role at United. Recently joining Joe we announced that Timothy Canavan also joined United from Delta as Vice President of Line Maintenance and Aircraft Appearance. This represents just a few of the moves we are making across the company to put the right team in place to go after these opportunities and we are confident that we will make steady progress each quarter and we will continue to report that progress in calls in the future.

These leaders share common characteristics. They have deep functional experience. They are true performance managers with a strong sense of urgency and the well-earned confidence to get the job done and show up with the results.

In closing, we have done the work to find the areas of opportunity for improvement. We have set the stress targets, put the right leadership in place and we are executing against our plan. The current environment demands more action and you can count on us to continue to act aggressively and responsibly. We know what we need to achieve, how we need to do it and that we are ultimately accountable for that outcome.

Now I will turn it back to Jake.

**Jake Brace**

Thanks John. Let me move to guidance here real quickly. For the third quarter we expect mainline North American capacity to be down 5.5% to 6.5% while international capacity is expected to be down 1% to 2%. Overall third quarter mainline capacity is expected to be down 3.5% to 4.5%. Express capacity is expected to be flat which results in third quarter consolidated capacity being down 3% to 4%.

For the full year 2008 we expect mainline capacity to be down 7.5% to 8.5% and consolidated capacity to be down 3.5% to 4.5%.

Our current capacity plan is to size the business to solve for $125 per barrel crude. If higher fuel prices prevail we are ready to make further capacity adjustments to account for this, and in fact John and his team are in the process of examining what the next round of capacity cuts would look like.

The large number of unencumbered aircraft in our fleet, even after removing the 737, and the latitude in our collective bargaining agreements gives us the ongoing flexibility we need to make the changes to the business necessary in light of this environment.

On the cost side, we estimate that mainline costs per ASM excluding fuel will be up 1.5% to 2.5% in the third quarter and up 1.5% to 2.5% for the full year as well. All of those numbers exclude the special and other accounting charges we highlighted this quarter as well as any other special accounting charges that may be incurred later this year.

As you will note, our full year cost guidance remains unchanged from the guidance we provided in January, despite the significant reduction in capacity since that time, reflecting the additional cost reductions that we discussed earlier in the call. As you know, as the airline shrinks it becomes increasingly difficult to maintain the same cost per ASM excluding fuel, however we are committed to getting the costs out of the system as we reduce capacity and are pleased with our progress so far this year.

You can find our fuel and hedge position guidance in our earnings release and now, Teresa, we are ready to open the call for questions.

**Question-and-Answer Session**

**Operator**

(Operator Instructions) your first question comes from William Green with Morgan Stanley.

**William Green – Morgan Stanley**

I'm wondering if you could talk a little bit about elasticity of the band, both on the corporate and leisure side. Obviously with the increases in fares that we've seen you would expect to be seeing quite a bit more of that. I would just like to hear your thoughts.

**John P. Tague**

I think we have all been a little disappointed in yield performance relative to the changes we have made to the pricing structure and the fuel surcharge increases. We are clearly seeing business travelers change behavior and book earlier,

so we have seen a modest decline from that perspective.

We continue to believe we have the right level of capacity now and we believe that for the time being our fourth quarter capacity plans were addressed with this trend in mind. But at the end of the day, we have to right size around a profitable demand base and I think the next six to nine months will give us a clear indication as to what that is.

**William Green – Morgan Stanley**

If we turn to the Star Alliance, now that Continental is joining does it change how you think about how the part of it with the US Airways? Do you even have the right to reassess it or is that solely a US Airways decision?

**John P. Tague**

No, we've come to an agreement with US Airways and we expect them to fully participate as they have in the past. I think that is one of the great accomplishments of this agreement is to be able to bring Star with Continental under the Star Alliance and maintain the enormous partnership and its full economic impact of US Air.

**Glenn F. Tilton**

We had a unanimous vote of all of the Star members, including US Airways, in support of Continental joining the alliance.

**Operator**

Your next question comes from Mike Linenberg - Merrill Lynch.

**Mike Linenberg - Merrill Lynch**

Your capacity cuts in North America, they are big and you are also cutting Express later this year and yet I believe you are still committed to five domestic hubs. How do you cut that big without compromising the integrity of the network or reducing the conductivity? What are some of the challenges that you run into here?

**John P. Tague**

I think when we talk about the competitiveness in the network we really have to look at what the relative strength of the network is. The whole industry is going through the type of dramatic capacity reductions that United is, so I think we are quite comfortable around the relative strength of the network. A number of the reductions we took might like the elimination of service to some hubs but clearly not all hubs, again allowing for continued presence in each of these cities.

So look, these are hard decisions to make but the need to do so is inarguable and we are quite comfortable that we can float traffic over multiple hubs with the five, ad then our comparable value proposition for corporate is still quite robust from a network perspective.

**Mike Linenberg - Merrill Lynch**

When you look at some of the cuts, and I think it seems like LA, Denver, are a little bit bigger than what is going on in Dulles, is their an opportunity to downsize facilities and get savings from reduced rental expense etc.?

**John P. Tague**

Let me start with saying the fourth quarter comparative cuts may be somewhat misleading. If I look at 2008 in total, Denver is being reduced by five two, Dulles is actually growing a bit, LA is down by one, one and actually the biggest cut comes from Chicago with a ten, three reduction.

However, we do have a significant opportunity to reevaluate our facilities footprint, particularly in combination with the relationship and discussions we have underway with Continental.

**Glenn F. Tilton**

That's one of the things that we really asked everyone to focus on, and did, is not just that Continental is coming into the Star Alliance but the partnership arrangement with us gives us opportunities that are unique to any relationship that we've had with a previous Star Alliance partner.

**Operator**

Your next question comes from Gary Chase - Lehman Brothers.

**Gary Chase - Lehman Brothers**

A couple of quick follow ups on the credit agreement which I tried to read while you were running through the call. The first is, you obviously freed up $350 million in cash. Are there circumstances where that could change adversely and you would be subject to additional cash restrictions? Should we consider that more of a permanent condition here?

**Jake Brace**

There are some triggers in there, just like there were in the original agreement. We modified those triggers in a way that we think was actually favorable to the current agreement. We will outline the specifics of those triggers in our SEC filings, but you can think of them as along the Continental lines.

**Gary Chase - Lehman Brothers**

I'm curious about the comment that says it will improve cash flow by about $200 million in the next two years. Is that P&L? I'm just curious why you use the term cash flow. If you could give us a little flavor for how it is going to improve cash flow?

**Jake Brace**

Sure, that is P&L. The deal has a number of components, obviously there is a liquidity component which we outlined of approximately $1 billion. In addition to that, we improved in certain areas both the rate per mile and the number of miles that we would be selling in the short term. It is more of a P&L improvement but it is better than our current circumstance which is why we highlighted in the press release.

**Gary Chase - Lehman Brothers**

Is the rate improvement, Jake, the substantive portion of it or is it more the volume?

**Jake Brace**

Both of them are relevant.

**Gary Chase - Lehman Brothers**

You've all talked a lot about the Continental alliance. If that were happening in a vacuum I could see why there would be clear optimism on that front but it is, and I mean, you have Delta and Northwest merging, you have four-way immunity being granted to Sky Team. There are at least press reports -- or I should say, at least we fully expect British Airways and American to look to immunize their own alliance. When you think about all the different things that are shifting on the alliance front, not just what's happening to United and Continental in a vacuum, how do you feel about your ability to retain revenue and retain benefit net of all those competitive changes?

**Glenn F. Tilton**

A couple of things to think about. Number one, Gary, we would obviously accentuate the work that we are doing ourselves that the three of us have outlined on the call as the most important book of work that we had to do at United. That work also enables us to take full advantage of the workstreams that we have agreed with Continental. As I said a

moment ago in response to Mike, yes it is membership in the Star Alliance, but it is also the creation of joint ventures in numerous international markets. As we said, we're going to progress from the Atlantic in what we are calling A++ and we shouldn't leave recognition of Air Canada out of this. They have been a strong participant in it. So Air Canada, United, Continental, Lufthansa.

If you look at the revenue opportunities that that combination presents to us across the Atlantic and then you triangulate it into the footprint that Continental has in Latin America that candidly we did not; and then you go from there to the Pacific, I think you can see the strength of the network opportunity that John and his team, Kevin, will have to prosecute.

The thing that excites me about it is what we have agree with respect to efficiencies, productivity, cost reduction in areas such as – and I am just going to mention one, because I think that it presents itself promptly -- in areas such as IT and procurement of IT. There's truly an opportunity for us there, but I think it is going to be competitive with the other propositions that you mentioned a moment ago.

You can look at it two ways, I suppose. It is on the one hand we think aggressive; on the other you could say that it is defensive. But nonetheless, it is something that we have to add to our own book of work and in that regard, we are very excited about it, Larry and I both.

### John P. Tague

I'd only add one thing. Our alliance valuation model is looking just at the alliance impacts both competitively and with this agreement, code share impacts and things of that nature, as Glenn suggested, just a small [inaudible] opportunity. These have been very active models in the past and they suggest that we will fully recover the impact of the competitive changes you've noted and generate net new value just from an alliance valuation perspective.

### Operator

Your next question comes from Ray Neidl - Calyon Securities.

### Ray Neidl - Calyon Securities

Glenn, as an old oilman, you sounded pretty militant against what is happening with oil prices --

### Glenn F. Tilton

I take some modest exception to "old".

### Ray Neidl - Calyon Securities

I said ol' not old. You sound pretty militant, which is understandable, about the recent sharp increase in oil prices, but do you think that trading in futures has really contributed to that and it is not basically a law of supply and demand? What is your opinion on that?

### Glenn F. Tilton

I think it has absolutely contributed to volatility, unpredictability, I think that the indexing speculation has created an enormous momentum play in oil, almost in a unique commodity context. I think that it certainly contributed. I don't think that to accept that, to take that position, Ray, one need argue the point relevant relative to supply and demand.

As I have said in my very, very frequent visits to Washington, the country needs a comprehensive energy strategy. It needs to moderate the growth in this particular commodity activity. I think that the opacity and the over-the-counter trade is too great. The ratio of the over-the-counter volumes of the NYMEX and the physical side of the business is too disproportionate. I think that bringing some disclosure, transparency, position limitations as the Reed Bill does that I note was now just voted to the floor unanimously by the Senate for consideration and debate, is an important part of the proposition.

That having been said, I think that solutions on the supply side are equally important. I certainly think that we need to

open up the offshore. I think we also need to pursue alternatives, Ray. I think all of that, if we do that and we show resolve will bring down the perception of the future value of this particular commodity. If we don't do that, I think it's going to continue to escalate.

**Ray Neidl - Calyon Securities**

There seems to be another ill wind beginning to blow right now for the industry, this time coming from the direction of Europe where the environmental movement is putting in new rules, regulations, taxes and fees on the airlines. Being an international carrier with large operations to these areas, do you think this is going to be the next crisis for the airlines as governments try and raise extra cash by taxing airlines under the guise of environmental protection?

**Glenn F. Tilton**

Ray, I don't know. I will let John speak to that here in a second. I don't know that I would call it the next crisis but I would certainly refer to it as piling on. It's certainly an incremental challenge that we don't need. I think as usual, Ray, [inaudible] said it best when he said this is absolutely the wrong thing at the wrong time. We subscribe to IATA's assessment of it. John do you want to add anything? Maybe you, Kevin?

**John P. Tague**

I think Glenn said it all. I think we are now beginning to see European carriers be under the same pressure that we are and hopefully we will have a unified front here. As you know, Europe has often been out in front of some of the issues that ultimately end up in the States so we're working very, very hard to moderate the impact, Ray.

**Operator**

We'll go next to Daniel Mckenzie - Credit Suisse

**Daniel Mckenzie - Credit Suisse**

First off, just a quick housekeeping detail. What is the loss per share after adjusting for out of period fuel hedges? I am arriving at a loss of $3.63 per share but I suspect I'm not adjusting the tax rate properly.

**John P. Tague**

You have to be a little bit careful because the only taxes in there relate to the special charge, so you should think of it as a zero tax. If I recall correctly that number was $2.99 excluding the out of period mark to market.

**Daniel Mckenzie - Credit Suisse**

John, could you provide some perspective about the link between corporate travel and the need to adjust capacity to keep RASM constant? I guess in particular I appreciate that we are not seeing any significant decline today, but if corporation begin cracking down by cutting corporate travel say 10% to 15% does that mean capacity needs to be cut 10% to 15% to hold RASM constant?

**John P. Tague**

I think you're correct in saying that we are really sizing the system around that most profitable core customer base and I think it is inevitable that we are going to see changes. As I was driving to work this morning I even heard that if you work for some investment banks you are not going to be able to fly in first class. I thought that was a significant change.

Look, our capacity plans presume that is going to occur. The elasticity in this market is less than the rest of the market, but nevertheless it exists. We're going to size the airline around that. We believe, as Jake said, for $125 we get the capacity in the right place but if learnings over the next several months suggest that more needs to be done, we will do more.

**Daniel Mckenzie - Credit Suisse**

I wonder if you can talk about your contractual flexibility to cut regional affiliate flying, and in particular I am wondering how much regional flying can you cut without cause?

**John P. Tague**

We recently terminated seven aircraft in 2009. Most of our flexibility is further out into 2010, 2011 2012 range although we do believe that contract extensions and the few that we may be willing to provide could provide economic and/or capacity relief.

We are also lowering our utilization which is driving the reduction in the outlook for Express capacity that we are seeing. We are going to press on this issue. It is inevitable that we're going to have to improve the economics and the flexibility of these relationships. For those who recognize that early in the game, there may be extensions available. For those that don't, the risk around a 50-seat aircraft renewal is going to be theirs to bear.

**Jake Brace**

I would remind you that we have a lot of flexibility in the rest of our fleet so we can change to whatever environment we need to change to. Even though we may have a little bit less flexibility on the regional side we have a lot of flexibility on the mainland side.

**Operator**

Your next question comes from Jamie Baker - J.P. Morgan.

**Jamie Baker - J.P. Morgan**

Jake, a question on the aircraft side. Are you concerned that the window for raising money against unencumbered aircraft is closing? I am just trying to assess whether you are still focus here on any near-term borrowing potential now that the $1.7 billion is behind you?

**Jake Brace**

We chose, Jamie, to focus our initial efforts on things that didn't require more collateral, viewing that things that do require collateral are a little bit easier to do. So, we have also in parallel paths a number of other aircraft financings and obviously selling the aircraft that we are going to permanently ground, both of which we think can raise substantial liquidity. So we have those efforts underway in parallel but we just chose to focus on doing it in a very collateral friendly way first and then tap the secured market second.

**Jamie Baker - J.P. Morgan**

Secondly, expanding on what Glenn was speaking to earlier, given the mainline capacity and the full-year ex fuel cost guidance that you have given, it implies very, very strong cost control in the fourth quarter. I will admit that perhaps I haven't been the kindest among the analysts of United in the past on the subject of cost controls, but this really does imply very stellar performance. Can you outline some of the additional inputs that contributes to your confidence to offer up this guidance.

**Glenn F. Tilton**

I'll let John speak to it, Jamie, and I will be silent on your comment relative to your own perspective on our abilities.

**Jamie Baker - J.P. Morgan**

I'm humbled here, as long as you deliver on it.

**Glenn F. Tilton**

I'll let John outline some of the areas that are incremental to what he mentioned in his prepared remarks, Jamie, but we

really do think it's two things. Number one, we have perfect transparency into our competitiveness or lack thereof; we're focused on the significant few, and we really do mean the significant few and they will yield benefit to us. We are putting the right team in place to execute against opportunity.

So I am very confident and I'll turn it over to the guy that I am going to be talking to every morning at about eight o'clock about our progress.

### John P. Tague

I think as Jake indicated certainly the reduction of 20% is significant. We are also beginning during the quarter and looking forward, beginning to see significant improvements in our maintenance cost outlook. Part of that is focusing on an improvement agenda, but part of that is simply making sure that we are fully capitalizing on the structural change the elimination of the 737 creates.

So we know where all this money is. There isn't a blank space in the guidance that Jake indicated. We have programs, commitments and I would say that my perspective is that this does not represent our full potential. As Jake indicated, reduction in costs is tough in a capacity-reduced environment but we in the industry have no choice.

The value of the incremental $100 million that Jake indicated is about $250 million on an annual run rate. So it's important to indicate we're not getting this performance through deferral. We're getting it through sustainable cost elimination.

### Jake Brace

Jamie, I would just add that I think you've seen both with us and maybe to a lesser extent in the industry as we have faced this very difficult time of unprecedented cost challenges the industry and especially United have found different ways to adapt. That, I think when you're facing the kind of cost pressures that we face from fuel, you look at the world a little bit differently and that's what we've been doing. When we look at it differently, we see these opportunities out there. So we are very, very confident that we're going to be able to deliver on these numbers.

### Operator

Your final question comes from Kevin Crissey - UBS.

### Chris Allen – UBS

This is Chris Allen for Kevin. As you guys are reducing capacity are you seeing low-cost carriers start to get into those markets or make incursions into that?

### John P. Tague

We haven't seen a substantial change in the low-cost carrier plans. They tend to be flattish right now although as you know, we have seen some significant increases in Denver, particularly on the part of Southwest. I think as you've heard, as I've heard, Southwest seems to be biased to capitalizing despite the current economic condition of the industry. But overall, we don't see a significant threat. Look, low-cost carriers with the exception of Southwest pay the same for fuel that we do and we are very competitive in terms of our revenue premium. If these markets weren't profitable for United, I have no reason to believe they would be profitable for a low-cost carrier.

### Glenn F. Tilton

If I could, operator, let me wrap up for a moment just with a couple of remarks. Number one, it is a privilege that the Chief Executive Officer get to be able to thank people for extraordinary work during challenging times. With respect to the crafting of the new agreement with Chase, the executive team here on the call gets the opportunity to thank Dennis Cary, our Chief Marketing Officer; Kathy Mikells, somebody very familiar to all of you on the call. The two of whom are sitting here with us, both of them a little bleary-eyed and Kathy of course for whom this work was decidedly extracurricular and took her back to her days as Treasurer of the company and the Vice President of Financial Analysis and Planning. I personally and the executive team appreciate the work that Dennis and Kathy put in to reach this agreement. I want to thank Robert Sahadevan, our Vice President responsible for Mileage Plus who was the third very important member of the team in terms of crafting this new agreement.

That having been said, I also want to thank Ray Fisher at J.P. Morgan Chase and his team for all of the work that they put into the effort on behalf of United as an important partner and customer of J.P. Morgan Chase. It just furthers the quality of our long-term relationship with that institution.

Thanks very much for that. I'll bring this segment of the call to a close. Thanks.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com.** All other use is prohibited.

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

# Exhibit 8

**Remarks of Robert Sumwalt, Vice Chairman**
**National Transportation Safety Board**
**to the**
**FAA Aviation Fatigue Management: Partnerships for Solutions Symposium**
**June 17-19, 2008**
**Vienna, VA**

**MR. SUMWALT**:  Thank you.  And thank you for that nice introduction.  It really is an honor for the NTSB to be invited at this venue, and I'd like to congratulate the FAA for pulling this together.  I think that this is such an important topic, and we definitely appreciate your commitment to making it happen.

And, also, as I've come to realize, you can have a wonderful symposium, but if people don't come then you don't have much of a symposium at all.  So I'd like to look out into the audience, and it really warms my heart to see that we have 300 people from around the industry who have gathered, gathered to learn more about fatigue, to look for common solutions.  And as the title of this symposium is, to form a partnership for solutions.  So congratulations to all of you for being here.

I put a fair amount of thought into the title of the discussion this morning.  What should I title this?  The first part of it, "Reduce Aviation Accidents and Incidents Caused by Fatigue," that's right off of the Safety Board's most wanted list.  That is the verbiage right here on this list.  We've been saying that for a long time.  But the second part of the title, "It's Time to Act," that's what I came up with because it is time to act.

We have been dealing with trying to resolve fatigue in aviation for a long time, and what we do at the Safety Board is we put a red mark on our most wanted list next to this recommendation, which means that the recipient of the recommendation is moving at an unacceptable pace.  And the recipient happens to be the FAA.  But you know what?  The FAA really is in sort of a bind.  And it's not my position to try and apologize for other federal agencies, but the fact is, by the Administrative Procedure Act of 1946, federal agencies are bound to go through a rule-making process.  They have to publish a notice of proposed rule-making.  They have to solicit public comment.

The FAA formed an advisory rule-making advisory committee on fatigue in 1995, and it didn't appear that there was going to be an industry consensus on fatigue.  And so that sort of puts the recipient of our recommendation in a bind because, by law, they have to do something, they have to solicit the input.  They're trying to achieve consensus.  But if the industry can't achieve consensus, than the regulator can't put forth the regulations.

So what I'd like to do is challenge everybody to come together for a partnership for solutions.  Let's spend the next three days looking for solutions.  Let's put the past behind us, and let's move forward.

I'd like to start by talking about my stamp collection.  I have sort of a strange stamp collection.  I started collecting stamps as a child and, over the years, my stamp collection has gotten a little more strange.  But I collect airmail that never made it to where it was going from the 1920's and the 1930's because the airmail was in a plane crash.

So let's look at a few of my stamps.  Here's one here from 1926, and, ironically, this was on the inaugural service of airmail between Chicago and the Twin Cities.  And what happened?  The plane crashed.  And it's hard to see that green stamp that is right there, but it says, "Mail delayed by accident in Mendota, Minnesota in which pilot Elmer Lee Partridge was killed."

And here's another one and another one and another one. Here's one from 1930. And yet another. And I've got several more, but I just wanted to show you some of my stamp collection.

But of all of the crash stamps that I've collected over the years, this is one that I don't have, and this is one that I would absolutely love to have. There's only one of these known to exist. You see, this one is from 1926. It was on a flight between St. Louis and Chicago. The pilot bailed out at 14,000 feet. I think he had iced up and bailed out. Obviously, the plane crashed. The pilot went over to the wrecked plane and recovered as much of the mail as he could possibly get. He got about 60 pounds of mail and then went and got on a train and took it to Chicago. Remember the mail must get through. But this is the only remaining one of those that exists, and there's a stamp on there that says "arrived in damaged condition," and then the pilot wrote "due to airplane crash," and he signed it. He signed it with an "L," and that "L" was Charles Augustus Lindbergh.

What I think is just as interesting, it was only five or six months later, it was May of the next year, that Lindbergh made his famous flight across the Atlantic as a solo pilot. And I don't know how many of you have ever read the book "The Spirit of St. Louis." How many of you have read that book? A fair number. All throughout the book, Lindbergh punctuates the book with quotations talking about how tired, how fatigued he was. For example, "My mind clicks on and off. I try letting one eyelid close at a time when I prop the other open with my will. But the effort is too much. Sleep is winning. My whole body argues dully that nothing, nothing life can attain is quite so desirable as sleep. My mind is losing resolution and control."

This isn't just something that went away with Charles Lindbergh. This is something that we've experienced for the last 80 years of aviation. In fact, let's look at the paper from a week ago, from this time last week. Pilots falling asleep.

There's three points I'd like to make this morning. The first is fatigue is real and it does affect safety. Let's look at a few examples.

Well, let's go back to Charles Lindbergh. "The nose is down, the wing is low, the plane is diving and turning. I've been asleep with open eyes. I kick the left rudder and pull the stick back. My eye has jumped to the altimeter. I'm at 1600 feet. The turn indicator leans over to the left. The air speed drops, the ball rolls quickly to the side. My plane is getting out of control."

When I read this, I'm reminded of an accident the Safety Board investigated a number of years ago. This airplane was a Continental Express in Pine Bluff, Arkansas back in 1993. It was an EMB-120. The pilots were climbing through 17,000 feet. They had allowed the speed to decay. The airplane had picked up some ice as they had climbed through the clouds. And with the decayed speed, the airplane stalled at a speed that they didn't expect it to. They were talking to the flight attendant. They were doing other things. They weren't adequately monitoring the airplane. The airplane got away from them. But the amazing thing is that they stalled, they lost control, they got it into a 111-degree bank angle, 67 degrees, nose down, and they finally recovered at 5,500 feet. Imagine what the dry cleaning bill would have been after that ride.

The left prop shed three blades during the process, and the crew made a forced landing on a closed runway. They ran off the runway. And the Safety Board found that the crew's failure to maintain professional cockpit discipline and inattention to the flight instruments and selection of inappropriate automation mode were certainly the causal factors in the accident. But the Safety Board also found that contributing to the accident was fatigue induced by the flight crew's failure to properly manage provided rest periods.

You see, it was day three of a trip.  They had had short layovers on the first night of the trip.  But on the second day of the trip, the crew got in at 11:30 in the morning.  They didn't have to report to duty until about 5:00 or 5:30 the next morning.  Now, granted, that is early, but they had, according to the Safety Board, ample layover opportunities, but the crew did not take advantage of their layover rest.  You see, they stayed up until 11 or 12 watching TV, reading, whatever, and they had to get up at 4:00 in the morning.

So we did find that fatigue was a contributing factor, and this accident occurred at a time of day that is normally associated with fatigue.  And so that was a contributing factor, and it underscores a couple of things: that there's not a lot of difference between Charles Lindbergh's plane going out of control and this one here; and that fatigue is a problem and it is something that we need to do something about.

But it also makes a point that I believe it was Bobby made--that there is a personal responsibility.  You can have the best flight and duty time limitations in the world, but if people don't exercise that professional responsibility it's not very good.  Let's move on.

This airplane was an accident, a fatal accident, 13 fatal.  There was a jet stream operated by Corporate Airlines, doing business as American Connection, back in 2004.  The crew was conducting a nighttime non-precision approach into Kirksville, and they hit the ground.  If you ask me, when we go back and look at the factors involved in this accident, this was a recipe for a fatigue-related accident.  Let's look at a few of the ingredients.

First, the crew had been on duty for 14 1/2 hours, and their two previous days had also been very long.  They had less than optimal overnight rest time the night before the trip.  They had to wake up early.  The captain got up at 4:00, and the first officer got up at 4:30.  It was the sixth flight of the day.  They had been doing approaches and low ceilings and low visibility all throughout the day, and this would have been their final landing.  It was now late at night.  And just think about this: the high demands associated of manually flying a dive-and-drive non-precision approach when you're tired.

And these were the ingredients.  And now we come in and we add in something else, something that I hate to talk about, but it happened; and that is the crew's failure to follow SOPs and their less-than-professional demeanor.  When we tie all of those together, we get the perfect storm.  We've got a recipe for a fatigue-related accident, and, unfortunately, we had 13 fatalities, two serious injuries.

The Safety Board found that the existing FAA flight and duty time limitations don't reflect the recent research on pilot fatigue and sleep issues, which, of course, increases the possibility that pilots will fly while they're fatigued.  And we also said that providing pilots, providing crew members, with fatigue-related training may increase their awareness and therefore, help pilots to avoid flying when they're fatigued.

We came out, and we made recommendations on each of these findings.  Dr. Jana Price will speak on the NTSB panel later this morning and talk specifically about our recommendations.

Another flight that the Safety Board deliberated just in mid-April, this accident occurred in February of `07, an Embraer 170 at Cleveland, runway overrun, no fatalities fortunately.  But what we found, what our investigators found, is that the captain had slept only one out of the past 32 hours, and he did not advise Shuttle America of his fatigued state, nor did he attempt to take himself off of the trip because he had been notified by his company that he had used an excessive number of sick calls and that if he used more he could be subjected to discipline, including termination.  And the captain said that his lack of sleep affected his ability to concentrate and to process information and to make decisions and that he

was not at the best of his game.

The probable cause was something along the lines of the captain's faulty decision to continue this approach. But contributing to the probable cause was the captain's fatigue, which affected his ability to effectively plan for and monitor the approach and landing, and also the company, Shuttle America's failure to administer an attendance policy that permitted crew members to call in as fatigued without fear of reprisals. Once again, we made recommendations to address each of these areas, and Dr. Price will be discussing those in her presentation.

Let's just look, without even getting into them, let's just look at a few other fatigue-related accidents. Here's one that the Board deliberated a week ago today. And here's another one. And another one, five fatal on a Part 91 repositioning flight on a Learjet. And another one, 11 fatalities, 45 serious injuries. Here's one, 228 fatalities, 26 serious injuries. And yet another one. And there are more.

The point I want to make is that fatigue is serious and it has serious implications. In fact, as Dr. Brenner from the Safety Board will say in his part of their panel, in the last 15 years fatigue has been associated with over 250 fatalities in air carrier accidents investigated by the Safety Board. 250 fatalities. There are countless other general aviation accidents, but the numbers are just countless.

So that's my first point. Fatigue is real, and it does have serious safety consequences. The second point is that the Safety Board has had a longstanding concern about fatigue. We've issued, since 1972, 117 fatigue-related safety recommendations in all modes of transportation. Thirty-four of those are related to aviation, and they apply to the flight crew, mechanics, air traffic controllers; and they've been issued to a number of organizations and governmental entities.

Fatigue has been on the Safety Board's most wanted list since the very inception of this list in 1990, and today's most wanted list has seven, seven aviation fatigue-related recommendations that concern air traffic control, maintenance, and flight crew. We believe in a comprehensive approach to addressing fatigue. Yes, we think that we do need flight duty time limitations that are based on fatigue research, circadian rhythms, and sleep and rest requirements. And we've been saying that now since the Kirksville accident.

But we also say, and we just came out with this recommendation last week, we approved this recommendation last week. The Board also believes in fatigue management systems or, as it is called also and you'll hear a lot of discussion about that later during this symposium, these fatigue risk management systems. What are they?

We'll let the panel after lunch discuss it. But, basically, it's a comprehensive tailored approach to address fatigue in the workplace. The Safety Board believes that both of these are needed to fully address the issue of fatigue in aviation.

I want to make the point that just because we might have a fatigue management system, it does not mean that we don't need good flight and duty time limitations. We need to have both. We need good structure in place by good flight and duty time limitations. And then the fatigue risk management, or the FRMS, is just another part of that. But the fatigue management system should not be looked at to replace the flight and duty limitations.

You know, I did have a great career flying for the airline. And as I look back, I see that some things have changed. I think really it's amazing how the airplanes have changed over the years. Some things have changed, but then others have not. The same myths exist today that existed when I entered that airline cockpit in 1981, like fatigue is a sign of weakness. Fatigue is something that you can overcome

with coffee, a shower, and some willpower.  Or how about this one?  We're paid to do the job, and we can handle it.

When I left the airline in 2004, I went to run a Fortune 500 flight department.  When I got there, there was no flight operations manual at all.  And this was the company that I went to work for.  We changed that, but no flight operations manual meant that there were no flight duty time, no duty restrictions because the chief pilot had the attitude that we are paid to do the job and we will do it.  It was a can-do attitude that, if we can't do the job, the company will find somebody that can.  They'll sell the airplanes, they'll start chartering, they'll go to fractional ownership, whatever; so we need to be able to do the job for our company.

Well, within a few months, we had a flight operations manual, and we did have flight and duty time limitations.  And, occasionally, it would irk some member of senior management that the new manager would call up -- by the way, the chief pilot left shortly after I got there -- it would irk some in senior management that this new guy would call them up and say, "Look, we can't fly the trip as scheduled.  You can leave later, you can come back earlier, but we will not exceed our duty day."  They didn't like that.

But, unfortunately, it sort of all came home to me after I joined the Safety Board.  I had been at the Board about five months when somebody called me early on a Friday morning to tell me that the former chief pilot had been killed in a plane crash.  He was pushing limits trying to get back into the home airport under very low IFR, and he was at the end of a 16-hour duty day.

So despite what we've learned, despite great research, despite great intentions, we still have not made significant changes to adequately address fatigue in aviation, which leads to my third and final point.  It is time to implement workable solutions.

Outside of the NTSB's training center, we have a plaque, and I usually like to pause and read that plaque before I walk into the building.  It says, "From tragedy, we draw knowledge to improve the safety of us all."  And that is what we do at the NTSB.  We take tragedy, we try to learn from it to improve the safety of us all.  But we can't change it.  We don't have the congressional authority to go out and change rules.  All we can do is make recommendations and try to urge people to come together to, as the title of this symposium is, to form a partnership for solutions.  If it's going to happen, it's going to happen within the four walls of this room.

Back to Lindbergh--we'll close on a quote from Lindbergh.  Lindbergh says, "I've got to find someway to keep alert.  There's no alternative but death and failure."  And with respect to Mr. Lindbergh, I'm going to propose that death is certainly not an alternative.  We've had over 250 deaths due to fatigue in air carrier operations of accidents investigated by the Safety Board over the past 15 years.  Death is not an alternative, and I dare say that anyone in this room wants to accept failure as an alternative.

I challenge you to take the knowledge from this symposium, come together and form workable solutions, and let's solve this thing once and for all.  Thank you very much.

Speeches & Testimony

# Exhibit 9



## Washington Headquarters Press Release

**For Immediate Release**
June 24, 2008
Contact: Les Dorr, Jr.
Phone: (202) 267-3883

**FAA Statement on the Aviation Fatigue Management Symposium**

The Federal Aviation Administration's (FAA) first Aviation Fatigue Management Symposium produced agreement on two major points: As in other modes of transportation, fatigue can be a genuine factor affecting aviation operations, and now is the time to do something about it.

The symposium, which ran from June 17 through 19, brought together 325 experts from industry, government and academia to share the most current information on fatigue and discuss possible fatigue management strategies and best practices. The participants looked at issues affecting flight and cabin crews, air traffic controllers, technicians, mechanics, dispatchers and ramp workers.

The first day of the conference featured a comprehensive review of the factors contributing to fatigue in flight operations and air traffic control by researchers from the National Transportation Safety Board. Other sessions covered evidence for fatigue in flight, air traffic, maintenance and ramp operations, and what many experts consider the key to addressing the problem: scientifically based fatigue risk management systems.

Day Two included presentations on the current state of fatigue management from organizations as varied as the FAA, airlines, NAVCANADA and university scientists.

The evidence and scientific research presented at the symposium served as the background for continuing discussion groups that covered international long-haul operations, domestic operations (transcontinental, multi-leg, and short haul), air traffic control and technical operations, and maintenance. The discussion groups presented their findings on the third day of the symposium.

The conference attendees generally agreed that fatigue mitigation must be based on scientific principles developed through enhanced data collection. They also emphasized the necessity for government and industry to develop a culture that does not penalize employees who excuse themselves from duty due to fatigue. The conferees recognized that incorporating fatigue risk management systems into everyday operations is the ultimate goal, but doing so will take innovation in addressing a myriad of regulatory issues.

The FAA hopes the participating individuals and organizations will use the information and concepts shared during the symposium as a springboard to develop effective fatigue management strategies.

###

# Exhibit 10


Federal Aviation
Administration

## Washington Headquarters Press Release

**For Immediate Release**
August 14, 2008
Contact: Les Dorr, Jr.
Phone: (202) 267-3883

### FAA Seeks Penalties Against American Airlines for Deferred Maintenance, Other Violations

WASHINGTON, D.C. — The Federal Aviation Administration (FAA) today announced actions totaling $7.1 million in civil penalties against American Airlines for improperly deferring maintenance on safety-related equipment and deficiencies with its drug and alcohol testing programs and exit lighting inspections.

The FAA asserts that in December 2007, American used the wrong provisions of its Minimum Equipment List (MEL) to return two MD-83 aircraft to service after pilots had reported problems, and flew the planes 58 times in violation of FAA regulations. The MEL contains components and systems without which the aircraft may operate safely under specific limitations, as proven by the operator or manufacturer.

On December 11 and 12, American operated the first MD-83 on eight flights in airspace it should have been restricted from after maintenance on part of the autopilot system was improperly deferred. An FAA inspector discovered the improper deferral and informed the airline, however American flew the plane on 10 more revenue flights until the problem was fixed on December 17.

In another incident, the autopilot disconnected during a landing by the same aircraft on December 21. American technicians did not check for the actual problem, and instead deferred maintenance using an inappropriate MEL item. The plane flew another 36 passenger-carrying flights during December 21-31. Airline maintenance later discovered the fault was in a radio altimeter – not the autopilot.

For the violations involving this MD-83, the FAA is proposing a $4.1 million civil penalty.

A different MD-83 experienced an autopilot disconnect on December 27. Although American mechanics correctly diagnosed the problem, they again deferred maintenance under the wrong item of the MEL. As a result, the aircraft operated on four revenue flights without a fully functioning autopilot. The FAA is proposing a $325,000 civil penalty in this instance.

The FAA believes the large total amount of the fine for these violations is appropriate because American Airlines was aware that appropriate repairs were needed, and instead deferred maintenance. In intentionally continuing to fly the aircraft, the carrier did not follow important safety regulations intended to protect passengers and crew.

Also, in May of this year the FAA proposed civil penalties in the amount of $2.7 million in civil penalties against American for alleged past deficiencies in its drug and alcohol testing programs and for allegedly operating aircraft in past years without timely inspections of emergency escape path lighting systems. The amount included $1.7 million civil penalty for the testing program violations and $1 million for the lighting inspection violations.

American Airlines will have the opportunity to respond to the proposed civil penalties.

# Exhibit 11

## CONFIDENTIAL AGREEMENT

1. The United MEC will immediately issue the following statement to all UAL pilots.

MEC statement – August 1, 2008 (to be communicated to all pilots via the MEC update and blast e-mail)

As you are probably aware by now, on July 30 United Airlines filed a lawsuit in federal district court in Chicago alleging that ALPA and individual pilots have engaged in unlawful activity by encouraging pilots to call in sick and to refuse junior/senior manning assignments. The federal judge today set that motion for a hearing on August 27, 2008.

The United MEC is taking this opportunity to confirm its position that pilots should not engage in activities either individually or collectively that may disrupt operations. Specifically, the United MEC and its officers do not condone and strongly oppose calling in sick when you are not ill, refusing to accept junior/senior manning assignments for the purpose of disrupting operations, or pressuring other pilots in any way with respect to their individual decisions to accept junior/senior manning assignments.

If there is a continuation of the sick leave levels that United experienced in July, and if United is unable to obtain pilots who will accept junior/senior manning to avoid flight cancellations, United will argue that it is a justification for the court to issue a preliminary injunction. Please understand that this is a serious matter, and that failure to comply with our legal obligations could have serious consequences.

2. ALPA will issue the following statement to all 767/320/737 First Officers, and work with and support United management in identifying other ways to encourage pilots to accept junior/senior manning assignments.

TO: 767/320/737 First Officers

As you know, the pilot agreement contains a provision providing for junior/senior manning that is designed to assist the company during times of irregular operations and in extraordinary circumstances. The Company alleges and the Court may find that the recent spike in absenteeism in your fleet and seat has gone well beyond the Company's planned absences, which ALPA has reviewed and believes is reasonable. These circumstances have caused the Company to experience irregular operations sufficient to make requests for senior/junior manning appropriate.

3. United states that the number of pilots on sick leave should not exceed the company's August 2008 plan for sick leave on a system-wide basis and on a fleet and seat basis for the B767, A320 and B737-300 First Officer positions. The Company's

system-wide plan for sick leave for the pilot flying month of August 2008 is 426 pilots; which includes 53 B767 FO's, 51 A320 FO's and 23 B737-300 FO's. ALPA will support the Company's efforts to keep sick leave within these levels.

4. The motion for preliminary injunction will be set down for hearing the week of August 25, 2008. United will not seek injunctive relief before then, unless it reasonably believes there is a bona fide emergency situation, in which case United shall first make reasonable efforts to work matters out with ALPA without judicial intervention.


Tom A. Jerman
O'Melveny & Myers LLP
for United Air Lines, Inc.

James Linsey
Cohen, Weiss and Simon
for the Air Line Pilots Association, Int'l

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------------------x
                        :

UNITED AIR LINES, INC.,          :

                        :

               Plaintiff,    :       Civil Action No. 08 CV 4317

                        :       Judge Lefkow

     - v. -               :       Magistrate Judge Denlow

                        :

AIR LINE PILOTS ASSOCIATION,  :

INTERNATIONAL, et al.,     :

                        :

             Defendants   :

                        :
-----------------------------------------------------------------X

## COMPENDIUM OF DEPOSITION EXHIBITS AND EXCERPTS
## FROM DEPOSITION TRANSCRIPTS SUBMITTED BY DEFENDANTS

Michael E. Abram
Joseph J. Vitale
Travis M. Mastroddi
Eyad Asad
Robin H. Gise
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036
(212) 563-4100

Elizabeth Ginsburg
David Semanchik
AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
Legal Department
535 Herndon Parkway
Herndon, VA 20170
(888) 359-2572

Judiann Chartier
KATZ, FRIEDMAN, EAGLE,
EISENSTEIN, JOHNSON & BARECK
77 West Washington Street, Suite 2000,
Chicago, Illinois  60602
(312) 263-6330

Attorneys for Defendants

**<u>Compendium of Deposition Transcript Excerpts and Deposition Exhibits</u>**

Deposition of James Anderson (August 15, 2008)

Deposition of Paul Carslon (August 13, 2008)

- Exhibit 4

- Exhibit 5

Deposition of Robert J. Domaleski (August 14, 2008)

Deposition of Xavier F. Fernandez (August 14, 2008)

Deposition of Anthony R. Freemen (August 13, 2008)

Deposition of Joseph C. Kolshak (August 15, 2008)

- Exhibit 7

Deposition of Jay D. Malone (August 14, 2008)

Deposition of Steven Tamkin (August 13, 2008)

- Exhibit 14

Deposition of Stephen Wallach (August 15, 2008)

- Exhibit 12

- Exhibit 15

- Exhibit 16

- Exhibit 17

- Exhibit 21

Excerpts and Select Exhibits from the
Deposition of James Anderson
August 15, 2008

ANDERSON (3).txt

ROUGH DRAFT                              1


1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3      UNITED AIR LINES, INC.,              )
                                            )
4                       Plaintiff,          )
                                            )
5              vs.                          ) No. 08 CV 4317
                                            )
6      AIR LINE PILOTS ASSOCIATION          )
       INTERNATIONAL; STEVEN M.             )
7      TAMKIN; ROBERT J. DOMALESKI,         )
       JR.; XAVIER F. FERNANDEZ;            )
8      and ANTHONY R. FREEMAN,              )
                                            )
9                       Defendants.         )

10

11             The videotaped deposition of JAMES

12     ANDERSON, called by the Plaintiff for

13     examination, taken pursuant to notice and

14     pursuant to the Federal Rules of Civil

15     Procedure for the United States District

16     Courts pertaining to the taking of

17     depositions, taken before Tina M. Alfaro,

18     Registered Professional Reporter and Notary

19     Public, at the offices of the Airline Pilots

20     Assocation, 9550 West Higgins Road, Rosemont,

21     Illinois, commencing at 9:25 a.m. on the 15th

22     day of August, A.D., 2008.

23

24

25


ROUGH DRAFT                              2

ANDERSON (3).txt

1    APPEARANCES:

2        O'MELVENY & MYERS
         BY: APARNA JOSHI, ESQ.
3            1625 Eye Street N.W.
             Washington D.C. 20006
4            (202) 383-5202

5                On behalf of the Plaintiff;

6        AIR LINE PILOTS ASSOCIATION
         BY: DAVID SEMANCHIK, ESQ.
7            535 Herndon Parkway
             Herndon, Virginia 20170
8            (703) 481-2421

9                On behalf of the Defendants.

10

     ALSO PRESENT: Slawomir Kojro (videographer)
11                 Chuck Vanderheiden (United)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

☐

                    ROUGH DRAFT                3

1        THE VIDEOGRAPHER:  We're going on the

2    video record at 9:25 a.m.  Today's date is

ANDERSON (3).txt

15    the MEC; is that right?

16        A.   Correct.

17        Q.   When were you appointed to chairman

18    of the SPC?

19        A.   January 1st of -- ask the question

20    again, please.

21        Q.   When were you appointed to the -- as

22    chairman of the SPC?

23        A.   Late 2006.

24        Q.   At the same time that it was created;

25    is that right?

ROUGH DRAFT                34

1        A.   Yes.

2        Q.   And did you -- you may have already

3    answered this, but did you seek to be

4    appointed to the SPC?

5        A.   I did not.

6        COURT REPORTER:  I did not?

7        THE WITNESS:  I did not.

8    BY MS. JOSHI:

9        Q.   Do you know how you were chosen to be

10    chairman of the SPC?

11        A.   I do not.

12        Q.   At the time you were asked to be

13    chairman of the SPC, I take it you agreed; is

14    that right?

15        A.   Yes.

16        Q.   And at that time, at the time that

17    you were asked to be chairman of the SPC, were

Page 31

ANDERSON (3).txt

18    you told what the SPC would be doing?

19        A.  It would be preparing the pilots of

20    United Airlines should there be a merger; that

21    the contract would be reopened, and we would

22    need the pilots prepared should that happen.

23        Q.  And did you learn of this in a

24    conversation with the MEC chairman at the

25    time?


                    ROUGH DRAFT                    35


1        A.  Yes.

2        Q.  So with Mr. Bath hoist pa*ern?

3        A.  Yes.

4        Q.  Did you receive any sort of training

5     at the time you were appointed to the SPC

6     chair position?

7        A.  Yes.

8        Q.  And what training did you receive?

9        A.  ALPA National has an SPC seminar.

10       Q.  When did you take that seminar?

11       A.  Late 2006.

12       MR. SEMANCHIK:  I think we're getting

13    close to the edge of strategy.

14    BY MS. JOSHI:

15       Q.  Where did that take place?

16       A.  Memphis.

17       Q.  Who else was in attendance?

18       A.  Strike chairmans from a number of

19    airlines.

ANDERSON (3).txt
25        Q.   Have you ever -- since you've learned

                          ROUGH DRAFT                    101

1        of the Web site, have you visited the Web
2        site?
3                A.   I have not.
4                Q.   Are you aware of a sick-out that
5        occurred in the middle of July of this year?
6                A.   I am not.
7                Q.   Are you aware of any increase in sick
8        leave that occurred in the middle of July of
9        this year?
10               A.   I am.
11               Q.   And who did you understand to be
12       responsible for the increase in sick leave?
13               A.   Glenn Tilton.
14               THE REPORTER:   (TAPE)
15               THE WITNESS:   (TAPE).
16       BY MS. JOSHI:
17               Q.   And how is Mr. Tilton responsible for
18       the increase in sick leave?
19               A.   Well, it is my personal belief that
20       we are furloughing pilots for the second time.
21       It is my personal belief that these pilots
22       will never have -- there's a good possibility
23       that they will never come back to this
24       company, and that if they have any sick list
25       in their bank, that they are going to provide

ANDERSON (3).txt
ROUGH DRAFT                                  102

1   for their families and provide for looking for

2   another job.

3       Q.  Have you discussed this belief with

4   Mr. Wallach?

5       A.  I have not.

6       Q.  Have you discussed this belief with

7   anyone else?

8       A.  Only people that ask me -- no one in

9   particular, you know -- why do you think this

10  is going on.

11      Q.  And by "this is going on," what are

12  you referring to?

13      A.  As far as why, according to what I've

14  read, that the 300 and 320 copilots

15  are -- have an increased amount of sickless

16      Q.  And when you refer to what you've

17  read, what are you referring to?

18      A.  I've read it -- I believe it came out

19  in a company communication.

20      Q.  And your belief is that the reason

21  there is an increase in sick leave usage among

22  the 323 pilots (TAPE) is because of an

23  impending furlough?

24      A.  Yes.

25      Q.  Do you believe that it was an

                                            103
ROUGH DRAFT

ANDERSON (3).txt

18    have -- don't have their name on there that
19    would like to get their name on there or
20    pilots who know people who have their name on
21    there that said, you know, maybe I better
22    start doing the same thing.
23        Q.  Do you -- Strike that.
24            Are you aware of the MEC resolution
25    in January of 2008 in which the MEC resolved

ROUGH DRAFT                    136


1    that it does not endorse the use of junior/
2    senior manning as a manpower planning tool?
3        A.  I am aware of it.
4        Q.  Were you -- was the SPC involved in
5    any way in formulating or drafting the policy?
6        A.  Was not.
7        Q.  Did anyone consult with you prior to
8    drafting the policy?
9        A.  Did not.
10       Q.  Do you have a view as to whether the
11   policy is appropriate?
12       A.  We -- we have a difference of
13   opinion.  The company believes -- we believe
14   that that was -- when it was put in the
15   contract years ago that it was part of a
16   recovery program should the airline fall apart
17   due to weather or other circumstances.  We
18   believe the company has adopted this as a
19   manpower tool, and when they -- and when
20   weather comes around, there's no way to
                        Page 125

ANDERSON (3).txt

21      recover and it's a mess for everyone.

22          Q.  Once the MEC issued the resolution in

23      January of 2008, are you aware of whether

24      pilots' behavior changed?

25          A.  I am not aware.

 

ROUGH DRAFT                137

1           Q.  So you don't know whether pilots

2       stopped accepting junior manning assignments

3       after that point?

4           A.  I'm not aware of that.

5           Q.  Have you had any discussions about

6       the pilot behavior regarding junior/senior

7       manning at any time since the resolution was

8       issued?

9           A.  I have not.

10          Q.  You testified earlier, I believe,

11      that you were not aware of the MEC telling

12      pilots not to waive provisions of the

13      contract; is that correct?

14          A.  Restate the -- or say the question

15      again.

16          Q.  You testified earlier, I believe,

17      that you were not aware of the MEC telling

18      pilots not to waive provisions of the

19      contract; is that correct?

20          A.  It's -- I don't understand the -- I

21      personally don't waive portions of the

22      contract.  So it's not -- it's nothing new to

Page 126

Excerpts and Select Exhibits from the
Deposition of Paul Carlson
August 13, 2008

PAUL CARLSON, AUGUST 14, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED AIR LINES, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 08 C 4317 |
| AIR LINE PILOTS ASSOCIATION | ) | |
| INTERNATIONAL, et al., | ) | |
| Defendants. | ) | |

The deposition of PAUL CARLSON, called for
examination, taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts pertaining
to the taking of depositions, taken before LISA SCHWAM,
CSR No. 840-4650, a Notary Public within and for the
County of Cook, State of Illinois, and a Certified
Shorthand Reporter of said state, at Suite 2400, 131
South Dearborn Street, Chicago, Illinois, commencing, on
the 14th day of August, A.D. 2008, at 9:20 a.m.

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON, AUGUST 14, 2008

Page 2

```
 1     PRESENT:

 2          O'MELVENY & MYERS LLP,

 3          (Times Square Tower, 7 Times Square,

 4          New York, New York  10036,

 5          212-326-2000), by:

 6          MR. MARK W. ROBERTSON,

 7          mrobertson@omm.com,

 8              appeared on behalf of the Plaintiff;

 9

10          UNITED AIRLINES, SENIOR COUNSEL, LAW DIVISION,

11          (77 West Wacker Drive, 16th Floor,

12          Chicago, Illinois  60601,

13          312-997-8230), by:

14          MS. JENNIFER A. COYNE:

15          jennifer.coyne@united.com,

16              appeared on behalf of the Plaintiff;

17

18          COHEN, WEISS AND SIMON LLP,

19          (330 West 42nd Street,

20          New York, New York  10036-6976,

21          212-563-4100), by:

22          MR. MICHAEL E. ABRAM,

23          MABRAM@CWSNY.COM,

24              appeared on behalf of the Defendants;
```

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,  AUGUST  14,  2008

Page 3

```
 1     PRESENT (CONTINUED):

 2

 3         AIR LINE PILOTS ASSOCIATION, INC.,

 4         (9550 W. Higgins Road, Suite 1000,

 5         Rosemont, Illinois  60618,

 6         847-292-1700), by:

 7         MR. JOHN G. SCHLEDER,

 8         JOHN.SCHLEDER@ALPA.ORG,

 9             appeared on behalf of the Defendants.

10

11         ALSO PRESENT:  JENNIFER GONZALEZ, VIDEOGRAPHER,

12                        FIRST OFFICER CULLEN BANKOLE.

13

14

15

16

17

18

19

20

21

22

23

24
```

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON, AUGUST 14, 2008

Page 10

1    talking about August 2008. And you -- Somebody in the

2    Company told you maybe 18 months ago what they were

09:25:56    3    looking at for August 2008 for each fleet in the airline.

4        Would that be a fair assumption on my part that

5    that sort of thing might have happened?

6        A.   Yes.

7        Q.   Okay. And what kinds of -- What would you do

8    once you got some information from, I assume, marketing

9    in the Company as to what the planning shows for various

10   types of aircraft for August 2008?

11       MR. ROBERTSON:  Objection, vague and

12   ambiguous.

13   BY MR. ABRAM:

14       Q.   You may answer.

15       MR. ROBERTSON:  You can answer.

16   BY THE WITNESS:

09:26:27   17       A.   We would -- Like I mentioned before, we would

18   plug that into our proprietary manpower model. The model

19   knows where pilots are today. It would present a plan to

20   train new pilots in the appropriate fleet and seat if the

21   flying level for August of 2008 suggested that.

22       We would also have some other inputs related to

23   how much vacation pilots have been awarded that month.

24   How much additional vacation we plan to award between now

PAUL CARLSON,  AUGUST  14,  2008

Page 11

1    and when the month starts.  Assumption is related to

2    training -- proficiency training -- these kinds of

09:27:00    3    things.

4    BY MR. ABRAM:

5        Q.    How many different assumptions do you have to

6    build into or are built into the model?

7        A.    The assumptions that we would build in are

8    solely because we are, say, 18 months out in your

9    example.  As we get closer, we know exactly where pilots

10    are, where they're trained, and then when we get to the

11    month of, most of those assumptions have been eliminated

12    and we're down to this is the number of pilots that we

13    have to fly this schedule.

14        Q.    When you're planning for how many pilots you

09:27:27    15    need in a fleet and seat, say, 18 months out, do you take

16    into account the likely level of sick usage for that

17    month?

18        A.    Yes.  One of the entries in the manpower model

19    is a sick leave forecast.

20        Q.    What are the other manpower forecasts that go

21    into the model, other than sick leave forecasts?

22        A.    We also have reserve pilots that we use for

09:27:58    23    events like military drops that happen after the months

24    start, for weather, for trip drops.  We have a

PAUL CARLSON, AUGUST 14, 2008

Page 12

1    contractual provision called Life Events where pilots can

2    drop trips.

3           So we have reserve staffing levels to pick up

4    those type of activities.

5       Q.   How do you go about making assumptions about

6    these items as you just talked about?

7       A.   We would have what I would call two

09:28:28    8    forward-looking metrics and then one backward looking

9    metric.  The two forward-looking metrics, first of all,

10   in the pilot contract, we have a minimum-staffing

11   requirement that we have to adhere to.  So that would be

12   a forward-looking requirement that we apply that

13   minimum-staffing level to the flying that we have for the

14   month ahead.

15          Then we -- Since we staff over that

16   minimum-staffing level, we'll also look to see what

17   our -- what the ALPA System Scheduling Committee is

18   saying about the month, and they'll provide some

19   forward-looking guidance on whether they think the

09:29:00    20   staffing is appropriate or not.

21          And then the backward-looking metric is:  How

22   did the month turn out?  Did we have to cancel any

23   flights because of staffing-related reasons?  How many of

24   those cancellations were there?  And what kind of

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON, AUGUST 14, 2008

Page 13

1       adjustments, either up or down, do we have to make going

2       forward?

3           Q.   When do you make assumptions regarding

09:29:26    4   absences, sick leave or any other kinds of absences, with

5       respect to a month for which you're planning?

6           MR. ROBERTSON:  Objection, incomplete

7       hypothetical.  You can answer.

8       BY MR. ABRAM:

9           Q.   Let me rephrase it then.  Do you make

10      assumptions about various kinds of absences, including

11      sick leave?

12          A.   Yes.

13          Q.   As you're planning for a particular month?

14          A.   Yes.

15          Q.   And when do you start to do that for that month

16      that you're planning for?

09:29:58    17      A.   As they're inputs to the long-term outlook, we

18      would start making those assumptions at the same point

19      that we got the corporate flying level and started

20      looking at our overall staffing plan.  We would then

21      refine those assumptions as we got closer until we got to

22      the point that we could no longer do so because we were

23      close enough to be locked in for the number of pilots and

24      the flying that we have.

PAUL CARLSON, AUGUST 14, 2008

Page 14

09:30:30

1    Q.    Let's say for August 2008.  When did you first

2    make an assumption about the level of sick leave absences

3    for each of the fleets and seats for August 2008?

4    A.    When we started doing the annual budget work

5    around August or September of 2007, we would have started

6    focusing on that.

7    Q.    When would you have done it for January 2008?

8    About the same time?

09:30:59

9    A.    A little bit earlier because it's earlier in

10    that budget year.  But in the sense that we would have

11    kind of a rolling six-month look regardless of the budget

12    process.  January would have popped up a little bit

13    earlier on our forecast and then August.

14    Q.    Let me direct your attention then for a moment

15    to the subject of another potential assumption that I'd

16    like to discuss with you.  And that is the Company's --

09:31:31

17    the way in which the Company fills unplanned absences

18    among pilots.

19        What would be an unplanned absence, in your

20    parlance?

21    A.    The broadest definition of an unplanned absence

22    is one that happens after we award the monthly schedules

23    for the month.  So we have a pilot-bidding system that we

24    use, and if we know about the absence before then, then

PAUL CARLSON,  AUGUST  14,  2008

Page 15

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | we would call that plan because we would build schedules |
| 09:31:59 | 2  | taking that into account.                                |
|          | 3  | An absence that happened after that would be an          |
|          | 4  | unplanned absence.                                       |

5    Q.   All right.  And an unplanned absence can lead

6    to an unplanned shortage?  Would that be a fair

7    statement?

8    A.   If it was a high enough level, yes, it could.

9    Q.   Do you assume in your planning for a month --

10    your manpower planning -- do you make an assumption about

11    a level of unplanned absences?

09:32:27    12    A.   Of course.  Since sick leave, for example, is

13    typically not known at the time that we award schedules,

14    we make an assumption for what that is going to be, and

15    that would typically all be in the category of unplanned

16    absences.

17    We also know that we historically have a

18    certain level of military leave absences that we find out

19    on an unplanned basis.  So that's accommodated for in our

20    planning.

21    Q.   Are there any other kinds of unplanned absences

22    for which you make accommodation in your planning?

09:33:00    23    A.   A lot of the smaller categories would be

24    grouped into our overall reserve staffing.  We might have

PAUL CARLSON,  AUGUST  14,  2008

Page 16

1    jury duty.  We might have life event drops.  We might

2    have drops on a particular weekend related to trip

3    trading or these types of things.

4         But there's a lot of smaller categories that we

5    would put in our reserve assumption.

6         Q.   There's a variety of events that can lead a

7    pilot to drop a trip to which that's been assigned to him

09:33:28   8    and do so during the month; is that correct?

9         A.   Correct.

10         Q.   All right.  Or at least to do so after he's

11    been awarded the flying for that month?

12         A.   Correct.

13         Q.   All right.  And we're talking about events that

14    occur basically to line holders or are you also talking

15    about events that occur to reserve pilots?

16         A.   The events can happen to any pilot.

17         Q.   What's the difference between a line holder and

18    a reserve?

19         A.   A line holder is a pilot that has a schedule or

09:33:58   20    a sequence of trips to fly for the month coming out of

21    our bidding system.  A reserve is a pilot that has a

22    series of days on of reserve requirements coming out of

23    our bidding system.

24         Q.   Now, in building your plan for a particular

PAUL CARLSON, AUGUST 14, 2008

Page 17

1    month and recognizing that there will be, what you call,

2    unplanned absences during the month, how do you quantify

3    the expected level of unplanned absences?

09:34:33    4        A.   For some of the unplanned absences, they are

5    built into the minimum-staffing requirement that the

6    contract specifies that we staff to.

7            The other unplanned absences, we'll look at a

8    historical analysis or if we know of any unusual events

9    coming up, we'll factor that in as well.

10       Q.   What would be an example of an unusual event?

11       A.   Sometimes we would see military leave spike up

09:34:58    12   at the end of the government budget year so we might

13   expect our military leave to be higher, say, in September

14   than it might be in October.

15       Q.   So that's something you've seen in the past and

16   you build that in for your -- in your plan for

17   September?

18       A.   Right.

19       Q.   Do you -- Are there any other items for which

20   you use historic data in order to make that kind of

21   plan?

09:35:29    22       A.   No.

23       Q.   Okay.  Now, is it fair to say that the cadre of

24   reserve pilots is one of United's tools for dealing with

PAUL CARLSON, AUGUST 14, 2008

Page 18

1    unplanned absences during the month?

2        A.   Yes.

3        Q.   And the Company attempts to have enough reserve

4    pilots to be able to deal with most of the unplanned

09:35:58  5    absences?  Would that be fair?

6        A.   That would be fair.  We would have enough

7    reserves to cover what our forecasted level is and

8    hopefully enough to even go a slight amount over our

9    forecasted level.

10        Q.   You're familiar, I'm sure -- I know you are --

11    with the subject called junior/senior manning?

12        A.   Yes.

13        Q.   And was that something that was in place when

09:36:27  14    you first came to United Airlines?

15        A.   Yes.

16        Q.   Were you party to the negotiations of the

17    junior/senior manning system at United Airlines?

18        A.   No.

19        Q.   And is -- was or junior/senior manning in

20    United's view -- Withdrawn.

21             Is junior/senior manning in United's view one

22    of the tools available to it for dealing with unplanned

09:36:59  23    absences during the month?

24        A.   We would expect to use junior/senior manning as

PAUL CARLSON,  AUGUST  14,  2008

Page 21

1    expected level of junior/senior manning?

2        A.    There is no entry in the manpower model for the

3    junior/senior manning amount.  It's not a dial that we

4    can turn up and down.  It's not a parameter in the m

5    odel.

6             We would instead more react to any environment

7    that we would know about.  And if we felt that there were

09:39:59    8    reasons why junior/senior manning might be higher or

9    lower, we would react to that.

10            But there wouldn't be any specific entry in the

11    manpower model for senior/junior manning.

12        Q.    Has that been true ever since you came to

13    United Airlines?

14        A.    Yes.

15        Q.    In the year 2006, you were engaged in the same

16    work that you're doing now; is that correct?

17        A.    Yes.

09:40:25    18        Q.    Right.  At that time, did you come to observe

19    any change in the rate at which pilots accepted offers of

20    junior/senior manning?

21        A.    Absolutely.

22        Q.    When did that take place?

23        A.    It began in the summer of 2006 and has

24    continued to decline steadily ever since.

PAUL CARLSON,  AUGUST  14,  2008

Page 22

1        Q.    Did you first -- Did you observe a decline in

2    the summer of 2006?

3        A.    Yes.

09:40:58    4        Q.    What did you -- What did you do in your work to

5    address that decline?

6        MR. ROBERTSON:  Objection, calls for a

7    narrative.

8        MR. ABRAM:  It does call for a narrative,

9    but I think that's a fair thing to ask for.  So

10    please.

11        MR. ROBERTSON:  You can answer.

12    BY THE WITNESS:

13        A.    As I mentioned in my declaration, we have

14    increased our reserve percentage to take in account the

15    overall environment, including the senior/junior man

16    decline.

17    BY MR. ABRAM:

09:41:25    18        Q.    When did you increase the reserve percentage to

19    address the reduction in junior/senior manning?

20        A.    My recollection is that we started to do that

21    in September of 2006, and it's been continuing

22    throughout.

23        Q.    Well, have you continued to increase the

24    reserve level in each category?

PAUL CARLSON,  AUGUST  14,  2008

Page 23

1       A.    That's correct.

2       Q.    What is it on average for August 2008?

09:41:59    3       A.    The reserve staffing, independent of our sick

4    leave forecast, in August of 2008, I believe, averages

5    around 18 or 19 percent of the overall staffing.

6            When our sick leave staffing is added to that,

7    because they are mixed together at the end of the day

8    when we come out of our bidding system, that number would

9    be somewhere between 25 and 30 percent.

10       Q.    What do you mean by "sick leave staffing"?

09:42:28   11       A.    Well, our forecast for -- Our forecast for sick

12    leave is implemented through having reserve pilots to

13    cover that sick leave.  So we have -- Our staffing for

14    our reserves is primarily built on our general reserve

15    forecast, as well as our sick leave forecast.

16            But when reserves are given schedules and come

17    out of the bidding system, there is no distinguishing

18    between reserves at that point.

19       Q.    A reserve is a reserve?

20       A.    Correct.

21       Q.    Available for whatever appropriate

22    assignment?

23       A.    Right.

09:43:01   24       Q.    When do you decide how many reserves to have in

PAUL CARLSON,  AUGUST  14,  2008

Page 28

| | | |
|---|---|---|
| 09:49:07 | 1 | Q.   Did there come a time in the course of 2008 |
| | 2 | when you changed the reserve assumptions with respect to |
| | 3 | any particular months for which you were still |
| | 4 | planning? |
| 09:49:27 | 5 | A.   I believe all of the assumptions were |
| | 6 | determined by the end of the calendar year 2007. |
| | 7 | Q.   As a year goes on and you see various things |
| | 8 | occurring on the airline or in the industry, do you |
| | 9 | attempt to adjust your planning with respect to months |
| | 10 | that are coming up for which you've already made plans? |
| | 11 | A.   We could. |
| | 12 | Q.   You can do that.  Do you do so? |
| | 13 | A.   We can do that in some months.  For some of the |
| | 14 | months where our peak flying months, we have limited |
| 09:49:59 | 15 | ability to make changes on a close-in manner.  But other |
| | 16 | months we would have a greater ability to do that. |
| | 17 | Q.   When did you first learn that United Airlines |
| | 18 | was likely to be starting a process of grounding aircraft |
| | 19 | in 2008? |
| | 20 | A.   I would say that I initially heard that around |
| 09:50:29 | 21 | May 1st.  Maybe the last week of April. |
| | 22 | Q.   Do you remember who you heard it from? |
| | 23 | A.   I either heard it from my direct supervisor or |
| | 24 | at a biweekly meeting that we have with the marketing |

PAUL CARLSON,  AUGUST  14,  2008

Page 29

1      group to talk about the upcoming flying.

2          Q.   Who is your direct supervisor?

3          A.   At the time -- Right now he is Joe Kolshak.  At

09:50:58  4      the time, it was Sean Donohue.

5          Q.   So you report directly to the Senior Vice

6      President of Operations?

7          A.   Correct.

8          Q.   And then you mentioned you also have a biweekly

9      meeting to review upcoming flying?

10         A.   Correct.

11         Q.   And who do you have that meeting with?

12         A.   Representatives from the marketing or Aircraft

13     Scheduling Group.

14         Q.   Is Aircraft Scheduling part of the marketing

15     department or is that a different group?

16         A.    At United, the marketing group is technically

09:51:28  17     more of the sales and promotions group.  But generically,

18     I would call it the Aircraft Scheduling Group marketing.

19     But at United they're called the Aircraft Scheduling

20     Group so ...

21         Q.   They are what we would think of as people who

22     figure out how many seats to sell to whom and where and

23     when?

24         A.   Correct.

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,  AUGUST  14,  2008

Page 30

1     Q.   Okay.  And that's the information you need to

2   have in order to figure out how many pilots you need to

3   have in any particular seat and fleet?

4     A.   Correct.

09:51:58   5     Q.   So you have this biweekly meeting with this

6   Aircraft Scheduling Group.  And how -- Are you getting --

7   In these meetings, are you getting from them information

8   about the upcoming month or are you getting information

9   about a year out or both?

10     A.   Both.

11     Q.   Okay.  So they might tell you in one of these

12   meetings, next month we're going to be doing more flying

13   than we told you or less flying than we told you,

14   something like that?

09:52:28   15     A.   Next month would be a little close in for them

16   to make changes, but not unprecedented in certain

17   circumstances.

18        But typically we're talking from probably three

19   months to a year out, typically.

20     Q.   Obviously, after some major event, you can have

21   a significant change in plans that can be pretty

22   rapidly -- there's a need to rapidly respond to; is that

23   correct?

24     A.   Would not be unprecedented.

PAUL CARLSON,  AUGUST  14,  2008

Page 31

1      Q.    When you were at Northwest during the 9/11

2    events?

3      A.    9/11, SARS, both those events caused a fairly

09:53:00    4    dramatic, rapid change.

5      Q.    And the Iraq War was another event that some

6    people responded to in the industry?

7      A.    Don't recall that personally, but could have

8    happened.

9      Q.    Okay.  All right.  And so, say, after 9/11,

10   Northwest Airlines, for which you were working, made

11   decisions to rapidly reduce flying in a number of its

12   markets -- or really overall.

13     A.    Correct.

09:53:27   14     Q.    Okay.  So let's take this period around

15   May 1st, I think you said --

16     A.    Uh-huh.

17     Q.    -- with regard to the current plan of United

18   Airlines to draw down flying.

19     A.    It wasn't the current plan at that time.  It

20   was the first time that I heard about some level of

21   aircraft groundings.  Was the answer to the question.

22     Q.    Okay.  Very good.

23          What did you hear about -- What level did you

24   hear it, I should say?

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,  AUGUST  14,  2008

Page 34

09:56:57      1       announcement of taking out 30 airplanes on your staffing

2       assumptions other than -- on your short-term staffing

3       assumptions, I should say?

4             For example, just to be specific about it, did

5       you discuss that this might impact how pilots felt about

6       coming to work?

7          MR. ROBERTSON:  Objection, vague and

8       ambiguous and multiple questions.

9       BY MR. ABRAM:

10          Q.   I'll just ask one.  Did you have any

11       discussions about whether that decision to take out 30

09:57:27     12       airplanes would have any impact on how pilots felt about

13       coming to work?

14          MR. ROBERTSON:  I was just confused about

15       what meeting you're talking about, Mike.

16          MR. ABRAM:  I'm sorry.  I'm talking about

17       your meeting around May 1st.  Thank you.

18       BY THE WITNESS:

19          A.   With the aircraft scheduling group?

20       BY MR. ABRAM:

21          Q.   Right.

22          A.   No.  We did not have that conversation.

23          Q.   Did you have a conversation about that with

24       your own group?

PAUL CARLSON,  AUGUST  14,  2008

Page 35

1       A.   No, not to my knowledge.

2       Q.   Did there come a time that the number 30 came

09:57:58    3   to your attention to be larger than 30?

4       A.   Yes.

5       Q.   When did that happen?

6       A.   In the last two weeks of May.

7       Q.   All right.  Again, a meeting with Aircraft

8   Scheduling?

9       A.   Either a meeting or a phone call.  If there's

10   news that we need to hear about, we often don't wait

11   until the scheduled time to find out that information.

12       Q.   Do you remember who told you?

09:58:29    13      A.   It would either have been my boss at the time

14   or my counterpart in Aircraft Scheduling.

15       Q.   Your boss at the time was Sean Donohue still?

16       A.   Sean Donohue.

17       Q.   Do you remember what you were told?

18       A.   I was told that the entire 737 fleet would be

19   grounded by the end of 2009.

20       Q.   And how many aircraft is that?

21       A.   I believe that's about 94 aircraft.

09:59:02    22      Q.   Were you told why?

23       A.   I was told that it was due to the price of oil

24   and the economics of flying those airplanes.

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,  AUGUST  14,  2008

Page 36

| | | |
|---|---|---|
| | 1 | Q.    Okay.  Were you told anything about any other |
| | 2 | airplanes? |
| | 3 | A.    There were also six 747s that were going to be |
| | 4 | grounded as well. |
| | 5 | Q.    Okay.  And same reasons? |
| | 6 | A.    Yes. |
| 09:59:30 | 7 | Q.    Did you have any discussions with whoever spoke |
| | 8 | to you about that initially, about the impact of that |
| | 9 | decision on pilots' feelings about coming to work? |
| | 10 | A.    No. |
| | 11 | Q.    Did you have any discussions on that question |
| | 12 | with anybody after you learned about the plan to reduce a |
| | 13 | hundred airplanes? |
| 09:59:58 | 14 | A.    Not in the context about reducing the |
| | 15 | airplanes, no. |
| | 16 | Q.    In what context? |
| | 17 | A.    Can you repeat the question. |
| | 18 | Q.    The question is whether you had discussions |
| | 19 | with people about pilots' attitudes about coming to work. |
| | 20 | And this would be in the May time frame, say. |
| | 21 | A.    Yeah.  Not discussions specifically about |
| 10:00:30 | 22 | attitudes of coming to work, but discussions about the |
| | 23 | impact of the news on the operation overall. |
| | 24 | Q.    The impact of the news of a hundred airplanes |

PAUL CARLSON,  AUGUST  14,  2008

Page 37

1    leaving the fleets, leaving the Company?

2         A.    Correct.

3         Q.    And this was before the announcements were

4    made; is that correct?

5         A.    Before the public announcements were made?

6         Q.    Yes.

7         A.    Possibly, but not by more than a few days

8    before the announcements were made.

10:01:00    9         Q.    Who did you have the discussions with about the

10    impact of this decision on --

11         A.    My boss at the time, Sean Donohue.

12         Q.    Do you remember what you and he discussed?

13         A.    Like I said, we discussed the -- just the

14    overall impact to the operation, the reliability of the

15    operation, given the news about the fleet adjustments.

16         Q.    First, what would be the reason to have a

10:01:29    17    relationship between the announcement of the fleet

18    reductions and the reliability of the operation?

19         MR. ROBERTSON:  Objection, vague and

20    ambiguous.

21    BY THE WITNESS:

22         A.    Can you repeat the question.

23    BY MR. ABRAM:

24         Q.    Sure.  Let me see if I can rephrase it.

PAUL CARLSON,   AUGUST   14,   2008

Page 38

1        In your mind, why was there a relationship

2  between the announcement of this fleet reduction and

3  operational reliability?

10:01:58    4     A.   The reduction at that point was of such a size

5  that furloughs were certainly in the cards, so to speak.

6  And I was concerned that that anticipation or news would

7  impact our ability to cover all of our flights.

8     Q.   And you expressed that concern to Captain

9  Donohue?  Is it Captain Donohue or Mr. Donohue?

10     A.   Mr. Donohue.  I did.

11     Q.   And what did Mr. Donohue say?

12     A.   I don't recall.

10:02:29   13     Q.   Did you express that concern to anyone other

14  than Mr. Donohue?

15     A.   I don't believe so.

16     Q.   Did you -- Just to help you with that, you

17  don't remember discussing that concern with members of

18  your staff?

19     A.   I don't believe I did.

20     Q.   And why did you think that there was -- that

10:02:59   21  the potential for furloughs would have an impact or could

22  have an impact on operational reliability?

23     A.   Because the news of the furloughs would be

24  negative news to the pilot group.  And they may express

PAUL CARLSON, AUGUST 14, 2008

Page 39

1    that in ways that would impact the operation.

2         Q.    For example?

3         A.    For example, calling in sick.

4         Q.    So increase usage of sick leave might be an

10:03:28    5    effect of a furlough announcement?

6         A.    Yes.

7         Q.    Any others?

8         A.    There possibly could be some other operational

9    disruptions, but not of the type that would be in my

10   purview.

11        Q.    Not that would affect your staffing of the

12   airplanes?

13        A.    Right.

14        Q.    Okay.  So with respect to the sick leave usage,

10:03:58   15   did you take any steps -- Withdrawn.

16             When were you told that the announcement of

17   these aircraft reductions would be made?

18        A.    So the last week of May I was told that the

19   announcement would be made the following week.  First

20   week of June.

21        Q.    Did you take any steps to adjust your manpower

10:04:31   22   staffing for pilots for June, July or August in light of

23   your concern about the impact of the announcements on

24   operational -- on staffing?

PAUL CARLSON, AUGUST 14, 2008

Page 50

1    A.   I'm not aware of the details of the combination

2    of the shortages.

3    Q.   Okay.  Now addressing your attention to

10:31:56   4    paragraph 11 of your declaration.  Paragraph 11.  You

5    refer to "a significant increase in pilot sick calls."

6    And you said, "In May of 2008, the highest number of

7    pilots on the sick list on any given day was 350."

8    And that's for all pilots; is that correct?

9    A.   That's correct.

10:32:27   10    Q.   And was that number 350 lower than your plan

11    for May of 2008?

12    A.   I would say no.  I believe our May plan would

13    have been a little lower than that, but somewhere -- My

14    recollection is that it would be somewhere in that 325 to

15    350 range.

10:32:59   16    Q.   So it's pretty close?  The 350 was pretty close

17    to your plan?  Withdrawn.

18    Let me ask this question:  The number you said,

19    325, 350, that's intended to be a daily average or a

20    monthly average?  An average for the month or an average

21    per day?  How does that work when you talk about that

22    number?

23    A.   Yes.  It's a monthly average.

24    Q.   Okay.  So on any day it might be expected to be

PAUL CARLSON, AUGUST 14, 2008

Page 51

1    higher, and other days it might be expected to be

2    lower?

3        A.   Correct.

10:33:27    4        Q.   On the day when it was 350 -- Or you said on

5    any given day, so let me ask it this way:  Was there more

6    than one day when it was 350?

7        A.   I don't recall.

8        Q.   On the day -- at least one day that it was 350,

9    was that higher or lower than planned for that day?

10       A.   The plan that we have for the sick list is a

11    monthly number.  And then we don't vary the sick list

12    plan by day.

10:33:59    13        Q.   You might vary the reserve staffing by day, but

14    not the sick list plan?

15       A.   Correct.

16        Q.   Okay.  What happened -- Withdrawn.

17            Were you aware of anything happening on or

10:34:29    18    about June 5th that in your judgment had any relationship

19    to the -- what you observed as an increase in sick leave

20    usage?

21       A.   I believe we've established that before that

22    that first week of June was the announcement of the final

23    grounding -- fleet grounding plan.

24        Q.   So based upon your previous testimony, would it

PAUL CARLSON,   AUGUST   14,   2008

Page 52

| | | |
|---|---|---|
| 10:34:58 | 1 | be fair to say that you were not surprised that the |
| | 2 | number of sick calls began to go up after that |
| | 3 | announcement? |
| | 4 | MR. ROBERTSON:  Objection, vague and |
| | 5 | ambiguous. |
| | 6 | BY THE WITNESS: |
| | 7 | A.   I would say that I was not surprised that it |
| | 8 | went up.  No, I was not surprised that it went up. |
| | 9 | BY MR. ABRAM: |
| | 10 | Q.   Okay.  And you mentioned that the number went |
| 10:35:25 | 11 | up.  As you say, it "began a steady and swift increase." |
| | 12 | And this is a list of all of the pilots; is |
| | 13 | that correct? |
| | 14 | A.   That's correct. |
| | 15 | Q.   And then in the next paragraph, you refer to in |
| | 16 | the fourth line -- this is paragraph 12 of your |
| 10:35:59 | 17 | declaration -- to a spike in sick leave, which you said |
| | 18 | was the most recent spike. |
| | 19 | What was the period covered by that most recent |
| | 20 | spike in your declaration? |
| | 21 | A.   I believe that would be the month of July. |
| | 22 | Q.   For the whole month of July? |
| 10:36:29 | 23 | A.   I believe so, yes. |
| | 24 | Q.   Okay.  Let's do this because we've had a lot of |

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,   AUGUST   14,   2008

Page 56

1    and 777 first officers.   767 captain and first officer.

2    The A320 -- Or Airbus 320 -- captains and first officers.

3    And the Boeing 737 captains and first officers.

4         A.   Correct.

5         Q.   And which of these fleets are the ones that are

6    identified by the announcement made on June 4th

10:40:57   7    concerning the grounding of aircraft?

8         A.   Because of the nature of pilot seniority and

9    the impact that placing 737 captains in their new

10   assignments, I would say that except for the wide-body

10:41:24   11   captain positions and the 767 captain position, a lot of

12   them would have been impacted by it.

13        Q.   Okay.   So I was a little vague in my question.

14   I guess most narrowly, the specific fleets that were

15   effected by the grounding announcement were the 300?

16        A.   The fleets that were announced to be grounded

17   were the 300 and the 747.

18        Q.   But what you're saying is with respect to the

19   furlough results from the grounding, that was going to

10:41:59   20   take place, including pilots, in the 767 first officer

21   and 320 first officer and 300 first officer categories;

22   is that correct?

23        A.   We would not expect to be furloughing any other

24   pilots than from those three places that you mentioned.

PAUL CARLSON, AUGUST 14, 2008

Page 57

1          Q.    But you would be expecting to furlough pilots

2     from among those three categories?

3          A.    Correct.

10:42:29    4          Q.    Okay.  Now, you mentioned in your declaration,

5     you said that the sick leave usage began a steady and

6     swift increase on June 5.

7                And in looking at the data, where do you see

8     that increase beginning?

10:43:02    9          A.    I believe it would be June 5.

10          Q.    Okay.  And which categories do you see it?

11          A.    The declaration was referring to the overall

12     number on the left-hand column.

13          Q.    So on June 5, the number went from 319 to 327.

10:43:28   14          A.    Right.  So the declaration said that since

15     June 5th, so June 5th was 327.  There was a steady and

16     swift increase from that point.

17          Q.    Okay.  So you meant to say that June 5th was

18     your baseline for measuring the increase; is that

19     correct?

20          A.    I don't know if we formalized a baseline and

10:43:55   21     all these things, but June 5th was the point that we tied

22     the sentence into which tied into the announcement of the

23     fleet groundings.

24          Q.    Okay.  Then in going down the data, you were

PAUL CARLSON,  AUGUST  14,  2008

Page 58

1    looking at the left-hand column and saying there was an

2    increase all the way up through the month of June.  You

10:44:26    3    went from 327 on June 5th and ended up with 484 on

4    June 29th; is that correct?

5        A.    Correct.

6        Q.    And is that the increase that your declaration

7    was referring to?

8        A.    No.  We touched to the next day which is not

9    shown here, to the 497 on June 30th.

10        Q.    All right.  That's fair enough.

10:44:59    11        In fact, why don't we take a look at that

12    because we show that on another sheet for a different bid

13    month.

14        MR. ABRAM:  We could mark this, please, as

15    ALPA Exhibit 5.  One-page sick leave data for

16    July 2008 bid month.

10:45:32    17        (ALPA Exhibit 5 marked as requested.)

18    BY MR. ABRAM:

10:46:03    19        Q.    Okay.  So I can represent to you again that

20    ALPA Exhibit 5 is a depiction of the data that United

21    Airlines supplied to ALPA for the July 2008 pilot bid

22    month.

23        And just before we get into it, I'll ask you to

24    review it and tell me if you recognize it to be such.

PAUL CARLSON, AUGUST 14, 2008

Page 59

| | 1 | A. I believe it is, yes. |
| 10:46:27 | 2 | Q. Okay. So here we have June 30th is shown on |
| | 3 | the first day of the July bid month. And that's the 497 |
| | 4 | number that you referred to; is that correct? |
| | 5 | A. Right. |
| | 6 | Q. Okay. Did you find that the increases in the |
| | 7 | month of June that you referred to were concentrated in |
| | 8 | any particular categories? |
| | 9 | A. Yes. |
| | 10 | Q. What were they? |
| 10:46:58 | 11 | A. Mainly the 320 first officer and the 300 first |
| | 12 | officer. |
| | 13 | Q. Okay. And as I am looking at the data for the |
| | 14 | 300 first officer on the far right, I am seeing an |
| | 15 | increase from starting on June 5 of 19 and then ending up |
| 10:47:28 | 16 | on June 30th of 44; is that correct? |
| | 17 | A. Correct. |
| | 18 | Q. But in the meantime, the number had gone as |
| | 19 | high as 48 earlier in the last week of June. |
| | 20 | A. Correct. |
| | 21 | Q. And then it declined leading to the end of the |
| | 22 | month; is that correct? |
| | 23 | A. Correct. |
| 10:47:58 | 24 | Q. So in one sense, at least in that category, the |

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,  AUGUST  14,  2008

Page 60

1    increase was perhaps not steady.  It was up and then down

2    and then up again?

3        A.    Correct.

4        Q.  ˙ What about in the 300 -- Excuse me, the 320

5    first officer group, we started out on June 5th with 33

10:48:29    6    and ended up there with 75; is that correct?

7        A.    Correct.

8        Q.    And here, too, the number had gone to as high

9    as 81 on June 27?

10        A.    Correct.

11        Q.    And also on June 24th; is that correct?

12        A.    Correct.

13        Q.    Now, all of these increases -- Withdrawn.

10:49:04    14            Your declaration on paragraph 12, refers to,

15    again, to the most recent spike, largely driven by pilots

16    who serve as first officers on United's narrow-body

17    Airbus 320 and Boeing 737 aircraft.  That's paragraph 12.

10:49:29    18            And again, that spike was the spike in July of

19    2008?  Is that the spike you're referring to?

20        A.    I believe that now that I've seen the data, the

21    most recent spike would just be generally the increase

22    over the entire period.

23        Q.    So the increase for June and July?

24        A.    I believe so, yes.

PAUL CARLSON, AUGUST 14, 2008

Page 61

| | | |
|---|---|---|
| 10:49:58 | 1 | Q. All right. So do you see any distinction in |
| | 2 | the data between June and July in regard to the sick |
| | 3 | leave usage among the copilots on the 300 and the 320? |
| | 4 | A. Yes, I do. |
| | 5 | Q. Where do you see that? |
| | 6 | A. On the 300 first officer. |
| | 7 | Q. Okay. Could you explain, please. |
| 10:50:28 | 8 | A. From a starting point of 44 on June 30th, up to |
| | 9 | a high of 66 on July 20th. |
| | 10 | Q. Okay. So you're comparing those first officers |
| | 11 | to -- Withdrawn. |
| | 12 | Are you saying that the experience in July was |
| | 13 | different from what it was in June? |
| | 14 | A. Yes. |
| | 15 | Q. Okay. And so would you specifically show where |
| | 16 | you see that difference appearing. |
| 10:51:04 | 17 | A. In June, the sick leave ranged from 16 up until |
| | 18 | about 46 or 48. And then in July, the upper bound was |
| | 19 | much higher up at about 65 or 66. |
| | 20 | Q. Okay. So the high point of 48 that was reached |
| | 21 | on June 25th for the 300 or the 737 first officers, was |
| 10:51:28 | 22 | reached again in July on -- Well, you reached 49 on |
| | 23 | July 10th; is that right? |
| | 24 | A. Yes. |

PAUL CARLSON, AUGUST 14, 2008

Page 62

1    Q.    And then after that you began to see a further

2    increase in the sick leave usage among the 737 first

3    officers; is that correct?

4    A.    Correct.

5    Q.    So would it be fair to say that in your view,

10:51:59    6    there was a spike in July in the 737 first officers that

7    started on or around July 12th?

8    A.    I believe that at that point we were already in

9    the midst of a spike.  But in the sense that it kept

10    going, I believe the data would show that.

10:52:26    11    Q.    All right.  But would it -- It would show that

12    the first time in this entire period that the number 50

13    was reached was actually the weekend of -- well, Sunday,

14    July 13th; is that right?

15    A.    I believe the data shows that, yes.

16    Q.    And then from that point forward, the numbers

17    were in the 50s and higher for that group for the rest of

18    July; is that correct?

19    A.    The exhibit shows that, yes.

20    Q.    All right.  Thank you.

10:53:00    21    And are you aware of any reason why the number

22    that had been in the 40s for some several days -- a

23    couple of weeks really -- before July 12th, July 13th,

24    why that number started going into the 50s on

PAUL CARLSON,  AUGUST  14,  2008

Page 63

|            |    |                                                            |
|------------|----|------------------------------------------------------------|
|            | 1  | July 13th?                                                 |
|            | 2  | A.   I am not aware of any reason.                         |
| 10:53:34   | 3  | MR. ABRAM:  Okay.  Let's take a break because we're        |
|            | 4  | about to run out of tape.                                  |
|            | 5  | THE VIDEOGRAPHER:  Going off the record at                 |
| 10:53:39   | 6  | 10:53 a.m. .                                               |
|            | 7  | (Recess was taken.)                                        |
| 11:12:20   | 8  | THE VIDEOGRAPHER:  Okay.  We're back on the                |
|            | 9  | record at 11:21 a.m.  This is Tape No. 2.                  |
|            | 10 | BY MR. ABRAM:                                              |
| 11:21:29   | 11 | Q.   Mr. Carlson, let me direct your attention back        |
|            | 12 | to paragraph 12 of your declaration.  And again, the       |
|            | 13 | sentence that refers to, "This most recent spike in sick   |
|            | 14 | leave."                                                    |
|            | 15 | Do you see that sentence again?                            |
|            | 16 | A.   Yes.                                                  |
|            | 17 | Q.   Now, by saying, "This most recent spike," is it       |
|            | 18 | fair to say that you were intending to refer to something  |
|            | 19 | that had happened -- that had started just before the      |
|            | 20 | time of your declaration?                                  |
| 11:22:02   | 21 | A.   Let me read the paragraph 12, if I could, and         |
|            | 22 | I'll answer your question.                                 |
|            | 23 | I believe the intent of the declaration was to             |
|            | 24 | point back to June, especially as the sentence after that  |

6e6397e0-6ab8-453a-bf0b-100beef8a616

PAUL CARLSON,   AUGUST   14,   2008

Page 64

11:22:29    1    says that, "The sick list has remained significantly

2    above what is considered normal or typical."

3        And so we're referring to that period that is

4    above normal or typical, which happened in the middle of

5    June.

6        Q.   So just to be clear, your understanding -- It's

7    your declaration, and so I'm trying to get your

8    understanding -- of the sentence that says, "This most

9    recent spike in sick leave," that sentence refers to the

10    entire period beginning in early June?

11:23:20    11        A.   I'm not exactly sure when I wrote that if I was

12    referring to the period immediately preceding it or if I

13    was referring to the entire period.

11:23:29    14        Q.   And would your testimony now be that it

15    describes the entire period?

16        A.   If I set aside the declaration and look at the

17    data, I believe that it was speaking up in June and then

18    continued to spike in July.

19        Q.   Well, the word "spike" to me represents in the

20    data world kind of sharp points, as opposed to trends.

11:23:56    21    Not a slope, but a point on a slope.  At least in my data

22    world, and that's not the same as yours, perhaps, so I'm

23    trying to understand the use of the word "spike" here.

24        Is that then intending to refer to the entire

PAUL CARLSON, AUGUST 14, 2008

Page 65

1    slope going from June and forward through July?

2        A.   I would view the word "spike" as not

3    necessarily having to be a specific day or a couple days,

4    but could refer to a period of elevated time over

11:24:28    5    longer -- a longer period, as much as a month or so.

6        Q.   Okay.  So in your review of the data in front

7    of you in Exhibits 5 and 6, your -- would it be fair to

8    say that your testimony now would be that the period that

9    you're referring to with respect to the narrow-body

10   Airbus 320 and Boeing 737 copilots, was the period of

11:24:58    11   June and July?

12       MR. ROBERTSON:  For the record, I think you

13   meant to refer to Exhibits 4 and 5.

14       MR. ABRAM:  I meant to refer to Exhibits 4

15   and 5, and thank you for that.

16   BY THE WITNESS:

17       A.   Yeah.  Like I mentioned, I feel like there were

18   a couple spikes during that period.

19   BY MR. ABRAM:

20       Q.   Okay.  Where were the spikes during that

21   period?

22       A.   For example, in the 300 first officer, if our

23   typical or expected rate was in the mid 20s, I would

11:25:28    24   regard the spike from the 20 to 25 that we saw in early

PAUL CARLSON, AUGUST 14, 2008

Page 66

1    June, up to the 45 or 50 at the end of the month, as a

2    spike.  And then from the low 40s that we saw in the

3    first part of July, up to 65, as kind of a second spike

4    in that fleet and seat.

5         Q.   Okay.  So in that fleet and seat, you would

6    observe two spikes, the second of them starting early in

11:25:57  7    July and moving up to a high point in the middle of July;

8    is that fair to say?

9         A.   Correct.

10        Q.   And what about in the 320 first officer fleet

11   and seat?

12        A.   The 320 first officer saw a similar spike in

13   June from, you know, kind of a 35 to 40 range, up to 80

11:26:27  14   or 81.  And then the action in July was a little bit

15   different than the 737 first officer where we again saw a

16   spike from about 65 on July 10th, up to 84 on July 24th.

17        But they had -- As you can see from the data

18   they had during that first part of July, had sunk a

19   little lower than the 737 first officer did.

20        Q.   Okay.  So the second spike with respect to the

11:26:59  21   320 first officers, you saw as beginning around --

22        A.   Kind of like a 65 to 70 range that we were

23   experiencing in the first half of the month.

24        Q.   Right.  And so the second spike you saw as

PAUL CARLSON,  AUGUST  14,  2008

Page 67

1    beginning around July 12th when they hit 70?

2          A.    Yeah.   About that time.

3          Q.    Or maybe July 7th when they hit 70.   I'm not

4    sure which.

5          A.    Yeah.   Around that time.

6          Q.    Around July 7th to 12th?

7          A.    Yeah.

11:27:37    8          Q.    We've been talking about absolute sick leave

9    numbers, specific numbers of pilots.   You also in your

10   work use a metric called a sick leave rate, do you not,

11   or a sick list rate?

12         A.    We express the absolute sick list in our

11:27:59   13   manpower model as a percent of total hours to convert

14   that into the man months that we need to use on our

15   manpower model.

16         Q.    Okay.   So that would be a percentage rate as a

17   result?

18         A.    Right.   Correct.

19         Q.    Okay.   And would it be fair to say that in

20   planning the months of July and August 2008 or at

21   least -- Withdrawn.

22               Would it be fair to say that in implementing

11:28:27   23   the months of July and August 2008, you and your work

24   assumed a sick list rate for -- A sick list rate of about

6e6397e0-6ab8-453a-bf0b-100beef8a616

# UAL Pilot Sick Leave Data for June 2008 Pilot Bid Month

| Sick | 2008 Actual | 400C | 400F | 777C | 777F | 767C | 767F | 320C | 320F | 300C | 300F |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SA 5/31 | 368 | 22 | 36 | 28 | 43 | 45 | 50 | 53 | 44 | 25 | 22 |
| SU 6/1 | 350 | 18 | 38 | 27 | 37 | 44 | 49 | 44 | 42 | 22 | 28 |
| 6/2 | 343 | 18 | 37 | 28 | 38 | 47 | 49 | 47 | 40 | 22 | 34 |
| 6/3 | 324 | 19 | 34 | 25 | 29 | 50 | 48 | 50 | 32 | 20 | 33 |
| 6/4 | 319 | 19 | 35 | 20 | 25 | 45 | 48 | 54 | 31 | 16 | 27 |
| 6/5 | 327 | 18 | 32 | 21 | 26 | 50 | 50 | 44 | 29 | 24 | 28 |
| 6/6 | 366 | 18 | 32 | 20 | 34 | 48 | 48 | 54 | 42 | 26 | 33 |
| SA 6/7 | 389 | 17 | 35 | 21 | 33 | 46 | 50 | 59 | 50 | 29 | 32 |
| SU 6/8 | 412 | 17 | 34 | 22 | 33 | 54 | 49 | 49 | 50 | 23 | 33 |
| 6/9 | 435 | 14 | 38 | 24 | 39 | 59 | 51 | 63 | 62 | 31 | 36 |
| 6/10 | 421 | 13 | 37 | 23 | 40 | 64 | 56 | 67 | 61 | 31 | 36 |
| 6/11 | 400 | 13 | 33 | 23 | 41 | 67 | 62 | 61 | 66 | 38 | 38 |
| 6/12 | 398 | 12 | 32 | 21 | 39 | 62 | 56 | 56 | 66 | 38 | 26 |
| 6/13 | 409 | 15 | 32 | 22 | 42 | 56 | 53 | 52 | 63 | 34 | 26 |
| SA 6/14 | 428 | 15 | 36 | 20 | 46 | 59 | 52 | 46 | 66 | 33 | 29 |
| SU 6/15 | 439 | 15 | 40 | 22 | 46 | 61 | 46 | 52 | 66 | 33 | 31 |
| 6/16 | 440 | 17 | 39 | 21 | 49 | 61 | 46 | 47 | 63 | 32 | 33 |
| 6/17 | 412 | 18 | 38 | 25 | 46 | 62 | 47 | 48 | 64 | 31 | 32 |
| 6/18 | 414 | 19 | 33 | 22 | 48 | 61 | 48 | 51 | 69 | 39 | 33 |
| 6/19 | 424 | 17 | 38 | 23 | 46 | 56 | 49 | 55 | 60 | 35 | 34 |
| 6/20 | 436 | 18 | 32 | 22 | 43 | 56 | 51 | 59 | 60 | 36 | 36 |
| SA 6/21 | 445 | 19 | 28 | 21 | 38 | 64 | 53 | 66 | 74 | 34 | 38 |
| SU 6/22 | 462 | 19 | 33 | 23 | 43 | 63 | 54 | 71 | 74 | 35 | 40 |
| 6/23 | 462 | 19 | 33 | 22 | 38 | 62 | 51 | 80 | 81 | 32 | 46 |
| 6/24 | 457 | 16 | 37 | 21 | 39 | 61 | 54 | 72 | 81 | 38 | 48 |
| 6/25 | 460 | 14 | 39 | 23 | 40 | 62 | 56 | 61 | 77 | 39 | 48 |
| 6/26 | 454 | 16 | 43 | 21 | 40 | 61 | 53 | 65 | 78 | 37 | 40 |
| 6/27 | 464 | 16 | 45 | 17 | 33 | 62 | 59 | 73 | 81 | 37 | 41 |
| SA 6/28 | 474 | 18 | 54 | 19 | 37 | 60 | 59 | 67 | 78 | 41 | 41 |
| SU 6/29 | 484 | 16 | 57 | 21 | 39 | 62 | 63 | 65 | 79 | 40 | 42 |



# UAL Pilot Sick Leave Data for July 2008 Pilot Bid Month

| Sick | 2008 Actual 400C | 400F | 777C | 777F | 767C | 767F | 320C | 320F | 300C | 300F |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/30 | 497 | 14 | 57 | 25 | 64 | 69 | 73 | 75 | 38 | 44 |
| 7/1 | 452 | 13 | 47 | 31 | 51 | 64 | 65 | 70 | 32 | 43 |
| 7/2 | 450 | 14 | 50 | 31 | 52 | 62 | 60 | 72 | 29 | 44 |
| 7/3 | 435 | 14 | 41 | 30 | 55 | 62 | 63 | 72 | 27 | 46 |
| 7/4 HD | 421 | 13 | 38 | 27 | 60 | 55 | 61 | 68 | 24 | 41 |
| 7/5 SA | 429 | 14 | 39 | 28 | 62 | 53 | 60 | 74 | 26 | 42 |
| 7/6 SU | 433 | 13 | 38 | 31 | 60 | 55 | 60 | 72 | 29 | 43 |
| 7/7 | 444 | 14 | 34 | 30 | 61 | 54 | 66 | 67 | 30 | 42 |
| 7/8 | 432 | 17 | 34 | 29 | 63 | 57 | 66 | 70 | 26 | 40 |
| 7/9 | 439 | 18 | 26 | 28 | 66 | 59 | 72 | 70 | 26 | 43 |
| 7/10 | 454 | 22 | 27 | 27 | 64 | 65 | 75 | 73 | 22 | 49 |
| 7/11 | 461 | 21 | 33 | 26 | 57 | 67 | 72 | 75 | 30 | 48 |
| SA 7/12 | 472 | 19 | 36 | 23 | 58 | 60 | 78 | 70 | 29 | 49 |
| SU 7/13 | 483 | 17 | 39 | 22 | 54 | 58 | 79 | 70 | 39 | 50 |
| 7/14 | 474 | 17 | 39 | 19 | 55 | 60 | 72 | 78 | 44 | 50 |
| 7/15 | 475 | 14 | 40 | 19 | 57 | 59 | 68 | 68 | 42 | 55 |
| 7/16 | 470 | 18 | 35 | 19 | 63 | 64 | 81 | 71 | 43 | 55 |
| 7/17 | 493 | 18 | 34 | 23 | 61 | 71 | 75 | 70 | 46 | 50 |
| 7/18 | 525 | 18 | 34 | 24 | 68 | 73 | 82 | 67 | 47 | 58 |
| SA 7/19 | 538 | 15 | 31 | 21 | 66 | 75 | 82 | 73 | 50 | 65 |
| SU 7/20 | 538 | 14 | 28 | 22 | 70 | 78 | 83 | 70 | 52 | 63 |
| 7/21 | 510 | 13 | 27 | 27 | 69 | 74 | 77 | 75 | 48 | 66 |
| 7/22 | 494 | 13 | 34 | 28 | 70 | 69 | 68 | 74 | 46 | 63 |
| 7/23 | 500 | 12 | 33 | 27 | 80 | 69 | 62 | 78 | 42 | 60 |
| 7/24 | 509 | 15 | 39 | 28 | 80 | 74 | 57 | 84 | 34 | 62 |
| 7/25 | 513 | 14 | 39 | 27 | 74 | 69 | 64 | 83 | 37 | 61 |
| SA 7/26 | 513 | 15 | 42 | 31 | 79 | 78 | 59 | 72 | 38 | 63 |
| SU 7/27 | 522 | 16 | 40 | 28 | 73 | 79 | 57 | 77 | 37 | 60 |
| 7/28 | 492 | 15 | 36 | 25 | 80 | 76 | 54 | 72 | 43 | 54 |
| 7/29 | 480 | 12 | | | 73 | 78 | 59 | 65 | 41 | 53 |

Excerpts and Select Exhibits from the
Deposition of Robert Domaleski
August 14, 2008

tb162284 (2).txt

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT          1

1     THE VIDEOGRAPHER:  We are going on the video record
2  at 9:34 a.m.  Today's date is August 14, 2008.
3          My name is Joe Pate, and I am a legal
4  videographer in association with Merrill Legal
5  Solutions.  The court reporter today is Tracy Blaszak.
6          Here begins the videotaped deposition of Robert
7  Domaleski, Jr., taken in the matter of United Air Lines
8  vs. Air Line Pilots Association, International, et al.
9  bearing case No. 08 CV 4317 in the United States
10  District Court for the Northern District of Illinois,
11  Eastern Division.
12          This deposition is being held at 9550 West
13  Higgins Road, Rosemont, Illinois.
14          Will counsel please identify yourselves for the
15  record and state whom you represent starting with the
16  noticing party.
17     MS. JOSHI:  Aparna Joshi from O'Melveny & Myers for
18  United Air Lines.
19     MR. VITALE:  Joseph Vitale from the law firm of
20  Cohen, Weiss & Simon, LLP, for the defendants.  And,
21  Aparna, on the record could you identify other United
22  representatives in the room, please.
23     MS. JOSHI:  Certainly.  Mr. Chuck Vanderheiden is
24  here as a representative of United Air Lines.
25     MR. VITALE:  And I just want it on the record, renew
          UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT          2

1  the conversation that, Aparna, you, me, and Tom and
2  Travis had yesterday morning before the deposition
3  started.

                    Page 1

tb162284 (2).txt

22    a group, and he thought it would be valuable to have him

23    at the meeting.

24        Q    Okay.  So what did Mr. Tamkin say as to why --

25    at the meeting, what did Mr. Tamkin say as to why Tony

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        38

1    was there?

2        A    Well, I had learned all this at that time

3    because I did not know anything about this group, but,

4    you know, as all the records show, the group of 2172,

5    and that Tony was evidently a leader of this group 2172

6    and he felt it was very valuable to have him at the

7    meeting.

8        Q    And what did Mr. Tamkin say after that?

9        A    He kind of -- which was unusual for X and I, but

10    he went on this discussion regarding disciplining

11    members of the IRC.

12        Q    What did he say?

13        A    Well, he said that he had been hearing things

14    that -- he basically said that if anybody on the

15    committee decides to do something that is contrary to

16    the committee's message, then that person would be on

17    their own and not defended by the Air Line Pilots

18    Association.

19        Q    And do you know what he was referring to?

20        A    I learned then that evidently this group of 2172

21    was planning some kind of sick out over the July 4th

22    weekend.

23        Q    And what did Mr. -- well, when Mr. Tamkin said

24    this, did Mr. Freeman respond?

25        A    Yes.

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        39
Page 32

tb162284 (2).txt

1      Q    And what did he say?

2      A    He said that he referred to the group of 2172,

3   he used to refer to them as my guys, and he said my guys

4   are really upset regarding basically the furlough

5   letters that had come out by United Air Lines and that

6   they're really, really mad, they're very angry, they're

7   stressed out about being furloughed for a second time,

8   and that they were so pissed off at United Air Lines

9   that they wanted to do something, and that their plan

10   was to have this sick out over the July 4th weekend.

11      Q    And what did Mr. Tamkin say in response to that?

12      A    He said that a sick out is completely

13   unacceptable, that the association can be fined, they

14   can have an injunction placed against them, and that

15   Tony had to do everything he could to stop that from

16   happening.

17      Q    Did Mr. Freeman respond?

18      A    He said I am going to do my best to try to stop

19   this thing, but he says I don't know how long I can keep

20   the lid on the pot.

21      Q    Do you know what he meant by that?

22      A    I would just say that my personal view on that

23   would be that the emotions were boiling over with this

24   group and, you know, they were just going to do

25   something whether he liked it or not and you couldn't

           UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      40

1   control it any longer.

2      Q    Did Mr. Tamkin respond to that?

3      A    He did, yes.

4      Q    What did he say?

                        Page 33

Excerpts and Select Exhibits from the
Deposition of Xavier Fernandez
August 14, 2008

DRAFT Fernandez 8-14-08 (2).TXT

** DRAFT, UNCERTIFIED COPY **

1

1    August 14, 2008.

2            THE VIDEOGRAPHER:  We are going on the video

3    record at 9:51 a.m.  Today's date is August 14, 2008.

4    My name is Slawomir Kojro.  I am a legal videographer

5    in association with Merrill Legal Solutions.  The

6    court reporter today is Judith Walsh.

7            Here begins the videotaped deposition of

8    Xavier F. Fernandez, taken in the matter of United

9    Airlines, Incorporated, versus Air Line Pilots

10   Association, et al., bearing Case No. 08 CV-4317 in

11   the United States District Court, Northern District of

12   Illinois, Eastern Division.  The deposition is being

13   held at 9550 West Higgins Road, Rosemont, Illinois.

14           Will counsel please identify themselves for

15   the record, state whom you represent starting with the

16   noticing party.

17           MR. JERMAN:  Tom Jerman of O'Melveny & Meyers,

18   LLP, for United Airlines.

19           MR. MASTRODDI:  Travis Mastroddi of Cohen,

20   Weiss & Simon, LLP, for the defendants.

21           THE VIDEOGRAPHER:  Will the court reporter

22   please swear in the witness.

23                       (Whereupon, the witness was

24                       duly sworn.)

MERRILL LEGAL SOLUTIONS
(800) 868-0061   (312) 386-2000

2

** DRAFT, UNCERTIFIED COPY **

1            THE VIDEOGRAPHER:  Proceed.

Page 1

DRAFT Fernandez 8-14-08 (2).TXT
2                    WITNESS NAME HERE,

3    called as a witness herein, having been first duly

4    sworn, was examined upon oral interrogatories and

5    testified as follows:

6                         EXAMINATION

7                       BY MR. JERMAN:

8        Q.    Good morning, Captain Fernandez.  My name is

9    Tom Jerman.  I'm representing United Airlines in this

10   matter.  Have you ever had your deposition taken

11   before?

12       A.    No.

13       Q.    Your attorney has probably given you an

14   explanation of what would occur today, but I want to

15   just go through a few basic ground rules.  I'll be

16   asking you a series of questions related to your --

17   related to United Airlines' lawsuit against you and

18   the Air Line Pilots Association.  You'll be providing

19   answers to those questions.  Your attorney may

20   interpose objections to those questions.

21            Everything we say in this room unless we

22   expressly agree to go off the record will be recorded

23   by the court reporter here in transcript form and will

24   also be videotaped, and both the transcript and the

3

** DRAFT, UNCERTIFIED COPY **

1    videotape can be used at any hearing in this matter

2    just as if you were testify in court.  You're under

3    oath, so it has same importance as if you were giving

4    court testimony.

5            The court reporter can only take down verbal

DRAFT Fernandez 8-14-08 (2).TXT
16    you came to make Captain Tamkin's acquaintance?

17        A.    I flew with him when I was a copilot on the

18    Airbus in Los Angeles.

19        Q.    Did you have some relationship with him other

20    than just flying with him occasionally?

21        A.    No.

22        Q.    At the time you were appointed, were there any

23    other members of the IRC besides Captain Tamkin?

24        A.    I think -- I think I was simultaneous kind of

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

16

** DRAFT, UNCERTIFIED COPY **

1    with Captain Domaleski.

2        Q.    Since you were appointed to the Industrial

3    Relations Committee along with Captain Domaleski, have

4    there been other members appointed?

5        A.    No.

6        Q.    Are there -- in addition to the MEC level

7    members of the IRC, are there local coordinators?

8        A.    Yes.

9        Q.    Can you list as many local coordinators as you

10    can recall?

11        A.    It's not a formal position.  I will list some

12    pilots for you, but if you ask them if they were local

13    coordinators, they probably wouldn't even know the

14    term.

15        Q.    Okay.

16        A.    Does that make sense?

17        Q.    Yes.

18        A.    I don't want them to -- Kevin Simicek, Jim

19    Crail.

Page 14

DRAFT Fernandez 8-14-08 (2).TXT

20    Q.    How do you spell that?

21    A.    C-r-a-i-l.

22          Jeff Glicksman, G-l-i-c-k-s-m-a-n; Tom

23    Finnegan; and Clarence Copping.

24    Q.    How do you spell that?

MERRILL LEGAL SOLUTIONS
(800) 868-0061   (312) 386-2000

17

** DRAFT, UNCERTIFIED COPY **

1     A.    C-o-p-p-i-n-g.

2     Q.    Any others?

3     A.    Those would be the primary coordinators if you

4     were going to call them that for me.

5     Q.    As a member of the Industrial Relations

6     Committee, do you have a particular area of

7     responsibility that is different from the area of

8     responsibility for other members of the IRC?

9     A.    Yes.

10    Q.    What is your area of responsibility?

11    A.    Loosely defined, Chicago.

12    Q.    And do the other members have different set

13    geographical areas that they're in charge of?

14    A.    It's not -- I'm trying to think of the best

15    way to answer you correctly with this.  Captain Tamkin

16    lives on the west coast.  Captain Domaleski lives on

17    the east coast.  I live in the middle.  That's about

18    as formal as it gets.  Does that make sense?

19    Q.    Yes.

20          Do you know Anthony Freeman?

21    A.    Yes.

22    Q.    How long have you known Mr. Freeman?

Page 15

DRAFT Fernandez 8-14-08 (2).TXT

23    A.    Can you define "known"?  First time I talked

24    to him, is that how you would define it?

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

18

** DRAFT, UNCERTIFIED COPY **

1     Q.    Sure.  Let's take it that way.

2     A.    Probably the first time I had a phone

3     conversation with him was maybe six or eight months

4     ago, but I'm not sure.

5     Q.    Do you recall the circumstances under which

6     you had a phone call with him?

7     A.    No.

8     Q.    At some point, did you become aware that

9     Mr. Freeman was involved in a group of junior United

10    pilots that called themselves the 2172?

11    A.    Yes.

12    Q.    When did you become aware of the existence of

13    this group called 2172?

14    A.    I'm not sure.

15    Q.    Is it more than six months ago?

16    A.    Oh, yes.

17    Q.    When did you first become aware of

18    Mr. Freeman's involvement in that group?

19       ** DRAFT COPY -- UNEDITED, UNCERTIFIED COPY **

20

21    A.    I'm not sure.

22    Q.    Was it more than six months ago?

23    A.    Yes.

24    Q.    You said that you first talked with him six or

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000
Page 16

DRAFT Fernandez 8-14-08 (2).TXT

19

** DRAFT, UNCERTIFIED COPY **

1    eight months ago.  At the time you first talked with
2    him, were you aware of his involvement with 2172?
3        A.    I'm not sure.
4        Q.    What is your understanding of Mr. Freeman's
5    role with that group?
6        A.    First, the 2172 became the 2172 when United
7    furloughed 2172 pilots.  And they started calling
8    themselves that then.  How, you know, it became a
9    slogan or a web site, that evolved over time.  My --
10   now repeat the question.  I'm sorry.  If you would,
11   please.  Thanks.
12       Q.    My question is, what is your understanding of
13   Mr. Freeman's role in that group, and I think I
14   understand your answer in that context.
15            When did you become aware of Mr. Freeman's
16   role in connection with a web site called UAL2172?
17       A.    I don't think I was aware of his role in the
18   web site until the last couple months.
19       Q.    And how did you become aware of that?
20       A.    I think -- it was gradual, you know.  It
21   wasn't like all at once.  My awareness of the -- his
22   involvement with the web site came from conversations
23   with him.
24       Q.    Have you ever logged on to the website?

20

** DRAFT, UNCERTIFIED COPY **

1        A.    No.  And can I clarify that?

DRAFT Fernandez 8-14-08 (2).TXT

2    Q.    Sure.

3    A.    I'm not a 2172, so I can't log on to the web

4  site.  I tried to, but it didn't let me.

5    Q.    Do you recall a meeting on June 11 or 12 of

6  this year in Los Angeles with Captain Tamkin,

7  yourself, Captain Domaleski, and Mr. Freeman?

8    A.    Yes.

9    Q.    Where did that meeting take place?

10    A.    At Captain Tamkin's house.

11    Q.    Prior to that meeting, had you heard either

12  rumor or more conclusively that a group of junior

13  pilots were planning a sick-out in July?

14    A.    Yes.

15    Q.    When did you first hear that?

16    A.    Again, that was a gradual transition.

17    Q.    Can you give me the date when you first

18  learned of it?

19    A.    It graduated and increased from when United

20  first said they were going to park 30 airplanes, which

21  I think was late April, early May, until United

22  announced that it was going to park 100 airplanes, at

23  which point it was still largely rumor but strong

24  enough that it alarmed us or alarmed me.

MERRILL LEGAL SOLUTIONS
(800) 868-0061   (312) 386-2000

21

** DRAFT, UNCERTIFIED COPY **

1    Q.    At some point prior to meeting in Los Angeles,

2  did you have a conversation with Captain Tamkin about

3  the rumored sick-out?

4    A.    Yes.

5    Q.    And when did that conversation occur, at least

DRAFT Fernandez 8-14-08 (2).TXT

6    the first conversation in relationship to the meeting?

7        A.    First conversation in relationship to the

8    meeting that occurred?  The first conversation

9    receipting to the concern about the pilots calling in

10   sick?

11       Q.    Right.  Let me rephrase the question.  How far

12   in advance of the meeting on June 12th did you first

13   discuss with Captain Tamkin the rumors you had heard

14   about a sick-out?

15       A.    I'm not sure.

16       Q.    What's your best estimate?

17       A.    What I would say is that I report back to

18   Captain Tamkin what I hear.  And so as the volume of

19   the discord or volume of the issue about pilots being

20   sick got louder over time, my conversations with

21   Captain Tamkin would have reflected that.

22       Q.    At some point in time, did you tell Captain

23   Tamkin that Anthony Freeman was involved in the

24   discussions about a potential sick-out?

                                                22
** DRAFT, UNCERTIFIED COPY **

1        A.    No.

2        Q.    Did Tamkin, Captain -- strike that.

3              Did Captain Tamkin ever tell you prior to the

4    June 11 meeting that he believed Mr. Freeman was

5    involved in organizing the sick-out in some way?

6        A.    No.

7        Q.    Did you, prior to the June 11 meeting, talk to

8    Mr. Freeman about his knowledge of or involvement in

DRAFT Fernandez 8-14-08 (2).TXT

9    the sick-out?

10        A.   Two questions there.

11        Q.   Yes.

12        A.   Important distinction.

13        Q.   Let's just take them in order.  Did you talk

14   with him about his knowledge of a potential sick-out?

15        A.   Yes.

16        Q.   When did that occur?

17        A.   I'm not sure.  Prior to the 11th, but not that

18   far apart.

19        Q.   What did he tell you?

20        A.   He had the same concerns that I did.  He was

21   hearing them even louder than I was.

22        Q.   Did he give you any detail about where you was

23   hearing them or who was involved or any other

24   information?

                                                     23

** DRAFT, UNCERTIFIED COPY **

1        A.   No.

2        Q.   Did you at some point have a conversation with

3    Mr. Freeman about his involvement, if any, in the

4    organization of the sick-out?

5             MR. MASTRODDI:  Objection to form.

6    BY MR. JERMAN:

7        Q.   I'll rephrase that.  Did you at some point

8    have a conversation with Mr. Freeman about whether or

9    not he was involved in organizing this sick-out?

10        A.   Yes.

11        Q.   And what did you say and what did he say?

12        A.   I don't know that I said anything.  I don't

DRAFT Fernandez 8-14-08 (2).TXT

13    remember.  But he was telling me that he was trying

14    his best to hold these guys back.

15        Q.    Did he give you any detail about what he was

16    doing to try to hold them back?

17        A.    Making an awful lot of phone calls.

18        Q.    Did he tell you anything else he was doing?

19    Did he tell you --

20        A.    No.

21        Q.    -- what he was saying on those phone calls?

22        A.    I can't quote it.  He --

23        Q.    Can you paraphrase?

24        A.    Yes.  He said he was trying to tell guys,

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

24

** DRAFT, UNCERTIFIED COPY **

1    educate guys on why they don't want to do that, you

2    know.

3        Q.    And you know what they told them -- strike

4    that.

5             Did he tell you what he was telling them about

6    why they didn't want to do this or shouldn't do it?

7        A.    No, I don't think so.

8        Q.    When did you first learn that Mr. Freeman

9    would be at a meeting with you, Captain Tamkin, and

10    Captain Domaleski in L.A.?  Captain Tamkin?

11        A.    About a woke before the meeting.

12        Q.    Who told you he would be there?

13        A.    Captain Tamkin called me and said that he was

14    going to bring Tony Freeman out to the Los Angeles

15    meeting to meet with us.  I said, told captain Tamkin,

Page 21

DRAFT Fernandez 8-14-08 (2).TXT

16    that the fact that there was a concern that there

17    would be a sick-out, is that a dangerous thing to do

18    because it would look like we were connecting

19    ourselves to the 2172.  Captain Tamkin's response to

20    me was, we have a legal obligation to stop a sick-out

21    and we're going to get blamed for it anyway if it

22    happens.  So Tony is the most effective guy to help us

23    stop the sick-out.  And I couldn't argue with that.

24        Q.    Did you have any further conversations with

** DRAFT, UNCERTIFIED COPY **

1    Captain Tamkin on this subject between that

2    conversation and when you actually showed up at his

3    home in L.A.?

4        A.    Did we have another conversation between -- I

5    don't recall.

6        Q.    Describe what occurred at the meeting at

7    Captain Tamkin's home in Los Angeles.

8        A.    We arrived, captain Domaleski had just flown

9    in from northern Canada or something.  He had been on

10   the road for 18 hours.  So he went and took a shower.

11   We all had a drink.  Once everybody was together, we

12   all met out on the patio.  And Captain Tamkin -- I'm

13   trying to describe the best way to describe the made

14   sure we all understood how serious the conversation we

15   were having was, and he said he wanted us all to

16   understand that we were going to have to get involved

17   in this sick-out thing and try to stop it.  And it was

18   our job and it didn't matter, that essentially it was

19   kind of a conversation of, you know, this is not an

Page 22

DRAFT Fernandez 8-14-08 (2).TXT

20  optional thing, you know.  You have to be on board

21  with this.  And I think that was -- he just kind of --

22  that was the gist of that conversation.

23      Q.   Did he tell you what you should do to attempt

24  to stop it?

MERRILL LEGAL SOLUTIONS
(800) 868-0061   (312) 386-2000

26

** DRAFT, UNCERTIFIED COPY **

1       A.   We were going to utilize the -- you know, the

2   committee's structure and influence to stop it; all

3   the assets of the committee.

4       Q.   When you say "the committee," you mean the

5   IRC?

6       A.   The IRC, yes.

7       Q.   When you use the term "all the assets of the

8   committee," what do you mean by that?

9       A.   We were going to try to communicate as loud as

10  possible to the pilot group that they should knock

11  this off.  We didn't -- a sick-out is not a good thing

12  to do.

13      Q.   Do you recall anything else that was said at

14  the meeting regarding the topic of the sick-out?

15      A.   No.

16      Q.   Do you recall anything else that was said at

17  the meeting about the issue of junior pilots generally

18  and their concerns?

19      A.   Not that meeting.

20      Q.   Was there a subsequent discussion in the next

21  day or two about junior pilots and the concerns they

22  had?

Page 23

DRAFT Fernandez 8-14-08 (2).TXT

23    A.   Yes.

24    Q.  When did that discussion occur?

27

** DRAFT, UNCERTIFIED COPY **

1    A.   After we picketed the shareholders meeting, we

2  went and kind of found a room or something at the

3  hotel we were staying at.  And that's when that

4  subject came up.

5    Q.   What hotel was that?

6    A.   I think it was a Holiday Inn or something.  I

7  don't remember.

8    Q.   The patio, is that the same as the veranda?

9    A.   Where I'm from, you don't say veranda.

10    Q.   A little inside joke.

11       The discussion at the Holiday Inn, was

12  Mr. Freeman present for that?

13    A.   Yes.

14   ** DRAFT COPY -- UNEDITED, UNCERTIFIED COPY **

15

16    Q.   What was discussed about junior pilots and

17  their concerns at that meeting?

18    A.   We -- the scheduling at United is incredibly

19  onerous on those that are in the bottom half of the

20  narrow body airplanes, both left seat and right seat,

21  captain and first officer.  I'm in that category.  And

22  I think first officer Freeman is in that category as

23  well.  And the scheduling practices of the airline

24  have incrementally, consistently, and repeatedly

DRAFT Fernandez 8-14-08 (2).TXT

28

** DRAFT, UNCERTIFIED COPY **

 1     ratcheted down the manning on the airline at least as
 2     far as it's felt by the pilot in the junior categories
 3     like that to the extent that they can't get time off.
 4     They can't have -- they don't have any flexibility in
 5     their schedule.  United schedules them days off, month
 6     in, month out, year in, year out.  CHECK and they're
 7     exhausted.  And I get -- we discussed the fact that
 8     this was a really severe chronic safety issue for the
 9     pilots at United.
10          Q.   Did you discuss steps that the IRC could take
11     to deal with this problem?
12          A.   Yes.
13          Q.   What was discussed?
14          A.   We were concerned that -- we understood the
15     problem.  And I live the problem, so I understand the
16     problem.  And so certainly wanted to improve the lives
17     of the junior pilots but more importantly for us was
18     to figure out how to get those pilots -- if they need
19     the rest, they have to get the rest, how can we get
20     them the rest in a legal and appropriate way.  We were
21     concerned that pilots might be calling in sick because
22     they're exhausted.  And we were concerned that that
23     may not be the appropriate course of action for a
24     fatigued pilot.

29

** DRAFT, UNCERTIFIED COPY **

 1          Q.   Can you explain why calling in sick is not an

DRAFT Fernandez 8-14-08 (2).TXT

2  appropriate action for a fatigued pilot?

3    A.  Well, there's a differentiation in the air

4  naught I can information manual, the FARs, the OEM and

5  flight manual in how we discuss these different

6  issues.  Fatigue is specifically described in the air

7  naught I canal information manual and specifically

8  addressed in our FOM.  And there's our specific, you

9  know, the aeronautical information manual is specific

10  about not flying when you're fatigued.  And the FOM is

11  specific about what to do if you're fatigued.  Does

12  that make sense?  And we were concerned that this was

13  going to turn into a sick issue instead of a fatigue

14  issue.  And if it's a fatigue issue, it should be

15  documented appropriately, you know.  The FAA should be

16  made aware of it.  All of those things, all the

17  appropriate fatigue mechanisms should be triggered in

18  that process as opposed to just assuming everybody was

19  getting the flu at the same time.

20    Q.  And what actions did you decide to take in

21  order to deal with the fatigue issues?

22    A.  Other than the suppression of the sick-out

23  that we discussed at that meeting, we didn't come out

24  of that meeting with any other direct actions, that I

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

30

** DRAFT, UNCERTIFIED COPY **

1  recall. Ing.

2    Q.  Did Captain Tamkin say that he was going to

3  use institutional channels of ALPA to address the

4  fatigue issue?

5    A.  Yes.  I think he wanted to take it to

Page 26

DRAFT Fernandez 8-14-08 (2).TXT

6    leadership and say, this is a problem, how do you want

7    to -- how do you want to handle this.

8        Q.   Did the members of the IRC have any other

9    meetings in L.A. during that three-day period?

10       A.   I don't think so.

11       Q.   The following week, June 19, 20, and 21 --

12       A.   Okay.

13       Q.   -- there was a meeting in Chicago with members

14   of the MEC, Captain Tamkin, among others.  Were you

15   present for those meetings?

16       A.   No.

17       Q.   What actions did you take, if any, following

18   the meets in L.A.?

19       A.   Called a number of my friends and talk to them

20   about the sick-out and that we really need to be

21   aggressive in trying to stop it, explain to them ad

22   nauseam why it was bad for us and why pilots should

23   care and ask them to spread that word.

24       Q.   What did you tell them ad nauseam?

** DRAFT, UNCERTIFIED COPY **

1        A.   I'm sorry.  I laughed --

2        Q.   About why it was bad?

3        A.   Well --

4        Q.   Let me rephrase the question so we have a

5    clean record.

6        A.   Sure.

7        Q.   What did you tell the people you called about

8    why it was a bad idea to engage in a sick-out?

DRAFT Fernandez 8-14-08 (2).TXT

9    A.    Pilots have in general a poor understanding of

10   the law.  And what I was trying to impress upon them

11   was, if there is a sick-out and the company decides

12   they want to take it to court, they will sue ALPA and

13   in my at the time opinion was the law was not friendly

14   to us.  The law, this is my very amateurish opinion,

15   okay, my understanding of the law is we have a legal

16   duty to stop an illegal strike like that.  And I tried

17   to explain to them that they needed to understand that

18   it was -- that a sick-out would lead to legal action

19   which would lead to us being in some way or another

20   sanctioned probably.  I had some of these guys go, all

21   right, man, I've heard it enough.  This is the third

22   time you've told me.  I'm tired of hearing it.  That's

23   why I said ad nauseam.

24       ** DRAFT COPY -- UNEDITED, UNCERTIFIED COPY **


                    MERRILL LEGAL SOLUTIONS
                 (800) 868-0061  (312) 386-2000
                                                           32
              ** DRAFT, UNCERTIFIED COPY **


1

2    Q.    Was there anybody else present for the two

3    meetings in Los Angeles that you told us about besides

4    Captain Tamkin, yourself, Captain Domaleski, and

5    Mr. Freeman?

6    A.    Not on the 11th, not on the patio meeting, but

7    in the hotel meet, captain Bill Renner was there.

8    Q.    And what was the reason for his presence?

9    A.    He was -- he was up for the -- he was up at

10   the picketing of the shareholders meeting.  I guess he

11   lives in L.A. somewhere.  And he's a friend of Captain

12   Tamkin's.

                        Page 28

DRAFT Fernandez 8-14-08 (2).TXT

13    Q.    Do you know what his position is?

14    A.    Captain Renner?

15    Q.    Yes.

16    A.    No -- oh, do you mean like what does he fly?

17    Q.    Yes.

18    A.    I think he's a triple 7 captain.

19    Q.    Between June 11th and the second week of July,

20    so in the 30 days following the June 11 meeting, did

21    you have any further conversations or communications

22    via e-mail or text mail --

23    A.    Right.

24    Q.    -- with Mr. Freeman regarding this sick-out

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

33

** DRAFT, UNCERTIFIED COPY **

1    issue?

2    A.    I can't recall exactly when, but I spoke with

3    Tony several times or more during that time period.

4    It was a busy time for him especially but for all of

5    us.

6    Q.    Why was it a busy time for him?

7    A.    He was the one guy that was going to be able

8    to stop the sick-out on the 4th of July.  And so he

9    was busy suppressing that.

10    Q.    In approximately mid-July, did you learn that

11    there had been a spike in sick leave and that the

12    company was taking action as a result of that?

13    A.    Let me think.  I'm just trying to get the time

14    line right.  I was leaving for a trip.  I think it was

15    a Monday.  Maybe that's the 17th or 18th.  I'm not

Page 29

DRAFT Fernandez 8-14-08 (2).TXT

16    sure.  I think I had a trip on Tuesday.  And I was

17    looking, my copilot had kind of -- I was looking to

18    see who I was going to fly with the next day because I

19    didn't have a copilot assigned.  And so when I did

20    that, I pulled up what we call the pneumatic display

21    coverage page, DSPCR.  And that pulls up all the open

22    trips for tomorrow or whatever day you're looking at

23    and all the pilots on reserve to cover them.  When I

24    pulled it up for the next day, there were 13 or 14

34

** DRAFT, UNCERTIFIED COPY **

1    open trips, most of them multidays, and there were

2    maybe two reserves to cover.  At that point, I became

3    very concerned.  And I started looking out at the

4    other fleets, Airbus in Denver, 300 in Denver, and

5    they all looked tight but covered, but Chicago was

6    bad.  And I looked out the day after that and it was

7    maybe even worse.  It was bad, too.  And at that

8    point, I called Captain Tamkin and said, "We have a

9    problem."

10        Q.    What did Captain Tamkin say?

11        A.    Again, I just want to make sure we've got the

12    date right.  We're talking July 18, 19, is that what

13    you said, is that the time frame you're talking about.

14        Q.    That is the general time frame we're talk

15    about?

16        A.    I told him what it was.  He was concerned

17    about it.  And he was going to talk to people about

18    it.  And I think that was the substance of that

19    conversation.

Page 30

DRAFT Fernandez 8-14-08 (2).TXT

20    Q.    Did you call Mr. Freeman?

21    A.    I don't remember if I called him.  I --

22    Q.    Over the next, let's call it, two weeks, did

23    you have any further conversations with Captain Tamkin

24    about the sick leave issue?

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

35

** DRAFT, UNCERTIFIED COPY **

1    A.    Oh, yes.  We talk about it frequently.

2    Q.    Describe in general terms the conversation?

3    A.    In general?  Again, to give it a little

4    context, after -- sometime after I sort of kind of

5    stumbled upon what looked like a real serious problem

6    in pilots, you know, them being unable to cover trips

7    at any rate.  I don't even remember seeing why they

8    were all on the open flying, how the trips got there.

9    But clearly we were going to are have some

10    cancellations out of that whole thing.  And so I

11    started calling, it was either that night or the next

12    day, everybody I knew in that pilot population.  And

13    because I wanted to know what was going on.  I thought

14    we -- at that point, I thought we were pretty much

15    under control.  We kind of squished the thing down,

16    these guys weren't going to call in sick, everybody

17    understood why they shouldn't do this.  And so I went

18    out and was trying to gather, you know, intelligence

19    on what's going on in the pilot group, was this, you

20    know, a bunch of guys calling each other or what.  And

21    every single guy I talked to said, I -- you know, I

22    don't think that this was concerted.  I don't think

Page 31

DRAFT Fernandez 8-14-08 (2).TXT
23   guys were calling each other and doing it on purpose.

24   I think it just exploded.  You know, at any rate, so

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000

36

** DRAFT, UNCERTIFIED COPY **

1    that was the context of the conversations I was having

2    with Captain Tamkin, was feeding that back to him.  I

3    don't know.  I think I talked to First Officer Freeman

4    in there somewhere, but I don't recall exactly that.

5    But I was feeding that information back to Captain

6    Tamkin when I spoke to him over that period of time.

7         Q.   Between the time of this trip and learning

8    that United had filed a lawsuit --

9         A.   Right.

10        Q.   -- which would have been probably July 31st,

11   did you have any conversations with Mr. Freeman about

12   the issue, that you recall?

13        A.   About a sick-out issue?

14        Q.   Yes.

15        A.   Yes.

16        Q.   How many conversations?

17        A.   Oh, I don't know.

18        Q.   Can you describe the conversations?

19        A.   Anger at being sued in federal court for

20   something we spent two to three months trying to

21   squelch.  That would be the context there.  That would

22   be the gist of the conversations I had with First

23   Officer Freeman.

24        Q.   Prior to hearing about the lawsuit, from the

MERRILL LEGAL SOLUTIONS
(800) 868-0061  (312) 386-2000
Page 32

Excerpts and Select Exhibits from the
Deposition of Anthony Freeman
August 13, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED AIR LINES, INC.,           )
                                  )
            Plaintiff,            )
                                  )
        -vs-                      )   No. 08 CV 4317
                                  )
AIR LINE PILOTS ASSOCIATION,      )
INTERNATIONAL,                    )
                                  )
            and                   )
                                  )
STEVEN M. TAMKIN,                 )
                                  )
            and                   )
                                  )
ROBERT J. DOMALESKI, JR.          )
                                  )
            and                   )
                                  )
XAVIER F. FERNANDEZ,              )
                                  )
            and                   )
                                  )
ANTHONY R. FREEMAN,               )
                                  )
            Defendants.           )


        Videotaped deposition of ANTHONY R. FREEMAN

taken before TRACY L. BLASZAK, CSR, CRR, and Notary

Public, pursuant to the Federal Rules of Civil Procedure

for the United States District Courts pertaining to the

taking of depositions, at Suite 1000, 9550 West Higgins

Road, in the Village of Rosemont, Cook County, Illinois

at 9:16 a.m. on the 13th day of August, A.D., 2008.

565ae733-5afc-436e-a600-6da882aa7fad

Page 2

1          There were present at the taking of this

2      deposition the following counsel:

3

           O'MELVENY & MYERS LLP by
4          MS. APARNA B. JOSHI
           1625 Eye Street, N.W.
5          Washington, D.C. 20006-4001
           (202) 383-5300
6

               on behalf of the Plaintiff;
7

8          COHEN, WEISS AND SIMON LLP by
           MR. JOSEPH J. VITALE
9          330 West 42nd Street
           New York, New York 10036-6976
10         (212) 563-4100

11             on behalf of the Defendants;

12

           ALSO PRESENT:   Ms. Melissa Oliver-Janiak,
13                         O'Melveny & Myers LLP;

14                         Mr. Paul Carlson;

15                         Mr. Joseph Pate,
                           Legal Videographer.
16

17                          - - - - -

18

19

20

21

22

23

24

25

Page 14

1    Q    Continental Connection.

2    A    In 1995 while I was still attending college.

3    Q    So as a pilot you've worked for Continental

4  Connection and Mesaba and United Air Lines.  Anywhere

5  else?

6    A    Frontier Airlines.

7    Q    When did you work at Frontier?

8    A    From October of 2003 to August of 2006.

9    Q    What was your position at Frontier?

10    A    First officer.

11    Q    At -- Start with Continental Connection, did you

12  hold any -- Let me ask this:  I assume that -- Were the

13  pilots at Continental Connection represented by ALPA?

14    A    No.

15    Q    Okay.  Who were they represented by?

16    A    No one.

17    Q    No one.

18         Okay.  What about at Mesaba?

19    A    ALPA.

20    Q    And did you hold any position with ALPA at that

21  time?

22    A    No.

23    Q    Including any committee?

24    A    No.

25    Q    Okay.  What about at Frontier, did you --

565ae733-5afc-436e-a600-6da882aa7fad

Page 15

1    represented by ALPA?

2        A    No.

3        Q    Who were they represented by?

4        A    Frontier Airline Pilots Association, FAPA.

5        Q    Did you hold any position with that union?

6        A    No.

7        Q    You're currently employed by United Air Lines,

8    is that right?

9        A    Correct.

10       Q    And you are currently a first officer on the

11   A320?

12       A    Correct.

13       Q    How long have you held that position?

14       A    Since August of 2006.

15       Q    When you were first hired by United Air Lines on

16   March 6th, 2000, what position did you hold?

17       A    737 first officer.

18       Q    How long did you hold that position?

19       A    From March of 2000 until my furlough, January of

20   2003.

21       Q    Okay.  So when you were hired back in August of

22   2006, you went straight to an A320 first officer

23   position?

24       A    That's correct.

25       Q    You mentioned furlough in January of 2003.  Were

Page 16

1    other pilots furloughed at the same time?

2        A    Yes.

3        Q    Do you know how many?

4        A    No.  I don't totally understand your question.

5        Q    How many other pilots were furloughed at the

6    same time that you were furloughed?

7        A    On the day that I was furloughed?

8        Q    At around that time, yes.

9        A    Well, there was a total of 2,172 pilots that

10   were furloughed.

11       Q    Over what period?

12       A    Over a three-year period -- or, yes, three-year

13   period.

14       Q    Do you know when that period began?

15       A    Yes.

16       Q    What was the date that that period began?

17       A    October of 2001.

18       Q    And when did it end?

19       A    January of 2004, I believe.

20       Q    And over that period 2,172 pilots were

21   furloughed, is that right?

22       A    That's correct.

23       Q    Did any formal groups form among the -- I'll

24   call them 2,172 pilots furloughed at that time, so

25   anywhere between October, 2001, and January, '04?

Page 17

1    A    Describe formal groups.

2    Q    Well, something other than just a few people

3  hanging out, something more organized than that.

4    A    What's a few people?

5    Q    Why don't you tell me what happened.

6    A    There was a web site called the half-wingers

7  board located on the Yahoo! message boards.

8    Q    And how did you know about that board?

9    A    Word of mouth.

10    Q    Do you know who started that board?

11    A    Ryan Manning, I believe, I'm not sure.

12    Q    Can you spell that name?

13    A    M-A-N-N-I-N-G.

14    Q    And the first name was Ryan?

15    A    Correct.

16    Q    And who is Ryan Manning?

17    A    Another first officer that was furloughed.

18    Q    Do you know when that board was created?

19    A    I can't recall exactly.

20    Q    Do you have like a year?

21    A    Late '03 time frame.

22    Q    Does it still exist today?

23    A    Yes.

24    Q    Is access to the board restricted in any way?

25    A    I'm not sure.

Page 18

1     Q    Have you accessed the board?

2     A    Four years ago.  It's been a long time.

3     Q    So the last time you accessed the board was four

4    years ago?

5     A    Yes.

6     Q    And at that time did you have to join --

7     A    I can't remember how I signed up.

8     Q    Do you know what the purpose of the board was?

9     A    I don't know exactly why it was created, but we

10   only talked about resolutions to give to the LECs.

11    Q    What kind of resolutions?

12    A    Resolutions to help the furloughees' cause, jets

13   for jobs type resolutions.

14    Q    Did ALPA communicate with the furloughees after

15   they were furloughed?

16    A    Yes.

17    Q    What communications did ALPA have with the

18   furloughees?

19    A    Todd Coomans was the furlough coordinator, and

20   he --

21    Q    Can you spell that last name for me.

22    A    C-O-O-M-A-N-S.

23    Q    Okay.

24    A    He was the furlough coordinator and our point of

25   contact with the union and the company.

Page 22

1    A    It is in the MEC updates.

2    Q    So in the MEC updates you're told to either wear

3    your hat or not according to this campaign?

4    A    Well, I guess you could say we are told.  Not

5    everyone views it as being told.

6    Q    What do you view it as?

7    A    A request but not a directive.

8    Q    So do you believe that pilots are free to choose

9    to follow this request without repercussion?

10    A    Correct.

11    Q    Are you an ALPA officer?

12    A    I am.

13    Q    What is your position?

14    A    Industrial relations committee.

15    Q    And what is your position on the industrial

16    relations committee?

17    A    Mid-level committee member to cover the domicile

18    of Denver.

19    Q    How many committee members are there for the

20    IRC?

21    A    I don't know the exact number.

22    Q    Do you have an approximation?

23    A    I don't want to guess.

24    Q    Is there a committee member for each domicile?

25    A    As far as each domicile?  I think there are

Page 23

1   members that cover more than one domicile, but I don't

2   think each domicile has its own person.

3        Q    But you cover only Denver?

4        A    Correct.

5        Q    Who are the members of the IRC?

6        A    Steve Tamkin, Robert Domaleski, Xavier

7   Fernandez, and me.

8             There are other members that I don't know, but

9   they are lower level in the structure of the industrial

10  relations committee.

11       Q    So tell me what the structure of the industrial

12  relations committee is.

13       A    Steven Tamkin covers, as far as I know,

14  Los Angeles and San Francisco.  I cover Denver.  Xavier

15  covers Chicago.  Robert covers D.C. and New York.

16       Q    And you said you are a mid-level committee

17  member and that there were lower-level committee

18  members.  Am I to understand that there are upper level,

19  mid level, and lower level?

20       A    Thinking about that, I would say that there are

21  two levels, upper level and lower level.

22       Q    And you are a member of the upper level?

23       A    Correct.

24       Q    You may have already answered this, but do you

25  know how many lower level committee members there are?

Page 24

1      A    I don't.

2      Q    Would it be more than ten?

3      A    I can't approximate.

4      Q    Does anyone, to your knowledge, know how many

5    lower-level committee members there are?

6      A    Sure.

7      Q    Who would know that information?

8      A    Steve Tamkin.

9      Q    Other than the IRC, are you a member of any

10   other committee?

11     A    No.

12     Q    Do you hold any other position with ALPA?

13     A    No.

14     Q    Have you ever been a member of any other

15   committee at ALPA?

16     A    No.

17     Q    Have you held any other position with ALPA?

18     A    No.

19     Q    When did you become a member of the IRC?  And

20   when I say IRC, you know that I'm referring to the

21   industrial relations committee?

22     A    Right.  Approximately June of 2007.

23     Q    How did you come to be a member of the IRC?

24     A    I met Steve Tamkin and we had several

25   conversations.  And after several conversations, I

Page 25

1   became a member of the industrial relations committee.

2       Q    What were the circumstances of your meeting

3   Steve Tamkin?

4       A    When we had a TA back in March of 2007, we had a

5   couple of disagreements and we talked about those

6   disagreements.  And that was the content of our

7   conversations leading up to me becoming a member of the

8   IRC.

9       Q    When you say we had disagreements, who had

10  disagreements?

11      A    Steve Tamkin and I.

12      Q    What were these disagreements?

13      A    Views on the effect of the TA.

14      Q    What was your view on the effect of the TA?

15      A    At the time or now?

16      Q    At the time.

17      A    At the time I felt that it was a good thing.

18      Q    Why did you think it was a good thing?

19      A    Because I was desperate.

20      Q    What about it made you think it was a good

21  thing, can you be more specific?

22      A    Sure.  The work rules that we had on the Airbus

23  and the 737 at the time were so terrible that at the

24  time I felt that the rules had to be changed so bad that

25  I justified a negative effect on a more senior person's

Page 26

1  aircraft for my gain.

2         Does that make sense?

3     Q   Can you explain that to me.   What was the effect

4  on the senior person's aircraft?

5     A   They were going to be forced to work more hours

6  as an effect of the TA.

7     Q   And what was going to result in their working

8  more hours?

9     A   We would have more work rules on the narrow

10 body.   We were going to take work rules away from the

11 wide body guys and give work rules to the narrow body

12 guys.

13    Q   What do you mean by work rules?

14    A   Duty rigs, trip rigs, pay issues, that sort of

15 thing.

16    Q   And what was Mr. Tamkin's view?

17    A   Steve's view was that it's never a good idea to

18 justify taking away part of someone else's contract,

19 which is totally correct.

20    Q   And how did it come to be that you had these

21 conversations with Mr. Tamkin?

22    A   We had a PC at the training center together, and

23 that's when we met and that's when we had our

24 conversations.

25    Q   What's a PC?

Page 32

1    Q    You disconnected your phone because you can't

2  afford it?

3    A    That's correct.

4    Q    Is there a reason why you can no longer afford

5  your house phone?

6    A    We're trying to cut all bills as possible.  On

7  the verge of getting furloughed, we have to try to pay

8  down as much debt as possible.  I've got twins at home,

9  I've got a family, we're doing our best just to keep our

10  house right now.

11    Q    What other phone numbers do you use?

12    A    My cell phone.

13    Q    What is that number?

14    A    303-618-8902.

15    Q    And you -- We should back up.  You mention that

16  you're on the verge of being furloughed.  When -- Do you

17  have an understanding of when you will be furloughed?

18    A    I've got no idea.

19    Q    And do you understand that others will be

20  furloughed around the same time?

21    A    Yes.

22    Q    And do you have an understanding of how many

23  will be furloughed around that time?

24    A    Yes.

25    Q    How many?

Page 33

1     A    1,450.

2     Q    And how do you know that?

3     A    It's been announced by the company.

4     Q    Do you use your cell phone to text message?

5     A    Yes.

6     Q    And how frequently do you use your cell phone to

7  text message?

8     A    My wife I text message maybe 20 times a day.

9     Q    What about people other than your wife?

10    A    Friends several times a day.

11    Q    What about any other United pilot?

12    A    I don't really text message any United pilots.

13    Q    Have you text messaged other United pilots in

14  the past?

15    A    I have in the past, yes.

16    Q    About when would you say you started text

17  messaging other United pilots?

18    A    I don't really understand your question.  Are

19  you saying mass text messages or just friends that

20  happen to be United Air Line pilots?

21    Q    Let's split it up.  Do you send mass text

22  messages?

23    A    No.

24    Q    Okay.  Let's split it up into -- have you used

25  your cell phone to text message in your capacity as an

Page 37

1    vBulletin.

2        Q    Who registered the domain name?

3        A    Jay Schumaker.

4        Q    Who is Jay Schumaker?

5        A    First officer for United Air Lines.

6        Q    What aircraft is he on?

7        A    The 737 300, I believe.

8        Q    And did you pay the $180 out of pocket?

9        A    I did.

10       Q    Did anyone reimburse you for that?

11       A    No.

12       Q    Do you own any domain names?

13       A    No, just that one.

14       Q    Are you the administrator of any other web site?

15       A    No.

16       Q    When did you create the 2172 web site?

17       A    December of 2007.

18       Q    Why did you call it ual2172?

19       A    Because 2,172 is the number of pilots that were

20   furloughed during the first -- during the furlough

21   period that we had in early '01 -- or late '01.

22       Q    How did you come up with the idea for the web

23   site?

24       A    Well, there was another board, as I talked about

25   earlier, the half-wingers board.  That board was not

Page 38

1  created until most of us were on the street.  And for

2  that reason, us getting together, we had minimal

3  influence on the union at the time because we were no

4  longer on the property.

5        So I set up the 2172 board while we were on the

6  property so we could have more influence on the union to

7  create a voting block and to have our interests met.

8    Q    And you created this board after you became an

9  IRC member?

10   A    That's correct.

11   Q    Was anyone else involved with the idea -- coming

12  up with the idea for the web site?

13   A    Just Jay Schumaker and I, that's it.

14   Q    Did you have communications with Mr. Schumaker

15  about coming up with this web site?

16   A    Yes.

17   Q    And when did those take place?

18   A    November and early December of 2007.

19   Q    And about how many times would you say you guys

20  communicated about it?

21   A    10 to 20.

22   Q    And were those communications oral or written?

23   A    Both.

24   Q    The written communications, what form did they

25  take?

Page 55

1    A    Just word of mouth, getting the word out.  We

2 would do things like when we had shut down aircraft and

3 we got off the aircraft, there was a good chance that

4 the first officer that was going to fly that airplane

5 out was a former furlough pilot, so we would write

6 2172.com in the scratch pad.  Everyone knew -- if you

7 were furloughed, you knew what 2172 was, and so that --

8 those two methods.

9    Q    So you would publicize it by writing it down to

10 the other person taking the plane, the aircraft after

11 you, right, and just by talking to other people?

12    A    That's correct.

13    Q    Did you have any e-mails that were sent from the

14 web site, do you have that capability?

15    A    Yes.

16    Q    Okay.  So e-mails can come from the web site.

17 Are you personally able to send them?

18    A    Yes.

19    Q    Are the other two administrators able to send

20 them?

21    A    Yes.

22    Q    With respect to e-mails that come from the web

23 site, what is the e-mail address that a recipient would

24 see?

25    A    Tpilott@aol.com.

Page 56

1    Q    And do you approve every message before it goes

2    out from that account?

3    A    No.

4    Q    So Mr. Schumaker and Mr. Jaslow can send

5    messages that you haven't seen?

6    A    That's correct.

7    Q    Do they have access to your AOL account, then?

8    A    No.

9    Q    But they can send messages that appear to be

10   from your AOL account?

11   A    That's correct.

12   Q    Have they ever sent a message that you disagree

13   with?

14   A    They have sent messages that I may have worded

15   differently, yes.

16   Q    Do you recall which messages those were?

17   A    No.

18   Q    Do you remember how many there have been?

19   A    Not a lot, one or two.

20   Q    What is the process for sending e-mails from the

21   web site?

22   A    Well, there is a -- you have to go to the

23   user -- the admin. user control panel.

24   Q    Okay.

25   A    There is several links on the left-hand side of

Page 57

1    the page.  You go under the user bar, and you click on

2    the e-mail user's link.  That takes you to another page

3    where you pick which subgroups you want the e-mail to be

4    sent to.

5           The subgroups are broken down by domicile,

6    registered users, unregistered users, users waiting to

7    be moderated, and several other categories.  You type in

8    what you want to be sent out, you hit submit, and that's

9    how the information is e-mailed to everyone.

10   Q    Going back just a second, you mentioned that

11   there were one or two e-mails that have been sent by

12   either Mr. Jaslow or Mr. Schumaker that, you know, you

13   would have worded differently.

14          Do you recall when those e-mails were sent?

15   A    I don't.

16   Q    Was it recently?

17   A    No.

18   Q    Okay.  Would you say it was in the past six

19   months?

20   A    Yes.

21   Q    Okay.  So coming back, you said that there are

22   subgroups to which you can e-mail.  Could you select

23   only one subgroup to send an e-mail to?

24   A    Yes.

25   Q    What is the unregistered user?

565ae733-5afc-436e-a600-6da882aa7fad

Page 58

1    A    Those are users that have signed up and have not
2  been -- but haven't been approved yet.
3    Q    And what are users waiting to be moderated?
4    A    It's very similar to the unregistered users.
5  The difference is the users waiting to be moderated are
6  the ones that have signed up -- There is a process when
7  you sign up.  You sign up.  The web site sends you an
8  e-mail back.  You have to click on a link to verify your
9  e-mail.  And after you do that, then it kicks it back to
10  us.  And when that happens, you are a user awaiting
11  moderation.
12    Q    When are you an unregistered user, then?
13    A    When you haven't verified your e-mail address.
14    Q    I see.  So is the e-mail that comes back from
15  the web site an automatic --
16    A    Yes.
17    Q    Okay.  So that's automatically generated and
18  sitting in somebody's inbox and they just haven't
19  clicked on the link?
20    A    That's right.
21    Q    When you're looking at these subgroups, can you
22  see the e-mail addresses that are in each subgroup?
23    A    You have to search for it.  It's not right there
24  in front of your face.
25    Q    But you can get to it?

Page 59

1    A    Yes.

2    Q    Now, you said that -- Were there additional

3    subgroups that you have?

4    A    There is several subgroups that I can't recall

5    right now.

6    Q    How many subgroups total would you say that

7    there are?

8    A    There is probably about 10 to 15 different

9    available choices on that page.

10   Q    When one of the administrators wants to send an

11   e-mail to the group or any subgroup, do you discuss or

12   otherwise communicate about the content of the e-mail

13   that's going to be sent out?

14   A    Only sometimes.

15   Q    What are the sometimes that you do discuss them?

16   A    When someone asks what do you think about this.

17   Q    But otherwise you don't?

18   A    No.

19   Q    Okay.  E-mails that are sent from the web site,

20   are they stored in a sent folder?

21   A    Not that I am aware of.

22   Q    Do they come to you, as well, as a user?

23   A    Yes.

24   Q    So if you send to any of these subgroups, would

25   it still come to you or would you have to be a member of

Page 62

1    A    That's correct.

2    Q    Are there any other reasons why you would deny

3    membership to someone else?

4    A    No, the only requirement is that you have to be

5    a member of the 2,172.  You have to be a former

6    furloughed pilot.

7    Q    What if someone has a United e-mail account?

8    A    From my knowledge, folks with the United e-mail

9    account have been deleted.

10   Q    Okay.  So anything other than having a United

11   e-mail account and being -- and not being a member of

12   the 2,172 that would cause somebody not to be permitted

13   to join the site?

14   A    No, that's all I could think of.

15   Q    Do you know how many people have been rejected

16   from the web site?

17   A    Many.  I can't guesstimate.

18   Q    What's your view of many?

19   A    Over 100.

20   Q    Over 100.

21        Did you respond -- Well, of these individuals

22   who have been rejected by the web site, do they contact

23   the administrators typically?

24   A    Yes.

25   Q    And have you responded personally to each of

Page 63

1  those?

2      A    Not each of them, but some of them.

3      Q    Okay.  And which ones do you choose to respond

4  to?

5      A    It depends on how much time I have.  If I have

6  time, I respond to all of the replies that I get.

7      Q    Other than the tpilott@aol.com web site, are

8  there other ways in which you communicate with the

9  members on the web site?

10     A    Verbally.

11     Q    And when you say verbally, do you mean over the

12  phone?

13     A    In person and over the phone.

14     Q    And which phone do you use to communicate with?

15     A    I used to use my house phone and sometimes my

16  cell phone.

17     Q    When was your house phone disconnected?

18     A    A week or two ago.

19     Q    With respect to the subgroups, do you ever

20  send -- have you ever sent communications to all of the

21  subgroups at once, meaning including those who were not

22  registered users?

23     A    No, I've never sent an e-mail to unregistered

24  users.

25     Q    Okay.  I think you already answered this, but

Page 64

1    with respect to postings on the various forums, are they

2    ever automatically deleted?

3        A    No.

4        Q    So there is no time frame, for example, after

5    which threads or posts --

6        A    They don't fall off, no.

7        Q    What are inappropriate topics for the web site?

8        A    Sick leave.

9        Q    Are there any others?

10       A    Anything that refers to any sort of job actions

11   is not allowed on the board.

12       Q    What's a job action?

13       A    Something that's illegal and against the RLA.

14   MS. JOSHI:  How long have we been going for?

15   MR. VITALE:  About an hour and a half.

16   MS. JOSHI:  Are you good to continue or do you want

17   to take a break?

18   THE WITNESS:  I'm fine.

19   MS. JOSHI:  Q   Okay.  Have you had any

20   conversations with any officer of ALPA regarding

21   ual2172.com?

22       A    No.

23       Q    You've never discussed the web site with

24   Mr. Tamkin?

25       A    I did discuss the web site after it became known

Page 65

1    that it existed to him.

2        Q    When did he learn that it existed?

3        A    I'd say probably late May or early June.

4        Q    What did you say to him about it?

5        A    Well, he -- I didn't say anything to him about

6    it.  He brought it up.

7        Q    What did he say to you?

8        A    What he said was that there were rumors of some

9    folks talking about illegal job actions, and he wanted

10   to know if I knew anything about that and if there was

11   anything about that subject on the message board.

12       Q    What did you say?

13       A    I told him that I deleted posts that were in

14   relation to that subject.

15       Q    What did he say?

16       A    Keep it that way.

17       Q    And what did you say?

18       A    Of course I will.

19       Q    Did you have any conversations with

20   Mr. Fernandez about the web site?

21       A    I had the same conversation with Xavier, yes.

22       Q    I guess, let me ask it this way:  When you had

23   the conversation with Mr. Tamkin, was anyone else

24   present?

25       A    The first time, no.

Page 66

1    Q    How many times did you have a conversation with

2    him about the web site?

3    A    Several over the course of the last couple

4    months.

5    Q    The one you just told me about, was that the

6    first conversation you had with him?

7    A    About the web site?

8    Q    Yes.

9    A    That's correct.

10    Q    Okay.  What about the second conversation you

11    had with him?

12    A    The second conversation that I had with him in

13    regards to the web site was in person.

14    Q    And was anyone else present?

15    A    Yes.

16    Q    Who else was present?

17    A    Xavier Fernandez and Robert Domaleski.

18    Q    Anyone else?

19    A    No.

20    Q    What was said about the web site then?

21    A    It was about keeping that kind of content off

22    the web site, which I had done previously, but they were

23    reiterating the point of not allowing -- that I should

24    not allow that to be on my web site.

25    Q    When did that conversation take place?

Page 67

1      A    Around June 12th.

2      Q    And that was an in-person meeting, you said?

3      A    That's correct.

4      Q    What about the next time you had a conversation

5  about the web site with either Mr. Tamkin, Fernandez, or

6  Domaleski?

7      A    I can't remember.  Sometime in July, but I can't

8  give you an exact date.

9      Q    Okay.  Who was -- who participated in that

10 conversation?

11     A    Steve Tamkin.

12     Q    Was anyone else present?

13     A    No.

14     Q    And that was, again, an in-person conversation?

15     A    No, over the phone.

16     Q    Over the phone.

17          What was said?

18     A    Just he wanted to make sure that that kind of

19 content was not on the board and was not being passed

20 around by word of mouth.  And I told him, no, it was

21 not.

22     Q    Any other conversations with him about the web

23 site?

24     A    No.

25     Q    What about with Mr. -- with James Anderson, Jim

Page 68

1  Anderson?

2      A    I've never had a conversation regarding the web

3  site with James Anderson.

4      Q    What about with Mr. Wallach?

5      A    I've never had a conversation dealing with the

6  web site with Mr. Wallach.

7      Q    Are Mr. Tamkin, Fernandez, and Domaleski

8  officers with ALPA?

9      A    Yes.

10     Q    Did any of the conversations that you had with

11  any of those three individuals about the web site, were

12  any of them in writing?

13     A    No.

14     Q    Do you e-mail with any of those individuals at

15  all?

16     A    No.

17     Q    Do you text message with them?

18     A    No.

19     Q    Is there a reason for that?

20     A    No particular reason.

21  MS. JOSHI:  I know I asked if you needed a break,

22  but I actually need a break, so if you don't mind.

23          No, that's fine.  We're going to be running out

24  of tape --

25          THE VIDEOGRAPHER:  We have about 20 minutes

565ae733-5afc-436e-a600-6da882aa7fad

1        Do you have an understanding or what is your

2  understanding of the phrase not wait for our leverage of

3  the busy summer months?

4      A    I've got no idea what they're trying to say.

5      Q    You have no idea what leverage of the busy

6  summer months means?

7      A    I don't know what they're referring to, no.

8      Q    So when you read that, it's just nonsense to

9  you?

10     A    I didn't write it, so I can't --

11     Q    I'm asking you --

12     A    I can't speculate what they're trying to say.

13     Q    I'm not asking you to speculate what they were

14  trying to say.  I'm asking you what your understanding

15  of the words are?

16     A    Let me read it.  Okay.  Now ask your question

17  again.

18     Q    What is your understanding of those words, the

19  leverage of the busy summer months?

20     A    I interpret that to mean don't wait until the

21  fall to enforce your contract.

22     Q    What does the busy summer months have to do with

23  leverage?

24     A    Because usually that's when -- now, again, I'm

25  guessing as to what someone else is trying to

Page 96

1    understand.

2         Q    I'm asking for your understanding.

3         A    That's the time where the manpower levels of the

4    company are more critical.

5         Q    And why is that?

6         A    Because the block hours are generally higher

7    during the summer than any other month.

8         Q    Because more --

9         A    Season, rather.

10        Q    Is that because more passengers are traveling

11   during the summer?

12        A    Correct.

13        Q    We talked a little about leverage earlier, and

14   you told me, I think, what your understanding of

15   leverage -- the term leverage, what it means to you.

16   Can you refresh what you said.  I can't remember.

17        A    Not verbatim, but in so many words I said the

18   leverage is basically what you have to lean on in

19   negotiations, that's your bargaining chip, that's your

20   leverage.

21        Q    And do you believe that if all pilots refuse to

22   accept voluntary flying assignments such as

23   junior/senior manning, would that give pilots leverage?

24        A    I've got an opinion on that, but that's not it.

25        Q    What is your opinion on it -- Well, wait,

Page 97

1    actually, let me get an answer to my question first.

2             So my question -- Can you read it back, please.

3             (From the record above, the reporter read

4             the following:

5             "Q  And do you believe that if all pilots

6             refuse to accept voluntary flying

7             assignments such as junior/senior manning,

8             would that give pilots leverage?")

9    THE WITNESS:  It would probably help.

10   MS. JOSHI:  Q   It would probably help give

11   leverage?

12       A    Correct.

13       Q    What about increased use of sick leave, would

14   that help give pilots leverage?

15       A    I don't think so.  I think it would put us -- it

16   would de-leverage us.

17       Q    And why do you believe that it would de-leverage

18   you?

19       A    Look at where we're at now.  It's a terrible --

20   it's a bad idea.  And I've written as such on the web

21   site.  That is not how you negotiate.  People -- there

22   are some folks out there that think that it gives them

23   leverage.  I've tried to educate them otherwise.

24       Q    What else do you think that pilots could do to

25   give them leverage?

565ae733-5afc-436e-a600-6da882aa7fad

Page 98

1    A    Just obey the contract.

2    Q    Does that mean refuse to waive any provisions in

3    the contract?

4    A    It could.

5    Q    What else could it mean?

6    A    That's it, just follow the contract.

7    Q    Well, how does following the contract give

8    pilots leverage?

9    A    Because I am of the belief and many folks out

10   there are of the belief that the reason that the company

11   is able to run smoothly is by the pilots going above and

12   beyond and doing things that we aren't paid to do in

13   order to make the airline run smoothly.

14        And the company talks about the goodwill of the

15   pilots and the morale of the pilots.  And it's insulting

16   because we do what we can every day in order to, you

17   know, bend over backwards to get our passengers from A

18   to B safely, and then we have management coming out and

19   saying that the morale of its employees does not matter

20   when it does.  So --

21   Q    Let me stop you here because I'm not sure you're

22   actually answering my question anymore.  I think we're

23   getting a little bit off track here.

24        Let me ask you -- so your answer to my question

25   in terms of creating leverage, the only thing that you

Page 99

1    can think of is to follow the contract and that's it?

2        A    Is to follow the contract and to not volunteer

3    as much as far as waiving some of the provisions of the

4    contract.

5        Q    And as I understand it -- Well, junior/senior

6    manning is permitted by the contract, is that not right?

7        A    That's correct.

8    MS. JOSHI:  Let's mark the next one as 7.

9        (Exhibit 7 marked as requested.)

10   THE WITNESS:  Okay.

11   MS. JOSHI:  Q   Do you recognize this e-mail?

12       A    I've seen this before, yes.

13       Q    When was the last time you saw it?

14       A    Yesterday.

15       Q    Had you seen it before yesterday?

16       A    When it came out, yes.

17       Q    I'm actually referring not just to the portion

18   drafted by Mr. Wallach.

19       A    Oh, I'm sorry.

20        Okay.

21       Q    So had you seen the portion that's attached to

22   the end of the message from --

23       A    Not until yesterday.

24       Q    Yesterday was the first time you had seen it?

25        This is dated June 4th, 2008.  Is there a

Page 100

1    thread on ual2172 dated June 4th and June 5th regarding

2    stress and fatigue?

3        A    I'm not sure.  I'd have to go back and look.

4        Q    Did you delete any such thread?

5        A    I didn't delete any threads dealing with fatigue

6    that I can recall, no.

7        Q    The reference at the top of the second page that

8    says, "we will be asking for volunteers of the 2,172 to

9    help counsel those members on the issues relating to

10   fatigue as well," what does that refer to?

11       A    I'm not sure.

12       Q    And then the letter from Captain Wallach, in the

13   fourth paragraph of it it says, "I have made this latest

14   development my top priority."

15            Do you understand what he is referring to

16   there?

17       A    He is referring to furlough mitigation.

18       Q    And he goes on to say in that same paragraph,

19   "No idea will be discounted."

20            Do you know what he is referring to there?

21       A    Any ideas that probably the folks that are in

22   harm's way by the parking of the aircraft.  I think he

23   is saying that he is open to ideas as far as jets for

24   jobs and that sort of thing.

25       Q    Did you contact Mr. Wallach with any ideas?

1    A    No.  He got ideas from resolutions that were

2    floored at LEC meetings, but, no, I never contacted him

3    directly with my ideas.

4    Q    When you say resolutions that were floored at

5    LEC meetings, how do those percolate up to Mr. Wallach?

6    A    What happens is that you floor a resolution at

7    the meeting, you have a discussion about it, and then

8    it's voted on.  If it's passed, it goes to the

9    facilitator of the meeting, which is usually the captain

10   rep of the council, and they either vote it timely or

11   untimely.

12        Now, if it's voted timely, it is presented to

13   the MEC at the next MEC meeting, and that's how it gets

14   up to Captain Wallach.

15   Q    And do you know when the MEC meeting -- Well,

16   let me ask you this:  Have you attended MEC meetings?

17   A    I have attended two MEC meetings in the past.

18   Q    Which MEC meetings have you attended?  What were

19   the dates of them?

20   A    They were in 2006.  I was still furloughed when

21   I attended.

22   Q    And why?

23   A    Because they just happened to be in Denver, they

24   had two meetings in Denver.  They don't always have

25   meetings in Denver, they're usually in Chicago.  But I

Page 102

1   was off, they were in Denver, and I decided to stop on

2   by.

3        Q    Are MEC meetings open to the general pilot

4   population?

5        A    Parts of the meeting.

6        Q    So were there parts of the meetings that you

7   attended that you were not permitted, you know, to stay

8   for?

9        A    Yes.

10       Q    Are you aware of a committee, an ALPA committee

11   called the strike preparedness committee?

12       A    I am aware, yes.

13       Q    Do you know who is on that committee?

14       A    I know who runs the committee, that's about it.

15       Q    Who runs the committee?

16       A    James Anderson.

17       Q    Okay.  And do you know when that committee was

18   created?

19       A    I do not.

20       Q    Do you know why the committee was created?

21       A    I don't know exactly why, no.

22       Q    What's your understanding of why?

23       A    I'm guessing that it's to prepare for a possible

24   strike after our amendable date on December 31st of

25   2009.

1    Q    Do you have an understanding of what -- Well,

2    actually, let me ask you this:  How did you come to that

3    understanding?

4    A    That's only my guess.

5    Q    What are you basing it on?

6    A    The title of the committee.  Strike

7    preparedness, you can only strike after your amendable

8    date.

9    Q    So you don't have any additional knowledge --

10    A    No.

11    Q    Have you met with any -- Well, since you say --

12    you only know that Jim Anderson is a member of the SPC?

13    And when I say SPC, I'm referring to the strike

14    preparedness committee.

15    A    Yes.  There are a couple members of our pilot

16    group that I think are on the SPC.

17    Q    But you don't know?

18    A    I don't know for sure.

19    Q    Have you met with Mr. Anderson since -- any time

20    since January, 2008?

21    A    I shook his hand while we were walking the

22    picket line outside the BOD meeting in Southern

23    California; but other than that, no.  As a matter of

24    fact, that was my first time ever meeting him.

25    Q    And that was your first and last time meeting

Page 104

1    him?

2        A    Correct.

3        Q    Now, you mentioned that you're a member of the

4    IRC.  How many times has the IRC met since January,

5    2008?

6        A    Just meetings where I was included, just once.

7        Q    When was that?

8        A    That was during the board of directors meeting

9    in Southern California in middle -- in mid-June.

10        Q    So between June 11th and June 13th, does that

11    sound right?

12        A    Whenever the BOD meeting was, yes.

13        Q    And who attended that meeting, not the BOD

14    meeting, the IRC meeting?

15        A    Me, Steve Tamkin, Xavier Fernandez, and Rob

16    Domaleski.

17        Q    Anyone else?

18        A    No, that was it.

19        Q    Any guest appearances by anyone else?

20        A    No.

21        Q    How long did the meeting last?

22        A    About two hours.

23        Q    And where did it take place?

24        A    At Steve Tamkin's house.

25        Q    When was the meeting arranged?

Page 105

1    A    I became aware within a week before the meeting,

2    I would say probably around June 8th or 9th.

3    Q    And who made you aware of the meeting?

4    A    Steve Tamkin.

5    Q    What did he say to you?

6    A    He wanted me to come out so the IRC can picket

7    at the board of directors' meeting, and he had something

8    that he wanted to talk to me in person about.

9    Q    What did he want to talk to you in person about?

10    A    He wanted to talk about the rumors that were

11    going around that people were talking about having a

12    sick-out on July 4th.

13    Q    And did you talk about that when you met with

14    him?

15    A    That was the bulk of our conversation.

16    Q    And can you tell me to the best of your

17    recollection what he said and what you said?

18    A    In so many words he told me it was a terrible

19    idea, which I already knew, but he hammered that point

20    home.  He knew that I had contact with a large part of

21    the pilot group, and so he wanted me to use my streams

22    of communication to not allow that to happen.

23    Q    How did he hammer it home?

24    A    He spoke about it for two hours as if I am the

25    one who created it, and I wasn't.  The rumors didn't

Page 106

1  start from me, but he kept saying the same thing over

2  and over and over again.  And it was duly noted, of

3  course.

4      Q   Did Mr. Domaleski or Mr. Fernandez participate

5  in the conversation?

6      A   They did.

7      Q   And what did they say?

8      A   The exact same thing.

9      Q   So it was two hours of just saying don't engage

10  in a sick-out over July 4th?

11      A   And why it was a bad idea.

12      Q   Was anything else discussed at the meeting?

13      A   That's all I can recall right now.  That was the

14  bulk of the conversation.  That's what I remember best

15  from our conversation.

16      Q   So after you had the two-hour meeting, did you

17  have any additional meetings with any of the members of

18  that committee?

19      A   We just talked to each other during the picket

20  of the board of directors' meeting, but that night

21  was -- that was our only meeting.

22      Q   And that's the only meeting of the IRC that you

23  have attended?

24      A   That, yes, that's the only IRC meeting that I

25  attended, yes.

Page 107

1    Q    Are you aware of other IRC meetings that you
2    have not attended?
3    A    I know that there have been meetings.  I don't
4    know when, and I don't know who attended.
5    Q    How do you know that there have been meetings?
6    A    I heard the -- I heard Steve and Rob and X
7    talking about previous meetings that they had.
8    Q    Were these meetings that took place while you
9    were a committee member?
10    A    I'm not aware.  I don't know exactly when the
11    meetings took place.
12    Q    After you returned from that meeting -- You said
13    it was in Southern California?
14    A    Yes.
15    Q    What did you do?
16    A    When I got -- Well, actually, before I got on
17    the plane, I called Jeff Jaslow.  I had not been on the
18    site.  At the time I did not have a laptop, I just got
19    my laptop in July.  So I got e-mails on my phone that
20    were -- some of the posts on the message board dealt
21    with sick list.  And so I called him Jeff Jaslow, and I
22    told him to do a search of the web site.  And the search
23    term I wanted him to put in was sick or sick list.  And
24    I told him any post or thread that comes up with that in
25    it I want you to delete it.

Page 108

1    And when I got home, I tried to make calls to

2    some of the individuals that had posted posts that had

3    sick or sick list in it and tried to explain to them why

4    they shouldn't put that kind of post in the board.

5    Q    Were you aware before the meeting about the

6    rumor regarding a sick-out on the 4th of July weekend?

7    A    I had heard the rumor, yes.

8    Q    Okay.  And how did you hear about the rumor?

9    A    Just word of mouth.

10   Q    Do you recall who specifically told you about

11   it?

12   A    No, I don't.

13   Q    Did you start a phone tree at that point to tell

14   people not to engage in a sick-out?

15   A    I started the phone tree -- Did I activate the

16   phone tree?

17   Q    Yes, sorry, did you activate the phone tree?

18   A    That was one of the communications that went

19   down the phone tree.

20   Q    Okay.  And then you did -- you did something

21   similar to that again later in the month, right?

22   A    Every time that I told folks about the progress

23   of the negotiations, I passed that message down because

24   there were a lot of folks that were restless and getting

25   very nervous about what was going on during

Excerpts and Select Exhibits from the
Deposition of Joseph C. Kolshak
August 15, 2008

JOSEPH C. KOLSHAK,   AUGUST 15, 2008

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED AIR LINES, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 08 C 4317 |
| AIR LINE PILOTS ASSOCIATION | ) | |
| INTERNATIONAL, et al., | ) | |
| Defendants. | ) | |

The deposition of JOSEPH C. KOLSHAK, called for
examination, taken pursuant to the Federal Rules of Civil
Procedure of the United States District Courts pertaining
to the taking of depositions, taken before LISA SCHWAM,
CSR No. 840-4650, a Notary Public within and for the
County of Cook, State of Illinois, and a Certified
Shorthand Reporter of said state, at Suite 2400, 131
South Dearborn Street, Chicago, Illinois, commencing, on
the 15th day of August, A.D. 2008, at 9:13 a.m.

74a1c554-e693-40f4-a10c-f22e71b3041d

JOSEPH C. KOLSHAK,   AUGUST 15, 2008

Page 2

```
 1    PRESENT:

 2          O'MELVENY & MYERS LLP,

 3          (Times Square Tower, 7 Times Square,

 4          New York, New York  10036,

 5          212-326-2000), by:

 6          MR. MARK W. ROBERTSON,

 7          mrobertson@omm.com,

 8              appeared on behalf of the Plaintiff;

 9

10          UNITED AIRLINES, SENIOR COUNSEL, LAW DIVISION,

11          (77 West Wacker Drive, 16th Floor,

12          Chicago, Illinois  60601,

13          312-997-8230), by:

14          MS. JENNIFER A. COYNE:

15          jennifer.coyne@united.com,

16              appeared on behalf of the Plaintiff;

17

18          COHEN, WEISS AND SIMON LLP,

19          (330 West 42nd Street,

20          New York, New York  10036-6976,

21          212-563-4100), by:

22          MR. JOSEPH J. VITALE,

23          JVITALE@CWSNY.COM,

24              appeared on behalf of the Defendants;
```

74a1c554-e693-40f4-a10c-f22e71b3041d

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 3

1    PRESENT (CONTINUED):

2

3        AIR LINE PILOTS ASSOCIATION, INC.,

4        (9550 W. Higgins Road, Suite 1000,

5        Rosemont, Illinois  60618,

6        847-292-1700), by:

7        MR. JOHN G. SCHLEDER,

8        JOHN.SCHLEDER@ALPA.ORG,

9            appeared on behalf of the Defendants.

10

11        ALSO PRESENT:  JENNIFER GONZALEZ, VIDEOGRAPHER.

12

13

14

15

16

17

18

19

20

21

22

23

24

74a1c554-e693-40f4-a10c-f22e71b3041d

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 24

| | | |
|---|---|---|
| | 1 | A.    No. |
| | 2 | Q.    Who was harassing whom? |
| | 3 | A.    There was either notes or names or something, |
| | 4 | but I have -- That's the extent of my knowledge on it. |
| 09:38:28 | 5 | Q.    Do you recall who informed you of -- |
| | 6 | A.    It was in the course of a meeting that I was in |
| | 7 | that it was mentioned, but I have no recollection of |
| | 8 | where it was taking place. |
| | 9 | Q.    Who was in the meeting where this topic was |
| | 10 | discussed? |
| | 11 | A.    I believe it was Jay Milone. |
| | 12 | Q.    Just you and Jay Milone? |
| 09:38:58 | 13 | A.    I think there may have been other people, but I |
| | 14 | don't recall exactly who was in the meeting. |
| | 15 | Q.    Do you recall when it -- the meeting with you |
| | 16 | and Mr. Milone and perhaps others? |
| | 17 | A.    It would have been in the last month. |
| | 18 | Q.    In your capacity as Senior Vice President of |
| 09:39:29 | 19 | Operations, do you have any responsibility for recording |
| | 20 | hotlines? |
| | 21 | A.    Generally not, though I have done one. |
| | 22 | Q.    Just one? |
| | 23 | A.    Just one. |
| | 24 | MR. VITALE:  Okay.  Can I have this marked as |

74a1c554-e693-40f4-a10c-f22e71b3041d

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 25

09:39:48    1    ALPA 7.

2    (ALPA Exhibit 7 marked as requested.)

3    BY MR. VITALE:

09:41:22    4    Q.    I'm sorry, Mr. Kolshak.  Have you had an

5    opportunity to review what's been marked as ALPA

6    Exhibit 7?

7    A.    I have.

09:41:30    8    Q.    Is this the text of the hotline you recorded?

9    A.    It is.

10    Q.    Just so I'm -- And I apologize for coughing.

11    Just so I'm clear, is the hotline something

12    you -- a message -- an audio message -- you record?

13    A.    It's an audio message that's generally recorded

14    by the head of flight operations, except in special

15    circumstances others can use it.

09:41:57    16    Q.    Okay.  And how does one get to listen to the

17    audio message that gets recorded as a hotline?

18    A.    I assume they have to call in to some number.

19    Q.    Do you know who has the number to call in?

20    Does every pilot have that number to call in?

21    A.    I am not sure, but I suspect if it's like other

22    airlines -- the one I came from -- that it would be

23    posted in the domiciles, and pilots would be generally

24    aware of it.

74a1c554-e693-40f4-a10c-f22e71b3041d

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 26

|          |    |
|----------|----|

09:42:28

09:42:58

09:43:37

1        Q.    Okay.  And would it just be pilots or would it

2   be company wide, carrier wide?

3        A.    Generally, it's pilots, but if it's an 800

4   number, obviously there's no controlled access.

5        Q.    And do you know if it's an 800 number?

6        A.    I'm not aware -- I'm not sure.

7        Q.    And then whatever message is recorded, is it

8   also transcribed, reduced to written form?

9        A.    I don't know if it is or not.

10        Q.    Okay.  Do you know whether the hotline you

11   recorded was sent as an e-mail to pilots?

12        A.    I'm not aware that it was.

13        Q.    Did you author this hotline?

14        A.    Our corporate communications department did.

15        Q.    Did you have any participation in the crafting

16   of this text?

17        A.    After it was crafted, I reviewed it.

18        Q.    Did you make any changes?

19        A.    I did make some changes.

20        Q.    Do you recall any of the changes you

21   suggested?

22        A.    I don't recall the specific changes.  And I'm

23   not -- There's one number in here that I know was

24   changed, and I'm not sure if this is the corrected number

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 27

1    or not.

2            There is a 50 percent.  I know that we did

3    record it once, and it was erroneous and it was

09:43:57    4    re-recorded.  But I'm not sure if that's the corrected

5    number or not.

6        Q.    I will represent to you that this is the

7    uncorrected number.

8        A.    Okay.

9        Q.    Do you see the third paragraph of the hotline

10    begins with the word "with"?

11        A.    Yes.

12        Q.    Do you recall if you suggested any changes to

13    that paragraph?

14        A.    I don't recall.

09:45:03    15        Q.    Do you know for a fact that Steven M. Tamkin

16    organized sick leave abuse by certain pilots?

17        A.    I'm sorry.  Who is that?

18        Q.    Steven M. Tamkin, Robert J. Domaleski, Junior;

19    Xavier F. Fernandez and Anthony R. Freeman are the four

20    individual Defendants in the litigation.

09:45:26    21            In the paragraph that begins with the word

22    "with," when you were referring to four -- "With this

23    complaint, we are seeking a preliminary injunction

24    against ALPA and four pilots" -- when you refer to four

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 28

1    pilots, are you referring to the four Defendants?

2        A.    I would assume that's who is being referred

3    to.

4        Q.    Do you know for a fact that Steven M. Tamkin

09:45:58    5    organized sick leave abuse by certain pilots?

6        MR. ROBERTSON:  Objection, vague and

7    ambiguous.

8    BY THE WITNESS:

9        A.    I believe that's the nature of the complaint.

10    BY MR. VITALE:

11        Q.    Is the complaint an allegation or a statement

12    of fact?

13        MR. ROBERTSON:  Objection, calls for a legal

14    conclusion.

15    BY MR. VITALE:

16        Q.    Your understanding.

17        A.    Again, I'm not a lawyer.

18        Q.    Okay.

19        A.    So you're asking me a specific term.  And I

20    don't know.

21        Q.    Okay.  Well, even if you're not a lawyer, you

22    would agree with me, don't you, that there is a

23    difference between saying "I believe something happened"

09:46:28    24    and saying "something happened"?

JOSEPH C. KOLSHAK,    AUGUST 15, 2008

Page 29

1    A.    The Company believes that the facts will prove

2    that.

3    Q.    Okay.  When you were reviewing the paragraph

4    that we're talking about now, did you suggest any changes

5    to the paragraph to say, "We believe the facts will

6    establish that four pilots have organized sick leave"?

7    A.    I don't recall.

09:47:04    8    Q.    When you reviewed this paragraph, did you

9    suggest any changes to include the word "allegedly" in

10    the paragraph?

11    MR. ROBERTSON:  Objection, asked and

12    answered.

13    BY THE WITNESS:

14    A.    I don't recall.

15    BY MR. VITALE:

09:47:31    16    Q.    Is it your testimony that there is no

17    difference in the meaning of this paragraph if you insert

18    "allegedly" between "who" and "have"?  That the sentence,

19    "We are seeking a preliminary injunction against ALPA and

20    four pilots who have allegedly organized sick leave abuse

21    by certain pilots," has the same meaning as "four pilots

09:47:59    22    who have organized sick leave abuse by certain pilots"?

23    MR. ROBERTSON:  Objection, multiple

24    questions and vague and ambiguous.

74a1c554-e693-40f4-a10c-f22e71b3041d

From: Masterson, William [WHQPR]Sent: Wed 7/30/2008 3:57 PMTo: all.pilots;
all.pilots-personalCc: Subject: Hotline 7-30-2008

Message from Joe Kolshak, Senior Vice President of Operations.

Flight Ops Hotline

Hello, this is Joe Kolshak, senior vice president – of Operations on July 30, 2008, with a special
hotline message for all United pilots. First of all, I want to thank you for your continued commitment to
safety and professionalism and your hard work in support of United and our customers.
I also appreciate the warm welcome I've received traveling the system, learning about my new
responsibilities at United, including Maintenance, Flight Operations and the Operational Control
Center. I'm delighted to be a member of the team and certainly very aware of the challenges United
and the industry face today and the opportunity available to improve our operating
performance........Regrettably, my message today focuses on an unfortunate, but necessary, action
that the company is taking today in support of our customers and employees.

Today, United filed a complaint in federal court, seeking to stop ALPA and certain pilots from
engaging in organized and unlawful job actions. These actions have resulted in hundreds of flight
cancellations that have adversely impacted our customers and employees who are working hard to
make United successful.

With this complaint, we are seeking a preliminary injunction against ALPA and four pilots who have
organized sick leave abuse by certain pilots. The company also seeks to end a campaign of
intimidation and harassment that discourages picking up additional flying.

While our action is not without precedent, it is by no means an easy decision and one which we took
great steps to avoid. We pursued this course only after working on every other possible resolution,
including increasing reserve pilot staffing by 50 percent at significant cost to the company. We also
modified a number of work rules in our current agreement.

Now, it is necessary for us to ensure the integrity of our operation for our customers, our owners and
employees... and to put an end to the targeted intimidation and harassment that has put many of you
and your families in a very difficult position. We are focused on driving the results necessary for
United's success in today's volatile and challenging marketplace. The actions the complaint is
intended to address seriously undermine all of our efforts.

And I want to emphasize to you today – and be very clear that the actions referenced in the
complaint are the work of ALPA and a small group of pilots. I know that you continue to act
professionally and are providing the very best service to our customers and supporting our
colleagues across the company.

As we work to resolve these issues, we need to remain focused on improving reliability, working
effectively as a team to ensure our best performance and, most importantly, continuing to meet the
highest safety standards.
That is the work we need to focus on and that is the work necessary for us to be successful. Again,
thank you for all you do for United and fly safely.



Excerpts and Select Exhibits from the
Deposition of Jay D. Milone
August 14, 2008

JAY D. MILONE,  AUGUST  13,  2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED AIR LINES, INC., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 08 C 4317 |
| AIR LINE PILOTS ASSOCIATION | ) | |
| INTERNATIONAL, et al., | ) | |
| Defendants. | ) | |

        The deposition of JAY D. MILONE, called for

examination, taken pursuant to the Federal Rules of Civil

Procedure of the United States District Courts pertaining

to the taking of depositions, taken before LISA SCHWAM,

CSR No. 840-4650, a Notary Public within and for the

County of Cook, State of Illinois, and a Certified

Shorthand Reporter of said state, at Suite 2400, 131

South Dearborn Street, Chicago, Illinois, commencing, on

the 13th day of August, A.D. 2008, at 9:14 a.m.

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST 13,   2008

Page 2

```
 1     PRESENT:

 2           O'MELVENY & MYERS LLP,

 3           (Times Square Tower, 7 Times Square,

 4           New York, New York  10036,

 5           212-326-2000), by:

 6           MR. MARK W. ROBERTSON,

 7           mrobertson@omm.com,

 8              appeared on behalf of the Plaintiff;

 9

10           UNITED AIRLINES, SENIOR COUNSEL, LAW DIVISION,

11           (77 West Wacker Drive, 16th Floor,

12           Chicago, Illinois  60601,

13           312-997-8230), by:

14           MS. JENNIFER A. COYNE:

15           jennifer.coyne@united.com,

16              appeared on behalf of the Plaintiff;

17

18           COHEN, WEISS AND SIMON LLP,

19           (330 West 42nd Street,

20           New York, New York  10036-6976,

21           212-563-4100), by:

22           MR. MICHAEL E. ABRAM,

23           MABRAM@CWSNY.COM,

24              appeared on behalf of the Defendants;
```

JAY D. MILONE, AUGUST 13, 2008

Page 3

```
 1      PRESENT (CONTINUED):

 2

 3          AIR LINE PILOTS ASSOCIATION, INC.,

 4          (9550 W. Higgins Road, Suite 1000,

 5          Rosemont, Illinois  60618,

 6          847-292-1700), by:

 7          MR. JOHN G. SCHLEDER,

 8          JOHN.SCHLEDER@ALPA.ORG,

 9              appeared on behalf of the Defendants.

10

11          ALSO PRESENT:  JENNIFER GONZALEZ, VIDEOGRAPHER.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE, AUGUST 13, 2008

Page 10

|  |  |  |
|---|---|---|
|  | 1 | A.  Got it. |
|  | 2 | Q.  In paragraph 11 of your declaration, you refer |
|  | 3 | to a Strike Preparedness Committee, SPC, that you said |
|  | 4 | was created in December 2006. |
|  | 5 | Do you see that? |
| 09:21:00 | 6 | A.  I see that. |
|  | 7 | Q.  All right.  And in that same paragraph, you |
|  | 8 | refer to a statement in a publication that the "theme is |
|  | 9 | the SPC's message to you that you need to join us in |
|  | 10 | ensuring we all fly the present contract and not waive |
| 09:21:26 | 11 | any section of it."  And then it goes on to say, "Only |
|  | 12 | through one voice will management hear us." |
|  | 13 | In reference to the statement that you've |
|  | 14 | quoted in paragraph 11, is it your assertion in this |
|  | 15 | declaration that the statement you're referring to was a |
|  | 16 | violation of the collective bargaining agreement between |
|  | 17 | ALPA and United Airlines? |
|  | 18 | MR. ROBERTSON:  Objection, calls for a legal |
|  | 19 | conclusion. |
|  | 20 | BY MR. ABRAM: |
|  | 21 | Q.  You may answer. |
| 09:22:01 | 22 | A.  Mike, could you just repeat the question piece |
|  | 23 | of it, not the prelim. |
|  | 24 | Q.  In regard to the statement that you've quoted |

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 11

```
 1   in paragraph 11, is it your position -- or was it your

 2   position at any time that the statement you're quoting

 3   represented a violation of the collective bargaining

 4   agreement between United and ALPA?

 5       MR. ROBERTSON:  Same objection.

 6   BY THE WITNESS:

 7       A.   I do not believe that it represents a violation

 8   of the collective bargaining agreement.

 9   BY MR. ABRAM:

10       Q.   Is it a message to which United Airlines has

11   objection?

12       A.   Taken in conjunction with many other statements

13   that the Association has put out subsequent to this, yes.

14       Q.   All right.  And what is the objection of United

15   Airlines?

16       A.   The objection of United Airlines is that we

17   believe this is just one of many communications similar

18   to the pilot group that they should engage in a campaign

19   of concerted activity on a variety of fronts with the

20   purpose of pressuring the Company into reopening their

21   collective bargaining agreement prior to the scheduled

22   date to exchange openers in 2009.

23       Q.   And when this was published in December of

24   2006, the statement that you quoted in paragraph 11, were
```

09:22:30  (line 10)

09:22:58  (line 18)

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 12

1      you employed by United Airlines at that time?

09:23:29    2         A.    Yes, I was.

3         Q.    Were you in the present position that you

4      occupy?

5         A.    Yes, I was.

6         Q.    Were you made aware of this statement at the

7      time?

8         A.    Within a matter of days I would say I was made

9      aware of it.

10        Q.    Right.  Do you have responsibilities for

11     communication with the Air Line Pilots Association

12     concerning collective bargaining matters?

13        A.    Yes.  At a certain level, yes.

09:23:56   14        Q.    Does that include if the Air Line Pilots

15     Association is making statements or engaging in conduct

16     which United Airlines finds objectionable, do your

17     responsibilities include bringing those objections to the

18     attention of the Air Line Pilots Association?

19        MR. ROBERTSON:  Objection, incomplete

20     hypothetical and vague and ambiguous.

21     BY THE WITNESS:

22        A.    I would say with respect to this type of

23     communication, my communication with them is really more

09:24:28   24     along day-to-day individual collective bargaining

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE, AUGUST 13, 2008

Page 13

1    agreement issues that I speak often with Mr. Schleder,

2    who is in attendance here.  Issues like this would

3    probably be handled at higher levels than me, Mike.

4    BY MR. ABRAM:

5        Q.   Do you know -- Withdrawn.

6             Did you raise any objection with ALPA

7    concerning the statement that you see in paragraph --

8    that you quoted in paragraph 11, at the time that it came

09:24:55    9    to your attention?

10       A.   No.

11       Q.   Do you know whether United Airlines through any

12   other official did so?

13       A.   I don't know that.

14       Q.   I'd like to turn your attention then to

15   paragraph 13 of your declaration.  You stated in the

16   first sentence of paragraph 13, quote, "The general theme

09:25:29   17   of ALPA's campaign is that United pilots must create

18   leverage to force United to reopen the United-ALPA

19   Agreement," closed quote.

20            Turn, please, to Exhibit 1 of your declaration.

21   It follows page 18.  Yes.  It follows page 18 of your

09:25:55   22   declaration.

23       A.   Okay.  I have it.

24       Q.   All right.  Now, Exhibit 1 is the document that

JAY D. MILONE, AUGUST 13, 2008

Page 14

1    you referred to in paragraph 11 of your declaration, is

2    it not?

3        A.   Yes, it is.

4        Q.   All right.  And could you please identify where

5    in Exhibit 1 one would find a statement that refers to a

6    theme of a campaign that United pilots must create

09:26:29    7    leverage to force United to reopen the United-ALPA

8    Agreement.

9        A.   The exhibit is attached to paragraph 11 --

10   referenced in paragraph 11 of my declaration -- not in

11   paragraph 13.

12        Again, I think this statement -- Statements

13   made in Exhibit 1 are consistent with an overall theme

14   that's developed in subsequent Association communications

15   where the campaign theme is developed more fully.

09:27:01    16        Specifically, though, on page 1 of Exhibit 1,

17   "It's time to fix it now," my interpretation of that is

18   that the Association wanted to fix the contract that they

19   were unhappy with.

20        Q.   And what part of the contract did they want to

21   fix?

22        MR. ROBERTSON:  Objection, calls for

23   speculation.

24   BY MR. ABRAM:

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 18

09:32:06    1    Captain Wallach has "directed the Negotiating Committee

2    and the System Schedule Committee to devote all their

3    time and energy to protecting the jobs of all of our

4    pilots.  No idea will be discounted."

5          Does that reflect a campaign by ALPA to use

09:32:26    6    self-help, take action that you regard as improper in

7    order to reverse the furloughs?

8          MR. ROBERTSON:  Objection, compound.

9    BY MR. ABRAM:

10         Q.    Does it reflect either of those things?

11         A.    Can you ask it one question at a time.

12         Q.    Does the statement that you're referring to on

13    Exhibit 9 of your declaration reflect a campaign by ALPA

14    to reverse the furloughs through any kind of improper

15    activity?

16         A.    There's nothing on the face of this memo that

09:32:59   17    would reflect anything improper.  But again, Mr. Abram, I

18    would assert that virtually all these communications kind

19    of build on each other.  And communications subsequent to

20    the 4th and the evidence that we've found regarding the

21    Industrial Relations Committee's involvement in the Web

22    site, all point to the Association's involvement in

09:33:27   23    promoting the sick leave campaign in response to the

24    Company's announcement of furloughs.

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST  13,  2008

Page 19

1          Q.    What -- Withdrawn.

2               I take it from your answer that you saw nothing

3     improper in Captain Wallach's telling the pilots that he

4     has "directed the Negotiating Committee and the System

5     Schedule Committee to devote all their time and energy to

6     protecting the jobs of all of our pilots"; is that

7     correct?

8          MR. ROBERTSON:  Objection, misstates prior

9     testimony.

10    BY MR. ABRAM:

09:33:59   11          Q.    Well, I'm asking you for your opinion, so you

12    may answer.

13          A.    I find nothing improper in that specific

14    communication.

15          Q.    All right.  Now, with respect to your statement

16    a moment ago that you have evidence of the Industrial

17    Relations Committee's involvement in the Web site that

18    you're referring to.  Let's ask about what is that Web

19    site?

20          MR. ROBERTSON:  Objection, vague and

09:34:29   21    ambiguous.

22    BY MR. ABRAM:

23          Q.    What is the Web site that you're referring to

24    in your testimony?

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 20

1          A.    Are you asking about the e-mail address or the

2    Web site address?

3          Q.    Well, what is your -- When you're talking about

4    a Web site, how would you describe that Web site?

5          A.    I believe it's a Web site that is purportedly

6    put together for members -- for United pilots who were

7    furloughed subsequent to 9/11.  I think there were 2,172

8    of them.  And that's in the Web site address.

09:34:57      9          And the Web site is -- my understanding -- it's

10    been used to assist in coordinating the sick leave

11    campaign.

12          Q.    What is that understanding based on, the

13    understanding that you just stated, that the Web site has

14    been used in coordinating the what you call a sick leave

15    campaign?

16          A.    I don't know if I can catalog everything, but

17    in additional work that our corporate security technology

09:35:27     18    people did, they found an e-note traffic in our e-note

19    system references to the UAL 2172 Web site, which

20    indicate that it is -- which have references to it being

21    used to coordinate activities.

22          Q.    Are those the e-notes that you referred to or

23    that you've attached to your declaration?

09:35:58     24          A.    I believe those are.  Those are the ones that I

JAY D. MILONE, AUGUST 13, 2008

Page 21

1    am aware of.  I don't purport to have the whole catalog

2    of information on this.

3        Q.    But when you were giving your opinion that the

4    Web site is involved in promoting a sick leave campaign

5    or a sickout campaign, or however you describe it, that's

6    based, in part, upon the e-notes that you have attached

7    to your declaration?

8        A.    In part.  And it's also based on the connection

9    of Mr. Freeman with the Industrial Relations Committee

10   and what my general understanding of what the Industrial

09:36:29    11   Relations Committee does, along with the very evident

12   statistical spikes in sick leave following virtually

13   every communication -- well, not virtually every

14   communication, but following certain communications from

15   the ALPA MEC chairman.

16       Q.    But not following other communications?

17       A.    In following certain of them, yes.

18       Q.    But not following others; is that correct?

19       A.    You have to point out a specific one, and we

20   could walk through which ones are and which ones

21   aren't.

22       Q.    But the MEC issues many communications at

23   United Airlines, does he not?

24       A.    It's my understanding he issues many

JAY D. MILONE, AUGUST 13, 2008

Page 22

| | | |
|---|---|---|
| 09:37:00 | 1 | communications publicly and many communications |
| | 2 | privately. |
| | 3 | Q. All right. So you have knowledge of his |
| | 4 | private communications? |
| | 5 | A. I don't have knowledge of the substance of |
| | 6 | them, but I certainly believe that he has a number of |
| | 7 | communications that are not public communications |
| | 8 | distributed to all pilots, that's correct. |
| | 9 | Q. Distributed to all pilots. Are any of these |
| | 10 | piles people who work in United Airlines management? |
| | 11 | A. The private communications? |
| | 12 | Q. Yes. |
| | 13 | A. I doubt it. |
| 09:37:28 | 14 | Q. Right. Have you heard what those private |
| | 15 | communications are? Have you heard them? Have they been |
| | 16 | repeated to you? |
| | 17 | A. No. It is a general understanding. |
| | 18 | Q. It's a general understanding based upon a |
| | 19 | belief? |
| | 20 | A. Based on being in this industry for 16 years. |
| | 21 | Q. So being in the industry for 16 years qualifies |
| | 22 | you to say that Captain Wallach issues private |
| | 23 | communications that you find objectionable, but you do |
| | 24 | not know the content of these communications? |

JAY D. MILONE,  AUGUST  13,  2008

Page 27

1    A.    I didn't look into it.

2    Q.    Do you know where they traveled to, according

3    to your records?

4    A.    Who traveled to?

5    Q.    The three members of the Industrial Relations

6    Committee, Captain Anderson, Mr. Freeman.

7    A.    Yes.  It appears that they traveled to the Los

8    Angeles, California area.

9    Q.    Do you know what was happening in Los Angeles,

10   California that day in relationship to -- or that period

09:42:29    11   in relationship to United Airlines?

12   A.    We had -- There was a shareholders meeting.  It

13   was in and about that same time frame.

14   Q.    Do you know whether or not the members of the

15   Industrial Relations Committee, Captain Anderson and

16   Mr. Freeman attended any part of the shareholders

17   meeting?

18   A.    I do not know.

19   Q.    Did you look into that?

20   A.    No.

09:43:08    21   Q.    Now, how is it that United Airlines decided to

22   look at the travel record of Mr. Freeman?

23   A.    We decided to look at his travel record -- I

24   believe I already explained this -- because the ALPA drop

JAY D. MILONE, AUGUST 13, 2008

Page 28

09:43:26

1    request that his name was submitted on, contained the

2    names of the three Industrial Relations Committee

3    members, as well.

4          So we wanted to see, did they all travel

5    together?  Which, in our minds, would indicate that they

6    were acting in concert.

7          Q.    Certainly traveling in concert, I suppose,

8    would be one way of looking at it; isn't that correct?

9          A.    That's one way of looking at it.  We believe

10    that they were acting in concert.

11          Q.    Well, what do you base that belief on other

12    than the fact that they were apparently traveling or

09:43:59

13    intending to travel together, to the same place from the

14    same place?

15          A.    That's primarily it.

16          Q.    Primarily.  Anything else?

17          A.    Well, what transpired afterwards I think

18    solidifies our belief.

19          Q.    Well, what transpired afterwards?

20          MR. ROBERTSON:  Objection, calls for a

21    narrative.

22    BY MR. ABRAM:

23          Q.    I'm asking you what you're referring to.

24          A.    A very -- In a very short time frame, a very

JAY D. MILONE,  AUGUST  13,  2008

Page 29

1    sharp and distinctive increase in sick leave.

09:44:30    2        Q.    This travel event took place, according to what

3    you just said, during the period something like June 11

4    to 13; is that correct?

5        A.    Approximately, yes.

6        Q.    And United Airlines had announced its plan to

7    ground a large number of airlines on June 4th; is that

8    correct?

9        A.    I believe that's correct.

10        Q.    And how many airplanes did United announce at

11    that time it was going to ground?

12        A.    I believe it announced in June 4th it was going

09:44:59    13    to ground a hundred aircraft.

14        Q.    Okay.  And how many -- It did not announce at

15    that time how many pilots would be furloughed as a result

16    of that; is that correct?

17        A.    That's correct.

18        Q.    When did it make that announcement?

19        A.    I don't know the specific date.

20        Q.    It was a couple weeks later?

21        A.    Yes.  There was, I would say, a two- to

22    four-week period of time between when we announced the

09:45:29    23    grounding of the aircraft and how many pilots that would

24    actually impact.

JAY D. MILONE,  AUGUST  13,  2008

Page 34

1    hasn't yet been a search for e-mail on that subject, that

2    it be searched for.  If we could, please, Counsel.

3    BY MR. ABRAM:

09:50:58    4    Q.   Now, do you recall any of the -- Well, back up.

5    Withdrawn.

6    What was said by the participants in the

7    conversations concerning the timing of the

8    announcements?

9    A.   I don't recall specific -- what the specific

10   conversation was about the timing of the announcement.

11   Q.   Do you recall any conversation concerning

09:51:25   12   United's concern that once it announced furlough numbers,

13   the level of sick leave use among those likely to be

14   furloughed would go up?

15   A.   I don't remember that being part of the

16   discussion.  I believe our primary -- The reason that I

17   can remember why there was some delay between the time we

18   announced the number of aircraft and when we announced

19   the number of pilots were going to be furloughed was it

20   took us several weeks to figure out how many that was

09:51:58   21   going to be, and we didn't want to put a number out there

22   that we had to change shortly thereafter.

23   So we were trying to get as much certainty

24   around the number as we could.  And it was -- It's a very

JAY D. MILONE,  AUGUST  13,  2008

Page 35

1    gray area trying to project attrition, trying to project

2    the outcome of furlough mitigation discussions that had

3    already commenced with the Association and how many

4    pilots we would get to voluntarily leave, things like

5    that.

09:52:26    6        So that's my recollection as to why we couldn't

7    announce on June 5 what the announcement date was going

8    to be, what the pilot furloughs were going to be.

9        Q.    You announced the number of aircraft?

10        A.    On June 4.  The number of aircraft were

11    announced on June 4.  That's the date I do remember.  I

12    don't recall exactly what date we came out with the

13    announcement of furloughs.

14        Q.    After the announcement of the number of

15    aircraft, did United and ALPA engage in discussions on

16    what you've called furlough mitigation?

17        A.    Yes.

18        Q.    What is furlough mitigation?

09:52:59    19        A.    In my mind, furlough mitigation is primarily

20    the effort to get people to voluntarily leave so the

21    number of involuntary furloughs would be reduced.

22        Q.    Was it improper for ALPA to want to engage with

23    United in furlough mitigation?

24        A.    Not at all.

JAY D. MILONE, AUGUST 13, 2008

Page 36

1          Q.   Was the fact that ALPA wanted to do so evidence

2     of some kind of concerted activity on ALPA's part that

3     United regarded as improper?

09:53:28    4          A.   I would say their efforts to engage in furlough

5     mitigation discussions were not part of a concerted

6     campaign.

7          Q.   Now, the announcement on June 4th concerning a

8     hundred aircraft being grounded -- Withdrawn.

9               You mentioned a little while ago that one of

10    the reasons, I think, that you felt that the fact that

11    the members of the Industrial Relations Committee and

09:53:57   12    Mr. Freeman were apparently together in one city at the

13    same time, that that, in your view, was related to the

14    use of sick leave among United pilots; is that correct?

15         A.   I apologize.  Would you read that back.

16         Q.   All right.  Well, I'll just state it again.

17    Make it a little easier.

18              Did I correctly understand you to be saying

19    earlier that you believe that there was a relationship

09:54:27   20    between the use of sick leave among United pilots and the

21    apparent fact that some -- that members of the Industrial

22    Relations Committee and Mr. Freeman were intending to

23    travel together to Los Angeles during the June 11-13 time

24    frame?

JAY D. MILONE,  AUGUST  13,  2008

1      A.   Mike, I don't understand the question insofar

2   as you're asking me the sick leave -- Do we believe the

3   sick leave had something to do with their intention to

4   travel together?

5      Q.   No.  The fact that they were together,

09:55:00   6   according to your view.

7      A.   That's a different question.

8      Q.   All right.

9      A.   Do I believe there is a correlation between

10   them?

11      Q.   Yes.

12      A.   Yes.

13      Q.   All right.  Now, is it because the use of sick

14   leave started to go up after they met, according to your

15   view, that they met?

16      A.   Yes.  Not immediately thereafter, but within

17   the next few weeks.

09:55:30   18      Q.   Went up within the next few weeks.  When did it

19   start to go up?

20      A.   Excuse me.  It started to go up about four

21   weeks after they met.

22      Q.   Started to go up about four weeks later.  So

23   the middle of July, approximately?

24      A.   Right.  I believe on or about July 18th is when

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST  13,  2008

Page 38

1      we saw the first significant spike.

09:55:48   2          Q.   Okay.  Are you aware of any other occasions

3      between the middle of June and the middle of July when

4      members of the Industrial Relations Committee and

5      Mr. Freeman were together?

6          A.   Not that I'm aware of.

7          Q.   Are you aware of any communications that they

8      made, any of them, made to the pilots or to any pilots,

9      following their apparently being together in Los Angeles

10     in the middle of June?

09:56:35   11          A.   Not that I'm aware -- Wait just a minute.  I

12     want to check.

13          Q.   Checking on your declaration?

14          A.   Checking on exhibits attached to my

15     declaration.  I don't believe the e-notes that are

16     attached here are directly to or from Mr. Freeman, so

17     no.

09:56:56   18          Q.   Okay.  I'd like to direct your attention to

09:57:26   19     Exhibit 2 to your declaration.

20          A.   Okay.

21          Q.   Exhibit 2 includes in the middle a -- of this

22     page that's shown here, the first page, page 1 of 3, a

09:58:00   23     set of statements concerning fatigue policy and pilot

24     pushing.

JAY D. MILONE,   AUGUST   13,   2008

Page 39

1          Do you see that?

2          A.    I see it, yes.

3          Q.    All right.  What is pilot pushing, as you

4    understand it?

5          A.    As I understand it, it is the pilot's

6    perception that the Company generally, through the Flight

09:58:27   7    Ops Management Group, is pushing them to fly when they

8    don't feel they should be flying or something similar to

9    that.

10         Q.    Well, for example, if a pilot is sick would be

11    one instance or calls in sick and he gets a pushback of

12    some kind from Flight Ops, that would be considered pilot

13    pushing, as you understand the pilots see it?

09:58:58   14         A.    I can't answer how the pilots see it.  That's

15    not really the way I viewed it.  I've felt it's more in

16    the lines of them not taking an aircraft when we believe

17    it's a deferrable item and the aircraft is safe.

18         More things like that.  I really haven't viewed

19    it in the sick leave arena.

20         Q.    Have you viewed it in the fatigue policy arena?

21         MR. ROBERTSON:  Objection, vague and

22    ambiguous.

23    BY THE WITNESS:

24         A.    I think it can come into play in that.

JAY D. MILONE,   AUGUST  13,  2008

Page 40

BY MR. ABRAM:

1

2      Q.    All right.  And it does on this page, does it

09:59:27   3   not?  The two of them are linked?

4      A.    This is the Association's documents?

5      Q.    Yes.  We're talking about the pilots' view of

6   things.

7      A.    Right, right.

8      Q.    You're in charge of Labor Strategy.  I'm trying

9   to understand your view of what the pilots understand by

10   pilot pushing.

11         That's a phrase you've heard them use, is it

12   not?

13      A.    Yes.  And I believe I gave you what I believe

14   what my perception was.

15      Q.    All right.  Your perception of the pilots'

16   view; is that correct?

17      A.    Yes.

09:59:58   18   Q.    All right.  What is your view on behalf of

19   United Airlines, your perception by United Airlines of

20   what is pilot pushing?

21      A.    I don't believe we consider it's pilot pushing

22   when we question a pilot decision on such things.  They

23   believe that from the pilots' perspective apparently they

24   believe that it is at times.  I think in our perspective

JAY D. MILONE, AUGUST 13, 2008

Page 41

| | | |
|---|---|---|
| | 1 | it's a management prerogative to ask questions of pilots |
| 10:00:28 | 2 | who are unwilling to do what they were assigned to do. |
| | 3 | May be for legitimate reasons, may not be. |
| | 4 | Q. You're aware, I -- Are you aware that the Air |
| | 5 | Line Pilots Association and other -- Withdrawn. |
| | 6 | Are you aware that the Air Line Pilots |
| | 7 | Association at United Airlines has been concerned for |
| | 8 | some period of time about the subject of pilot fatigue? |
| | 9 | A. Yes. There have been discussions with the |
| 10:00:59 | 10 | Company and the Association about pilot fatigue and |
| | 11 | efforts to mitigate that in the operation. |
| | 12 | Q. All right. And why is that, to your |
| | 13 | understanding? Why have those discussions taken place? |
| | 14 | A. We have been trying to work with the |
| | 15 | Association to find solutions to mitigate the number of |
| | 16 | instances where pilots would become fatigued in the |
| | 17 | operation. It does happen. |
| | 18 | Q. All right. And what is the impact of -- What |
| 10:01:29 | 19 | is the potential impact, as you understand it, of pilots |
| | 20 | becoming fatigued in the operation? |
| | 21 | A. Impact on who? |
| | 22 | Q. On the operation. |
| | 23 | A. If a pilot becomes fatigued in the operation, |
| | 24 | it can lead to a shortage of pilots if we don't have a |

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087    800.708.8087    FAX: 312.704.4950

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 42

1    reserve available to cover.  If we have no volunteers to

2    do your senior man flight.  It can result in a delay or

3    even cancellation of a flight.

4        Q.   And that's because if a pilot is fatigued, he

5    should not be taking the flight; is that correct?

6        A.   That's correct.  A pilot who is fatigued should

10:01:58    7    never take the flight.

8        Q.   To your knowledge, did United Airlines object

9    to ALPA's publication on or about July 15th of a

10    statement by the -- on the subject of fatigue policy and

11    pilot pushing?

12        A.   I personally did not relay any objection to the

13    Association over this document.  I don't know if others

10:02:29    14    did because, again, as I've stated several times before,

15    it's our view, you have to look at the entirety of the

16    Association communications together and not at the

17    individual communications to understand what is going on

18    here.

19        Q.   All right.  So when you say "to understand what

20    is going on here," with respect to this Exhibit 2, was

21    it -- What is your understanding -- What is your

22    understanding of what is going on here in regard to

23    Exhibit 2?

10:02:59    24        A.   I believe this is further evidence, further

JAY D. MILONE,   AUGUST  13,   2008

Page 43

1    indication, that the Association is trying to get the

2    pilots to fly as close to the contract as possible.  Fly

3    to the book.  Fly -- To slow the operation.  To make the

4    operation more difficult for United to manage.

5         Q.   So in regard to this particular statement with

6    respect to fatigue policy and pilot pushing, it's your

10:03:27  7    view that this was part of an effort to slow the

8    operation?

9         A.   I believe that this, in conjunction with many

10   other communications that came out both before and after

11   this, is part of a concerted effort to impact the

12   operation.  To create leverage for the Association.  To

13   reopen the contract early.

14        Q.   All right.  And did you or anyone else on

15   behalf of United Airlines advise ALPA at the time of this

16   publication that it objected to ALPA's talking to the

10:03:58  17   pilots about fatigue policy and pilot pushing?

18        A.   I believe I already indicated that I did not

19   say -- I did not speak to anyone at the Association about

20   this.  I do not know if others at United spoke to

21   individuals at the Association about this.

22        Q.   Did you have communications with anyone within

23   ALPA during this time frame of mid-July concerning the

10:04:29  24   subject of ALPA's communications on fatigue policy?

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087     800.708.8087     FAX: 312.704.4950

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST  13,  2008

Page 44

1      A.   I think we're going to have to get very

2   specific because there was some discussion, I believe --

3   This is dated, what, July 15th?

4      Q.   Correct.

5      A.   Just a moment.  I need to review.

10:05:03   6           Prior to this communication, sometime in July

7   there was discussion with members of the Negotiating --

8   the ALPA Negotiating Committee -- about fatigue and

9   fatigue-related issues as we were trying to move forward

10   with a prior agreement where we agreed to establish a

11   Joint Implementation Team to look at some of the fatigue

12   issues in the operation.

13           There were discussions with the Association

10:05:30   14   prior to July 15.  You know, we could -- somewhere

15   around -- somewhere in July before the 15th.

16      Q.   What was the joint implementation team or what

17   is it?

18      A.   It's an agreed-upon committee of three or four

19   representatives from the Association with three or four

20   Flight Operations Management people who have agreed to

21   sit down at some point in the future and look at our PBS

10:06:00   22   system.  Look at some of the ways build trips to figure

23   out ways to avoid situations where pilots would become

24   fatigued in the operation.

JAY D. MILONE,   AUGUST  13,   2008

Page 45

1       Q.    So this is an effort by both the Company and

2    the Union to reduce the level of fatigue; is that

3    correct?

4       A.    That is correct.

5       Q.    And is it your understanding that the FAA, the

6    Federal Aviation Administration, has recently also taken

10:06:29    7    an increased interest in the subject of fatigue?

8       A.    The FAA has put out several communications

9    recently that that's an area of study industry wide.

10       Q.    All right.  And just finally with respect to

11    this area at the moment, do you recall having -- do you

12    recall reviewing communications that ALPA was putting out

13    or planning to put out in July on the subject of

14    fatigue?

10:07:04    15       A.    The only communication that we typically review

16    before it's put out are what are referred to as "Did You

17    Knows" that the MEC Grievance Committee puts out.  They

18    would typically send them to us a week ahead of time and

19    ask us if we have comments on them.

20            I don't know -- I don't recall off the top of

21    my head whether a "Did You Know" regarding fatigue was

10:07:26    22    put out in the time frame we're talking about here.

23       MR. ABRAM:  Let's mark as Exhibit -- ALPA

24    Exhibit 1 -- a document titled "Did You Know."

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST   13,   2008

Page 48

| | | |
|---|---|---|
| | 1 | A.    I read this "Did You Know" draft when it was |
| 10:10:26 | 2 | first sent across.  Yes, so I did. |
| | 3 | Q.    All right.  And this was in mid-July, was it |
| | 4 | not? |
| | 5 | A.    I can't tell you if it was mid-July, early |
| | 6 | July, late June.  I don't know exactly when I saw it. |
| | 7 | I've seen it somewhere in the last two months. |
| | 8 | MR. ABRAM:  Let's mark as ALPA Exhibit 2 a |
| | 9 | two-page document which would include a series of |
| 10:10:55 | 10 | e-mail trail. |
| | 11 | (ALPA Exhibit 2 marked as requested.) |
| | 12 | BY MR. ABRAM: |
| | 13 | Q.    Do you recognize the e-mails within this |
| | 14 | trail? |
| | 15 | A.    Yes, I do. |
| | 16 | Q.    Did you either receive or author any of these |
| | 17 | e-mails? |
| | 18 | A.    Yes.  I authored the e-mail.  There are |
| | 19 | actually three e-mails here on this one page.  I authored |
| 10:11:28 | 20 | the middle e-mail, which on July 14 I sent to the other |
| | 21 | members of my team asking them to review it and then |
| | 22 | discuss it, which is our standard practice when we get |
| | 23 | one of these. |
| | 24 | Q.    All right.  And this e-mail trail reflects that |

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 49

1  Captain Schoofs, who is the MEC Grievance Chairman, sent

2  you and others a copy of the draft "Did You Know" on

10:11:56  3  July 11th; is that correct?  Looking at the bottom of the

4  first page.

5      A.   Yes.  That appears to be correct.

6      Q.   And at the top are Mr. Fishburn's comments on

7  the "Did You Know."

8      A.   That's correct.

9      Q.   All right.  And this is on the fatigue "Did

10  Know."  The same "Did You Know" that we have in front of

11  us as Exhibit 1; is that correct?

12      A.   Yes, that's correct.

13      Q.   All right.  And then you took Mr. Fishburn's

14  comments and forwarded them to Captain Schoofs; is that

15  correct?

16      A.   No, that's not correct.

17      Q.   All right.

10:12:28  18      A.   Mr. Fishburn forwarded them directly.

19      Q.   He did that directly?

20      A.   Correct.

21      Q.   And did you have any further comments on the

22  "Did You Know" then, the ones that Mr. Fishburn sent?

23  Did you make any to ALPA other than what Mr. Fishburn

24  sent?

JAY D. MILONE,   AUGUST  13,  2008

Page 50

1        A.    No.

2        Q.    Is it correct then that looking at these

10:12:56    3   comments from Mr. Fishburn, that you did not raise with

4   ALPA a concern that the fatigue "Did You Know" being sent

5   in July of 2008, or being proposed to be sent, was part

6   of or a concerted effort to affect the Company

7   operations, to slow down the Company's operations?

8        A.    No.  Mr. Abram, I believe I answered this the

9   same way I answered a previous question along these

10   lines.  My job is the day-to-day administration of the

10:13:28   11   contract; what I work on with Mr. Schleder fairly

12   closely.

13        Efforts about concerted activity would be

14   handled at different levels; above me either in the law

15   department or at more senior levels in the Company.

16        Q.    Did you bring this "Did You Know" to the

17   attention of more senior levels in the Company?

18        A.    I don't recall if we sent the specific "Did You

10:13:56   19   Know" to anybody more senior at the time.  I believe that

20   I mentioned it in conversation with my boss that there

21   was yet another MEC communication coming out that I felt

22   was part of an overall campaign to convince pilots that

23   they should rigidly adhere to the contract.

24        Q.    Were you referring to ALPA Exhibit 1 when you

JAY D. MILONE, AUGUST 13, 2008

Page 51

1      just said that?

10:14:27    2          A.    Oh, I could go through my declaration and

3      identify most of the documents that were put out.

4          Q.    Well, I'm asking specifically whether you, when

5      you spoke to, I think you said, your boss.

6          A.    Yes.  Doug McKeen.

7          Q.    M-c-K-e-e-n.  That you said there was another

8      communication coming that you felt was part of this

9      concerted campaign that you've been talking about.  I'm

10:14:55   10    asking whether that referenced ALPA Exhibit 1, which ALPA

11     Exhibit 1 is obviously not a part of your declaration or

12     else we wouldn't be marking it separately.

13         A.    Right.  Yes.  That would have been one of the

14     instances.

15         Q.    All right.  So you remember actually telling

16     Mr. McKeen that there is going to be another publication

17     from ALPA on the subject of fatigue, and it's going to be

18     part of this effort to hurt the Company?

19         A.    I remember telling Mr. McKeen that ALPA was

20     putting out yet another communication regarding fatigue

10:15:29   21    in this time frame.

22         Q.    And what else did you say besides that fact?

23         A.    I don't recall the exact substance of the

24     conversation.

JAY D. MILONE,  AUGUST  13,  2008

Page 74

1        MR. ABRAM:  All right.  I'll withdraw my

2    question.

3        THE WITNESS:  The question that you asked

4    originally that you haven't withdrawn was who I

5    had the discussions with.  And that's why I

6    indicated Ms. Coyne because I believe she was

7    present when I discussed this with Mr. Kain.

11:04:59    8        MR. ABRAM:  Okay.  Thank you.

9    BY MR. ABRAM:

10       Q.   Now, at the time of this discussion regarding

11    the Pilot Unity Handout, United and ALPA had been engaged

12    in a dispute, had they not, on the subject of pilot

13    waivers of provisions of the collective bargaining

14    agreement?

11:05:32    15       A.   The issues come up.  I can't say, as I sit here

16    right now, without reviewing -- I don't even know if

17    there is a document that would reflect this.  It has come

18    up with them, but I can't say if it occurred in this

19    exact time frame or not.

20       Q.   Well, there are provisions of the ALPA

21    agreement with United that are not subject to waiver;

22    isn't that correct?

11:05:59    23       A.   That's correct.

24       Q.   And do you recall that there was a dispute

JAY D. MILONE,  AUGUST  13,  2008

Page 75

1    between United and ALPA over United's -- the question of

2    United's effort to obtain pilots' agreement to waive such

3    provisions?

4        A.   Yeah.  I think I've already indicated that

5    there was discussion about that with the Association.  I

6    just can't put the time frame down.

7        Q.   Do you recall that there was, in fact, an

11:06:29    8    agreement reached between United and ALPA on that

9    subject?

10        A.   There may have been.  I honestly don't recall

11    that.  But if you showed me the document, I won't be

12    surprised.

13        MR. ABRAM:  Let's mark Exhibit 3 to this

11:06:54    14    deposition.  ALPA 3.

15            (ALPA Exhibit 3 marked as requested.)

16    BY MR. ABRAM:

17        Q.   ALPA 3 is a one-page document headed

18    "Settlement Agreement United Airlines, Inc. and the

19    Airline Pilots in the Service of United Airlines, Inc. as

20    represented by the Air Line Pilots Association

21    International."

22            Do you recognize ALPA 3?

23        A.   Yes, I do.

24        Q.   What is it?

JAY D. MILONE,   AUGUST  13,  2008

Page 76

| | 1 | A.    It's a settlement agreement of an ALPA |
|---|---|---|

11:07:29   2   Grievance No. 2006-U-12-4R.

3        Q.    And you signed this settlement agreement?

4        A.    I did.

5        Q.    Does that not refresh your recollection that

6    this subject was being discussed in early 2007?

7        A.    It must have been.  I can -- Honestly, I don't

8    have a recollection of it even -- but it obviously was.

9        Q.    All right.  Do you recall that United has

11:07:59   10   committed to ALPA that it would not permit a pilot to

11    waive a section of the agreement that's not waivable

12    under Section 2T?

13        A.    That's correct.

14        Q.    And that the Company would not ask a pilot to

15    waive a section that's not waivable as defined in 2T?

16        A.    That's correct.

17        Q.    And until this settlement was reached, there

18    was a dispute between the Company and the Association

11:08:28   19   over the issue of waiver of nonwaivable provisions; isn't

20    that correct?

21        A.    Yes.

22        Q.    All right.  And this agreement settled that

23    dispute?

24        A.    I hope so.

JAY D. MILONE,   AUGUST  13,  2008

Page 77

| | | |
|---|---|---|
| | 1 | Q.   It was intended to? |
| | 2 | A.   It was intended to. |
| | 3 | Q.   And when the Exhibit 3 to your declaration was |
| | 4 | issued, which is the -- just by coincidence also |
| 11:08:55 | 5 | Exhibit 3, which is the Unity Handout, that exhibit was |
| | 6 | issued at the time when there was a dispute between -- |
| | 7 | there was still a dispute between United and ALPA over |
| | 8 | the subject of waiver of provisions of the contract? |
| | 9 | A.   That's correct. |
| | 10 | Q.   Now, one of the elements of -- Withdrawn. |
| 11:09:30 | 11 | There are provisions of the collective |
| | 12 | bargaining agreement that pilots are entitled to waive; |
| | 13 | isn't that correct? |
| | 14 | A.   That's correct. |
| | 15 | Q.   For example, if a provision says that it can be |
| | 16 | modified or waived with pilot concurrence, that would be |
| | 17 | one of those provisions? |
| | 18 | A.   That's correct. |
| | 19 | Q.   All right.  And when that happens -- Withdrawn. |
| | 20 | Does that happen from time to time that a pilot |
| 11:09:55 | 21 | agrees to, concurs in a waiver of a waivable provision? |
| | 22 | A.   I don't have any personal knowledge of it. |
| | 23 | That would happen between the crew desk typically and the |
| | 24 | pilot, and I don't -- I'm not part of that process. |

JAY D. MILONE,  AUGUST  13,  2008

Page 78

1            I would assume it does, but I don't know.

2       Q.   Do you know whether or not when that occurs a

3  record is kept by United Airlines or anyone in United

4  Airlines of that waiver?

5       A.   I don't know what the process is or what

6  records are kept on that.

11:10:27    7       Q.   Does your department in Labor Relations have

8  any records of such waivers?

9       A.   We would not routinely keep those.  The only

10  way my department would get that is if there was some

11  dispute over it and a grievance was filed.  We might at

12  that point in time get the documentation, but, no,

13  otherwise, we do not get notified when a pilot has

14  concurred to waive a portion of a contract.  We wouldn't

11:10:58    15  have records of that.

16       Q.   Whose documentation is it that you're referring

17  to that you would get if there was a grievance?

18       A.   We might get a statement from the pilot.  We

19  might get a statement from the FODM.  Or somebody from

20  the crew desk.  I don't know.  There are several ways

21  that we could get some information about the pilot

22  concurrence, but, again -- My lawyer would chew me out

23  for this when we're done, but I'm speculating that we may

24  have occasionally gotten something only in the context a

JAY D. MILONE,  AUGUST 13, 2008

Page 107

12:05:28    1    We don't use it in manpower planning because it is

2    basically dried up to such an extent, there is no way we

3    could possibly plan on it.  But I don't believe we agree

4    with the MEC's position on this, and I think we've told

5    them this; that we don't agree that it was intended

6    solely to be solely for unplanned absences like this or

7    unexpected.

8         Q.   Well, your declaration says that it's used to

9    address unplanned shortages of pilots.  Isn't that your

10    position?

12:05:58   11         A.   That is what we use it for because we can't use

12    it for anything else because it's so unreliable.

13         Q.   Well, it was intended to address unplanned

14    shortages of pilots.  Isn't that what the agreement

15    provides for?

16         A.   Yes.

17         Q.   So that was the purpose of the provision in the

18    agreement?

19         A.   Yes.

20         Q.   Now, the MEC's position is also that it's

21    intended to address unplanned shortages of pilots; isn't

22    that correct?

23         A.   The MEC's public statements, like the

24    resolution and other public statements, is that it's not

JAY D. MILONE, AUGUST 13, 2008

Page 108

12:06:29

1    to be used as a staffing tool.

2        Q.   Meaning, it's supposed to be used for unplanned

3    shortages?

4        A.   Exactly.  And we believe their practical

5    interpretation of that, based on the level of harassment

6    that pilots have experienced, is that they don't believe

7    any junior/senior manning is appropriate.

8        Q.   You think that's the position of the MEC?

9        A.   I do.

10       Q.   Is there -- Are you saying that the harassment

11   that you referred to was carried out by the MEC?

12       A.   I believe the MEC is -- If they are not

12:06:59

13   actually endorsing it, they are absolutely aware of it

14   and have taken no steps to -- that we're aware of -- to

15   stop the harassment or discourage it.

16       Q.   Do you know whether United Airlines ever asked

17   the MEC to discourage harassment of pilots in respect to

18   junior/senior manning?

19       A.   I believe that conversation was had between

20   Mr. Donohue and Captain Bathurst.

21       Q.   When did that occur?

22       A.   It would have occurred in late -- mid to late

23   2007.

24       Q.   Were you present?

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 109

| | | |
|---|---|---|
| | 1 | A.  No. |
| 12:07:29 | 2 | Q.  Do you have a report of that conversation? |
| | 3 | A.  Mr. Donohue relayed it. |
| | 4 | Q.  All right.  And what did he say?  What did he |
| | 5 | relate that he said to Mr. Bathhurst? |
| | 6 | A.  That it needed to stop. |
| | 7 | Q.  The harassment needed to stop? |
| | 8 | A.  Harassment needed to stop. |
| | 9 | Q.  And did Mr. Bathurst -- What was reported about |
| | 10 | what Mr. Bathurst said? |
| | 11 | A.  I don't recall. |
| | 12 | Q.  Okay.  Have you asked ALPA to address the |
| | 13 | alleged harassment of pilots in regard to junior/senior |
| 12:07:59 | 14 | manning? |
| | 15 | A.  Not that I recall. |
| 12:08:35 | 16 | Q.  Now, you said in your declaration in |
| | 17 | paragraph 25 that ALPA has encouraged harassment of |
| | 18 | pilots who accepted junior/senior manning requests. |
| | 19 | How has ALPA encouraged that harassment? |
| 12:08:58 | 20 | A.  By the publication that Captain Bathurst put it |
| | 21 | on a video, which was described I think in another |
| | 22 | paragraph of my declaration.  Stating their public |
| | 23 | position about it.  Junior/senior manning not to be used |
| | 24 | as a staffing tool. |

JAY D. MILONE,   AUGUST  13,   2008

Page 110

| | |
|---|---|
| | 1 |
| | 2 |
| 12:09:26 | 3 |

1    It's repeated, I believe, in several other

2    communications.  The resolution.  And I believe those are

12:09:26    3    clearly signals to the pilots that they are not supposed

4    to do it, and for those who choose to show their unity to

5    the ALPA message, they have harassed pilots who have

6    engaged in it.  And I believe that ALPA is fully aware

7    that it's gone on.

8        Q.   Well, you believe it's aware of it because

9    you've heard that ALPA was informed about it by, for

10    example, Mr. Donohue?

11        A.   Yes.  And I know there are other instances

12:10:00    12    where ALPA officials have watched it take place and done

13    nothing to stop it.

14        Q.   When did that happen?

15        A.   The one incident I know of for certain I

16    believe happened probably the spring of 2007.

12:10:32    17        Q.   So did United counsel anybody involved in

18    that?

19        A.   We have counseled -- We did not counsel the

20    ALPA official.

21        Q.   Did United write a letter to ALPA protesting

22    what happened -- what you believed happened?

23        A.   I don't believe any letters were written.  I

24    believe that communications that United had on this issue

JAY D. MILONE,   AUGUST  13,  2008

1    were between -- primarily between Mr. Donohue and Captain

2    Bathurst.

12:11:00    3         Q.    There is a procedure in the United-ALPA

4    Agreement called Grievance Procedure, is there not?

5         A.    Yes, there is.

6         Q.    Is that procedure available to ALPA?

7         A.    Yes, it is.

8         Q.    Is it also available to United Airlines?

9         A.    Technically it is, yes.

10         Q.    United has in the past filed grievances with

11    respect to ALPA's conduct, has it not?

12         A.    That's actually news to me.  They have not

13    filed any grievances since I've been here, and I have not

14    heard that they had.

15         Q.    United has not, and you're not aware that it

16    had in the past?

17         A.    They have not done since I've been here, and

12:11:28    18    I'm not aware that they have done it in the past.  But

19    they could have.  I just don't know the history.

20         Q.    And there's nothing in the agreement that

21    prevents United from doing that; is that correct?

22         A.    Not that I'm aware of.

23         Q.    All right.  And so what you're telling me is, I

24    take it, is that United has not filed any grievances with

JAY D. MILONE, AUGUST 13, 2008

Page 112

1    ALPA with respect to -- against ALPA with respect to

2    ALPA's position on junior/senior manning not being used

3    as a manpower planning tool?

4        A.    That's correct.  We have stated our position

12:12:00    5    that we don't agree with them on that, but that's as far

6    as it's gone.

7        Q.    You think that junior/senior manning can be

8    used as a manpower planning tool?

9        A.    Yes.  There is nothing in the language of the

10    contract or my understanding of the negotiating history

11    that would prohibit that.

12        Q.    So that it can be -- It can be used for doing

13    things other than unplanned shortages?

14        A.    We'd have to get the contract section out to

15    see exactly what it states.  But I think whatever the

12:12:29    16    contract says, if there are limitations in the contract,

17    then those are the limitations we'd have to live with.

18    But I'm not aware of any.

19        Q.    So your declaration says in lines -- in the

20    first two lines of paragraph 25 -- that the junior/senior

21    manning is a procedure, quote, "to address unplanned

22    shortages of pilots which might occur for a number of

23    reasons."

24            Do I understand that you're now saying that it

JAY D. MILONE, AUGUST 13, 2008

Page 113

1    is not limited to -- it's not simply to address unplanned

2    shortages of pilots?

12:13:00    3        A.    This is how we have applied it since it was

4    negotiated.  But I don't believe the language

5    specifically limits it to that.

6        Q.    So you've applied it since it was negotiated to

7    address unplanned shortages?

8        A.    That's my understanding.

9        Q.    And that goes back to contract 2000?

10        A.    I don't know when it came into being.

11        Q.    Certainly it was there when you came in.

12        A.    Yes.

13        Q.    And it certainly was there in the contracts

14    that were reached in the bankruptcy period because they

15    were the contracts you're living in.

16        A.    It was in the 2000 agreement.  Yes.  We have

12:13:28    17    actually rewritten the 2000 agreement now in the 2007 so

18    we have a rewrite.  But, yes, it is, in essence, the 2003

19    agreement.

20        Q.    It certainly goes back then several years.

21        A.    Yes.

22        Q.    And so you have applied it to address unplanned

23    shortages of pilots, so far as you know, during that

24    time?

JAY D. MILONE, AUGUST 13, 2008

Page 116

| | 1 | manning? |
|---|---|---|
| 12:16:29 | 2 | A.    No. |
| | 3 | Q.    And you're aware that, as you said elsewhere, |
| | 4 | that any pilot can, for the most part, find out the |
| | 5 | schedule of any other pilot? |
| | 6 | A.    Yeah.  Unless a pilot blocks his calendar.  All |
| | 7 | pilots have access to each other's calendars. |
| | 8 | Q.    So that a pilot would not need any access |
| | 9 | generally to this monthly summary in order to see who has |
| | 10 | been accepting junior manning? |
| 12:16:59 | 11 | A.    That's correct. |
| | 12 | Q.    And with respect to the so-called "Rat List" |
| | 13 | that you describe in paragraph 27, you mentioned that |
| | 14 | such lists "have been posted on both the inside and |
| | 15 | outside of ALPA's glass case bulletin board in Chicago |
| | 16 | Flight Operations." |
| | 17 | That's the Company's Flight Operations |
| | 18 | office? |
| | 19 | A.    Correct. |
| | 20 | Q.    And ALPA has a bulletin board there, correct? |
| | 21 | A.    Correct. |
| 12:17:29 | 22 | Q.    Is it a locked bulletin board? |
| | 23 | A.    Yes. |
| | 24 | Q.    And is there a way in -- Do you know if there |

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 117

1    is a way in that bulletin board by which pieces of paper

2    can be slipped into the bulletin board to be inside the

3    bulletin board without the bulletin board being

4    unlocked?

5         A.    That can happen.

12:18:40    6         Q.    Let me direct your attention, please, to

7    paragraph 31 of your declaration.  You're referring to

8    Exhibit 5, which is a message from the Council 12.  A

9    Council 12 update.

12:19:00   10         Now, Council 12 is one of several ALPA councils

11   at United Airlines; is that correct?

12         A.    That's correct.

13         Q.    And its officers communicate with the members

14   of Council 12 from time to time; is that correct?

15         A.    I believe so, yes.

16         Q.    Now, in the last paragraph of Council 12 update

12:19:28   17   there on the first page, there is a reference to the

18   "Company having assigned an abnormally large amount of

19   involuntary vacations in May.  As a result, the crew desk

20   is now short of crews."

21         Now, what is that referring to this abnormally

22   large amount of involuntary vacations?

23         MR. ROBERTSON:  Objection, calls for

24   speculation.

JAY D. MILONE,  AUGUST  13,  2008

Page 118

1    BY MR. ABRAM:

2         Q.    What is your belief it's referring to?

12:19:59    3         A.    What they're referring to is the practice of

4    assigning vacations to pilots that weren't requested by

5    the pilot.  It's typically done in the slower flying

6    months.

7              I have no recollection whether we -- what the

8    May assignment of vacations was in this particular case.

9    But that's basically what it is.  The Company assigns the

10    vacation.

12:20:26   11         Q.    So if the Company is assigning vacation, it is

12    planning for that pilot not to be available during his

13    vacation; is that correct?

14         A.    That would be correct.

15         Q.    So his absence is a planned absence?

16         A.    That's correct.

17         Q.    If the Company assigns too much vacations, it

18    can wind up being short of crews in a month; isn't that

19    correct?

20         A.    It could happen.  That could be a contributing

21    factor.

22         Q.    And do you know if that's what happened in

23    May?

24         A.    I have no idea.

JAY D. MILONE, AUGUST 13, 2008

Page 119

1      Q.    So you don't know whether Council 12 was

12:21:00    2      correct in its assessment that the crew desk was short of

3      crews because of the Company's own actions?

4      A.    No idea.

5      Q.    And if it was because of the Company's own

6      actions, would it have been a fair view for the

7      Council 12 officers to take that junior/senior manning if

8      was not designed for that purpose, for dealing with the

9      Company's own actions?

10      MR. ROBERTSON:  Objection, incomplete

11      hypothetical.

12      BY MR. ABRAM:

13      Q.    Would that have been a fair view?

12:21:28    14      A.    From their perspective.

15      Q.    Well, not just from their perspective.

16      Wouldn't that have been a fair position to take that if

17      the Company is the one that caused the shortage, it

18      shouldn't be using junior/senior manning to remedy it?

19      A.    That's their position, yes.  And again, this

20      gets us back to our whole discussion about what the

21      limitations, if any, there are on the use of

22      junior/senior manning.

23      Q.    In terms of the Company's practice over the

12:21:56    24      years, as you've described it, the junior/senior manning

JAY D. MILONE,   AUGUST  13,  2008

Page 120

1    practice was for unplanned shortages?

2         A.    That's correct.

3         Q.    And assignment of vacation is, by definition, a

4    planned event?

5         A.    That's correct.

12:22:48    6         Q.    In your declaration, you refer to another

12:22:55    7    publication of Local Council 12, Vice Chairman Captain

8    Briggs.  This is in paragraph 34.  And this goes back to

9    March of 2007.  And you have this under the heading at

10   the top of "'Work to Rule' and Sick Leave."

11        Did you understand that in March 2007, Captain

12:23:29    12   Briggs was publishing this newsletter in order to

13   encourage a "Work to Rule" campaign?

14        A.    Let me take a look at the exhibit.

15        Q.    It's Exhibit 6.

16   MR. ROBERTSON:  This copy may be missing an

17   exhibit cover.

18   MR. ABRAM:  I apologize for that.  And let's

19   see if I can help.

20   BY THE WITNESS:

12:23:59    21        A.    It's the March 26th.  I've got it.  I've got

22   it.

12:24:57    23        If anyone can speed this up by finding it

24   before I do, point it out.

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE, AUGUST 13, 2008

Page 121

1          Q.   I apologize.  I thought you wanted to see the

2     whole thing.

3               It's the top of page 205, this particular

4     quote.

5          A.   Yes.

6          Q.   Okay.  Yes, meaning what?

7          A.   I've found it.  If you'd ask the question

8     again.

9          Q.   All right.  Very good.

10              The question is whether you regarded this

12:25:27   11     Council 12 update as an effort to encourage a "Work to

12     Rule" campaign?

13         A.   Yes.

14         Q.   Now, when I read Council 12 update, it's dated

15     March 26th, 2007, so my first question then is it was

16     United's understanding that the United pilots were

17     engaged in a "Work to Rule" campaign as long ago as March

18     2007?

19         A.   Yes.  We believe -- I believe that the

12:25:59   20     inception of it formally was the launching of the "Fix It

21     Now" campaign.

22         Q.   And do you think that that started a "Work to

23     Rule" campaign?

24         A.   We believe parts of it were initiated then.

JAY D. MILONE,   AUGUST  13,  2008

Page 122

1        Q.    Okay.  And that would have been actually in

2    late 2006?

3        A.    December 2006.

12:26:28    4        Q.    Now, this particular publication dated

5    March 25, 26, 2007 --

6        A.    It's dated both.

7        Q.    Dated both, correct.

8              Seems to me to spend most of its time talking

9    about the tentative agreement that was concluded on

10   March 17th, 2007.

11             Am I right about that?

12       A.    I would agree with that.

13       Q.    All right.  Would it be fair to say that the

12:26:57   14   purpose of this communication was to encourage the

15   members of Council 12 to vote yes on that agreement?

16       A.    Yes.

17       Q.    But you read this as actually encouraging a

18   "Work to Rule" campaign at the time that they were voting

19   yes on -- that they were to vote yes on this agreement?

20       A.    Yeah.  I believe it's -- The language of "Let's

21   continue to work, to fly the contract," is to continue to

12:27:29   22   apply leverage.

23             I think there's a subsequent reference in there

24   that "This TA does not mark the end of the 'Fix It Now'

JAY D. MILONE,   AUGUST  13,  2008

Page 125

1          A.    Right.  I think we have some management pilots

2     who do share communications with the Association.

3          Q.    It's good.  It's good.  Let's ask about this

4     particular update.  This refers pilots to a Web site.

13:12:58      5     And that's a Web site that's available to members of

6     ALPA, is it not?  And this is in reference to Exhibit 8.

7          A.    Correct.  Yeah.  I believe that's in reference

8     to the unitedpilotunity.org Web site.

9          Q.    Right.

10          A.    It's my understanding it's available to United

11     pilots.

12          Q.    Right.  And to members of ALPA?

13          A.    I believe so.

14          Q.    So have you received any briefings on the

13:13:30     15     contents of that Web site from your management pilots who

16     are members of ALPA?

17          A.    I don't know that I've ever received briefings.

18     I think maybe occasionally somebody tells me they saw X

19     or Y, but I don't recall.  I have no specific

20     recollection of any item.

21          Q.    Does United -- Do you have a policy of having

22     somebody go on to that Web site to see what it says?

13:13:58     23          A.    I can't speak for United, but I do not.

24          Q.    And you have not seen any photographs or

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,   AUGUST  13,  2008

Page 126

1    downloads from that Web site?

2        A.   I don't know if I have or not.  I may have.  I

3    just -- I don't know.

4        Q.   And in reference to the statement here about

5    the "tools required to effectively execute our mission of

6    unity," are you -- is it your testimony that an unlawful

13:14:27   7    use of sick leave is one of those tools referred to on

8    that Web site?

9        A.   I don't know if an unlawful use of sick leave

10    is what is referenced in this particular thing.  I think

11    given the timing of this communication in February of

12    '08, well before we saw the spike in sick leave, I don't

13    think it's referencing that.

14        Q.   Well, your next paragraph says that on --

13:14:56   15    shortly thereafter, on February 19th, sick leave

16    increased significantly.

17        Are you intending to relate that Web site

18    referred to by the Council 12 officers on February 5th to

19    what happened on February 19th?

20        A.   Well, I should have read the next paragraph.  I

21    forgot that we also had a spike in sick leave back in

22    February.  I don't believe they are unrelated.

13:15:28   23        Q.   That's a funny way of putting it, isn't it?

24        A.   I do believe they are related.

JAY D. MILONE,  AUGUST  13,  2008

Page 127

1          Q.    And do you have any evidence of that?

2          A.    The timing.

3          Q.    Well, so February 5th to February 19th, that's

4     the timing, the two weeks?

5          A.    Yeah.  Again, I just believe this is all part

6     of a continued steady drumbeat of communication.  I don't

7     know if they are specifically referencing sick leave in

8     there, but, you know, candidly, I believe there's all

9     kinds of back-channel communications that the Association

13:15:59    10    uses that never see the light of day in print that drive

11    many of these actions.  Whether they did it in response

12    to this or not, I don't know.

13         Q.    So you're not asserting in your declaration

14    that there was a cause-and-effect relationship between

15    what happened in paragraph 36 and what happened in

16    paragraph 37?

17         A.    There may be.

18         Q.    There may be, but are you asserting that there

19    was?

20         A.    There may be.  I don't know for sure.

21         Q.    You don't know for sure?

22         A.    I don't know for certain.

23         Q.    And so you didn't mean to tell the court that

24    you believed that there was?

JAY D. MILONE, AUGUST 13, 2008

Page 128

1          A.    I think -- I don't know for certain, but I will

13:16:28   2     state again, I do believe that every communication that

3          the Association has been putting out has a purpose to it.

4          And that purpose is to unite the pilot group to engage in

5          a variety of actions to put leverage on the Company to

6          open a collective bargaining agreement.  I believe that

7          the Council 12 update was of the same ilk and for the

8          same intended purpose.

9          Q.    But you don't know what was on the Web site

10         that they were directed to?

11         A.    I do not know.

12         Q.    So this is just a belief that you have?

13         A.    That's correct.

13:17:02   14    Q.    And the Council 12 update is in reference to

15         the members of Council 12; is that correct?

16         A.    I think it's titled "Council 12 Update."  I

17         don't know if they circulate it broader.  I do believe

18         there are instances where if one council believes that

19         another council has put out some correspondence or

13:17:30   20    communication that's of interest, they will take it, send

21         it out further.

22               I don't know if this was disbursed further than

23         this or not, but I would assume that it at least went to

24         the Council 12 pilots.

JAY D. MILONE,  AUGUST  13,  2008

Page 129

1   Q.   Okay.  But you have no evidence that it went

2   beyond the Council 12 pilots?

3   A.   I don't know.

4   Q.   And with regard to the sick leave increase on

5   February 19th, that was for that day?

6   A.   I'd have to look back at the charts.

7   Q.   Well, your declaration says it happened on

8   February 19th.

13:17:59   9   A.   Correct.  I don't recall that that was a

10   one-day spike.  I believe it lasted a little longer than

11   that, but I'd have to go back and look at the charts.

12   Q.   But you don't know sitting here?

13   A.   I don't recall without looking at the material.

14   Q.   Right.  Have you investigated as to what fleets

15   this took place in?

16   A.   I don't -- No, I did not.

17   Q.   Did anyone on behalf of United?

18   A.   I don't know.

13:18:27   19   Q.   Did you or anyone else on behalf of United make

20   a complaint to ALPA about that increase in sick leave?

21   A.   I did not.  I don't know if anyone else from

22   United did.

23   Q.   Did you or anyone else on behalf of United

24   investigate whether there were any causes for the

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 130

13:19:01

1    increase in sick leave over the anticipated rate other

2    than your belief that this was something that ALPA

3    somehow brought about?

4        A.   I apologize.  Can you ask the question again.

5        Q.   Well, I'm really asking if there was an

6    increase in sick leave above the anticipated rate on

7    February 19th.

8             Did you look into what might have been going on

9    in terms of people?  Whether there were any patterns of

10   illness, any particular types of illness going through?

13:19:29

11   After all, February is not the healthiest month.

12             So have you looked at that?

13        A.   I did not.

14        Q.   Do you know if anyone else did?

15        A.   I don't know.

13:20:25

16        Q.   Now, you earlier testified that the increase in

13:20:29

17   sick leave usage that you were concerned about in this

18   lawsuit took place starting in the middle of July.  And

19   I'd like to direct your attention to paragraph 42 of your

20   declaration.  And here I observe that you referred to

21   Mr. Carlson's declaration, and you say that "sick leave

22   usage by pilots began increasing on June 5, 2008."

13:21:01

23             Does that in any way refresh your recollection

24   as to whether your prior testimony was correct?

JAY D. MILONE,  AUGUST  13,  2008

Page 131

1       A.    Yeah.   I think there was a discernible increase

2    in sick leave immediately following the announcement of

3    the grounding of the aircraft.   And then there was a

4    sharp, dramatic spike in sick leave beginning on

5    July 18.

13:21:25      6       Q.    Okay.   Now, the Company's -- According to this

7    declaration, the Company made it's announcement of the

8    furlough notices on June 23.

9            Does that now refresh your recollection as to

10   when that took place?

11      A.    Yes.

12      Q.    All right.   So the discussions that --

13   discussions concerning when to make that announcement

14   would have taken place before June 23?

15      A.    Correct.

16      Q.    And you participated in those discussions?

17      A.    At least one or two.

13:21:58     18       Q.    All right.   And included in that discussion, do

19   you now recall that there was consideration of the

20   likelihood that an announcement of specific numbers or

21   furloughs would further increase the sick leave usage by

22   pilots who were going to be furloughed?

13:22:34     23       A.    I'm trying to remember if I can remember that

24   as a specific conversation item.   I don't -- As I sit

JAY D. MILONE,  AUGUST  13,  2008

Page 132

1    here right now, I don't recall a specific conversation

2    item.  It makes sense to me that it's something we may

3    have discussed.

4         Q.   Why does that make sense to you?

5         A.   I think there would be some understandable

13:22:56    6    increase in sick leave when an announcement like that is

7    made.

8         Q.   The increase in sick leave, it would be

9    understandable there would be some increase among those

10    people who are likely to be furloughed?

11         A.   There would be some.  It did not surprise to

12    see some amount of increase.

13         Q.   And in fact, you did see some beginning

14    June 5th?

15         A.   Correct.

16         Q.   And that was right after the announcement of a

13:23:28    17    hundred airplanes being grounded which would have led to

18    furloughs inevitably?

19         A.   That's correct.  And that did not surprise us.

20    But the sharp, dramatic spike beginning in mid-July isn't

21    explainable by that.

22         Q.   Okay.  So the dramatic spike beginning in

23    mid-July, you think, is explainable by some factor other

24    than the announcement of furloughs?

JAY D. MILONE,   AUGUST  13,  2008

Page 133

1       A.    Yes.

13:23:59   2       Q.    It was primarily -- That increase in the middle

3    of July, was primarily among pilots who were the most

4    likely to be furloughed; isn't that correct?

5       A.    It came -- I've not done an individual

6    analysis.  It came from the fleets and seats where you

7    would expect -- the junior fleets and seats where you

8    would expect individuals to be furloughed.

9            We have not undertaken an individual analysis

10    to see who sicked out.

13:24:28   11       Q.    Well, those were the fleets where the Company

12    instituted a doctor certification requirement?

13       A.    That's correct.

14       Q.    Meaning, the A320 and B737 copilot seats?

15       A.    That's correct.

16       Q.    And the requirement that the Company imposed

17    was that in order to be paid for sick leave, pilots who

18    took in those fleets and seats who took sick leave would

19    have to submit a doctor certification.

20       A.    That is correct.

21       Q.    And the certification would have to provide a

13:24:58   22    statement from a medical professional that the pilot was,

23    in fact, sick during the period of time for which he or

24    she took sick leave.

JAY D. MILONE, AUGUST 13, 2008

Page 134

1      A.    It would have to contain a statement from a

2    doctor that the pilot was sick.  I don't agree

3    necessarily with the pilot was, in fact, sick.  I would

4    agree that it would have to contain the statement that

5    the pilot was sick.

6      Q.    The pilot was sick?

7      A.    Correct.

8      Q.    A statement by a doctor?

9      A.    Correct.

10      Q.    And that statement would be required before the

13:25:28    11    pilot would be paid for sick leave?

12      A.    That's correct.

13      Q.    Has any pilot who took sick leave during the

14    period July 18th to July 30th, been denied pay for his

15    use of that sick leave?

16      A.    I have no idea.

17      Q.    Have you looked into that?

18      A.    I have not.

13:27:02    19      Q.    Let me direct your attention to paragraph 48 of

20    your -- Back up a little bit.

21          Let me direct your attention to paragraph 46 of

22    your declaration.  At the time you signed this

23    declaration, which was July --

24      A.    29.

JAY D. MILONE,  AUGUST  13,  2008

Page 135

1      Q.   29?

2      A.   Correct.

13:27:26  3      Q.   You asserted to the court that the spike in

4    sick leave that started the weekend of July 18th, quote,

5    "has not dissipated," closed quote.

6           And that was correct at that time?

7      A.   That was correct at that time, yes.

8      Q.   Is that still correct?

9      A.   No.

10      Q.   It has dissipated?

11      A.   It dissipated, climbed back over the weekend,

12    and has now dissipated again over the last two days.

13      Q.   When it climbed back up over the weekend, you

14    mean this past weekend?

15      A.   Yes.

13:28:00  16      Q.   Did it climb back up in any particular fleets

17    and seats?

18      A.   I did not look at a complete fleet/seat

19    analysis.  I looked at whether it was running above plan.

20    And it did get back above plan in the 320 and 300 and, I

21    believe, the 767 FO positions.

22      Q.   In the other positions, it was below plan?

23      A.   Again, I didn't look at the entire fleet.  As a

13:28:29  24    system wide number, it is below plan.  It is below the

JAY D. MILONE,  AUGUST  13,  2008

Page 136

1   system wide plan.  But in those three fleets and seats --

2   or those three seats anyway, it's above plan.

3        Q.   Three seats, meaning 67, 320 --

4        A.   67, 320 and 300.

5        Q.   300 copilot?

6        A.   Yes.

7        Q.   All right.  But it's not above plan anywhere

8   like it was, in your view, in the period -- in July?

9        A.   No.  It mitigated shortly after the lawsuit was

10  filed.

11       Q.   All right.  And it also mitigated shortly after

12  ALPA issued statements to pilots regarding the use of

13:28:59   13  sick leave?

14       A.   Yes.

13:29:27   15       Q.   Now, on paragraph 48 of your declaration, you

16  refer to a statement issued -- another statement issued

17  by Local Council 12 which you described as, quote,

18  "subtly encouraging" -- and you say "all United pilots."

19  But I think you mean Council 12 pilots.

20       A.   Again, these statements are issued by one

21  council.  They are sometimes picked up and sent around to

22  other councils.

13:30:00   23       Q.   But the statement was issued to Council 12

24  pilots, was it not?

JAY D. MILONE,   AUGUST  13,  2008

Page 137

1      A.   Yes.

2      Q.   It was not issued to all United pilots?

3      A.   I don't know if it was or not.

4      Q.   So to the extent that it says that it was, then

5  that may not be correct?

6      A.   To the extent that Council 12's communications

7  find their way into pilots in other councils -- I don't

8  think they were telling just Council 12 pilots to not do

9  this and other council members could do it so ...

10      Q.   All right.  But the statement was not issued to

11  all United pilots?

12      A.   I don't know that.

13:30:29    13      Q.   You don't know --

14      A.   I don't know whether it was or not.

15      Q.   All right.  And you also say that, this

16  statement, "subtly encouraged pilots who decline to fly

17  aircraft with minimum equipment issues."

18           And I'd like to direct your attention to that

19  statement, which is Exhibit 12 of your declaration.  That

13:30:57    20  was a statement issued by the Council 12, if you have it

21  at hand.

22      A.   I have it.

23      Q.   Council 12 Safety Committee, was it not?

24      A.   Yes.

JAY D. MILONE,   AUGUST  13,  2008

Page 149

13:45:28   1         A.   I would say it ranged from -- I wasn't here

2      what it happened, but from my recollection of when we

3      began these, I think it would have ranged from a maximum

4      of six and a half or seven years for pilots who were

5      furloughed right after 9/11 and who didn't come back

6      until late in the recall game, to pilots -- I think we

7      were continuing the furloughs until 2003 and 2004.

8              So a pilot in that group may have been

13:45:59   9      furloughed for two or three years.

10         Q.   So the first pilots to be furloughed after 9/11

11      were the then-most junior pilots?

12         A.   Yes.

13         Q.   And they would have been on furlough before

14      they were recalled six or seven years?

15         A.   Correct.

16         Q.   So they would have come back in 2007?

17         A.   Correct.

18         Q.   And then they would be after the new hires,

19      among the first pilots to be furloughed?

20         A.   Correct.

21         Q.   So that this was a group that would have been

13:46:28   22      on furlough six or seven years, come back for a year,

23      year and a half, and then furloughed again?

24         A.   Yes.

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE,  AUGUST  13,  2008

Page 150

1      Q.   And this was the group among which the use of

2   sick leave during the period that you're concerned about

3   was the highest?

4      A.   I think that's probably a fair statement.  That

5   they were occupying the seats where, again, we did not do

6   an individual analysis by pilot and where they fit on the

7   seniority list, but they were occupying the junior seats

13:47:00   8   where we had the very high rates of sick leave.

9      Q.   Right.  And United, when it announced its plan

10   to reduce the fleet, was not surprised -- or at least you

11   were not surprised, I should say -- that the rate of sick

12   leave usage went up, is that correct, among those

13   pilots?

14      A.   We were not surprised that there was a

13:47:24   15   discernible increase much as in the June 5 time frame,

16   shortly after the announcement was made, that was not

17   unexpected.

18      Q.   Right.  And did you regard that discernible

19   increase as part of the so-called quote, "bad behavior,"

20   closed quote, that you felt that United should not

21   reward?

22      A.   I felt that was probably the natural -- my own

23   personal opinion -- I don't know that United ascribes to

24   it as an entity, but my own personal opinion was that was

JAY D. MILONE, AUGUST 13, 2008

Page 151

| | | |
|---|---|---|
| 13:47:58 | 1 | probably about the amount of individual response in a |
| | 2 | noncollective, nonconcerted activity, that you would |
| | 3 | expect to see following that announcement. |
| | 4 | Q. And then there was another announcement on |
| | 5 | June 23rd of the actual numbers that were going to be |
| | 6 | furloughed, and following that announcement there was |
| | 7 | another increase in sick leave? |
| | 8 | A. Again, I'd have to see the chart again, but I |
| | 9 | believe there was. |
| 13:48:26 | 10 | Q. And was that also part of the natural amount |
| | 11 | that you would expect to see, you personally? |
| | 12 | A. I'd have to see the chart to be able to answer |
| | 13 | that. |
| | 14 | Q. All right. But going back to my previous |
| | 15 | question with respect to the amount -- the sick leave |
| | 16 | that you saw after the June 4th announcement, was that |
| | 17 | sick leave that you felt United should not -- that |
| | 18 | behavior, you felt, United should not reward by |
| | 19 | liquidating sick leave? |
| 13:48:59 | 20 | A. I don't believe that there was any discussion |
| | 21 | about liquidating sick leave at that time frame. I |
| | 22 | believe that came up several weeks or a month later. So |
| | 23 | we didn't even really look at it in that time frame. |
| | 24 | I would state as a general proposition, I |

JAY D. MILONE, AUGUST 13, 2008

Page 152

1  would -- I would never encourage the Company to reward

2  bad behavior. And if they were abusing sick leave, even

3  if it's an understandable reason for doing so -- that

4  they are very disappointed in their career expectations

13:49:28   5  not being met or whatever -- I still wouldn't personally

6  recommend that we reward people who are abusing their

7  sick leave.

8      Q.   All right.  Let's talk about the word "abuse"

9  that you just used.  It's kind of a strong term, I'm sure

10  you'll agree, intended it to be.

11      A.   Yes.

12      Q.   And let's just try to analyze that a bit.

13  There are -- There is this long list that we looked at a

14  few minutes ago that Captain Wallach published from the

13:49:58   15  Federal Aviation Regulations, a long list of conditions

16  that the Federal Aviation Administration tells pilots

17  don't fly with these conditions, correct?

18      A.   That's correct.

19      Q.   And in your own experience, would it be true

20  that there are many times when pilots decide to go ahead

21  and fly with some degree of those conditions?  They use

22  their discretion and they do so?

23      A.   I can't speak to that.

24      Q.   You don't know?

19c0b9da-61c9-456a-b5c9-d4b89bf17ecc

JAY D. MILONE, AUGUST 13, 2008

Page 153

1          A.    I don't know.

2          Q.    All right.  So you don't know whether, in fact,

3     any pilot who decided in June or July to take sick leave,

13:50:29    4     was exercising a discretion in one direction that

5     previously he exercised in another direction?

6          A.    I can't speak to that.

7          Q.    If you can't speak to that, how can you say

8     that that pilot was abusing his sick leave?

9          A.    The statistical jumps that were evident after

10    the furlough announcements, I believe, are -- couldn't

11    happen by just pilots deciding they're going to exercise

12    their discretion if it was not a concerted, collective

13    effort.

14         Q.    That's what you're saying with regard to what

13:50:58   15    happened in mid-July.  But you're not saying that that's

16    what happened after June 4; is that correct?

17         A.    That's correct.

18         Q.    And you don't know whether any pilot who took

13:51:27   19    sick leave after July 18th, did so in a condition in

20    which he was not sick as defined in the Federal Aviation

21    Regulations?  ·

22         A.    On an individual basis, I have no knowledge of

23    that.

24         Q.    Nor has the Company?

JAY D. MILONE, AUGUST 13, 2008

Page 154

1          A.   I don't know.  I don't get the doctors's notes

2     or anything like that so I don't know what the Company

3     knows.

13:52:22    4          Q.   Now, going back to paragraph 49 of your

13:52:28    5     declaration, the July 22nd letter.  You previously

6     testified that the spike in sick leave that you believe

7     resulted from concerted action began the weekend of

8     July 18th.

9          Was there another spike after Captain Wallach's

10     letter of July 22nd?

11          A.   I'd have to see the sick leave data.  I don't

12     recall.

13:52:58    13          Q.   And you're not saying in your declaration that

14     that's what happened?

15          A.   I'm not saying it happened.  I'm not saying it

16     didn't happen.

17          Q.   All right.  And then with respect to the unity

18     update of July 25th, are you saying that that led to a

19     further spike in sick leave usage?

20          A.   Again, without looking at the sick leave graph,

21     I can't answer that question.

22          Q.   So you're not saying that in your

23     declaration?

13:53:26    24          A.   And I'm not saying it didn't.

JAY D. MILONE,  AUGUST  13,  2008

Page 165

1          MS. COYNE:  July 29th was a Tuesday.

2     BY MR. ABRAM:

3          Q.   We're told it's a Tuesday.

4          A.   If it was a Tuesday, I probably saw a first

5     draft of it the Friday before.

6          Q.   When did you first meet with United's lawyers

7     to begin preparation of that first draft?

14:22:47    8          A.   I've been trying to remember.  It was a very

9     compressed time frame.  It would have been within a day

14:22:56   10     or two of when I got the draft.  This all was a very

11     compressed period.

12          Q.   Had you been maintaining a file up until that

13     time of ALPA communications that you thought reflected on

14     a concerted program to harm United Airlines?

15          A.   Yes.

16          Q.   When did you start to collect that file?

14:23:27   17          A.   Not long after I arrived, and I'm trying to

18     remember if my predecessor may have actually turned over

19     a few things to me.  I don't recall that for certain.

20          But when the junior/senior man harassment

21     started getting reported, I know at that point it was at

22     the latest is when I started keeping communications

23     around concerted activity.

24          Q.   When did you -- Withdrawn.

JAY D. MILONE,  AUGUST  13,  2008

Page 166

| | | |
|---|---|---|
| | 1 | Did you ultimately turn that file over to |
| 14:23:59 | 2 | United's lawyers? |
| | 3 | A.   Yes. |
| | 4 | Q.   When did you do that? |
| | 5 | A.   In this same -- Within a few days prior to me |
| | 6 | seeing a draft of my declaration. |
| | 7 | Wait a minute.  Let me correct that actually. |
| | 8 | I gave them my entire file, my hardcopy file, |
| 14:24:25 | 9 | at that point in time.  I had previous communications |
| | 10 | with Mr. German (phonetic) regarding some of this |
| | 11 | activity over the course of many months. |
| | 12 | Q.   Starting when? |
| | 13 | A.   Spring of 2007. |
| | 14 | Q.   So sometime after the -- what you thought was |
| | 15 | the harassment on junior/senior manning? |
| 14:24:59 | 16 | A.   Correct. |
| 14:25:27 | 17 | Q.   If you could look, please, at Exhibit 21 to |
| | 18 | your declaration.  And then again at Exhibit 22. |
| | 19 | Am I correct that both of these text messages |
| | 20 | were sent by the same person? |
| 14:25:58 | 21 | A.   It appears that way based on the author |
| | 22 | number. |
| 14:26:38 | 23 | Q.   Now, who -- In your declaration, you say that |
| | 24 | Exhibit 21 and Exhibit 22 were sent by First Officer |

Excerpts and Select Exhibits from the
Deposition of Steven Tamkin
August 13, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED AIR LINES, INC.,            )
                                   )
            Plaintiff,             )
                                   )
      vs.                          ) No. 08-CV-4317
                                   )
AIR LINE PILOTS ASSOCIATION,       )
INTERNATIONAL, et al.,             )
                                   )
            Defendants.            )


        The videotaped deposition of STEVEN TAMKIN,

called for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

JUDITH A. WALSH, Illinois Certified Shorthand Reporter

No. 84-2824, at Suite 1000, 9550 West Higgins Avenue,

Rosemont, Illinois, on the 13th day of August 2008, at

the hour of 9:11 o'clock a.m.

        There were present at the taking of this

deposition the following counsel:

Page 2

1          O'MELVENY & MYERS, LLP, by
           MR. TOM A. JERMAN
2          1625 Eye Street, N.W.
           Washington, D.C. 20006
3          (202) 383-5233
           tjerman@omm.com,
4
                on behalf of the Plaintiff;
5
6          COHEN, WEISS AND SIMON, LLP, by
           MR. TRAVIS M. MASTRODDI
7          330 West 42nd Street, Suite 2500
           New York, New York 10036
8          (212) 356-0248
           tmastroddi@cwsny.com,
9
                on behalf of the Defendants.
10
11    ALSO PRESENT:
12          MR. SLAWOMIR KOJRO,
13          Legal Videographer;
14          MR. CHUCK VANDERHEIDEN.
15
16
17
18
19
20
21
22
23
24
25

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 18

1    prerogative to appoint other members?

2        A.    Yes.

3        Q.    And did you appoint other members in April of

4    2007?

5        A.    I did.

6        Q.    Who did you appoint?

7        A.    Robert Domaleski, Xavier Fernandez, and

8    Anthony Freeman.

9        Q.    If you review the published MEC materials on

10   committees, it does not reflect that Mr. Freeman is a

11   member of the industrial relations committee.  Do you

12   know why that is?

13       A.    Well, that's because Mr. Freeman was in a

14   subordinate role in Denver.  He performed industrial

15   committee work, but I don't believe that he was

16   rostered or published in any form anyplace.

17       Q.    Those documents that I just referenced also

18   show the appointment dates of you, Captain Fernandez,

19   and Captain Domaleski as being the beginning of 2008.

20   Do you have any understanding as to why those

21   documents reflect that you were appointed in 2008 when

22   you were, in fact, appointed in April of 2007?

23       A.    I don't know.

24       Q.    When you were appointed by Captain Bathurst,

25   were you provided by him with any instructions as to

Page 45

1    caused in July by an increase in sick leave?

2        A.    Yes.

3        Q.    The United MEC policy manual reflects that the

4    MEC maintains a telephone tree system and has an

5    individual who's assigned as telephone tree

6    administrator.  Are you familiar with that?

7        A.    I'm not directly familiar with that.

8        Q.    Are you familiar with the fact that there is a

9    telephone tree administrator?

10       A.    At times, I was aware of it, but not in the

11   present tense.

12       Q.    When you were aware of it, what was the

13   telephone tree used for?

14       A.    Strike prep.

15       Q.    How does a telephone tree operate?

16       A.    I believe that there's a geographical

17   component to it.  And my recollection, this was many

18   years ago, but that there were pilots, pilots were

19   given a publication that listed individual telephone

20   numbers in their region.  And the pilots went down the

21   list that were designated make the calls, and they

22   went down the list with a published list.

23       Q.    How many calls was each pilot supposed to make

24   to other pilots?

25       A.    I don't recall.

Page 46

1    Q.   Was it a system where one pilot might call 10

2    pilots and they would each call 10 pilots and they

3    would each call 10 pilots?

4    A.   No, I don't -- to my recollection, it was

5    not -- it was just a division of work load among a few

6    individuals.

7    Q.   Okay.  And when you say you were aware of it

8    being used in strike preparation, which negotiations

9    was that?

10   A.   I'm going to estimate that it was the 1989 and

11   1991 time frame.

12   Q.   Do you recall what kind of messages related to

13   strike preparation that ALPA would disseminate through

14   the telephone tree?

15   A.   Well, to some degree, there was negotiation

16   updates that were going on.  And I think that there

17   was a coalescing of the pilot group and its resources.

18   Q.   Explain what you mean by that.

19   A.   Well, the -- the activity on the part of the

20   pilots that would have been related to strike

21   preparation, in other words, establishing lines of

22   communication, taking stock of resources that were

23   available to them, that would have been at a local or

24   cellular level.  So it involved the activation of

25   those communication channels with the assumption that

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 47

1    there was going to be a protracted preparation phase.

2          So in other words, it was the connection of

3    the wires to the network, would be the analogy I would

4    give you.

5      Q.   Do I understand it correctly that the

6    individual cells, as you called them, had previous

7    instructions and then the telephone tree was used to

8    say, implement the instructions you were given

9    previously?

10     A.   No.

11     Q.   Are you aware of any use by the association,

12   and I'm talking here about the MEC, any MEC officer,

13   committee, anybody connected with the Air Line Pilots

14   Association, using a telephone tree system in the last

15   two years?

16     A.   Not in any structural -- not in a formally

17   structured, defined application.

18     Q.   I take it from your answer, you're aware of it

19   being used in an unstructured or informal --

20     A.   Of course.

21     Q.   -- setting?

22          Can you tell us which cases you're aware of it

23   being used in an unstructured or informal setting?

24     A.   Pilots in a social network, pilots that are

25   connected to ALPA work, pilots that are centrally

9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 53

1        A.   I want to go back to the previous question.

2    There was -- something comes to mind.  I have never

3    spoken at a union meeting, a local union meeting.

4    However, I've spoken one time on my initial

5    appointment in April --

6             THE VIDEOGRAPHER:  One moment.  I'm getting a

7    beeping from somebody's phone.  It stopped.

8             MR. MASTRODDI:  It could be me.  My apologies.

9             THE VIDEOGRAPHER:  Please repeat your answer.

10            THE WITNESS:  I spoke briefly at the MEC

11   meeting in April of 2007.

12   BY MR. JERMAN:

13        Q.   Do you recall your remarks?

14        A.   I think they were introductory in nature, and

15   I don't recall specific remarks.

16        Q.   While we're off subject, so to speak, I forgot

17   to ask you, did you ever serve in the military?

18        A.   No.

19        Q.   Okay.  The question that I was starting to

20   pursue was this.  When was the IRC formed?

21        A.   I don't know.

22        Q.   Do you know the reason that the IRC was

23   created?

24        A.   No.

25            MR. JERMAN:  Mark this as Exhibit 12.  And

Page 61

1     A.   San Francisco.

2     Q.   Renner?

3     A.   Los Angeles.

4     Q.   Fortin?

5     A.   Los Angeles.

6     Q.   Freeman?

7     A.   Denver.

8     Q.   Moore?

9     A.   Denver.

10    Q.   Klaffey ?

11    A.   JFK.

12    Q.   Ferguson?

13    A.   DCA.

14    Q.   What about Chicago?  Are there any

15    coordinators in Chicago?

16    A.   Well, Chicago is handled by Xavier Fernandez,

17    so I don't get to that level of detail in Chicago.

18    Q.   Does the IRC hold meetings?

19    A.   No.

20    Q.   And what I say "meetings," I'm talking either

21    meetings with the four MEC level members or meetings

22    with the coordinators.  Are you saying you don't hold

23    either type of meetings?

24    A.   Well, I thought you were asking me in

25    context -- in the context of the local organization.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 62

1    But yes, at the MEC level, we have had several

2    meetings.  And this would include the other

3    defendants.  And we do not have regularly scheduled

4    meetings.

5        Q.    Okay.  Do you have any written records of the

6    agenda for what was said or done at the meeting or

7    notes of the meeting?

8        A.    I do not.

9        Q.    And why don't you have any records of the

10   meetings?

11       A.    Well, they've generally been very informal or

12   they've been clustered on social events.

13       Q.    Do I understand you correctly that you just

14   didn't create any records, not that you had them once

15   and they have been destroyed?

16       A.    That's correct.

17       Q.    How do you communicate with the local

18   coordinators?

19       A.    Telephone.

20       Q.    And when you say "telephone," is that a

21   conference call, or is that you or other MEC level

22   members talking directly to individuals?

23       A.    It's the second description.

24       Q.    Why don't you have meetings with all of the

25   local coordinators?

Page 63

1    A.    Because we're not in that state of readiness.

2    We're not in that status.

3    Q.    I understand that Mr. Freeman testified

4    earlier today in his deposition that he was not aware

5    of the names of the local coordinators.  Do you have

6    any explanation as to why Mr. Freeman would not be

7    aware of the names of the local coordinators?

8    A.    Yes.  As I had stated, there is a variable

9    nature to the participants.  And we're in an informal

10   mode.  And I have not published a list of

11   coordinators.

12   Q.    Is the name -- strike that.

13         Are the names of the local coordinators deemed

14   by you to be confidential, private in some way?

15   A.    No.

16   Q.    Do you have any written record of your

17   telephone calls to local coordinators?

18   A.    I do not keep a written record of that.

19   Q.    Do you communicate with the local coordinators

20   or with other members at the MEC level by email or

21   text message?

22   A.    Yes.

23   Q.    And does that answer go for both local

24   coordinators and the MEC level members, or are your

25   communications with the local coordinators limited to

9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

1    "The Gardener."  And I was connected with it in 2007.

2       Q.    In connection with the litigation that

3    resulted in the two depositions of Captain Dubinsky

4    that I showed you which were lawsuits filed against

5    ALPA and United, there was testimony by some of the

6    individuals that the -- they believed the IRC had been

7    involved in publishing or distributing a booklet on

8    ways to harass individuals like sending magazine

9    subscriptions to them that they didn't want, things

10   like that.

11          First of all, are you aware such a booklet

12   from the 1985 period?

13      A.    I've never seen any publication of that

14   nature.

15      Q.    Have you heard about it?

16      A.    I haven't even heard about it.

17      Q.    Who -- who asked you to serve as a local

18   coordinator back in 1987?

19      A.    Jack McDonald, retired.

20      Q.    What was his position at the time?

21      A.    I believe he was the industrial relations

22   chairman, Los Angeles, but I don't recall the precise

23   title that that was his role.

24      Q.    Did you ever have a conversation with Mark

25   Seal about serving on the industrial relations

Page 67

1    committee?

2    A.    I need a more specific question because I

3    served on the industrial relations committee with Mark

4    Seal.

5    Q.    Okay.   Here is a more specific question.   Did

6    you ever hear Captain Seal say to you or to anybody

7    else that, "If you're not willing to lie to a federal

8    judge, I don't want you on the IRC"?

9    A.    Never, never.

10   Q.    Nothing like that?

11   A.    I've never heard a statement like that.

12   Q.    You've never heard a statement like that from

13   anyone else?

14   A.    Ever under any circumstances.

15   Q.    What type of actions were pursued by the IRC

16   during the period from '87 to '93 when you were a

17   local coordinator?

18   A.    Exchange of information in two directions.

19   There was undoubtedly coordination with other labor

20   groups on the property.   I was involved in those

21   activities, but I'm not able to recall the precise

22   characteristics of those activities, but I did engage

23   in those activities.

24   Q.    Anything else?

25   A.    That's pretty much it.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 80

1    about fatigue, if we want to talk about junior/senior

2    manning, you can ask him specific questions about

3    those kind of things.

4         MR. JERMAN:  Well, I'd sort of like to leave

5    it open and see what he says.  I don't want to lead

6    him to say this or that.  I want to hear what he has

7    to say.

8         MR. MASTRODDI:  Well, again, you know, the

9    lawsuit concerns alleged illegal actions by pilots

10   and/or the union.  Let's talk about potential illegal

11   actions by the pilots and/or the union.  There are

12   plenty of legitimate things that the committee may or

13   may not do that really aren't appropriate for us to

14   delve into today.

15   BY MR. JERMAN:

16   Q.   Okay.  Let's go to information that would

17   affect pilot behavior with regard to use of sick leave

18   or not taking a flight because they're fatigued.  I

19   don't know what the proper term for that is.  What

20   information has the IRC passed with regard to those

21   topics?

22   A.   We have passed most recently information to

23   the pilot group condemning the use of sick leave if

24   you're not actually sick.

25   Q.   Have you been involved in either gathering

1    Q.   And when you say "merger situation," you're

2   referring to discussions of the merger with U.S.

3   Airways, Continental, or both --

4    A.   Both.

5    Q.   -- or some other party?

6    A.   And another party.

7    Q.   What was the role of the IRC with regard to

8   potential merger issues?

9       MR. MASTRODDI:  I'm going to object again.  I

10  mean, this is --

11      THE WITNESS:  Thank you.

12      MR. MASTRODDI:  -- far outside the scope of

13  the lawsuit.  If you want to ask what the IRC has done

14  or does with regard to sick leave, fatigue,

15  junior/senior manning, or things in the Complaint, so

16  be it, but this isn't really a fishing expedition to

17  find out what the IRC does in every aspect of the

18  union's activity.

19  BY MR. JERMAN:

20   Q.   Okay.  I thought it was an innocent question,

21  but I'll move on.

22      I think you answered this already, but does

23  the IRC have any direct communications with United

24  pilots generally?

25   A.   Well, I mean, it's implicit in the local

Page 96

1    Q.    When did you view it?

2    A.    I viewed the website at the MEC meeting in

3  July by standing behind a pilot that had the authority

4  conferred to visit that website, which I do not have.

5    Q.    When was the July MEC meeting?

6    A.    Approximately the 2- -- the week of the 20th

7  of July.  I'd have to refer to notes to give you the

8  exact dates.

9    Q.    Were you doing this surreptitiously, or was

10  the pilot who had access trying to show you what was

11  on the website?

12    A.    It was a request that I made of that pilot who

13  was an MEC member because at that point, the sick-out

14  was under way, what we now refer to as the sick-out or

15  the spike in the sick leave consumption.  That was

16  under way at that point.

17    Q.    And who was the junior pilot who was a member

18  of the MEC?

19    A.    It's Tony Snyder.

20    Q.    What did you observe on the website while you

21  were viewing it behind Mr. Snyder?

22    A.    Well, I had a disadvantage because there were

23  a great number of messages on the website.  It looked

24  like it was heavily trafficked.  But I was looking for

25  either incendiary language or a call to action that

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 97

1    prescribed specific behavior.  And I had an interest

2    in that.

3        Q.   And did you find such messages?

4        A.   I did not.

5        Q.   Okay.  Let's go back then to the June 11, 12,

6    and 13 meetings.  Did you ask Mr. Fernandez at the

7    meetings about his involvement with the website?

8        A.   No.

9        Q.   Did you ask him about his knowledge of a

10   potential sick-out among the junior pilots?

11       A.   Yes.

12       Q.   What did he tell you?

13       A.   He, to the best of my recollection, said words

14   to the effect that something was going on there.  It

15   was an affirmative response, in other words.

16       Q.   And did he give you any detail about who had

17   planned it or how it was planned?

18       A.   I don't recall that.

19       Q.   And what did you say to him?

20       A.   I was going to talk to Tony Freeman about it.

21       Q.   I thought we were just having discussions

22   about your conversations with Mr. Freeman, but maybe

23   not.

24       A.   You just said Fernandez.

25       Q.   Okay.  My mistake.  I apologize.

Page 100

1    residence and had a discussion.

2        Q.    And when you say "the pilots," you mean the

3    four --

4        A.    The defendants.

5        Q.    -- individual -- and what was the discussion

6    over cocktails in your home about?

7        A.    Well, technically we were on the veranda.  And

8    we were -- because it's memorable to me.  This is a

9    very memorable event.  And we had a glass of wine.  I

10   think a few of us had wine, and there was another --

11   maybe another couple cocktails involved, and sat on

12   the veranda.  And I was facing the other gentlemen.

13           And I said words to the effect that, "I'm

14   aware that there's stuff going on, and that if

15   somebody wants to run their own program or get off the

16   reservation, they can be considered on their own.  And

17   they would be treated as an individual discipline case

18   by the union and the company."

19       Q.    Do you recall what else you said at that time?

20       A.    There was an additional comment that there was

21   a difference in following the policies of our

22   committee and having the full weight of the leadership

23   and the pilots behind you and being on your own.

24       Q.    Was the implication of what you were saying

25   that Mr. Freeman and/or Captain Fernandez had become

1    involved in something without your knowledge and

2    approval?

3        A.    Yes.

4        Q.    And did they respond --

5        A.    And I want to answer that fully, that if they

6    weren't directly involved in it, they had some access

7    to feed the information the other direction.

8        Q.    And --

9        A.    I want to be clear about that.

10        Q.    Did they respond to your statements?

11        A.    They responded affirmatively both verbally and

12    with body language.

13        Q.    Affirmatively meaning what in this context?

14        A.    "Yes, you know, I understand," words to that

15    effect and the nodding of the head.  And just there

16    was no push-back on the message.

17        Q.    Was there any further discussion either that

18    evening or during the three days that you were

19    together about the junior pilots and a sick-out?

20        A.    Yes.

21        Q.    Tell me about when the next discussion

22    occurred.

23        A.    My recollection is that there were some

24    reinforcements of that message during the day, during

25    the rally, during casual conversation.  And --

9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

1    Q.   In addition to that, do you recall any further

2    discussions?

3    A.   We met at the Holiday Inn prior to dinner the

4    night of the 12th.  And we had a discussion about

5    trying to come up with something to deal with the

6    junior pilot problem because we obviously had a

7    runaway situation with them.

8    Q.   What was said, what else was said by you or

9    others about the junior pilot problem?

10   A.   There were a number -- there were a number of

11   suggestions that I can't recall because pretty much

12   they were rejected, but there was a lengthy

13   discussion.  But the product of the discussion was

14   that we would try to work out an arrangement where the

15   pilots, rather than illegitimately using their sick

16   leave, causing a problem for the Association and our

17   strategy, that we would offer some form of recourse to

18   them in that their chief complaint being that they

19   were overscheduled and they were on unsustainable

20   schedules, the recourse would be that that would call

21   in tired for the trips if they were genuinely tired.

22   Q.   Do you remember any other conversation?

23   A.   I remember that I told them that I didn't want

24   them to release the information to anybody because my

25   desire was to have that option institutionally

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 103

1    administered.

2        Q.    "That option" being --

3        A.    The option of informing the pilots that if

4    their schedule is unacceptable and that they're tired

5    and they feel that they're unable to continue, that

6    there would be a structured option for that.

7        Q.    Do you remember anything else about what was

8    said on this topic during the three days of meetings?

9        A.    I think that there was consensus at that point

10   so there wasn't -- there wasn't a lot of deliberation

11   beyond that point.  It was pretty much social

12   interaction.  And, you know, we went to dinner.  I

13   don't -- I recall that there were just personal,

14   social discussions.  There wasn't any further

15   discussion on that matter.

16       Q.    If you could refer back to your calendar --

17       A.    Yes.

18       Q.    -- Exhibit 17.

19       A.    Yes.  Is that 15?

20       Q.    15.  I'm sorry.  What did I say, 17?

21             There was -- there's listed an MEC meeting in

22   Chicago the 19th, 20th, and 21st of June.  Was there,

23   in fact, an MEC meeting in Chicago that you attended

24   on those three dates?

25       A.    As far as I know.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

1    Q.   As I understand it, the MEC has regularly

2    quarterly meetings; is that correct?

3    A.   That's correct.

4    Q.   And the most recent quarterly meeting was in

5    July; is that correct?

6    A.   Correct.

7    Q.   So this was not a regular MEC meeting; is that

8    correct?

9    A.   Yes.  I believe that that was a special MEC

10   meeting.

11   Q.   And do you recall a purpose for which the

12   meeting was called?

13   A.   My recollection is that that meeting was

14   intended to cope with the airline's downsizing plans.

15   Q.   And was the entire MEC in attendance?

16   A.   To the best of my recollection, yes, the

17   entire MEC was there.

18   Q.   Was the entire IRC there --

19   A.   No.

20   Q.   -- or just you?

21   Just you?

22   A.   Just myself.

23   Q.   Was Captain Anderson there on behalf of the

24   strike preparedness committee?

25   A.   No.

Page 105

1    Q.    Was there someone there from the family

2    awareness committee?

3    A.    As I recall, yes.

4    Q.    What does the family awareness committee do?

5    A.    It's more analogous to the telephone tree that

6    you had earlier described from what I believe was

7    probably literature from the 1980s.

8    Q.    And why is it called "family awareness"?

9    A.    Well, because it's the involvement or the

10   embodiment of the pilot's family and social structure

11   in his environment, you know, relative to labor

12   relations.

13   Q.    Is the family awareness committee -- strike

14   that.

15        Are the programs put together by the family

16   awareness committee primarily social events to involve

17   the family, or do they have what you might call a

18   business role as well?

19   A.    I'm -- I'm not sufficiently familiar with the

20   family awareness structure to answer those questions.

21        MR. JERMAN:  We need to change the tape, so

22   we'll take a minute.

23        THE VIDEOGRAPHER:  This is the end of Tape 2.

24   Off the record at 2:29 p.m.

25                    (Whereupon, a recess was had.)

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 106

1          THE VIDEOGRAPHER:  This is Tape 3, continuing

2    deposition of Steven Tamkin.  The time is 2:32 p.m.

3    On the record.

4    BY MR. JERMAN:

5        Q.   Did you take notes of the MEC meeting in

6    June -- the 19th, 20th, 21st of June?

7        A.   I did not.

8        Q.   Was there a written agenda?

9        A.   Yes, there was.

10       Q.   And was Captain Wallach in attendance?

11       A.   Yes, he was.

12       Q.   Was there any discussion at this meeting of

13   the concept that you had outlined to the IRC members

14   in Los Angeles with regard to fatigue?

15       A.   I don't recall any discussion of that

16   occurring at that meeting.

17       Q.   When you told the committee members that you

18   wanted to deal through the institutional structure,

19   did you at some point following your meetings in Los

20   Angeles meet with Captain Wallach or somebody else to

21   get the institutional structure to assist?

22       A.   I did.

23       Q.   When did that occur?

24       A.   That, I believe, occurred very soon after the

25   shareholder meeting.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

1    Q.    What was the context?  Did you have a meeting,

2    or did you have an email exchange or telephone call?

3    A.    It would have either been a follow-up,

4    face-to-face meeting that was coincident with the

5    rally or a telephonic contact.  I don't remember

6    which, but I do have it in my mind that it was -- that

7    the message was carried to him.

8    Q.    At the end of the MEC meeting on June 19th,

9    20th, and 21st, do you recall if the MEC had decided

10   upon any action items to deal with the downsizing

11   plans of United?

12   A.    There was closed session instruction given to

13   the negotiating committee, to the best of my

14   recollection.

15   Q.    What is a closed session?

16   A.    That's information that isn't distributed to

17   the general pilot population on the record.

18   Q.    And so if there were a closed session, would

19   it still have been the entire MEC inside the closed

20   session --

21   A.    Yes.

22   Q.    -- or just -- okay.

23         And were you present for that?

24   A.    I believe I was present for part of that.

25   Q.    And what were the instructions to the

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

1  negotiating committee?

2      A.   I don't have a specific recollection of what

3  the actual parameters were.  They were technical,

4  but -- you know, I don't have a specific recollection

5  of it.

6      Q.   Has the industrial relations committee during

7  your tenure since 2007 ever addressed the issue of

8  fuel usage or fuel burn by pilots?

9      A.   There's been references on and off to doing

10  favors and safety margins.

11      Q.   And can you explain to me as a layperson how

12  fuel burn relates to either doing favors or safety

13  margins?  It's not clear to me.

14      A.   You drive your car and you're aware of how

15  much fuel you can consume in your car.  And you might

16  make a decision to drive your car and consume the fuel

17  down to a lower level, at which point you might have

18  to deal with a problem, whether it's making some kind

19  of an unusual stop to get the gas or, moreover,

20  running out of gas on the side of the road.

21          And that is very similar to the decisions that

22  the pilots make in adjusting their fuel loads.  And

23  there's a certain assumption of stress involved in

24  that because if you carry less fuel, then you're --

25  you have a narrower margin to the point where you

9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 112

1    you explain why you think there might not be?

2        A.    What if you run into an unanticipated delay

3    and because you don't have enough fuel, you land at

4    another airport.  Those are astronomical expenses that

5    get incurred in that instance.  And I have been

6    involved in those situations.  And if you have an

7    accident, it's really expensive.  Avianca ran an

8    airplane out of fuel and United Air Lines is running

9    airplane out of fuel with a crash with a loss of lives

10   and property damage.  It's relatively expensive.

11       Q.    Yes.  When did United have a --

12       A.    Portland in 1978.

13       Q.    -- accident?

14             Was that the incident where there was some

15   lack of communication between the captain and the

16   first officer that resulted in ALPA focusing more on

17   crew communications?

18       A.    I'm going to answer that in the affirmative,

19   although the engines failed because there was no gas

20   going to them.

21       Q.    But there was an incident at some point in

22   time --

23       A.    You are correct.

24       Q.    -- that caused ALPA internally to focus on --

25       A.    CLR.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

Page 132

1   And that would be a recent communication.

2       Q.   Is it your recollection that that was posted

3   on the website?

4       A.   Yes.

5       Q.   Are you aware of any other efforts?

6       A.   I have a mindset that there has been other

7   communication, spoken and posted, but I don't have a

8   specific recollection of those.  I can't cite the

9   individual communications.

10      Q.   Are you aware of a video that was put out to

11  United pilots of a speech, I will call it, by Captain

12  Bathurst and Captain Anderson on or about April 20,

13  2007, after rejection of the tentative agreement with

14  the company?

15      A.   I'm aware of the video.  I don't have a

16  recollection of specific elements of the video.

17      Q.   Were you in your position as IRC chair when

18  that video was put out?

19      A.   No, I wasn't -- I didn't have my feet on the

20  ground, if you get my meaning.

21      Q.   Okay.  Yes, I do.

22      A.   In other words, if I had been appointed, it

23  would have just occurred prior to that, and I wasn't

24  really involved with the -- you know, directly

25  involved with their affairs.

1    MR. MASTRODDI:  There's no question pending.

2  BY MR. JERMAN:

3    Q.    Approximately how much time per month do you

4  devote to your position as chairman of the IRC?

5    A.    It's highly variable.

6    Q.    Over the last year, let's deal with the

7  question this way, do you bid a normal line of flying

8  and then you drop trips as needed to do your IRC work?

9    A.    That's correct.

10    Q.    Over the last year, what percentage of your

11  trips do you estimate you dropped to do IRC work?

12    A.    I've never looked at it, and I can't

13  responsibly give you an estimate.

14    Q.    Could you say whether it's closer to 25

15  percent or 75 percent?

16    A.    No.  I can't -- no, I can't answer the

17  question.

18    Q.    Would it be accurate to say that you still do

19  a substantial amount of line flying?

20    A.    I still perform line flying.

21    Q.    How many trips a month would you estimate?

22    A.    That's too difficult for me to tell you at

23  this stage.  I can't state that with any reliability.

24    Q.    Have you ever had a flight where the first

25  officer was assigned through junior manning?

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
9fc7e4ce-e424-4d65-9b1b-e4fd77ae6f08

UAL MEC POLICY MANUAL

**VOLUME I**                                                      10/1/05

<u>UNITED AIRLINES PILOTS'</u>

<u>MASTER EXECUTIVE COUNCIL</u>

<u>POLICY MANUAL</u>

SECTION 30

OF THE

ALPA ADMINISTRATIVE MANUAL

1

TAMKIN Ex 14

# UAL MEC POLICY MANUAL

**VOLUME I**                                                                10/1/05

    f.    Utilize local hotel committees when possible.

    g.    Maintain a current list of approved facilities in use showing date approved and whether they are training, field or downtown layover hotels. List will be maintained in Company CRT. (October, 1991)

    h.    Maintain a current list of approved suitable lounge facilities as provided for in the appropriate section of the Agreement. (October 1991)

    i.    Selection of other than MEC Hotel Committee members as Association Hotel inspectors will be at the discretion of the MEC Hotel Chairman who will ultimately be responsible for final approval or disapproval of all hotel selections. (October 1991)

    j.    Submit suggested improvements/changes relating to the pertinent sections of the Agreement to the Negotiating Committee one hundred and twenty (120) days prior to the amendable date. (April 1974)

    k.    Send a written report to the MEC prior to each regular MEC Meeting. (September 1977)

L.    Industrial Relations Committee:

    1.    Composition:

    This Committee shall consist of a Chairman, appointed by the MEC Chairman, subject to ratification by the UAL-MEC and four (4) members appointed by the Committee Chairman, subject to approval by the MEC Chairman.

    2.    Term of Office:

    The term of office shall be concurrent with the term of office of the MEC Chairman.

    3.    Scope:

    The Industrial Relations Committee shall be responsible for insuring that the pilots of United Airlines are in a continuing state of preparedness to respond to Company and industry actions which affect the relations between the pilots and other parties.

    4.    Duties and Responsibilities:

59

# UAL MEC POLICY MANUAL

**VOLUME I**                                                           **10/1/05**

The activities of the Industrial Relations Committee shall include but not be limited to:

a.    Coordination between other labor groups both on and off the United property.

b.    Analysis of Company and industry actions and positions and their effect on the United pilots.

c.    The formulation and implementation of labor actions which will accomplish the goals of the United pilots and the directives of the UAL-MEC.

d.    Maintain a current inventory of facilities and equipment available for the use of the United pilots necessary to accomplish these goals.

e.    Communicate with the Local Council Industrial Relations Coordinators (appointed by each LEC) to implement any activity, either local or national in nature, which is significant to the United pilots.

f.    Report to the MEC Chairman.

(October 1985)

M.    International Committee:

1.    Composition:

This Committee shall consist of a Chairman and a Vice-Chairman elected by the MEC and additional members as required to be appointed by the Committee Chairman and approved by the MEC Chairman.

2.    Term of Office:

The Committee shall serve a term of office concurrent with the term of office of the MEC Chairman.

3.    Scope:

Monitoring, identifying and suggesting solutions to problems associated with the UAL international operation.

4.    Duties and Responsibilities:

60

Excerpts and Select Exhibits from the
Deposition of Stephen Wallach
August 15, 2008

tb162199 (3).txt

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        1

1      THE VIDEOGRAPHER:  We are going on the video record

2    at 9:26 a.m.  Today's date is August 15, 2008.

3           My name is Joe Pate and I am a legal

4    videographer in association with Merrill Legal

5    Solutions.  The court reporter today is Tracy Blaszak.

6           Here begins the videotaped deposition of

7    Stephen Wallach taken in the matter of United Air Lines

8    vs. Air Line Pilots Association, International, et al.,

9    bearing case No. 08 CV 4317 in the United States

10   District Court for the Northern District of Illinois,

11   Eastern Division.

12           The deposition is being held at 9550 West

13   Higgins Road, Rosemont, Illinois.

14           Will counsel please identify yourselves for the

15   record and state whom you represent starting with the

16   noticing party.

17   MR. JERMAN:  Tom Jerman of O'Melveny & Myers, LLP,

18   for United Air Lines.

19   MR. ABRAM:  Michael Abram, Cohen, Weiss & Simon,

20   LLP, counsel for defendants.

21   THE VIDEOGRAPHER:  Will the court reporter please

22   swear in the witness.

23   MR. ABRAM:  Excuse me, we'd also like to, since she

24   doesn't have a microphone on, Betty Ginsburg, ALPA legal

25   department, Washington and Herndon, counsel for

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        2

1    defendants.

2      THE VIDEOGRAPHER:  Thank you.  Court reporter,

3    please swear in the witness.

tb162199 (3).txt

24    vice-chairman of the MEC international committee.

25         And then I was elected as the master chairman

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT         7

1    in October of 2007.

2       Q    Do you hold any positions with the Air Line

3    Pilots Association at the international level?

4       A    No.

5       Q    Have you ever done so?

6       A    No.

7       Q    Are you --

8       MR. ABRAM:  Do you mean other than by virtue of his

9    position as MEC chairman, counsel?

10      MR. JERMAN:  I'm not sure if that makes him an

11   international officer or not.

12      MR. ABRAM:  He is a member of the executive board.

13   He is not an officer but it's a position.

14      MR. JERMAN:  Q    Thank you.  What is the ALPA

15   executive board?

16      A    That's a board composed of all of the master

17   chairmen of all of the represented -- of all of the

18   represented locals, of all of the airlines of the Air

19   Line Pilots Association.

20      Q    What authority does the executive board have?

21      A    The executive board basically receives

22   resolutions, questions of policy, et cetera, from the

23   various master executive councils.  They meet twice a

24   year.

25         Their role is to review those resolutions,

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT         8

1    requests for resolutions, policy statements, et cetera,

2    pass them along with a decision or guidance to the

Page 6

tb162199 (3).txt

3     national officer, and then I guess I would say is it

4     biannually, biannually twice a year they provide that

5     direction to the board of directors, which is a meeting

6     which is held once every two years of all of the status

7     representatives throughout the Air Line Pilots

8     Association.

9          Q    Are you a member of the United Air Lines, Inc.,

10    board of directors?

11         A    Yes, I am.

12         Q    And how long have you been a member of the board

13    of directors?

14         A    I was elected to that position through my

15    ascension as the master chairman, and my term commenced

16    January 1st.

17         Q    Of 2008?

18         A    Of 2008, yes.

19         Q    I'd like to ask a few questions about

20    communication mechanisms, and I'm talking at this point

21    about you personally, not the Air Line Pilots

22    Association generally.

23             Do you communicate with ALPA representatives by

24    e-mail?

25         A    Personally?

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        9

1          Q    Yes.

2          A    No, not personally.

3          Q    I've seen e-mails with your name on them.

4          A    Generally that's done through my -- as I'm

5     communicating through my MEC position.

6          Q    That -- well, maybe I'm not being clear then.

7     When I say personally, I mean whether in your capacity

tb162199 (3).txt

8    as-needed basis.

9       MR. JERMAN:  I'm going to mark this as Exhibit

10   Wallach 1.

11          (Exhibit 1 marked as requested.)

12      MR. JERMAN:  Q   Captain Wallach, what we marked as

13   Exhibit 1 is three pages of some documents that were

14   produced to us by --

15      A   Yes.

16      Q   -- attorneys for ALPA.

17          Do you recognize this document?

18      A   Yes.

19      Q   Is this document what it appears to be, which is

20   notes reflecting a conference call about the pilot to

21   pilot committee that was then sent to you?

22      A   Yes.

23      Q   Am I correct in interpreting this to mean that

24   these are the subject matters that the association wants

25   the pilot to pilot representatives to discuss with

              UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        29

1    pilots on their next visits?

2       A   These are items that potentially could come up

3    as questions from the pilots.

4           And these are items which have been discussed

5    on -- or I should say were discussed in terms of what's

6    happening.  Most of the time the P to P information

7    comes in to us as questions from the pilots.  These are

8    the questions we're hearing from the pilots, how, you

9    know, how do we talk -- how do we talk to them about

10   this, what do we tell them.

11          So these are bullet points of discussion points

12   on how we talk to them.

                        Page 24

tb162199 (3).txt

13     Q   If I could directs your attention to the second

14   page of this document, the third bullet point that says,

15   "We must continue to educate pilots on the Railway Labor

16   Act."

17          What is your understanding of what type of

18   education the P to P committee was being asked to

19   undertake?

20     A   This pie lot group is an extremely young pilot

21   group, they don't understand the railway labor act.

22   They think that come December 31st, 2009, if we don't

23   have a contract we can go out on strike.  They don't

24   understand what the Railway Labor Act is.  And so I

25   actually think that the P to P people have a handout

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT          30

1    that they provide when they're out on the road

2    discussing the Railway Labor Act and exactly how it

3    pertains to negotiations.

4        MR. JERMAN:  Do you think they use a copy of the

5    treatise?

6        MR. ABRAM:  I doubt it.  It's too expensive.

7        THE WITNESS:  I can assure you it was approved by

8    legal.

9        MR. JERMAN:  Q   Two, I guess it's three bullets

10   down there is a reference to business cards designed by

11   ALPA.

12          Can you tell me what that refers to?

13     A   This is the -- in the domiciles the pilots have

14   what's called trading cards, and the trading cards

15   basically show airplanes, and if you turn the

16   airplane -- if you turn the trading card over, it talks

17   all about, you know, the airplane, you know, technical

                              Page 25

tb162199 (3).txt

22    A    Uh-huh.

23    Q    And that would create leverage?

24    A    Right.

25    Q    What is leverage?  That's my question.

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        57

1    A    Leverage could be, you know, as small as optics.

2    If a negotiation the company sees all of the pilots not

3    wearing their hats, they know that they're unified.

4    Q    Okay.  I think you've alluded to the issue, let

5    me ask you more directly.  Does leverage mean leverage

6    in negotiations with United?

7    A    Well, certainly in any negotiation, section 6

8    negotiation if the pilots are not unified, you know, the

9    company picks -- picks off various groups.  And that's

10   not acceptable in any struggle.  I mean, you can -- I'll

11   just leave it at that.

12   Q    Okay.  Let me try again.

13   A    Okay.

14   Q    Is leverage a term that is frequently applied to

15   negotiations between two parties or two entities?

16   A    I'm sure it is.

17   Q    And does leverage as applied to negotiations

18   mean that one side has some sort of upper hand in the

19   negotiations by means of that leverage?

20   A    I think that leverage could be applied to either

21   party, so unified pilots create leverage.

22   Q    And is leverage something that the union can use

23   to obtain a better contract negotiation?

24   MR. ABRAM:  A better contract or better contract

25   negotiation?

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        58

Page 48

tb162199 (3).txt

1        MR. JERMAN:  Well-stated objection.

2        Q    Is leverage something that can be used to create

3    a better contract?

4        A    Certainly.

5        Q    Could you refer to the second page of the

6    document?

7        A    Yes.

8        Q    The second sentence, that being said, our

9    contract still contains numerous provisions that many of

10   you choose to ignore or waive.  Every time you ignore or

11   waive a provision contained in your collective

12   bargaining agreement, the company either benefits

13   financially or marks the event and uses it against your

14   negotiators in future negotiations.

15            Is that language that you wrote?

16       A    Is what?

17       Q    Did you write that?

18       A    Yes.

19       Q    And the next sentence, the time has stopped --

20   the time has come to stop helping the company get your

21   collective bargaining agreement.  Is that something you

22   wrote?

23       A    Yes.

24       Q    And does -- Strike that.

25            Did you intend by those sentences to tell

              UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        59

1    United's pilots that they should not ignore or waive

2    contract provisions?

3        A    No.  I intended to start educating -- educating

4    the pilot group about their contract.  And the way that

5    that in any future contract negotiation and/or contract

Page 49

tb162199 (3).txt

6    that historically speaking the company monitors and

7    tracks waivers, whether waivable or unwaivable, and uses

8    that against the negotiators in negotiation.

9        Q    And did you also intend to explain to them that

10   waiving a provision may benefit the company financially?

11       A    I think that -- I think that the company would

12   have to make that determination whether or not --

13   whether it benefits them.

14       Q    If the company would have to make that

15   determination, why did you write here that every time

16   you ignore or waive a provision contained in your

17   collective bargaining agreement, the company either

18   benefits financially or marks the event for use in

19   future negotiations?

20       A    It's my understanding that they do benefit

21   financially from a waiver.

22       Q    This document goes on to reference a series of

23   did you knows that have been put out and will continue

24   to be put out by the grievance committee.

25           Do you see that?

         UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT       60

1        A    Yes.

2        Q    What is a did you know?

3        A    A did you know is a highlight of the contract

4    that is meant to education the pilots about the

5    contract.

6        MR. JERMAN:  Let's mark this as Exhibit 5.

7           (Exhibit 5 marked as requested)

8        MR. JERMAN:  This will be Exhibit 6.

9           (Exhibit 6 marked as requested.)

10       MR. JERMAN:  Q   Are Exhibits 5 and 6 examples of

tb162199 (3).txt

23   were being harassed or ostracized by other pilots?

24      A   As the chair elect?

25      Q   Yes.

         UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        76

1       A   No.

2       Q   Prior to becoming chair elect, had United

3    brought that to your attention?

4       A   Prior to becoming a chair elect?

5       Q   Right.

6       A   As a line pilot, no.

7       Q   After becoming chairman, did United bring that

8    to your attention?

9       A   I think in an informal way, as I recall, I think

10   the subject of discussion from I think it was Sean

11   Donohue.

12      Q   What do you recall Mr. Donohue saying?

13      A   I think we both agreed that it was not

14   professional behavior.

15      Q   Was this in a meeting or a telephone call or an

16   e-mail or what?

17      A   It was just in a -- I think in a meet and greet.

18      Q   In the briefings you had received when you were

19   chair elect or some other form, did Captain Bathurst or

20   some other ALPA representative tell you that United had

21   brought this issue to their attention?

22      A   No.

23      Q   Did you call Captain Tamkin in November of 2007

24   to discuss the I shall shoe of alleged harassment of

25   pilots who had accepted junior or senior manning?

         UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        77

                        Page 64

tb162199 (3).txt

1      A    I believe I called Captain Tamkin after a note

2   was put in my mailbox, which was a -- for lack of a

3   better term -- a flier, which was attempting to counsel

4   whoever received this flier about junior senior manning.

5   And whoever put it in my mailbox had written on it this

6   is B.S.  And I immediately called up Captain Tamkin and

7   said what the heck is this?  This is a bunch of B.S.

8   Stop it.  Not implying that he had anything to do with

9   it, but that he had the communication ability to talk to

10   the pilots to stop it.

11      Q    Why did you call Captain Tamkin as compared to

12   any of the other ALPA representatives or employees?

13      A    Well, because as I indicated to you, Captain

14   Tamkin has -- is a communication conduit that I use to

15   keep the pulse of the pilots and that he can immediately

16   communicate to the pilots.

17      Q    Are you aware of the phrase rat lists?

18      A    Not since this litigation.

19      Q    During the period in 19 -- excuse me, in 2007

20   and 2008 have you seen posted in crew rooms or other

21   public areas lists of pilots who had accepted

22   junior/senior manning assignments?

23      A    No.

24      Q    Have you seen posted derogatory comments about

25   pilots who take junior or senior manning?

         UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        78

1      A    No, not that I can recall.

2      Q    Other than -- well, strike that.

3           When did your conversation with Captain Tamkin

4   occur?

5      A    I really don't recall.  I recall the

                        Page 65

tb162199 (3).txt

5      Q    So would it be accurate to say that by including

6   those statements in every single update you intend to

7   focus pilot attention on the union's request to reopen

8   the request?

9      A    I intend to focus the pilots' attention on the

10   fact that they've been living under this contract for

11   that long.

12      Q    And that the company had declined to sit down

13   with you to negotiate a new contract?

14      A    That the company has every opportunity at any

15   time to sit down and talk about the contract.

16      Q    Let me direct your attention to page 4 --

17      A    Yes.

18      Q    -- of the document.  Let's begin with the quote,

19   fighting with a large army under your command is no wise

20   different than fighting with a small one, it is merely

21   an question of instituting signs and signals.

22      A    Yes.

23      Q    Is that something that you directed to be

24   included in all MEC updates?

25      A    I didn't direct it.  It was brought to me as

                 UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        85

1   what do you think about including this.

2      Q    So it was somebody else's idea?

3      A    It was the communications committee's idea.

4      Q    And did they explain to you why they thought it

5   was a good idea?

6      A    Because the switch right above it is a signal.

7      Q    What is the genesis of this quote, if you know?

8      A    It's from a book by Sun Su, the book is called

9   The Art of War.

                        Page 71

tb162199 (3).txt

10      Q    Was the use of this quote intended to signify
11   you believed the union was in a war with the company?
12      A    No.
13      Q    Now, the graphic here that says hats on hats
14   off.
15      A    Yes.
16      Q    And then the text underneath it that says the
17   hat switch is now on, any time you're likely to be
18   viewed by management, wear your hat and so on.
19      A    Yes.
20      Q    Is that a campaign that you came up with or was
21   that recommended to you by somebody else?
22      A    That was a campaign that one of the other
23   officers elect -- it was his idea.
24      Q    Whose idea was it?
25      A    It was the vice-chairman Jeffrey Barath.

              UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        86

1      Q    Did he tell you why he thought that the MEC
2   should adopt this idea?
3      A    Well, we discussed it I would say within a day
4   or two after our election about how it was going to be
5   extremely challenging unifying the pilot group and that
6   it was going to take a lot of time and we were going to
7   have to start with small steps.
8      Q    Can you expand and connect that with the
9   campaign?
10      A    Well, it's -- in terms of the hat campaign?
11      Q    Yes.
12      A    It's a method by which the pilots can
13   communicate to their leadership that they are listening
14   maybe because we can look out and see that the pilots'
                        Page 72

tb162199 (3).txt

15    hats are on or off, that they are -- that they are

16    unified, in other words, that they are -- they don't

17    have their hats on and we look out and see they don't

18    have their hats on, it's a unified group.  They're

19    starting to act cohesively.

20        Q    Captain Tamkin described it in his deposition as

21    a unity exercise.  Would you agree with that

22    characterization.

23        A    I would agree with that characterization.  It is

24    a unity exercise.

25        Q    When you first started this campaign, was it

             UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        87

1     immediately effective or did it become more effective

2     over time?

3         A    Oh, you know, when we first started the campaign

4     it was universally derided, I would say, maybe not

5     universally, but a large majority of the pilots derided

6     it.

7         Q    And what occurred -- Strike that.

8              What actions, if any, were taken to cause the

9     pilot group to comply with the directive to wear or not

10    wear their hat?

11        A    I think that it was education.

12        Q    Explain what you mean by education?

13        A    Well, over time I think the pilots started

14    talking to themselves and through our various, you know,

15    communications, talking about solidarity, talking about

16    acting as a cohesive unit, I think they finally realized

17    that it was a demonstration of unity.

18        Q    Was one element of the eventual success of the

19    campaign the fact that pilots who supported this

             Page 73

tb162199 (3).txt

8    Milone was present for United on or about May 22nd,

9    2008, in which you said that you wanted the parties to

10   complete negotiations or show substantial progress by

11   May 31, 2008?

12       A   Yes.

13       Q   Okay.  Do you recall telling Mr. Milone that if

14   the parties did not make substantial progress by that

15   date there would be "serious consequences" for United

16   during the summer?

17       A   I recall that, yes.

18       Q   Do you recall what Mr. Milone said in response?

19       A   I think he asked -- I think his -- as I recall,

20   his response was what or something along those lines.

21       Q   And do you recall what you said?

22       A   I think that at that point he rephrased the

23   question.  And I think that he asked me what they could

24   expect if we were able to -- if we were able to come to

25   negotiations.  And I think my response was along the

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        92

1    lines that the pilot group would, you know, be -- it

2    would be viewed as a positive outcome.

3        Q   Did Mr. Milone ask you whether your statement

4    about serious consequences was intended as some sort of

5    threat?

6        A   No.  And it wasn't intended as a threat.

7        MR. JERMAN:  It's 1:40 and I'll be switching to a

8    new subject area, so want to take a lunch break now.

9        MR. ABRAM:  I have 12:40, but it's okay to take a

10   break.

11       MR. JERMAN:  It's 1:40 in New York, that's what I

12   meant.

                            Page 77

tb162199 (3).txt

13    MR. ABRAM:  Thank you.

14    MR. JERMAN:  And in D.C., as well.

15    THE VIDEOGRAPHER:  Take a lunch break now?  Going

16    off the record.  The time is approximately 12:41 p.m.

17        (a brief recess was taken)

18    THE VIDEOGRAPHER:  Going on the record.  The time is

19    now approximately 1:38 p.m.  Please proceed.

20    MR. JERMAN:  Mark that as 16.

21        (Exhibit 16 marked as requested.)

22    MR. JERMAN:  Q   Captain Wallach, can you identify

23    what we've marked as Exhibit 16??

24    A    Yes.

25    Q    What is it?

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT       93

1    A    It's a letter that I sent to the pilots on June

2    4th.

3    Q    And why did you send this letter?

4    A    Because United Air Lines released an

5    announcement that they were going to park 100 airplanes.

6    Q    If you could look at the very last paragraph.

7    A    Uh-huh.

8    Q    The third sentence after you say that you've

9    made this your type priority and are directing

10   committees to devote their time and energy to protecting

11   the jobs of United pilots, you say, "No idea will be

12   discounted."

13        What did you mean by that?

14   A    No idea will be discounted.

15   Q    Just what it says?

16   A    Just what it says.

17   Q    Thank you.

Page 78

tb162199 (3).txt

18    MR. JERMAN:  This will be Exhibit 17.

19         (Exhibit 17 marked as requested.)

20    MR. JERMAN:  Q   Can you identify Exhibit 17?

21    A    This is the -- it looks to be the update for

22 June 24th.

23    Q   And this appears to be a special update outside

24 of the ordinary course.  Was it, in fact, a special

25 update?

          UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT       94

1    A    I guess because it says special update.

2    Q    What was it that prompted you to issue a special

3 MEC up date?

4    A    I think because of the announcement on Monday by

5 the system chief pilot was the number of furloughs that

6 were going to be -- that they intended to -- or the

7 number of people that they intended to furlough.

8    Q    The week immediately prior to the issuance of

9 this statement was there a meeting in Chicago that

10 included representatives of the MEC, the industrial

11 relations committee, the strike preparedness committee

12 and the family awareness committee?

13    A    Yes.

14    Q    Was that a multi-day meeting?

15    A    I believe it was.

16    Q    What was the purpose of that meeting?

17    A    The purpose of that meeting was to discuss the

18 status of negotiations relative to furlough

19 mitigation/quality of life/fatigue mitigation, pilot

20 early retirement.

21    Q    What was the reason that you had asked the IRC

22 to attend that meeting?

Page 79

tb162199 (3).txt

23    A    Because it's a communications conduit.

24    Q    Do you recall if at the time of that meeting you

25    had had a conversation with Captain Tamkin about a

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        95

1    program to encourage pilots to utilize fatigue calls

2    rather than sick calls?

3    A    I don't recall that I discussed him to use

4    fatigue calls.

5         I recall that fatigue was an issue.

6    Q    Did you have a conversation with Captain Tamkin

7    about the general topic of fatigue?

8    A    Yes.

9    Q    Approximately when did that occur?

10    A    Oh, I can't remember.

11    Q    Did it occur sometime between -- Strike that.

12         Are you aware of a meeting that occurred on

13    June 11 and 12 of 2008 in Los Angeles with members of

14    the industrial relations committee and a pilot named

15    Anthony Freeman?

16    A    I'm -- it's been reported to me.

17    Q    Okay.  Were you aware of that meeting at the

18    time it occurred?

19    A    No.

20    Q    Okay.  Captain Tamkin and the other members of

21    that committee testified that during two days of

22    meetings they had a discussion about the issue of

23    fatigue and I want to characterize --

24    MR. ABRAM:  I object to that characterization of two

25    days meeting.  There was no testimony that they met for

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        96

1    two days.

tb162199 (3).txt

2    MR. JERMAN:  Q   There was a one meeting and then

3    they had a meeting the other day and they were, in fact,

4    testified to be short meetings, so I'll accept your

5    concern there.

6        But they testified that after those meetings --

7    Strike that.

8        During two meetings that occurred on the 11th

9    and 12th they had a discussion about fatigue and that

10   Captain Tamkin said he was going to address it through

11   the institutional channels of ALPA.

12       My question to you is following that meeting

13   did Captain Tamkin contact you to discuss the issue of

14   fatigue?

15   A   Yes, he called to discuss the issue of fatigue.

16   Q   Okay.  Thank you.

17       Was that issue further discussed in the

18   meetings of the MEC, IRC, SPC, and FAC on June 19 and 20

19   in Chicago?

20   A   No.

21   MR. JERMAN:  Let's mark this as Exhibit 18.

22       (Exhibit 18 marked as requested.)

23   MR. JERMAN:  Q   Did you create a video message that

24   was sent to United pilots on or about June 25, 2008.

25   A   Yes.

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        97

1    Q   Okay.  And can you identify Exhibit 18 of a

2    transcript of what you said in that video?

3    A   Yes.

4    Q   What was --

5    A   I -- I just have to ask you if this is the

6    transcript we have or is this something been

Page 81

tb162199 (3).txt

17    be an organized sick out among junior pilots?

18        A    No.

19        Q    At any point prior to the date that the present

20    lawsuit was filed, on July 31st, did you have any

21    discussions with Captain Tamkin or other members of the

22    industrial relations committee in which they told you

23    about concerns that there might be a sick out among

24    junior pilots?

25        A    Yes.

             UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT         100

1         Q    When did you first have such discussions?

2         A    I think the first time I had a discussion with

3     Captain Tamkin was either right before June 11th --

4     well, I think it was right before June 11th when I

5     started to become aware of this web site and there

6     started to be some chatter that I was hearing that there

7     was some discussion about sick list.

8              And I called up Captain Tamkin and in no

9     uncertain terms told him to use his communications

10    ability to stop it.

11        Q    And your best recollection is that was before

12    June 11th, which was the day before the picketing event?

13        A    It was sometime in that time frame.  I don't

14    know the exact date.  It was at some -- it was at some

15    point in June because I heard -- I started hearing this

16    chatter in, you know, late May, early June time frame.

17    And, of course, it was -- that's when I started hearing

18    it.

19        Q    When you talk about hearing chatter, can you

20    describe in more detail what that means?

21        A    That would be I would have -- there would be
                        Page 84

tb162199 (3).txt

22    anecdotal conversations related to me or I would be on

23    the forum and I would see -- you know, I would be seeing

24    something, just no specific, just all of a sudden talk.

25        Q    Between your first conversation in June and the

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        101

1    end of July, did you have any further conversations with

2    Captain Tamkin?

3        A    Yes, I had another conversation after the phone

4    call from Mr. McKeen, pressing a concern about an

5    elevated sick list in the narrow body fleets and called

6    up Mr. Tamkin once again -- Captain Tamkin once again

7    and reinforced even more forcefully to stop it, use his

8    communication with the pilots to stop it.

9        Q    Did you in that conversation ask Captain Tamkin

10    what he knew about what was actually happening among the

11    June I don't know pilots?

12        A    Yes, I asked him if he knew of anything.

13        Q    What did he say?

14        A    His response was he was not aware.

15        Q    He told you he wasn't aware of any possible

16    organized sick leave among the junior pilots?

17        A    Yes, that's what I -- that's what I took away

18    from that.

19        Q    Did you have any other conversations with

20    Captain Tamkin on this subject before the lawsuit was

21    filed?

22        A    No, not that I recall.  I think his exact words

23    were spontaneous combustion.

24        Q    What does spontaneous combustion mean?

25        A    I think it means that it was just something

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT        102
Page 85

tb162199 (3).txt

10   A   Yes.

11   Q   At the time you wrote your response to

12   Mr. McKeen, had you had the conversation with Captain

13   Tamkin in which he referred to spontaneous combustion?

14   A   I think -- this was on July 21st, and I believe

15   the conversation with Mr. Tamkin occurred -- Captain

16   Tamkin occurred probably in the 18, 19, 20 -- 20, 20

17   time frame.  It was shortly after the phone call from

18   Mr. McKeen when I called up and asked what was going on.

19   And then he reported back that there was nothing that he

20   could determine that was going on.  And then I -- that's

21   when I said, well, to whatever extent you can stop it,

22   stop it.

23   Q   And then going to the middle of this document,

24   there is an e-mail dated July 21 from Doug McKeen to

25   you.  Was that Mr. McKeen's response to your e-mail?

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT     105

1   A   Yes, as I recall it was.

2   MR. JERMAN:  Mark this as Exhibit 21.

3        (Exhibit 21 marked as requested.)

4   MR. JERMAN:  Q   Can you identify Exhibit 21,

5   please?

6   A   This was a letter that was sent out to the

7   pilots.  It doesn't have the date but sometime during

8   that week of the MEC meeting, that was an MEC meeting.

9   Q   If I represented to you that our records

10  indicate this letter was sent on July 22, 2008, would

11  that appear correct to you?

12  A   Sure, probably correct, yes.

13  Q   Did you prepare this e-mail or did you assign

14  somebody -- let me start again.

Page 88

tb162199 (3).txt

15          Did you prepare this letter or did you assign

16   somebody else to do so?

17      A   This letter was prepared by the communications

18   committee at -- it was prepared by the communications

19   committee.

20      Q   And do you know who specifically on the

21   communications committee wrote the letter?

22      A   No.

23      Q   If you could go back to Exhibit 20, in your

24   e-mail of July 21 in the second paragraph at the end of

25   the first sentence says I will remind the pilots of that

           UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      106

1    in a communication which we are preparing now.

2           Is Exhibit 21 the communication that you were

3    referring to?

4       A   No.

5       Q   What were you referring to when you said in a

6    communication that we are preparing now?

7       A   Actually, this e-mail was written by Bob

8    Nichols, our attorney, and he was instructed -- I

9    instructed him that we need to communicate to the

10   pilots.  And he -- his response was I'll take the first

11   whack at it.

12      Q   So the reference to a communication we are

13   preparing now was a reference to Mr. Nichols' whack at a

14   letter?

15      A   A letter.

16      Q   And did Mr. Nichols prepare a letter?

17      A   I -- you know, I can only assume that this

18   letter is a compilation of the work that was done with

19   him and the communications committee.

                          Page 89

tb162199 (3).txt

20      Q    Well, do you recall at any point in time having

21   more than one draft letter prepared to the pilots on the

22   subject of sick leave and having to choose between one

23   or more letters?

24      A    No.

25      Q    What was your purpose in sending out Exhibit 21?

UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      107

1      A    This was to address the issue relative to the

2   e-note that had gone out, reinforce the fact that we do

3   not condone the inappropriate use of sick leave, and to

4   remind the pilots that the medical standards that they

5   are held to are contained in the FARs and the airman's

6   information manual.

7      Q    Did you consider simply stopping this

8   communication after the first two sentences of the first

9   paragraph and not including all of the information about

10   when it's appropriate to use sick leave?

11      A    This communication was handed to me and I was

12   asked to review it and said -- asked are you okay with

13   this?  My first question was:  Have the attorneys seen

14   it?  The attorney happened to be there.  And he said,

15   yes, I've seen it, it's okay.  And then I said send it.

16      Q    Do you recall who handed it to you?

17      A    No.

18      Q    Did you at the time it was handed to you

19   consciously consider whether it would be better not to

20   include all of the information in the third paragraph

21   and beyond in the letter?

22      MR. ABRAM:  Objection, that question has been asked

23   and answered, it has been answered.

24          You may answer it again.  But we're not going

Page 90

tb162199 (3).txt

25    to permit a continued repetition of the same questions.

        UNITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      108

 1    You may answer.

 2        THE WITNESS:  No.

 3        MR. JERMAN:  Q   Was the attorney in question

 4    Mr. Nichols?

 5        A   Yes.

 6        THE WITNESS:  Can we just take a minute here.

 7        MR. JERMAN:  Take a five-minute break, that's fine.

 8        THE VIDEOGRAPHER:  Going off the record.  The time

 9    is now 2:10 p.m.

10            (a brief recess was taken)

11        THE VIDEOGRAPHER:  Going on the record.  The time is

12    now 2:14 p.m.  Please proceed.

13        MR. JERMAN:  This will be Exhibit 22.

14            (Exhibit 22 marked as requested.)

15        MR. JERMAN:  Q   Captain Wallach, let me represent

16    to you that Exhibit 22 is five pages from a document

17    production we received from the association.  And I

18    think we're going to have to jump around a little bit in

19    this exhibit to get it in chronological order, but

20    that's what I would like to do.

21        A   Sure.

22        Q   Beginning on the first page of the exhibit, is

23    that an e-mail that you sent to the chairman of the

24    grievance committee asking him to prepare a do you know

25    on fatigue?

        UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      109

 1        A   Yes.

 2        Q   And why did you ask the chairman of the

 3    grievance to do this as compared to someone on the

tb162199 (3).txt

1    under advisement were or, you know.

2        Q    Okay.  Fine.  If you don't know.  That's all I'm

3    trying to find out?

4        MR. JERMAN:  Take a five-minute break at this point.

5        THE VIDEOGRAPHER:  We can go ahead and change the

6    tape here, if you don't mind.

7        MR. JERMAN:  That's fine.

8        THE VIDEOGRAPHER:  This is the end of tape No. 2 in

9    the deposition of Stephen Wallach.  Going off the

10   record.  The time is approximately 2:40 p.m.

11           (a brief recess was taken)

12       THE VIDEOGRAPHER:  This is the beginning of tape No.

13   3 in the videotaped deposition of Stephen Wallach.

14   Going on the record.  The time is approximately 2:52

15   p.m.  Please proceed.

16           (Exhibit 36 marked as requested.)

17       MR. JERMAN:  Q  Captain Wallach, I marked as

18   Exhibit 36 a three-page document that appears to be a

19   letter from you to fellow pilots dated July 15, 2008.

20   Can you identify that document, please?

21       A    Yes.

22       Q    What is it?

23       A    It appears to be the letter that was sent to the

24   pilots on July 15th.

25       Q    What was your purpose in sending this letter to

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      122

1    the pilot group?

2        A    Part of my responsibility to the membership is

3    to provide them my view of the world as I see it.  And

4    that was my view of the world at the time.

5        Q    Was there any particular event that caused you

                              Page 102

tb162199 (3).txt

6   to send the letter at this time?

7      A   The -- I wouldn't necessarily say that it was an

8   event, but the negotiations that we had been attempting

9   to complete were unproductive, the pilots were clamoring

10  for information, they wanted to know what was going on,

11  where were we on the various -- you know, various

12  negotiations, and this was the culmination of that.

13     Q   The negotiations that you were engaged in at the

14  time, at least part of that included quality of life and

15  fatigue mitigation issues, is that correct?

16     A   It was furlough mitigation, quality of

17  life/fatigue mitigation and pilot early retirement

18  package.

19     Q   Did you subsequently reach an agreement on

20  furlough mitigation?

21     A   I believe we reached an agreement on furlough

22  mitigation prior to this letter being sent out.  I think

23  somewhere in here I actually reference it.  July 10th.

24     Q   Was there discussion within ALPA about whether

25  to send this letter out earlier than you sent it out?

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      123

1      A   Discussion within ALPA?

2      Q   Yes.

3      A   There were quite a few calls upon me from a

4   number of constituency, I guess you would say, that I

5   had to, you know, communicate to the pilots.  I had to

6   communicate to the pilots.

7      Q   I guess what I'm trying to understand is was

8   there something particular that caused you to send this

9   letter on July 15 as opposed to a week earlier or two

10  weeks earlier?

                        Page 103

tb162199 (3).txt

19   notices to pilots, one concerning junior manning and one

20   concerning sick leave and other issues generally?

21       A   Yes.

22       Q   As I understand it from Captain Tamkin's

23   deposition yesterday, the industrial relations committee

24   also in response to that agreement utilized its

25   resources to discourage any improper use of sick leave,

                 UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      132

1   do you have that same understanding?

2       A   Yes.

3       Q   Okay.  And do you have the understanding that

4   that has been -- those efforts have been successful in

5   reducing sick leave levels fairly substantially over

6   what they were in July?

7       A   I don't know.

8   MR. JERMAN:  I have nothing further.

9                       EXAMINATION

10                      by Mr. Abram:

11      Q   Have you then received any complaints from the

12   company that sick leave levels have not dropped?

13      A   No.

14      Q   Thank you.

15          Now, let me direct your attention to Exhibit

16   16.

17      A   16.

18      Q   Wallach 16.

19      A   Yes.

20      Q   Questions were asked concerning a sentence in

21   the last paragraph of Wallach 16, your letter of June

22   4th.

23          The second sentence refers to your direction to

                              Page 111

tb162199 (3).txt

24   the negotiating committee and the system schedule
25   committee to devote all their time and energy to
            UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      133

1    protecting the job of our pilots.
2            Why would the negotiating committee have been
3    involved in that subject?
4       A   The negotiating committee would be involved with
5    that because of the what eventually became referred to
6    as the furlough mitigation agreement.
7       Q   That is to say they would be involved in
8    negotiating with the company on that subject?
9       A   Correct.
10      Q   Why would the system schedule committee be
11   involved with that?
12      A   And the system schedule committee would be
13   involved in that because they would be making the
14   analytical -- they would be providing the analytical
15   knowledge on the proposals that were being passed back
16   and forth on how many pilots would be -- how many jobs
17   would be saved.
18      Q   In the next sentence you said, "No idea will be
19   discounted."
20           Do you remember that?
21      A   Yes.
22      Q   In making that statement, did you intend to
23   refer to economic pressure that would be placed on the
24   company?
25      A   No.
            UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT      134

1       Q   What kind -- what did you mean to refer to?
2       A   I meant that the instructions to the negotiating
                        Page 112

tb162199 (3).txt

3    committee and system schedule committee was to think

4    outside of the box on the ways that we may assist in the

5    negotiations on mitigating furloughs.

6        Q    Let me direct your attention to Exhibit 36,

7    Wallach 36, close to the end of the trail here.

8        A    Yes.

9        Q    You were asked questions about the reasons for

10    sending this letter, do you recall that?

11        A    Yes.

12        Q    Let me direct your attention to the first sent

13    fence of the letter, which says, "Recently this

14    corporation compared our current environment to the

15    crisis of September 11th which led to the bankruptcy we

16    entered nearly six years ago."

17            Do you remember writing that sentence?

18        A    Yes.

19        Q    What was the relationship between what you said

20    in that sentence and the sending of this letter?

21        A    What was the relationship?

22        Q    Yes, my question, let me rephrase the question,

23    then, if it's not clear.

24            Did the company's statement, the corporation's

25    statement that you referred to have anything to do with

                UNEDITED ROUGH DRAFT - UNEDITED ROUGH DRAFT     135

1    your decision to send this letter?

2        A    Certainly it had something to do with my letter

3    in terms of the attitude that I heard and continued to

4    hear from senior management relative to them comparing

5    this crisis to the same.

6        Q    And what were you hearing?

7        A    I was hearing that their attitude was that we

                        Page 113

Wallah 12

Page 2 of 2

**Produced by the MEC Communications Committee**

**Friday, January 25, 2008**

**Today was the 25th day that the Company could have sat down with its pilots to discuss a fair and equitable contract. They chose not to.**

## What's New

**The United MEC today adopted** the following resolutions during the MEC Meeting in Chicago:

**BE IT RESOLVED** the MEC directs that the UAL-MEC Policy Manual be revised to include wording specifying that, although allowed in the Collective Bargaining Agreement, the UAL-MEC does not endorse the use of JRM/SRM as a manpower planning tool.

Carried Unanimously

**PROPOSED SOLUTION:**
BE IT RESOLVED the UAL-MEC approves a change to the UAL-MEC Policy Manual, Volume II, Section XIV as follows:
SECTION XIV - SCHEDULING AND HOURS OF SERVICE

C. General:

1. Flight and Duty Time Limitations:

f. Although allowed in the Collective Bargaining Agreement, the UAL-MEC does not endorse the use of JRM/SRM as a manpower planning tool.

✈✈✈

7/28/2008

**UNITED**

A STAR ALLIANCE MEMBER  ™

April 11, 2008

*Wallach 15*

Captain Steve Wallach
Chairman
UAL MEC Air Line Pilots Assn.
9550 W. Higgins Rd., Suite 1000
Rosemont, IL 60018

Dear Captain Wallach:

I received the copy of your letter to Pete McDonald dated April 9 and wanted to respond directly to your question about opening negotiations with ALPA prior to the previously agreed bargaining process.

I know you and ALPA understand well the underpinnings of our negotiated provisions. When United and ALPA agreed to open Section 6 negotiations on April 6, 2009, we anticipated the demands of conducting parallel negotiations with ALPA and other bargaining representatives. As such, we will be prepared to commence the bargaining process as agreed. We believe there are opportunities to avoid the type of protracted bargaining common to airline negotiations, and we will be prepared to explore alternatives with ALPA and other unions in an effort to creatively address the negotiation process.

We also remain committed to a meaningful and honest dialogue about the day-to-day issues that confront ALPA-represented pilots and our employees. As you know, we are currently in discussions with ALPA about changes to Success Sharing payments and we recently reached agreements with both the AFA and IAM on this matter.

We are focused on making the right decisions for the future of our company in the face of $110 fuel and softening economy, and we believe our employees recognize the seriousness of the challenges we face. In difficult times, the need to maintain strategic focus becomes critical. We want to work productively with ALPA and all of our unions on how we are going to confront the challenges we are all facing.

Sincerely,

P. Douglas McKeen
Senior Vice President
Labor Relations

Cc: Pete McDonald

June 4                              *Wallach 16*                    Page 1 of 1

June 4, 2008

Dear fellow pilots:

Today's announcement by United Airlines on their planned reduction in fleet size is the latest in a long saga of disappointments and lack of communication to the pilots by the company. The company's announcement in April to ground 30 B-737s and reduce its represented union workforce by approximately 600 employees by year-end without providing any further details only created anxiety and stress for all of us.

The announcement to increase the number of aircraft groundings has again been made without any consultation with your union. We do not know whether their plan to ground 80 aircraft this year and 20 more next year fully considers the displacement of the pilots who fly these aircraft, training requirements, domicile staffing, etc. When the company creates a large retraction of operations as experienced after 9/11, they end up with significant numbers of pilots waiting to be trained due to limitations of the training center. Pilots should expect secondary and possibly tertiary rounds of surpluses to develop as a result of the surpluses and potential overstaffing.

In April, your officers directed the Negotiating Committee to meet with the company to discuss all matters including furlough mitigation. It was not until after the company's announcement today that the company was prepared to present details of pilot furloughs. We met with the company this afternoon. Due to management's delinquency in providing sufficient details, we contacted senior management and have scheduled a meeting with them on June 9th to discuss these topics.

I have made this latest development my top priority. I have directed the Negotiating Committee and the System Schedule Committee to devote all their time and energy to protecting the jobs of all our pilots. No idea will be discounted. We hope that the meeting on the 9th and its subsequent meetings immediately thereafter will provide us with answers and a workable plan. We will communicate with you shortly after the meetings.

Fraternally,

☒

Captain Steve Wallach
Chairman, United MEC



**United Pilots**
**Master Executive Council**
**Special MEC Update**
Tuesday, June 24, 2008

UNITED
MASTER
EXECUTIVE COUNCIL

**With a Special MEC Update for Tuesday, June 24, 2008, this is MEC Chairman Captain Steve Wallach.**

*Today was the 176th day that the Company could have sat down with its pilots to discuss a complete fair and equitable contract. They chose not to.*

*That makes 1,882 days (5 years, 1 month, 24 days) of living under the current draconian contract and work rules negotiated under duress of bankruptcy.*

Ever since the company announced on June 4th that they wanted to park 100 aircraft, your Union has been in talks with them about how they plan to accomplish their proposed fleet reduction and how to minimize the number of affected pilots. Even while discussions were taking place last week, the company continued to treat their planned furlough numbers as confidential information, and, as such, we were not able to report their manpower proposal to you.

In the meantime, I activated a task force comprised of several ALPA committees committed to assisting those pilots who may be affected by the company's plan, minimizing the number of furloughees, and negotiating Quality of Life and Work Rule improvements.

Finally, completely frustrated with the company's lack of transparency, on Friday, June 20th, I urgently requested that they release their proposal to the pilots. Following that communication, United's System Chief Pilot finally released a message to our pilots on Monday. Though we continue to talk with the Company seeking to lessen the impact of the pending involuntary furloughs, our negotiators have made what I would term "meager" progress in getting the company to consider measures that would soften the impact on our pilots and their families.

We believe United's fleet reduction, as compared to our competitors, is a drastic over-reaction to current market realities. We think that the company is being overly pessimistic about our ability to compete. And we know that the company's timetable for accomplishing their manpower reduction is overly ambitious, if not simply unachievable.

While we remain hopeful that we can reduce some of the furloughs, manpower reduction *will* be the near term reality for United pilots until the company alters its business plan. For the sake of our pilots and other employees, the customers, and United's shareholders, we hope that our management isn't placing our company in yet another untenable and poorly considered market position.

I know that all of this laborious process, negotiating, and waiting are of little solace to our most junior brothers and sisters. Watching the company announce a fleet plan and then having to wait 19 days for them to announce their furlough proposal has been agonizing for those pilots and their families. However, we expect to have negotiations completed by the end of next week.

Please, stay connected, take care of each other, and expect further communication from me in the very near future.



*"Fighting with a large army under your command is nowise different from fighting with a small one: it is merely a question of instituting signs and signals."*
**—Sun Tzu**

Dear Fellow Pilots:                                                                                Page 1 of 3

Dear Fellow Pilots:

Over the weekend, the Company's System Chief Pilot issued an E-note stating that "…(f)irst officer manpower on the 300 and 320 is very tight due to a dramatic increase in sick leave… (p)ursuant to section 13-a-5 of the pilots' agreement, effective immediately and until further notice, all 300 & 320 first officers will be required to provide a doctor's certificate before sick leave will be paid."

Let me make one thing perfectly clear: **Your MEC does not condone the inappropriate use of sick leave. Sick leave should only be used for purposes set out in the contract or as required by law.** That being said, you are absolutely entitled to use sick leave for appropriate circumstances. Federal Regulations outline your rights and responsibilities when exercising the privileges of your medical certificate. In short, you are *required* to call in sick when you are unfit to fly. Sick leave, and the pay that goes with it, is a contractually negotiated benefit to be used for a specific purpose and in specific situations.

Medical standards are defined in Title 14 of the Code of Federal Regulations Part 67 (Part 67, FARs). It states, among several things, that a pilot must remain eligible for his or her first or second class medical certificate while exercising its privileges. Some requirements include but are not limited to:

- Normal fields of vision;
- No disease or condition of the middle or internal ear, nose, oral cavity, pharynx, or larynx that interferes with, or is aggravated by, flying or may reasonably be expected to do so;
- No disease or condition manifested by, or that may reasonably be expected to be manifested by, vertigo or a disturbance of equilibrium.
- No other organic, functional, or structural disease, defect or limitation that makes the person unable to safely perform the duties or exercise the privileges of the airman certificate applied for or held.

The Aeronautical Information Manual (AIM, Chapter 8) is even more definitive. It states the following:

- Even a minor illness suffered in day-to-day living can seriously degrade performance of many piloting tasks vital to safe flight. Illness can produce fever and distracting symptoms that can impair judgment, memory, alertness, and the ability to make calculations. Although symptoms from an illness may be under adequate control with a medication, the medication itself may decrease pilot performance.
- The safest rule is not to fly while suffering from any illness.
- Pilot performance can be seriously degraded by both prescribed and over-the-counter medications, as well as by the medical conditions for which they are taken. Many medications, such as tranquilizers, sedatives, strong pain relievers, and cough-suppressant preparations, have primary effects that may impair judgment, memory, alertness, coordination, vision, and the ability to make calculations. Others, such as antihistamines, blood pressure drugs, muscle relaxants, and agents to control diarrhea and motion sickness, have side effects that may impair the same critical functions. Any medication that depresses the nervous system, such as a sedative, tranquilizer or antihistamine, can make a pilot much more susceptible to hypoxia.
- The CFRs prohibit pilots from performing crewmember duties while using any medication that affects the faculties in any way contrary to safety. The safest rule is not to fly as a crewmember while taking any medication, unless approved to do so by the FAA.
- **Fatigue**

  o Fatigue continues to be one of the most treacherous hazards to flight safety, as it may not be apparent to a pilot until serious errors are made. Fatigue is best described as either acute (short-term) or chronic (long-term).

  o A normal occurrence of everyday living, acute fatigue is the tiredness felt after long periods of physical and mental strain, including strenuous muscular effort, immobility, heavy mental workload, strong emotional pressure, monotony, and lack of sleep. Consequently, coordination and alertness, so vital to safe pilot performance, can be reduced. Acute fatigue is prevented by adequate rest and sleep, as well as by regular exercise and proper nutrition.

  o Chronic fatigue occurs when there is not enough time for full recovery between episodes of acute fatigue. Performance continues to fall off, and judgment becomes impaired so that unwarranted risks may be taken. Recovery from chronic fatigue requires a prolonged period of rest.

- **Stress**

Dear Fellow Pilots:                                                      Page 2 of 3

o  Stress from the pressures of everyday living can impair pilot performance, often in very subtle ways. Difficulties, particularly at work, can occupy thought processes enough to markedly decrease alertness. Distraction can so interfere with judgment that unwarranted risks are taken, such as flying into deteriorating weather conditions to keep on schedule. Stress and fatigue (see above) can be an extremely hazardous combination.

o  Most pilots do not leave stress "on the ground." Therefore, when more than usual difficulties are being experienced, a pilot should consider delaying flight until these difficulties are satisfactorily resolved.

•  **Emotion**

o  Certain emotionally upsetting events, including a serious argument, death of a family member, separation or divorce, loss of job, and financial catastrophe, can render a pilot unable to fly an aircraft safely. The emotions of anger, depression, and anxiety from such events not only decrease alertness but also may lead to taking risks that border on self-destruction. Any pilot who experiences an emotionally upsetting event should not fly until satisfactorily recovered from it.

Taking all of the various factors above into consideration, it should come as no surprise that sick leave has increased among United pilots who are forced, month after month, to fly maximum hours with minimum days off. Moreover, many of those in the selected categories face additional issues as they confront United's newest round of furloughs and surpluses.

United is requiring all 737 and A320 First Officers to obtain a doctor's certificate in order to be paid for sick time, for which you should use the Company's Pilot Absence Certificate. In filling out that form, note the box at the bottom in which you may authorize your medical provider to release or discuss medical information about your medical condition for purposes of clarifying or amplifying the information provided on the absence certificate. It is your decision as to whether you check that box or not. Some conditions may require explanation, but most are relatively straightforward and a completed form, certified by your physician, should suffice.

It is ALPA's position that you are entitled to be reimbursed for doctors' fees incurred when required by the Company to provide documentation for a medical absence, particularly in circumstances such as this. To that end, please document and save everything concerning your lawful use of sick leave: conversations with the Company, receipts for medical bills, CALRECs, PAYSUMS, etc. Should the Company refuse to reimburse these expenses, your MEC *will* file a grievance.

Medical professionals use signs and symptoms to evaluate patients. A sign is something the physician can physically observe, such as a broken bone. A symptom is subjective and is experienced by the patient, such as anxiety. How many of the non-fitness items listed above can be measured by a physician? Some of these can only be detected by the pilot. Nonetheless, it is your legal obligation not to fly if you are not fit to do so. You may have to explain that to your doctor. That is the law, and failure to comply with any of the above may jeopardize your license.

Your MEC is monitoring the airline's manpower situation and will vigorously defend your right to the appropriate and lawful use of your contractually negotiated sick leave benefit.

I am confident that you will continue to exercise your best judgment as professionals. As always, fly safely.

Fraternally,

*[signature]*

Dear Fellow Pilots:                                            Page 3 of 3


Captain Steve Wallach
Chairman, United MEC