IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
------------------------------------------------------------------x
                                                         :
UNITED AIR LINES, INC.,                                  :
                                                         :
                              Plaintiff,                 :
                                                         :     Case No. 08-CV-4317
              - against -                                :
                                                         :
AIR LINE PILOTS ASSOCIATION,                             :
INTERNATIONAL, et al.,                                   :
                                                         :
                              Defendants.                :
                                                         :
------------------------------------------------------------------X
```

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

TOM A. JERMAN
APARNA B. JOSHI
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
1625 I Street, N.W.
Washington, D.C. 20006
(202) 383-5300
e-mail: tjerman@omm.com

GARY S. KAPLAN
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
(312) 460-5000
e-mail: gkaplan@seyfarth.com
Attorneys for Plaintiff
United Air Lines, Inc.

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

SUPPLEMENTAL STATEMENT OF FACTS ................................................. 6

    A.    ALPA's Involvement In The Sick Out ................................................. 6

           1.    The Industrial Relations Committee ...................................... 6

           2.    The IRC Met With Freeman In June 2008, Prior To A July Sick-Out And Nearly All Acknowledge A July Sick-Out Occurred ................. 7

           3.    The Defendants Failed To Take Action To Stop The Sick-Out Until The Court-Ordered Stand-Still Agreement ....................................... 9

    B.    ALPA's Actions Since The Lawsuit ................................................. 11

           1.    The Stand-Still Agreement ................................................... 11

           2.    Sick Leave Usage Plummets After The Stand-Still Agreement ............. 12

           3.    ALPA Focuses On Other Campaigns Against the Company ................. 12

ARGUMENT ................................................................................................. 13

I.    THE COURT HAS JURISDICTION TO, AND SHOULD ISSUE, A PRELIMINARY INJUNCTION PROHIBITING ALPA'S UNLAWFUL ALTERATION OF THE STATUS QUO ........................................................... 13

II.    DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENT FAILS BECAUSE ALPA'S SLOWDOWN CAMPAIGN CONSTITUTES A CONTINUING VIOLATION ........................................................................ 19

III.    ALPA'S ASSERTIONS THAT THERE WAS NO ORGANIZED SICK-OUT, AND THAT ALPA DISCOURAGED ANY JOB ACTIONS, ARE CONTRARY TO THE EVIDENCE ....................................................................................... 21

    A.    The Evidence Demonstrates That A Group Of United Pilots Engaged In An Organized Sick-Out In July 2008 ................................................. 21

    B.    The Evidence Demonstrates That ALPA And The IRC Failed To Make Sufficient Efforts To End The Sick-Out Prior To The Filing Of This Lawsuit ...................................................................................... 22

IV.    ALPA'S "LITIGATION-INDUCED" ACTS CANNOT BE CITED AS EVIDENCE THAT ALPA TOOK VOLUNTARY ACTION AND THE FACTS DEMONSTRATE THAT A PRELIMINARY INJUNCTION IS NECESSARY ......... 25

V.    THE NORRIS-LAGUARDIA ACT DOES NOT PROHIBIT AN INJUNCTION IN THIS CASE ............................................................................................... 28

## TABLE OF AUTHORITIES

**Page**

### Cases

*Air Line Pilots Association, Int'l v. United Air Lines, Inc.*,
  802 F.2d 886 (7th Cir. 1986) ................................................................. 29

*Association of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*,
  976 F.2d 541 (9th Cir. 1992) ................................................................. 20

*Atlas Air, Inc. v. Air Line Pilots Ass'n*,
  232 F.3d 218 (D.C. Cir. 2000) .............................................................. 20

*Bhd. of R. R. Carmen of Am., Local No. 429, v. Chi. & N. W. Ry. Co.*,
  354 F.2d 786 (8th Cir. 1965) ................................................................. 15

*Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*,
  353 U.S. 30 (1957).................................................................................. 14

*Bhd. of R.R. Trainmen v. Howard*,
  343 U.S. 768 (1952)................................................................................ 29

*Burlington N. & Santa Fe Ry. v. Bhd. of Locomotive Eng'rs*,
  No. 01 C7743, 2002 WL 47963 (N.D. Ill. Jan. 14, 2002) ................... 15

*Charles D. Bonanno Linen Serv., Inc. v. McCarthy*,
  532 F.2d 189 (1st Cir. 1976)................................................................. 28

*Chi. & N.W. Ry. Co. v. United Transp. Union*,
  402 U.S. 570 (1971)................................................................................ 29

*Chi. & N.W. Transp. Co. v. Int'l Bhd. of Electrical Workers*,
  829 F.2d 1424 (7th Cir. 1987) .............................................................. 15

*Chi. & N.W. Transp. Co. v. Ry. Labor Executives Ass'n*,
  855 F.2d 1277 (7th Cir. 1988) .............................................................. 15

*Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*,
  491 U.S. 299 (1989).................................................................. 14, 15, 26

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n*,
  238 F.3d 1300 (11th Cir. 2001) ............................................. 16, 19, 22

*Donnelly Garment Co. v. Dubinsky*,
  154 F.2d 38 (8th Cir. 1946) ................................................................. 29

*Elgin, J. & E. Ry. v. Burley*,
  325 U.S. 711 (1945)................................................................................ 14

*Itasca Lodge 2029 of Bhd. of Ry. and S.S. Clerks v. Ry. Express Agency, Inc.*,
  391 F.2d 657 (8th Cir. 1968) ................................................................. 15

*Long Island R.R. Co. v. Int'l Ass'n of Machinists*,
  874 F.2d 901 (2nd Cir. 1989) ............................................................... 18

*Mayo v. Dean*,
  82 F.2d 554 (5th Cir. 1936) ................................................................. 28

# TABLE OF AUTHORITIES
## (continued)

Page

*Melville Confections, Inc. v. NLRB*,
327 F.2d 689 (7th Cir. 1964) ................................................ 20

*Milwaukee Police Ass'n v. Jones*,
192 F.3d 742 (7th Cir. 1999) ............................................... 26

*N. Am. Coal Corp. v. Local Union 2262, United Mine Workers of Am.*,
497 F.2d 459 (6th Cir. 1974) ............................................... 29

*New York State Nat'l Org. for Women v. Terry*,
159 F.3d 86 (2d Cir. 1998) ................................................. 25

*Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters*,
736 F. Supp. 1179 (D. Mass. 1990) ....................................... 29

*The N.Y. Times Co. v. N.Y. Stereotypers' Union No. 1*,
No. 92 Civ. 6739, 1992 U.S. Dist. LEXIS 14151 (S.D.N.Y. Sept. 18, 1992) .......... 26

*United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*,
243 F.3d 349 (7th Cir. 2001) ....................................... 16, 22, 26

*United Brotherhood of Carpenters v. United States*,
330 U.S. 395 (1947) ........................................................ 28

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966) ........................................................ 29

*United States v. Oregon State Med. Soc'y*,
343 U.S. 326 (1952) ........................................................ 27

*United States v. Ry. Employees' Dep't of the Am. Federation of Labor*,
290 F. 978 (N.D. Ill. 1923) ................................................ 26

*Wernsing v. Thompson*,
423 F.3d 732 (7th Cir. 2005) ............................................... 26

*West v. Conrail*,
481 U.S. 35 (1987) ......................................................... 19

**Statutes**

29 U.S.C. § 106 ............................................................. 28, 29

29 U.S.C. § 107(a) ............................................................. 28

29 U.S.C. § 108 ................................................................. 29

45 U.S.C. § 152 ......................................................... 14, 19, 29

45 U.S.C. § 153 ................................................................. 14

## PRELIMINARY STATEMENT

In this motion, United Air Lines, Inc. ("United" or the "Company") seeks a preliminary injunction under Section 2, First of the Railway Labor Act, 45 U.S.C. § 151 *et seq.* (the "RLA") against the Air Line Pilots Association, International ("ALPA") and four pilots employed by United (collectively, "Defendants") to stop an ALPA-sponsored work slowdown against United designed to force the Company to renegotiate a collective bargaining agreement that would otherwise remain in force through the end of 2009.  United took this action because the slowdown had a serious adverse impact on customers and employees, hurt the company financially and caused damage to its brand and reputation.

For nearly two years, ALPA has worked to pressure United into opening its existing collective bargaining agreement early.  United has been consistent in its response:  the Company has a contract in place with ALPA through 2009, and is open to discussing – and when appropriate, acting on – matters that are mutually beneficial to United and its pilots, as it did when it reached an agreement with ALPA earlier this year to modify contract work rules.  Because United has not agreed to open negotiations early, as set forth in United's moving papers, ALPA and its members have been engaged in a wide-ranging variety of actions over the last 18 months that have led to hundreds of cancellations and thousands of flight delays, caused incalculable harm to the Company's reputation and relationships with customers and cost United millions of dollars in lost revenue.  These actions have included concerted efforts to refuse voluntary flight assignments, adhering strictly to contractual requirements, and, most recently, an organized sick-out by United's pilots.

When it filed this motion, United believed that three members of the Industrial Relations Committee ("IRC"), a secretive ALPA committee whose stated function is to engage in "labor actions" against United, had met in June 2008 with a junior United pilot, Anthony Freeman

("Freeman"), to plan the sick-out, and that Freeman had used his position as organizer of a group of junior pilots known as "the 2172" to organize the sick-out. In expedited discovery taken over the last two weeks, United has learned that Freeman was actually a *member* of the IRC, although his exact role is somewhat hazy, and that the IRC indeed met in Los Angeles on June 11 and 12, 2008, as United suspected. United also learned that the IRC answers to Stephen Wallach ("Wallach"), chairman of the United Airlines Master Executive Council ("MEC"), and controls a network of United pilots whose identity is secret from each other, and even from some of the IRC members. The IRC members admitted that their role is to pass instructions from MEC Chairman Wallach to a network of 18 or more "local coordinators," who in turn pass those messages to "their people" -- a network of ALPA activists that the chairman of the IRC, Steven Tamkin ("Tamkin"), estimated at "several hundred." The IRC also operates in reverse, passing intelligence about United up through the chain of command to MEC Chairman Wallach. The IRC members testified that communications are conducted orally, without any written record, because of "the nature of the communications."

Two of the IRC members were also involved with the IRC during 2000, and admitted that the IRC was used by ALPA at that time to pass instructions to pilots to refuse voluntary flying, decline contract waivers or engage in other types of actions during the summer of 2000. IRC Chairman Tamkin further admitted that he was one of the authors of The Gardener, an underground publication often cited as encouraging jobs actions against United, and took credit for participating in the formulation of plans to encourage United pilots to not to fly voluntary overtime.

Most importantly for present purposes, the IRC members acknowledged that there was an effort underway in June 2008 among junior United pilots to organize a sick-out, that Freeman

was deeply connected with this group and had knowledge of the sick-out, and that the IRC met in Los Angeles on June 11 for the sole purpose of discussing the planned sick-out. What they contend, however, is that the purpose of the meeting was not to *plan* the sick-out but to *stop* it from happening. Although the testimony differed in some significant details, the four defendants generally agreed that Tamkin criticized Freeman for planning actions without Tamkin's approval (although Freeman testified he had no involvement in planning anything); that everyone agreed that a sick-out was a bad idea because it could lead to a lawsuit and injunction; that Tamkin told Freeman and IRC member Xavier Fernandez ("Fernandez") to use their contacts to stop it; that Tamkin said ALPA could offer an option -- calling in fatigued instead of calling in sick -- to mollify the concerns of the junior pilots who said they were overworked; and that the meeting ended with an understanding that there would be no July sick-out. MEC Chairman Wallach and IRC Chairman Tamkin also testified that Wallach had become aware of a potential sick-out, asked Tamkin to use the IRC's resources to stop it, and that Tamkin ensured Wallach that there would be no sick-out.

Based upon this testimony, Defendants contend in their Opposition Memorandum that there was no organized sick-out, but only "spontaneous combustion," and that Defendants opposed such an action and made efforts to stop it. Thus, Defendants argue, there is no basis for a finding that they have violated the RLA based on the sick-out. Defendants further assert that they took actions after this lawsuit was filed, albeit pursuant to the parties' stand-still agreement executed on August 1, 2008, that were immediately successful in dramatically reducing sick leave. As explained below, there *was* an astonishing reduction in sick calls, and the testimony established that Defendants accomplished this by sending the word through the IRC's communication mechanism to knock if off. Thus, Defendants argue, there is no need for, and no

basis for, a preliminary injunction. Finally, Defendants argue that while ALPA concededly began a campaign in 2007 to discourage pilots from accepting junior/senior manning or waiving contract provisions, United's claims based on that conduct (1) constitute minor disputes under the RLA because they involve interpretation of the parties' collective bargaining agreement; and (2) are barred by the six-month statute of limitations because ALPA openly announced those positions more than a year ago.

As discussed below, and as will be demonstrated with further evidence at the hearing on United's motion, Defendants' arguments are baseless. First, Defendants simply ignore the various other elements of the ALPA slowdown that United has challenged. Even if everything Defendants claimed were accurate with regard to a July sick out, an injunction is still necessary to deal with the other elements of ALPA's slowdown -- elements that continue to disrupt United's operations and inconvenience thousands upon thousands of United's customers.

Second, Defendants' minor dispute and statute of limitations arguments are without merit as a matter of law. This case plainly involves a major dispute over ALPA's request to reopen the contract, and there is no dispute between the parties over interpretation or application of the junior/senior manning and contract waiver provisions of the agreement – both United and ALPA agree that they are voluntary decisions when made on an individual basis. More importantly, Section 2, First of the RLA prohibits concerted action to disrupt a carrier's operations over *any* dispute, major or minor, and the courts have jurisdiction to enforce that obligation in both major and minor disputes. Similarly, it is black letter law that the statute of limitations does not bar a challenge to an active, ongoing violation of law simply because it began before the limitations period. Defendants offer no other defense to United's assertion that these elements of ALPA's slowdown violate Section 2, First of the RLA -- and there is no defense under existing case law.

Finally, Defendants' curious explanation of the IRC's involvement in the July sick-out -- in essence, that they flew to Los Angeles to bury the sick-out, not to praise it -- is simply not credible when viewed in the light of the other, contemporaneous evidence of Defendants' conduct and the now- indisputable fact that there *was* a sick-out by junior pilots, "spontaneous" or otherwise. United will present a full explanation of that evidence at the hearing in this matter. For present purposes, it is sufficient to note that the Defendants' explanation raises a number of unanswered questions.

- *Given that the IRC was immediately successful in stopping the sick-out after the lawsuit was filed, why was it not equally successful at stopping the sick-out in July if, in fact, it really attempted to do so*?

- All of ALPA's publications during the relevant time period were designed to incite United's pilots, and the letter that MEC Chairman Wallach distributed on July 22, 2008, was essentially a step-by-step guide on how to call in sick. *If ALPA was aware of the planned sick-out, and truly wanted to stop it, why publish these documents, and why did it fail to put out a single written directive that clearly and explicitly discouraged the conduct?*

- Freeman claims that he used his position as administrator of the ual2172.com web site and a related phone tree system to discourage the junior pilots from calling in sick. *If this is true, why do all of Freeman's posts on the ual2172.com website, and all of his written correspondence to other pilots, make what clearly appear to be references to a planned job action?*

- Finally, if Freeman sincerely sought to discourage the sick-out, *why did Freeman and the two other administrators of the web site call in sick at the height of the sick-out?*

In short, despite Defendants' denials the evidence at hearing will leave no question but that ALPA and the IRC were involved in the organization of a sick-out by United pilots in July as one more element of ALPA's ongoing job action against United. These actions indisputably violate ALPA's obligations under Section 2, First of the RLA to "resolve all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier," and a preliminary

injunction should issue to compel Defendants to "exert every reasonable effort" to end the job action and restore United's normal operations.

## SUPPLEMENTAL STATEMENT OF FACTS

**A.     ALPA's Involvement In The Sick Out.**

      1.     **The Industrial Relations Committee**

The Industrial Relations Committee ("IRC") is a self-identified "secretive" committee that intentionally operates in a manner that avoids leaving a written trail of communications. (Transcript of Robert Domaleski Deposition ("Domaleski Tr.") at 59-60; Transcript of Xavier F. Fernandez ("Fernandez Tr.") at 12.)  This clandestine, "grapevine" committee "keep[s] the pulse of the pilots" and disseminates messages from the MEC to the pilot group at United regarding what it characterizes as "labor strategy."  (Domaleski Tr. at 59, 60; Transcript of Stephen A. Wallach ("Wallach Tr.") at 82.)  More specifically, the IRC formulates and implements "labor actions," including "the generation of support for corporate campaigns," and passing on information to pilots that would influence their behavior.  (Transcript of Steven Tamkin ("Tamkin Tr.") at 56, 77; Domaleski Tr. at 50-51.)  The IRC also serves to pass information up to the MEC, and answers to the MEC and, in particular, the Chairman, Stephen Wallach. (Wallach Tr. at 23; (Domaleski Tr. 94-95.)  Two of the IRC members – Tamkin and Domaleski – were also involved with the IRC during 2000, and admitted that the IRC was used by ALPA at that time to pass instructions to pilots to refuse voluntary flying, decline contractual waivers or engage in other types of job actions during the summer of 2000.  (Domaleski Tr. at 54; Tamkin Tr. at 65-66, 68-69.)

The IRC's structure includes an "upper-level" and a "lower-level" membership. (Transcript of Anthony R. Freeman ("Freeman Tr.") at 23.)  The lower-level IRC members are approximately 18 local IRC coordinators.  (Tamkin Tr. at 60-61; Fernandez Tr. 18-19.)  Each

upper-level member is responsible for a geographic area and the local IRC coordinators for that area report to him.  (Fernandez Tr. at 18-19.)  The upper-level members do not share the names of their local coordinators with each other.  (Tamkin Tr. at 63.)  This local structure of the IRC permits "extensive [and] ongoing" communications between the IRC and the pilot group, although those communications, by design, are not in written form due to the "nature of the communications."  (Domaleski Tr. at 60-61; Tamkin Tr. at 62-64, 86.)

Defendants agreed that Tamkin, Domaleski and Fernandez are unquestionably "upper-level" members of the IRC.  (Tamkin Tr. at 12; Fernandez Tr. at 18.)  Defendants, however, provided conflicting testimony regarding Freeman's position on the IRC.  Freeman himself testified that he is an "upper level" member of the IRC, and MEC Chairman Wallach testified that he was introduced to Freeman as a member of the IRC.  (Freeman Tr. at 23; Wallach Tr. at 22.)  Tamkin testified that Freeman was one of the three upper level members of the IRC whom Tamkin appointed, but that Freeman was not publicly rostered as an IRC member, had a subordinate role in Denver, and also served as a local IRC coordinator.  (Tamkin Tr. 12, 18, 60-61.)  Fernandez, Domaleski and the Strike Preparedness Committee Chair, Jim Anderson, each testified that Freeman was simply a local IRC coordinator who reported to Tamkin.  (Fernandez Tr. at 17-18; Domaleski Tr. at 38; Transcript of James Anderson ("Anderson Tr.") at 101.)

> 2.   **The IRC Met With Freeman In June 2008, Prior To A July Sick-Out And Nearly All Acknowledge A July Sick-Out Occurred**

Defendants concede, as they must, that the IRC met with Freeman on June 11, 2008, and periodically on June 12 and 13, 2008.  (Opp. Mem. at 15; Tamkin Tr. at 92-93; Fernandez Tr. at 22.)  It was "very unusual" for Freeman to attend the meeting because, according to Domaleski, Freeman was not an officer of the IRC.  (Domaleski Tr. at 41.)  There is no dispute that the meeting related to a planned sick-out of which the IRC members had become aware.

Fernandez testified that he began hearing rumors of a July sick out when United first announced it would park 30 aircraft in the spring of 2008, and that rumor became strong enough to "alarm[]" him. (Fernandez Tr. at 22.) He testified that he reported the potential sick out to Tamkin as the "volume of the discord or volume of the issue about pilots being sick got louder over time." (Fernandez Tr. at 23; Tamkin Tr. at 97-98.) Tamkin, who is an Airbus A320 captain and therefore would have flown with junior pilots on a regular basis, also testified he was aware through rumors of a planned sick-out among the A320 and 737 first officers. (Tamkin Tr. at 14-15, 94-95.)

Tamkin and Fernandez each testified that prior to the June Los Angeles meetings, they spoke with Freeman about a potential sick out among the 2172 group, and Tamkin further testified that Freeman confirmed to Tamkin that something was going to happen around a July 4th target. (Tamkin Tr. at 98; Fernandez Tr. at 24.)

Freeman and Fernandez testified that the reason for the group to meet in June was to tell Freeman to stop the sick-out planned by the junior pilots for the July 4th weekend (Freeman Tr. at 105; Fernandez Tr. at 26), and Domaleski agreed that Tamkin in fact did caution Freeman at that meeting to stop the sick-out that the 2172 group was planning (Domaleski Tr. at 42-43). Domaleski also testified, however, that Tamkin informed him that Freeman would attend the meeting because "Tony [Freeman] had something to do with a group, and he thought it ***would be valuable to have him at the meeting***." (Domaleski Tr. at 41) (emphasis added.)

Tamkin himself testified that at the meeting, he called out both Fernandez and Freeman, telling them that if "if somebody wants to run their own program or get off the reservation, they can be considered on their own. And they would be treated as an individual discipline case by the union and the company." (Tamkin Tr. at 100.) Freeman responded by saying that "my guys

are really upset" and "they're really, really mad, they're very angry, they're stressed out about being furloughed for a second time, and that they were so pissed off at United Air Lines that they wanted to do something, and that their plan was to have this sick-out over the July 4th weekend." (Domaleski Tr. at 42) (emphasis added.)

Ultimately, all of the IRC members except Freeman freely conceded that there was a sick-out in July, albeit later in the month than originally envisioned, and that the junior pilots (i.e., the 2172) were responsible for it.  (Tamkin Tr. at 95-96 (during the week of July 20, "the sick-out was under way"); Domaleski Tr. at 31, 65; Fernandez Tr. at 34, 35 (on July 17, 18, or 19, Fernandez "called Captain Tamkin and said, 'we have a problem.'").)  Freeman, on the other hand, claims that no organized sick-out at all, that he was in no way involved in the sick-out. (Freeman Tr. at 113.)  Despite this denial, the evidence at hearing will show that not only Freeman called in sick during the height of the sick-out but so did Jay Schumacher and Jeff Jaslow -- the other two administrators of ual2172 web site.  (Freeman Tr. at 43).

> 3.    **The Defendants Failed To Take Action To Stop The Sick-Out Until The Court-Ordered Stand-Still Agreement.**

Regardless of the role ALPA or the other Defendants may have had in planning the sick-out, the testimony at hearing will establish that Defendants were aware that there was sick-out, even if only an incredible "spontaneous combustion," and ALPA took no meaningful action whatsoever to stop it.  For example, while MEC Chairman Wallach testified that he became aware in June of "some chatter . . . about sick list," and told Tamkin to "use his communications ability to stop it" (Wallach Tr. at 105), there is no evidence that Tamkin took any action other than purportedly relying on representations by Freeman and Fernandez that they would stop it.[1]

---

[1]    Tamkin testified that after the sick-out had begun he directed that certain messages be removed from the message boards within ALPA's own website.  Yet the e-mail that Tamkin sent does not reflect that he thought a

In particular, the IRC did not invoke its own, elaborate communications mechanism to deal with the sick-out until *after the lawsuit was filed*. When the IRC finally invoked this mechanism, sick leave use immediately and dramatically returned toward normal levels. (Milone Tr. 135-36.)

While Fernandez and Freeman claim to have taken some actions, there is no evidence they did anything that was successful. For example, Fernandez testified that he made some phone calls to his friends in an effort to follow this directive and asked them to spread the word because the law was against them in that they had a legal duty to stop the sickout. (Fernandez Tr. at 32-33). Likewise, Freeman asserts that he made a number of telephone calls, and removed evidence of a planned sick-out from the website (Freeman Tr. at 107-08), but the written record of Freeman's actions do not reflect any desire to stop the sick-out and Freeman's alleged efforts were plainly not successful. In fact, the innuendo in Freeman's posted statements to his website signal just the opposite: "I wish I could tell you that this is a completely sterile board. No board is. That said, it's not smart at all to talk about how you may be feeling sick. It's especially not smart to allude that it may occur on a specific day. … ***no hints or references to any code words or phrases that would give anyone the idea that you're trying to put something illegal together.***" (Freeman Ex. 12; emphasis added.) Freeman also wrote to the members of the 2172 that "You think when you're told to be smart we're saying shut the fuck up because we're scared… I'm glad we're all pissed but if you think for one mother fuckin minute that nothin is being done so fuckin be it. I can't say it enough times. You want to pour a shit load of energy on the line before we get the rudder where we want it and without enough of the other folks we need to help paddle paddle? Do you understand what I'm getting at ?????. . . *The problem here is the*

---

sick-out was wrong; it only reflects that he though a written record put ALPA and the members at legal risk. (Tamkin Tr. at 40-45; Exs. 6, 10.)

*fight is going on but you don't see it. But that's how it's supposed to be at this point*." (Freeman Ex. 14 (emphasis added).)

Whatever Defendants expected would happen, it was clear by mid-July 2008 that there was an ongoing sick-out among junior pilots. (Fernandez Tr. at 35; Domaleski Tr. at 65; Wallach Tr. at 106 (Tamkin told Wallach the sick-out was "spontaneous combustion").) Rather than attempt to douse this fire, however, Wallach and the MEC continued to stoke it. On July 15, 2008, Wallach issued a letter to United's pilots that had been drafted several weeks earlier, and that was filled with inflammatory attacks on United and its management. (Milone Decl. ¶ 44; Ex. 10.) One week later, in response to United's requests that ALPA take action to discourage the sick-out, Wallach sent the letter of July 22, 2008, that as noted in United's moving papers, was a virtual blueprint for implementing a sick-out. (*Id.* ¶ 49, Ex. 13). In light of this evidence, and additional testimony and exhibits that will be introduced at hearing, United submits that the characterization of Defendants' actions in their Opposition Memorandum is utterly incredible.

**B.     ALPA's Actions Since The Lawsuit.**

**1.     The Stand-Still Agreement.**

On July 31, 2008, the day after United filed this lawsuit, ALPA agreed at the Court's suggestion to enter into a "Stand-Still Agreement" with United to protect United's operations pending the hearing on United's Motion for Injunctive Relief. (See Transcript of Proceedings, July 31, 2008). Pursuant to the terms of that agreement, entered into on August 1, 2008, ALPA agreed to issue a statement to all United pilots on August 1, 2008 discouraging them from engaging in activities that may disrupt United's operations, including calling in sick when the pilot is not ill, refusing junior/senior manning assignments for the purpose of disrupting operations, or pressuring pilots who choose to accept such assignments. (Gise Ex. 11.) ALPA

also agreed to issue a separate statement encouraging the acceptance of junior/senior manning

assignments by First Officers in the airline's narrow body fleets.  ALPA did issue this second

statement, but not until August 13, 2008 – nearly two weeks after entering into the stand-still

agreement requiring the statement.  Finally, the parties agreed that ALPA would support

United's efforts to keep sick leave within the Company's August 2008 sick-leave plan levels.

### 2.    Sick Leave Usage Plummets After The Stand-Still Agreement.

Immediately following the parties' entry into the stand-still Agreement, and ALPA's

August 1, 2008 statement discouraging concerted activity, United's pilot sick rates began to fall

precipitously, and even reached a point where system-wide sick leave was *below* United's plan

for sick leave.  (Milone Tr. at 135-36.)  While United did not learn of the explanation for this

reduction until discovery, it now knows that Defendants achieved these reductions by activating

the IRC's communications network shortly after Defendants executed the stand-still agreement.

(Domaleski Tr. at 31; Fernandez 40-42; Tamkin Tr. at 48-49.)  In those messages, the IRC

instructed ALPA's members to stop the sick out and told them that it would be permissible for

pilots to accept junior/senior manning for the months of August because of the sick-out.

(Domaleski Tr. at 31.)

### 3.    ALPA Focuses On Other Campaigns Against the Company.

At the same time ALPA was taking the actions required under the stand-still agreement to

reduce sick leave, it has signaled to the pilot group that other aspects of the job action should

continue, and has added a new element to the campaign.  In particular, beginning in mid-July

2008, ALPA began a fatigue campaign, and nearly every MEC publications since July 15, 2008,

has discussed fatigue, and described various ways pilots could be fatigued.  (Wallach Tr. at 113-

15; 117-18.)

The Company has always said pilots should not fly if they are fatigued – a fact the evidence will show is reinforced in numerous safety-related communications from United to its pilots.  (*See* Milone Tr. at 42.)  In this case, however, ALPA is manipulating the use of fatigue in order to put economic pressure on the company to open the contract early.  Based on discovery in this action, United is able to document the development, and the use, of ALPA's fatigue campaign by the IRC and MEC.  According to the deposition testimony, during the IRC meetings on June 11-12, 2008, IRC Chairman Tamkin said that rather than use the IRC to communicate a fatigue campaign, he preferred that this option be "institutionally administered" by ALPA.  (Tamkin Tr. at 102-03; Fernandez Tr. at 30-31.)  Following that meeting, Wallach and Tamkin spoke about the issue (Tamkin Tr. at 106; Wallach Tr. at 101), and Wallach has since implemented the fatigue campaign through the MEC's communication mechanisms.  On July 8, 2008, Wallach asked the Chairman of the MEC Grievance Committee to prepare a "Did You Know" on Fatigue.  (Wallach Tr. Ex. 22.)  On July 14, 2008, Wallach also instructed the MEC Communications Committee to "start highlighting fatigue in our updates."  Since July 15, 2008, nearly every single MEC publications has included some form of statement on fatigue. (Wallach Tr. at 113-15; 117-18.)

## ARGUMENT

I.    **THE COURT HAS JURISDICTION TO, AND SHOULD ISSUE, A PRELIMINARY INJUNCTION PROHIBITING ALPA'S UNLAWFUL ALTERATION OF THE STATUS QUO.**

In its Opposition Memorandum, ALPA argues that the Court lacks jurisdiction over United's claim that ALPA has unlawfully encouraged its pilots to adhere strictly to contractual requirements and refuse to fly any voluntary assignments, notwithstanding the fact that these efforts that are designed to put economic pressure on United by disrupting its operations, because United's claims constitute so-called "minor disputes" under the RLA.  As demonstrated below,

13

ALPA's argument is unsupported by any authority under the RLA, and is contrary to the well-established case law governing the distinction between "major" and "minor disputes" under the RLA, and the case law enjoining similar union slowdown campaigns.

Although the terms do not appear in the statute, there is a large body of jurisprudence under the RLA that addresses whether a particular dispute between a carrier and its unions should be characterized as a major dispute or a minor dispute. Major disputes are disputes over attempts to negotiate a new collective bargaining agreement, or modify an existing one, while minor disputes concern grievances or other disputes over the interpretation or application of an *existing* agreement. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 302-03 (1989); *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 722-23 (1945). In a major dispute, the parties must follow the negotiation and mediation process required under the RLA. In a minor dispute, the parties must submit the dispute to an adjustment board required under the RLA for final and binding resolution. 45 U.S.C. § 153. While major and minor disputes are treated differently in many respects under the RLA, the obligations under Section 2, First of the RLA to exert every reasonable effort to resolve the dispute without disruption to the carrier's operations applies to *both* major disputes (making agreements) and minor disputes (maintaining agreements). Indeed, under the express terms of Section 2, First, the obligation to resolve disputes without interruption to commerce applies to *all* disputes, "whether arising out of the application of such agreements or otherwise." 45 U.S.C. § 152, First.

In a minor dispute, the union is prohibited from exercising any self-help at any point because the dispute must be submitted to an adjustment board for resolution. *See Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co*., 353 U.S. 30 (1957) (to preserve the exclusive jurisdiction of the adjustment boards over minor disputes, a union may not engage in any work

stoppage, withdrawals of service, strike or other form of job actions over a matter referable to an

adjustment board); *Chi. & N.W. Transp. Co. v. Ry. Labor Executives Ass'n*, 855 F.2d 1277,

1286-87 (7th Cir. 1988); *Chi. & N.W. Transp. Co. v. Int'l Bhd. of Electrical Workers*, 829 F.2d

1424 (7th Cir. 1987); *Burlington N. & Santa Fe Ry. v. Bhd. of Locomotive Eng'rs*, No. 01

C7743, 2002 WL 47963, at *2 (N.D. Ill. Jan. 14, 2002), .  The legal principle that the federal

courts have no jurisdiction over minor disputes means only that the court cannot decide the

merits of the dispute over interpretation of the collective bargaining agreement.  *Consol. Rail.*

*Corp.*, 491 U.S. at 304.  The case law is clear that the federal courts do have jurisdiction to

enforce Section 2, First, and to prohibit a union from engaging in a job action over a minor

dispute.  *Id.  See also Itasca Lodge 2029 of Bhd. of Ry. and S.S. Clerks v. Ry. Express Agency,*

*Inc.*, 391 F.2d 657, 665 (8th Cir. 1968) (upholding issuance of injunction against union to

prevent a work stoppage over a minor dispute); *Bhd. of R. R. Carmen of Am., Local No. 429, v.*

*Chi. & N. W. Ry. Co*., 354 F.2d 786, 792 n.5 (8th Cir. 1965) (same).  In the present case,

therefore, while United believes that the dispute between the parties over ALPA's request to

renegotiate the parties existing agreement is plainly a major dispute, it does not matter how the

dispute is characterized because in either case ALPA's job action is unlawful under Section 2,

First.

This is a major dispute because the underlying disagreement between the parties concerns

ALPA's demand to renegotiate the collective bargaining agreement.  While ALPA seeks to

create economic pressure on United to agree to its demands through a concerted refusal to accept

junior/senior manning assignments or waive various provisions of the collective bargaining

agreement, there is no dispute between United and ALPA over the proper interpretation of the

collective bargaining agreement.  To the contrary, both parties agree that accepting a

junior/senior manning assignment and waiving a contract provision are voluntary actions under the labor agreement. The only question is whether United's pilots may engage in a concerted refusal to exercise those voluntary options to put pressure on United to reopen the contract. This question was addressed, and decided, in both *Delta Air Lines, Inc. v. Air Line Pilots Ass'n,* 238 F.3d 1300, 1308-09 (11th Cir. 2001), and *United Air Lines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 243 F.3d 349 (7th Cir. 2001). In both cases, the appellate court held that even though actions may be voluntary under the collective bargaining agreement, the union (or, in the *Delta* case, individual employees purporting to act without union direction) cannot engage in a concerted action to put economic pressure on the carrier.

While ALPA acknowledges that the Eleventh Circuit ruled against this argument in the *Delta* case, it argues that the decision is distinguishable because Delta involved concerted actions by employees without the union taking a position on the issue. This distinction should make no difference, however, because Section 2, First applies with equal force to employees and their union. Indeed, it would make no sense to interpret the *Delta* decision to apply only to job actions that were not based on a union "policy" judgment; ALPA's own argument in that case was that the job action did not violate the RLA *because* ALPA had not authorized it. Moreover, the Seventh Circuit, in the *IAM* case, addressed exactly the same issue involving a concerted refusal of overtime, and reached the same conclusion, citing the *Delta* decision with approval.

While there is no dispute that both junior/senior manning assignments and contract waivers are voluntary under the parties' agreement, ALPA contends there are two "contractual disputes" between the parties: (1) whether the junior/senior manning provisions of the parties' collective bargaining agreement can be used by United as a "manpower planning tool," or only in cases of irregular operations, and (2) whether pilots can refuse to waive contractual terms.

(Opp. at 23-24.)  Although it does not matter under the RLA whether the parties actually have a contractual dispute or not because, as noted, self-help is unlawful even over a legitimate question of contract interpretation, ALPA's efforts to create a contractual interpretation dispute in this case are made of whole cloth.  While ALPA has said that it disapproves of the use of junior/senior manning as a manpower planning tool, it has never claimed that this violates the parties' agreement.  To the contrary, the actions of the United MEC upon which ALPA relies -- a resolution in January 2008 to amend its internal Policy Manual -- states that "*[a]lthough allowed in the Collective Bargaining Agreement*, the UAL-MEC does not endorse the use of JRM/SRM as a manpower planning tool."  (Wallach Tr. Ex. 12.)  In light of this assertion, the claim that a contractual dispute exists makes no sense because there is no disagreement between the parties as to whether United *can* use junior/senior manning as part of its manpower planning process. The argument is even more attenuated than that, however, because as a factual matter United does <u>not</u> use junior/senior manning as part of its manpower planning process.  Rather, United uses junior/senior manning exactly as ALPA contends it should -- a fail safe to avoid flight cancellations during unanticipated pilot shortages or irregular operations.

With respect to contractual waivers, the alleged contract dispute is even harder to discern because United agrees with ALPA that pilots may refuse to waive contractual provisions that say they are waivable with pilot concurrence.  The only possible dispute in this regard is whether United may ask a pilot to waive a provision that does not say it is waivable but this case is entirely unrelated to that issue, and ALPA itself alleges that it has been resolved by the parties in any event.

ALPA also argues that this is a minor dispute because ALPA has had "longstanding" positions that junior/senior manning was not intended as a manpower planning tool and that the

waiver of contractual terms can erode the contract. (Opp. at 23-24.) Whether ALPA has held those positions for 18 days, 18 months or 18 years, however, is irrelevant because the law is clear that ALPA may not encourage its members to exercise, or not exercise, a contract right on a concerted basis to put pressure on United (and the members may not do so on their own initiative) whether the dispute is over the meaning of the existing contract or efforts to negotiate a new contract.

If ALPA seriously believed that United was taking actions in violation of the collective bargaining agreement, the proper process would be for ALPA to file a grievance, and allow the board of adjustment to rule on the issue. While this might create a minor dispute under the RLA, the case law is clear that ALPA could *not* seek to force United to agree with its position by exercising self-help. Rather, the RLA would require ALPA to refrain from self-help, and abide by whatever decision the adjustment board reached. *See Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1042 (1990) (union may not exercise self-help in a minor dispute even where its right to engage in the conduct in question raises an issue of contractual interpretation). That is not what ALPA is doing, however, or even what it wants to do. To the contrary, ALPA's own statements make clear that ALPA's directives against junior/senior manning and contract waivers are intended to create pressure on United to reopen the contract, and that pilots may resume their normal behavior when a contract is reached. (Wallach Tr. Ex. 9.)

What ALPA's minor dispute argument really demonstrates is that ALPA has no defense to the basic allegations in this lawsuit. ALPA concedes in its Opposition Memorandum that it has encouraged United's pilots to refuse to waive any terms of the collective bargaining agreement "*so as not to undermine the union's leverage at the bargaining table*" (Opp. at 7

(emphasis added)); in light of the numerous, explicit directives that ALPA has put out over the last 18 months it could not credibly take any other position.  Putting aside the plainly flawed minor dispute argument that ALPA has attempted to make, there simply is no defense that ALPA could articulate under Section 2, First of the RLA for expressly instructing its members to withhold voluntary services to put pressure on United to reopen the parties' agreement.  As the Eleventh Circuit stated in *Delta Air Lines,* "this dispute centers on 45 U.S.C. § 152 First, which imposes a statutory obligation 'to exert every reasonable effort to make and maintain agreements.'  This clear statutory provision is at the heart of the RLA and is clearly within the province of the federal courts to enforce.  When the public interest, commerce, and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the RLA so as to avoid 'any interruption to commerce.' 45 U.S.C. § 152 First."  *Delta Air Lines,* 238 F.3d at 1307-1308.

## II.    DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENT FAILS BECAUSE ALPA'S SLOWDOWN CAMPAIGN CONSTITUTES A CONTINUING VIOLATION

In its Opposition Memorandum, ALPA also argues that United's claims are barred by the RLA's six-month statute of limitations -- at least insofar as those claims are based on refusals to accept junior/senior manning or to waive contract terms.  (Opp. at 25-26.)  This argument is without merit.  This lawsuit is not about a single discrete act that occurred outside the statute of limitations, but involves a multi-faceted – *and ongoing* – slowdown campaign.  In this situation, the law is clear that Defendants' campaign constitutes a continuing violation, and thus their statute of limitations argument should be summarily rejected.

The six-month statute of limitations under the RLA is borrowed from Section 10(b) of the National Labor Relations Act, 29 U.S.C. §160(b).  *See West v. Conrail*, 481 U.S. 35, 37-38 (1987).  Under Section 10(b), when a violation begins outside of the limitations period but

continues into the limitations period, the claim is not time barred. *See*, *e.g.*, *Melville Confections, Inc. v. NLRB*, 327 F.2d 689, 692 (7th Cir. 1964) ("Nor does the fact that the [defendant's] violation antedated the Section 10(b) period applicable to the instant charge preclude a finding of a violation which occurred through a continuation of the proscribed conduct during and within the six-month period prior to the filing of the charge."). Because the limitations period itself derives from the NLRA, the courts have applied the same principles under the RLA. *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 226-227 (D.C. Cir. 2000) (continuing violations doctrine applies to RLA claims just as it does to Section 10(b) claims); *Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 547-548 (9th Cir. 1992) (RLA claim not barred because alleged bad faith bargaining which commenced outside the limitations period continued during the six months prior to commencement of the action).

While ALPA argues that United has been aware of ALPA's positions on junior/senior manning contract waivers since at least April 2007, the directives by ALPA to its members, and concerted action by United's pilots designed to dispute United's operations by refusing junior/senior manning and contract waivers, continue to this day. Indeed, as outlined in United's opening brief, it was ALPA's continuing campaign against junior/senior manning that contributed in part to the numerous cancellations at the height of the sick-out campaign during the last two weeks of July 2008. Moreover, ALPA wholly ignores that United's claims under Section 2, First of the RLA are not directed solely at two, discrete positions taken by ALPA last year. What United challenges is an ongoing, multifaceted slowdown campaign that continues to disrupt United's operations, and continues to include new and different elements almost every month. Thus, while the concerted refusals to engage in junior/senior manning and waive contractual provisions may be the clearest violation of the RLA because ALPA has publicly and

brazenly advised its members to take these actions, the slowdown campaign includes concerted

efforts by ALPA and its members to create flight delays and cancellations, and otherwise to put

economic pressure on United, by refusing to operate aircraft with non-safety related deferrable

maintenance items, by taking more time for pre-flight checks than necessary for safety, and

longer than they have historically, by adding unnecessary fuel to aircraft to increase United's

fuel costs, by intentionally increasing fuel consumption through such actions as taxiing with both

engines running, by a concerted effort to significantly increase the amount of claims of fatigue

above and beyond actual fatigue calls, and, of course, by encouraging and condoning a sick-out

by United pilots which was active on the day this lawsuit was filed.

III.    **ALPA'S ASSERTIONS THAT THERE WAS NO ORGANIZED SICK-OUT, AND THAT ALPA DISCOURAGED ANY JOB ACTIONS, ARE CONTRARY TO THE EVIDENCE**

ALPA's characterization of the July sick-out among junior pilots, and ALPA's reaction

to that sick-out prior to filing of this lawsuit, bears no relationship to the facts as known at the

time United filed its Complaint in this action, and as further known today following expedited

discovery.

A.    **The Evidence Demonstrates That A Group Of United Pilots Engaged In An Organized Sick-Out In July 2008**

ALPA admits that sick leave use was "elevated" during mid-July 2008, and also that this

"elevation impacted United's operations."  (Opp. at 13.)  After making those admissions,

however, ALPA spends several pages of its opposition brief arguing that this "elevation" was not

a "spike" indicative of a job action because the Company's witnesses did not provide the

identical start dates for the "spike."  (*Id*. at 13-14.)  The bottom line is that this spike in sick

leave (or "elevation" or whatever the union wants to call it) was so severe that United was forced

to cancel 329 flights in less than 10 days, impacting more than 36,000 passengers.  (McDonald

Decl., ¶¶ 18, 20.)  And, from a statistical standpoint, the odds that this increase in sick leave

usage among narrow-body first officers was random rather than collaborative behavior are

precisely zero.  (Kasper & Lee Report, Exh. 6.)  The insincerity of ALPA's argument that there

was no "spike" in sick leave indicative of a job action is further exemplified by the fact that all

members of the United MEC's Industrial Relations Committee testified at their depositions that

there was indeed an active, organized sick-out underway by junior pilots.

> **B.    The Evidence Demonstrates That ALPA And The IRC Failed To Make Sufficient Efforts To End The Sick-Out Prior To The Filing Of This Lawsuit.**

The Seventh Circuit has made clear that "[a] union has the affirmative duty under the

status quo provisions of the RLA to exert every reasonable effort to prevent or discourage a

strike or a concerted work action . . . ." *United Air Lines*, 243 F.3d at 363.  This duty applies

regardless of whether the union sponsored or ratified the campaign.  *See Delta Air Lines*, 238

F.3d at 1310 n.22 ("The duty of ALPA under the RLA is sufficiently high that even if it has not

sponsored or ratified the unlawful job action by the pilots, it has a duty to end such unlawful

action").

Acknowledging a sick-out occurred, MEC Chairman Steve Wallach and the members of

the IRC each claim that they made efforts to prevent or stop it.  The weight of the evidence,

however, demonstrates that none of them made any serious efforts of that nature before this

lawsuit was filed.  Prior to the filing of this lawsuit, the written record evidence demonstrates

only that ALPA encouraged pilots to call in sick or instead claim fatigue in an effort to disrupt

United's operations.  For instance, faced with pressure from the Company to respond to the sick-

out, Wallach issued a statement in which he cursorily advised pilots to not make inappropriate

use of sick leave, but with a nod and a wink went on to inform the pilot group that there are a

variety of reasons to call in sick, including such vague "illnesses" as stress and emotion that

cannot easily be "measured by a physician." (Milone Dec. ¶ 49, Ex. 13). Wallach also approved of a plan conceived by the IRC to launch a campaign to encourage pilots to replace inappropriate sick leave calls with claims of inability to fly due to fatigue. This written record of implicit encouragement undermines the credibility of the Defendants' easily-fabricated claims that, after they met in Los Angeles in June they attempted to discourage the sick-out. In contrast to this written record of implicit encouragement, there is <u>no</u> written record of any communications by ALPA, the IRC or Freeman prior to the filing of this lawsuit to discourage the sick-out. If the Defendants were sincere in their desire to discourage a sick-out, the clearest and most effective response would have been a written directive to the group of junior pilots they knew were involved in the sick-out.

Given the lack of a written record to support their defense to this action, the Defendants rely heavily on a June 11, 2008 meeting at Tamkin's home in Los Angeles in which the MEC-level members of the IRC supposedly met with Freeman to discourage Freeman from conducting a sick-out. The evidence, however, strongly suggests that this was not the true reason for the meeting:

- The Defendants have admitted in testimony that the IRC's role is to <u>implement</u> labor actions, not to stop them.

- The inexplicable dispute among the IRC members over Freeman's actual role on the IRC makes sense only if they were trying to conceal why they were meeting with him in Los Angeles in the first place. If Freeman was truly engaged in rogue actions of which ALPA disapproved, ALPA could have and would have simply dealt with him individually.

23

- Tamkin's characterization of the meeting in Los Angeles as a dressing down of Fernandez and Freeman for acting or being affiliated with those who acted in concert "off the reservation" without authorization from Tamkin, is inconsistent with his claim that he opposed the sick-out on its merits.

Individually, the members of the IRC have not presented any credible evidence that they acted to prevent or stop the sick-out. IRC Chairman Tamkin does not claim to have taken any action himself except to ask Freeman and Fernandez to stop the sick-out and to ask ALPA to remove certain posts from the ALPA website at the height of the sick-out. Yet an e-mail that Tamkin sent asking for removal of a post does not reflect that he thought a sick-out was wrong; it only reflects that he thought a written record put ALPA and the members at legal risk. Domaleski did not testify to having taken any action to stop the sick out until after the litigation was filed, and Fernandez claims only to have called some of his friends to let them know of the legal liability they faced if a sick out was not stopped. Indeed, MEC Chairman Wallach himself does not even claim to have taken any action other than a single phone call to Tamkin, and issuing a thinly-veiled statement that was instead a virtual blueprint for implementing a sick-out.

The testimony of Anthony Freeman, upon which Wallach and the IRC members heavily rely as evidence that ALPA discouraged the job action, is utterly inconsistent with known conduct. To begin with, Freeman's written communications on the ual2172.com website, described in United's opening brief, clearly imply he was involved with planning a sick-out. Moreover, the communications by other pilots on the website that he administered clearly show concerted action, and Freeman's explanation for removing them shows only that "some things just aren't meant for paper or electronic communications," not that he was opposed to the sick-out. Finally, the evidence will show Freeman and the two other administrators of the web site

themselves called in sick during the height of the sick-out is completely inconsistent with Freeman's claims that there was, in fact, no sick-out.

The course of action that the IRC claims to have pursued in lieu of a sick-out -- encouraging pilots to call in fatigued instead of sick -- was intended to have the same effect as a sick-out except that it would be harder to prove.  The fact that when the IRC seriously wanted to stop the sick-out to protect ALPA's legal interests it was immediately successful in doing so belies any claim that it tried seriously to do this before the lawsuit was filed.

**IV.    ALPA'S "LITIGATION-INDUCED" ACTS CANNOT BE CITED AS EVIDENCE THAT ALPA TOOK VOLUNTARY ACTION AND THE FACTS DEMONSTRATE THAT A PRELIMINARY INJUNCTION IS NECESSARY**

ALPA argues that an injunction is not necessary because its "actions have obviated any need for a preliminary injunction in that it has essentially afforded the relief that the company seeks."  (Opp. at 29.)  This argument fails because the *only* actions that ALPA took were taken pursuant to a stand-still agreement that ALPA negotiated with United as a condition of postponing the hearing for a preliminary injunction, and thus cannot be cited as evidence that ALPA voluntarily took action.  Moreover, the facts suggest a strong possibility that ALPA will ramp up its prior illegal activities once it is no longer being monitored by this Court.

As explained above, ALPA entered a stand-still agreement two days after United filed its motion, agreeing to take certain actions to protect United's operations.  ALPA now attempts to rely on these actions to argue that a preliminary injunction is no longer needed.  Because ALPA only took these actions to discourage unlawful activity under threat of United's motion for preliminary injunction and pursuant to a negotiated agreement to postpone the hearing, however, ALPA's actions are not evidence of any bona fide desire by the union to reverse its course.  *See N.Y. State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 92 (2d Cir. 1998) ("[V]oluntary cessation of misconduct does not engender mootness where the cessation resulted from a coercive order

and a threat of sanctions."); *United States v. Ry. Employees' Dep't of the Am. Federation of Labor*, 290 F. 978, 982 (N.D. Ill. 1923) (even though unlawful conduct ceased after temporary injunction issued, permanent injunction was necessary to prevent recurrence of such conduct).

Thus, the Court should look to the state of affairs that existed at the time that United filed its motion, and ALPA's "old ways," to determine the propriety of entering a preliminary injunction. *See The N.Y. Times Co. v. N.Y. Stereotypers' Union No. 1*, No. 92 Civ. 6730, 1992 U.S. Dist. LEXIS 14151, at *18 (S.D.N.Y. Sept. 18, 1992) (in face of evidence that union engaged in past efforts to slowdown work, court granted preliminary injunction against slowdown even though court found that defendants had made some efforts at compliance with the prior TRO and had not engaged in additional violations of the TRO).

While Defendants cite cases for the proposition that "the mere theoretical possibility of a repeat violation is not enough," the facts demonstrate that, rather than a "mere theoretical possibility," the activities complained of in this lawsuit will likely continue unless an injunction is issued.[2] Indeed, absent an injunction, because ALPA continues to attempt to put pressure on United in order to reopen contract negotiations before the amendable date in December 2009, there is simply no reason to expect that the union will not ramp up its prior – and new – illegal activities once it is no longer being monitored by this Court. As the Supreme Court has warned, "[i]t is the duty of the courts to *beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption*." *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333

---

[2]    Notably, the case that ALPA cites in support of this proposition (*Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005)), and the other case that it relies on in support of its argument that a preliminary injunction is no longer needed in light of its actions (*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742 (7th Cir. 1999)), are both non-RLA cases addressing the traditional required showing of irreparable injury.  But, as explained in United's Opening Brief, no showing of irreparable injury is required to obtain an injunction against a status quo violation under the RLA. *See Consol. Rail Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. at 303 ; *United Air Lines*, 243 F.3d at 362.

(1952) (emphasis added).

ALPA's continuing efforts – even after the stand-still agreement was entered – to take on the Company with multi-faceted and continually changing job actions, demonstrates that nothing short of injunctive relief will put an end to ALPA's illegal activities. Thus, while the concerted refusals to engage in junior/senior manning and waive contractual provisions may be the clearest violation of the RLA because ALPA has publicly and brazenly advised its members to take these actions, the slowdown campaign includes concerted efforts by ALPA and its members to create flight delays and cancellations, and otherwise to put economic pressure on United, by refusing to operate aircraft with non-safety related deferrable maintenance items, by taking more time for pre-flight checks than necessary for safety, and longer than they have historically, by adding unnecessary fuel to aircraft to increase United's fuel costs, by intentionally increasing fuel consumption through such actions as taxiing with both engines running; by a concerted effort to significantly increase the amount of claims of fatigue above and beyond actual fatigue calls, and, of course, by encouraging and condoning a sick-out by United pilots which was active on the day this lawsuit was filed.

The evidence presented at the hearing in this matter will show that ALPA's directives to its members have caused a spike in delays, cancellations and costs associated with the foregoing actions. For example, since mid-2007, daily cancellations due to non-safety related deferrable maintenance items has quadrupled. Delays related to these non-safety related deferrable maintenance items have not only sky-rocketed over the past year, but it well exceeds the rate experienced during the pilot job action in the summer of 2000. Cockpit check delays have also more than doubled from January 2007 to July 2008. Likewise, the percentage of pilots adding fuel has doubled over the past 18 months. Lastly, after the start of ALPA's fatigue campaign in

July 2008, the number of monthly calls has jumped from 33 in May 2008 to climb to 84 in July

2008.  These increases at ALPA's command demonstrate not only the control ALPA has over its

membership, but the multitude of ways in which it continually seeks to disrupt United's

operations through cumulative, concerted unlawful activity.

## V.    THE NORRIS-LAGUARDIA ACT DOES NOT PROHIBIT AN INJUNCTION IN THIS CASE

Defendants argue that Section 6 of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. §

106, which prohibits the federal courts from holding a union or its officers "responsible or liable"

for the acts of union members absent "clear proof of actual participation in, or actual

authorization of, such acts, or of ratification of such acts after actual knowledge thereof," bars

any injunction here.  Defendants also urge the same conclusion under Section 7 of the NLGA, 29

U.S.C. § 107(a), which requires that "unlawful acts have been threatened and will be committed

unless restrained or have been committed and will continue unless restrained."  (Opp. at 31-34.)

Defendants' arguments based on the NLGA fail for several reasons.

First, as demonstrated in United's Opening Brief, Section 6 of the NLGA does not apply

to actions for injunctions.  The purpose of Section 6, as the Supreme Court noted in *United*

*Brotherhood of Carpenters v. United States*, 330 U.S. 395, 403 (1947), is to relieve unions "from

liability for damages or imputation of guilt" for the unauthorized acts of individual officers or

members.  Thus, as the First Circuit held in *Charles D. Bonanno Linen Serv., Inc. v. McCarthy*,

532 F.2d 189 (1st Cir. 1976), "it is readily apparent that § 106 applies only (by its own terms) to

liability for damages or criminal responsibility," and not to requests for injunctive relief.  *Id.* at

191; *see also Mayo v. Dean*, 82 F.2d 554, 556 (5th Cir. 1936) (Section 6 "might prevent

punishment for contempt or the recovery of damages, but clearly was not intended to apply to the

issuance of an injunction to prevent future acts of coercion in a case where such relief would be

proper"); *Suffolk Constr. Co. v. Local 67, United Bhd. of Carpenters*, 736 F. Supp. 1179, 1182

(D. Mass. 1990) ("the prohibition of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, does not

apply to injunctions but only to claims for damages").[3]

Second, Section 6 of the NLGA addresses vicarious liability of a union or union officer

for acts of another.  Under Section 2, First of the RLA it is ALPA itself that has the obligation to

exert every reasonable effort to resolve disputes without interruption to commerce, and it is

ALPA itself that has violated that obligation.

Third, as the Eleventh Circuit held in the *Delta* case, it is well established that the more

specific provisions of the RLA take precedence over these more general provisions of the

NLGA:  "It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a 'specific

provision' of the RLA and, moreover, is central to the purpose and functioning of the RLA.

Therefore, the provision takes precedence over the more general provisions of the NLGA."

*Delta*, 238 F.3d at 1307; *Chi. & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 581-82

(1971); *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30 (1957); and *Bhd. of

R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952)).

Finally, to the extent that Section 6 has any application here the evidence at hearing will

clearly show that ALPA encouraged, condoned and ratified the actions of its members seeking to

disrupt United's operations.

---

[3]        Defendants' reliance on *Air Line Pilots Association, International v. United Air Lines, Inc.*, 802 F.2d 886
(7th Cir. 1986), is also misplaced.  The Seventh Circuit held that Section 8 of the NLGA, 29 U.S.C. § 108, the
"clean hands" provision, did not prohibit a union from obtaining injunctive relief against the carrier's violation of
the RLA because its members had engaged in an allegedly unauthorized sick out.  Thus, this case demonstrates only
that a union cannot be held "responsible" for the unauthorized acts of its members, and in no way bars a court from
ordering the union or its members to fulfill *their own statutory obligations* under Section 2, First of the RLA.  The
remainder of the cases cited by Defendants are simply inapposite because they do not arise under the RLA (and
therefore do not implicate the affirmative duty of Section 2, First), or do not involve injunctive relief, or both.  *See
Donnelly Garment Co. v. Dubinsky*, 154 F.2d 38 (8th Cir. 1946) (did not arise under the RLA, and therefore did not
implicate the affirmative duty of Section 2, First); *N. Am. Coal Corp. v. Local Union 2262, United Mine Workers of
Am.*, 497 F.2d 459, 466 (6th Cir. 1974) (same); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 717, 737
(1966) (did not arise under the RLA, and did not involve injunctive relief).

DATED: August 22, 2008.

Respectfully submitted,

By:___/s/ Aparna B. Joshi_____
    TOM A. JERMAN
    APARNA B. JOSHI
    MARK W. ROBERTSON
    O'MELVENY & MYERS LLP
    1625 I Street, N.W.
    Washington, D.C. 20006
    (202) 383-5300
    e-mail:  tjerman@omm.com

    GARY S. KAPLAN
    SEYFARTH SHAW LLP
    131 South Dearborn Street
    Suite 2400
    Chicago, IL 60603-5577
    (312) 460-5000
    e-mail:  gkaplan@seyfarth.com

    Attorneys for Plaintiff
    United Air Lines, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-------------------------------------------------------------------x
                  :

UNITED AIR LINES, INC.,             :

             Plaintiff,     :     Case No. 08-CV-4317

     - against -           :

AIR LINE PILOTS ASSOCIATION,    :
INTERNATIONAL, *et al.*,        :

           Defendants.   :

-------------------------------------------------------------- X

**DEPOSITION TRANSCRIPT EXCERPTS IN SUPPORT OF REPLY MEMORANDUM
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

TOM A. JERMAN
APARNA B. JOSHI
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
e-mail: tjerman@omm.com

GARY S. KAPLAN
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
(312) 460-5000
e-mail: gkaplan@seyfarth.com
Attorneys for Plaintiff
United Air Lines, Inc

**Deposition Transcript Excerpts In Support of Reply Memorandum In Support of Plaintiff's Motion for Preliminary Injunction**

1. Deposition of James Anderson, August 15, 2008
2. Deposition of Robert J. Domaleski, August 14, 2008
3. Deposition of Xavier F. Fernandez, August 14, 2008
4. Deposition of Anthony R. Freeman, August 13, 2008
   - Exhibit 5
   - Exhibit 12
   - Exhibit 14
5. Deposition of Steven Tamkin, August 13, 2008
   - Exhibit 6
   - Exhibit 10
6. Deposition of Stephen A. Wallach, August 15, 2008
   - Exhibit 9
   - Exhibit 12
   - Exhibit 22

1

**Excerpts from the
Deposition of James Anderson
August 15, 2008**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED AIRLINES, INC.,              )
                                    )
                Plaintiff,          )
                                    )
        vs.                         ) No. 08 CV 4317
                                    )
AIRLINE PILOTS ASSOCIATION          )
INTERNATIONAL; STEVEN M.            )
TAMKIN; ROBERT J. DOMALESKI,        )
JR.; XAVIER F. FERNANDEZ;           )
and ANTHONY R. FREEMAN,             )
                                    )
                Defendants.         )

The videotaped deposition of JAMES

ANDERSON, called by the Plaintiff for

examination, taken pursuant to notice and

pursuant to the Federal Rules of Civil

Procedure for the United States District

Courts pertaining to the taking of

depositions, taken before Tina M. Alfaro,

Registered Professional Reporter and Notary

Public, at the offices of the Airline Pilots

Assocation, 9550 West Higgins Road, Rosemont,

Illinois, commencing at 9:25 a.m. on the 15th

day of August, A.D., 2008.

Page 101

12:15:47  1        Q.  Are you aware of any closed session

12:15:52  2    with the -- that the Family Awareness

12:15:56  3    Committee has had with the MEC at an MEC

12:15:58  4    meeting?

12:16:01  5        A.  I am -- I would -- no, I'm not.  And

12:16:08  6    I believe all Family Awareness parts of the

12:16:10  7    discussion have been in open session.

12:16:13  8        Q.  What about with respect to the SPC?

12:16:16  9    Are you aware of a closed session with the SPC

12:16:21 10    at an MEC meeting?

12:16:23 11        A.  I have -- I'm not -- I believe all

12:16:28 12    SPC meetings have been in open session.

12:16:53 13        Q.  Do you understand Anthony Freeman to

12:16:56 14    be a member of the IRC?

12:16:59 15        A.  I do not.

12:17:02 16        Q.  Have you had any meetings with

12:17:04 17    Anthony Freeman since you met him in June?

12:17:07 18        A.  I have not.

12:17:08 19        Q.  Have you had any discussions with

12:17:09 20    him?

12:17:11 21        A.  Other than to meet him, I have not.

12:17:18 22        Q.  Have you heard of the 2172?

12:17:22 23        A.  Yes.

12:17:23 24        Q.  And when did you first hear about

12:17:25 25    that?

2

**Excerpts from the Deposition of Robert J. Domaleski**
**August 14, 2008**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED AIR LINES, INC.,          )
                                 )
                Plaintiff,       )
                                 )
          -vs-                   )   No. 08 CV 4317
                                 )
AIR LINE PILOTS ASSOCIATION,     )
INTERNATIONAL,                   )
                                 )
          and                    )
                                 )
STEVEN M. TAMKIN                 )
                                 )
          and                    )
                                 )
ROBERT J. DOMALESKI, JR.         )
                                 )
          and                    )
                                 )
XAVIER F. FERNANDEZ,             )
                                 )
          and                    )
                                 )
ANTHONY R. FREEMAN,              )
                                 )
                Defendants.      )


          Videotaped deposition of ROBERT J. DOMALESKI,

JR., taken before TRACY L. BLASZAK, CSR, CRR, and Notary

Public, pursuant to the Federal Rules of Civil Procedure

for the United States District Courts pertaining to the

taking of depositions, at Suite 1000, 9550 West Higgins

Road, in the Village of Rosemont, Cook County, Illinois

at 9:34 a.m. on the 14th day of August, A.D., 2008.

1    how many times have you been asked to send a message?

2        A    Maybe five times.

3        Q    The message that you were -- and who asks you to

4    send the message?

5        A    Steve Tamkin.

6        Q    And do you know who asks him to send the

7    message?

8        A    No.

9        Q    But the message is from the MEC, is that right?

10       A    I believe so, but I don't know that, per se.

11   Steve doesn't tell me that.

12       Q    Okay.  The last message that you send in late

13   July, early August, what was the substance of that

14   message?

15       A    Stop the sick-out and August is an irregular

16   month for junior manning/senior manning.

17       Q    What does that mean?

18       A    An irregular month?

19       Q    Yes.

20       A    That pilots if they choose can accept junior

21   manning/senior manning.

22       Q    In a regular month, would pilots not be

23   permitted to accept junior/senior manning?

24       A    Well, it's a voluntary program, so they're

25   always permitted to do it if they want.

Page 34

1    A    It's difficult for me to remember because I have

2  it on my phone and I just slew down my contacts list.

3    Q    On your phone is it listed as, you know, a

4  subgroup of people you're supposed to call?

5    A    No.

6    Q    And how do you know who you're supposed to call?

7    A    Because I recognize the number and the name, I

8  recognize the name.

9    Q    No.  So in terms of how do you know that you're

10  supposed to call these 13 people?

11    A    A message is put out, I'm told by Steve Tamkin,

12  and I contact them.

13    Q    I see.  And is the group of people that you're

14  supposed to contact the same for each one of these, I

15  guess, informal phone tree activations?

16    A    I don't understand the question.

17    Q    So in the five times that you've used this

18  informal phone system, has it been the same group of

19  people that you've called?

20    A    Yes.

21    Q    Okay.

22    A    They're local members of the IRC.

23    Q    Okay.  So prior -- the question I had asked you

24  earlier and then not let you answer was prior to the

25  late July, early August phone call, what was the phone

Page 38

1    don't know who they are, except for Tony Freeman now who

2    was one of his members.

3        Q    So is Tony Freeman a local member that

4    Mr. Tamkin is responsible for?

5        A    Yes.  He was in Denver is my understanding.

6        Q    And have you ever met Mr. Freeman?

7        A    Yes.

8        Q    On how many occasions?

9        A    Well, subsequent to this whole complaint a

10   number of times.

11       Q    Prior to the complaint how many times had you

12   met him?

13       A    The first time I had met him and the only time I

14   had met him, I never met him prior to this time, was the

15   day before the shareholders' meeting in Los Angeles.

16       Q    And what were the circumstances of your meeting?

17       A    We were -- Steve, X, and myself were given trip

18   drops to attend the rally that was taking place in

19   Los Angeles, as well as the shareholders' meeting.

20       Q    And how did you come to meet Mr. Freeman?

21       A    I met him at the airport the day that I arrived.

22       Q    Why?

23       A    Why?  Because Steve Tamkin had invited him out.

24       Q    And do you know why Mr. Tamkin had invited him?

25       A    At the time I didn't know.

Page 40

1       MS. JOSHI:  Q   All four of you had that meeting?

2       A   Yes.

3       Q   And what was the substance of that meeting?

4       A   Well, we talked about the rally the next day,

5   and, you know, what was planned.

6       Q   What was planned for the rally?

7       A   They were going to have a comedian, they were

8   going to have a, you know, video, food, a number of

9   other labor unions were going to attend, people were --

10  I guess a band that one of the co-pilots in Los Angeles

11  was a singer in, and we discussed the shareholders'

12  meeting.

13          There was a whole number of people that were

14  there from ALPA from almost every committee.  Almost the

15  chairman of every committee was probably there, invited

16  out.

17      Q   At this meeting --

18      A   Not at the meeting.  At the rally.  That's what

19  we were discussing.  There was only four people at the

20  meeting that night.

21          And then we had a discussion regarding why Tony

22  was there, which, you know, I was very curious about.

23      Q   So you didn't expect that he would attend that

24  sort of meeting?

25      A   No, because it was just Steve, X, and myself

Page 41

1    were the officers of the IRC, so it was very unusual for

2    him to be there.

3        Q    And Mr. Tamkin hadn't told you in advance of the

4    meeting that he would be attending, that Mr. Freeman

5    would be attending?

6        A    I think he told me that morning when I was on my

7    way out before I got on the airplane.

8        Q    Did he tell you why he would be there?

9        A    He mentioned that Tony had something to do with

10   a group, and he thought it would be valuable to have him

11   at the meeting.

12       Q    Okay.  So what did Mr. Tamkin say as to why --

13   at the meeting, what did Mr. Tamkin say as to why Tony

14   was there?

15       A    Well, I had learned all this at that time

16   because I did not know anything about this group, but,

17   you know, as all the records show, the group of 2,172,

18   and that Tony was evidently a leader of this group of

19   2,172 and he felt it was very valuable to have him at

20   the meeting.

21       Q    And what did Mr. Tamkin say after that?

22       A    He kind of -- which was unusual for X and I, but

23   he went on this discussion regarding disciplining

24   members of the IRC.

25       Q    What did he say?

Page 42

1    A    Well, he said that he had been hearing things

2    that -- he basically said that if anybody on the

3    committee decides to do something that is contrary to

4    the committee's message, then that person would be on

5    their own and not defended by the Air Line Pilots

6    Association.

7    Q    And do you know what he was referring to?

8    A    I learned then that evidently this group of

9    2,172 was planning some kind of sick-out over the July

10   4th weekend.

11   Q    And what did Mr. -- well, when Mr. Tamkin said

12   this, did Mr. Freeman respond?

13   A    Yes.

14   Q    And what did he say?

15   A    He said that he referred to the group of 2,172,

16   he used to refer to them as my guys, and he said my guys

17   are really upset regarding basically the furlough

18   letters that had come out by United Air Lines and that

19   they're really, really mad, they're very angry, they're

20   stressed out about being furloughed for a second time,

21   and that they were so pissed off at United Air Lines

22   that they wanted to do something, and that their plan

23   was to have this sick-out over the July 4th weekend.

24   Q    And what did Mr. Tamkin say in response to that?

25   A    He said that a sick-out is completely

Page 43

1    unacceptable, that the association can be fined, they

2    can have an injunction placed against them, and that

3    Tony had to do everything he could to stop that from

4    happening.

5        Q    Did Mr. Freeman respond?

6        A    He said I am going to do my best to try to stop

7    this thing, but he says I don't know how long I can keep

8    the lid on the pot.

9        Q    Do you know what he meant by that?

10       A    I would just say that my personal view on that

11   would be that the emotions were boiling over with this

12   group, and, you know, they were just going to do

13   something whether he liked it or not and you couldn't

14   control it any longer.

15       Q    Did Mr. Tamkin respond to that?

16       A    He did, yes.

17       Q    What did he say?

18       A    He said, Tony, if you can hold these guys at bay

19   and keep them from doing this, there may be something

20   coming that can help solve some of their problems.

21       Q    Did he say anything else?

22       A    I believe he mentioned -- I think there was

23   negotiations taking place with the company.

24       Q    When he said that there was something coming

25   that could help them, do you know what he was referring

Page 46

1      A    Not really, no.

2      Q    Was there any discussion about informing ALPA

3   members that they should use fatigue if they feel tired?

4      A    At that meeting?

5      Q    At that meeting.

6      A    No.

7      Q    So at that point did the meeting just end?

8      A    No, we went out to -- well, Steve showed off his

9   video equipment to us first, and then we went out to

10  dinner.

11     Q    And were there -- were there any discussions at

12  dinner regarding anything related to what you had talked

13  about at the meeting?

14     A    No, most of our discussion, I think, had ended,

15  and we just kind of had a couple drinks and had a real

16  nice dinner together and laughed.

17     Q    After this meeting, did you have occasion to

18  speak with Mr. Freeman again?

19     A    Tony was at the rally the next day, and I

20  believe we had breakfast together and then we all went

21  to the rally together, so I saw him throughout the day

22  on and off.

23     Q    And then after that did you speak with him?

24     A    I think I probably -- we had no conversations,

25  really, regarding IRC or anything like that after that

Page 50

1              (Exhibit 1 marked as requested.)

2      MS. JOSHI:   Q   Captain Domaleski, is this the

3   policy manual excerpt that you were referring to?

4      A   Yes.

5      Q   And on the third page of that excerpt you note

6   at the top it states, "The activities of the industrial

7   relations committee shall include but not be limited

8   to," and then it lists six different things.

9          Is that your understanding of what the

10  activities of the industrial relations committee are?

11     A   I don't think we do everything on this list.

12     Q   Okay.  What don't you do on the list?

13     A   I would say A.

14     Q   Okay.

15     A   I would say B, we don't do that.

16     Q   Okay.

17     A   I would say we do E is probably the only one on

18  there that I do.  I think F is another one that we do.

19  And that would be about it.

20     Q   Okay.  So is it your view that the IRC does not

21  formulate or implement labor actions which will

22  accomplish the goals of the United pilots and the

23  directives of the UAL MEC?

24     A   I guess part of that is true.

25     Q   What part is not true?

Page 51

1      A    Well, I don't get involved in the formulation.

2  I would say that --

3      Q    So the implementation is correct, but not the

4  formulation?

5      A    On my part, yes.

6      Q    Do you believe Mr. Tamkin to be involved with

7  the formulation as chairman?

8      A    Yes.

9      Q    Okay.  Do you personally report to the MEC

10 chairman or is that something that Mr. Tamkin does?

11     A    Mr. Tamkin does that.

12     Q    Okay.  Since you've been on the IRC, and I'm

13 including your time as a local representative, have you

14 done anything to implement any labor action that would

15 accomplish the goals of the United pilots?

16     A    I would say that the communication would be part

17 of that implementation.

18     Q    And when you say the communication, are you

19 referring to the informal phone system that you've

20 activated?

21     A    Yes.

22     Q    Anything else?

23     A    No.

24     Q    How much time would you say you spend on

25 IRC-related activities -- well, let me ask you this:

Page 54

1    to a meeting somewhere or whatever, then it's more in

2    that particular month.

3        Q    Now, when you say that you were a local -- I'm

4    going to call it a local representative, is that

5    correct?  What's the proper terminology?

6        A    I would say LEC local -- LEC industrial

7    relations as opposed to MEC industrial relations.

8        Q    Okay.  So when you were on the LEC industrial

9    relations, you said that was the beginning of 2000?

10       A    That was probably, I would think, in the early

11   spring of 2000.

12       Q    And for six months following that?

13       A    Let's see, six or seven months.

14       Q    So close to the end of the year is when you

15   stopped being an LEC IRC member?

16       A    I believe that it coincided with the election of

17   the new master chairman.

18       Q    Do you know when that was?

19       A    I think it was October -- or, actually, the

20   beginning of the year probably would be when he took

21   office.

22       Q    And what were your duties while you were a local

23   IRC member?

24       A    The same, communication with a group of

25   individuals.

Page 59

1        A    No.

2        Q    You mentioned earlier that you don't know the

3   lists of the local contacts for the IRC that Mr. Tamkin

4   has or that Mr. Fernandez has, and that you don't share

5   those lists, is that right?

6        A    Yes.

7        Q    Why is that?

8        A    It's an informal committee for one, and I

9   believe it's the informality aspect that we don't share.

10       Q    Why is it an informal committee?

11       A    It's kind of a grapevine communications

12   committee.

13       Q    And is it intentionally that way?

14       A    Yes.

15       Q    And why is that?

16       A    Because I think the anonymity of the committee

17   allows people to communicate more freely without feeling

18   a risk of being disciplined by United management.

19       Q    Why would they have a fear of being disciplined

20   by United management based on communications?

21       A    I mean, in your own entries here you said it's

22   some secretive committee.

23       Q    Is that accurate?

24       A    It probably is, yes.

25       Q    You told me that you communicate with -- Well,

1    actually, let me ask you this:  Do you communicate with

2    the other members of the IRC by cell phone?

3        A    Sometimes by cell, sometimes by home phone.

4        Q    Do you communicate with other members of the IRC

5    by text messaging?

6        A    No.

7        Q    How about by e-mail?

8        A    No.

9        Q    Is the reason that you don't use text message or

10   e-mail so that there is no written trail of what your

11   communications are?

12       A    Yes.

13       Q    And is that because of the nature of the

14   communications?

15       A    Yes.

16       Q    And how would you characterize the nature of the

17   communications?

18       A    As labor strategies and negotiation-type

19   strategies.

20       Q    Are you aware of the strike preparedness

21   committee?

22       A    Yes.

23       Q    And do you know when that committee was created?

24       A    I believe it was created under Mark Bathurst,

25   probably January of 2007, somewhere in that area.

1    Q    And do you know why it was created at that time?

2    A    Yes.

3    Q    Why?

4    A    To start bringing the pilot group together to

5    prepare for an eventual -- if a potential strike took

6    place.

7    Q    And do you know who the members of the SPC are?

8    A    I know the chairman is Jim Anderson, and I know

9    our local in New York, which is where my member of

10   Council 52 is.  I believe it's Venstra, Randy Venstra,

11   but aside from that, I don't know anybody else on the

12   committee.

13   Q    Have you had any interaction with Mr. Anderson?

14   A    Yes.

15   Q    And what was the nature of that interaction?

16   A    I saw him at the rally in L.A., and I've seen

17   him at the MEC office, and we're cordial with each

18   other, I mean I guess essentially you could say we're

19   friends, we discuss friend-type things.

20   Q    Have you discussed with him any activities of

21   the IRC?

22   A    No.

23   Q    And has he discussed with you any activities of

24   the SPC?

25   A    Yes, he has.

Page 65

1      Q    Did Mr. Fernandez agree with you?

2      A    Yes.

3      Q    Were you surprised by the sick-out in mid-July?

4      A    Yes, I was.

5      Q    Why is that?

6      A    Well, I didn't think that the junior pilots were

7   organized like that or whatever to do something of that

8   nature, and I thought it was really stupid.

9      Q    So you were surprised that they were organized

10   enough to get it done?

11      A    Yes.  I mean, if you look at the statistics,

12   it's all the junior co-pilots.

13      Q    Do you know whether -- Well, did you have any

14   conversations with Mr. Freeman at that point?

15      A    At what point?

16      Q    At the point that you realized that a sick-out

17   was going on.

18      A    No.

19      Q    Do you know whether Mr. Tamkin had any

20   conversations with him?

21      A    I don't know.

22      Q    Going back to the IRC generally, do you hold

23   meetings as a committee?

24      A    Only when we get together, say, at the MEC

25   office or at the rally, you know, we meet that way, but

Page 94

1      A    Yes.

2      Q    Do you know if Steve Tamkin is assigned the

3  responsibility for monitoring the forum?

4      A    No, my understanding is he's not.

5      Q    You were asked questions about how Mr. Tamkin

6  became aware of the planned sick-out among the 2,172s.

7  Do you remember that question?

8      A    Yes.

9      Q    And you had not heard of this planned sick-out

10 until June 11th, the day before the rally?

11     A    Correct.

12     Q    And you're a 777 captain?

13     A    Correct.

14     Q    Are any of the 2,172 serve as crew members on a

15 777?

16     A    No.

17     Q    And what piece of equipment does Mr. Tamkin fly?

18     A    He is an Airbus 320 captain.

19     Q    Are any of the 2,172 members serve as crew

20 members on that piece of equipment?

21     A    Yes.

22     Q    You were also talking about the goal of the IRC

23 and supporting the MEC.  Do you remember being asked

24 that question?

25     A    Yes.

Page 95

1      Q    And one way you support the MEC is helping

2   disseminate MEC communications --

3      A    Yes.

4      Q    -- messages?

5           Is the flow of information one way?

6      A    No.

7      Q    Is there another way in which the IRC supports

8   the MEC?

9      A    Yes, we bring message in -- I mean information

10  inbound through the organization that we pass up above.

11      MR. VITALE:  I have no further questions.  Thanks.

12      THE WITNESS:  You're welcome.

13      MS. JOSHI:  I don't have any questions.

14      THE VIDEOGRAPHER:  This is the end of tape No. 2 and

15  the conclusion of today's deposition of Robert

16  Domaleski, Jr., consisting of two videotapes.  Going off

17  the record.  The time is now approximately 1:57 p.m.

18                        - - - - -

19

20

21

22

23

24

25

3

**Excerpts from the**
**Deposition of Xavier F. Fernandez**
**August 14, 2008**

1          IN THE UNITED STATES DISTRICT COURT

           NORTHERN DISTRICT OF ILLINOIS

2              EASTERN DIVISION

3    UNITED AIR LINES, INC.,          )

                              )

4          Plaintiff,          )

                              )

5          vs.              ) No. 08-CV-4317

                              )

6    AIR LINE PILOTS ASSOCIATION,      )

     INTERNATIONAL, et al.,          )

7                        )

           Defendants.          )

8

9

10          The videotaped deposition of XAVIER

11    F. FERNANDEZ, called for examination pursuant to the

12    Rules of Civil Procedure for the United States

13    District Courts pertaining to the taking of

14    depositions, taken before JUDITH A. WALSH, Illinois

15    Certified Shorthand Reporter No. 84-2824, at Suite

16    1000, 9550 West Higgins Avenue, Rosemont, Illinois, on

17    the 14th day of August 2008, at the hour of 9:51

18    o'clock a.m.

19          There were present at the taking of this

20    deposition the following counsel:

21

22

23

24

25

1    anything responsive?

2        A.  I looked around, but I don't keep those

3    documents.  It's not -- I don't have like a file

4    folder that says "IRC" on it.  There's no real written

5    documents associated with this.

6        Q.  Are you saying you looked and you didn't have

7    any, or --

8        A.  Sure.  I looked around just to see, looked

9    through my office to see if there was something that

10    had anything to do with this case on it, but there was

11    nothing there.

12        Q.  And when you say "to do with this case," you

13    mean anything to do with your duties --

14        A.  Right.

15        Q.  -- as a member of the IRC?

16        A.  Right.

17        Q.  Do you have more than one email address?

18        A.  I have two that I use.

19        Q.  Okay.  What are they?

20        A.  Xff737@gmail.com, and xfernandez@satx, as in

21    San Antonio, Texas, .rr.com.

22        Q.  And were archives that might exist of any

23    emails sent or received on those email addresses

24    included in the computer that you provided to your

25    attorneys?

1    committee, did you have conversations with him about

2    possibly serving on the committee?

3       A.   Yes.

4       Q.   Describe what was said by you and what was

5    said by him in those conversations.

6       A.   I don't recall.

7       Q.   Did Captain Tamkin tell you why -- excuse me.

8    Did he tell you why he wanted you as compared to six

9    other -- 6,000 other pilots to serve on the committee?

10      A.   No.

11      Q.   Had you known him before being selected to

12   serve on the committee?

13      A.   Yes.

14      Q.   How long?

15      A.   Probably -- how long before I was selected on

16   the committee did I --

17      Q.   Yes.

18      A.   -- know him?

19      Q.   Yes.

20      A.   Four or five years.

21      Q.   And what were the circumstances under which

22   you came to make Captain Tamkin's acquaintance?

23      A.   I flew with him when I was a copilot on the

24   Airbus in Los Angeles.

25      Q.   Did you have some relationship with him other

1    than just flying with him occasionally?

2    A.  No.

3    Q.  At the time you were appointed, were there any

4    other members of the IRC besides Captain Tamkin?

5    A.  I think -- I think I was simultaneous kind of

6    with Captain Domaleski.

7    Q.  Since you were appointed to the industrial

8    relations committee along with Captain Domaleski, have

9    there been other members appointed?

10    A.  No.

11    Q.  Are there -- in addition to the MEC level

12    members of the IRC, are there local coordinators?

13    A.  Yes.

14    Q.  Can you list as many local coordinators as you

15    can recall?

16    A.  It's not a formal position.  I will list some

17    pilots for you, but if you ask them if they were local

18    coordinators, they probably wouldn't even know the

19    term.

20    Q.  Okay.

21    A.  Does that make sense?

22    Q.  Yes.

23    A.  I don't want them to -- Kevin Simicek, Jim

24    Crail.

25    Q.  How do you spell that?

1      A.  C-r-a-i-l.

2          Jeff Glicksman, G-l-i-c-k-s-m-a-n; Tom

3    Finnegan; and Clarence Copping.

4      Q.  How do you spell that?

5      A.  C-o-p-p-i-n-g.

6      Q.  Any others?

7      A.  Those would be the primary coordinators if you

8    were going to call them that for me.

9      Q.  As a member of the industrial relations

10   committee, do you have a particular area of

11   responsibility that is different from the area of

12   responsibility for other members of the IRC?

13     A.  Yes.

14     Q.  What is your area of responsibility?

15     A.  Loosely defined, Chicago.

16     Q.  And do the other members have different set

17   geographical areas that they're in charge of?

18     A.  It's not -- I'm trying to think of the best

19   way to answer you correctly with this.  Captain Tamkin

20   lives on the west coast.  Captain Domaleski lives on

21   the east coast.  I live in the middle.  That's about

22   as formal as it gets.  Does that make sense?

23     Q.  Yes.

24         Do you know Anthony Freeman?

25     A.  Yes.

1     Q.  Sure.

2     A.  I'm not a 2172, so I can't log on to the

3     website.  I tried to, but it didn't let me.

4     Q.  Do you recall a meeting on June 11 or 12 of

5     this year in Los Angeles with Captain Tamkin,

6     yourself, Captain Domaleski, and Mr. Freeman?

7     A.  Yes.

8     Q.  Where did that meeting take place?

9     A.  At Captain Tamkin's house.

10    Q.  Prior to that meeting, had you heard either

11    rumor or more conclusively that a group of junior

12    pilots were planning a sick-out in July?

13    A.  Yes.

14    Q.  When did you first hear that?

15    A.  Again, that was a gradual transition.

16    Q.  Can you give me the date when you first

17    learned of it?

18    A.  It graduated and increased from when United

19    first said they were going to park 30 airplanes, which

20    I think was late April, early May, until United

21    announced that it was going to park 100 airplanes, at

22    which point it was still largely rumor but strong

23    enough that it alarmed us or alarmed me.

24    Q.  At some point prior to meeting in Los Angeles,

25    did you have a conversation with Captain Tamkin about

1     the rumored sick-out?

2       A.  Yes.

3       Q.  And when did that conversation occur, at least

4     the first conversation in relationship to the meeting?

5       A.  First conversation in relationship to the

6     meeting that occurred?  The first conversation

7     relating to the concern about the pilots calling in

8     sick?

9       Q.  Right.  Let me rephrase the question.  How far

10    in advance of the meeting on June 12th did you first

11    discuss with Captain Tamkin the rumors you had heard

12    about a sick-out?

13      A.  I'm not sure.

14      Q.  What's your best estimate?

15      A.  What I would say is that I report back to

16    Captain Tamkin what I hear.  And so as the volume of

17    the discord or volume of the issue about pilots being

18    sick got louder over time, my conversations with

19    Captain Tamkin would have reflected that.

20      Q.  At some point in time, did you tell Captain

21    Tamkin that Anthony Freeman was involved in the

22    discussions about a potential sick-out?

23      A.  No.

24      Q.  Did Tamkin, Captain -- strike that.

25        Did Captain Tamkin ever tell you prior to the

1     June 11 meeting that he believed Mr. Freeman was

2     involved in organizing the sick-out in some way?

3         A.   No.

4         Q.   Did you, prior to the June 11 meeting, talk to

5     Mr. Freeman about his knowledge of or involvement in

6     the sick-out?

7         A.   Two questions there.

8         Q.   Yes.

9         A.   Important distinction.

10        Q.   Let's just take them in order.  Did you talk

11    with him about his knowledge of a potential sick-out?

12        A.   Yes.

13        Q.   When did that occur?

14        A.   I'm not sure.  Prior to the 11th, but not that

15    far apart.

16        Q.   What did he tell you?

17        A.   He had the same concerns that I did.  He was

18    hearing them even louder than I was.

19        Q.   Did he give you any detail about where he was

20    hearing them or who was involved or any other

21    information?

22        A.   No.

23        Q.   Did you at some point have a conversation with

24    Mr. Freeman about his involvement, if any, in the

25    organization of the sick-out?

1      do it?

2          A.  No, I don't think so.

3          Q.  When did you first learn that Mr. Freeman

4      would be at a meeting with you, Captain Tamkin, and

5      Captain Domaleski in L.A.?

6          A.  About a week before the meeting.

7          Q.  Who told you he would be there?

8          A.  Captain Tamkin called me and said that he was

9      going to bring Tony Freeman out to the Los Angeles

10     meeting to meet with us.  I said, told Captain Tamkin

11     that, you know, given the fact that there we were very

12     concerned that there might be a sick-out, is that a

13     dangerous thing to do because it would look like we

14     were connecting ourselves to the 2172.

15         Captain Tamkin's response to me was, "We have

16     a legal obligation to stop a sick-out, and we're going

17     to get blamed for it anyway if it happens.  So Tony is

18     the most effective guy to help us stop the sick-out."

19     And I couldn't argue with that.

20         Q.  Did you have any further conversations with

21     Captain Tamkin on this subject between that

22     conversation and when you actually showed up at his

23     home in L.A.?

24         A.  Did we have another conversation between -- I

25     don't recall.

1    the pilots at United.

2       Q.  Did you discuss steps that the IRC could take

3    to deal with this problem?

4       A.  Yes.

5       Q.  What was discussed?

6       A.  We were concerned that -- we understood the

7    problem.  And I live the problem, so I understand the

8    problem.  And so certainly wanted to improve the lives

9    of the junior pilots but more importantly for us was

10   to figure out how to get those pilots, if they need

11   the rest, they have to get the rest, how can we get

12   them the rest in a legal and appropriate way.

13          We were concerned that pilots might be calling

14   in sick because they're exhausted.  And we were

15   concerned that that may not be the appropriate course

16   of action for a fatigued pilot.

17      Q.  Can you explain why calling in sick is not an

18   appropriate action for a fatigued pilot?

19      A.  Well, there's a differentiation in the

20   airman's -- aeronautical information manual, the FARs

21   and even our FOM and flight manual in how we discuss

22   these different issues.  Fatigue is specifically

23   described in the aeronautical information manual and

24   specifically addressed in our FOM.

25          And there's our specific -- you know, the

1    aeronautical information manual is specific about not

2    flying when you're fatigued.  And the FOM is specific

3    about what to do if you're fatigued.  Does that make

4    sense?  And we were concerned that this was going to

5    turn into a sick issue instead of a fatigue issue.

6    And if it's a fatigue issue, it should be documented

7    appropriately, you know.  The FAA should be made aware

8    of it.

9        All of those things, all the appropriate

10    fatigue mechanisms should be triggered in that process

11    as opposed to just assuming everybody was getting the

12    flu at the same time.

13    Q.  And what actions did you decide to take in

14    order to deal with the fatigue issues?

15    A.  Other than the suppression of the sick-out

16    that we discussed at that meeting, we didn't come out

17    of that meeting with any other direct actions, that I

18    recall.

19    Q.  Did Captain Tamkin say that he was going to

20    use institutional channels of ALPA to address the

21    fatigue issue?

22    A.  Yes.  I think he wanted to take it to

23    leadership and say, "This is a problem.  How do you

24    want to -- how do you want to handle this?"

25    Q.  Did the members of the IRC have any other

1    meetings in L.A. during that three-day period?

2        A.  I don't think so.

3        Q.  The following week, June 19, 20, and 21 --

4        A.  Okay.

5        Q.  -- there was a meeting in Chicago with members

6    of the MEC, Captain Tamkin, among others.  Were you

7    present for those meetings?

8        A.  No.

9        Q.  What actions did you take, if any, following

10   the meetings in L.A.?

11       A.  Called a number of my friends and talked to

12   them about the sick-out and that we really need to be

13   aggressive in trying to stop it; explained to them ad

14   nauseam why it was bad for us and why pilots should

15   care and ask them to spread that word.

16       Q.  What did you tell them ad nauseam --

17       A.  Ad nauseam.  I'm sorry.  I laughed --

18       Q.  -- about why it was bad?

19       A.  Well --

20       Q.  Let me rephrase the question so we have a

21   clean record.

22       A.  Sure.

23       Q.  What did you tell the people you called about

24   why it was a bad idea to engage in a sick-out?

25       A.  Pilots have in general a poor understanding of

1    the law.  And what I was trying to impress upon them

2    was, if there is a sick-out and the company decides

3    they want to take it to court, they will sue ALPA and

4    in my, at the time, opinion was that the law was not

5    friendly to us.

6         The law -- this is my very amateurish opinion.

7    Okay.  My understanding of the law is we have a legal

8    duty to stop an illegal strike like that.  And I tried

9    to explain to them that they needed to understand that

10    it was -- that a sick-out would lead to legal action

11    which would lead to us being in some way or another

12    sanctioned probably.  I had some of these guys go,

13    "All right.  I've heard it enough, man.  This is the

14    third time you've told me.  I'm tired of hearing it."

15    That's why I said "ad nauseam."

16        Q.  Was there anybody else present for the two

17    meetings in Los Angeles that you told us about besides

18    Captain Tamkin and yourself, Captain Domaleski, and

19    Mr. Freeman?

20        A.  Not on the 11th, not on the patio meeting, but

21    in the hotel meeting, Captain Bill Renner was there.

22        Q.  And what was the reason for his presence?

23        A.  He was -- he was up for the -- he was up at

24    the picketing of the shareholders meeting.  I guess he

25    lives in L.A. somewhere.  And he's a friend of Captain

1    Tamkin's.

2        Q.  Do you know what his position is?

3        A.  Captain Renner?

4        Q.  Yes.

5        A.  No -- oh, do you mean like what does he fly?

6        Q.  Yes.

7        A.  I think he's a triple 7 captain.

8        Q.  Between June 11th and the second week of July,

9    so in the 30 days following the June 11 meeting, did

10    you have any further conversations or communications

11    via email or text mail --

12        A.  Right.

13        Q.  -- with Mr. Freeman regarding this sick-out

14    issue?

15        A.  I can't recall exactly when, but I spoke with

16    Tony several times or more during that time period.

17    It was a busy time for him especially but for all of

18    us.

19        Q.  Why was it a busy time for him?

20        A.  He was the one guy that was going to be able

21    to stop the sick-out on the 4th of July.  And so he

22    was busy suppressing that.

23        Q.  In approximately mid-July, did you learn that

24    there had been a spike in sick leave and that the

25    company was taking action as a result of that?

1        A.  Let me think.  I'm just trying to get the time

2    line right.  I was leaving for a trip.  I think it was

3    a Monday.  Maybe that's the 17th or 18th.  I'm not

4    sure.  I think I had a trip on Tuesday.  And I was

5    looking, my copilot had kind of -- I was looking to

6    see who I was going to fly with the next day because I

7    didn't have a copilot assigned.  And so when I did

8    that, I pulled up what we call the Unimatic display

9    coverage page, DSPCVR.  And that pulls up all the open

10   trips for tomorrow or whatever day you're looking at

11   and then all the available pilots on reserve to cover

12   them.  When I pulled it up for the next day, there

13   were 13 or 14 open trips, most of them multi days, and

14   there were maybe two reserves to cover.

15        At that point, I became very concerned.  And I

16   started looking out at the other fleets.  And airbus

17   in Denver, you know, 300 in Denver, looking around.

18   And they all looked tight but covered, but Chicago was

19   bad.  And I looked out the day after that and it was

20   maybe even worse.  I mean, it was bad, too.  And at

21   that point, I called Captain Tamkin and said, "We have

22   a problem."

23        Q.  What did Captain Tamkin say?

24        A.  Again, I just want to make sure I've got the

25   date right.  We're talking July 18, 19.  Is that what

1    Q.  After the lawsuit was filed.

2    A.  After the lawsuit was filed.

3    Q.  That were not in the presence of one of your

4    lawyers.

5    A.  Right.  But you didn't ask me what we

6    discussed.

7    Q.  Right.  That's my next question.

8    A.  Your follow-up was --

9    Q.  What did you discuss and with whom?

10    MR. MASTRODDI:  Stop doing my job, Captain

11    Fernandez.

12    THE WITNESS:  Sorry.  Just want to make sure.

13    BY MR. JERMAN:

14    Q.  M.B.A. is pretty close to a law degree.

15    A.  I've spoken with the other two members of the

16    industrial relations committee fairly frequently.  I

17    mean, you know, once or twice a day maybe on average,

18    I don't know, since this happened.  And then more

19    rarely with First Officer Freeman.  The context of

20    those conversations has been more about running the

21    IRC in the interim.  I think we all figured out pretty

22    quick that given the fact we were taken to court and

23    given the history of those sorts of actions in our

24    industry in the past, given the historical tendency

25    for the group that is taken to court to overreact and

1    actually misbehave even more, I think we all

2    understood that it was going to be even more important

3    that we be active and trying to keep that from

4    happening because it was in everybody's best interest

5    for the sick list issue to not get worse and all of

6    that.

7        So that was the context of the conversations

8    I've had with them and then, you know, details of,

9    when are you going to Chicago, and you know, I'll be

10   there and do you want to go get a beer, whatever,

11   those kind of just general things.

12       Q.   As a result of these conversations between you

13   and Captain Tamkin and Captain Domaleski, have you

14   utilized the contacts you have in connection with the

15   IRC to encourage pilots not to call in sick?

16       A.   I want to make sure I've got the question

17   exactly right.  Have we on the IRC encouraged the

18   pilots not to call in sick?  In other words, have we

19   discouraged the pilots --

20       MR. MASTRODDI:  I don't know if that was the

21   exact question.

22       THE WITNESS:  I want to get it right.

23   BY MR. JERMAN:

24       Q.   I'll rephrase it.  As a result of the

25   conversations among the members of the IRC, have you

1    as an IRC member taken action to discourage pilots

2    from calling in sick improperly?

3    A.  Yes.

4    Q.  And what have you done to do that?

5    A.  Called everybody I could think of.

6    Q.  That raises a good question.  How many United

7    pilots within your regional area -- strike that.  Let

8    me just ask the question open-ended.

9        How many United pilots do you believe you have

10   a personal relationship with or a long-standing

11   professional relationship where you would feel free to

12   call them and ask them to do or not do something?

13   A.  20 to 30.

14   Q.  Are you familiar with a pilot named Jew -- Jay

15   Schumacher?

16   A.  Yes, I know Jay.

17   Q.  And are you familiar with Jeffrey Jaslow?

18   A.  No, I don't know Jeff Jaslow.

19   Q.  Do you have any understanding of the role of

20   either Schumacher or Jaslow in connection with the

21   2172 website?

22   A.  I had thought -- and I don't even know if this

23   is true.  I had thought that Jay Schumacher was the

24   one who had started the 2172 website.  I don't know

25   what the fact is on that.  And I talked to Jay

4

**Excerpts and Select Exhibits from the
Deposition of Anthony R. Freeman
August 13, 2008**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED AIR LINES, INC.,           )
                                  )
              Plaintiff,          )
                                  )
         -vs-                     )   No. 08 CV 4317
                                  )
AIR LINE PILOTS ASSOCIATION,      )
INTERNATIONAL,                    )
                                  )
         and                      )
                                  )
STEVEN M. TAMKIN                  )
                                  )
         and                      )
                                  )
ROBERT J. DOMALESKI, JR.          )
                                  )
         and                      )
                                  )
XAVIER F. FERNANDEZ,              )
                                  )
         and                      )
                                  )
ANTHONY R. FREEMAN,               )
                                  )
              Defendants.         )


        Videotaped deposition of ANTHONY R. FREEMAN
taken before TRACY L. BLASZAK, CSR, CRR, and Notary
Public, pursuant to the Federal Rules of Civil Procedure
for the United States District Courts pertaining to the
taking of depositions, at Suite 1000, 9550 West Higgins
Road, in the Village of Rosemont, Cook County, Illinois
at 9:16 a.m. on the 13th day of August, A.D., 2008.

Page 23

1    members that cover more than one domicile, but I don't

2    think each domicile has its own person.

3         Q    But you cover only Denver?

4         A    Correct.

5         Q    Who are the members of the IRC?

6         A    Steve Tamkin, Robert Domaleski, Xavier

7    Fernandez, and me.

8              There are other members that I don't know, but

9    they are lower level in the structure of the industrial

10   relations committee.

11        Q    So tell me what the structure of the industrial

12   relations committee is.

13        A    Steven Tamkin covers, as far as I know,

14   Los Angeles and San Francisco.  I cover Denver.  Xavier

15   covers Chicago.  Robert covers D.C. and New York.

16        Q    And you said you are a mid-level committee

17   member and that there were lower-level committee

18   members.  Am I to understand that there are upper level,

19   mid level, and lower level?

20        A    Thinking about that, I would say that there are

21   two levels, upper level and lower level.

22        Q    And you are a member of the upper level?

23        A    Correct.

24        Q    You may have already answered this, but do you

25   know how many lower level committee members there are?

Page 43

1        Q    Did the system operator of the ALPA MEC forum

2    provide any assistance in setting up ual2172.com?

3        A    No.

4        Q    They are both hosted by vBulletin, is that

5    correct?

6        A    That's correct.

7        Q    You mentioned $180.  Was that a one-time

8    payment?

9        A    It's an annual fee.

10       Q    And do you pay that?

11       A    I do.

12       Q    So as an administrator of the web site, are you

13   the administrator of the web site?

14       A    I'm one of the administrators.

15       Q    Who are the other administrators?

16       A    Jay Schumaker and Jeff Jaslow.

17       Q    Can you spell Jaslow?

18       A    J-A-S-L-O-W.

19       Q    Who is Mr. Jaslow?

20       A    He is a first officer with United Air Lines.

21       Q    On which aircraft?

22       A    Airbus.

23       Q    And how do you know Mr. Jaslow?

24       A    We were furloughed in 2003, and we both flew

25   over at Frontier Airlines while on furlough.

1    the rest of the posts, you wrote about deleting posts

2    from the board.  And you wrote, "It's truly because I'm

3    trying to look out for you and our group's best

4    interests, not because I'm trying to hose you down."

5         What were you trying to convey there?

6    A    I was trying to convey that I wasn't trying to

7    censor certain people by deleting their posts.  I was

8    simply trying to look out for their and our best

9    interests.

10   Q    Why do you believe that deleting their posts was

11   looking out for their best interests?

12   A    Because it dealt with people that were genuinely

13   sick but chest beating.  And it's -- and there are also

14   a couple of posts of folks saying, well, maybe I should

15   call in sick here, there.  And that's definitely not a

16   good idea to talk about predicting being sick.  So

17   that's what I'm talking about.

18   Q    And you then write, "Some things just aren't

19   meant for paper or electronic communications, though."

20   A    Right.

21   Q    Were you suggesting that -- Well, let me ask

22   you:  What were you suggesting there?

23   A    I was suggesting that for the folks that really

24   wanted to vent because there was a lot of frustration

25   out there, don't use my web board to vent in that

Page 90

 1    fashion.

 2        Q    Because you were concerned that it would suggest

 3    evidence of a concerted action?

 4        A    Correct.

 5        Q    On the next page you write, "It's going to get

 6    interesting."

 7             What were you referring to?

 8        A    The talks that were going on.  We had several

 9    rounds of negotiations going on.

10        Q    Going back to the first page, the second

11    paragraph you write, "Well, it will be imperative that

12    we all stay tuned in over the next week.  It will be

13    imperative to pay attention to all communications put

14    out by the MEC.  And it will be imperative for us to

15    keep in touch with each other."

16             What were you referring to?

17        A    Well, when I wrote this, I was anticipating the

18    furlough mitigation TA being signed within that week.

19    So that's what I was referring to.

20             And the keeping in touch part, I had heard

21    rumors about what the furlough TA mitigation -- furlough

22    mitigation TA included, and I knew that it was not going

23    to be enough to save every job.  So it was imperative

24    for us to keep in touch to give further direction to the

25    MEC to be more specific.

1       A    I became aware within a week before the meeting,

2    I would say probably around June 8th or 9th.

3       Q    And who made you aware of the meeting?

4       A    Steve Tamkin.

5       Q    What did he say to you?

6       A    He wanted me to come out so the IRC can picket

7    at the board of directors' meeting, and he had something

8    that he wanted to talk to me in person about.

9       Q    What did he want to talk to you in person about?

10      A    He wanted to talk about the rumors that were

11   going around that people were talking about having a

12   sick-out on July 4th.

13      Q    And did you talk about that when you met with

14   him?

15      A    That was the bulk of our conversation.

16      Q    And can you tell me to the best of your

17   recollection what he said and what you said?

18      A    In so many words he told me it was a terrible

19   idea, which I already knew, but he hammered that point

20   home.  He knew that I had contact with a large part of

21   the pilot group, and so he wanted me to use my streams

22   of communication to not allow that to happen.

23      Q    How did he hammer it home?

24      A    He spoke about it for two hours as if I am the

25   one who created it, and I wasn't.  The rumors didn't

1        Q    Are you aware of other IRC meetings that you

2    have not attended?

3        A    I know that there have been meetings.  I don't

4    know when, and I don't know who attended.

5        Q    How do you know that there have been meetings?

6        A    I heard the -- I heard Steve and Rob and X

7    talking about previous meetings that they had.

8        Q    Were these meetings that took place while you

9    were a committee member?

10       A    I'm not aware.  I don't know exactly when the

11   meetings took place.

12       Q    After you returned from that meeting -- You said

13   it was in Southern California?

14       A    Yes.

15       Q    What did you do?

16       A    When I got -- Well, actually, before I got on

17   the plane, I called Jeff Jaslow.  I had not been on the

18   site.  At the time I did not have a laptop, I just got

19   my laptop in July.  So I got e-mails on my phone that

20   were -- some of the posts on the message board dealt

21   with sick list.  And so I called him Jeff Jaslow, and I

22   told him to do a search of the web site.  And the search

23   term I wanted him to put in was sick or sick list.  And

24   I told him any post or thread that comes up with that in

25   it I want you to delete it.

Page 108

1            And when I got home, I tried to make calls to

2    some of the individuals that had posted posts that had

3    sick or sick list in it and tried to explain to them why

4    they shouldn't put that kind of post in the board.

5        Q    Were you aware before the meeting about the

6    rumor regarding a sick-out on the 4th of July weekend?

7        A    I had heard the rumor, yes.

8        Q    Okay.  And how did you hear about the rumor?

9        A    Just word of mouth.

10       Q    Do you recall who specifically told you about

11   it?

12       A    No, I don't.

13       Q    Did you start a phone tree at that point to tell

14   people not to engage in a sick-out?

15       A    I started the phone tree -- Did I activate the

16   phone tree?

17       Q    Yes, sorry, did you activate the phone tree?

18       A    That was one of the communications that went

19   down the phone tree.

20       Q    Okay.  And then you did -- you did something

21   similar to that again later in the month, right?

22       A    Every time that I told folks about the progress

23   of the negotiations, I passed that message down because

24   there were a lot of folks that were restless and getting

25   very nervous about what was going on during

1    Tamkin and other members within the union inquiring if

2    anything was going on.

3         Q    At any time have you spoken to anyone about

4    calling in sick as a group?

5         A    I'm sorry?

6         Q    At any time either, you know, prior to mid-July,

7    we'll say July 17th, prior to that time have you spoken

8    to anyone about calling in sick as a group?

9         A    No.

10        Q    Did you at any time ask any other pilots to call

11   in sick during that, say, July 17th after?

12        A    Never.

13        Q    Did you at any time suggest that other pilots

14   should use sick leave starting July 17th or after?

15        A    No.

16        Q    Do you, therefore, deny any involvement

17   whatsoever in any increase in sick leave usage between

18   July 17th and July 31st?

19        A    I deny all of that.

20        Q    Did you call in sick between July 17th and July

21   31st?

22        A    I did call in sick.  I was on the sick list on

23   July 17th.  I came off on July 19th, Saturday morning,

24   and I flew on Saturday.

25        Q    You were on sick list July 17th, July 18th, just

EXHIBIT

FREEMAN #5
8-13-08 TB

| | |
|---|---|
| From: | tpilott@aol.com |
| Sent: | Wednesday, June 18, 2008 7:24 PM |
| To: | jeffrey.rogaliner@united.com |
| Subject: | Update |

I know that some of you have received phone calls regarding the 2172 from other members on the phone tree. It's become apparent that some of you were not expecting these introductory calls. I apologize for that. I know that we're all out there flying 5 days a week on the border of exhaustion and many of you can't visit the message board on a regular basis to see that introductory phone calls were going to start going out. I should have sent an e-mail telling you all to expect a phone call. I take responsibility for that. But, the intended purpose of the phone calls that were made last week were to introductory in nature to form a rapport for the smooth flow of information amongst folks in the 2172. That being the case, if you don't want to be contacted during the process of exchanging information, please send an e-mail to us by clicking on contact the administrator and I will take care of it.

Now, there is a lot happening this week. The negotiating committee and the company had or are currently having their second meeting of the week. To follow will be a Special MEC meeting Thursday to be concluded on Friday in Chicago. I know it's been quiet for a couple of weeks now. Well, it will be imperative that we all stay tuned in over the next week. It will be imperative to pay attention to all communications put out by the MEC. And it will be imperative for us to keep in touch with each other.

The obvious fact is that jobs are being leveraged by UAL management. What may not be so transparent is that these same jobs are being fought for as I write this. Remember that you are being held hostage by management. You are not being leveraged or held hostage by our current MEC like it appears we were with Bathurst and Whiteford. Now, I know we as a group get a lot of needed energy from the folks that are still skeptical I think that's excellent. We need to stay on our toes for sure. We will not allow what happened to us before to happen again. Not quietly and without repercussions anyway. But that's not where we're at in my opinion. I do feel that we are as well represented or better than any other time that any of us have been at UAL. Where we are is our greedy management going fishing again. Your job, fuel prices, downgrades, equipment bumps, and the threat of a 100 aircraft reduction are the bait.

I know there have been a lot of questions about furlough numbers. I have the exact same feeling as I had months ago. I hope you do to. And that feeling is if they furlough one then that is synonymous with them furloughing me. Again, I hope you all feel the same. That said, I know the number is important to a lot of folks. I don't have numbers at this time but the point is there is NO NUMBER that could be given that should make anyone out there feel better other than zero. If they do decide to announce a number and that number doesn't touch you I wouldn't breathe easy yet. If they don't get you now they will come for you later. That being said, never let your guard down and never do anything that would enable the company to furlough you or any of your counterparts quicker than the company desires. Also, if they do get us, just some of us, or even the 8 ball new hire on our seniority list, don't let that deflate your ambitions on fighting for your job. Ever. The company counts on bad news to decrease your resolve and it's worked much too often over the past 7 years.

As far as the board is concerned, I received some angry phone calls from a few folks. Some of those calls came from good friends of mine that I've known way before UAL. It's dealing with the fact that a few post were pulled from the board. Hell, I agree with just about everything written on the board. If you noticed this, it isn't because I'm trying to censor anyone. It's truly because I'm looking trying to look out for you and our groups best interest. Not because I'm trying to hose you down. We need the energy. Certain post weren't singled out. A certain subject was though. Some things just aren't meant for paper or electronic communications though. If you're still unhappy, I understand. Please call me and we'll talk about it.

Finally, keep your ears open. Keep in touch through the tree and through your friends

1

here. It's going to get interesting. And we aren't alone although it seems that way sometimes. Harness that energy and be smart. Always follow and protect your contract. We've all been through this before. Fight for someone else's job as if you're fighting for your own. We are in this together.

Tony Freeman
DEN320 FO

Quality Control and cohesiveness - UAL2172 Forums

Page 1 of 8

UAL2172 Forums :

**Alert: The forums are currently turned off!**

Welcome, Anthony Freeman.
You last visited: 22 Hours Ago at 07:40 PM
Private Messages: Unread 0, Total 0.

| User CP | Register | FAQ | Members List | Calendar | New Posts | Search | Quick Links | Log Out |

Go Back : UAL2172 Forums > Main Page > The Watering Hole
Reload this Page Quality Control and cohesiveness

Thread Tools    Search this Thread    Rate Thread    Display Modes

Page 1 of 2  1  2  >

Reply

06-26-2008                                                                                                    #1

Anthony Freeman's Avatar    **Anthony Freeman**  [x] Anthony Freeman is online now
                            Administrator
                                                            Join Date: Dec 2007
                                                            Location: DEN
                                                            Posts: 198

Exclamation - Quality Control and cohesiveness

**QUALITY CONTROL**

Here's the deal. I hate to preach but we really have to tighten this shit up. Folks have to be smarter. Folks have to resist the urge to panic. And folks have to realize the the negative affects of what they type. I wish I could tell you that this is a completely sterile board. No board is.

That said, it's not smart at all to talk about how you may be feeling sick. It's especially not smart to allude that it may occur on a specific day. And it is downright careless to hint that its organized when it's not. If the company comes after you, sure you can say they have to prove you're sick, but you make their job of fucking you over much easier, and make the jobs of the folks that are paid to protect you, much tougher. Look, we're all pissed off. You don't have to prove it to anyone on this board by writing something crazy. We're here to get together. A gathering of folks with a shit load in common. Not to think up strategies or actions. That isn't what the board is about. That isn't what the tree is about. The tree is about getting a voice on the phone to help each other through this.

I'm not saying that you should be complacent. What I'm saying is don't let your emotions make you do something stupid. I know it's a reflex from what we've been through the past 6 years. You have to resist it. You aren't doing yourself, or any of the rest of us any good to do so. As a matter of fact, your putting other folks in harms way. This whole game is more serious than you can imagine. So the next time you have the urge to say something full of emotion, think about it first. Please. It's OK to maybe feel that way. If you want to tell or vent to somebody, get on the phone, don't do it on the board.

One last thing on that note, no hints or references to any code words or phrases that would give anyone the idea that you're trying to put something illegal together.

EXHIBIT
FREEMAN #12
8-15-08 CS

A-100069

Quality Control and cohesiveness - UAL2172 Forums

Page 2 of 8

## COHESIVENESS

What prevents cohesiveness? Panic, feeling left in the dark, feeling like you're alone or forgotten, etc... Hey folks, emotions are high right now. No one could tell you to completely suppress them. Just know that there are many situations where those emotions can be a severe detriment to what you've seek.

You want information right now. Completely understand that. Can you think of a situation where if information you seek was put out, would result in a weaker position negotiating wise, or result in having less people of the larger group you belong to, on board?

We take reality as a sign of uncaring. Reality isn't a sign of uncaring and more importantly, it doesn't mean you won't do what you can to change what, in the short term, appears to be reality. We want to hear in the daily updates that the MEC won't stand for one furlough. The reality is that they will fight for the job of every single person that wants to stay here. But for the letter that came out two days ago, personally, I would have wrote it way differently, but just because it isn't said does not mean it's not being done.

The failure of the the leadership we had in Whiteford and Bathurst have us mypoic right now and it's extremely evident that their failure will have a negative affect on us for a long time to come. We don't trust anyone. Even the folks we have to trust in. The folks that haven't given us any real reason to think otherwise. Some feel that Wallach doesn't care about the junior folks and that is far far far from the truth.

We're looking for something in the form of words right now. That won't do anything but make you feel better. The goal isn't to make you feel good. The goal is to save jobs, not show weakness in the ranks, not to panic, and to not do anything stupid. Further, the goal is to get folks that otherwise wouldn't care, to care. To get those folks in a certain mindset.

The fact is that Wallach has been in charge for only 6 months. He got the TA damn near his first week on the job without pounding his chest and being vocal about it. He killed the Airways merger without pounding his chest or being vocal about it. Look, he's a smart man and he isn't weak. He isn't apathetic. He knows what he's doing. I know I sound like a campaign manager right now. My goal isn't to make him look good. My goal is to get us to settle down. To do otherwise at this point will be a detriment.

Another thing, from talking to a few folks, they seem to have a clock in their head. And when that clock hits a certain time or date, they believe we're officially fucked. That's not the case. We come up with a lot of ideas for mitigation on this board. Trust me, nothing has been thought up here that wasn't thought up with those guys 3 weeks ago...before the BOD meeting.

We now even compare our situation with Continental's ability to get a decent mitigation package in a short amount of time. Why are we different? We're different because we have management that is used to fucking us over with little to little resistance. The process to reconciliation them has been in effect for 6 months now, but they were so successful with the other two downs we have had leading us, that some old habits take longer to break.

Our concerns are the focal point of what's being talked about right now. Settle down. I know it's hard. I know we're conditioned to weak and uncaring leaders. The smarter we are and the more focused we are will provide the best results at this time. Now is not the time to say fuck everyone else.

Tony Freeman
DEN 320 F/O

Edit/Delete Message    Reply With Quote    Multi-Quote This Message    Quick reply to this message

A-100070

Quality Control and cohesiveness - UAL2172 Forums

Page 3 of 8

06-26-2008                                                                                            #2

**JIMMY**  JIMMY is offline

Default  **I am with you**

Good post Tony!! Thanks for the hard work. Left you a couple phone messages.
Jim Nielsen
DEN 320

Join Date: Feb 2008
Location: DEN
Posts: 5

Edit/Delete Message | Reply With Quote | Multi-Quote This Message | Quick reply to this message

---

06-26-2008                                                                                            #3

**Damon Aske**  Damon Aske is offline

Default

All right, stepping away from the edge.

However, after seeing Wallachs video message, I'm not sure that they get it.

Thank you by the way for all your efforts.

Join Date: Feb 2008
Location: LAX
Posts: 3

Edit/Delete Message | Reply With Quote | Multi-Quote This Message | Quick reply to this message

---

06-26-2008                                                                                            #4

**dkav8r**  dkav8r is offline

Default

Great post Tony! I wish I had waited to make my other post until I had cooled down a little. I want to make things right and help in any way I can. Call if there is something I

Join Date: Feb 2008
Location: DEN
Posts: 9

A-100071

Quality Control and cohesiveness - UAL2172 Forums

can do. I assume you have my # through the site registration, if not, PM me and I will send it to you.

On a side note, note, we can not afford to alienate anyone who is on our side right now. While I never have and never will (you can check!) accepted JRM, there are those of us that have made that mistake. While I don't agree with ANY excuse, we need everyone together in this fight.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Reply With Quote | Multi-Quote This Message | Quick reply to this message | |

06-26-2008    #5

**rmnelms** ☒ rmnelms is offline
Member
☒ Default

Join Date: Feb 2008
Location: lax
Posts: 87

Well said, Tony. Thanks for your efforts. Mike

| | | | | | | |
|---|---|---|---|---|---|---|
| EditQuote Message | | Reply With Quote | Multi-Quote This Message | Quick reply to this message | |

06-26-2008    #6

**Quincy Fleming** ☒ Quincy Fleming is offline
Member
☒ Default : What he said

I believe Captain Walisch cares about us a great deal. I too get wrapped up if someone says the wrong thing to me about getting furloughed again, but there is emotion and there is fact. And the fact is, most of these people that are fighting for us care about us very much. Even if they don't always vet their words perfectly.

I have been in a lot of interesting rooms in the last 6 months and have not encountered anyone (in the UAL MEC structure) who is anything but horrified with how we have been treated. These people are trying very hard to exploit every advantage that has reared its head in order to benefit the pilots of United. I don't know what is going to happen, but I bet this used car salesman first offer of 1450 pilots the company has thrown in our faces will be less in the end. Maybe a lot less. I currently have no "inside" information, this is just my gut.

Either that, or the entire airline is going to go up like a roman candle.

Guys, we have THIS MEC's ear, they need us, we need them. WE are THEM. Don't let them forget it. And be SMART. Jeez.

A-100072

Quality Control and cohesiveness - UAL2172 Forums

Q

P.S.-Tony, thank you for your energy and enthusiasm, and your tireless work on our behalf. I appreciate it more than I can really express. I also enjoy your expletive laced pep talks. I truly feel like flxing bayonets and taking a hill after reading your posts. Reminds me of Patton's speech to the troops, "Don't die for your country, make some other poor bastard die for HIS country!" Kickass.

Q

*Last edited by Quincy Fleming ; 06-26-2008 at 11:03 PM. Reason: Clarifying who the enemy is*

| 06-27-2008 | Reply With Quote | Multi-Quote This Message | Quick reply to this message |

**hypoxic1** ☒ hypoxic1 is offline

☒ Default

Tony,

Keep up the good work. I love you bro!

Mark

#7

Join Date: Dec 2007
Location: ord
Posts : 11

| Edit/Delete Message | Reply With Quote | Multi-Quote This Message | Quick reply to this message |

---

| 06-27-2008 | Reply With Quote | Multi-Quote This Message | Quick reply to this message |

**Steve Schmackers** ☒ Steve Schmackers is offline
Senior Member

☒ Default

Quote:

#8

Join Date: Dec 2007
Location: DCA
Posts : 122

☒ Send a message via AIM to Steve Schmackers

| Edit/Delete Message | Reply With Quote | Multi-Quote This Message | Quick reply to this message |

A-100073

Quality Control and cohesiveness - UAL2172 Forums

Page 7 of 8

Reply

Edit/Delete Message | Reply With Quote | Multi-Quote This Message | Quick reply to this message

Page 1 of 2   1   2   >

« Previous Thread | Next Thread »

Moderation
Merge Posts

Go

Message:

Please click one of the Quick Reply icons in the posts above to activate Quick Reply.

Options
☐ Quote message in reply?

☑ Show your signature

Quick Reply

Post Quick Reply   |   Go Advanced

Posting Rules

You may post new threads
You may post replies
You may post attachments
You may edit your posts

vB code is On
Smilies are On
[IMG] code is On
HTML code is Off

Forum Jump

Go

Quality Control and cohesiveness - UAL2172 Forums

All times are GMT. The time now is 05:19 PM.

Powered by vBulletin® Version 3.6.8
Copyright ©2000 - 2008, Jelsoft Enterprises Ltd.

Alert: The forums are currently turned off!

Contact Us - UAL2172.com - Admin - Mod - Archive - Top

A-100076

UAL2172 Forums - Reply to Topic

Page 1 of 5

[X] UAL2172 Forums

A-100095

EXHIBIT
Freeman #14
8-13-08 TB

[X] Go Back |
UAL2172 Forums > Main Page > The Watering Hole > It's the....of....
[X] Reply to Thread

| User CP | Register | FAQ | Members List | Calendar | New Posts | Search | Quick Links | Log Out |

Welcome, Anthony Freeman.
You last visited: 20 Minutes Ago at 11:03 PM
Private Messages: Unread 0, Total 44.

Preview

[X] Delete

Quote:

Originally Posted by **r£al Pilot**  [X] View Post

*Now boys, you are not sounding professional. We must negotiate everything (away that is), obey the law(RLA) and follow all the rules(FAR and contract). Looks like we have put ourselves into a corner.*

*Just think. If the founding fathers of this conservative judeo-christian nation would have approached their dilemna that way, where would we bloody be today......*

*Carpe Diem*

Is that what you really think is fuckin going on g** damnit?? You think when you're told to be smart we're saying shut the fuck up because we're scared and we don't want resistance while we help give fobs away?? I'm glad we're all pissed but if you think for one mother fuckin minute that nothin is being done so fuckin be it. I can't say it enough times. You want to pour a shit load of energy on the line before we get the rudder where we want it and without enough of the other folks we need to help paddle paddle?

Do you understand what I'm getting at?????

If we do then the whole fuckin shit is pointless. What's your fuckin goal? To make us feel better or to save some fuckin jobs? What's this shit about the RLA? You think folks are scared of the fuckin RLA? I shouldn't even mention the fuckin phrase sidcout on this board but I have to since you brought up the RLA. Why the fuck do one when you don't have to? You know what happens? We do the shit, the opperation doesn't get as fucked up as we hoped....and then we are truly fucked! Out of energy, out of fuckin ideas, and out of leverage. And that's only the half. What happens if it didn't have the effect one was looking for? The company shrugs it off, looks at us thinking the best we got didn't do shit. Now how the fuck are we going to look at the table the next time which I doubt there would even be a next time? and now you're truly in a fuckin corner with a mother fuckine main fuckin point is we can get to where we're tryin to get without

The problem here is the fight is going on but you don't see it. But that's how it's supposed to be at this point.

A-100096

UAL2172 Forums - Reply to Topic

Tony Freeman
DEN 320 F/O

**Reply to Thread**

Thread: Is it rea....or....

Logged in as Author: Tony Freeman

Title:

Message:

```
<p>[quote=Real Pilot;2242]Now boys, you are not sounding professional.
We must negotiate everything (away that is), obey the law(RLA) and follow
all the rules(FAR and contract). Looks like we have put ourselves into a
corner.</p>
<p> </p>
<p>Just think, if the founding fathers of this conservative judeo-christian
nation would have approached their dilemma that way, where would we
bloody be today.....</p>
<p> </p>
<p>Carpe Diem[/quote]</p>
<p> </p>
<p>Is that what you really think is fuckin going on g** damnit?? You think
when you're told to be smart we're saying shut the fuck up because we're
scared and we don't wont resistance while we help give jobs away?? I'm
```

Smiles

Post Icons
You may choose an icon for your message from the following list:

- No Icon
- Post
- Thumbs Down
- Web
- Red face
- Talking
- Angry
- Smile
- Cool
- Question
- Exclamation
- Lightbulb
- Unhappy
- Thumbs up
- Arrow

Submit Reply   Preview Post

UAL2172 Forums - Reply to Topic

**Additional Options**

**Miscellaneous Options**
☑ Show your signature
☑ Automatically parse links in text
☐ Disable smilies in text

**Attach Files**
Valid file extensions: bmp doc gif jpe jpeg jpg pdf png psd txt xls zip

**Thread Subscription**
Notification Type:
Do not subscribe

**Rate Thread**
If you like, you can add a score for this thread.
Choose a rating

**Thread Management**
☐ Close this thread after you submit your message
☐ Stick this thread after you submit your message

[ Submit Reply ]   [ Preview Post ]

---

**Topic Review (Newest First)**

**37 Minutes Ago 10:46 PM**

**rEal Pilot**     Now boys, you are not sounding professional. We must negotiate everything (always that is), obey the law(RLA) and follow all the rules(FAR and contract).
Looks like we have put ourselves into a corner.

Just think. If the founding fathers of this conservative judeo-christian nation would have approached their dilemna that way, where would we bloody be today.....

Carpe Diem

**1 Hour Ago 10:09 PM**

A-100097

UAL2172 Forums - Reply to Topic

**Steve Schmackers**

> Quote:
>
> Originally Posted by "Papi" Boyington [×] View Post
>
> *I thought there would be a ton of pissed of bubba's......*

I'm tired of getting abused!

I'm ready to grow up and do some abusing!!!! [×]

**1 Hour Ago 09:41 PM**

**"Papi" Boyington**

**3 Hour Ago 09:48 PM**

NOW THAT's THE SPIRIT!!!!!!!!!!!!!!

**808Castaway**

> Quote:
>
> Originally Posted by "Papi" Boyington [×] View Post
>
> Kinda silent around here?????
>
> *I thought there would be a ton of pissed of bubba's......guess nobody is home.*

Pap,

Now...we've been pissed for about 7 years now. For me, moreso at our pole-smoking, knee-pad wearing, dipshit, save UAL, sackless, spineless, crybaby, selfish fellow pilots most of which are the mid-90s hire 3 yr capt/WB f/os who never stood up for anything douche-bags.

Being as we are are getting furloughed, IDGAF anymore and I just let these "capts" have it whenever appropriate. F them. I find ALL the broken shit and write it up. I don't waive shit. Truly liberating when one finally has abso-fri-lutely nothing left to lose.

Harachi.

I am just numb. Getting whacked AGAIN.

**1 Hour Ago 05:27 PM**

**Mike Gruenthal**

I am tired of not being represented. I am tired of seeing RJ's and E-jets parked at our gates. I am tired of ALPA representing pilots who are in direct competition for our own seats who are taking our jobs at an ever-ACCELERATING rate. I am tired various pilot groups holding our jumpseats hostage in aircraft that we GAVE TO THEM. I am tired of of a management that is consistently incapable of maneuvering this airline into a position to achieve success. I am tired of executives treating this airline like a giant ATM machine for themselves. I am tired of my job constantly being under attack. I am tired of being shown a furlough mitigation agreement that will not result in any furloughs being mitigated. I am tired of ALPA national leadership coming in

A-100098

with their own agenda, ignoring their own members desires, taking a front and center position aiding the overnight ram-rodding of Age 65. I am tired of pilots who benefitted their ENTIRE career from Age 60 now getting an absolutely enormous windfall at OUR expense and working Bill 65. I am tired of our NO FURLOUGH clause being given away by people who were in no danger of being furloughed and not getting ANYTHING in return—ever—it's our contract too. I am tired of our flying being given away, and not even given the courtesy of being offered employment at the airlines where our jobs are going. I am tired that the same peer-pressure being exerted on JR4'ers/SR4'ers is not being exerted on overS0er's. I am tired of being told this is a good deal, when I know it's a big nuthin-burger. I am tired of starting over again, and again,and again. I am tired of paying my dues, literally and figuratively. I am tired of typing.

**2 Hours Ago 08:43 PM**

"Pap!" Boyington    **Is it me....or....**

Kinda silent around here?????

I thought there would be a ton of pissed of bubba's.....guess nobody is home.



**Posting Rules**

You may post new threads
You may post replies
You may post attachments
You may edit your posts

vB code is On
Smilies are On
[IMG] code is On
HTML code is Off

A-100099

5

**Excerpts and Select Exhibits from the Deposition of Steven Tamkin**
**August 13, 2008**

1       IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

2         EASTERN DIVISION

3  UNITED AIR LINES, INC.,     )

                     )

4      Plaintiff,    )

                     )

5      vs.        ) No. 08-CV-4317

                     )

6  AIR LINE PILOTS ASSOCIATION,   )

  INTERNATIONAL, et al.,     )

7                  )

      Defendants.    )

8

9

10      The videotaped deposition of STEVEN TAMKIN,

11  called for examination pursuant to the Rules of Civil

12  Procedure for the United States District Courts

13  pertaining to the taking of depositions, taken before

14  JUDITH A. WALSH, Illinois Certified Shorthand Reporter

15  No. 84-2824, at Suite 1000, 9550 West Higgins Avenue,

16  Rosemont, Illinois, on the 13th day of August 2008, at

17  the hour of 9:11 o'clock a.m.

18      There were present at the taking of this

19  deposition the following counsel:

20

21

22

23

24

25

1    was in the Complaint, junior man, senior man, and the

2    organization of a sick-out.  And there was a date

3    involved, too.

4        Q.  Do you know whether any of the documents that

5    you provided to Cohen, Weiss have been withheld on the

6    grounds that they were attorney-client privilege

7    documents?

8        A.  I don't know.

9        Q.  Have you discussed this lawsuit with anyone

10    other than counsel?

11        A.  Only as it relates to a response to the

12    litigation.

13        Q.  Who did you discuss it with as it relates to a

14    response to the litigation?

15        A.  Members of the industrial relations committee.

16        Q.  And who are the members of the industrial

17    relations committee?

18        A.  Robert Domaleski, Xavier Fernandez, and

19    Anthony Freeman.

20        Q.  When did Mr. Freeman become a member of the

21    industrial relations committee?

22        A.  In 2007.

23        Q.  Do you know the date in 2007?

24        A.  I can pin it down to April.  Likely late April

25    of 2007.

1    the strike?

2    A.  With United Air Lines?

3    Q.  Yes.

4    A.  No.

5    Q.  What is your current position with United?

6    A.  I'm an A320 captain assigned to the Los

7    Angeles base.

8    Q.  Have you always been domiciled in L.A.?

9    A.  I believe that there was a brief period when I

10    was initially hired, perhaps only the first month of

11    employment, where I was assigned to Chicago as were

12    most new hire pilots before I was processed out to an

13    outlying base, which has been Los Angeles for the

14    balance of my employment.

15    Q.  Prior to being hired by United, were you

16    employed as an airline pilot for another carrier?

17    A.  Yes.

18    Q.  Can you tell us what other carriers you worked

19    for and the period for which you worked for them?

20    A.  DHL Couriers, approximately 1983 to 1985.

21    Q.  Any others?

22    A.  Desert Sun Airlines.  I don't recollect the

23    dates, but that would have been prior to 1983.

24    Q.  Any others?

25    A.  Not air carriers.

1 Q.  Did you -- strike that.

2  Were either DHL or Desert Sun Airlines

3 carriers where the pilots were represented by the Air

4 Line Pilots Association?

5 A.  No.

6 Q.  Prior to your present position as chairman of

7 the industrial relations committee, have you held

8 other positions for ALPA at United Air Lines?

9 A.  Yes.

10 Q.  Can you -- beginning with your employment in

11 1985, can you walk me through every position you have

12 held with ALPA?

13 A.  Yes.  In approximately 1987, I served locally

14 on the industrial relations committee.  And that

15 continued until 1994 -- excuse me, 1993.  In 1993, I

16 served on the MEC level with the industrial relations

17 committee until the year 2001, at which point I ceased

18 performing ALPA work.  Also I was a local hotel

19 chairman in Los Angeles.  I believe the time line on

20 that was 1988 to about 1998, to the best of my

21 recollection.

22 Q.  Are those all of the positions that you've

23 held with ALPA, that you recall?

24 A.  Yes.

25 Q.  When you were a local IRC member from 1987

1    prerogative to appoint other members?

2    A.  Yes.

3    Q.  And did you appoint other members in April of

4    2007?

5    A.  I did.

6    Q.  Who did you appoint?

7    A.  Robert Domaleski, Xavier Fernandez, and

8    Anthony Freeman.

9    Q.  If you review the published MEC materials on

10   committees, it does not reflect that Mr. Freeman is a

11   member of the industrial relations committee.  Do you

12   know why that is?

13   A.  Well, that's because Mr. Freeman was in a

14   subordinate role in Denver.  He performed industrial

15   committee work, but I don't believe that he was

16   rostered or published in any form anyplace.

17   Q.  Those documents that I just referenced also

18   show the appointment dates of you, Captain Fernandez,

19   and Captain Domaleski as being the beginning of 2008.

20   Do you have any understanding as to why those

21   documents reflect that you were appointed in 2008 when

22   you were, in fact, appointed in April of 2007?

23   A.  I don't know.

24   Q.  When you were appointed by Captain Bathurst,

25   were you provided by him with any instructions as to

1    look if you just went on to your computer email system

2    and printed an email.

3         So that's the predicate for my question is,

4    how did you save this particular message so that it

5    comes out in this particular format?

6    A.  From looking at this, from what I recollect

7    because this is recent is that it was composed on a

8    notepad and then copied to other people and

9    transmitted via email.  So you're looking at the

10   parent document that was grafted into emails and sent.

11   Q.  So this document does not reflect who it was

12   actually ultimately sent to, correct?

13   A.  That's correct.

14   Q.  As I read this email, you're making a

15   distinction between what you viewed as legitimate

16   debate and controversy over the doctors letter

17   practice and discussions where the risk to the

18   association and the individuals outweighed the value

19   of the discussion because the responses condoned or

20   encouraged unauthorized improper behavior.  Is that a

21   correct --

22   A.  That is correct.

23   Q.  Can you tell me how you draw that line between

24   what is legitimate discussion and what goes over the

25   line to improperly encouraging or condoning unlawful

1    behavior?

2        A.  What was the famous quote from the judge?  "I

3    can't describe pornography, but when I see it, I'll

4    let you know."

5        Q.  Do you know whether the threads that were

6    pulled -- well, strike that.

7            Were these threads, in fact, pulled pursuant

8    to your request?

9        A.  Yes.

10        Q.  And do you know whether the content that was

11    on these threads that was ultimately pulled was saved

12    on to your computer and ultimately produced to us?

13        A.  I don't know because that was outside of my

14    control, that process.

15        Q.  Can you tell from this document when it was

16    sent?

17        A.  No, not from this document.

18            MR. JERMAN:  This will be Exhibit 7.

19                (Tamkin Deposition Exhibit 7

20                was marked for identification.)

21    BY MR. JERMAN:

22        Q.  Can you tell us what Exhibit 7 is?

23        A.  It looks like work in progress to me.

24        Q.  Can you elaborate on that, please?

25        A.  It appears to me -- this is going to require

1    speculation on my part.

2       Q.  Give me your best recollection as to what you

3    think it is.

4       A.  It would appear that possibly this was revised

5    because some of the threads were already pulled that I

6    was asking to be pulled.  What I'm saying is, it looks

7    like Exhibit 7 predates Exhibit 6.

8       Q.  So this may have been a draft of the message

9    that you sent and then you revised it and sent it as

10   Exhibit 6?

11      A.  I believe that's correct, yes.

12      Q.  I have just a couple of questions about some

13   of the terms here.  About eight lines down in the

14   list, there's a phrase, "I'm safe AIM."  What does AIM

15   mean in that context?

16      A.  Airman's Information Manual.

17      Q.  What is the Airman's Information Manual?

18      A.  That's a guide that's published by the United

19   States government for safe operation of aircraft.

20      MR. JERMAN:  Mark this as Exhibit 8.

21          (Tamkin Deposition Exhibit 8

22          was marked for identification.)

23   BY MR. JERMAN:

24      Q.  Can you identify Exhibit 8 for us, please?

25      A.  Can you repeat that?

1    Q.  Can you identify this document for us, please?

2    A.  Yes.  It looks familiar to me.

3    Q.  Is this something that you posted on the

4    United forum?

5    A.  Well, specifically it appears to me that it is

6    a portion of an action that I took on the UAL MEC

7    forum.

8    Q.  What is the phrase, "thread" -- what did you

9    mean by the phrase, "thread will attract unwitting

10   moths to the light bulb"?

11   A.  The content which is not in front of us right

12   now was incendiary.  And my concern was that it would

13   incite pilots to participate in the thread and it

14   would influence their behavior, undesirable behavior.

15       MR. JERMAN:  Mark this as Exhibit 9.

16           (Tamkin Deposition Exhibit 9

17           was marked for identification.)

18   BY MR. JERMAN:

19   Q.  Exhibit 9 is a document that was produced to

20   us by the association that reflects another pilot

21   named Chris McCarthy -- excuse me -- had printed out a

22   page in which you had posted a statement that the

23   thread was being pulled because it could incite

24   improper behavior.

25   A.  Uh-huh.

1      Q.  Is this an example of you stopping a

2      particular topic because you felt it could be

3      actionable?

4      A.  Yes, it is.

5      Q.  Do you recall what the topic was that you were

6      concerned about in this instance?

7      A.  I do not because it's truncated by this

8      exhibit.

9          MR. JERMAN:  Mark this as Exhibit 10.

10              (Tamkin Deposition Exhibit 10

11              was marked for identification.)

12     BY MR. JERMAN:

13     Q.  Exhibit 10 is a document produced to us that

14     appears to be a thread that you asked to be pulled in

15     Exhibit 6 which references, quote, "7/25, 8:23 p.m.,

16     64 KSOL."  Do you see that?

17     A.  Yes, I see that.

18     Q.  What was it about this thread that gave you

19     concern?

20     A.  The thrust of the communication on the thread

21     was pilots were gloating about the cancellations.  And

22     my concern was that it would -- that it would incite

23     more behavior, more adverse behavior.

24     Q.  And when you use the phrase "gloating about

25     the cancellations," these are cancellations that were

1    caused in July by an increase in sick leave?

2        A.  Yes.

3        Q.  The United MEC policy manual reflects that the

4    MEC maintains a telephone tree system and has an

5    individual who's assigned as telephone tree

6    administrator.  Are you familiar with that?

7        A.  I'm not directly familiar with that.

8        Q.  Are you familiar with the fact that there is a

9    telephone tree administrator?

10        A.  At times, I was aware of it, but not in the

11    present tense.

12        Q.  When you were aware of it, what was the

13    telephone tree used for?

14        A.  Strike prep.

15        Q.  How does a telephone tree operate?

16        A.  I believe that there's a geographical

17    component to it.  And my recollection, this was many

18    years ago, but that there were pilots, pilots were

19    given a publication that listed individual telephone

20    numbers in their region.  And the pilots went down the

21    list that were designated make the calls, and they

22    went down the list with a published list.

23        Q.  How many calls was each pilot supposed to make

24    to other pilots?

25        A.  I don't recall.

1    involved in the affairs of the union.  There is a

2    propagating effect of those pilots talking to each

3    other, but there is not a structured telephone list

4    that people work off of.  And let me qualify that by

5    saying, not that I'm directly aware of, in other

6    words.

7        Q.  In the examples you are aware of, can you tell

8    us what types of actions were being activated by use

9    of the informal telephone tree network?

10       A.  Well, just the passage of information in two

11   directions.

12       Q.  In these informal or unstructured uses of

13   telephone communications that you are aware of, are

14   you aware of any of them that discussed sick leave?

15       A.  No.

16       Q.  Are you aware of any of them --

17       A.  Well, we have to qualify that.  Not -- not

18   prior to this case.

19       Q.  Okay.  And you're aware of some since this

20   case?

21       A.  Yes.

22       Q.  And explain that.

23       A.  Well, information was propagated through many,

24   many channels that relates to the agreement.

25       Q.  When you say "the agreement," you're referring

1    to an agreement between the company and the union?

2    A.   Correct, and the court.

3        MR. MASTRODDI:  That's why I asked for the

4    warning.

5        MR. JERMAN:  I need to grab something.

6        Let's mark this as Exhibit 11.

7            (Tamkin Deposition Exhibit 11

8            was marked for identification.)

9    BY MR. JERMAN:

10    Q.   I just picked this at random out of my box,

11    Captain, because I wanted to give you an example of a

12    question I had.  And it's on the second-to-the-last

13    page of this document.  And it is a box that

14    says, "Text message alert system, click here."  Do you

15    see that?

16    A.   Yes, I see that.

17    Q.   Can you explain to us what that box means?

18    A.   I believe that that would be the port or the

19    mechanism for pilots to register their hand-held

20    devices so that they could receive official

21    communication from the pilots union.

22    Q.   Who within ALPA or the MEC is responsible for

23    the system that sends the text messages to the pilots

24    if they register?

25    A.   I believe that it is the communications

1      Q.   Captain Tamkin, Exhibit 14, I will represent

2    to you, is two pages from the UAL MEC policy manual

3    that was printed from the manual as it appears on the

4    MEC website.  Focusing in Section L on Page 59 through

5    60, does that description accurately describe the

6    duties and responsibilities of th industrial relations

7    committee?

8      A.   It does.

9      Q.   If you could focus on Page 60, Item C where it

10   says, "The formulation and implementation of labor

11   actions."  Do you see that?

12     A.   Yes, I do.

13     Q.   What is your understanding of the term "labor

14   actions"?

15     A.   That would potentially cover a very wide range

16   of activity.

17     Q.   And can you give me examples of what would be

18   within that wide range of activity?

19     A.   The activity that I've been involved with in

20   my tenure as the chairman of the industrial relations

21   committee.

22     Q.   Can you give me examples of what you've been

23   involved in?

24     A.   Demonstrations, rallies, and the generation of

25   support for corporate campaigns.

1      Q.   Okay.  Why don't we do it this way.  Identify

2      everyone you can that is currently a local IRC

3      coordinator.

4      A.   Do you want me to do that, break that down by

5      city?

6      Q.   By city is fine or by name, whatever is

7      easiest for you.

8      A.   Okay.  Robert Bronstein, Peter Belzebor,

9      Darren Bishop, Antwaan Lamere, William Renner, Todd

10     Fortin, Anthony Freeman, Gary Moore, Joseph Klaffey,

11     Jamie Ferguson.  That would be my estimation of the

12     primary local coordinators as we speak today.

13     Q.   And let me -- I'm just going to read off the

14     last name.  If you can give me the domicile, that

15     would be helpful.

16     A.   Yes, of course.

17     Q.   Burnstein?

18     A.   It's Bronstein.

19     Q.   Bronstein.

20     A.   Seattle.

21     Q.   Belzebor?

22     A.   Seattle.

23     Q.   Bishop?

24     A.   San Francisco.

25     Q.   Lamere?

1     A.  San Francisco.

2     Q.  Renner?

3     A.  Los Angeles.

4     Q.  Fortin?

5     A.  Los Angeles.

6     Q.  Freeman?

7     A.  Denver.

8     Q.  Moore?

9     A.  Denver.

10    Q.  Klaffey ?

11    A.  JFK.

12    Q.  Ferguson?

13    A.  DCA.

14    Q.  What about Chicago?  Are there any

15    coordinators in Chicago?

16    A.  Well, Chicago is handled by Xavier Fernandez,

17    so I don't get to that level of detail in Chicago.

18    Q.  Does the IRC hold meetings?

19    A.  No.

20    Q.  And what I say "meetings," I'm talking either

21    meetings with the four MEC level members or meetings

22    with the coordinators.  Are you saying you don't hold

23    either type of meetings?

24    A.  Well, I thought you were asking me in

25    context -- in the context of the local organization.

Page 62

1    But yes, at the MEC level, we have had several

2    meetings.  And this would include the other

3    defendants.  And we do not have regularly scheduled

4    meetings.

5        Q.   Okay.  Do you have any written records of the

6    agenda for what was said or done at the meeting or

7    notes of the meeting?

8        A.   I do not.

9        Q.   And why don't you have any records of the

10   meetings?

11       A.   Well, they've generally been very informal or

12   they've been clustered on social events.

13       Q.   Do I understand you correctly that you just

14   didn't create any records, not that you had them once

15   and they have been destroyed?

16       A.   That's correct.

17       Q.   How do you communicate with the local

18   coordinators?

19       A.   Telephone.

20       Q.   And when you say "telephone," is that a

21   conference call, or is that you or other MEC level

22   members talking directly to individuals?

23       A.   It's the second description.

24       Q.   Why don't you have meetings with all of the

25   local coordinators?

Page 63

1      A.    Because we're not in that state of readiness.

2    We're not in that status.

3      Q.    I understand that Mr. Freeman testified

4    earlier today in his deposition that he was not aware

5    of the names of the local coordinators.  Do you have

6    any explanation as to why Mr. Freeman would not be

7    aware of the names of the local coordinators?

8      A.    Yes.  As I had stated, there is a variable

9    nature to the participants.  And we're in an informal

10   mode.  And I have not published a list of

11   coordinators.

12     Q.    Is the name -- strike that.

13           Are the names of the local coordinators deemed

14   by you to be confidential, private in some way?

15     A.    No.

16     Q.    Do you have any written record of your

17   telephone calls to local coordinators?

18     A.    I do not keep a written record of that.

19     Q.    Do you communicate with the local coordinators

20   or with other members at the MEC level by email or

21   text message?

22     A.    Yes.

23     Q.    And does that answer go for both local

24   coordinators and the MEC level members, or are your

25   communications with the local coordinators limited to

1    telephone?

2        A.    They are predominantly telephone.  I don't

3    text well.

4        Q.    How are local coordinators selected?

5        A.    Since my tenure as the chairman of the IRC,

6    they've been selected by the three MEC members, myself

7    and the other two MEC members.

8        Q.    What criteria do you apply in selecting

9    members?

10       A.    Stature with the pilot group, popularity, and

11   the ability to work.

12       Q.    Let's go back to your service as a local

13   coordinator for the IRC from 1987 through 1993.

14   During that period of time, did the IRC have any

15   involvement in creating strategies for the manner in

16   which the pilot group would treat nonstriking pilots?

17       A.    No.

18       Q.    You're aware, I assume, of a number of actions

19   that were taken by United pilots with regard to the

20   nonstriking pilots?

21       A.    Yes.

22       Q.    Clickers, for example?

23       A.    Yes.

24       Q.    Did the IRC have any role in developing those

25   strategies such as using clickers whenever the

1     nonstriking pilots would come into a domicile office?

2         A.  I was not exposed to that policy formulation

3     at my level, so I'm not aware of that.

4         Q.  Were you ever asked as a local coordinator to

5     implement policies or practices at the local level

6     with regard to nonstriking pilots?

7         A.  I don't recall any directions of that nature.

8         Q.  Are you aware of a publication called "The

9     Gardener"?

10        A.  Yes.

11        Q.  To your knowledge, did the IRC or any of its

12    members have involvement in publishing that document?

13        A.  In the past, the industrial relations

14    committee has been involved in various ways with that

15    document.  And I should carefully qualify that that

16    document has been produced by individual pilots at

17    times spontaneously.

18        Q.  Did you ever have a role in writing part of

19    "The Gardener"?

20        A.  Yes.

21        Q.  Do you recall which -- I don't know if issue

22    is the right word, but do you recall specific

23    documents that you wrote under the banner, "The

24    Gardener"?

25        A.  Yes.  In 19- -- 2000, I expressed ideas about

1    "The Gardener."  And I was connected with it in 2007.

2        Q.  In connection with the litigation that

3    resulted in the two depositions of Captain Dubinsky

4    that I showed you which were lawsuits filed against

5    ALPA and United, there was testimony by some of the

6    individuals that the -- they believed the IRC had been

7    involved in publishing or distributing a booklet on

8    ways to harass individuals like sending magazine

9    subscriptions to them that they didn't want, things

10   like that.

11       First of all, are you aware such a booklet

12   from the 1985 period?

13       A.  I've never seen any publication of that

14   nature.

15       Q.  Have you heard about it?

16       A.  I haven't even heard about it.

17       Q.  Who -- who asked you to serve as a local

18   coordinator back in 1987?

19       A.  Jack McDonald, retired.

20       Q.  What was his position at the time?

21       A.  I believe he was the industrial relations

22   chairman, Los Angeles, but I don't recall the precise

23   title that that was his role.

24       Q.  Did you ever have a conversation with Mark

25   Seal about serving on the industrial relations

1    Q.  During the summer of 2000 in connection with

2    the contract negotiations with United, it's been

3    widely reported and believed by people that the

4    association engaged in a slowdown.  Are you aware of

5    that fact?

6    A.  I'm aware of the allegations.

7    Q.  Did you or the IRC have any involvement during

8    2000 in actions that were interpreted by others as

9    being a work slowdown?

10    A.  Well, you're asking me to interpret -- you're

11    asking me to provide interpretation from other people.

12    Q.  Did -- let me rephrase the question.  Did you

13    or the IRC have any involvement in encouraging pilots

14    to engage in any action at all?

15    A.  There was some limited information that was

16    passed to the pilot group.

17    Q.  And can you tell me what that limited

18    information was?

19    A.  Not to fly voluntary overtime.

20    Q.  And what mechanisms were used to pass that

21    information?

22    A.  I believe it was direct contact.

23    Q.  Face-to-face?

24    A.  Word of mouth.

25    Q.  Do you recall any other actions such as not

1    flying voluntary overtime that the IRC suggested to

2    United's pilots?

3        A.  I think there were -- that was the principal

4    message, to my recollection, that was transmitted.

5        Q.  Do you remember any others, whether they were

6    minor or major parts of what you were doing?

7        A.  I think there was some minor focus on pilots

8    not taking extraordinary action to advance the

9    company's interest.

10       Q.  Can you give me some examples of some

11   extraordinary actions a pilot might take in normal

12   circumstances that would advance the company's

13   interest?

14       A.  Breaking federal air regulations to operate a

15   flight on schedule.

16       Q.  And is that something pilots at United

17   normally do, break FARs?

18       A.  Yes.

19       Q.  Did the IRC suggest to pilots that they should

20   not waive provisions of the collective bargaining

21   agreement that were waivable?

22       A.  I don't have a specific recollection of that,

23   but --

24       Q.  Do you recall -- do you recall that being part

25   of the campaign in 2000?

1    doing?

2        A.  Yes.

3        Q.  Can you give me a rough estimate as to the

4    number of pilots that you think fall into that group?

5        A.  Would you want a very rough estimate?

6        Q.  Yes.

7        A.  Several hundred.

8        Q.  Item No. C, the formulation and implementation

9    of labor actions which will accomplish the goals of

10   the United pilots and the directives of the MEC, from

11   April 2007 to present, what have you or the IRC done

12   to formulate and implement labor actions?

13       A.  Well, we've been directly involved in a

14   campaign that has been directed toward senior

15   management.

16       Q.  Anything else?

17       A.  The passage of information that would -- that

18   would be influential on the behavior of the pilots.

19       Q.  Anything else?

20       A.  Well, it goes back to the first -- to the

21   statement we just made, but the validation of certain

22   official communications and positions of the

23   leadership.

24       Q.  When you say "validation of positions," you

25   mean finding facts that can be used to support the

1    structure that the communication is extensive and

2    ongoing.

3        Q.  Okay.

4        A.  It is deeply embedded in the United pilots

5    population.

6        Q.  What about written publications or -- whether

7    they be letters, emails that are sent to the entire

8    pilot group?  Has the IRC done that under your tenure?

9        A.  That's not -- that's not a routine

10   communication for us.

11       Q.  Have you ever done it during your tenure?

12       A.  And now we're going back to the other -- to

13   include pre-2001?

14       Q.  Actually --

15       A.  You're saying --

16       Q.  -- I was talking about April 2007 to the

17   present.

18       A.  No, no.

19       Q.  Okay.  Going back to the earlier period, did

20   the IRC ever provide direct written communications to

21   the pilot group?

22       A.  I'm not able to recall a specific instance of

23   it.

24       Q.  I'd like to go into the relationship between

25   the IRC and some other committees.  As I understand

1    Q.  What occurred -- who attended the MEC IRC

2    meeting on June 12th?

3    A.  June 12th was attended -- I need to qualify

4    this answer, that that was coincident with the rally.

5    So we had various side discussions and interactions

6    during the rally, which was coincident with the UAL

7    shareholders meeting.

8    Q.  Okay.

9    A.  So --

10   Q.  The question was, who attended the meeting.

11   A.  And in that case, the meeting included Robert

12   Domaleski, Xavier Fernandez, Anthony Freeman, William

13   Renner, and that was it.

14   Q.  Was anyone from the MEC present?

15   A.  Yes -- you mean at the rally or --

16   Q.  No --

17   A.  -- in my sidebar discussions?

18   Q.  Well, let me back up to make sure I understand

19   it.  I read the entry on June 11 to say there was a

20   meeting between the MEC and the IRC.

21   A.  No.

22   Q.  Is that accurate?

23   A.  That's not accurate.

24   Q.  What did you intend to reference by MEC, IRC

25   meeting on June 11?

1    A.  That was a meeting that -- that was a social

2    function that involved my meeting up with and

3    collecting the three other defendants.

4    Q.  Okay.  So you didn't meet with either Captain

5    Wallach or other MEC members on June 11 --

6    A.  That --

7    Q.  -- for business purposes?

8    A.  That is correct.

9    Q.  You may have had some social meetings with

10    them?

11    A.  No.  There wasn't even a social contact on

12    that evening of the 11th.

13        To clarify, MEC/IRC refers to the MEC IRC, not

14    IRC and the MEC.

15    Q.  That's a very helpful clarification because

16    that's where I was going with the question.

17        Did you continue to meet with the five of you,

18    Domaleski, Fernandez, Freeman, Renner, and yourself on

19    the 12th and 13th?

20    A.  On and off, yes.

21    Q.  Was there any discussion during those meetings

22    of a group of junior pilots called the UAL 2172?

23    A.  There was.

24    Q.  And tell me what was discussed about them.

25    A.  Are we referring to the 11th or the 12th?

1      Q.   I was hoping I could refer to the three

2   meetings as collective meetings --

3      A.   Okay.

4      Q.   -- since it was, as I understand it, the five

5   of you meeting periodically over three days.

6      A.   Okay.  The discussion centered around the

7   junior problem -- the junior pilots and their problems

8   and the dealing with a possible impending job action

9   with that group.

10      Q.   And how did you have knowledge of a possible

11   impending job action?

12      A.   I had initially heard of it days before in

13   what I would describe as routine background noise, in

14   other words, chatter, but unsubstantiated and isolated

15   chatter about it, stuff that I've heard frequently in

16   the past, over the past 24 years on the property.

17      Q.   And what was the discussion among the five of

18   you about that issue?

19      A.   Well, I wanted to validate the chatter that --

20   as to my suspicion that what I had heard is that there

21   was going to be a sick-out that was going to occur on

22   July 4th amongst the pilots that were going to be

23   potentially furloughed.

24      Q.   And how did you anticipate you could validate

25   this?

1    A.  From accounts from Anthony Freeman and Xavier

2    Fernandez.

3    Q.  And what reason did you have to believe that

4    either Mr. Freeman or Captain Fernandez would be aware

5    of the planning of this, if it was planned?

6    A.  Well, I became aware shortly before this

7    meeting that Tony Freeman had close ties to that group

8    of junior pilots.  And I also became aware that he was

9    in some way connected to their internet site.

10    Q.  And what information do you think Captain

11    Fernandez might have?

12    A.  He had an affiliation with the junior pilots

13    because he was assigned to the airplanes that would

14    have been the affected fleets.  He was assigned to the

15    737/300 airplane fleet.

16    Q.  When did you first learn that Mr. Freeman had

17    involvement in a website called the UAL 2172?

18    A.  That was almost coincident with the run-up to

19    that meeting, so it was on the order of days prior to

20    that meeting.

21    Q.  At any time prior to meeting with the other

22    IRC members, had you viewed the website?

23    A.  No.

24    Q.  Have you since that time viewed the website?

25    A.  I have viewed the website in one instance.

1      Q.  When did you view it?

2      A.  I viewed the website at the MEC meeting in

3   July by standing behind a pilot that had the authority

4   conferred to visit that website, which I do not have.

5      Q.  When was the July MEC meeting?

6      A.  Approximately the 2- -- the week of the 20th

7   of July.  I'd have to refer to notes to give you the

8   exact dates.

9      Q.  Were you doing this surreptitiously, or was

10   the pilot who had access trying to show you what was

11   on the website?

12      A.  It was a request that I made of that pilot who

13   was an MEC member because at that point, the sick-out

14   was under way, what we now refer to as the sick-out or

15   the spike in the sick leave consumption.  That was

16   under way at that point.

17      Q.  And who was the junior pilot who was a member

18   of the MEC?

19      A.  It's Tony Snyder.

20      Q.  What did you observe on the website while you

21   were viewing it behind Mr. Snyder?

22      A.  Well, I had a disadvantage because there were

23   a great number of messages on the website.  It looked

24   like it was heavily trafficked.  But I was looking for

25   either incendiary language or a call to action that

1    prescribed specific behavior.  And I had an interest

2    in that.

3        Q.  And did you find such messages?

4        A.  I did not.

5        Q.  Okay.  Let's go back then to the June 11, 12,

6    and 13 meetings.  Did you ask Mr. Fernandez at the

7    meetings about his involvement with the website?

8        A.  No.

9        Q.  Did you ask him about his knowledge of a

10   potential sick-out among the junior pilots?

11       A.  Yes.

12       Q.  What did he tell you?

13       A.  He, to the best of my recollection, said words

14   to the effect that something was going on there.  It

15   was an affirmative response, in other words.

16       Q.  And did he give you any detail about who had

17   planned it or how it was planned?

18       A.  I don't recall that.

19       Q.  And what did you say to him?

20       A.  I was going to talk to Tony Freeman about it.

21       Q.  I thought we were just having discussions

22   about your conversations with Mr. Freeman, but maybe

23   not.

24       A.  You just said Fernandez.

25       Q.  Okay.  My mistake.  I apologize.

1    A.  That's okay.

2    Q.  Okay.  Did you then have a conversation with

3    Mr. Freeman?

4    A.  Yes.

5    Q.  And what did you ask him?

6    A.  Well, we're a little out of sequence because I

7    actually made an inquiry to Tony Freeman prior to the

8    meeting.  And I believe that was a telephonic inquiry

9    about this.

10    Q.  Okay.  Tell me about your first --

11    A.  So that was my first --

12    Q.  Your first inquiry to Mr. Freeman, tell me

13    what you asked and what he said.

14    A.  On my first inquiry, he confirmed that there

15    was something going on in the group.

16    Q.  Did he give you any details about planning or

17    dates or anything?

18    A.  Yes.  My recollection is that it was confirmed

19    that July 4th was a target and that words to the

20    effect that, something was going to happen.  And there

21    were further words to the effect that there were

22    individual pilots that were acting out and that that

23    was his intelligence.

24    Q.  Did he tell you what, if any, involvement he

25    had had in planning the action?

1      A.   I believe that was one of the points where he

2      had told me that it was just going to happen no matter

3      what; in other words, the implication that it was out

4      of his control.  And there was also some qualification

5      about how upset that particular group of pilots were,

6      which I already had an awareness of anyway.  You know,

7      it wasn't the first time I heard that.

8      Q.   Do you remember anything else about the

9      telephonic conversation with Mr. Freeman?

10     A.   No -- no, not that I can recall.

11     Q.   And then as I understand it, when you got in

12     Los Angeles -- into Los Angeles, you had a

13     conversation with Captain Fernandez that you've

14     already described.

15     A.   Well, that may well -- that may well be,

16     because of the numerous contacts that we had, that may

17     have been in the period immediately preceding that

18     telephonically.

19     Q.   Okay.  Regardless of whether it was telephonic

20     or in person, what was the next step you took after

21     talking with Captain Fernandez?

22     A.   Well, the next step was that I met with the

23     pilots, collected them at the Los Angeles airport, and

24     took the pilots up to my home.  And in my residence,

25     we had cocktails and we sat in the backyard of my

1    residence and had a discussion.

2        Q.  And when you say "the pilots," you mean the

3    four --

4        A.  The defendants.

5        Q.  -- individual -- and what was the discussion

6    over cocktails in your home about?

7        A.  Well, technically we were on the veranda.  And

8    we were -- because it's memorable to me.  This is a

9    very memorable event.  And we had a glass of wine.  I

10    think a few of us had wine, and there was another --

11    maybe another couple cocktails involved, and sat on

12    the veranda.  And I was facing the other gentlemen.

13        And I said words to the effect that, "I'm

14    aware that there's stuff going on, and that if

15    somebody wants to run their own program or get off the

16    reservation, they can be considered on their own.  And

17    they would be treated as an individual discipline case

18    by the union and the company."

19        Q.  Do you recall what else you said at that time?

20        A.  There was an additional comment that there was

21    a difference in following the policies of our

22    committee and having the full weight of the leadership

23    and the pilots behind you and being on your own.

24        Q.  Was the implication of what you were saying

25    that Mr. Freeman and/or Captain Fernandez had become

1    Q.  In addition to that, do you recall any further

2    discussions?

3    A.  We met at the Holiday Inn prior to dinner the

4    night of the 12th.  And we had a discussion about

5    trying to come up with something to deal with the

6    junior pilot problem because we obviously had a

7    runaway situation with them.

8    Q.  What was said, what else was said by you or

9    others about the junior pilot problem?

10    A.  There were a number -- there were a number of

11    suggestions that I can't recall because pretty much

12    they were rejected, but there was a lengthy

13    discussion.  But the product of the discussion was

14    that we would try to work out an arrangement where the

15    pilots, rather than illegitimately using their sick

16    leave, causing a problem for the Association and our

17    strategy, that we would offer some form of recourse to

18    them in that their chief complaint being that they

19    were overscheduled and they were on unsustainable

20    schedules, the recourse would be that that would call

21    in tired for the trips if they were genuinely tired.

22    Q.  Do you remember any other conversation?

23    A.  I remember that I told them that I didn't want

24    them to release the information to anybody because my

25    desire was to have that option institutionally

1    administered.

2        Q.  "That option" being --

3        A.  The option of informing the pilots that if

4    their schedule is unacceptable and that they're tired

5    and they feel that they're unable to continue, that

6    there would be a structured option for that.

7        Q.  Do you remember anything else about what was

8    said on this topic during the three days of meetings?

9        A.  I think that there was consensus at that point

10   so there wasn't -- there wasn't a lot of deliberation

11   beyond that point.  It was pretty much social

12   interaction.  And, you know, we went to dinner.  I

13   don't -- I recall that there were just personal,

14   social discussions.  There wasn't any further

15   discussion on that matter.

16       Q.  If you could refer back to your calendar --

17       A.  Yes.

18       Q.  -- Exhibit 17.

19       A.  Yes.  Is that 15?

20       Q.  15.  I'm sorry.  What did I say, 17?

21          There was -- there's listed an MEC meeting in

22   Chicago the 19th, 20th, and 21st of June.  Was there,

23   in fact, an MEC meeting in Chicago that you attended

24   on those three dates?

25       A.  As far as I know.

1          THE VIDEOGRAPHER:  This is Tape 3, continuing

2     deposition of Steven Tamkin.  The time is 2:32 p.m.

3     On the record.

4     BY MR. JERMAN:

5          Q.  Did you take notes of the MEC meeting in

6     June -- the 19th, 20th, 21st of June?

7          A.  I did not.

8          Q.  Was there a written agenda?

9          A.  Yes, there was.

10          Q.  And was Captain Wallach in attendance?

11          A.  Yes, he was.

12          Q.  Was there any discussion at this meeting of

13     the concept that you had outlined to the IRC members

14     in Los Angeles with regard to fatigue?

15          A.  I don't recall any discussion of that

16     occurring at that meeting.

17          Q.  When you told the committee members that you

18     wanted to deal through the institutional structure,

19     did you at some point following your meetings in Los

20     Angeles meet with Captain Wallach or somebody else to

21     get the institutional structure to assist?

22          A.  I did.

23          Q.  When did that occur?

24          A.  That, I believe, occurred very soon after the

25     shareholder meeting.

1    after this lawsuit was filed, you had taken action

2    through a telephone tree to discourage pilots from

3    calling in sick.  Do you recall that?

4        A.   Well, I wouldn't call it a telephone tree, but

5    I exercised multiple contacts in disseminating

6    information.

7        Q.   Okay.  Can you identify any other actions that

8    the MEC or you have taken to discourage pilots from

9    calling in sick when they are not sick?

10       A.   Yes.  There were multiple communications from

11   the MEC in the form of official updates and postings

12   on the UAL MEC website, being the UAL MEC forum.  And

13   I've been involved in the editing or suppression of

14   multiple posts since that time where there was what I

15   would call push-back.

16       Q.   When you say "editing of multiple posts," you

17   mean on the UAL MEC forum?

18       A.   That's correct, which was the same practice I

19   was engaged in to begin with.

20       Q.   When you refer to the multiple communications

21   by the MEC, are you referring to the documents that

22   are publicly available on the website?

23       A.   That's correct.

24       Q.   Are you aware of any efforts that ALPA has

25   taken since you've been chairman of the industrial

                              Heppner Call-rev.txt
I am reccommending that we pull the following threads from Boyles Discussion
section:

"CNX Flts for 7/22"
"7/25, 8:23 a.m., 64 KF's ALONE!"
"Contract AME for Routine Sick Calls"
"CP message to 320 and 300 FO's"
"Flt Manager Called about SL"
"I think there are going to be some crew cx's tomorrow"
"Making me proud"

I was going to make this request earlier, but there were exchanges ongoing re:
reaction to official MEC communications as well as legitimate debate and controversy
over the doctor"s letter practice.

In my estimation, at this point, the value of the the discussion is outweighed by
the risk to individuals and the association due to multiple individual's responses
that condone or encourage unauthorized, improper behavior.

I have discussed this with Jay Heppner as well.

Thanks,

Steve Tamkin



EXHIBIT
Tamkin
6
8/13/08

A-100830

7/25, 8:23 a.m., 64 KF's ALONE! - United MEC Forums

Page 1 of 9

[x] UAL-MEC Forum

---

| [x] Go Back | United MEC Forums > Boyle's Bar & Grill > Boyle's Discussion | Welcome, Steven Tamkin. |
| [x] Reload this Page | 7/25, 8:23 a.m., 64 KF's ALONE! | You last visited: 6 Hours Ago at 01:31 PM |
| | | Private Messages: Unread 0, Total 84. |

User CP     FAQ     Members List     Calendar     New Posts     Search [x]     Quick Links [x]     Log Out

[x] Reply

Thread Tools [x]     Search this Thread [x]     Rate Thread [x]     Display Modes [x] [x]

---

[x]  1 Day Ago                                                                    #1 [ ]

**Lee Pantas**
2172
[x]

[x] Lee
Pantas's
Avatar

Join Date: Aug 2006
Location: DCA
Posts: 194
[x] Lee Pantas Positive

| [x] Default | 7/25, 8:23 a.m., 64 KF's ALONE! |

Isn't this the sh*t that got Forte fired a couple
years ago?

─────────────────────────────
100% behind the MEC and completely disgusted
with alpa national!

[x] Lee Pantas is offline  .  [x] Add to Lee Pantas's Reputation

[x] Add Infraction for Lee Pantas  [x] Report Post  [x] IP

[x] Edit/Delete Message     [x] Reply With Quote

[x] Multi-Quote This Message

[x] Quick reply to this message

---

[x]  1 Day Ago

Posted in reply to Lee Pantas's post "7/25, 8:23 a.m., 64 KF's
ALONE!"
#2 [ ]

**Michael Lebright**
United Pilot
[x]

Join Date: Aug 2006
Location: DCA
Posts: 307
[x] Michael Lebright Positive

| [x] Default |

All 300's

---

**EXHIBIT**
Tamkin
10
8/13/08

A-100716

6

**Excerpts and Select Exhibits from the
Deposition of Stephen A. Wallach
August 15, 2008**

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3
     UNITED AIR LINES, INC.,      )
 4                                )
             Plaintiff,     )
 5                                )
             -vs-           ) No. 08 CV 4317
 6                                )
     AIR LINE PILOTS ASSOCIATION,  )
 7   INTERNATIONAL,            )
                                  )
 8          and          )
                                  )
 9   STEVEN M. TAMKIN,        )
                                  )
10          and          )
                                  )
11   ROBERT J. DOMALESKI, JR.    )
                                  )
12          and          )
                                  )
13   XAVIER F. FERNANDEZ,       )
                                  )
14          and          )
                                  )
15   ANTHONY R. FREEMAN,       )
                                  )
16          Defendants.    )
17
18       Videotaped deposition of STEPHEN A. WALLACH
19   taken before TRACY L. BLASZAK, CSR, CRR, and Notary
20   Public, pursuant to the Federal Rules of Civil Procedure
21   for the United States District Courts pertaining to the
22   taking of depositions, at Suite 1000, 9550 West Higgins
23   Road, in the Village of Rosemont, Cook County, Illinois
24   at 9:26 a.m. on the 15th day of August, A.D., 2008.
25
```

1    relations committee?

2        A   I think there is policy language that discusses

3    what their function is.

4        Q   Other than as set forth in the UAL MEC policy

5    manual, do you have any other understanding of their

6    function?

7        A   As far as I'm concerned, they're a

8    communications -- a communications conduit.

9        Q   Who is the chair?

10       A   Of the industrial relation committee?

11       Q   Yes.

12       A   Steve Tamkin, Captain Steve Tamkin.

13       Q   Who are the members of the industrial relations

14   committee?

15       A   Current members -- MEC industrial relations

16   committee, current members as I have been told are

17   Xavier Fernandez, Rob Domaleski, and Anthony Freeman.

18       Q   We took the depositions yesterday of Captain

19   Fernandez and Captain Domaleski, and they both testified

20   that Mr. Freeman was not a member of the industrial

21   relations committee.  Can you explain that apparent

22   contradiction?

23       A   I was introduced to him as such.  Now, maybe he

24   is not a member of the MEC industrial relations

25   committee, he could be a member of a local industrial

1    relations committee, but that's as far as I know.

2        Q   When committee members are appointed to an

3    MEC-level ALPA committee, do you have to approve the

4    appointment?

5        A   It depends.  Sometimes I do, sometimes I don't.

6        Q   For the IRC do you?

7        A   The only person that I appointed was Captain

8    Tamkin.  And his committee is a committee that basically

9    he has control over the appointments below.

10       Q   And is the industrial relations committee

11   authorized to act on behalf of the MEC or you as the

12   master chair?

13       A   He is representative of the MEC and, as such,

14   carries out the policies and direction of the MEC and/or

15   master chairman.

16       Q   How frequently do you confer with Captain

17   Tamkin?

18       A   On official level?  He is a friend of mine, so I

19   talk to him --

20       Q   Well, on anything that concerns the Air Line

21   Pilots Association.

22       A   I would say infrequently, maybe a couple times a

23   month, maybe three or four times a month.  Very rarely

24   does he call me up because he knows how busy I am.

25       Q   Do you believe that you are kept informed of the

1    whoever received this flier about junior/senior manning.

2    And whoever put it in my mailbox had written on it this

3    is B.S.

4        And I immediately called up Captain Tamkin and

5    said what the heck is this?  This is a bunch of B.S.

6    Stop it.  Not implying that he had anything to do with

7    it, but that he had the communication ability to talk to

8    the pilots to stop it.

9        Q   Why did you call Captain Tamkin as compared to

10    any of the other ALPA representatives or employees?

11       A   Well, because, as I indicated to you, Captain

12    Tamkin has -- is a communication conduit that I use to

13    keep the pulse of the pilots and that he can immediately

14    communicate to the pilots.

15       Q   Are you aware of the phrase rat lists?

16       A   Not since this litigation.

17       Q   During the period in 19 -- excuse me, in 2007

18    and 2008 have you seen posted in crew rooms or other

19    public areas lists of pilots who had accepted

20    junior/senior manning assignments?

21       A   No.

22       Q   Have you seen posted derogatory comments about

23    pilots who take junior or senior manning?

24       A   No, not that I can recall.

25       Q   Other than -- well, strike that.

1   days meeting.  There was no testimony that they met for

2   two days.

3       MR. JERMAN:  Q   There was a meeting and then a

4   meeting the other day and they were, in fact, testified

5   to be short meetings, so I'll accept your concern there.

6       But they testified that after those meetings --

7   Strike that.

8       During two meetings that occurred on the 11th

9   and 12th they had a discussion about fatigue and that

10   Captain Tamkin said he was going to address it through

11   the institutional channels of ALPA.

12       My question to you is:  Following that meeting,

13   did Captain Tamkin contact you to discuss the issue of

14   fatigue?

15   A   Yes, he called to discuss the issue of fatigue.

16   Q   Okay.  Thank you.

17       Was that issue further discussed in the

18   meetings of the MEC, IRC, SPC, and FAC on June 19 and 20

19   in Chicago?

20   A   No.

21   MR. JERMAN:  Let's mark this as Exhibit 18.

22       (Exhibit 18 marked as requested.)

23   MR. JERMAN:  Q   Did you create a video message that

24   was sent to United pilots on or about June 25, 2008?

25   A   Yes.

1      Q  When did you first have such discussions?

2      A  I think the first time I had a discussion with

3   Captain Tamkin was either right before June 11th --

4   well, I think it was right before June 11th when I

5   started to become aware of this web site and there

6   started to be some chatter that I was hearing that there

7   was some discussion about sick list.

8         And I called up Captain Tamkin and in no

9   uncertain terms told him to use his communications

10   ability to stop it.

11      Q  And your best recollection is that was before

12   June 11th, which was the day before the picketing event?

13      A  It was sometime in that time frame.  I don't

14   know the exact date.  It was at some -- it was at some

15   point in June because I heard -- I started hearing this

16   chatter in, you know, late May, early June time frame.

17   And, of course, it was -- that's when I started hearing

18   it.

19      Q  When you talk about hearing chatter, can you

20   describe in more detail what that means?

21      A  That would be I would have -- there would be

22   anecdotal conversations related to me or I would be on

23   the forum and I would see -- you know, I would be seeing

24   something, just no specific, just all of a sudden talk.

25      Q  Between your first conversation in June and the

1    end of July, did you have any further conversations with

2    Captain Tamkin?

3        A   Yes, I had another conversation after the phone

4    call from Mr. McKeen expressing a concern about an

5    elevated sick list in the narrow body fleets and called

6    up Mr. Tamkin once again -- Captain Tamkin once again

7    and reinforced even more forcefully to stop it, use his

8    communication with the pilots to stop it.

9        Q   Did you in that conversation ask Captain Tamkin

10   what he knew about what was actually happening among the

11   junior pilots?

12       A   Yes, I asked him if he knew of anything.

13       Q   What did he say?

14       A   His response was he was not aware.

15       Q   He told you he wasn't aware of any possible

16   organized sick leave among the junior pilots?

17       A   Yes, that's what I -- that's what I took away

18   from that.

19       Q   Did you have any other conversations with

20   Captain Tamkin on this subject before the lawsuit was

21   filed?

22       A   No, not that I recall.  I think his exact words

23   were spontaneous combustion.

24       Q   What does spontaneous combustion mean?

25       A   I think it means that it was just something

1    to permit a continued repetition of the same questions.

2    You may answer.

3        THE WITNESS:  No.

4        MR. JERMAN:  Q   Was the attorney in question

5    Mr. Nichols?

6        A   Yes.

7        THE WITNESS:  Can we just take a minute here?

8        MR. JERMAN:  Take a five-minute break, that's fine.

9        THE VIDEOGRAPHER:  Going off the record.  The time

10    is now 2:10 p.m.

11        (a brief recess was taken)

12        THE VIDEOGRAPHER:  Going on the record.  The time is

13    now 2:14 p.m.  Please proceed.

14        MR. JERMAN:  This will be Exhibit 22.

15        (Exhibit 22 marked as requested.)

16        MR. JERMAN:  Q   Captain Wallach, let me represent

17    to you that Exhibit 22 is five pages from a document

18    production we received from the association.  And I

19    think we're going to have to jump around a little bit in

20    this exhibit to get it in chronological order, but

21    that's what I would like to do.

22        A   Sure.

23        Q   Beginning on the first page of the exhibit, is

24    that an e-mail that you sent to the chairman of the

25    grievance committee asking him to prepare a Do You Know

1    on fatigue?

2      A   Yes.

3      Q   And why did you ask the chairman of the

4    grievance committee to do this as compared to someone on

5    the safety committee or the medical committee?

6      A   Because Do You Knows are produced by the

7    grievance committee.

8      Q   And then if you could jump to the third page of

9    the document, at the bottom it says 005762.

10     A   Yes.

11     Q   Is that an e-mail that you received from Jerry

12   Schoofs, the chairman of the grievance committee, on

13   July 8, 2008, enclosing a draft Do You Know on fatigue?

14     A   Yes, it's actually Did You Know.

15     Q   Did You Know, sorry.

16         In the text of that he says, "Do you mind if I

17   run this past CASC for their input."

18     A   Yes.

19     Q   What is CASC?

20     A   Central air safety committee.

21     Q   And is that the committee within the ALPA

22   structure who is responsible for dealing with the safety

23   issues generally?

24     A   Safety issues, yes.

25     Q   And then if you could go to the second page of

1    the document, Bates stamped at the bottom A 005761, is

2    that an e-mail from you back to Captain Schoofs saying

3    that, yes, this is what you were looking for and to

4    please run it by the CASC?

5    A  Yes.

6    MR. JERMAN:  This will be Exhibit 23.

7    (Exhibit 23 marked as requested.)

8    MR. JERMAN:  Q  Okay.  If you go to the second page

9    of this document, 005727, there is an e-mail dated July

10    11, 2008, from you to Jerry Schoofs saying, "Jerry, how

11    is this coming along?"  Was that an e-mail you sent on

12    that date to find out where the draft was in progress?

13    A  Yes.

14    Q  And on that same date July 11 at 1:09 p.m. did

15    he send you an e-mail back saying, "Steve, finally got

16    everyone's input, negotiations, legal and safety, do you

17    want me to run this past Milone before we mail this

18    out"?

19    A  Yes.

20    Q  Does Milone refer to Jay Milone, the director of

21    labor relations at United Air Lines?

22    A  Yes.

23    Q  And then did you respond to that e-mail the same

24    day by asking Mr. Schoofs what his opinion is on running

25    it by Milone?

1      A   This apparently is an addendum -- or, I'm sorry,

2      a forward to the communications committee relative to

3      the system schedule committee, which is attached,

4      wherein the system schedule committee talks about

5      fatigue in their report.  And I have forwarded this to

6      the communication committee asking them that they need

7      to start highlighting fatigue in our updates.

8          Q   What was the reason that you wanted every update

9      to contain something about fatigue?

10     A   The reason was, is because the union responds to

11     their membership.  And the membership from everything

12     that we were hearing, whether it was from central -- or

13     safety, whether it was from scheduling, whether it was

14     from the line pilots, wherever, was complaining about

15     being fatigued.

16          And so it was an effort on my part to respond

17     to the membership that we hear you and we are attempting

18     to address fatigue.

19     Q   Could I refer you to the second to the last page

20     of Exhibit 24.

21     A   Second to the last page.

22     Q   Bates stamp No. 005678.

23     A   Yes.

24     Q   There are two charts at the top of the page,

25     one, two-year historical junior/senior manning events,

1    and right next to it, two-year historical crew

2    cancellations.

3      A   Yes.

4      Q   Did a version of those charts appear in every

5    system scheduling committee report?

6      A   I can't -- I don't know.

7      Q   Do you know why the system scheduling committee

8    elected to put the chart on historical junior manning

9    events and the chart on historical crew cancellations

10   right next to each other?

11     A   No, I don't know.

12     MR. ABRAM:  Assuming that they did that as opposed

13   to it coming that way from the company.

14     MR. JERMAN:  This will be Exhibit 25.

15       (Exhibit 25 marked as requested.)

16     MR. JERMAN:  Q   Is Exhibit 25 a copy of an e-mail

17   from Todd Daniels to you on July 14, 2008, acknowledging

18   your request to put fatigue updates in every MEC

19   publication?

20     A   Yes.

21     Q   And when he says, "Roger on the fatigue

22   emphasis," do you interpret that to mean, yes, I will

23   follow your direction on the fatigue emphasis?

24     A   I think that's what's stated in the e-mail

25   below.  So the answer would be yes.

## Donovan, Blair, IT Operations Services

| | |
|---|---|
| **From:** | Wallach, Steve, UALMEC Chairman |
| **Sent:** | Sunday, July 06, 2008 17:43 |
| **To:** | UALGrievance, UALMEC |
| **Subject:** | DYK Fatigue |

Jerry - I'd like t prepare a DYK on fatigue. Specifically a pilot's responsibilty for assessment, the FAR implications, how to do it - i.e. must show up and then call in fatigued - what to expect from company and what kind of representation they can expect from the union. If able, work the recent NTSB fatigue findings in to the piece. I'd like to look at a draft by the end of the week.  Thanks.

Sent from my TREO

1

A 005760

Hello, I'm MEC Chairman Mark Bathurst. Today, April 20, we announced the results of the membership ratification vote on the tentative agreement. A majority of those of you who voted rejected the agreement. With the vote now behind us, I can assure all of you that the MEC will take to heart the input you have provided and recommit ourselves to doing the best we can to live up to your expectations and deliver improvements to our contract. We work for you!

I want to take a moment tell you that the MEC, the Negotiating Committee and I respect the clear and direct contribution that many of you made to your local representatives since we released the early details of the agreement in principal. It is clear the TA did not satisfy all of your goals. But we are not done. As we have said, we have just getting started. We will continue to press for corrective change to our contract at every opportunity. I urge all of you to continue to contribute your energy and ideas as you have done during this ratification process. ALPA is you, and is most effective when we work collectively toward a common goal.

I cannot over emphasize the importance to all of us, however, that we embrace a new attitude about our contractual obligations. It is in no one's interest to waive anything in our contract. It is not in our collective interest to seize opportunities for personal gain at the expense of delaying collective contractual gains. If the contract does not say that a waiver requires pilot concurrence, the provision is not waivable and the company has no business asking that you do so. Even where the contract says that a provision may be waived with your concurrence, there may be adverse collective consequences to consider. For example, I have spoken to you previously about how the widespread use of junior-senior manning, which was originally designed as a tool for irregular operations and how it slows down recalls and promotions. This is only one example. Until our work rules and compensation are restored, these issues should be carefully considered before waiving any part of our contract.

It's hard for anyone to understand how management could expect a pilot, any pilot to show enthusiasm in an environment that has shown such callous disrespect for us as professionals.

I now want to turn our focus on what's next, which is the MEC's plan for our continuing steps in the FIX IT NOW campaign. Captain Jim Anderson, your Strike Preparedness Committee Chairman, is going to talk with you about his committee's planned activities, and your role in those activities. Before I introduce Jim, however, I want to remind you of a couple of things.

As we have repeatedly said, this TA is only the first step in the FIX-IT-NOW campaign.

The MEC has clearly heard your anger and frustration with management's bonuses while we toil under the bankruptcy contracts extracted from us. The MEC understands your frustration at the Company's refusal to fix trip trading, and refusal to address many quality of life issues that still to be need repaired. Equally important, we know that compensation is a critical component of any future discussions with the Company. The recently formed Union Coalition has also stressed issues that affect all employees and compensation is high on that list. ALPA's recommendation to withhold your vote for the reelection of the 10 independent members of the Board of Directors as echoed by the AFA, is yet another example of our collective voice being heard by management and the world outside United.

In every action our union takes, in every action our union undertakes, the key to success is you. Achieving anything meaningful prior to contract 2009 centers on a pilot group focused on the issues that affect our work life and all of us supporting the ongoing efforts to solidify the unity that empowers our negotiators at the table.

With that, I want to introduce to you your SPC Chairman, Captain Jim Anderson. Jim.

2

**Captain Jim Anderson**
**Chairman, UAL-MEC Strike Preparedness Committee**

Thanks Mark.

As Mark said, the outcome of the TA is behind us. Your SPC is focused on the next several steps of the FIX-IT-NOW campaign. As we have repeatedly said, the TA was only the first step and if we are to succeed, we need your help. Whether you personally voted for or against this TA, the powerful feedback you gave to the MEC after the AIP was released is the energy that the SPC is going to harness. We all need to accept that our future endeavors are complex and multi-faceted.

Many of you think that management hasn't heard how angry you are at the current state of affairs at United. Many of you think that they can put us off, talk to us when they want and leave us dangling the rest of the time. Well, guess what? They're wrong.

We're going to talk to the MEC the week of April 23 in Denver about our plans. Here's an advance look at what we are going to recommend.

All ALPA pilots groups, as well as the APA pilots, are dealing with managements who have adopted a similar approach to their attack on our profession. Is it a coincidence? Most of these other pilot groups have initiated public campaigns, and beginning May 3rd, your SPC will commence an informational picketing schedule that will take our message to the traveling public. I am personally asking you to join us on the picket lines in your domicile or on a layover.

Nothing that I am about to say to you today or anything that the SPC will ask you to do in the coming months should hinder the exercise of good judgment and the utmost discretion when dealing with our fellow employees, and the traveling public.

Remember: Our dispute is solely with the United Airlines management.  It will be a further measure of our solidarity as a union and our maturity as individuals as we embrace the collective decision on this TA and go forward to reassert our career expectations.  Step by step, section by section, one for all, all for one.

The FIX-IT-NOW campaign ends only when United pilots say it ends.  The logical transition will be the campaign to have a new contract in place as a just reward for our sacrifices well in advance of the amendable date in 2009.  The energy and focus of the pilots must be sustained for the next several years if we are to capitalize on the momentum you have already created. Sustaining momentum requires a unified effort.  Your involvement is vital to our success.  Send me an email at strikeual@alpa.org and say: "Count me in."  Wear a FIN button; display your support for the SPC.

Management has led a calculated assault against the pilots of United Airlines utilizing the bankruptcy court to end their obligation to fund our pension and to gut our collective bargaining agreement.  With the concurrence of the Creditor's Committee, management was allocated tens of millions of dollars in stock while we only got a negotiated claim.  Management's "shared sacrifice" mantra to save United seems to have been nothing but a simple public relations slogan.

"Shared sacrifice" seems now to be nothing more than a ploy to gain our cooperation in a plan with a hidden agenda; an agenda that would ultimately transfer the previously earned wealth of employee pensions and the product of massive pay cuts into management's pockets.

Outrageous stock and options awarded to upper management, right after bankruptcy exit certainly doesn't seem like sharing to me.  Management missed a golden opportunity to lead our airline in refusing to share these newfound riches with the employees.  The SPC's message is

4

simple: "United Management, we refuse to stand by silently while you continue to line your pockets."

Let me speak to the realities of negotiations. Whether it's a Tentative Agreement, a Letter of Agreement or a new Contract, the Company sits across the table from our Negotiating Committee. One of the keys to our Negotiating Committee's success is the backing of a unified pilot group. Leverage is a word that has been bandied about among our pilot group lately. There is no better leverage than having a unified voice sitting at the bargaining table. That is where our real power resides.

One thing management fears is a unified pilot group. They realize they are up against an intelligent, passionate group of individuals who have an expertise that this airline cannot operate without. You want leverage? There is no better leverage than everyone pulling on the same end of the rope.

My committee's mission is to cultivate that unity among our pilot group. The SPC has a very different mindset than most of the committees you are used to seeing in ALPA. We are proactive, as well as reactive. We are an offensive tool, an action arm of the ALPA structure. We are not political. And the SPC is only as effective as its support. And that support comes from volunteers such as you working on your local SPC committee or getting involved in Family Awareness. Regardless of your ALPA politics, if you want power and leverage, then you need to work for it by stepping forward and getting involved.

SPC is all about strategy, tactics, and consequences. SPC is all about harnessing your anger and your energy and your brains; then converting that into leverage that our negotiators can literally take to the table with them. If you have any doubt about what leverage is and what it can

accomplish, please talk to some pilots who remember previous negotiations;  Unity worked and will work again.  It's up to all of us.  We have to keep our eye on our enemy.  Our fight is not with our fellow pilots.  Our fight is not with our fellow employees or our customers. Our fight is with a management team that believes that sharing ends at the sacrifice stage.

So where are we now?

Our collective bargaining agreement is under the Railway Labor Act.  We are required to follow the law.  The SPC's job is to prepare you for a strike at United.  Simply said, if things don't change in the pilot contract, we will strike when released by the National Mediation Board. There is no such thing as too much planning.  Sufficient preparation should provide our negotiators the capability to achieve our goals without the need to use the strike weapon. Nevertheless, if a strike becomes inevitable, the better prepared and unified the pilot group is, the shorter and less damaging to all parties the strike will be.  SPC does not desire, look forward to, advocate or encourage a strike at United.  What we will do, to the best of our ability, is lead  you through the proper preparations, enabling you to demand that your career expectations are met and your professional expertise is fairly compensated.

That key word, in case you missed it, is lead.  SPC is leading the effort to deliver the leverage that you develop in the daily operation.   If you want to be a leader, step forward!  SPC welcomes your ideas.  If you are willing to join the leaders, and support the SPC with your energy and your passion, step forward!  SPC welcomes you.

As soon as you finish watching this video, send an email to me at strikeual@alpa.org and get involved.  Our strategy is contingent upon each of you stepping forward.  We must speak with one voice to assure the clarity of our message.  We need to hear you say, "count me in."

If you choose to rationalize that, somehow, United management will wake up and recognize on their own the intrinsic value of pilots to an airline, or, if you want to play footsie with a pseudo group of malcontents who do not have a clue that ALPA is the 800 pound gorilla in the room; then go on your own way.  SPC has no time to waste on you and the rest of the United pilots cannot count on you.

Each pilot at United has had many opportunities to analyze the facts of our situation.  Supporting SPC is the only logical choice to force change.  I need your name on the list, your FIN button on your uniform, and your heart in the fight.  I need to see your support today.

Last month, I sent you a letter entitled, "The More Things Change, The More They Stay the Same."  Since then, we have developed a solid roster of volunteers.  You can join us by emailing strikeual@alpa.org and say count me in.  It is time to decide where you stand.  It is time to demonstrate your commitment.  It is time to step up and be ALPA.

Our first round of informational picketing has been set.  On May 3, we will be in Washington, D.C.  On May 8, we will be in San Francisco, and May 10, in Chicago.  Details of each event will be sent to you by your local SPC Chairman shortly.  I will see you on the picket line and I will look for your name on the list of those who support the SPC.  Thank you.

Wallach 12

Page 2 of 2

**Produced by the MEC Communications Committee**

*Friday, January 25, 2008*

*Today was the 25th day that the Company could have sat down with its pilots to discuss a fair and equitable contract. They chose not to.*

## What's New

**The United MEC today adopted** the following resolutions during the MEC Meeting in Chicago:

**BE IT RESOLVED** the MEC directs that the UAL-MEC Policy Manual be revised to include wording specifying that, although allowed in the Collective Bargaining Agreement, the UAL-MEC does not endorse the use of JRM/SRM as a manpower planning tool.

Carried Unanimously

**PROPOSED SOLUTION:**
BE IT RESOLVED the UAL-MEC approves a change to the UAL-MEC Policy Manual, Volume II, Section XIV as follows:
SECTION XIV - SCHEDULING AND HOURS OF SERVICE

C. General:

1. Flight and Duty Time Limitations:

f. Although allowed in the Collective Bargaining Agreement, the UAL-MEC does not endorse the use of JRM/SRM as a manpower planning tool.

✈✈✈

## Donovan, Blair, IT Operations & Services

**From:**   Wallach, Steve, UALMEC Chairman
**Sent:**   Tuesday, July 08, 2008 10:59
**To:**     Schoofs, Jerry, UAL MEC Grievance
**Subject:** RE: Fatigue DYK

Hi Jerry – Yes, this is along the lines of what I'm looking for.  Please run it by CASC and we can put the finishing touches on it by the end of the week.

Thanks.

Captain Steve Wallach
UAL MEC Chairman
Air Line Pilots Association
847.292.1701    Phone / Cell 415.246.9534
847.292.1705    Fax

*** NOTICE***Disclosure/ Confidential: By receipt of this communication, you are hereby notified that this communication and any files or documents attached to it are intended only for the sole use of the person (s) or entity to which it is addressed.  It contains information that may be privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient of this communication as depicted by the addressees "To" or "Cc" or "Bcc", you are hereby notified that the copying of, distribution of or other use of this communication is strictly prohibited without our express written permission.  If you have received this communication in error, please notify the sender immediately by electronic mail and destroy all forms of this communication (electronic or paper).

**From:** Schoofs, Jerry, UAL MEC Grievance
**Sent:** Tuesday, July 08, 2008 7:25 AM
**To:** Wallach, Steve, UALMEC Chairman
**Subject:** Fatigue DYK

Steve,

I have attached a first draft.  Is this what you had in mind?  Do you mind if I run this past CASC for their input?

Jerry Schoofs, Chairman
UAL - MEC Grievance Committee



Notice: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication without the permission of the sender is strictly prohibited. Please reply to the sender if you have received the message in error, then delete it. Thank you.

**A 005761**

8/11/2008

## Donovan, Blair, IT Operations & Services

| | |
|---|---|
| **From:** | Schoofs, Jerry, UAL MEC Grievance |
| **Sent:** | Tuesday, July 08, 2008 10:25 |
| **To:** | Wallach, Steve, UALMEC Chairman |
| **Subject:** | Fatigue DYK |
| **Attachments:** | Fatigue DYK.doc |

Steve,

I have attached a first draft. Is this what you had in mind? Do you mind if I run this past CASC for their input?

Jerry Schoofs, Chairman
UAL - MEC Grievance Committee



Notice: This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication without the permission of the sender is strictly prohibited. Please reply to the sender if you have received the message in error, then delete it. Thank you.

A 005762

8/11/2008

# Did You Know

## Fatigue

Fatigue is something we all have dealt with during our flying careers. It is insidious, in that it affects your judgment, allowing to you decide that you can continue to fly even after you should have stopped for the day.

Setting duty limits that take into effect fatigue research, circadian rhythms, as well as sleep and rest requirements is on to the NTSB most wanted list. After issuing a NPRM in 1995, the FAA still has not set a timeline to issue the new regulations. Meanwhile accidents continue occur, pilots and passengers continue to be injured or kill in accidents where pilot fatigue is listed as a probable cause.

With the amount of flying that the United pilots are forced to do under the post bankruptcy contract it has become even more important that we review our physical condition prior to every flight. *You* are the final authority on whether or not you are rested enough to fly your assignment.

On February 2, 2000, Captain Steve Forte, then the Senior Vice President – Flight Operations sent a letter to all United pilots notifying us of United's fatigue policy. Captain Forte's letter states in part, "no pilot should ever feel pressured to accept an assignment when not properly rested". Since that date, the Company incorporated the policy into the Flight Operations Manual.

The FOM Fatigue Policy states;

*It is the pilot's responsibility, as a professional, to decide if he is not adequately rested for an assignment. Should a pilot feel that safety of flight may be jeopardized, call the Crew Desk to advise them of inability to continue due to fatigue, inform the Crew Desk when once again available for an assignment, and then fill out an Operational Report.*

The policy as stated above is quite clear. If you are not "adequately rested" and you feel that the "safety of flight may be jeopardized", you are *required* call the crew desk to inform them that you are too fatigued to conduct the flight. You should plan to give the crew desk an idea how much rest you believe you will need, and at what time you believe you may once again begin your duties. Obliviously, the time that you give to the crew desk is only an approximation. You may find that you may need more or less rest then originally thought.

Once you have completed your phone call with the crew desk reporting that you are too fatigued to continue, complete a FSAP report. This allows the Central Air Safety Committee to monitor the level of fatigue on the line.

If you should ever be pressured by a Company official to continue to fly when calling in fatigued, *immediately* contact your Local Council Representative. If a Company official

**DYK 2008-XX**

A 005763

attempts to pressure you to fly include the details of the conversation as well as their name and position within the Company in your FSAP report. Neither Flight Managers, nor a FODM may order you to fly when calling in fatigued. *This is not only a contract issue but a safety issue.*. Remember, you never have to show at the airport to call in fatigued. Once again if ordered to do so, contact your LEC representative *immediately*.

Your monthly pay is affected by calling in fatigued. Pilots will not be paid for scheduled flying not completed due to the fatigue call. Reserves will not have their monthly pay reduced below the minimum monthly guarantee of 70 hours.



**DYK 2008-XX**

**A 005764**