**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| UNITED AIR LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **No. 08 CV 4317** |
| v. | ) | |
| | ) | **Judge Joan H. Lefkow** |
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL; STEVEN M. | ) | |
| TAMKIN; ROBERT J. DOMALESKI, | ) | |
| JR.; XAVIER F. FERNANDEZ; and | ) | |
| ANTHONY R. FREEMAN, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, United Air Lines, Inc. ("United"), filed a complaint on July 30, 2008 seeking

declaratory and injunctive relief under Section 2, First of the Railway Labor Act ("RLA"),

45 U.S.C. § 151 *et seq.*, against the Air Line Pilots Association, International ("ALPA") and four

United pilots—Steven M. Tamkin, Robert J. Domaleski, Xavier F. Fernandez, and Anthony R.

Freeman[1]—who are members of an ALPA committee known as the Industrial Relations

Committee ("IRC") (collectively, "defendants"). United alleges that ALPA has been engaged

for more than a year and a half in a campaign to pressure United to reopen the parties' collective

bargaining agreement ("CBA") through unlawful activity. The court's jurisdiction rests on

28 U.S.C. §§ 1331 and 1337.

---

[1] As addressed in detail below, the evidence is conflicting as to whether Freeman is a
member of the IRC and, if so, when he was appointed to that position. Nevertheless, both
plaintiff and defendants, at various points in their written submissions, have referred to Freeman
as a member of the IRC, and for the sake of simplicity, the court will do so here as well.

Before the court is United's motion for a preliminary injunction, on which the parties have presented evidence and testimony during an in-court hearing, submitted proposed findings of fact and conclusions of law, and orally presented final arguments to the court. Based on the evidence received, the proposed findings of fact and conclusions of law, and the arguments of the parties, the court enters the following findings of fact and conclusions of law under the provisions of Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

### I.  Overview of the Present Action

United alleges that in December 2006, ALPA launched a public campaign to pressure United to reopen the CBA by encouraging United pilots to engage in various actions intended to increase United's costs and to cause flight delays and cancellations. The elements of this campaign, which United alleges has both intensified and expanded in scope over the past 18 months, include encouraging pilots (a) to "fly the contract," (b) to refuse to voluntary waive provisions of the contract even if they are designated as waivable, (c) to refuse voluntary flight assignments known as "junior/senior manning," (d) to increase fuel consumption, (e) to refuse to operate aircraft with deferrable maintenance items, and (f) to take excessive time in pre-flight cockpit checks. Most recently, United alleges that in July 2008, ALPA and the four individual defendants coordinated a "sick-out" among United's junior pilots that, combined with ALPA's campaign against the acceptance of voluntary flight assignments, caused several hundred flight cancellations, affecting over 30,000 United customers.

Additionally, on August 1, 2008, shortly after being served in this action, ALPA, pursuant to negotiations with United, agreed to publish to the United pilots whom it represents

certain statements indicating that pilots should not engage in activities, such as calling in sick when they are not ill, that may disrupt operations and emphasizing that ALPA does not condone such conduct. That agreement has been described by the parties as the "Standstill Agreement." Pursuant to the Standstill Agreement, ALPA also published a negotiated statement on junior/senior manning to United's junior pilots, though it did not do so until August 13, 2008.

In response to United's motion, defendants argue that (a) United's disputes with ALPA regarding junior/senior manning and waiver of contract provisions are minor disputes that fall outside the court's jurisdiction; (b) United's claim challenging ALPA's conduct and communications regarding junior/senior manning and contract waivers is barred by the applicable six-month statute of limitations; (c) United has established only that there was an elevation in sick leave usage that was expected by the company as a result of its announcements of fleet reductions and resulting furloughs, not that there was an organized sick-out; (d) ALPA's statements to pilots in August 2008—indicating that they should not engage in activities that may disrupt operations and emphasizing that ALPA does not condone such conduct—obviate the need for a preliminary injunction; and (e) United has not satisfied the requirements of the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. §§ 101–115, for an injunction in this labor dispute.

## II.  The Parties

United, headquartered in Chicago, is the second largest airline in the United States, with both domestic and international operations. United is a carrier subject to the RLA. On an average day, United operates more than 1,500 flights and carries more than 200,000 customers. United presently employs approximately 55,000 employees, of whom about 6,500 are pilots.

ALPA is the certified collective bargaining representative for pilots employed by United. Under ALPA's constitution and bylaws, ALPA's United Master Executive Council ("the MEC or "UAL MEC") has authority and responsibility for representing United pilots. The MEC is comprised of the top three officers of each of the Local Executive Councils ("LECs"), which are local ALPA units that represent United pilots at a particular pilot domicile. The MEC Chairman, who is the highest-ranking ALPA officer at United, is elected every two years by the MEC. In 2007, Mark Bathurst was the MEC Chairman. In October 2007, the MEC elected Stephen Wallach as Chairman. Wallach officially took office on January 1, 2008 but began performing certain functions of the Chairman immediately following his election.

One of the MEC's principal communication vehicles for its membership is a website on which the MEC posts a newsletter called the "MEC Update" two or three times a week, correspondence and video presentations from the MEC Chairman, MEC statements and committee reports, and video presentations from other MEC entities. The MEC also emails these communications to those United pilots—approximately 90% of members—who have provided ALPA with their email addresses. Most of the MEC communications received in evidence during the preliminary injunction hearing were posted on the ALPA web site.

In addition, ALPA uses a variety of communications systems that are limited to ALPA members. One of these systems is a password-protected website known as the UAL MEC Forum, in which ALPA members may post statements to other United pilots. The UAL MEC Forum is divided into a series of topic-oriented sites and has been described as a place where "pilots can go and B.S. with each other." Wallach Dep. 41:22–23. Other communications systems limited to ALPA members include telephone trees and text messaging systems that the

MEC and its committees use to send time-sensitive information to United pilots, as well as a "Pilot to Pilot Committee" which sets up information tables in pilot domiciles at which volunteers can privately communicate information from ALPA to United pilots.

The IRC consists of three to four members (sometimes referred to as officers)[2] and includes a chairman. The IRC Chairman, who is appointed by the MEC Chairman, appoints the other members of the IRC. The IRC also maintains a network of more than a dozen local coordinators (sometimes referred to as local members or lower-level members),[3] who carry out the IRC's directions at each pilot domicile. *See, e.g.*, Tamkin Dep. 59:22–61:17. The MEC Chairman directs the operations of the IRC through the IRC Chairman, who transmits the instructions to the other members. The IRC members pass these instructions to the IRC's local coordinators who, in turn, pass those instructions to pilots through a network of ALPA allies whose number the current IRC chairman estimated at several hundred. Tamkin Dep. 76:23–77:7. The IRC also functions as an intelligence-gathering operation, using the same reporting structure in reverse.

According to the UAL-MEC Policy Manual, one of the central responsibilities of the IRC is the "formulation and implementation of labor actions." Pl.'s Ex. 24, at 2; *accord* Domaleski Dep. 50:20–51:8. The IRC operates secretly, communicates only in person or by telephone, and does not commit anything to writing, eschewing both email and text messaging, all for the acknowledged purpose of avoiding a "written trail" of its communications, which generally

---

[2] *See, e.g.*, Domaleski Dep. 37:6–41:2.

[3] *See, e.g.*, Freeman Dep. 23:5–24:8.

concern "labor strategies and negotiation-type strategies." *See, e.g.*, Domaleski Dep. 59:21–60:19.

Defendant Tamkin is the Chairman of the IRC, a position he has held since approximately April 2007. He was hired by United in 1985 and currently serves as a Captain on the A320 aircraft. Tamkin served as an IRC local coordinator from 1987 to 1993 and as an IRC member from 1993 to 2001. Tamkin testified in his deposition that "it was implicit" when he was appointed Chairman of the IRC that ALPA wanted to take a more "aggressive" or "progressive" stance in labor relations with United.[4] Tamkin Dep. 18:24–19:12. Tamkin describes himself as having a "close personal affiliation" with MEC Chairman Wallach and testified that he provided Wallach with "frequent and continuous" oral status reports on the IRC's actions. Tamkin Dep. 83:14–24.

Defendant Domaleski is the Vice-Chairman of the IRC. He was hired by United in 1985 and is currently a Captain on the B-777 aircraft. Domaleski served as an IRC local coordinator in 2000.

Defendant Fernandez is Secretary of the IRC. He was hired by United in 1995 and is currently a Captain on the B-737 aircraft.

Defendant Freeman, currently a First Officer on the A320 aircraft, was hired in March 2000, furloughed in January 2003, and recalled to active service in August 2006. Freeman was one of 2,172 United pilots—a group that refers to itself as "the 2172"—who were furloughed following September 11, 2001. In December 2007, Freeman created a website, ual2172.com, to

---

[4] Tamkin initially used the term "aggressive" but later asserted that the word he meant to use was "progressive." Tamkin Dep. 19:6–20:2.

facilitate communications to the 2172 and protect their mutual interests as the most junior pilots at United. There is no evidence that Freeman received assistance from ALPA in creating or maintaining the website. The website is password-protected, and access is allowed only to pilots who were furloughed after September 11 and are personally approved by either Freeman or one of the two other website administrators. The three administrators also communicate directly, through mass e-mails, with pilots who participate in the website. Freeman testified that the ual2172.com accounts of pilots who signed up with United e-mail accounts "have been deleted," Freeman Dep. 62:2–9, presumably in order to prevent United management from monitoring emails from the website. In early June 2008, Freeman and the other two administrators also established a phone tree system, which would not leave a paper trail. In emails and messages posted on ual2172.com, Freeman warned participants that the website was not completely secure and that only the phone tree system should be used if the content of a communication was something that "just [was]n't meant for paper or electronic communication." Pl.'s Ex. 179.

The deposition testimony of the four individual defendants is conflicting as to the dates of their respective appointments and, more significantly, whether Freeman is, or ever was, a member of the IRC.[5] All four agreed that Tamkin was Chairman of the IRC, Domaleski was Vice-Chairman, and Fernandez was Secretary. Tamkin testified that he was appointed in April 2007 by then-MEC Chairman Bathurst and that he appointed Domaleski, Fernandez, and Freeman in April 2007. Tamkin Dep. 12:20–25, 17:16–18:8. Domaleski, however, testified that he, Tamkin, and Fernandez were appointed to the IRC around November 2007 to support

_____

[5] The four individual defendants testified only at their depositions prior to the preliminary injunction hearing; none of the four was called to testify at the hearing.

newly-elected MEC Chairman Wallach, and that Freeman was *not* a member.[6]  Domaleski Dep.

37:6–41:2, 57:16–58:19.  Fernandez testified that he, Tamkin, and Domaleski were appointed in

May 2007, but he agreed with Domaleski that Freeman was *not* a member of the IRC.

Fernandez Dep. 16:20–24, 18:3–10.  Freeman himself testified that he *was* a member of the IRC,

appointed in approximately June 2007 and that the only other members were Tamkin,

Domaleski, and Fernandez.  Freeman Dep. 23:5–24:22.  In their most recent written submission,

presumably authored by their mutual counsel, defendants assert that Freeman is a member of the

IRC but do not specify when he was appointed to that position.  Defs.' Proposed Findings of Fact

¶ 160.

These discrepancies are material and cast doubt on the candor of the deposition testimony

of the IRC members, particularly with regard to a meeting among the four pilots on June 11,

2008 and their role in the July sick-out, both of which are addressed in detail below.  If Freeman

was not a member of the IRC, it would have been difficult for defendants to provide an innocent

explanation as to why he met with the IRC members on June 11, 2008.  Similarly, the date of

their appointments to the IRC bears on the issue of whether the IRC, which had been

"disbanded" at the end of 2000, Domaleski Dep. 79:24–81:11, was reactivated during former-

MEC Chairman Bathurst's tenure or after Wallach was elected MEC Chairman.  The

inconsistencies as to those dates could thus reflect an effort by IRC Chairman Tamkin and MEC

---

[6]  Specifically, Domaleski testified that Freeman was merely an IRC local coordinator, but not an upper-level "member" or "officer" of the IRC.  Domaleski Dep. 37:6–41:2.  Indeed, Domaleski indicated that he first met Freeman at a meeting in Los Angeles on June 11, 2008, at which time he "very curious about" why Freeman was there because "it was just Steve [Tamkin], X[avier Fernandez], and myself [that] were members of IRC, so it was very unusual for [Freeman] to be there."  Domaleski Dep. 40:21–41:2.

Chairman Wallach, whom Tamkin describes as a close friend, to place responsibility for reactivating the IRC on Wallach's predecessor, Bathurst, rather than on Wallach.

In its reply memorandum filed on August 22, 2008, well in advance of the evidentiary hearing, United argued at some length that these discrepancies cast serious doubt on the individual defendants' credibility and asserted that the defendants' "characterization of [their] actions in their Opposition Memorandum is utterly incredible." Pl.'s Reply (Dkt. No. 57), at 10–15. The four IRC members were on the witness list filed by defendants prior to the evidentiary hearing and were present in court throughout the hearing, yet were not called as witnesses to rebut United's interpretation of the evidence. Under these circumstances, the failure of defendants to call any of the IRC members or otherwise explain the discrepancies in the defendants' testimony casts even further doubt on ALPA's position that Freeman was a member of the IRC. Indeed, the preponderance of the evidence is that he was not a member at the time of the June 2008 meeting and that those who attended were less than candid about what occurred at that meeting.

### III. History and Background of the Current Labor Dispute

Both sides presented evidence regarding the history and background of labor relations between United and ALPA, including a pilots' strike at United in 1985, and a slowdown by United pilots during contract negotiations in the summer of 2000.

In May 1985, a highly contentious strike by United pilots occurred. During the strike, which lasted about a month, United hired permanent replacements for the striking pilots. Approximately 600 to 700 pilots either crossed the picket line or were hired by United and went

to work during the strike.[7]  The parties negotiated a "Back-to-Work Agreement" when the strike

ended.  That agreement provided that United would continue to employ the pilots who were

hired during the strike and that there would be no retaliation by United against the striking pilots

or by ALPA against the pilots who worked during the strike.

Although the parties offered some testimony regarding the background of the 1985 strike

and the numerous legal disputes arising out of it, the court need not rely on such testimony here,

because the background of the strike is set forth at length in *Air Line Pilots Assoc. Int'l* v. *United

Air Lines, Inc.*, 614 F. Supp. 1020 (N.D. Ill. 1985) (*modified*, 616 F. Supp. 849 (N.D. Ill. 1985)),

*aff'd in part and rev'd in part*, 802 F.2d 886 (7th Cir. 1986); *Air Line Pilots Assoc., Int'l* v.

*United Air Lines, Inc.*, 802 F.2d 886 (7th Cir. 1986), *cert. denied*, 480 U.S. 946 (1987); and

*Rakestraw* v. *United Air Lines, Inc.*, 765 F. Supp. 474 (N.D. Ill. 1991), *aff'd in part and rev'd in

part*, 981 F.2d 1524 (7th Cir. 1992).

Despite the no-retaliation provisions of the Back-to-Work Agreement, pilots who worked

during the strike were subjected to a pattern of ostracism and harassment by the striking pilots

for many years following the strike.  The ostracism included striking pilots' refusal to engage in

conversation or shake hands with non-striking pilots, outcomes that were likely exacerbated, if

not facilitated, by ALPA's issuance to striking pilots of a special ALPA pin known as the "battle

star," which made it possible to identify non-striking pilots.  Evid. Hearing Tr. 216:24–217:15.

Other forms of harassment included clicking a toy clicker whenever a non-striking pilot entered

a work area; theft and damage of flight bags and other personal belongings; pouring liquids,

---

[7]  United had anticipated that it would utilize approximately 570 new-hire pilots whom
the airline had trained before the strike.

urinating, or defecating into the flight bags of non-striking pilots; sending magazine subscriptions or other unsolicited materials to the homes of non-striking pilots; harassing phone calls and mail; and personal confrontations with non-striking pilots. According to Paul Vanderheiden, United's former Managing Director of Labor Strategy, the harassment had such a debilitating effect on the non-striking pilots that many ultimately resigned their employment. The continued ostracism and harassment of non-striking pilots in the two decades following the 1985 strike created a widely-held perception among United pilots that any pilot who did not follow the majority, or ALPA, party line would be subject to similar conduct.[8]

United presented at the hearing evidence that similar types of harassment have been directed at pilots who failed to follow ALPA's directives to "fly the contract" during both a pilot slowdown in 2000 and the current campaign to reopen the CBA (both of which are discussed further below). Examples of more recent harassment include the posting on bulletin boards of pilots' names, personal information, and printouts showing that they had accepted voluntary overtime assignments (often referred to as "junior/senior manning"); harassing notes left in pilots' mailboxes; magazine subscriptions or other unsolicited materials sent to pilots' homes; and harassing phone calls.

In 1999, United and ALPA entered into negotiations for a new collective bargaining agreement to replace the then-operative agreement, which became amendable[9] in April 2000.

---

[8] Defendants failed to produce evidence to rebut the testimony regarding pilot perceptions of the harassment they faced if they did not follow ALPA's directives.

[9] An "amendable date" is a term of art under Section 6 of the RLA, 45 U.S.C. § 156, which effectively dictates the duration of an agreement by providing a period of time during which neither party can unilaterally compel negotiations to modify the agreement. *See Equal*

(continued...)

With respect to those negotiations, United agreed, in a contract dated November, 20, 1998, that it would seek to negotiate a "seamless" agreement, meaning that the new agreement would take effect upon the amendable date of the then-existing agreement. When a new agreement was not achieved by April 2000, ALPA used the IRC to help implement a slowdown campaign by passing messages to pilots instructing them to refuse voluntary overtime flying and decline contract waivers. For example, defendant Domaleski testified that as an IRC local coordinator in the summer of 2000, he "[c]ommunicat[ed] a message to pilots that they didn't have to pick up overtime flying" and also told them to "fly according to the FARs [Federal Aviation Regulations], the flight operations manual, and the contract." Domaleski Dep. 55:12–17. Other evidence that ALPA implemented a slowdown campaign during the summer of 2000 includes (a) statistical evidence showing dramatic increases in flight delays and cancellations attributable to pilot actions (such as refusals to depart with minor equipment problems or delays in completing pre-flight checklists), beginning in April 2000 and decreasing abruptly after the parties reached agreement; (b) publications by ALPA during 2000 that openly encouraged members to "fly the contract" and engage in other actions designed to put pressure on United to agree to ALPA's demands; and (c) the testimony of ALPA's principal witness, MEC Coordinator and Senior Legal Counsel Robert Nichols, who implicitly admitted that United pilots had engaged in a slowdown during the summer of 2000.[10]

---

[9](...continued)
*Employment Opportunity Comm'n* v. *United Air Lines, Inc.*, 755 F.2d 94, 99 (7th Cir. 1985) ("[T]he service of the [Section 6] notice is the mode of amendment, implying that what is not sought to be changed continues in effect.").

[10] Although Nichols asserted that factors that affected delays that summer included
(continued...)

United has presented evidence that the summer 2000 slowdown was in many respects substantially the same as what has occurred in ALPA's current campaign to reopen the CBA. These include delays in completing pre-flight checklists, refusal to depart with minor equipment problems, refusal to waive contractual rest and duty requirements, and refusal to accept junior/senior manning assignments. Statements that appeared in ALPA publications in 2000 encouraging pilots to engage in a slowdown that summer are markedly similar to statements appearing in ALPA's publications over the last 18 months. For example, ALPA publications during both time periods included communications instructing pilots to "fly the contract" and "honor the contract." *Compare, e.g.*, Pl.'s Exs. 16–17 *and* Evid. Hearing Tr. 225:23–227:4, 228:9–15 *with, e.g.*, Pl.'s Ex. 25. Similarly, communications during both periods discouraged pilots from waiving sections of the contract and discouraged the acceptance of junior/senior manning assignments.

Some of the ALPA publications in 2000 expressly encouraged ALPA members to confront pilots who were not following ALPA's directives to refuse contract waivers or voluntary flight assignments. For example, a 2000 publication from one of the LECs stated,

> For a year now [we] have asked [you] to . . . honor your contract, write up broken airplanes and have them fixed, and not cut deals with the crew desk or others to the detriment of our pilot group. We encouraged you not to defer your vacation. . . . *If your peers are dogging it, bring it to their attention. Many pilots continue to believe their*

---

[10](...continued)
weather issues in the Midwest and air traffic controller issues, he also testified that what took place during the summer of 2000 was due, in part, to United's "failure to live up to their commitment to . . . achieve a seamless agreement" and suggested that "the company is the party that took the hay out of the . . . loft, spread it all around the outside of the barn, dumped gasoline all over it, and then gave the match to the pilots." Evid. Hearing Tr. 637:9–23.

> *little secret will either not be found out or doesn't really matter to the rest of the pilots.*
> All it takes is for another pilot to get screwed by a slimy do-gooder and it matters greatly.

Pl.'s Ex. 16, at 4 (emphasis added); *accord* Evid. Hearing Tr. 227:10–228:1. Pilots who accepted junior/senior manning or other voluntary flying assignments during the summer of 2000 were subject to harassment that was similar in many respects to the harassment of non-striking pilots following the 1985 strike, including posting their names on bulletin boards, often with derogatory comments written about them, receiving notes in their company mail files, and receiving phone calls at their homes warning them not to accept these assignments. The acceptance of junior/senior manning assignments decreased dramatically during the summer of 2000.

The delays and cancellations caused by ALPA's campaign damaged United operations and reputation. In the face of this, United agreed to a tentative agreement on a new collective bargaining agreement in late August 2000 that provided wage increases in the range of 30 to 40 percent. The day after that agreement was reached, delays and cancellations declined to "near normal" levels. Evid. Hearing Tr. 85:21–86:2.

Approximately 90 percent of United's current pilot workforce was employed by United during the summer of 2000. Accordingly, the court can infer that in 2007 and 2008, United pilots (a) understood how the elements of a slowdown campaign could be implemented; (b) understood what ALPA intended when it used terms such as "fly the contract"; (c) understood that failure to comply with ALPA's directives could result in harassment by other pilots; and (d) believed that a slowdown campaign could create "leverage" in negotiations with United that would likely create a favorable contract settlement.

The evidence regarding the 2000 negotiations also provides context for some of the communications by ALPA and its members in connection with the current dispute.  For example, in an April 20, 2007 video message to United pilots, Jim Anderson, the current Chairman of ALPA's Strike Preparedness Committee ("SPC") said, "If you have any doubt about what leverage is and what it can accomplish, please talk to some pilots who remember previous negotiations."  Pl.'s Ex. 1B, at 6.  On a similar note, during a debate in September 2007 among candidates for chairmanship of the MEC, soon-to-be-elected MEC Chairman Wallach stated, "Contract 2000 was obtained due to line pilots forcing the company to negotiate.  Our strength[] is with the line pilot.  Unless you guys take control of your destiny, it ain't gonna happen." Evid. Hearing Tr. 928:19–24; *accord* Pl.'s Ex. 227, at 4.  Wallach also expressed the opinion that "[w]e have to make it more expensive for [United] not to negotiate than to negotiate."  Pl.'s Ex. 227, at 11; Hearing Tr. 929:22–930:5.  Even more recently, in June 2008, MEC member Carlos Rodriguez sent an email to other members of the MEC, including MEC Chairman Wallach, referencing the summer of 2000.  Rodriguez wrote, "In 2000 we brought our CEO to his knees over a delay in our agreed upon 'seamless contract,'" and "I am prepared to increase my level of risk."  Pl.'s Ex. 223.

**IV.  United's Bankruptcy and the Current CBA**

In December 2002, as a result of reduced demand for air travel following the terrorist attacks of September 11, 2001, and high operating costs, United filed a petition under Chapter 11 of the Bankruptcy Code.  While in bankruptcy, United negotiated with each of its unions, including ALPA, new labor agreements that reduced its labor costs substantially.  In 2003, United and ALPA reached agreement on a package of wage, benefit, and work rule

modifications that included a 40% wage reduction for United pilots.  In late 2004 and early 2005, as the result of further deterioration in United's financial condition, the parties negotiated further modifications, including additional wage reductions and termination of the pilot defined benefit pension plan.  The resulting collective bargaining agreement (titled as the "2003 Agreement" even though it includes modifications negotiated as late as 2005) contains an amendable date of December 31, 2009.  Defs.' Ex. 62, at 281.  The 2003 Agreement further provides that it shall renew itself each year on January 1 unless proper written notice of an intended change is served by either party on the other.  Defs.' Ex. 62, at 281.  Such notice, however, cannot be served more than 270 days prior to the amendable date.  *Id.* at 281–82.  Thus, neither party may unilaterally initiate negotiations to modify the current CBA until April 2009.  The parties agree, however, that this provision would not prohibit the parties from agreeing to modify the contract prior to that date.

## V.  United's Financial Condition Since the Bankruptcy

United exited bankruptcy in February 2006 and became profitable.  United earned an operating profit of approximately $25 million in 2006 and about $1 billion in 2007.  In 2008, however, United's financial results deteriorated significantly as a result of substantial increases in the price of jet fuel.  The effect of fuel price increases is illustrated by the fact that during 2002, the year that United entered bankruptcy, it paid about $2 billion for fuel; in 2007, by contrast, United paid roughly $5.5 billion for fuel, and in 2008, United anticipates paying approximately $9 billion for fuel.  Largely as a result of these increased fuel costs, United suffered a $680 million operating loss, as well as a $2.7 billion net loss, in the first six months of 2008.

On June 4, 2008, United announced plans to retire 94 B-737 aircraft and six B-747 aircraft. The planned fleet reduction will result in furlough notices to 1450 United pilots, including 950 active pilots and 500 pilots on leaves of absence. According to United, the "vast majority" of pilots to be furloughed "would have been individuals who had been furloughed and recalled in the post 9/11 environment." Evid. Hearing Tr. 429:16–430:12.

## VI. ALPA's Recent Efforts to Reopen the CBA

Seeing that United was profitable again, less than a year after United exited bankruptcy, ALPA initiated efforts to renegotiate the 2003 Agreement, though that agreement has an amendable date of December 31, 2009. Beginning in December 2006, then-MEC Chairman Bathurst announced a campaign called "Fix It Now," and such efforts became more aggressive under current Chairman Wallach. Both Bathurst and Wallach have expressly tied the success of ALPA's efforts to reopen the agreement to actions by United pilots to create "leverage" by "flying the contract," refusing to waive anything in the contract, and similar directives denoting a "work-to-rule" or slowdown campaign. *See, e.g.*, Pl.'s Ex. 68; *accord* Pl.'s Exs. 1B, 53; Evid. Hearing Tr. 275:1–276:3, 298:2–300:12.

United asserts that its position throughout this period was that it was willing to address specific concerns of United pilots, particularly if those concerns could be addressed without increasing United's costs, but it would not agree to a wholesale reopening of the existing CBA.

United recognized that ALPA was employing slowdown tactics, and United's senior management addressed that concern directly with both Bathurst (in May 2007) and Wallach (in January 2008). Both Bathurst and Wallach denied ALPA's involvement in any unlawful behavior, and ALPA took no apparent action in response to United's requests. United thus

sought to manage the situation by negotiating agreements with ALPA to address the specific concerns of United pilots regarding the existing agreement, as well as by increasing its reserve staffing in an effort to ensure that ALPA's tactics did not disrupt United's operations. From late 2006 to the present, United increased the reserve component (for all reasons other than illness) in its manpower planning model by approximately 30 percent. The annual cost to United of this increase is approximately $15 million.

On July 14, 2008, at the direction of MEC Chairman Wallach, ALPA terminated all negotiations with United. Shortly thereafter, United pilots began a sick-out that resulted in several hundred flight cancellations.

### A. The "Fix It Now" Campaign Under Former MEC Chairman Bathurst

The "Fix It Now" campaign, launched by Bathurst in December 2006, was focused initially on modifying certain work rules negotiated during bankruptcy that ALPA believed were unreasonably onerous. In connection with the campaign, Bathurst reactivated the MEC's Strike Preparedness Committee ("SPC"), which had been inactive for nearly five years. At that time, ALPA could not lawfully strike for at least three more years. In announcing the campaign, ALPA told United pilots that "[t]he 'Fix It Now' theme is the SPC's message to you that you need to join us in ensuring we all fly the present contract and not waive _any_ section of it." Pl.'s Ex. 25, at 1 (emphasis in original). United's witnesses testified, without rebuttal, that the phrase "fly the contract" was widely recognized as a synonym for a "work-to-rule" campaign designed to slow down the airline's operations in order to put financial pressure on the company as a means of obtaining additional leverage in collective bargaining negotiations.

In January 2007, United agreed to discuss with ALPA the potential modification of some of the existing work rules if this could be done on a "cost-neutral" basis. Evid. Hearing Tr. 280:11–282:2. The parties convened their respective negotiating committees, and on or about March 16, 2007, the committees reached a tentative agreement, titled "Line Guarantee and LCO Pay Rig Letter of Agreement." Pl.'s Ex. 28, at 1. The tentative agreement was ratified by the MEC, but in April 2007, ALPA's membership refused to ratify it.

On April 20, 2007, then-MEC Chairman Bathurst recorded a video message in which he informed United pilots that the "Fix It Now" campaign would continue despite rejection of the tentative agreement and that ALPA would pursue a more aggressive posture in seeking to modify the existing labor agreement. In this message, Bathurst reiterated that the success of ALPA's efforts depended on actions by United pilots to create bargaining leverage:

> *I cannot over emphasize the importance to all of us, however, that we embrace a new attitude about our contractual obligations. It is in no one's interest to waive anything in our contract.* It is not in our collective interest to seize opportunities for personal gain at the expense of delaying collective contractual gains. If the contract does not say that a waiver requires pilot concurrence, the provision is not waivable and the company has no business asking that you do so. *Even where the contract says that a provision may be waived with your concurrence, there may be adverse collective consequences to consider.* For example, I have spoken to you previously about . . . the widespread use of junior-senior manning, which was originally designed as a tool for irregular operations[,] and how it slows down recalls and promotions. This is only one example. *Until our work rules and compensation are restored, these issues should be carefully considered before waiving any part of our contract.*

Pl.'s Ex. 1B, at 1–2 (emphasis added).

Following the Bathurst video, United began to see a substantial drop in the number of pilots willing to accept junior/senior manning assignments and an increase in so-called "rat lists" directed at pilots who accepted such assignments. United asked to meet with ALPA about the issue, and on May 30, 2007, four United officials—Chief Operating Officer Peter McDonald,

Senior Vice President of Flight Operations Sean Donohue, Vice President of Labor Relations Peter Kain, and Managing Director of Labor Strategy-Flight Jay Milone—met with MEC Chairman Bathurst and MEC Senior Legal Counsel Robert Nichols. At the meeting, McDonald expressed concern regarding the decline in acceptance of junior/senior manning assignments following the April video, and the posting of rat lists directed at pilots who accepted such assignments. In response, Bathurst told United that ALPA had no involvement in the rat lists, which he blamed on a rival group seeking to organize United pilots, and that United should deal with harassment issues itself through the disciplinary process.

ALPA took no apparent action in response to United's concerns. Rather, the acceptance of junior/senior manning requests continued to decline, and there was no apparent reduction in the level of harassing activities.

Although the parties did not revisit during Bathurst's tenure the issues covered by the March 2007 tentative agreement, United continued to negotiate with ALPA on other issues of concern to the pilots. On September 21, 2007, United and ALPA reached agreement on implementation of a web-based trip trading program, and on October 1, 2007, the parties reached agreement on providing a guaranteed minimum number of flying hours under the ALPA contract.

### B. The "Unity" Campaign Under MEC Chairman Wallach

The MEC elected Wallach as MEC Chairman in October 2007, and he officially assumed office on January 1, 2008. Like Bathurst, Wallach has vocally sought to reopen negotiations to improve the existing CBA and has tied the success of ALPA's efforts to actions by United pilots

to create leverage.[11]  Wallach, however, pursued ALPA's goals more aggressively than his predecessor and sought to reopen the entire agreement.

In campaigning for the MEC chairmanship election, for example, Wallach indicated that he opposed "cost neutral" concessions, such as those offered in the March 2007 tentative agreement with United, and pledged that he would take a more aggressive approach toward United than his predecessor.  Evid. Hearing Tr. 928:8–931:14.  In a September 30, 2007 e-mail to MEC members, one of his supporters, IRC member Fernandez, touted the new, more aggressive approach that Wallach promised to bring to the MEC, writing, "Since I can almost hear the grenades clinking in his pocket, you can pretty well guess that he is the kind of guy I like."  Fernandez Dep., Ex. 5, at 1.

In September 2007, Wallach outlined his plans in a debate among MEC chairmanship candidates before the San Francisco LEC.  In that debate, Wallach said that "Contract 2000 was obtained due to line pilots forcing the company to negotiate" and that "[w]e have to make it more expensive for [United] not to negotiate than to negotiate."  Pl.'s Ex. 227, at 4, 11; Evid. Hearing Tr. 928:12–930:5.  Wallach further asserted that he would

> [t]ell [United CEO Glenn] Tilton up front about [*ALPA's*] *intent to work against* [*United*].  Example:  The SPC picketed Abbott Labs . . . go outside the traditional . . . go on the offensive.  We could attack the RLA in Congress.  *Attack, attack, attack!*

Pl.'s Ex. 227, at 12 (emphasis added); *accord* Evid. Hearing Tr. 931:7–14.  Wallach also explained that although ALPA could not tell pilots specifically what action to undertake in support of a slowdown campaign, the MEC could tell pilots, "[H]ere is your flight manual, FOM

---

[11]  As one "Unity" handout emphasized, "Leverage does not just show up unannounced on one's doorstep.  Unified pilots create leverage."  Pl.'s Ex. 53, at 1.

[flight operations manual], pilot agreement. *Abide by it*." Evid. Hearing Tr. 929:6–12 (emphasis added); *accord* Pl.'s Ex. 227, at 5. Finally, Wallach suggested that he did not view the illegality of slowdowns under the RLA as a serious impediment, telling the audience, "You should use lawyers to get you out of jail when you do what you need to do. A lot more could be done. A good offense is a strong defense." Evid. Hearing Tr. 930:16–931:6; *accord* Pl.'s Ex. 227, at 12.

Wallach made clear that his primary goal as MEC Chairman was to force United to renegotiate the entire CBA and to restore the terms that were in effect before United's bankruptcy. On January 1, 2008, his first day in office as MEC Chairman, Wallach issued a video message to United pilots, declaring,

> Today, our fight to take back our airline and reclaim what was stolen from us begins. . . . This fight isn't about me, this fight isn't about you, it's about us[—]to win back what was stolen from us during United['s] bankruptcy[] will take determination, resolve, and most importantly[,] solidarity."

Pl.'s Ex. 68, at 2; Evid. Hearing Tr. 299:14–300:12. Wallach emphasized that his newly-acquired position "carries with it a clear mandate, to lead the pilots of United Airlines to reclaim what was pilfered from our family's pockets during the bankruptcy and to achieve" a new collective bargaining agreement. Pl.'s Ex. 68, at 1.

Since Wallach took office, virtually every MEC Update has begun with some version of the following text:

> *Today was the 197th day that the Company could have sat down with its pilots to discuss a complete fair and equitable contract. They chose not to.*
>
> *That makes 1,896 days (5 years, 2 months, 14 days) of living under the current draconian contract and work rules negotiated under duress of bankruptcy.*

Pl.'s Ex. 69, at 1 (emphasis in original); *accord* Evid. Hearing Tr. 300:13–301:10.

On December 13, 2007, a few weeks before formally assuming office, Wallach sent a letter to United's CEO proposing that the parties "commence early negotiations on a new collective bargaining agreement" and warning that the negotiation process "otherwise cannot reasonably be expected to conclude with an agreement by the amendable date" at the end of 2009. Pl.'s Ex. 67. In response to this letter, members of United management asked to meet with Wallach and ALPA's corporate governance attorneys in early January 2008. In that meeting, United's representatives informed Wallach that United was actively considering potential consolidation with another airline and asked for ALPA's support in that effort. As a result of these talks, the parties agreed to defer discussion of Wallach's request to reopen the CBA until after the consolidation issues were resolved.

In response to United's request for ALPA's support in possible merger discussions, Wallach told United in January 2008 that ALPA would support United's position if the company would agree, as a "goodwill gesture," to implement the portions of the failed tentative agreement of March 2007 that ALPA viewed as favorable to the pilots. Evid. Hearing Tr. 875:8–16. United, in turn, said it would agree to do so if ALPA would agree to "take the customer out of [it]," an agreement that United believed would result in an end to the slowdown campaign. Evid. Hearing Tr. 83:2–10, 875:25–876:10. At the evidentiary hearing, Wallach admitted that he agreed to United's request but testified that he was told by United that this condition applied only to "an informational picketing campaign of some local corporate clients and institutional clients," not to any other elements of ALPA's campaign to reopen the CBA. Evid. Hearing Tr. 875:8–876:23. ALPA did, in fact, stop certain customer picketing that it had been conducting for a period of time, though it resumed that picketing after United ended its consolidation

discussions in April 2008. Wallach testified that ALPA resumed the picketing because he believed the promise to "take the customer out of it" was limited to the period of time that United was actually pursuing merger discussions. Evid. Hearing Tr. 933:16–934:20.

On January 25, 2008, as the "goodwill gesture" that Wallach had sought, United and ALPA executed a letter of agreement that modified two work rules that had been at issue in the failed tentative agreement of March 2007, regarding "line guarantees" and "LCO pay rigs." Pl.'s Ex. 79; Evid. Hearing Tr. 304:12–305:22.

In February 2008, United's Pete McDonald presented Wallach with charts and data regarding operational issues, such as increases in cockpit check delays, and asked for Wallach's help in eliminating the disruptions. Following that meeting, the operational issues did not improve.

In April 2008, ALPA concluded that United had abandoned its consolidation efforts. Accordingly, Wallach sent United a letter in which he renewed his request from December 2007 to reopen negotiations on the CBA. In response to Wallach's request, United reiterated its position that it would not agree to reopen the entire contract but was willing to address specific issues where the company believed that modifications were appropriate.

On April 16, 2008, United and ALPA reached an agreement to set up a joint process to address fatigue issues. After executing this agreement, United agreed to discuss what ALPA termed "quality of work life" (or "QWL") issues—concerns that the existing work rules for pilots in United's A320 and B-737 fleets were unreasonably burdensome. Evid. Hearing Tr. 308:15–309:21.

On May 22, 2008, United and ALPA commenced negotiations regarding QWL issues, and ALPA provided United with a formal proposal. According to Wallach, this issue was important to him because "everything [he] had been hearing from the safety people, from the . . . schedule people, was that the rubber band was wound about as tight as it could be wound," meaning that "pilots were flying [the] maximum amount of hours that they would fly, that they had the minimum days off that they were entitled to, that there were no [] vacation drops," and "that if there was any event, weather event, any events whatsoever, that the operation was unsustainable." Evid. Hearing Tr. 882:11–883:2. During this negotiating session, Wallach asked to meet separately with two of United's negotiators, Managing Director of Labor Strategy-Flight Jay Milone and Managing Director of Pilot Staffing and Scheduling Paul Carlson. In that meeting, Wallach told Milone and Carlson that ALPA wanted an agreement on QWL issues by the end of May 2008 and that if the parties had not reached an agreement by that date, there would be "consequences" that United would have to deal with. Evid. Hearing Tr. 309:1–25, 936:10–16. Milone testified that Wallach refused to explain at that meeting what he meant by "consequences," but that in light of the circumstances, Milone interpreted this as a threat that ALPA would accelerate its efforts to disrupt United's operations during the busy summer months. Evid. Hearing Tr. 310:1–8.

The parties' negotiations over QWL issues were temporarily sidetracked by United's announcement on June 4, 2008 that it would reduce its fleet by 100 aircraft and its subsequent announcement that it would furlough approximately 1450 pilots. As a result of these announcements, the parties' negotiating committees agreed to devote their attention to negotiating a Furlough Mitigation Letter of Agreement, which ALPA viewed as more time

sensitive because it would reduce the impact of the furlough announcement. In late June 2008, the negotiating committees reached agreement on a Furlough Mitigation Letter of Agreement, which was designed to minimize the number and effect of involuntary furloughs on the pilot workforce. That agreement was approved by the MEC on July 11, 2008.

During this time period, the parties' negotiating committees continued to work on the QWL Letter of Agreement, and United also sought to address a request by ALPA for a Pilot Early Retirement Program ("PERP").

Around June 20, 2008, Wallach convened a special, multi-day, closed meeting of the MEC, the IRC, the SPC, and the Family Awareness Committee—a subcommittee of ALPA's SPC. About a week before that meeting, one MEC member had sent an email to the other members of the MEC, including Wallach, urging them to "ratchet up the heat" and declaring that "[t]he time has come to increase the level of risk in our plight to bring [United CEO Glenn] Tilton to his knees . . . . Now is the time to act boldly, decisively, and surgically." Pl.'s Ex. 223.

On June 24, 2008, shortly after the MEC meeting, Wallach sent United a preliminary draft of a letter to all United pilots and told United that it should "stick it in their decision matrix" regarding the ongoing QWL negotiations. Pl.'s Ex. 224. The draft letter attacked both the competence and the motives of United management, and suggested that United "gave not a damn" about successful completion of the QWL negotiations. Pl.'s Ex. 224, at 3. Wallach testified that at the time he prepared this letter in late June, he "didn't have an anticipation o[f] when it would be sent" to United pilots. Evid. Hearing Tr. 944:8–14.

On July 15, 2008, Wallach sent to United pilots a revised version of the draft letter he had previously sent to United. In that letter, Wallach informed United pilots that ALPA was

terminating all negotiations with United, including both the QWL negotiations and the PERP

negotiations.  Like the draft sent to United on June 24, the letter attacked United's management

and motives, declaring, "We face a focused, hostile and arrogant management group:  a

management group that gives not a damn about you, your well-being, or the well-being of your

family."  Pl.'s Ex. 83, at 1.  The letter concluded with the statement,

> You will see renewed and focused efforts on the part of your union that will highlight the
> importance of United pilots' contributions to this airline.  Do not discount the efforts all
> of us make each and every day that enable this company to operate.  *We cannot get out*
> *from under the present contract on time if we do not begin our work now.*  Stay
> connected, get on board and be unified.

Pl.'s Ex. 83, at 4 (emphasis added).  United's chief negotiator, Milone, testified that this was the

first and only notice United received of ALPA's decision to terminate negotiations and that he

viewed the letter as a "declaration of war" by Wallach.  Evid. Hearing Tr. 315:10–316:2.

Wallach testified that on the morning of July 14, 2008, he decided to terminate

negotiations with United on the QWL agreement because "all of the proposals that the company

continued to pass back and forth required, in my mind, offsets in order to pay for the pilots'[]

quality of life improvements.  And when we finally got to the end, it was just a matter of *there is*

*no more time, we're out of time, I'm done talking.*"  Evid. Hearing Tr. 889:21–890:1 (emphasis

added).  Wallach explained that they were "out of time" because, in his view, the pilots were full

of angst and "clamoring for information."  Evid. Hearing Tr. 890:2–9.  That explanation,

however, raises nearly as many questions as it answers.  First, what was the time constraint that

ALPA and the pilots it represented were under?  Second, what was the alternative to negotiating

with United?  At the time, ALPA had no other apparent options except, potentially, to implement

a more widespread job action.

By contrast, United has presented evidence that the parties' respective negotiating committees were making progress towards a QWL agreement. The committees had met several times over three weeks and had resolved a number of issues. Milone testified that he thought the parties had, in effect, reached an agreement, with the exception of one issue—"the proposal . . . to raise the line guarantee from 65 hours to 70 hours in [United's] scheduling construction system." Evid. Hearing Tr. 311:8–13. On the afternoon of July 14, 2008, Milone sent out a revised proposal that he thought would resolve that issue, though Wallach apparently did not receive it before making the decision to terminate negotiations. With regard to PERP negotiations, the record suggests that ALPA's negotiating committee simply never responded to United's proposal.

The court finds that the more likely explanation for Wallach's decision to send the letter of July 15, 2008, was to foster among the pilots further indignation and animosity towards United and thus encourage them to engage in a more widespread job action on the basis that United would not agree to ALPA's proposals. Indeed, this option was outlined in an e-mail that Wallach received from an ALPA representative at the Denver LEC on July 11, 2008. In that e-mail, the author urged Wallach,

> If ever there were a place and time to call it "enough," I can't imagine a better time to walk away from the table and fight this fight. If for nothing else, *it would be a unified position by this pilot group in the name of Safety—and oh by the way—cost neutral from our point of view, not theirs.*
>
> If we never let our mandate materialize, we never had one.

Pl.'s Ex. 229 (emphasis added); Evid. Hearing Tr. 951:1–25.

Also, consistent with these actions, Wallach informed United in July 2008 that ALPA would be withdrawing from the agreement that the parties had reached in September 2007

28

regarding implementation of a web-based trip trading program. That agreement allowed pilots to trade a trip that had been assigned to them in the scheduling process for an unassigned trip that they might prefer. Milone testified that ALPA's withdrawal from this agreement will create a burden on pilots who desire trip trades, without providing anything to ALPA in return.

Wallach's testimony that he did not see any progress in negotiations is further called into doubt by his failure to meet with United's new Senior Vice President of Flight Operations, Joseph Kolshak. On direct examination by defendants' counsel, Wallach testified that he had never met Kolshak, asserting that Kolshak had "never introduced himself to me," thus implying that Kolshak was not interested in sitting down with ALPA to work on improving the company's relationship with the union. Evid. Hearing Tr. 920:24–921:2. On cross-examination, however, Wallach admitted that Kolshak has been attempting to schedule a meeting with Wallach since as early as May 2008 but Wallach has declined to meet with him—purportedly on the basis that Wallach has "been busy." Evid. Hearing Tr. 923:3–17.

### C. The Elements of ALPA's Current Job Action

ALPA's current campaign to force United to renegotiate the CBA does appear to mirror tactics that ALPA employed during the slowdown campaign of summer 2000, including refusal to accept voluntary flight assignments such as junior/senior manning; refusal to waive contractual provisions that pilots would normally waive; the creation of flight delays through lengthy pre-flight checks; and the creation of flight delays and cancellations by refusing to accept aircraft with deferrable maintenance items. Most recently, ALPA has encouraged a sick-out among United's junior pilots that, combined with ALPA's campaign against acceptance of voluntary flight assignments, caused several hundred flight cancellations.

### 1. Refusal to Accept Junior/Senior Manning

"Junior/senior manning" is, essentially, a form of voluntary overtime under which United offers pilots flight assignments when the originally assigned pilot is unavailable and United does not have a reserve pilot available to cover the assignment. Pilots who accept such assignments receive a financial benefit or a scheduling benefit. Under the current CBA, United must offer junior/senior manning assignments in seniority order to pilots who have asked to be considered; if United cannot cover a flight in this manner, it must offer the flight in "inverse order of seniority" to all remaining available pilots. Def.'s Ex. 62, at 223. Until mid-2006, United was generally able to find a pilot willing to accept a junior/senior manning assignment. In situations where United has already utilized all available reserve pilots, a concerted refusal by pilots to accept junior/senior manning assignments can leave United with no option but to cancel flights.

For more than a year and a half prior to the commencement of this litigation, ALPA had been discouraging pilots from accepting junior/senior manning assignments in order to put pressure on United to reopen the parties' CBA. For example, in the April 20, 2007 video message discussed above, MEC chairman Bathurst told United pilots that "[u]ntil our work rules and compensation are restored," pilots should "carefully consider" whether to accept junior/senior manning assignments. Pl.'s Ex. 1B, at 2.

ALPA's campaign against junior/senior manning has been highly effective. For example, between January 2006 and April 2007, the number of pilots accepting requests for junior/senior manning averaged more than 430 per month. By comparison, between January and July 2008, the number of pilots accepting such requests has averaged only 83 per month.

ALPA argues that the statistical analysis of the data presented by United's expert, Daniel Kasper, was flawed, in that he testified as to a decline since 2006 in the number of pilots "willing to accept" junior/senior manning assignments but did not account for the fact that United offered a decreased number of such assignments beginning in 2007. While defendants' cross-examination of Kasper revealed some limitations in his methodology,[12] defendants did not call into doubt the overall soundness of Kasper's analysis, nor did they call an expert of their own to rebut Kasper's testimony regarding these, or any other, interpretations of the data. As to this particular objection, for example, neither party has suggested that United pilots would have accepted significantly more junior/senior manning assignments if United had made more such requests in recent months; on the contrary, the record indicates that in the months leading up to the filing of this lawsuit, the pilots were particularly unwilling to accept junior/senior manning assignments under any circumstances.

In light of these factors, the court finds that the evidence—including, but not limited to, Kasper's expert testimony and report—firmly supports the conclusion that United pilots' willingness to accept junior/senior manning assignments has dramatically declined since 2006 and that this decline is closely correlated with ALPA's directives.

---

[12] For example, on a similar note, ALPA suggests that in forming his opinions, Kasper did not adequately consider potential factors other than concerted behavior—such as the July 11, 2008 Furlough Mitigation Letter of Agreement—that may have caused changes in the pilots' behavior or otherwise influenced the data.

## 2. Refusal to Waive the Contract ("Work-to-Rule")

Under the labor agreement between United and ALPA, there are a number of rules and restrictions concerning duty time, flight time, and rest that can be waived with "pilot concurrence."  Evid. Hearing Tr. 15:2–7.  In a work-to-rule campaign, pilots refuse on a concerted basis to waive any contractual entitlement and, as described below, in virtually every ALPA publication over the last 18 months, ALPA has urged its members not to waive anything in the contract at any time.

## 3. Cockpit Check Delays

In a work-to-rule action, a pilot can intentionally create flight delays by taking more time than necessary to complete pre-flight procedures, known as "cockpit checks."  United maintains a system for tracking and categorizing all flight delays and cancellations.  Under this system, every delay and cancellation is assigned one of roughly 40 codes regarding the typical reasons for delays or cancellations.

ALPA asserts that the coding data on which United relies is unreliable because, for example, United management does nothing to audit the codes entered and "there is no sort of quality of assurance [*sic*] that goes through and evaluates" whether a particular code was entered accurately.  Evid. Hearing Tr. 102:9–102:22.  ALPA has offered little reason, however, to doubt the accuracy of such data.  On the contrary, the record suggests that United has employed the coding system not in preparation for this or any other litigation, but in order to analyze and increase the efficiency of its operations—a purpose that creates incentive for the company to ensure the accuracy and integrity of the coding data.

A delay caused by failure to complete cockpit checks in a timely manner is coded as a "KC" delay. Evid. Hearing Tr. 62:16–22. Since 2007, the number of KC delays, expressed as a percentage of all flights, has increased from less than three percent to more than six percent. Because United operates an average of 1,500 flights a day, this translates roughly to an additional 45 flights per day that have been delayed. Similarly, assuming an average of 150 passengers on each flight, this means that an additional 6,750 passengers per day have been subject to flight delays due to pilot cockpit check delays.

### 4. Minimum Equipment Delays and Cancellations

Under FAA regulations, an airline is entitled to defer maintenance on a variety of equipment items—known as "deferrable," "minimum equipment list," or "MEL" items—that do not affect flight safety (e.g., a broken passenger reading light). Evid. Hearing Tr. 66:11-67:12. United provides its pilots with discretion, however, over whether to accept an aircraft with deferred maintenance issues because in some circumstances the nature of the planned flight or the nature of the equipment may make it prudent to repair the equipment even if not required under FAA rules. In a pilot job action, however, discretion can be used as a pretext for creating flight delays and cancellations by rejecting aircraft where the pilot has no sincere concern over safety.

Under United's system, a flight delay or cancellation due to a pilot's refusal to depart with a deferrable maintenance item is coded "ME." Evid. Hearing Tr. 62:23–63:1. Since late 2006, the number of flights delayed for an "ME" reason, expressed as a percentage of scheduled flights, has increased six fold, from approximately 0.2 percent to more than 1.2 percent. Since the end of 2006, the number of flights cancelled each day for "ME" reasons has similarly

increased from less than 0.05 percent to more than 0.30 percent.  A one percent increase in flight

delays would, on average, affect roughly 2000 passengers every day.  This number, however,

does not capture the "ripple effect" that a flight delay has on later flights because the aircraft is

late in arriving at the destination airport.  Evid. Hearing Tr. 71:4–20.

ALPA asserts that the data presented by United show increases in *both* (a) delays for

deferrable maintenance items, where pilots may have discretion, *and* (b) delays where an aircraft

in fact needs repairs but cannot depart because the station does not have a necessary part.  ALPA

thus suggests that the increase in ME delays is consistent with a broader trend of delays due to

repair issues and is not the result of pilots' inappropriately exercising discretion.  As United

points out, however, an increase in ME delays and cancellations may also create an increase in

delays or cancellations of other flights for non-deferrable maintenance reasons because United

must divert its maintenance resources from other aircraft, which also require maintenance, to

deal with deferrable maintenance.  Since the beginning of 2007, the average number of delays

and cancellations for non-deferrable maintenance has increased from less than four percent to

more than six percent, at least part of which may be attributable to the increase in ME delays and

cancellations.

### 5.  Increased Fuel Consumption

The fuel required for a flight is determined in the first instance by United's dispatchers,

who make this decision using computerized systems that take into account all relevant

information regarding potential fuel use.  Under United's policies, however, the captain may, in

his or her discretion, add up to 2,000 pounds of additional fuel.  On the one hand, adding

additional fuel can, to some extent, provide pilots with more flexibility in dealing with

unanticipated events that may arise, such as bad weather that requires a flight path diversion.  On

the other hand, adding unnecessary fuel increases the weight of the aircraft, which in turn

increases the amount of fuel used, which in turn increases the cost of operating the flight.

In his deposition, IRC Chairman Tamkin indicated that, "on and off" since 2007, the

IRC—an ALPA committee that is primarily concerned with labor relations and job actions, not

flight operations or safety—has had discussions with pilots encouraging them to carry more fuel.

Tamkin Dep. 108:6–109:10.  Since the beginning of 2007, the percentage of United A319/320

and B-737 flights where fuel was added increased from approximately 30 percent to a high of 47

percent before a recent decrease to just over 35 percent.

### 6.  Increased Fatigue Calls

Under United's policies, if a pilot believes that he or she is too fatigued to fly safely, the

pilot is removed from the flight assignment, no questions asked.  United alleges that ALPA has

organized and encouraged a concerted effort by United pilots to use "fatigue" as a pretext,

leaving United with flights that it cannot cover.  In particular, United cites the IRC's decision in

early June 2008 to launch a campaign to encourage pilots to refuse flight assignments on the

basis of fatigue.

Beginning in June 2008, fatigue calls have more than doubled, from their prior level of

approximately 1 per day to more than 2.5 per day.  ALPA asserts that recent levels of fatigue

calls are "remarkably low" and that even at current levels, fatigue calls have the potential of

affecting only about 0.133 percent of all scheduled flights.  Similarly, ALPA asserts that an

increase of 1 pilot fatigue call per day represents only an additional 1 out of 2,000 pilots, or 0.05

percent, and that these data do not necessarily reflect any actual delays or cancellations, since a

reserve pilot may be available to assume the remainder of a fatigued pilot's trip. Nevertheless, assuming an average of 150 passengers on each flight, an additional 1 pilot fatigue call per day has the potential of affecting more than 4,500 additional customers per month. Irrespective of the magnitude of its impact on flight operations, however, the court finds evidence of an extraordinary increase in fatigue calls beginning in June 2008.

### D. ALPA's Encouragement of the Job Action

United alleges that ALPA instigated the job action described above through communications that began in December 2006 and have continued to present. ALPA admits that it has discouraged pilots from accepting junior/senior manning assignments and waiving contractual provisions but contends that United's challenge to these actions is barred by various legal defenses. For example, ALPA argues that until July 2008, no one from United complained to the union about its statements to pilots regarding junior/senior manning or waiving of contractual provisions. Further, ALPA denies that it has encouraged United pilots to engage in any other actions designed to disrupt the airline's operations and also generally denies that United pilots have engaged in such actions. ALPA appears to concede, however, (1) that some United pilots have engaged in harassment of pilots who have accepted junior/senior manning assignments, though ALPA maintains that it opposes such conduct; and (2) that some of United's junior pilots improperly called in sick during July, though ALPA contends that (a) there was not an organized sick-out, (b) the airline did not immediately inform the union about the rise in sick leave usage, and (c) ALPA took steps to discourage the conduct.

### 1. ALPA's Communications on Junior/Senior Manning Assignments

ALPA concedes that it has discouraged United pilots from accepting junior/senior manning assignments. ALPA argues, however, that it only opposes junior/senior manning being used as part of United's regular staffing model, or "manpower planning tool." Rather, ALPA contends, junior/senior manning may properly be used "for unanticipated pilot shortages for which adequate planning cannot protect, such as irregular operations and other extraordinary circumstances." Evid. Hearing Tr. 40:21–24. ALPA also argues that this is a contractual dispute that falls outside of the court's limited jurisdiction under the RLA.

The court concludes that ALPA's directives to United pilots went beyond anything arguably justified by its interpretation of the CBA because (a) ALPA discouraged pilots from accepting junior/senior manning even during periods when ALPA concedes that United was properly staffed and the only purpose of junior/senior manning requests by United would, by definition, have been for proper purposes; and (b) none of ALPA's publications discouraging pilots from accepting junior/senior manning assignments, with the sole exception of two statements by ALPA in connection with the July 2008 sick-out, made the distinction upon which ALPA relies (*i.e.*, discouraging use of junior/senior manning as a manpower planning tool but not in cases of irregular operations). ALPA's witness on the subject, MEC Senior Legal Counsel Robert Nichols, testified that the MEC believed United was understaffed during the summer of 2004 and the summer of 2006. Nichols did not take issue, however, with United's pilot staffing levels in 2007 or 2008. Nevertheless, the MEC adopted a resolution in January 2008, that, "*Although allowed in the Collective Bargaining Agreement*, the UAL-MEC does not endorse the

use of [junior/senior manning] as a manpower planning tool."  Milone Decl., Ex. 4, at 2 (emphasis added).

In any event, ALPA's statements regarding junior/senior manning have not informed pilots to reject junior/senior manning only when United was understaffed.  Rather, ALPA's communications have, up until the time that this lawsuit was filed, generally discouraged pilots from accepting junior/senior manning under any circumstances.

Defendants further assert that (a) United did not object to ALPA's position on junior/senior manning until July 2008, well over a year after Chairman Bathurst issued the video message discouraging acceptance of junior/senior manning, and (b) that United effectively conceded the issue in December 2007, when Senior Vice President of Flight Operations Sean Donohue sent a letter to all flight operations employees stating that it would update its staffing its assumptions "to reflect the virtual elimination of junior/senior manning acceptance during irregular operations recovery."  Def.'s Ex. 73, at 2.  Defendants assert that United thereby "establish[ed] that [its] pilots would no longer be expected to respond to requests for such assignments."  Defs.' Proposed Findings of Fact ¶ 43.  The court must reject this assertion, however, because it is it at odds with the evidence in this case, including the testimony of ALPA's own witnesses.  The December 2007 letter from Donohue reflects ALPA's tremendous success in discouraging acceptance of junior/senior manning requests, not that United would no longer make such requests or that United had concluded that such requests were impermissible or otherwise inappropriate under the CBA.  Indeed, even the MEC's own legal counsel testified that "[t]he MEC had consistently said, and continues to say to this day, that junior/senior

manning is appropriate for irregular operations and exceptional circumstance," Evid. Hearing Tr. 694:17–695:6, and there is no evidence that United has ever suggested otherwise.

### 2. ALPA Communications Regarding Contract Waivers

Similarly, although ALPA concedes that it has discouraged United pilots from waiving sections of the contract, MEC Chairman Wallach suggested that ALPA has only discouraged pilots from waiving *nonwaivable* contract provisions. The publications issued by ALPA over the past two years, however, contradict his testimony. For example, in November 2007, following his election but prior to formally beginning his term as MEC Chairman, Wallach directed the creation of a "Pilot Unity" communication to pilots, encouraging pilots to continue ALPA's campaign to reopen the CBA. Pl.'s Ex. 53, at 2; Evid. Hearing Tr. 896:6–17. The handout makes little distinction between waivable and nonwaivable provisions; rather, it urges pilots not to waive any provisions of the contract:

> [O]ur contract still contains numerous protections that many of you choose to ignore or waive. Every time you ignore or waive a provision contained in your collective bargaining agreement, the company either benefits financially or marks the event and uses it against your negotiators in future negotiations. **THE TIME HAS COME TO STOP HELPING THE COMPANY GUT YOUR COLLECTIVE BARGAINING AGREEMENT.**

Pl.'s Ex. 53, at 2 (emphasis in original).

Other communications over the past 18 months have similarly failed to distinguish between waivable and nonwaivable sections of the contract:

— The December 20, 2006 MEC Update announcing the "Fix It Now" campaign told pilots to "fly the present contract and not waive *any* sections of it." Pl.'s Ex. 25, at 1 (emphasis in original).

39

— An April 2007 video message by MEC Chairman Bathurst explicitly discouraged

pilots from waiving both nonwaivable and waivable contract provisions, stating,

> It is in no one's interest to waive anything in our contract. It is not in our collective interest to seize opportunities for personal gain at the expense of delaying collective contractual gains. If the contract does not say that a waiver requires pilot concurrence, the provision is not waivable and the company has no business asking that you do so. *Even where the contract says that a provision may be waived with your concurrence, there may be adverse collective consequences to consider . . . . Until our work rules and compensation are restored, these issues should be carefully considered before waiving any part of our contract.*

Pl.'s Ex. 1B, at 1–2 (emphasis added). The court concludes from the plain language of these

publications that ALPA has strongly and repeatedly discouraged pilots from waiving any

provisions of the contract and that these instructions were intended to put economic pressure on

United to reopen the contract.

### 3. ALPA's Communications on "Flying the Contract"

Since December 2006, ALPA has published a number of directives to United pilots using

the phrase "fly the contract" or substantially similar language:

- The December 20, 2006 MEC Update announcing the "Fix It Now" campaign

  stated that "[t]he 'Fix It Now' theme is the SPC's message to you that you need to

  join us in ensuring that we all *fly the present contract* . . . ." Pl.'s Ex. 25, at 1

  (emphasis added).

- On February 6, 2007, Council 12, which represents United pilots in Chicago,

  published a document calling on the pilots to be "battle ready" and to "*know*[] *the*

  *contract*." Pl.'s Ex. 71, at 1–2 (emphasis added).

- In March 2007, Council 12 published another communication in which its vice-chairman asserted,

> Leverage is not the Negotiating Committee pounding their fists on the table to the company. Leverage does not result from the company wanting to talk to us. *Leverage comes from* each of us flying the line and our actions *standing up for our contract*, and such leverage is required before our Negotiating Team can make progress in restoring our contract to its rightful state.

Pl.'s Ex. 26, at 2 (emphasis added).

- The "UAL Pilot Unity Handout" put out by Wallach in November 2007 urged pilots "to *maintain* [*the*] *contract*, and to honor your predecessors efforts." Pl.'s Ex. 53, at 2 (emphasis added).

- The same handout stated that the MEC would "continue to put out a series of *Did-You-Knows (DYK's)*," one to two page publications that are "intended to highlight [pilots'] contractual rights," and instructed pilots to "*follow them in order to protect your current contract and aid us in getting you a better one*." Pl.'s Ex. 53, at 2 (emphasis added).

United's witnesses testified that instructions such as "fly the contract," "know the contract," "honor the contract," "follow the contract," and similar phrases are understood in the field of airline labor relations to mean "work to rule." *See, e.g.*, Evid. Hearing Tr. 275:12–18. In a "work-to-rule" campaign, employees seek to slow down or disrupt the employer's operations by doing only what is required by the work rules and strictly adhering to those rules. The witnesses also testified that elements of ALPA's campaign described above are the types of actions that would be expected in a work-to-rule campaign by airline pilots. ALPA did not produce any evidence contradicting the testimony of these witnesses. The court concludes,

therefore, that the numerous instructions by ALPA to "fly the contract" were intended to, and did, convey to United pilots ALPA's instruction that they engage in a work-to-rule, or slowdown, campaign in order to disrupt United's operations and put financial pressure on United to reopen the CBA.

The court also finds that MEC Chairman Wallach personally intended these phrases to signal ALPA's direction to engage in a job action. In the September 2007 debate among candidates for MEC Chairman, Wallach explained that although ALPA could not tell pilots specifically what action to undertake in support of a slowdown campaign, the MEC could tell pilots, "here is your flight manual, FOM, pilot agreement. *Abide by it*." Evid. Hearing Tr. 929:6–12 (emphasis added); *accord* Pl.'s Ex. 227, at 5. Wallach thus plainly identified these instructions as code words for a work-to-rule or slowdown action. *Cf. United Air Lines, Inc.* v. *Int'l Ass'n of Machinists and Aerospace Workers*, 243 F.3d 349, 366 (7th Cir. 2001) (finding that "a union's suggestions to its mechanics to 'work safe' or to 'work by the book' are commonly recognized signals among union mechanics for a work slowdown" and "courts have found similar language to be 'codes' for job actions").

Perhaps out of concern that some pilots would not understand the meaning of these code words, Wallach also directed that, beginning in February 2008, every MEC update conclude with a quote taken from Sun Tzu's *The Art of War*: "Fighting with a large army under your command is nowise different from fighting with a small one; it is merely a question of instituting *signs and signals*." *See, e.g.*, Pl.'s Ex. 69, at 2 (emphasis added). This quote plainly suggests that ALPA's "army"—the pilots—should look for "signs and signals" from ALPA as to what actions they should be taking in the "fight" against United.

### 4. ALPA's Communications Regarding Fatigue

In July 2008, ALPA began a campaign to encourage pilots to decline flight assignments on the basis of fatigue. Although defendants assert that the fatigue campaign was aimed only at legitimate cases of pilot fatigue, the record indicates that a fatigue campaign was part of a larger effort by ALPA to put pressure on United to reopen the CBA. To begin with, IRC Chairman Tamkin testified that the fatigue campaign was developed by the IRC—as opposed to a safety-related ALPA committee—during a meeting of its four members on June 12, 2008, as a way of "trying to come up with something to deal with the junior pilot problem." Tamkin Dep. 102:1–7. According to Tamkin, the IRC decided that fatigue could be used to "offer some form of recourse" to the junior pilots, an alternative to illegitimately using their sick leave, and serve as a "structured option" for them that could be "institutionally administered" by ALPA. Tamkin Dep. 102:8–103:6.

Soon after that meeting of the IRC, Tamkin conferred with Wallach about administering the fatigue campaign. Wallach directed the MEC Grievance Chairman to draft a "Did You Know" about fatigue, and that publication was distributed to United pilots in July. On July 14, 2008, Wallach also directed that, starting then, a paragraph about fatigue should be included in every MEC Update. Since July 15, 2008, every MEC Update has included, as the first item in the newsletter, a paragraph discussing some aspect of fatigue. A number of LEC publications have also included similar discussions about fatigue.

Although Tamkin testified that he wanted the fatigue campaign to be "institutionally administered," IRC member Domaleski testified that the IRC activated the IRC phone tree to deliver its fatigue message. In addition, IRC member Freeman testified that he called 50 pilots

involved with the 2172 group to inform them that they should consider fatigue calls, rather than calling in sick, and also that he spoke to 50 to 100 pilots who called him regarding fatigue calls.

Messages posted at ual2172.com cast further doubt on defendants' contention that the fatigue campaign was aimed only at legitimate cases of pilot fatigue. For example, one of the website's three administrators, Jeff Jaslow,[13] posted a message on June 25, 2008, stating,

> Today I called in **fatigue**!
>
> Why you ask? **I do not need to say!** There are many reasons, but the only thing I will say is that I was Fatigued.
> * * *
> I flew a leg for the day and therefore will be paid my 5 hours of duty rig...I will then be deadheaded tomorrow to a hub in which I will pick up the rest of my flying for tomorrow.

Pl.'s Ex. 187, at 1 (emphasis in original).

ALPA, however, also presented evidence that its communications regarding fatigue coincided with substantial company, industry, and regulatory attention to the issue of fatigue. In mid-May 2008, for example, United began sending its pilots to "On the Line" training, a safety course that United developed in conjunction with ALPA at a cost of approximately $5 million. The "On the Line" curriculum places significant emphasis on the issue of pilot fatigue. As of September 2008, approximately 2,700 pilots, or nearly half of United's pilots, had attended the training. In mid-June 2008, the FAA held a symposium on the subject of "Aviation Fatigue Management" which stressed the urgency and importance of the issue. *See* Defs.' Ex. 16

---

[13] In his deposition, IRC member Freeman testified that he has known Jaslow since they both flew for Frontier Airlines while on furlough from United, beginning in 2003. Freeman further testified that he "asked Mr. Jaslow if he would assist [him] and Jay [Schumaker] in moderating the [ual2172.com] website" because Freeman "trust[s] [Jaslow's] judgment." Freeman Dep. 43:12–44.

(Remarks of Robert Sumwalt, Vice Chairman, National Transportation Safety Board), at 4 ("[D]espite what we've learned, despite great research, despite great intentions, we still have not made significant changes to adequately address fatigue in aviation . . . . It is time to implement workable solutions."). This confluence of fatigue-related communications from divergent sources—ALPA and the IRC, as well as United, the airline industry, and the FAA—in early to mid-2008 makes it impossible to determine to what extent the dramatic increase in fatigue calls that began in June 2008 may have been the result of illegitimate efforts by ALPA and the IRC.[14]

### 5. ALPA's Control Over United Pilots

In addition to evidence that ALPA has encouraged pilots to engage in a job action through its publications and through directives issued by the IRC, United has presented evidence from which the court can infer that ALPA has a substantial ability to control the conduct of its members. As background evidence of ALPA's control of the pilot group, United introduced evidence regarding a "Hats On, Hats Off" campaign implemented by Wallach shortly after he took office. As part of this campaign, every MEC Update since February 2008 has closed with a graphic of a light switch. In the initial stage of the campaign, the MEC Updates explained that when the light switch is in the "on" position, pilots are supposed to wear their hats, and when it is in the "off" position, they are not supposed to wear their hats whenever they are likely to be seen by United management. Wallach has described the campaign as a "unity exercise" and

---

[14] To the extent that ALPA asserts that other elements of the job action are actually due to the "On the Line" training, the court is not persuaded. For, with the exceptions of the sick-out and the increase in fatigue calls, the other elements of the job action—KC delays, ME delays and cancellations, and fuel adds—manifested appreciable increases beginning in 2007, well before the "On the Line" training began in mid-May 2008.

acknowledges that ALPA has been able to achieve, in Wallach's words, "overwhelming compliance" with its "hats on" and "hats off" directives. Evid. Hearing Tr. 932:23–25.

Part of the reason ALPA has been able to obtain compliance with its directives is that ALPA activists have confronted pilots who were not in compliance. One of the more serious of those incidents occurred in June 2008 when a first officer threatened two different captains with physical violence because they were wearing their hats during a "hats off" period. One of those captains was so upset that United had to cancel his flight, and the incident was reported in a national newspaper, *USA Today*.

While the Hats On, Hats Off campaign demonstrates ALPA's control over the pilot group in that instance, the record also reveals ALPA's actual control of pilots in the current job action. MEC legal counsel Nichols testified that on June 9, 2008, senior representatives of United and ALPA met over dinner to discuss the problems in the parties' relationship. According to Nichols, ALPA representatives said that if United would agree to three things—the Furlough Mitigation Letter of Agreement, the QWL Letter of Agreement, and an early reopening of the CBA—ALPA "would basically take down activities which [United was] unhappy about." Evid. Hearing Tr. 704:24-706:20.

Further evidence of ALPA's control over pilots is found in the record of the current lawsuit. ALPA's actual conduct after the Standstill Agreement was executed demonstrated that it could exert substantial control over the pilots' conduct. After ALPA delivered instructions to pilots, through both written messages negotiated with United and the IRC phone tree, to stop the sick-out, there was a prompt and dramatic decrease in sick leave. The number of pilots on the sick list dropped from approximately 475 on July 30, 2008, to approximately 350 just a few days

46

later.  The sick rate for B-737 First Officers dropped from 12.2 percent for the period of July

16–31, 2008, to 7.7 percent for the period of August 1–19, 2008.  Similarly, for A320 First

Officers, the sick rate dropped from 8.0 percent to 5.4 percent during the same time frames.

At the final oral arguments, defendants' counsel suggested that the court would be setting

a problematic precedent if it were to find that ALPA's voluntary actions after this lawsuit was

filed demonstrated that they were in control of its members' conduct:

> [T]he carrier says that because the standstill agreement was effective that must somehow prove that the union controlled its members and that therefore it leaps to the conclusion that ALPA was responsible for the alleged sick-out.  So under the company's argument the union not only gets no credit for entering into the standstill agreement and implementing it, it suffers—its legal position is eroded because if what it does is effective, it then gets the blame for everything that happened beforehand under the company's theory.  If that theory were adopted, I would think no Court would be able to mediate a standstill agreement such as the one that the Court mediated in this case.

Evid. Hearing Tr. 1032:6–18.

Defendants did not raise this argument in their written submissions nor did they provide

citations to any supporting case law.  Nevertheless, the argument bears a resemblance to the

doctrine of subsequent remedial measures, which generally provides that evidence of subsequent

remedial measures cannot be admitted to prove liability.  That doctrine, however, is codified in

Federal Rule of Evidence 407, which provides that evidence of subsequent measures is *not*

excluded "when offered for another purpose, such as proving ownership, *control*, or feasibility of

precautionary measures, if controverted."  Fed. R. Evid. 407 (emphasis added).  Plainly the

evidence is admissible to prove that ALPA exerts control over its members.

Furthermore, the court is not persuaded that taking into account such evidence for the

purpose of determining whether a union has control over its members will undermine the ability

of future courts to mediate a standstill agreement such as the one achieved in this case.  Indeed,

ALPA benefitted from the Standstill Agreement by avoiding the necessity of responding to United's motion for a preliminary injunction on an expedited basis and the risk that it would have been granted much earlier.

**6. Harassment of Pilots Who Accepted Junior/Senior Manning Assignments**

Following ALPA's commencement of its campaign against junior/senior manning, United began receiving reports from pilots who accepted junior/senior manning assignments that they were being harassed by other pilots. The most frequent form of harassment has been the posting of rat lists, which list the names of pilots who have accepted junior/senior manning assignments, generally with derogatory comments and often with the pilots' home telephone numbers and addresses. The documents were posted on bulletin boards and in hallways and elevators in flight offices and airports throughout the United system—including, on some occasions, ALPA's own bulletin boards (though both sides acknowledge that, even without a key, it is often possible to slip such documents behind the glass of a locked ALPA bulletin board). Since 2007, United claims to have collected hundreds of such lists that were removed from various of its flight offices.

The harassment has also included the posting of flyers discouraging or threatening pilots who engage in junior/senior manning; derogatory or threatening notes placed in pilots' company mailboxes or sent to pilots' homes; letters mailed to pilots' spouses accusing the pilot of infidelity; sending horror movies with graphically violent images on their packaging to pilots' homes; sending magazine subscriptions that pilots did not order to pilots' homes; applying for loans in pilots' names; and harassing phone calls to pilots' homes received by pilots, their spouses, and their children. These types of harassment increased appreciably following the April

20, 2007 videotape message from then-MEC Chairman Bathurst, which addressed junior/senior manning issues.

Since the summer of 2007, United has investigated each of the complaints it has received but generally has been unable to determine the identity of the individuals engaged in the harassment. During the summer of 2007, United installed video-cameras at its facilities in San Francisco and Chicago, the two domiciles where United believed the harassment was at its worst, in an attempt to identify pilots who were posting the rat lists. Through these efforts, United was able to identify only a few individuals, whom it counseled about their behavior.

ALPA asserts that United "has been aware of alleged pilot harassment since at least 2006 and has made scant efforts to seek ALPA's assistance." Defs.' Proposed Findings of Fact at 17. The evidence indicates, however, that United has asked ALPA on multiple occasions to deal with harassment issues. In response to these requests, ALPA has generally denied any involvement in the harassment and taken little or no apparent action to stop it.

While ALPA has asserted that it does not support the harassment of pilots who accept junior/senior manning assignments, the court concludes based on the following evidence that ALPA has ratified, if not authorized, such harassment by knowing about it and failing to take any meaningful action to discourage it. As a preliminary matter, it is clear that ALPA's effort to persuade pilots to reject junior/senior manning assignments is only successful when ALPA obtains nearly universal compliance with its directives on this issue. United's data on the frequency of junior/senior manning assignments shows that at its peak in early 2006, United made only around 500 junior/senior manning assignments per month. Thus, it appears that if only ten percent of the pilot workforce (roughly 650 pilots) accepted one junior/senior manning

49

assignment per month, United would have sufficient volunteers to meet its needs.  Given the

financial and scheduling incentives for pilots to accept these assignments, pressure on the pilots

who desire these assignments is likely necessary for ALPA's effort to be effective.

Although United did not produce direct evidence that ALPA has encouraged such

harassment during the last 18 months, it introduced two ALPA publications from the 2000 time

period that expressly encouraged pilots to enforce ALPA's directives to refrain from voluntary

flight assignments.  One publication by a San Francisco LEC in 2000, for example, told pilots,

> If your peers are dogging it [i.e., not following union directives such as "honor your
> contract"], bring it to their attention.  Many pilots continue to believe either their little
> secret will not be found out or doesn't really matter to the rest of the pilots.  All it takes is
> for another ALPA pilot to get screwed by a slimy do-gooder and it matters greatly. . . .  It
> is time for the line pilots to mentor their peers!

Pl.'s Ex. 16, at 4–5.  Another publication warned,

> It is apparent United is keeping track of pilots who waive the contract, accept junior
> manning, and do "deals." . . .  Lately, many pilots seem to be in the mindset "I want mine
> now, no one will know that I am doing a deal!"  Wrong!  United has always been
> watching and now ALPA is beginning to watch the gross violations of our pilots.

Pl.'s Ex. 19, at 2.  Thus, ALPA's leadership was well aware that harassment was a useful tool for

enforcing the rejection of junior/senior manning assignments.

United also presented evidence showing that ALPA has allowed the UAL MEC Forum to

be used to discuss efforts to identify pilots who accepted such assignments.  Similar discussions

also took place on ual2172.com's online forum.  At least two of the four IRC members,

Fernandez and Freeman, participated in such discussions.  On June 11, 2008, for example,

Freeman posted a message to ual2172.com's forum encouraging other pilots to "do forensic

work" to find out which pilots were accepting junior/senior manning, in order to "catch these ass

holes in the act" and "remind[] [them] of the affects [*sic*] of their selfish actions."  Pl.'s Ex. 178, at 4.

There is an absence of evidence that ALPA has made any serious efforts to discourage such conduct.  Based on the record in this case, the closest ALPA has come to doing so is a single paragraph published in one of ALPA's weekly MEC Updates.  In that case, shortly after the publicized incident between two pilots regarding the "Hats On, Hats Off" campaign, ALPA published a statement in the June 20, 2008 MEC Update stating,

> Differences and diversity are certainly allowed, but must be managed so as to not create conflict anywhere in the workplace.  This relates to, among other things, political views and differences in how employees interact with their unions and company, etc.

Defs.' Ex. 66, at 2.  Besides being vague and somewhat equivocal in tone, this language appeared in only one MEC Update, and on the second page, not as the lead item.  In contrast, when MEC Chairman Wallach wanted to promote ALPA's fatigue campaign, he directed that a statement on fatigue be published as the lead item in every MEC Update over a period of two months.

Similarly, Nichols testified that when the MEC office "occasionally"[15] receives complaints from pilots about harassment regarding the acceptance of junior/senior manning assignments, Nichols tells pilots,

---

[15]  Nichols testified that when the MEC office receives calls from pilots complaining about harassment regarding junior/senior manning, they are received by one of the three attorneys in the office, and that he has personally received as many as 6 such calls over the last year, though he is unsure of the specific number.  If each of the three MEC attorneys takes an equal number of such calls, then, by Nichols' own admission, as many as 18 such calls have been received by the MEC office over the past year—to say nothing of pilots who may have called the office to complain about harassment regarding pilots' failure to abide by ALPA directives on issues other than junior/senior manning.

> [I]f they have an[] individual that they can identify who is engaged in the activity, I will personally make certain that that individual is spoken with, or, alternatively, the pilot could take that matter to professional standards, which is a pilot committee . . . that . . . deal[s] with improper activity . . . . *If they are unable to identify*—you know, some of them, for example, have testified to maybe a magazine subscription, an unwanted magazine is coming to their home they don't know from where, *I tell them frankly there is not much that we can do about it.  But if something does happen that they can identify, please don't hesitate to call.*

Evid. Hearing Tr. 684:4–685:5 (emphasis added).  Given the anonymous nature of much of the harassment, particularly the worst forms of it, the MEC's professed response to pilots' complaints is no response at all.

The record also contains evidence of at least one recent instance in which one of the union's LECs has taken steps to retaliate against individuals involved in United's attempts to address the harassment.  After ALPA learned in this lawsuit of United's attempts to determine who was responsible for incidents of harassment in San Francisco by installing video surveillance, ALPA Council 34, which represents the pilots in San Francisco, passed a resolution regarding two management pilots who it believed were involved in the surveillance effort.  The September 9, 2008 resolution calls for

> the MEC and its Officers to pursue an investigation and prosecution of Article VII charges against Captain Durgan and Captain Singer *to include fines and banishment from the Airline Pilots Association*, and . . . the pilots of Council 34 respectfully request the MEC and its Officers to conduct an investigation into the reasonableness of pursuing civil and criminal prosecution of Captain Pat Durgan and Captain Paul Singer.

Pl.'s Ex. 226, at 3 (emphasis added).  ALPA stresses that the resolution is merely a "request" by the 41 pilots present at the meeting of Council 34 that the MEC investigate and prosecute the pilots involved in the video surveillance, and that the MEC has not acted on that request.  Nevertheless, ALPA has failed to provide any evidence indicating that it is not likewise resistant

to such efforts to identify and discipline pilots who engage in anonymous harassment of other pilots.

### E.  The July 2008 Sick-Out

When United announced its decision on June 4, 2008, to eliminate 100 aircraft, it anticipated an increase in sick leave usage among the pilots likely to be furloughed because it believed, based on experience, that some pilots would choose to use up their sick leave, regardless of whether they were sick, before they were furloughed.  United also believed, however, that such an increase would not create any operational problems, because sick leave usage was relatively low at the time, and United could absorb an increase of up to 70% in sick leave and still be able to avoid any operational disruption.  From June 4, 2008 until mid-July, there was an increase in sick leave use that was consistent with United's expectations.

In mid-July, however, United saw a sharp spike in sick leave use, particularly among the B-737 and A320 First Officers, exceeding United's available reserves and forcing United to begin cancelling flights.  At its height, from July 19 to 27, 2008, the sick list consistently exceeded 500 pilots per day, and United was forced to cancel 329 flights due to lack of crew. United has presented evidence that it could have avoided cancelling the vast majority of those flights if pilots had accepted junior/senior manning requests at the same level they did prior to the summer of 2006.  During the nine-day period from July 19 to 27, 2008, pilots accepted only 41 junior/senior manning assignments.

United estimated that the 329 cancellations cost United approximately $8 million in lost revenue and reduced United's operating profit by approximately $4 million.  Those cancellations also interfered with more than 30,000 United customers' travel.  United's witnesses also testified

that the cancellations adversely affected United's reputation. While members of the traveling public might understand the cancellation of a flight due to bad weather, they have little patience or tolerance for cancellations due to lack of a crew.

### 1. Evidence that the Sick-Out Was a Concerted Effort

At the hearing, substantial evidence was presented demonstrating that the increase in sick leave was attributable to concerted action.

First, United's statistical expert testified that there was no reasonable probability that the increase in sick leave usage between July 17 and July 30, 2008 was the result of chance. Indeed, the spike in sick leave during that period is statistically significant even with respect to the time period of June 4–July 3, 2008, the month immediately following United's announcement of a fleet reduction that would inevitably result in furlough notices to a substantial portion of United pilots. Defendants presented no expert to rebut United's showing in this regard. The sick rate for the last two weeks in July was 173 percent higher than the previous three and a half year average among B-737 First Officers. In 2005, 2006, and 2007, the sick rate for B-737 First Officers was 5.4, 4.0, and 4.3 percent, respectively, but in 2008 (through July 31), the rate increased to 9.2 percent. During the last two weeks of July, the rate jumped to 12.2 percent—three times the sick rate in 2006. During that same period, the increase in sick leave usage among A320 First Officers followed the same pattern, although at lower levels.

The number of pilots on the sick list reached a peak of 538 on July 19 and 20. Similarly elevated rates continued until this lawsuit was filed. By comparison, the number of pilots on the sick list on June 3, the day before the announcement of the fleet reduction, was 324; the number on June 11, a week after the announcement, was 400; and the number on July 4, a month after

the announcement, was 421.  Even though the sick leave capacity that United had provided for in its manpower planning model for the summer of 2008 was higher than for any other summer during the previous 10 years, the sick calls greatly exceeded the plan number, particularly among First Officers in B-737 and A320 aircrafts.  The daily plan number for B-737 First Officers was approximately 25, but the daily number of such pilots actually on the sick list in mid- to late-July peaked at 66 and was often over 60.  Similarly, the daily plan number for A320 First Officers was approximately 50, but the daily number of such pilots actually on the sick list in mid- to late-July peaked at 84 and was often over 70.

Second, Wallach and the IRC members testified that they became aware around the beginning of June 2008 of an organized sick-out being planned by junior pilots for the weekend of July 4, 2008.  The court finds it exceedingly unlikely that, as defendants suggest, the organized sick-out initially planned for early July never occurred and the sick-leave increase that began in mid-July, less than two weeks later, was mere coincidence.

Third, the IRC members acknowledge that the events in mid- to late-July were an organized sick-out.  IRC Chairman Tamkin testified that around July 20, he asked an MEC member who had access to ual2172.com to show him the website "because at that point, the sick-out was under way."  Tamkin Dep. 96:9–16.  Likewise, IRC Vice-Chairman Domaleski testified that there was a sick-out beginning in mid-July, stating that the IRC used its phone tree in "late July, early August" to put out a message that pilots should "[s]top the sick-out." Domaleski Dep. 30:23–31:16.

In-house counsel for ALPA, Robert Nichols, also testified that the sick leave numbers that he learned of on July 19 were "well out of the ordinary" and they "certainly got [his]

attention." Evid. Hearing Tr. 749:1–9. Nichols further testified that on July 22, United's Jay Milone emailed him charts showing recent levels of sick leave, which Nichols turned over to ALPA's System Schedule Committee ("SSC"); after reviewing the charts, the SSC reported back to Nichols that "there is a serious problem going on here." Evid. Hearing Tr. 724:14–725:14.

Fourth, the high levels of sick leave in July among participants in the ual2172.com phone tree system belie any assertion that the increase in sick leave was mere coincidence. All three of the administrators of the website—Jeff Jaslow, Jay Schumaker, and defendant Anthony Freeman—called in sick on multiple days during the second half of July. In all, approximately 67 percent of the ual2172.com phone tree leaders and 65 percent of the ual2172.com phone tree participants also called in sick during July.

Fifth, messages posted by United pilots on the UAL MEC Forum when sick leave use was at its height reflect an organized sick-out. IRC Chairman Tamkin testified that he acted in late July to pull a number of threads from the UAL MEC Forum, including one in which a pilot was "gloating about the cancellations," because he was concerned those threads would "incite . . . more adverse behavior." Tamkin Dep. 43:1–45:2.

Sixth, messages posted on ual2172.com reflect that pilots were engaged in an organized sick-out. For example, a post on July 24, 2008 stated, "[Y]ou guys are making me proud. When I checked unimatic [a United information system] this morning (24 Jul[y]) I saw that we are already up to 102 cancels. That is without any significant w[eather] or other external factors." Pl.'s Ex. 204, at 1. Another pilot wrote, "A classic demonstration of the phrase: The beatings will continue until morale improves. Only now...who's beating whom?" Pl.'s Ex. 204, at 2. Another pilot posted a message stating that he had been asked to accept a junior/senior manning

assignment, which he declined. He then identified an individual who had accepted the junior/senior manning assignment, and concluded, "This whole thing is going to make me sick." Pl.'s Ex. 209, at 1. Similarly, in response to a post entitled "Sick List Threat Worked (NOT)," which noted that there were a lot of crew-related cancellations despite the doctor's note requirement, another pilot wrote, "Twisted my ankle (old injury) and don't know when it will be better. I'll go to my [doctor] when I feel better to have him make an assessment." Pl.'s Ex. 212, at 2. Later in the thread, the same pilot wrote,

> Oh well,.....UAL will have to survive without me. I will abide by the AIM [Aeronautical Information Manual] and my doctor will have to sign a blank form (he's an AME [Aviation Medical Examiner]) to tell UAL I was SL [on the sick list] for reasons you are not privileged enough to know.
>
> F*&k them,
> [pilot's name]

Pl.'s Ex. 212, at 4.

## 2. Evidence that the IRC Instigated the Sick-Out

On June 5, 2008, the day after the public announcement of the fleet reduction, ALPA asked United to release the four IRC members on an "ALPA drop," *i.e.*, a release from work for union business—so that the IRC members, including defendant Freeman, could meet in Los Angeles. Evid. Hearing Tr. 324:9–325:12. There is no dispute that, on June 11, 2008, the four individual defendants met in Los Angeles to discuss a possible sick-out planned by the 2172 group for the July 4th weekend. The IRC members and Wallach contend that the central purpose of that meeting was to stop the planned sick-out and that they were successful in doing so. *See, e.g.*, Evid. Hearing Tr. 907:3–19 ("[The IRC] had thrown a wet blanket on [the sick-out]."). But

that contention is simply inconsistent both with the fact that a sick-out occurred in mid-July, less than two weeks later than originally planned, and with ALPA's conduct after the sick-out began.

Notably, Tamkin's own description of what he told the other defendants at the meeting in Los Angeles does not indicate that he told them to stop the sick-out or took steps himself to do so. Rather, Tamkin testified that he merely told them,

> I'm aware that there's stuff going on, and that *if somebody wants to run their own program or get off the reservation, they can be considered on their own.* And they would be treated as an individual discipline case by the union and the company.

Tamkin Dep. 100:13–18 (emphasis added). Tamkin did not testify that he told them to activate the IRC phone tree or otherwise take affirmative steps to stop the sick-out. Domaleski, on the other hand, testified that Tamkin told Freeman to stop the sick-out:

> [Tamkin] said that a sick-out is completely unacceptable, that the association can be fined, they can have an injunction placed against them, and that *Tony [Freeman] had to do everything he could to stop that from happening.*

Domaleski Dep. 42:24–43:4 (emphasis added). Like Domaleski, Freeman testified that Tamkin "[i]n so many words . . . told me [the sick-out] was a terrible idea . . . and so he wanted me to use my streams of communication to not allow that to happen." Freeman Dep. 105:10–106:15. According to Freeman, Tamkin "hammered that point home" for two hours. *Id.* Indeed, at the time of his deposition, Freeman testified that he could not recall anything else being discussed at the meeting.

In addition to the odd discrepancies between, on the one hand, Domaleski and Freeman's recollections of what Tamkin said and, on the other hand, what Tamkin himself recalled saying, it is worth noting here, again, that Domaleski testified that Freeman was not even a member of the IRC. Rather, Domaleski testified that Tamkin told him before the meeting that Freeman

would be there because "Tony had something to do with a group, and *he thought it would be valuable to have him at the meeting*." Domaleski Dep. 41:9–11 (emphasis added).

After the June 11 meeting, Freeman and the other ual2172.com administrators deleted posts regarding planning a sick-out and began cautioning the junior pilots not to write about a sick-out on the website because, although "he agree[d] with just about everything written on the board," "[s]ome things just aren't meant for paper or electronic communications." Pl.'s Ex. 179, at 1. On June 26, 2008, for example, Freeman posted a message on ual2172.com entitled "Quality Control" in which he stated, "Here's the deal. I hate to preach but we really have to tighten this shit up. Folks have to be smarter. . . . I wish I could tell you that this is a completely sterile board. No board is." Pl.'s Ex. 191, at 1. Freeman also instructed the ual2172.com group, "If you want to tell or vent to somebody, get on the phone, don't do it on the board. . . . [N]o hints or references to any code words or phrases that would give anyone the idea that you're trying to put something illegal together." Pl.'s Ex. 191, at 1.

The evidence suggests that rather than telling the junior pilots not to engage in a sick-out, Freeman told them to wait for the right time. On July 11, for example, in response to a post on ual2172.com complaining that action was not being taken, Freeman wrote,

> I'm glad we're all pissed but if you think for one mother fuckin minute that nothing is being done so fuckin be it. I can't say it enough times. If you think this is all we have then you are mother fuckin mistaken. *You want to pour a shit load of energy on the line before we get the rudder where we want it and without enough of the other folks we need to help paddle . . . ?* That shit is like eating empty calories.
>
> Do you understand what I'm getting at?

Pl.'s Ex. 198, at 4 (emphasis added); *accord* Freeman Dep., Ex. 14, at 1. Freeman also stated, "What's this shit about the RLA? You think folks are scared of the fuckin RLA? . . . The

problem here is *the fight is going on but you don't see it. But that's how it's supposed to be at this point*." Freeman Dep., Ex. 14, at 1 (emphasis added); *accord* Pl.'s Ex. 198, at 4. Freeman continued, "I'm not saying, especially on this board, that there was action in 2000 but I can tell you for sure what there wasn't, no violations against the RLA." Pl.'s Ex. 198, at 4.

ALPA's conduct after the sick-out began is also inconsistent with the contention that the June 11 meeting of the IRC was intended to stop the sick-out. Most conspicuously, defendants failed until *after* the lawsuit was filed to activate the IRC phone tree to tell pilots not to engage in a sick-out. That is, if as they assert, MEC Chairman Wallach and the members of the IRC were aware of a sick-out planned for the July 4th weekend, gave instructions to stop it, and then learned that it was occurring anyhow less than two weeks later, one would reasonably expect them to have promptly activated the IRC phone tree in an effort to stop it. Likewise, ALPA's issuance to pilots of the July 21 letter from Chairman Wallach, discussed at length below, suggests that ALPA was, at best, conflicted about the sick-out and, at worst, supportive of it. These facts, in addition to the significant discrepancies among their deposition testimony, as set out above, cast significant doubt on the veracity of defendants' assertions that the purpose of the June 11 meeting was to stop the planned sick-out.

### 3. Evidence that ALPA Did Not Make Reasonable Efforts To Stop The Sick-Out

Even if the IRC had not played a role in instigating the sick-out—though, to be sure, the evidence supports the conclusion that it did—the record also makes clear that ALPA failed to "exert every reasonable effort" to stop the sick-out. Indeed, the record provides scant evidence that the union made any serious efforts to stop the sick-out prior to the commencement of this lawsuit.

On July 16, 2008, Doug McKeen, United's Senior Vice President of Labor Relations, reported to MEC Chairman Wallach during a phone call that United was experiencing higher than normal sick leave among B-737 and A320 First Officers and asked Wallach if ALPA would provide assistance by altering their position with respect to junior/senior manning.

On July 21, 2008, in response to McKeen's request that ALPA take action, Wallach sent a letter to all pilots regarding the increase in sick leave. On its face, the letter could not reasonably have been interpreted by United pilots as discouraging the sick-out. The letter begins by announcing United's new requirement that B-737 and A320 First Officers provide a doctor's note before being paid for sick leave. In all, it contained only two sentences indicating that the MEC "**does not condone the inappropriate use of sick leave. Sick leave should only be used for purposes set out in the contract or as required by law**." Pl.'s Ex. 85, at 1 (emphasis in original). The remainder of the letter takes a markedly different tack, assuring pilots, "That being said, you are absolutely entitled to use sick leave for appropriate circumstances." Pl.'s Ex. 85, at 1 (emphasis added). The following eight paragraphs of the letter include lengthy lists of the myriad situations in which a pilot may or must take sick leave—including a wide variety of medical reasons, as well as various non-medical situations, such as fatigue, stress, and emotionally upsetting events—and also inform pilots that they may need to tell the doctor they are sick even if the doctor is unable to detect any "signs or symptoms." Pl.'s Ex. 85, at 2. ALPA asserts that such voluminous language was included "to remind pilots of their rights and safety obligations with the view that the new selectively imposed requirement for doctor's certificates could intimidate pilots from exercising proper sick leave." Defs.' Proposed Findings of Fact ¶ 219.

Even more telling than the content of the letter, however, was its effect. The number of sick calls did not decrease after the letter went out on July 21 but actually increased to their highest levels among A320 First Officers and continued at about the same high rate among B-737 First Officers.

While United's witnesses recognized that the letter actually encouraged sick leave use at the time it was published, effectively serving as a blueprint for taking sick leave under any circumstances, evidence obtained by United during discovery further supports the conclusion that the letter was originally intended for that purpose. For example, earlier drafts of the letter neglected to mention that ALPA does not condone the use of sick leave when a pilot is not actually sick, but did emphasize,

> **ONLY *YOU* CAN DETERMINE YOUR FITNESS TO FLY. IF YOU ARE SICK OR SHOULD NOT OTHERWISE BE FLYING, THEN <u>YOU MUST</u> CALL IN SICK.** It is the law, and failure to comply with any of the above may jeopardize your certificate. Do not allow United Airlines to misuse you.

Pl.'s Ex. 221, at 2 (emphasis in original). Similar language, albeit without the emphasis, was ultimately included in the final version of the letter.

Subsequently, on July 22, McKeen and the MEC's counsel Nichols corresponded in an attempt to agree on a statement to the pilots. Nichols declined to adopt the relatively simple and direct statement proposed by United, which explained that "[a]t present, the Company is *experiencing a significant spike in sick leave* in the A320 and B-737 First Officer categories" and that "this situation *makes it appropriate for pilots to accept junior manning* to avoid flight cancellations." Defs.' Ex. 39 (emphasis added). The statement that ALPA was willing to, and ultimately did, issue was far weaker and did not directly endorse the acceptance of junior/senior manning assignments:

A word or two about junior/senior manning, requests for which again are on the increase *by reason of, in the Company's words, a "sudden spike" in sick leave usage* in the A-320 and B-737 First Officer Categories. As ALPA has repeatedly said, these provisions, which permit the pilot to decide whether or not to accept such requests, were negotiated in order to assist the Company when it confronts irregular operations or extraordinary situations. They were never intended to be a regular component in the Company's staffing formula. *In considering whether or not to accept such an assignment, ALPA encourages pilots to evaluate the circumstances surrounding it and to accept such assignments only when they are made for legitimate purposes and not as a substitute for a properly staffed airline.*

Defs.' Ex. 43, at 2 (emphasis added).

ALPA took no further action to discourage the sick-out until after the lawsuit was filed and, at the court's suggestion, the parties entered into the Standstill Agreement.

## CONCLUSIONS OF LAW

**I. Section 2, First of the RLA imposes a duty on ALPA to exert every reasonable effort to avoid interruptions to United's operations.**

Congress enacted the RLA to prevent strikes or other interruptions to the nation's transportation systems. 45 U.S.C. § 151a; *Tex. & New Orleans R.R. Co.* v. *Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565, 50 S. Ct. 427, 74 L. Ed. 1034 (1930). To that end, Section 2, First of the RLA provides that "[i]t shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152, First. The obligations imposed by Section 2, First of the RLA apply equally to individual members of the union and the union itself. *See Delta Air Lines, Inc.* v. *Air Line Pilots Ass'n*, 238 F.3d 1300, 1309 & n. 19 (11th Cir. 2001) (noting that the RLA imposes on "employees" a duty to maintain agreements, and finding that the district court failed to "enforce

this clear provision of the RLA" when it did not enjoin pilots from engaging in an unlawful campaign to refuse overtime).

The Supreme Court has described the duty imposed by Section 2, First as "[t]he heart of the Railway Labor Act." *Bhd. of R.R. Trainmen* v. *Jacksonville Terminal Co.*, 394 U.S. 369, 377, 89 S. Ct. 1109, 22 L. Ed. 2d 344 (1969); *accord United Air Lines, Inc.* v. *Int'l Ass'n of Machinists and Aerospace Workers*, 243 F.3d 349, 361 (7th Cir. 2001) (herein, "*IAM*"), *cert. denied*, 534 U.S. 889, 122 S. Ct. 202, 151 L. Ed. 2d 143 (2001). For this reason, the obligation to make and maintain agreements without interruption to the carrier's operations is not "a mere statement of policy or exhortation to the parties"; rather, it is an affirmative legal obligation, "enforceable by whatever appropriate means might be developed on a case-by-case basis," including injunction. *Chicago & N.W. Ry. Co.* v. *United Transp. Union*, 402 U.S. 570, 577, 91 S. Ct. 1731, 29 L. Ed. 2d 187 (1971).

The prohibition against economic self-help by a union applies not only to strikes but to any alteration of the status quo that is designed to put economic pressure on the carrier. *Delta*, 238 F.3d at 1309 ("ALPA is statutorily bound to do everything possible to 'maintain' the CBA so that commerce is not in any way interrupted."). Accordingly, under Section 2, First, courts are authorized to "enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns and sit-ins." *IAM*, 243 F.3d at 362 (quoting *Air Line Pilots Ass'n, Int'l* v. *United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)); *accord Elevator Mfrs.' Ass'n* v. *Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982) ("That the overtime was designated as voluntary in the contract does not . . . render the concerted refusal to perform it any less a strike.") (internal quotation marks and

citations omitted).  Federal courts have invoked this principle to enjoin slowdowns, *e.g., IAM*, 243 F.3d at 369; *Pan Am. World Airways, Inc.* v. *Transport Workers Union*, No. CV 84-3357, 1984 WL 49055 (E.D.N.Y. Aug. 20, 1984); *Trans World Airlines* v. *Int'l Ass'n of Machinists*, No. 74 CV 460-W-2, 1974 WL 1170 (W.D. Mo. Aug. 22, 1974); sick-outs, *e.g., Pan Am.*,1984 WL 49055; *Pan Am. World Airways* v. *Indep. Union of Flight Attendants*, No. 81 Civ. 3785, 1981 WL 2367 (S.D.N.Y. July 20, 1981); work-to-rule programs, *e.g., Long Island R.R. Co.* v. *Sys. Fed'n No. 156, Am. Fed'n of Labor*, 368 F.2d 50, 52 (2d Cir. 1966); *Tex. Int'l Air Lines, Inc.* v. *Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203, 216 (S.D. Tex. 1981); "safety" campaigns, *e.g., IAM*, 243 F.3d at 368–69 & n.14; increased write-ups of maintenance problems, *e.g., Texas Int'l Air Lines, Inc.*, 518 F. Supp. at 207; and concerted refusals to work overtime, *e.g.*, *Delta*, 238 F.3d at 1311.

In order to justify injunctive relief, it is not necessary that the union authorize or otherwise ratify a slowdown campaign.  Rather, "[a] union has the affirmative duty under the status quo provisions of the RLA to exert every reasonable effort to prevent or discourage a strike or a concerted work action," such as a slowdown.  *IAM*, 243 F.3d at 363.  Accordingly, even if the court were to conclude that ALPA had not instigated the job action, ALPA would nevertheless have an affirmative duty to exert every reasonable effort to stop it.  *See Delta*, 238 F.3d at 1310 & n.22 ("The duty of ALPA under the RLA is sufficiently high that even if it has not sponsored or ratified the unlawful job action by the pilots, it has a duty to end such unlawful action."); *IAM*, 243 F.3d at 363 ("Once a court determines that such a concerted work action is occurring in violation of the RLA, an injunction can issue ordering the union to observe its statutory duty by trying to stop it.").

## II. Defendants have violated Section 2, First of the RLA.

Defendants do not dispute that ALPA has encouraged pilots both to refuse to accept junior/senior manning assignments and to refuse to waive contractual provisions. While defendants assert that these actions were based on ALPA's interpretation of the CBA, ALPA's communications plainly encouraged pilots to engage in this conduct for the purpose of obtaining a new collective bargaining agreement.

The court further concludes that ALPA has encouraged a much broader job action through its directives to "fly the contract" and similar phrases. The evidence indicates that such instructions were intended by ALPA and, likewise, understood by United pilots to signal that ALPA's members should engage in conduct that would increase flight delays and cancellations, as well as the airline's operating costs. The evidence also established that ALPA used a variety of publications and communication methods, including phone trees, to deliver these instructions.

The court further finds that defendants were directly involved in instigating a sick-out among United's junior pilots in July 2008. Absent proof to the contrary, the circumstantial evidence that the IRC planned that sick-out with members of the 2172 group is compelling. The IRC members admit that they convened in Los Angeles on June 11, shortly after United's fleet reduction announcement, and that the sole topic discussed at the meeting was action that the junior pilots might take, including a sick-out. Although defendants claim they sought to stop the planned sick-out, the court cannot credit that assertion for several reasons. First, the failure of the individual defendants to testify at the evidentiary hearing casts doubt on the candor of their deposition testimony, particularly in light of the conspicuous discrepancies among the respective attendees' testimony. In addition to the direct conflicts among them, their deposition testimony

also raises serious questions about the sincerity of their alleged efforts to stop the sick-out. For example, if, in fact, the four individual defendants resolved at the June 11 meeting of the IRC to use "all the assets" and "influence" of the IRC "to communicate as loud as possible to the pilot group" that "a sick-out is not a good thing to do," Fernandez Dep. 27:21–28:7, then why didn't they engage the IRC phone tree to deliver that message until after United had filed this suit?[16] Second, there is no doubt that an organized sick-out occurred in the last two weeks of July. Third, given the evidence that ALPA and the IRC were able to "tamp down" the sick-out after this lawsuit was filed, they likely would have been able to do so earlier if, in fact, they had attempted to do so. Fourth, the actions of MEC Chairman Wallach, with whom Tamkin conferred shortly after the June 11 meeting, had the clear effect of encouraging the sick-out and are inconsistent with a sincere attempt to stop it.

Moreover, even if defendants had not instigated the job action, ALPA has violated its duty to exert every reasonable effort to stop the disruption to United's operations. ALPA knew, both through notice from United and from its own sources, such as postings on the UAL MEC Forum and the members of the IRC, that United pilots were engaging in these activities. There is no evidence, nor even any argument except with regard to sick leave and pilot harassment, that ALPA published anything that was sincerely meant to discourage this conduct or otherwise took any serious actions to do so. On the contrary, ALPA continued to publish the sorts of communications and directives that were intended to encourage United pilots to engage in a slowdown campaign.

---

[16] Domaleski's deposition testimony indicates that the IRC did not "activate" the IRC phone tree to deliver that message until "late July, early August"—in other words, at or after the time United filed this action. Domaleski Dep. 30:8–35:13.

The evidence does not support ALPA's contentions that it took actions genuinely intended to discourage the pilot sick-out and the harassment of pilots who accepted junior/senior manning. In regard to the sick-out, none of ALPA's publications prior to the filing of this action were direct, forceful, or sincere attempts to discourage the sick-out. And with respect to the harassment of pilots who accepted junior/senior manning, the record is bare of any serious efforts taken by ALPA to address this issue.

### III.  The dispute is not a minor dispute outside the court's jurisdiction.

ALPA argues that United's claims regarding junior/senior manning and contract waivers constitute so-called "minor disputes" under the RLA, and that the court therefore has no jurisdiction over those claims. A large body of case law under the RLA addresses whether a particular dispute between a carrier and its union should be characterized as a "major dispute" or a "minor dispute." Major disputes are disputes over attempts to negotiate a new collective bargaining agreement or modify an existing one, while minor disputes concern grievances or other disputes over the interpretation or application of an existing agreement. *Consol. Rail Corp.* v. *Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302–03, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989); *Elgin, Joliet & E. Ry. Co.* v. *Burley*, 325 U.S. 711, 722–23, 65 S. Ct. 1282, 89 L. Ed. 1886 (1945). In the event of a major dispute, the parties must undergo a comprehensive process of negotiation and mediation. *Consol. Rail Corp.*, 491 U.S. at 302. Until they have exhausted those procedures as required under the RLA, the parties are obligated to maintain the status quo. *Id.* In a minor dispute, the parties must submit the dispute for final and binding arbitral resolution before an adjustment board, which "has exclusive jurisdiction over minor disputes." *Id.* at 303–04. As the Seventh Circuit has explained,

In order to ascertain if a dispute between a rail carrier and the union(s) representing its employees is major or minor, we must determine whether the dispute can be resolved by reference to an existing collective bargaining agreement.

If the dispute can be resolved by reference to the parties' collective bargaining agreement, i.e., *if it is arguably comprehended within an already existing collective bargaining agreement, it is a minor dispute*.

*Chicago & N.W. Transp. Co.* v. *Ry. Labor Executives Ass'n*, 855 F.2d 1277, 1282–83 (7th Cir. 1988) (internal quotation marks and citations omitted) (emphasis added).

Although major and minor disputes are treated differently in many respects under the RLA, the obligations under Section 2, First of the RLA to exert every reasonable effort to resolve the dispute without disruption to the carrier's operations applies to both major disputes and minor disputes. Under the express terms of Section 2, First, the obligation to resolve disputes without interruption to commerce applies to "*all disputes*, whether arising out of the application of such agreements or otherwise." 45 U.S.C. § 152, First (emphasis added). Thus, even in a minor dispute, the union is prohibited from exercising self-help because the dispute must be submitted to an adjustment board for resolution. *See Bhd. of R.R. Trainmen* v. *Chicago River & Ind. R.R. Co.*, 353 U.S. 30, 39, 42, 77 S. Ct. 635, 1 L. Ed. 2d 622 (1957) (in order to preserve the exclusive jurisdiction of adjustment boards over minor disputes, a union may not engage in any work stoppage over a matter referable to an adjustment board); *Chicago & N.W. Transp. Co.*, 855 F.2d at 1286–87 (7th Cir. 1988); *Chicago & N.W. Transp. Co.* v. *Bhd. of Elec. Workers*, 829 F.2d 1424, 1428 (7th Cir. 1987); *Burlington N. & Santa Fe Ry. Co.* v. *Bhd. of Locomotive Eng'rs*, No. 01 C7743, 2002 WL 47963, at *2 (N.D. Ill. Jan. 14, 2002). Put another way, a minor dispute that results in a job action is by definition a major dispute. In any event, the case law is clear that federal courts do have jurisdiction to enforce Section 2, First and to

prohibit a union from engaging in a job action over a minor dispute.  *E.g.*, *Chicago & N.W. Transp. Co.*, 829 F.2d at 1428; *Burlington N. & Santa Fe Ry. Co.* v. *Bhd. of Locomotive Eng'rs*, 2002 WL 47963, at *2.

ALPA contends that there are two "contractual disputes" between the parties: (1) whether, under the relevant provisions of the current CBA, junior/senior manning can be used by United as a "manpower planning tool," or only in cases of irregular operations, and (2) whether pilots can waive contractual terms that do not expressly state they can be waived with pilot concurrence.  It does not appear, however, that any contractual disputes regarding the interpretation of the CBA on these issues are presently before the court.  With regard to junior/senior manning, the resolution by ALPA's governing body in January 2008 to amend its internal Policy Manual states that "[*a*]*lthough allowed in the Collective Bargaining Agreement*, the UAL-MEC does not endorse the use of [junior/senior manning] as a manpower planning tool."  Pl.'s Ex. 52 (emphasis added).  This resolution suggests that there is no bona fide dispute between the parties as to whether United can use junior/senior manning as part of its manpower planning process.  With respect to contract waivers, United does not contend that it can ask pilots to waive non-waivable provisions of the CBA, and United entered into an agreement with ALPA in early 2007 to that effect.

Even if there were a contractual dispute between the parties on these issues, however, and even if ALPA could exercise self-help over the alleged "minor disputes," ALPA's directives to pilots go beyond anything that would be justified by the alleged contractual dispute.  The evidence indicates that ALPA has not merely encouraged pilots to reject junior/senior manning assignments only when they are being used in lieu of proper staffing; rather, the union has

encouraged pilots to reject such assignments under any circumstance, and it has expressly tied those instructions to obtaining a new collective bargaining agreement. Likewise, ALPA has not encouraged pilots to refuse to waive only non-waivable provisions of the CBA; it has urged them to refuse to waive any provisions, even if they are waivable, and it has tied those instructions as well to obtaining a new collective bargaining agreement.

In its opposition memorandum, ALPA argues that *Delta* and *IAM*, cases on which United relies heavily, are distinguishable because they involved concerted actions by employees without the union's taking a clear position on the issues, as ALPA has done here. This distinction is irrelevant, however, because Section 2, First applies with equal force to employees and their union. Indeed, it would make little sense to interpret the *Delta* decision to apply only to job actions that were not based on a union "policy" judgment when the union argued in that case that the job action did not violate the RLA *because* the union had not authorized it. 238 F.3d at 1309. Moreover, in *IAM* the Seventh Circuit relied, in part, on evidence of letters and flyers posted at work locations urging union members to refuse voluntary overtime. 243 F.3d at 357. Although some of these publications purported to be signed by the union, it was not clear that any were, in fact, authored or published by the union. *Id.* There is no reason to believe that the outcome of that decision (reversing the district court and remanding with instructions to enter a preliminary injunction against the union, *id.* at 369) would have been different had the union openly and expressly taken the position that its members should refuse voluntary overtime, as ALPA has done here.

Similarly, Section 2, First prohibits employees from engaging in concerted action to put economic pressure on the carrier even where the employees have a right under the existing

collective bargaining agreement to take the action in question. *See, e.g.*, *Delta*, 238 F.3d at 1308–09 (holding that Section 2, First prohibits concerted action to refuse voluntary assignments); *IAM*, 243 F.3d at 360 (same). This principle applies both in major disputes over renegotiation of the parties' agreement and in minor disputes over interpretation of the existing agreement. *See Long Island R.R. Co.* v. *Int'l Ass'n of Machinists*, 874 F.2d 901 (2nd Cir. 1989) (union may not exercise self-help in a minor dispute even where its right to engage in the conduct in question raises an issue of contractual interpretation), *cert. denied*, 493 U.S. 1042, 110 S. Ct. 836, 107 L. Ed. 2d 831 (1990); *see also Chicago & N.W. Transp. Co.* v. *Bhd. of Elec. Workers*, 829 F.2d 1424, 1428 (7th Cir. 1987) ("If, after referring to the existing collective bargaining agreement, the district court concludes that there is substance to the railroad's claim that it is acting within the terms of that agreement, the court's inquiry is concluded; the dispute is minor, and the court may invoke its injunctive power to preserve the jurisdiction of the [adjustment board].").

Accordingly, the court finds that this case involves a major dispute because the underlying disagreement between the parties arises from ALPA's request for early renegotiation of the CBA, and ALPA has encouraged pilots to engage in a concerted effort to refuse voluntary actions under the CBA in an effort to exert economic pressure on United toward that end. The court rejects ALPA's argument that its actions present minor disputes over the interpretation of the CBA and that such disputes are, therefore, outside of the court's jurisdiction. Furthermore, even if this action concerned minor disputes about contractual interpretation, the concerted action by United's pilots would nevertheless violate Section 2, First and merit injunctive relief.

**IV. United's claims are not barred by the six-month statute of limitations because it has demonstrated a continuing violation.**

ALPA argues that United's claims under the RLA are barred by a six-month statute of limitations—at least insofar as those claims are based on refusals to accept junior/senior manning or to waive contractual terms. The court must reject this argument, however, because this lawsuit concerns not simply a challenge to a couple of discrete acts that occurred outside the statute of limitations, but a multi-faceted and ongoing slowdown campaign. In such a situation, the law is clear that defendants' campaign constitutes a continuing violation.

The six-month statute of limitations under the RLA is borrowed from Section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b). *See West* v. *Conrail*, 481 U.S. 35, 37–38, 107 S. Ct. 1538, 95 L. Ed. 2d 32 (1987); *Bhd. of Locomotive Eng'rs* v. *Atchison, Topeka and Santa Fe Ry. Co.*, 768 F.2d 914, 919 (7th Cir. 1985). Under Section 10(b), when a violation begins outside of the limitations period but continues into the limitations period, the claim is not time barred. *See, e.g.*, *Melville Confections, Inc.* v. *N.L.R.B.*, 327 F.2d 689, 692 (7th Cir. 1964) ("Nor does the fact that the [petitioner's] violation antedated the Section 10(b) period applicable to the instant charge preclude a finding of a violation which occurred through a continuation of the proscribed conduct during and within the six-month period prior to the filing of the charge."). Because the RLA limitations period derives from that under the NLRA, courts have applied the same principles under the RLA. *Atlas Air, Inc.* v. *Air Line Pilots Ass'n*, 232 F.3d 218, 226–27 (D.C. Cir. 2000) (continuing violations doctrine applies to RLA claims just as it does to claims under Section 10(b) of the NLRA); *Ass'n of Flight Attendants* v. *Horizon Air Indus., Inc.*, 976 F.2d 541, 547–48 (9th Cir. 1992) (RLA claim not barred where alleged bad-faith bargaining commenced outside the limitations period and continued into the six-month period prior to commencement of the action).

ALPA relies on evidence that United has been aware of ALPA's positions on junior/senior manning and contract waivers since at least April 2007, but the evidence also shows that both the directives by ALPA to its members and the concerted action by United pilots designed to disrupt United's operations by refusing junior/senior manning and contract waivers have continued into the limitations period. Indeed, ALPA's continuing campaign against junior/senior manning contributed to the numerous flight cancellations at the height of the sick-out campaign in late-July 2008.

Such active engagement in the activity continuing within six months of the filing of the law suit forms the basis for a finding of a continuing violation of the RLA. In *Atlas Air*, for example, the court found a continuing violation based on the carrier's adoption and maintenance of a facially discriminatory policy that constituted a violation of Section 2, Third and Fourth of the RLA. 232 F.3d at 225. The court concluded that the carrier's "continued reliance upon its exclusionary eligibility policy, and repeated threats to enforce this policy should the crew members exercise their right to unionize," rendered the carrier's violation of the RLA a "continuing violation." *Id.* at 226. Defendants attempt to distinguish *Atlas Air* by claiming that "there is nothing intrinsically unlawful about ALPA's interpretation of the collective bargaining agreement; rather, ALPA has only continued to abide by its long-held interpretation of the parties' contract." Defs.' Bench Mem. Regarding Statute of Limitations at 4. Again, however, the issue is not ALPA's interpretation of the CBA nor its insistence on those positions, but rather the defendants' participation in an ongoing and illegal slowdown campaign. As the court made clear in *Atlas Air*, the "maintenance" of a violation of law through illegal actions which continue into the six-month limitations period prevents claims arising from that violation from being time-

barred. *Id.* at 226–27; *see also Limestone Dev. Corp.* v. *Village of Lemont, Ill.*, 520 F.3d 797, 801 (7th Cir. 2008) (noting that the purpose of the "continuing violation" doctrine is "to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought").

The two cases on which ALPA relies, *International Association of Machinists & Aerospace Workers* v. *Aloha Airlines, Inc.*, 790 F.2d 727 (9th Cir. 1986) and *United Transportation Union* v. *Florida East Coast Railway Co.*, 586 F.2d 520 (5th Cir. 1978), do not persuade the court that the general doctrine of continuing violation is inapplicable here. Neither case involved a situation where, as here, defendants have undertaken, and continued to actively undertake and maintain, illegal job actions. Instead, in both of those cases, the employer engaged in a single act—implementing new terms of employment in violation of a collective bargaining agreement—outside of the limitations period. *Aloha Airlines*, 790 F.2d at 730, 737; *Fla. E. Coast Ry. Co.*, 586 F.2d at 527. Both courts found that it was the implementation of new terms that violated the RLA and that no subsequent affirmative actions were undertaken that were not merely the effects of that implementation. *Aloha Airlines*, 790 F.2d at 737; *Fla. E. Coast Ry. Co.*, 586 F.2d at 527. Here, in contrast to either of those cases, ALPA has continued into the limitations period to urge its pilots to reject junior/senior manning requests and not to waive the contract, as well encouraging new and related job actions.

## V. United's claims are not barred by laches.

The court likewise rejects defendants' additional argument (raised in their proposed conclusions of law) that United's request for an injunction regarding conduct other than sick leave is barred by the doctrine of laches. The doctrine of laches derives from "the maxim that

those who sleep on their rights, lose them." *Hot Wax, Inc.* v. *Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). In order for laches to apply, the party asserting the defense must show "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* Defendants assert that (a) United has been aware since 2006 of ALPA's statements and positions on issues such as junior/senior manning and contract waivers; (b) United "slumbered on its rights until July 2008"; and (c) ALPA has "relied on United's silence to its detriment in that, had United raised its opposition on junior/senior manning earlier, ALPA could have filed a grievance earlier and resolved the issue at that time." Defs.' Proposed Conclusions of Law ¶¶ 291–92. The court is not persuaded either that United slept on its rights or that ALPA relied to its detriment on United's failure to file a grievance. Moreover, it is far from clear that United's filing of a grievance would have resolved the disputes between the parties, which stem primarily from ALPA's efforts to renegotiate a new collective bargaining agreement, rather than from disagreements over the interpretation or application of the provisions of the existing CBA.

## VI. The Norris-LaGuardia Act does not prohibit the issuance of a preliminary injunction.

Defendants argue that sections 6 and 7(a) of the NLGA prohibit the issuance of a preliminary injunction against them. As a general rule, the NLGA "strips courts of jurisdiction to enter injunctions against labor unions in cases growing out of labor disputes, 'express[ing] a basic policy against the injunction of activities of labor unions.'" *IAM*, 243 F.3d at 362 (quoting *Int'l Ass'n of Machinists* v. *Street*, 367 U.S. 740, 772, 81 S. Ct. 1784, 6 L. Ed. 2d 1141 (1961)). It is well established, however, that where a challenged action violates a specific provision of the RLA, the specific provision of the RLA take precedence over the more general provisions of the

NLGA. *Id.* (citing *Pittsburgh & Lake Erie R.R. Co.* v. *Ry. Labor Executives' Ass'n*, 491 U.S. 490, 513, 109 S. Ct. 2584, 105 L. Ed. 2d 415 (1989)); *Chicago & N.W. Ry. Co.* v. *United Transp. Union*, 402 U.S. 570, 582–83 & n.18, 91 S. Ct. 1731, 29 L. Ed. 2d 187 (1971).

Section 6 of the NLGA provides,

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof*.

29 U.S.C. § 106 (emphasis added). In interpreting this provision, the Seventh Circuit has held (a) that a carrier could not establish that a union had committed a status quo violation by means of an orchestrated sick-out unless it proved by "clear and convincing" evidence that the union had promoted the alleged sick-out, and (b) that statistical evidence indicating that pilots had taken twice their usual number of sick days during the relevant time period was insufficient by itself to implicate the union under this "clear proof" standard. *Air Line Pilots Assoc.*, 802 F.2d at 891.

More recently, in *IAM*, the Seventh Circuit determined that United had provided "clear proof" of the defendant union's involvement in a slowdown among United's mechanics. 243 F.3d 349. There, United had presented evidence of the union's involvement through documents posted on union bulletin boards that included exhortations to "work safe," which was recognized as a code word to signal a job slowdown. The Seventh Circuit found that the union's use of the term "work safe" in the context of discussing collective bargaining negotiations could only be interpreted to mean that employees should engage in a slowdown. *Id.* While the court found that some of those bulletins contained statements urging members not to "engage in any

job action," it found that such statements were dwarfed by the messages to "work safe," leaving the clear impression that the relatively inconspicuous statements discouraging a slowdown were not meant to be taken a face value. *Id.* at 366-67.

Here, United has presented far more evidence than the Seventh Circuit relied on in *IAM*, including numerous formal MEC communications, published on the ALPA website or distributed to United pilots, that explicitly urged United pilots to "fly the contract," to "not waive any section" of the contract, to "know[] the contract," and to not accept junior/senior manning assignments, as well as many other similar directives—all for the express purpose of "creating leverage" in negotiations with United. Such evidence, in addition to the statistical evidence of changes in pilot conduct and other circumstantial evidence presented by United, provides sufficient "clear proof" of defendants' involvement in the work slowdown to satisfy the standard of section 6 of the NLGA.

Section 7(a) of the NLGA deprives a court of jurisdiction to issue an injunction in a case involving a labor dispute unless the court finds that "unlawful acts have been threatened *and will be committed* unless restrained or have been committed and *will be continued* unless restrained." 29 U.S.C. § 107(a) (emphasis added); *accord IAM*, 243 F.3d at 365. With regard to the sick-out, ALPA acknowledges that United experienced an unusually high number of flight cancellations in late-July 2008 but argues that the situation at present is not the same. Rather, ALPA asserts, there is no evidence that United is suffering from ongoing operational problems, and "plaintiff concedes that the filing of the lawsuit, coupled with defendants' actions, have been adequate to address the operational disruptions it assertedly faced when it filed the lawsuit." Defs.' Proposed Conclusions of Law ¶ 281. That ALPA took some actions to mitigate the airlines' operational

disruptions after United filed this lawsuit, however, does not indicate that defendants' unlawful conduct either has entirely ceased or that, even in the absence of an injunction, it will not resume.[17] Rather, the court finds that an injunction is necessary to enforce the defendants' status quo obligations under the RLA.

ALPA similarly argues that its "overt repudiation of alleged improper conduct satisfies [its] duties under Section, 2 First [of the RLA] and obviates the need for a preliminary injunction." Defs.' Memo. in Opposition to Pl.'s Mot. for Preliminary Injunction at 28. In support of this argument, ALPA relies on the principle noted in *Milwaukee Police Ass'n* v. *Jones*, 192 F.3d 742 (7th Cir. 1999), that to obtain injunctive relief, there must be "some cognizable danger of recurrent violation, something more than [a] mere possibility." *Id.* at 748. The Seventh Circuit also makes clear in *Jones*, however, that "[v]oluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" *Id.* at 747 (quoting *DiGiore* v. *Ryan*, 172 F.3d 454, 466 (7th Cir. 1999) (quoting *United States* v. *W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S. Ct. 894, 97 L. Ed. 1303 (1953))). In this case, ALPA has offered little to demonstrate that there is no reasonable expectation that the illegal job action will continue. ALPA took actions to "tamp down" the sick-out only after United filed its case threatening the union with an injunction. The court is simply not convinced that defendants would fulfill their obligations under Section 2, First of the RLA even if the court were to deny United's request for injunctive relief at this time.

---

[17] The court is likewise unpersuaded by the limited, generalized evidence offered by defendants in support of their contention that "United's operations have materially improved." Defs.' Proposed Findings of Fact at 7.

**VII.    Injunctive relief is necessary to end the job action.**

In issuing a preliminary injunction, the court evaluates four factors:  (1) whether the plaintiff is likely to succeed at trial on the merits of its case; (2) whether the plaintiff has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied; (3) the irreparable injury the non-moving party will suffer if a preliminary injunction is issued, balancing that harm against the irreparable harm to the plaintiff if the relief is not granted; and (4) the public interest, in terms of "the consequences of granting or denying the injunction to non-parties." *Abbott Labs.* v. *Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992).  In applying these criteria, the court uses a "sliding scale" approach:  if a claim is very likely to succeed on the merits, less harm to the plaintiff will be required to justify an injunction, *id.* at 12; conversely, where the relative harm to the plaintiff is particularly great, the likelihood of success on the merits need only be "better than negligible."  *Meridian Mut. Ins. Co.* v. *Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).

**A.  United has demonstrated likelihood of success on the merits**.

In determining the likelihood that United will succeed in its claims at a trial on the merits, the court has evaluated the evidence in light of the specific circumstances of this case. While the parties and this court have worked diligently to resolve United's motion for preliminary injunction as quickly and efficiently as possible, the evidentiary record has been amply developed.  ALPA had nearly four weeks after United filed its complaint and motion in which to conduct discovery and prepare its defense before the first day of the evidentiary hearing.  Much of the relevant evidence was in ALPA's possession and control.  The hearing itself lasted for seven days over a three-week period, during which the parties presented the live

testimony of eight witnesses and the deposition testimony of five others, as well as introducing

hundreds of exhibits. The court is satisfied that ALPA's defenses have been aired and are not

likely to carry the day should this case proceed to trial. Based on this record, the court concludes

that United has established its likelihood of success on the merits of its claim that defendants

have violated Section 2, First of the RLA.

### B. United has no adequate remedy at law.

The question whether the plaintiff has an adequate remedy at law is closely tied to

whether the plaintiff will suffer irreparable injury if an injunction is not issued. *See, e.g.*,

*Antonic Rigging & Erecting of Minn., Inc.* v. *MDCON, Inc.*, No. 90 C 4800, 1990 WL 139079, at

*2 (N.D. Ill. Sept. 19, 1990). The rationale of both requirements is that if a damage award can

fully compensate the plaintiff for any injury suffered, the court should defer any remedy until a

full trial on the merits has been conducted. *See id.*

In an action under Section 2, First of the RLA, there is no need to address the issue of

irreparable injury, because such a showing is, as a matter of law, not required. *Consol. Rail*

*Corp.* v. *Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S. Ct. 2477, 105 L. Ed. 2d 250

(1989) ("[T]he district courts have subject-matter jurisdiction to enjoin a violation of the status

quo pending completion of the required procedures *without the customary showing of*

*irreparable injury*.") (emphasis added); *IAM*, 243 F.3d at 362 ("If either side unilaterally alters

the status quo during the bargaining and mediation process, a court may issue an injunction to

put a stop to that party's illegal self-help and to restore the status quo, and it may do so even

without the traditional showing of irreparable injury to the other party."). In fact, some courts

have held that injunctive relief is the only remedy available for a violation of Section 2, First.

*See Louisville & Nashville R. R. Co.* v. *Brown*, 252 F.2d 149, 155 (5th Cir. 1958) ("Where Congress sought to set up a right of action for damages for breach of duty in other management labor situations, it enacted a statute expressly spelling out the nature of the right of action. . . . We do not think that Congress here intended to or did create a new statutory right of action for damages . . . .").

Nevertheless, even if a showing of irreparable injury were required, the evidence of flight delays, flight cancellations, and additional costs incurred by United as a result of ALPA's slowdown campaign, as well as the unlawful pressure the campaign puts on United in negotiations with ALPA, would satisfy that requirement. While some of this harm might be compensated by a damage award if that were available under the RLA, there is no way to calculate the loss of customer goodwill or damage to the airline's reputation, *see Meridian Mut. Ins. Co.*, 128 F.3d at 1120 (finding that loss of goodwill constitutes irreparable injury); *Wesley-Jessen Div. of Schering Corp.* v. *Bausch & Lomb, Inc.*, 698 F.2d 862, 867 (7th Cir. 1983) ("[Movant's] loss of control over its reputation justifies a finding of irreparable harm . . . ."), and no way to remedy ALPA's exertion of unlawful bargaining pressure on United.

### C. The balance of hardships weighs in favor of United.

In balancing the harm that would be caused to United if an injunction were not issued and the harm to ALPA if an injunction were issued, the court finds that the harm to United outweighs the harm, if any, to ALPA. The injury to United includes direct financial harm, including lost profits from cancelled flights, lost revenues from customers taking their business elsewhere, and increased operating costs, as well as irreparable injury due to the loss of customer goodwill, damage to the airline's reputation, and the exertion of unlawful economic pressure in

negotiations.  Ordering ALPA and its members to refrain from engaging in a slowdown campaign, however, imposes no legally cognizable harm on ALPA, because it merely requires them to satisfy their existing legal obligations under the RLA.  In balancing the equities, therefore, on one side, there is substantial harm to United and the traveling public, and on the other side, there is little more than ALPA's "interest" in engaging in an unlawful job action, the existence of which it denies.

ALPA has suggested that issuance of the injunction would raise safety concerns by, for example, prohibiting ALPA from communicating with its members on the issue of fatigue.  United asserts, and the record supports the conclusion, that safety is foremost among United's priorities.  United is currently participating with ALPA in administering "On the Line," a joint training program for pilots that addresses, among other things, the issue of fatigue.  The court trusts that all of the parties have the ability to distinguish between good faith efforts to address safety issues, including fatigue, and the use of safety as a pretext for an unlawful job action and, furthermore, that enjoining the job action will not dissuade any of the parties from good faith efforts to ensure the safe operation of the airline.

### D.  The public interest weighs in favor of United.

In considering injunctive relief under the RLA, the public interest is particularly significant because the primary purpose of the RLA is to minimize disruptions to commerce caused by labor disputes.  *See* 45 U.S.C. § 151a (including as the first among the purposes of the act, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein"); *see also Tex. & New Orleans R.R. Co.* v. *Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565, 50 S. Ct. 427, 74 L. Ed. 1034 (1930) ("[T]he major purpose of Congress in passing the Railway

Labor Act was to provide a machinery to prevent strikes.") (citations omitted). Accordingly, the public interest alone justifies an injunction against disruptions to commerce due to a labor dispute. *See Am. Train Dispatchers Dep't of the Int'l Bhd. of Locomotive Eng'rs* v. *Fort Smith R.R. Co.*, 121 F.3d 267, 268 (7th Cir. 1997) (strike in violation of the RLA enjoined because of disruption to commerce and inconvenience to passengers); *Chicago River & Ind. R.R. Co.* v. *Bhd. of R.R. Trainmen*, 229 F.2d 926, 932 (7th Cir. 1956) (noting "the paramount interest of the public" and holding that interruption to transportation system, and consequent damages suffered by passengers, is itself sufficient irreparable injury to justify injunction), *aff'd*, 353 U.S. 30, 77 S. Ct. 635, 77 S. Ct. 635 (1957). The harm to the public interest caused by ALPA's slowdown has been substantial. The July sick-out alone caused some 329 flight cancellations over less than 10 days (July 19–27, 2008), affecting more than 30,000 United customers. More broadly, as discussed above, hundreds of thousands of United's customers have been harmed by the increase in delays and cancellations caused by ALPA's slowdown campaign.

This is said not to minimize the national importance of the right of union members to engage in collective action in order to better equalize bargaining power between management and labor, a right obtained through decades of political struggle. *See, e.g.*, David Ray Papke, THE PULLMAN CASE: THE CLASH OF LABOR AND CAPITAL IN INDUSTRIAL AMERICA (LANDMARK LAW CASES & AMERICAN SOCIETY) (1999)*; Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U.S. 724, 754, 105 S. Ct. 2380, 85 L. Ed. 2d 728 (1985) (upholding state minimum benefits law as not pre-empted by National Labor Relations Act and stating, "One of the ultimate goals of the [NLRA] was the resolution of the problem of depress[ed] wage rates and the purchasing power of wage earners in industry, and the widening gap between wages and profits, thought to be the

cause of economic decline and depression. Congress hoped to accomplish this by establishing procedures for more equitable private bargaining.") (internal citations and quotation marks omitted). Neither is it a comment on whether United has been fair or unfair to its pilots. As the cases cited in this opinion make clear, however, where as here the RLA controls, the public interest mandates that ALPA and its members adhere to the duty to exert every reasonable effort to stop the disruption to United's operations and to comply with the procedures established by the RLA to reach a new collective bargaining agreement. The actions described in this opinion demonstrate their failure to fulfill that duty. The court finds, therefore, that the public interest favors injunctive relief in this case.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary injunction [#12] is granted. A draft injunction order will follow.


Dated: November 17, 2008          Enter:_____

                                          JOAN HUMPHREY LEFKOW
                                          United States District Judge